# EXHIBIT "B"

1            UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF PENNSYLVANIA

3

4   TINA LINDQUIST,                )   COPY

5            Plaintiff,            )

6       vs.                        )  NO. 04-249E

7   HEIM L.P.,                     )

8            Defendant.            )

9

10       The discovery deposition of ANTHONY ROBERT

11   MASE, JR., taken in the above-entitled cause,

12   before Kyla Elliott, a notary public of Cook

13   County, Illinois, on the 27th day of July, 2005, at

14   33 North LaSalle Street, Chicago, Illinois,

15   pursuant to Notice.

16

17

18

19

20

21   Reported by:  Kyla Elliott, CSR, RPR

22   License No.:  084-004264

23

24

1    APPEARANCES:

2        DALLAS W. HARTMAN, P.C., by

3        MR. DALLAS W. HARTMAN

4        2815 Wilmington Road

5        New Castle, PA 16105

6        (724) 652-4081

7            Representing the Plaintiff;

8

9        MEYER, DARRAGH, BUCKLER, BEBENEK &

10       ECK, PLLC, by

11       MR. PAUL R. ROBINSON, Esquire

12       U.S. Steel Tower  Suite 4850

13       600 Grant Street

14       Pittsburgh, PA  15219

15       (412) 553-7146

16           Representing the Defendant.

17

18

19

20

21

22

23

24

2

I N D E X

WITNESS                                          EXAMINATION

ANTHONY ROBERT MASE, JR.

        By Mr. Hartman                               4

        By Mr. Robinson                            193

        By Mr. Hartman (Further)                   214

        By Mr. Robinson (Further)                  237

        By Mr. Hartman (Further)                   238

E X H I B I T S

NUMBER                                       MARKED FOR ID

Deposition Exhibit

        Nos. 1 & 2                                   4

        No. 3                                      131

        No. 4                                      141

        No. 5                                      193

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

1                    (Whereupon, Deposition

2              Exhibit Nos. 1-2 were marked for

3              identification.)

4              ANTHONY ROBERT MASE, JR.,

5    having been first duly sworn, was examined and

6    testified as follows:

7                         EXAMINATION

8    BY MR. HARTMAN:

9        Q.    For the record would you please state

10   your full name?

11       A.    Anthony Robert Mase, Jr.

12       Q.    Mr. Mase, would you give us your current

13   address, please?

14       A.    Tough question to begin with.

15       Q.    I'm going to ask you difficult ones.

16       A.    8616 Butterfield Lane, that's Orland Park,

17   Illinois, 60462.

18       Q.    By whom are you employed?

19       A.    Heim Corporation.

20       Q.    Is Heim Corporation the official name of

21   the company that you're working for?

22       A.    I believe that's correct.

23       Q.    And how long have you worked for the Heim

24   Corporation?

4

1     A.    I've worked for the Heim Corporation since

2   2001, but I had a previous employment with them

3   from 1984 through 1991.

4     Q.    What brought you back in '01?

5     A.    The company I was working for was in

6   Chapter 11 and I was looking for a new opportunity.

7     Q.    And what company was that?

8     A.    That was CNB Clear Niagra Bliss.

9     Q.    CNB?

10    A.    Yes.

11    Q.    What kind of company is CNB?

12    A.    Primarily a press manufacturer.

13    Q.    Clearing --

14    A.    Niagra Bliss.

15    Q.    Did you work for Clearing Niagra Bliss

16  from 1991 to 2001?

17    A.    Say that to me again.

18    Q.    Did you work for CNB from 1991 to 2001?

19    A.    Yes.  Yes.

20    Q.    Okay.

21    A.    There was one other employment there,

22  Midwest Brake for one year, I want to say it's

23  '91 -- '90 or '91.

24    Q.    Mr. Mase, my name is Dallas Hartman, I

1    introduced myself prior to the beginning of this

2    deposition, and I represent Tina Lindquist in a

3    claim that has been brought against the Heim

4    Corporation for injuries Ms. Lindquist sustained

5    while operating at Heim Press.  This is a

6    deposition.

7           Have you ever had your deposition taken

8    before?

9        A.   Yes.

10       Q.   Okay.  Approximately how many times?

11       A.   Once.

12       Q.   And about how long ago?

13       A.   One year ago, approximately.

14       Q.   What was the purpose -- what was the type

15   of lawsuit for which your deposition was taken?

16       A.   I can't remember what it was.  It was a --

17   I don't recall the case.

18       Q.   Was it an injury case?

19       A.   Yes.

20       Q.   Do you recall what kind of machine -- was

21   there a machine involved?

22       A.   Yes.

23       Q.   And do you recall what kind of machine?

24       A.   It was a punch press.

1    Q.    During the course of this deposition I'll

2    be asking you questions.  The court reporter will

3    be taking down my questions and she'll also be

4    taking down and recording your answers to those

5    questions.  It is very important during the course

6    of this deposition that you make sure you

7    understand my question and that you gave me a full

8    answer.  Do you understand that?

9    A.    Yes.

10    Q.    And to the extent you cannot give me

11    absolute, exact facts, I would ask and appreciate

12    if you would give me an estimate.  Do you

13    understand that instruction?

14    A.    Yes.

15    Q.    If you give me an estimate please tell me

16    you're estimating?

17    A.    Okay.

18    Q.    No one wants you to guess, I'm here to

19    find out basically what you know and what you can

20    help to shed some light on this case.

21         You're represented by counsel today?

22    A.    Yes.

23    Q.    If at any time you feel necessary to speak

24    with counsel please let me know and I'll leave the

1    room or the two of you can leave the room and have

2    a discussion.  Do you understand that instruction?

3        A.    Yes.

4        Q.    Is there anything that would prevent you

5    from testifying truthfully and accurately, any

6    infirmity, any medications, any problem or

7    condition whatsoever?

8        A.    No.

9        Q.    I'll show you Deposition Exhibit No. 1,

10    which is a Notice of Designated Corporate Official

11    Deposition.  Have you had an opportunity to review

12    that?

13        A.    Yes.

14        Q.    Am I correct today that Heim Corporation

15    has appointed you as the individual to provide

16    testimony with regard to the matters outlined in

17    that notice?

18        A.    Yes.

19        Q.    Okay.  Is there any area that's in the

20    notice that you are not prepared to testify on

21    behalf of Heim today?

22        A.    No.

23        Q.    Other than direct discussions with your

24    attorney, what have you done to prepare yourself

1  for today's deposition?

2      A.   I have read this document that you

3  presented to me here.  I have reviewed the sales

4  file.  I had looked at some past documents which

5  are the Heim sales files from 1970 through 1980

6  looking for particular information to prepare for

7  this case.  And that's about it.

8      Q.   Did you have the opportunity to read

9  Ms. Lindquist's deposition?

10     A.   No, I did not.

11     Q.   Did you have the opportunity to obtain an

12 understanding of how Ms. Lindquist alleges this

13 accident occurred?

14     A.   Only from conversation.

15     Q.   Other than with your attorney, could

16 you -- other than what your attorney's told you,

17 can you tell me what information you have?

18     A.   No.

19     MR. HARTMAN:  Do you feel comfortable letting

20 him testify as to what his understanding of how the

21 accident occurred?

22     MR. ROBINSON:  Not if it only came from

23 counsel.  You can ask him -- you could introduce, I

24 suppose, what you believe happened and ask him if

9

1    that's his understanding.  And I think that would

2    probably be the best way to do it while I still

3    preserve the attorney-client privilege.

4         MR. HARTMAN:  That's fine.

5    BY MR. HARTMAN:

6         Q.   What was your -- strike that.

7              Let's go back.  What's the highest level

8    of education you've obtained?

9         A.   Two years of college.

10        Q.   And what course or program of education

11   did you have in college?

12        A.   It was just general courses, not a

13   specific degree or anything working towards.

14        Q.   After your two years of college, did you

15   have any specialized technical training?

16        A.   No.

17        Q.   Did you -- do you have an engineering

18   background?

19        A.   No.

20        Q.   In 1984 what was your position with Heim

21   Corp?

22        A.   Sales manager.

23        Q.   Prior to 1984 by whom were you employed?

24        A.   Prior to 1984 I was employed by Clearing,

1  which was a division of US Industries.

2      Q.   What did you do?

3      A.   I was also sales manager there.

4      Q.   And what type of product did you sell?

5      A.   It was a -- mechanical power presses and

6  hydraulic.

7      Q.   And how long --

8      MR. ROBINSON:  I'm sorry, excuse me, and --

9      THE WITNESS:  And hydraulic.  They were both

10  hydraulic and mechanical.

11  BY MR. HARTMAN:

12      Q.   How long did you work for Clearing?

13      A.   From 1967 through '81 -- '84 -- no.  No.

14  '81, excuse me, '81.

15      Q.   And from '81 to '84 how were you employed?

16      A.   Alco standard?

17      Q.   And what does Alco Standard do?

18      A.   At the time Alco standard was a

19  conglomerate, had a lot of acquisitions of

20  companies.  I worked for a company named Roselle.

21      Q.   Am I correct that Roselle makes mechanical

22  and hydraulic presses as well?

23      A.   No.

24      Q.   What does Roselle make?

11

1      A.    Mechanical presses.

2      Q.    And what did you do with Roselle?

3      A.    I was sales manager.

4      Q.    Prior to -- prior to your employment with

5  Clearing in 1967, by whom were you employed?  Let's

6  go from high school up to Clearing to the best you

7  can.

8      A.    I was only employed by the United States

9  Army, '64.

10     Q.    Bad time to be in the Army?

11     A.    '64 to '67 I was in the military.

12     Q.    Did any of your military training or

13 experience carry over to give you -- were you able

14 to use your military training and experience to

15 help you in your sales with Clearing?

16     A.    No.

17     Q.    So when you went to Clearing it was a

18 whole new world of vocational experience?

19     A.    Yes.

20     Q.    When you went to Clearing, what did you

21 sell?

22     A.    They were mechanical power presses.

23     Q.    Before we go any further, let's clarify

24 some terms here, okay, because I've been reading

1    and everybody talks about things.  I'm going to

2    give you what I understand and you tell me if I'm

3    correct, and please listen carefully.

4         It's my understanding that the term

5    mechanical power presses encompasses a large group

6    of types of presses, am I correct?

7         A.    Correct.

8         Q.    Mechanical power presses includes what you

9    would call a punch press?

10        A.    Correct.

11        Q.    A brake press?

12        A.    I distinguish between mechanical power

13   press and a press brake.

14        Q.    Okay.  Well, tell me what type of

15   mechanical power presses there are?

16        A.    There's -- they range in tonnage from one

17   ton to 6,000 ton.  We're talking a big field,

18   various types.

19        Q.    Sizes?

20        A.    Sizes.  There are fly-wheel type,

21   back-eared type, gap presses, straight side

22   presses, OBS type presses, there are single crank,

23   double crank, 1.2.4.  That pretty much gives you an

24   idea of the --

1    MR. ROBINSON:  If I might interrupt just for

2  housekeeping.  Would we agree, as we have in the

3  other depositions, that all objections except as to

4  the form are reserved for the time of trial?

5    MR. HARTMAN:  Correct.

6    MR. ROBINSON:  Thank you.

7  BY MR. HARTMAN:

8    Q.   Am I correct that many times the term

9  mechanical power press would also include brake

10  press?

11    MR. ROBINSON:  Hold on.  I'm going to object to

12  the form of the question.  He's already indicated

13  that there's a difference as you know from our

14  prior conversations with the Court and personally

15  ANSI recognizes a distinction between presses and

16  press brakes.  They are distinct products that you

17  are continually trying to have this witness say in

18  various forms are the same, and I think that's

19  misleading.

20    MR. HARTMAN:  And I understand that.  And I'm

21  not trying to mislead you.  What I'm -- let me get

22  to the heart of the matter.

23    MR. ROBINSON:  And just for the record every

24  witness that we have talked to with Corey

14

1   Manufacturing also has detailed for Mr. Hartman and

2   the plaintiff the differences -- the significant

3   differences that they have described between power

4   presses and press brakes.

5       MR. HARTMAN:  And that has no bearing on this

6   deposition.

7       MR. ROBINSON:  It does when you continuously

8   try to equate the two for purposes that I frankly

9   cannot understand.

10      MR. HARTMAN:  I'm not trying to equate the two

11  for any purpose other than to find out how Heim

12  looks at it.

13  BY MR. HARTMAN:

14      Q.   Are press brakes referred to as opposed

15  to -- strike that.

16           Are press brakes sometimes referred to as

17  mechanical power presses by Heim?

18      A.   I wouldn't think so.

19      Q.   Okay.  So a press brake would not be

20  commonly known as a mechanical power press at Heim?

21      A.   Correct.

22      Q.   Okay.  Do you know in your experience as

23  sales manager in the selling of presses, and I'm

24  using that in a very generic sense, I'm not trying

15

1   to -- have you had the opportunity to review OSHA

2   standards for mechanical presses?

3       A.    Reviewing OSHA standards?  You need to

4   help me here.

5       Q.    Is Heim aware as to whether or not OSHA

6   discusses the guarding of mechanical presses?

7       MR. ROBINSON:  I'll object to the form of the

8   question.

9       THE WITNESS:  This is something that we build

10  presses to meet a code or a standard, ANSI, OSHA

11  standards.

12  BY MR. HARTMAN:

13      Q.    ANSI and OSHA standards?

14      A.    That's correct.

15      Q.    Do you know what OSHA standard governs

16  brake presses?

17      MR. ROBINSON:  Now you're talking about brake

18  presses, you're using -- I just want make sure.

19      MR. HARTMAN:  I know what I'm saying.  I want

20  you to take your time, listen to what I'm saying.

21  I will be switching back and forth --

22      THE WITNESS:  Okay.

23      MR. HARTMAN:  -- when we talk until I get an

24  understanding as to what you understand.  And it

16

1  will not be any means to trick you, I do ask that

2  you listen to my question .

3      MR. ROBINSON:  And just for the Court's

4  purposes, I think it's very misleading to ask all

5  of the introductory questions about OSHA

6  regulations, ANSI regulations relating to power

7  presses and just to throw in the reference to a

8  press brake when you get into a specific ANSI or

9  OSHA requirement.  I just think that's misleading

10  the way that's being done.  I'm not saying it's

11  intentionally so, I'm just saying I think it's

12  misleading.  And it does seem to me to be a way

13  that could be used to trip up a witness rather than

14  obtain actual facts that are helpful.

15      MR. HARTMAN:  I understand what you're

16  advocating, and my position is to find out what you

17  know.  I have to switch back and forth because I

18  have -- in my reading I have a misunderstanding or

19  at least it seems confusing to me.

20  BY MR. HARTMAN:

21      Q.  It's my understanding that OSHA when they

22  talk about mechanical presses, mechanical presses,

23  uses it -- that generic term.  And when OSHA talks

24  about OSHA talks about mechanical presses they're

1    including in that category what you would call a

2    brake press.  Do you agree with that statement?

3        A.    I don't know.  I truly don't know if I

4    agree with that statement.

5        Q.    Okay.  Do you know what OSHA regulations

6    govern point of operation protection?

7        MR. ROBINSON:  For what?  I'll object to the

8    form.

9        MR. HARTMAN:  Okay.  Okay.  That's fine.  Look,

10   I'm talking, there's no need to get upset.

11       MR. ROBINSON:  By all means please don't take

12   my objection as being upset.  You just indicated

13   that -- you asked the witness what OSHA standards

14   govern point of operation --

15       MR. HARTMAN:  I'm asking --

16       MR. ROBINSON:  -- question mark.  And there

17   are I can't imagine how many different types of

18   devices.  So please don't take my objection as

19   being upset.

20   BY MR. HARTMAN:

21       Q.    Do you have familiarity with the OSHA

22   regulations governing point of operation protection

23   for press brakes?

24       A.    No.

1       Q.    Okay.  Does Heim have familiarity with

2   OSHA's regulations governing press brakes?

3       A.    I do not know.

4       Q.    Are you familiar with ANSI's standards as

5   it relates to press brakes?

6       A.    Can you be more specific?  It's a

7   general --

8       Q.    Point of operation protection?

9       A.    Not point of operation protection.

10      Q.    Are you aware of ANSI's standards with

11  regard to the -- what they contend is the

12  manufacturer's responsibility with regard to

13  construction and distribution of mechanical press

14  brakes?

15      A.    I'm familiar.

16      Q.    With that part?

17      A.    Yes.

18      Q.    Are you familiar with the design

19  engineering process that goes into the construction

20  of a mechanical press brake?

21      A.    No.

22      MR. ROBINSON:  And for the record, I'll object

23  to the form of the question, that's very, very

24  broad.  And I don't know what particulars, if any,

1  you're referring to.

2     MR. HARTMAN:  Well, it talks about a number so

3  we know on Page 3 of my notice of corporate --

4     MR. ROBINSON:  No, I'm not concerned about the

5  wording of the notice, I'm concerned about the

6  wording of the question that you just asked.  You

7  just asked a general question, it's unlimited in

8  any time.  As we know our press brake was

9  manufactured in '78.  And I don't know -- I had a

10 problem with the way the question was asked.  And I

11 don't know if the witness did or not either, but I

12 needed to preserve that objection, it was very

13 general.  Perhaps he's thinking about something in

14 particular.  I'm sure he has some familiarity with

15 various aspects of the design or manufacture of

16 press brakes, but perhaps he's thinking of

17 something particular that you might be concerned

18 with.

19 BY MR. HARTMAN:

20    Q.    In reading engineering principles as it

21 relates to product design and manufacture, it

22 appears to me that all of the engineers and authors

23 indicate that there's a level of safety engineering

24 that goes into the design manufacture and sale of

20

1   each product?

2        MR. ROBINSON:  There's no question yet.

3   BY MR. HARTMAN:

4        Q.    There's no question.  It's my

5   understanding that first you have to recognize a

6   hazard.  Do you understand what recognizing a

7   hazard is?

8        MR. ROBINSON:  Object to the form of the

9   question.  Mr. Mase, if you can answer it, by all

10  means don't let my objections keep you from doing

11  that.

12       THE WITNESS:  I believe so.

13  BY MR. HARTMAN:

14       Q.    And what is a recognized hazard?

15       MR. ROBINSON:  Object to the form of the

16  question.

17       THE WITNESS:  Specific hazard or --

18  BY MR. HARTMAN:

19       Q.    In a sense what does a recognized hazard

20  mean?  If I would say we're looking for recognized

21  hazards, what would that mean to Heim?

22       MR. ROBINSON:  In what setting, Mr. Hartman?

23       MR. HARTMAN:  In the design and manufacture of

24  the brake press .

1      MR. ROBINSON:  In what time frame?

2      MR. HARTMAN:  Well, let's go back to prior to

3  the manufacture of the particular press brake

4  involved in this case.

5      MR. ROBINSON:  Just so the Court is aware of

6  what I'm struggling with, there are numerous

7  aspects of designing and manufacturing a press

8  brake.  And from what I understand the plaintiff's

9  allegations to be, they relate to the point of

10  operation, guarding for particular press brakes and

11  open-ended questions such as the one that has just

12  been asked I think are objectionable.

13      MR. HARTMAN:  Well, I disagree.  And this

14  deposition is going to take 10, 15 hours the way

15  we're going.

16      MR. ROBINSON:  We don't respond to --

17      MR. HARTMAN:  Please let me finish.

18      MR. ROBINSON:  I apologize.

19      MR. HARTMAN:  I've done a lot of product

20  liability cases, every manufacturer that I've ever

21  done a corporate designated deposition of in the 40

22  or 50 cases I've done has always understood what a

23  recognized hazard was and it appears -- it's always

24  been the same definition.  I'm just wondering if

1    Heim utilizes the same definition for a recognized

2    hazard in a general analysis of when you're

3    designing a product.

4        MR. ROBINSON:  And there's not a question on

5    the table at this point.  And your experience with

6    product liability litigation has nothing to do with

7    the objection that I just raised.  While I

8    appreciate your experience, it is meaningless for

9    purposes of the open-ended question that you just

10   asked, and that being whether or not Heim

11   recognizes hazards during the design or manufacture

12   of a press brake.  If you are going to continue to

13   ask questions like that, we will not be here for 10

14   or 15 hours because we will have to stop the

15   deposition at some point.  And we did not respond

16   to a threat that we're going to remain here for 10

17   or 15 hours as some effort to keep me from raising

18   objections to those types of questions.

19       MR. HARTMAN:  It's not a threat.  We will be

20   here until I get my information.  If at any time

21   you feel you need the Court's involvement, pick up

22   the phone and call.

23       MR. ROBINSON:  I can't imagine we would need

24   that.

1    BY MR. HARTMAN:

2        Q.    With regard to the design process of a

3    press brake, when you're looking to manufacture a

4    press brake, does part of the process of the design

5    include trying to recognize hazards to individuals

6    who would come in contact with that press brake?

7        A.    Yes.

8        Q.    And once you recognize that hazard that

9    would be what is typically called in project

10   engineering terms as hazard recognition, am I

11   correct?

12       A.    Yes.

13       Q.    And once you recognize a hazard, does Heim

14   take the responsibility to try to either design out

15   the hazard, guard against a hazard or warn against

16   a hazard?

17       A.    Yes.

18       MR. ROBINSON:    I'll object to the form of the

19   question, but continue to answer if you can,

20   Mr. Mase.

21   BY MR. HARTMAN:

22       Q.    Would you agree with me that as a press

23   brake designer and manufacturer, once a hazard is

24   recognized it is Heim's responsibility, if

1    possible, to design out the hazard?

2        MR. ROBINSON:  I will object to the form of the

3    question.

4    BY MR. HARTMAN:

5        Q.    You can answer.

6        A.    Yes.

7        Q.    Would you also agree that the next step in

8    a project -- a design engineer responsibility if

9    you cannot design out the hazard, then you would,

10   if possible, guard against a hazard?

11       MR. ROBINSON:  Let me object.  What hazards are

12   we referring to?  As you know there are many

13   hazards for which entities other than the

14   manufacturer are responsible for.

15       MR. HARTMAN:  That's a legal conclusion.  If he

16   wants to --

17       MR. ROBINSON:  Well, your questions have been

18   asking him for legal conclusions.

19       MR. HARTMAN:  No, they have not.

20       MR. ROBINSON:  You've asked if Heim has a

21   responsibility in general to design out or guard or

22   warn of hazards relating to the press brakes.  Your

23   case centers around point of operation safety

24   devices that are the responsibility of the user on

25

1  the machine pursuant to ANSI, pursuant to OSHA,

2  pursuant to trade custom, pursuant to all of those.

3  So I think your questions are very misleading.

4      MR. HARTMAN:  Well, Paul --

5      MR. ROBINSON:  Hold on.  Hold on.

6      MR. HARTMAN:  Okay.  Okay.

7      MR. ROBINSON:  One second.  I think your

8  questions are very misleading and that you will

9  attempt to use them down the road to suggest that

10  the issue in our case is encompassed in your

11  question to Mr. Mase and to Heim when, in fact, it

12  has no bearing because he's answering them in a

13  general sense.

14      MR. HARTMAN:  I'm not asking him in a general

15  sense, understand that, okay, we'll get to

16  particulars as we go.  Your narration of the law is

17  incorrect.  If you did as much research as you did

18  talking then you'd understand that neither ANSI --

19      MR. ROBINSON:  Keep your smart comments to

20  yourself -- no, not when you talk like that.

21  Please, we don't need the smart comments.  If

22  you're going to take a deposition and if you're

23  going to refer to my objections in that manner,

24  then we're going to stop the deposition,

1  Mr. Hartman.

2    MR. HARTMAN:  Good.  Stop it any time you want

3  to.

4    MR. ROBINSON:  I will tell you when I'm going

5  to.  If you keep acting like that without any

6  purpose whatsoever other than to be smart, then we

7  will stop it.  And I'll be sure to let you know

8  when I'm doing that.

9    MR. HARTMAN:  Paul, all you're doing is

10  obstructing the record and trying to coach your

11  witness.  You should spend the time preparing your

12  witness outside of the deposition.  I'm going to

13  ask my questions as I see fit.  I'm going to

14  conduct myself as I see fit.  If at any time you

15  feel it necessary to interject with the Court, pull

16  your client and talk to him, make this record as

17  long as you want it or stop the deposition, you're

18  free to do so.  I've traveled here at my expense,

19  if you stop the deposition the next will be at your

20  expense.  It's that easy.

21    MR. ROBINSON:  It's really not that easy, and

22  here's the point.  When I make an objection on

23  behalf of my client, just move on with your

24  question.  You'll get an answer if Mr. Mase can

1    answer it.  But we don't need you to direct your

2    sarcasm to my objection.  That's the problem that I

3    had with your response to my objection.

4        MR. HARTMAN:  Unfortunately the record doesn't

5    contain the tone of your voice or your demeanor so

6    that they would see that it's a two-way street

7    here.

8        MR. ROBINSON:  I don't follow that at all

9    either.

10       MR. HARTMAN:  That's because you choose not to.

11       MR. ROBINSON:  Pardon me.

12       MR. HARTMAN:  It's because you choose not to.

13       MR. ROBINSON:  Okay.  Once again, we have an

14   unprofessional comment, completely unnecessary,

15   being made during the deposition.  I'm going to try

16   to point them out as we go along so that whenever

17   we do cease the deposition, we know why.

18       MR. HARTMAN:  You have no right to cease the

19   deposition.

20       MR. ROBINSON:  I do when you're acting in an

21   obdurate and harassing manner to me and my client.

22       MR. HARTMAN:  I'm not.

23       MR. ROBINSON:  You can say that you're not and

24   I can say that you are and then we can disagree and

1    when we stop the deposition if it continues, the

2    Court will decide.

3        MR. HARTMAN:  Do what you got to do, Paul.

4    BY MR. HARTMAN:

5        Q.    You've been appointed by Heim to talk

6    about the design and manufacturing process of this

7    particular press brake.  And my Notice of Corporate

8    Designated Deposition talks about other press

9    brakes on similar machines.  What I need to know is

10    when you're designing the machine, we've already

11    established that you attempt to recognize the

12    hazards, am I correct?

13        A.    Correct.

14        Q.    Once you recognize the hazards, you

15    attempt to eliminate the hazards, am I correct?

16        MR. ROBINSON:  Same objections.

17    BY MR. HARTMAN:

18        Q.    Am I correct?

19        A.    Correct.

20        Q.    If you can't eliminate them, then you

21    would try to protect the operator or person that's

22    interfacing with your machines from the hazard, am

23    I correct?

24        MR. ROBINSON:  Objection to the form.

29

1        THE WITNESS:  Correct.

2   BY MR. HARTMAN:

3        Q.    And then if you can't design them out or

4   guard against them, then the proper process for

5   manufacturing and designing a product would be to

6   warn the user of the danger, am I correct?

7        MR. ROBINSON:  Objection to the form.

8        THE WITNESS:  I believe that to be the case.

9   BY MR. HARTMAN:

10       Q.    Okay.  Does Heim use that analysis when it

11  manufactured the brake press involved in the

12  accident with Tina Lindquist?

13       A.    I believe so.

14       Q.    Now, with regard to the point protection

15  and point of operation.  At the time Heim

16  manufactured -- strike that.

17            Do I have to --

18            Do you know what brake press I'm talking

19  about that was involved in the Tina Lindquist

20  accident?

21       A.    Yes.

22       Q.    Would you describe it for me?  What's the

23  model number?

24       A.    It's a 70-6, which is a 70 ton 6-foot

 1  press brake, mechanical.

 2      Q.    And when was it sold?

 3      A.    I believe it was sold in 1978.

 4      Q.    Okay.  How long had that press brake

 5  been -- how many years prior to '78 had that press

 6  brake been offered for sale by Heim?

 7      MR. ROBINSON:  The specific press brake ?

 8      MR. HARTMAN:  The model.

 9      THE WITNESS:  I'm not absolutely sure.

10  BY MR. HARTMAN:

11      Q.    Can you give me an estimate?

12      A.    My estimate would be 1968.

13      Q.    Okay.  And do you know when that model was

14  discontinued, the 70-6?

15      A.    It has not been discontinued.

16      Q.    It's still being used?

17      A.    That's correct.

18      Q.    I'm sorry, still being manufactured?

19      A.    Yes.

20      Q.    Is the 70-6 press brake part of a family

21  of press brakes, otherwise is there like a 60-6, is

22  there a family of similar press brakes except a

23  different size and width?

24      MR. ROBINSON:  I'll object to the form of the

1    question, you've just added similar and then you've

2    also added a difference in size and width.  I don't

3    know what you mean by family.

4    BY MR. HARTMAN:

5        Q.    Do you know what family press brakes would

6    be?

7        A.    I believe I know where you're going with

8    what your question is.

9        Q.    What would you call press brakes that are

10   essentially the same differing in size but

11   different in size?

12       A.    I would call them a series.

13       Q.    Okay.  What sizes are in the series of

14   press brakes that the 70-6 belongs to?

15       A.    They vary in lengths, such as, 4 foot, 6

16   foot, 8 foot, 10 foot.

17       Q.    They do not vary in tonnage?

18       A.    No.

19       MR. ROBINSON:  What were the other ones, 4

20   foot, 6 foot, 10 foot.

21       THE WITNESS:  Vary in length.  8 foot.

22   BY MR. HARTMAN:

23       Q.    The 70 series would be 70 tonnage

24   different sizes of bed, is that what you --

1       A.    That's correct.   70 ton would designate

2    the tonnage, the dash 6 would designate the length.

3       Q.    The length of what?

4       A.    The bed.

5       Q.    That's what I said.

6       A.    I'm sorry.

7       Q.    We're -- okay.   Is there like on 80

8    series, a 90 series, a 100 series of press brakes?

9       A.    Yes.

10      Q.    And would they differ -- would the series

11   differ only in that there are different bed sizes

12   as well when you talk about the 80, 90, 100?

13      A.    The change comes in tonnage and in bed

14   length.

15      Q.    Okay.   What's the lowest amount of tonnage

16   of a press brake that would be similar to the 70

17   series?

18      MR. ROBINSON:   I'll object to the question and

19   your confusion of the word similar.

20      THE WITNESS:   We build a 30-ton series, a

21   45-ton series, 70-ton series, 100-ton series.

22   BY MR. HARTMAN:

23      Q.    Is 100-ton series the highest tonnage you

24   go?

1      A.    No.

2      Q.    How far in?

3      A.    200.

4      Q.    200.

5             And I have to ask this because I don't

6    have the literature.  And what I'm trying to get at

7    is that basically the press brake, the 70-6, has

8    certain characteristics to it, in looks particular.

9    When you have different tonnage and different bed

10   lengths and different series, is it basically the

11   same application except it's heavier tonnage and

12   wider bed or are there differences in these things?

13       MR. ROBINSON:  I'll object to the -- I didn't

14   mean to cut you off.  I'll object to the form of

15   the question.  I don't know what you mean by

16   application and then you made it compound in the

17   end.

18   BY MR. HARTMAN:

19       Q.    Okay.  Explain to me the differences

20   between a 32 to 200 ton press brakes other than the

21   fact that they're heavier and wider?

22       A.    Basically that is the difference, the

23   tonnage goes up -- it's just plain physics, size is

24   the difference.

34

1      Q.   The machine gets bigger but it still looks

2  the same except bigger one?

3      A.   Correct.

4      Q.   Or smaller when it's smaller tonnage?

5      A.   Correct.

6      Q.   It's a narrower bed if it's shorter, it's

7  wider if it's wider?

8      A.   Correct.

9      Q.   Okay.  Now, how long -- is there a

10  particular name for the press brakes that go from

11  32 to 200 ton, this group of series, or is it a

12  particular model type other than a 70-6, is there a

13  family name that would include this whole group of

14  press brakes or is it just called press brakes?

15     MR. ROBINSON:  And I'll object.  I think you

16  just included in your series tonnages outside of

17  the 70 ton.  I thought Mr. Mase said that the

18  series that would encompass the 70-6 model would be

19  the 70 ton but beds of different lengths.

20     MR. HARTMAN:  Right.

21  BY MR. HARTMAN:

22      Q.   And what I'm saying is is there a name

23  that you would use to include all of the series of

24  tonnages and lengths of the press brakes that

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

1    you've just described?

2        A.    We would use a generic name, press brake.

3        Q.    There we go.  Okay.  And you've been

4    manufacturing press brakes similar to this --

5    strike that.

6            When I say similar I'm talking about the

7    aggregate of all of the series as far as the

8    similarity, okay?

9        MR. ROBINSON:  What do you mean by that?

10   BY MR. HARTMAN:

11       Q.    That they differ in tonnage, they differ

12   in bed length, but they don't differ in the basic

13   structure of them beyond tonnage and bed length.

14   Do you understand that?

15       A.    Yes.

16       Q.    It's not like you have a completely new

17   design, do you understand that?

18       A.    Correct.

19       Q.    So how long have you been making press

20   brakes of the series similar to the 70-6?

21       A.    Since 1967, '68.

22       Q.    Prior to '67 or '68, did Heim make press

23   brakes of a different design than the 70-6 series?

24       A.    No.

1    Q.    So Heim just started making press brakes

2  in 1967 or '68, correct?

3    A.    Approximately.

4    Q.    Now, Mr. Robinson has indicated to me that

5  Heim has made approximately 50,000 mechanical

6  presses and press brakes throughout its history, is

7  that correct?

8    MR. ROBINSON:  Is it correct that I've

9  indicated that to you?

10  BY MR. HARTMAN:

11    Q.    Is it correct that Heim has made 50,000

12  presses and press brakes?

13    MR. ROBINSON:  If you know.

14    THE WITNESS:  Can I have a minute?

15    MR. ROBINSON:  We can't have a conversation in

16  front of Mr. Hartman.

17                              (Whereupon, a short break

18                              was taken.)

19  BY MR. HARTMAN:

20    Q.    When I ask you questions and I use the

21  term similar with regard to the different series of

22  press brakes, what I'm trying to ascertain is that,

23  is there anything from a point of operation

24  protection that would be different in any of the

1    models of press brakes you made from '67 to the

2    present of the different series that you've

3    identified?

4        MR. ROBINSON:  Well, I'll object to the form of

5    the question.

6        MR. HARTMAN:  That's not a question, it's a

7    statement.

8        MR. ROBINSON:  Regardless, your point of

9    operation protection is the problem I had with the

10   introductory statement to your question that

11   perhaps is coming.

12   BY MR. HARTMAN:

13       Q.   Okay.  Do you see the series from was it

14   32 ton to 200 ton of press brakes as being similar?

15       MR. ROBINSON:  And I'll object to the form of

16   the question.  You can answer.

17       THE WITNESS:  Yes.

18   BY MR. HARTMAN:

19       Q.   Describe how they're similar.

20       A.   They're similar in the design in which

21   they only would vary in length and in capacity due

22   to size to deliver a force.

23       Q.   Okay.  Thank you.

24            Your attorney during our break has

1    indicated to me that you've had the opportunity to

2    review all of the types of press brakes from '67 to

3    1980, is that correct?

4        MR. ROBINSON:  No, that's not correct.  I had

5    told you during the break that I believe, and you

6    would have to ask Mr. Mase, that during his review

7    of the records of Heim, it included, I think, all

8    press brakes from 1972 to '80 as ordered by the

9    Court.  But I think Mr. Mase said he went back to

10   1970 in his earlier comment today on the record.

11   BY MR. HARTMAN:

12       Q.    When is it?

13       A.    I went back in the file to approximately

14   1970 through approximately 1980.

15       Q.    Okay.  And Heim has continued to make --

16   strike that.

17            When I use the term press brakes in a

18   plural sense, the press brakes, I'm talking about

19   all of the different series that you've just

20   described that vary only in tonnage and bed length,

21   okay?

22       A.    Okay.

23       Q.    And Heim continues to make those press

24   brakes today?

1    MR. ROBINSON:  Which press brakes?

2    MR. HARTMAN:  I just asked him.

3    MR. ROBINSON:  You had asked him if they still

4  make the 70-6, and the answer was, yes.  And now

5  you said all of them.  I didn't hear that answer, I

6  just --

7  BY MR. HARTMAN:

8    Q.   Does Heim continue to make all of the

9  press brakes today?

10    A.   Yes.

11    Q.   From the time -- from 1970 to 1980, did

12  Heim make any changes to the press brakes as it

13  relates to point of operation protection?

14    MR. ROBINSON:  I will object to the form of the

15  question.  I don't believe there's been any

16  testimony that Heim provides point of operation

17  protection, and I'm not sure how you're using that

18  term, on its press brakes.

19  BY MR. HARTMAN:

20    Q.   Okay.  Do you understand what point of

21  operation protection is on a press brake?

22    A.   Yes.

23    MR. ROBINSON:  Yeah.  And just for the Court's

24  edification his understanding may be different than

1  yours, may be different than mine.

2      MR. HARTMAN:  I'm going to ask that you define

3  it.

4      MR. ROBINSON:  That's the problem I have with

5  that.

6  BY MR. HARTMAN:

7      Q.  With regard to press brakes, what is

8  Heim's understanding of point of operation

9  protection?

10     A.  I believe it to be the actuation device

11 for the press.

12     Q.  And what is the actuation device?

13     A.  It could be the foot switch.  It could be

14 the palm button station.

15     Q.  Other than the brake presses we're talking

16 about that are similar, they differ only in

17 capacity and bed length, does Heim make any other

18 types of brake presses?

19     MR. ROBINSON:  Object to the form of the

20 question.  You can answer it again if you can,

21 Mr. Mase.

22     THE WITNESS:  I understand your question is

23 going back to the models we talked about from the

24 30 ton to the 200 ton.

1  BY MR. HARTMAN:

2      Q.    Other than those that are all basically

3  similar in design except for different capacities,

4  is there any other type of brake press made by

5  Heim?

6      A.    No.

7      Q.    I want to ask you -- strike that.

8          Who -- what is Roselle?

9      A.    Roselle is --

10     Q.    Go ahead.

11     A.    Roselle is a trademark name used under the

12 Heim group for punch presses that were built from 5

13 ton through 1,000 ton in capacity.

14     Q.    Okay.  You said something earlier about an

15 OMB press or was it an OMB press?

16     MR. ROBINSON:  What's the question.

17     THE WITNESS:  OBS.

18 BY MR. HARTMAN:

19     Q.    What is an OBS press?

20     A.    OBS stands for open back stationary, it

21 references to frame model.  It's a punch press.

22     Q.    Is there an OBI?

23     A.    Correct.

24     Q.    And what is that?

1      A.    Open backing climbable.

2      Q.    What type of press is that?

3      A.    It's a punch press that inclines, that's

4  what --

5      Q.    Could it be configured to do the same type

6  of forming that a brake press does?

7      MR. ROBINSON:  I'll object to the form of the

8  question.  I don't know what kind of forming you're

9  referring to.

10     THE WITNESS:  I'd like to answer this question.

11     MR. ROBINSON:  Answer all of them, yes,

12  Mr. Mase.

13     THE WITNESS:  The -- my belief is looking at

14  two separate punch press is primarily used for

15  stamping and brake press is primarily used for

16  bending under the normal circumstances of the

17  businesses as I understand it.

18  BY MR. HARTMAN:

19     Q.    Okay.  Let's talk about punch presses that

20  Heim manufactured in the period of 1970 to 1980.

21         Other than the point of operation

22  protection that you have identified as meaning to

23  you palm buttons or foot switches, exclude those

24  from anything, was there any type of point of

1  operation protection provided by Heim with regard

2  to those types of machines?

3      MR. ROBINSON:  And if I may object, and the

4  Court has issued a ruling on these questions that

5  were posed in the interrogatories precluding the

6  plaintiff from wasting effort and time in getting

7  into products other than press brakes.  And now

8  apparently the decision has been made by

9  plaintiff's counsel to reassess that ruling and now

10  attempt to obtain this information in a deposition

11  format as a result of him being precluded from

12  obtaining that unnecessary and irrelevant

13  information in an interrogatory format.

14      MR. HARTMAN:  Okay.  My position is is that the

15  Court ruled that I was to get information from '70

16  to 1980 and was to be provided by Mr. Robinson, and

17  Mr. Robinson's argument was that based on the

18  recordkeeping of Heim that my earlier request would

19  be unduly burdensome and cost prohibitive.  The

20  Court specifically indicated that during the

21  deposition that unless it was unduly burdensome or

22  cost prohibitive, the Court would revisit that

23  situation if Mr. Robinson and I had a problem with

24  regard to his witness answering questions.

1          If this witness indicates that for him to

2    sit here and answer what he knows is cost

3    prohibitive and unduly burdensome then maybe we

4    should contact the Court.  I would like to know

5    what the witness knows.

6    BY MR. HARTMAN:

7          Q.    So my question is, sir, is that with

8    regard to punch presses from 1970 to 1980, was

9    there any type of point of operation protection

10   offered by Heim with those punch presses other than

11   the two palm switch and the foot pedal?

12         A.    I do not know.  I didn't research those

13   files.

14         Q.    Did you sell punch presses during that

15   period of time as the sales manager?

16         A.    Between?

17         Q.    1970 and 1980.

18         A.    Not for the Heim Group.

19         Q.    Well, you worked from 1967 to 1981, what

20   was your job with Heim?

21         A.    Say that again for me.

22         Q.    You indicated earlier that you worked for

23   Heim -- I'm sorry, 1981 through 1984 is that

24   when --

1      MR. ROBINSON:  No.

2      THE WITNESS:  No, it was Roselle.

3  BY MR. HARTMAN:

4      Q.   '84 through 91.

5      MR. ROBINSON:  '81 through '91 and 2001 to the

6  present.  He was with Clearing from '67 to '81.

7      MR. HARTMAN:  Got it.

8  BY MR. HARTMAN:

9      Q.   Okay.  From 1984 to 1991, with regard to

10  punch presses, other than foot controls or two palm

11  switches, did Heim make available any other type of

12  point of operation protection for punch presses?

13     MR. ROBINSON:  I'll object to the form of the

14  question now we're talking from 1984 to 1991 in the

15  time frame that the Court eliminated from the

16  equation.  And we're also talking about punch

17  presses.

18     MR. HARTMAN:  I understand.

19     MR. ROBINSON:  And also I have a problem with

20  the term make available.  But with all of that,

21  Mr. Mase, if you can answer the question, by all

22  means, please do.

23     THE WITNESS:  Between 1984 and '91 offering I

24  believe at a customer's request that we quoted a

1  point of operation somewhere in that time frame.

2  BY MR. HARTMAN:

3      Q.    Okay.  Do you recall what types of point

4  of operation protection you would offer at a

5  customer's request for sale with regard to punch

6  presses?

7      MR. ROBINSON:  In 1984 to 1991?

8      MR. HARTMAN:  Yes.

9      MR. ROBINSON:  With punch presses.

10      MR. HARTMAN:  Right.

11      THE WITNESS:  I would believe it would be a

12  light curtain.

13  BY MR. HARTMAN:

14      Q.    From 1984 through 1991 other than point of

15  operation protection such as a palm switch or a

16  foot pedal, did Heim make available for purchase

17  along with its brake presses other types of point

18  of operation protection?

19      MR. ROBINSON:  I'll object to the form of the

20  question as asked, again, make available when

21  Mr. Mase has specifically indicated at the request

22  of a customer and now we're going back to the -- to

23  a more general statement in my opinion to possibly

24  trip up the witness.

1        THE WITNESS:  Between 1984 and '91 again?

2   BY MR. HARTMAN:

3        Q.    Yes.

4        A.    I do not recall a specific inquiry for a

5   light curtain for a press brake.

6        Q.    Okay.  When you worked for Clearing, what

7   types of machines did you sell?

8        A.    We sold primarily large mechanical punch

9   presses.

10       Q.    Did you sell brake presses?

11       A.    No.

12       Q.    When you worked for -- what is it?

13       A.    CNB.

14       Q.    It's pretty bad when you can't read your

15   own writing.

16       A.    When I worked for CNB Niagra had a press

17   brake series.

18       Q.    Did you sell them?

19       A.    I wasn't involved in sales with that

20   company.

21       Q.    What were you involved in?

22       A.    Aftermarket sales.

23       Q.    What is aftermarket sales?

24       A.    Parts.

48

1      Q.   Do you know the negotiations that took

2  place with Heim with regard to the sale of this

3  particular machine?

4      A.   No.

5      MR. ROBINSON:  Just for clarification, are you

6  talking about from personal knowledge or from his

7  review of the sales documents that we've provided?

8  BY MR. HARTMAN:

9      Q.   Well, A, personal knowledge.

10     A.   No.

11     Q.   Reviewing the sales documents, do you know

12 how the purchasing process took place?

13     A.   I believe I do.

14     Q.   Okay.  Would you please describe that for

15 me?

16     A.   I believe from reviewing the file it was

17 sold through a distributor through an end user

18 known as Afco.

19     MR. ROBINSON:  Afco.

20     THE WITNESS:  Afco.

21 BY MR. HARTMAN:

22     Q.   Do you know what Afco was going to do with

23 the press?

24     A.   No.