1      Q.   Does Heim know what type of parts were

2  going to be worked with utilizing the press?

3      MR. ROBINSON:   Just -- I don't mean to be

4  difficult.   When you say press, I assume you're

5  meaning press brake.

6      MR. HARTMAN:   We're talking about the

7  particular press brake.

8      MR. ROBINSON:   It is a press brake, it is not a

9  press, as this witness has indicated.

10 BY MR. HARTMAN:

11     Q.   When I refer I -- I will tell you this,

12 that when I refer to this particular press brake,

13 if I utilize the term -- shortened term press, I

14 will always mean press brake.   If I say press and

15 you agree, I'm not going to say it's something

16 other than a press brake.

17     MR. ROBINSON:   I appreciate that.

18 BY MR. HARTMAN:

19     Q.   Is that fair?

20     A.   Fair.

21     Q.   When we go beyond that then I'm going to

22 be talking specifically mechanical presses, press

23 brakes and punch presses, do you understand that?

24     A.   I understand.

1      Q.   Do you know what type of parts were going

2   to be formed utilizing the press brake that's

3   involved in this lawsuit?

4      MR. ROBINSON:  At its original purchase?

5      MR. HARTMAN:  Yes.

6      THE WITNESS:  I don't believe they knew.

7   BY MR. HARTMAN:

8      Q.   As a sales manager, when a customer

9   contacts you to purchase a press brake, would you

10  inquire as to what type of parts the customer's

11  going to utilize the press brake for in order to

12  ascertain the capacity of the press brake that fits

13  the customer's needs?

14     MR. ROBINSON:  I'll object to the form of the

15  question.

16     THE WITNESS:  No.

17  BY MR. HARTMAN:

18     Q.   Tell me how it works that a customer --

19  tell me how it works with regard to typically --

20  strike that.

21         Is there a typical scenario where a person

22  purchases a press brake?

23     A.   Yes.

24     Q.   Okay.  Tell me the typical scenario?

1      A.    I believe the scenario would be a customer

2   already has a knowledge of what he wants to

3   produce, has researched that product and would

4   provide a manufacturer such as Heim or someone else

5   a typical tonnage such as a 70 ton, a certain

6   length being a 6 foot would be the request.  It is

7   a general purpose machine.

8      Q.    Okay.  So the typical sales transaction

9   does not involve Heim trying to ascertain what the

10  press brake is going to be utilized for?

11     A.    Correct.

12     Q.    The customer makes that decision and makes

13  the request from Heim as to the size of tonnage and

14  the length of the bed?

15     A.    Correct.

16     MR. ROBINSON:  Just so we have the correct

17  terminology down, when you use the term customer,

18  you might want to ask some questions or delve into

19  that issue because many times these go through

20  distributors which, in fact, is a customer and not

21  the end user.

22     MR. HARTMAN:  That's fair.  Thank you for that.

23  BY MR. HARTMAN:

24     Q.    Was this a direct purchase by Afco --

52

 1         MR. ROBINSON:   That's it.

 2    BY MR. HARTMAN:

 3         Q.   Was that a direct purchase where Afco had

 4    communications directly with Heim or was it a

 5    hybrid where they purchased it through the

 6    distributor and had direct communication with Heim

 7    or did Afco just have communication with the

 8    distributor?

 9         A.   I believe this purchase was as an end user

10    through a distributor to Heim.

11         Q.   Did Heim have communication with Afco

12    Lycomie with regard to the purchase and sale of

13    this press brake?

14         A.   I don't believe that's the case.

15         Q.   So -- in looking at the manual and the

16    sales, it appears that a foot pedal accompanied

17    this press brake?

18         A.   Yes.

19         Q.   Am I correct that a foot pedal -- strike

20    that.

21         According to the manual a foot pedal came

22    standard with regard to these press brakes?

23         MR. ROBINSON:   What's the question?

24

1   BY MR. HARTMAN:

2      Q.   Am I correct?

3      MR. ROBINSON:   What is the question, does the

4   manual?

5   BY MR. HARTMAN:

6      Q.   No.   Does a foot pedal come standard with

7   the press brakes?

8      MR. ROBINSON:   With any press brake, is that

9   what you're asking.

10     MR. HARTMAN:   Yes .

11     MR. ROBINSON:   I object to the form.   You can

12   answer, if you can, Mr. Mase.

13     THE WITNESS:   I would answer that question the

14   end user or the purchaser of the machine would

15   choose a form of actuation being a foot switch or a

16   palm button station.

17   BY MR. HARTMAN:

18      Q.   And I'm not trying to be tricky here, it

19   was my understanding in reading through the manual

20   and the purchasing documents that a foot pedal is

21   standard, the palm button was the option?

22     MR. ROBINSON:   There's no question on the

23   table.

24

1  BY MR. HARTMAN:

2      Q.    Is that correct?

3      MR. ROBINSON:  Hold on.  He's not answering the

4  question whether or not it's your understanding.

5      MR. HARTMAN:  That's fine.

6      MR. ROBINSON:  And it's also compound in that

7  you've referenced the manual and the purchasing

8  documents, I have no idea what you could possibly

9  be talking about when you reference the purchasing

10  documents.  But if you'd like to show them.

11      MR. HARTMAN:  I'm trying to shorten the

12  process.  You're right.

13      MR. ROBINSON:  To be more blunt, I don't think

14  there's any purchasing documents that we have in

15  the sales file that makes that reference.  I could

16  be wrong, and I would be --

17      MR. HARTMAN:  I indicated both.

18      MR. ROBINSON:  Right.  And that makes -- that's

19  what made it compound.  So if he answered it, yes,

20  then you have an answer for the purchasing

21  documents when, in fact, it's not true.  The manual

22  itself, I believe I know what you're talking about.

23  BY MR. HARTMAN:

24      Q.    I'm going to show you Exhibit No. 2, is

1  this a true and correct copy of the manual that

2  would have accompanied the 70-6 brake press that

3  was involved in Tina Lindquist's accident?

4       A.    It appears to be --

5       Q.    Okay.

6       A.    -- a copy of that.

7       Q.    Does this same manual accompany the brake

8  presses?

9       A.    Yes.

10      Q.    Okay.  Does Heim have originals of this

11 manual?

12      A.    Original?

13      Q.    Well, since it still sells the brake

14 presses, does it still have the originals, this is

15 a copy?

16      A.    Yes.

17      MR. HARTMAN:  Would you please supply me an

18 original of this manual?

19      MR. ROBINSON:  A current one?  Just so you

20 don't think I'm being difficult here, you had

21 mentioned that some of the distributors identified

22 in the particular manual that we have relative to

23 this case are not legible in the copying.  And I'm

24 saying if you ask for a current manual that

1    accompanies a present sale, there may be different

2    distributors, some of which may have gone out of

3    business previously.  I don't know that, I'm just

4    saying that's a little different request than you

5    made to me off the record.  I'm glad to give you

6    one or both, I just want to make sure I understand

7    your request.

8        THE WITNESS:  If you don't mind --

9        MR. ROBINSON:  Please, please.

10       THE WITNESS:  They're all copies.  They're not

11   original documents.  I hope I'm explaining that

12   correctly.

13   BY MR. HARTMAN:

14       Q.   What I want to do is be able to see the

15   actual photos utilized -- see real photos that are

16   photocopied in this and see the distributors for

17   the different -- that Heim indicates in here that

18   are blacked out on mine?

19       MR. ROBINSON:  Yeah.  And my point is are you

20   asking for those that were listed in 1978?

21       MR. HARTMAN:  Yes.

22       MR. ROBINSON:  That was different than what you

23   just asked him for.

24

1  BY MR. HARTMAN:

2      Q.   Okay.  Well, has this manual changed since

3  1970?

4      A.   Yes.

5      Q.   In what ways?

6      A.   I would say it would change in probably

7  the control panel, which is changed somewhat today.

8      Q.   In the control panel?

9      A.   Yes.

10     Q.   Would changes in the control panel relate

11 to point of operation protection?

12     MR. ROBINSON:  I'll object to the form of the

13 question.  I don't know what you mean when you say

14 relate to.

15     THE WITNESS:  Let me answer the question as

16 when I'm referring to the control panel, it's the

17 operation for the functions of the press or for the

18 actuation its monitoring its lubrication and things

19 like that.

20 BY MR. HARTMAN:

21     Q.   Those things have changed with regard to

22 brake presses manufactured by Heim?

23     A.   Only in the -- only in that the we no

24 longer relay logic as opposed to solid state logic

1    today which is the current technology that's out

2    there today.

3        Q.    So the new brake presses have upgraded

4    electronics?

5        A.    Correct.

6        Q.    That would be the only change as it

7    relates to brake presses from the beginning when

8    Heim first started making brake presses to now, am

9    I correct?

10       A.    Correct.

11       Q.    If a customer called and wanted a manual

12   that relates to the 70-6 brake press, am I correct

13   that Heim would have that available for the

14   customer?

15       A.    Yes.

16       MR. HARTMAN:    I would like an original one of

17   those, please.

18       THE WITNESS:    Let me explain a little further.

19   I'm not quite sure when we say original because

20   this is what you would probably receive.

21   BY MR. HARTMAN:

22       Q.    Is there one with the actual pictures?

23       A.    Not that I'm aware of.  You're looking --

24   if you're looking for --

1      Q.    Pictures?

2      A.    -- the actual diagrams and the actual

3   photos like this?

4      Q.    Yeah.

5      A.    I don't believe I -- I've never seen them.

6      Q.    Would you check and see if there's one

7   that is clearer than what we've been provided?

8      A.    Clearer?

9      MR. ROBINSON:  We can check.  We'd be glad to

10  do that.

11     THE WITNESS:  My understanding is you're

12  looking for if we have the actual photo instead of

13  this reproduction copy ?

14     MR. ROBINSON:  Mr. Hartman had asked me this

15  before the deposition began and I said I would look

16  for that and we would produce that if we had it

17  available.

18     THE WITNESS:  Right.

19  BY MR. HARTMAN:

20     Q.    Other than incorporating a foot pedal or a

21  two palm switch in the period of 1970 to 1980, did

22  Heim undertake to provide any other type of point

23  of operation protection with regard to brake

24  presses?

```
 1        MR. ROBINSON:  I'll object to the form of that

 2    question.

 3    BY MR. HARTMAN:

 4        Q.   Okay.

 5        A.   Can I ask you to be a little bit more

 6    clearer on the question -- could you restate it for

 7    me again, please?

 8        Q.   Okay.  Generally -- let's talk about in a

 9    generic sense.

10        A.   Okay.

11        Q.   When OSHA and ANSI talk about point of

12    operation protection, do you understand what that

13    is?

14        A.   Yes.

15        Q.   Tell me what your understanding of point

16    of operation protection is?

17        A.   I believe point of operation guarding and

18    protection is responsible to the end user and it is

19    for prevention of any part going into a particular

20    dye space of a press or open spot of a press.

21        MR. ROBINSON:  I think what you were asking,

22    Mr. Hartman, goes back to where we started a little

23    while ago asking Mr. Mase to go through what he

24    found when he researched this 1970, 1980.  And I
```

 1  think if the question is did you find any sales

 2  files that noted the supplying of any, I think as

 3  you've pointed out, other point of operation safety

 4  devices besides a foot switch or a two palm button

 5  switch, Mr. Mase will be able to answer that

 6  question.

 7  BY MR. HARTMAN:

 8      Q.    Would you please do that?

 9      A.    Yes.

10            I had pulled the files approximately from

11  serial number 260 to 2600 which --

12      Q.    What was that, 260?

13      A.    Serial number 260 to 2600, which would be

14  consecutive serial numbers for Heim products from

15  the year I'd say roughly 1970 through 1980.  And I

16  did not see in those files that we ever provided

17  point of operation sensing devices such as a light

18  curtain or pull back or --

19      Q.    I think -- pardon me but I may be correct

20  your misstatement.  I think there's a difference

21  between sensing devices, point of operation

22  protection sensing devices and pull back switches.

23      MR. ROBINSON:  He didn't say that -- I object

24  to that comment about his misstatement.  He did not

```
 1   say that they were the same.

 2      MR. HARTMAN:  Read back his statement if you

 3   could, please.  I think he did misstate it.  I was

 4   trying to correct.

 5      MR. ROBINSON:  Maybe my hearing did not allow

 6   me to hear it.  Let's hear that -- let's read back.

 7   Okay.  If that's the way --

 8                     (Record read as requested.)

 9   BY MR. HARTMAN:

10      Q.   I was correct, every once in a while I get

11   to tell your attorney I was right and he was wrong.

12      MR. ROBINSON:  And Mr. Hartman was correct.

13   BY MR. HARTMAN:

14      Q.   It's my understanding that presence

15   sensing devices detect the presence of an operator

16   in proximity to throw the machine and shut down the

17   machine and pull backs pull the operator's hands

18   away from the machine as the ram comes down, am I

19   correct?

20      A.   Correct.

21      Q.   So a presence sensing device -- strike

22   that.

23           A pull back is not a presence sensing

24   device?
```

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

1     A.   Correct.

2     Q.   In looking at the ANSI standard for the

3 1970s, that govern the 1970s, I note that it talks

4 about presence sensing devices, are you aware of

5 that?

6     MR. ROBINSON:  I'll object to the form of the

7 question.

8     THE WITNESS:  I haven't read it in there

9 specific, but I believe I'm aware of that.

10 BY MR.  HARTMAN:

11     Q.   In the '70s what type of presence sensing

12 devices was Heim aware of?

13     A.   I do not know since I was not at the

14 company at the time.

15     MR. HARTMAN:  Paul, he's pointed to talk about

16 this point of time, and if he doesn't have it.

17     MR. ROBINSON:  I don't know if there's anyone

18 that can answer your questions since the press

19 brake was built that long ago we've produced to you

20 in person with one of the longest periods at Heim

21 that has information on, I believe, all of your

22 areas of designation.  I don't know what else I can

23 say.

24

1 | BY MR. HARTMAN:

2 |   Q.   Okay.  So Heim does not know whether it

3 | was aware of presence sensing devices in the 1970s;

4 | is that correct?

5 |   MR. ROBINSON:  I'll object to the form of the

6 | question.  He's just indicated he can't speak on

7 | behalf of Heim on that issue because he wasn't

8 | employed there in throughout the '70s.  So I think

9 | that's an unfair question to ask.

10 |   MR. HARTMAN:  I understand -- my position is,

11 | Paul, that we're specifically limited to the period

12 | of 1970 to '80 with regard to written discovery

13 | requests.  I've asked to have Heim designate

14 | somebody to testify regarding this particular

15 | machine and what standards applied.  The

16 | interrogatories indicate that the ANSI standard

17 | applied to this particular press brake.  And I'm

18 | asking the corporate designee who is, in fact, the

19 | person that Heim has chosen to talk about this as

20 | to what Heim knew in the '70s.

21 |   MR. ROBINSON:  You didn't actually ask that

22 | question.  You can ask Mr. Mase if he's aware of

23 | anyone that would have information on it.  I think

24 | your question is very misleading because the

1    presence sensing sections of ANSI refer to employer

2    responsibility.  So I think that's very misleading

3    the way you've couched that question.  We've

4    produced someone that has the most information.  If

5    you ever want to question the decision making

6    behind producing Mr. Mase who has been offered in

7    response to your request for a deposition, you can

8    do that.  We can try to find out if there's someone

9    on a specific issue that might have more

10   information to you that is relevant.  And I'll be

11   glad to work with you on that.

12   BY MR. HARTMAN:

13      Q.   ANSI refers to presence sensing devices?

14      A.   Yeah.

15      Q.   They refer to it in the 1972 edition of

16   the ANSI standard that Heim indicated applies to

17   the press brake at issue, are you aware of that?

18      MR. ROBINSON:  I'll object -- you need to

19   listen to his question because it's not a 1972

20   standard, it's a 1973 standard, and it refers to

21   the employer responsibilities.  I'm just

22   cautioning.  I'm objecting to the form of the

23   question.

24

1  BY MR. HARTMAN:

2      Q.    With -- what year was the ANSI standard

3  adopted that applied to the press brake that's

4  involved in this case?

5      A.    I believe ANSI standards were adopted in

6  1972.

7      Q.    Okay.  In 1972 the ANSI standard, when it

8  talks about safety devices for the point of

9  operation protection, refers to presence sensing

10  devices, are you aware of that?

11     A.    Yes.

12     Q.    Does Heim have knowledge as to what type

13  of presence sensing devices were available for

14  point of operation protection for this machine?

15     MR. ROBINSON:  I'll object to the form of the

16  question.  Again, if you can answer, Mr. Mase,

17  please go ahead.  I have a problem with the way the

18  question is phrased.

19     THE WITNESS:  I believe there was knowledge of

20  presence sensing devices.

21  BY MR. HARTMAN:

22     Q.    What type of presence sensing devices were

23  available in 1973 through 1978?

24     MR. ROBINSON:  I'll object to the form of the

1    question in that you're including a 7 year --

2    excuse me, a 5-year period of time.  But again, if

3    you can answer the question from 1973, '74, '75,

4    '76, '77, '78.

5    BY MR. HARTMAN:

6        Q.    Any type of presence sensing device that

7    was available at any time during that period.

8        A.    I believe the presence sensing devices

9    were probably light curtains.

10       Q.    Are you aware of any type of

11   radiofrequency presence sensing devices in the

12   period of 1973 to 1978?

13       A.    I'm not familiar with radio -- I'm not

14   familiar with it.

15       Q.    Okay.  Are you aware of any type of

16   presence sensing mats that were available during

17   that period of time?

18       A.    No.

19       Q.    Okay.  So the presence sensing devices

20   that you were aware of in the period of '73 to '78

21   would have been light curtains?

22       A.    Yes.

23       Q.    Do you know of any -- who manufactured

24   light curtains back then or is that too far for you

1    to go back?

2        A.    I believe there was some manufacturers of

3    light curtains that I was familiar with.

4        Q.    And who were they?

5        A.    I believe they would have been, Link would

6    have been one.  Dolanjenner might have been another

7    one.

8        Q.    Would you say that?

9        A.    Dolanjenner.

10        Q.    Spell that.

11        A.    D-o-l-a-n-j-e-n-n-e-r, Sick, S-i-c-k.

12    Those are a couple that come to mind.

13        Q.    Would you agree that light curtain

14    technology was available for point of operation

15    protection for -- since the 1960s?

16        MR. ROBINSON:  I'll object to the form of the

17    question.

18        THE WITNESS:  I don't know that.

19    BY MR. HARTMAN:

20        Q.    Okay.  You would agree it was available in

21    the '70s?

22        MR. ROBINSON:  I will object to the form of the

23    question.

24        THE WITNESS:  I believe it was.

```
 1   BY MR. HARTMAN:

 2        Q.    Okay.   In your -- in the job you held

 3   prior to your coming to work at Heim, were you

 4   involved in the sale of machines with light

 5   curtains?

 6        MR. ROBINSON:   Say that question again, I'm

 7   sorry.

 8   BY MR. HARTMAN:

 9        Q.    Prior to 1984 were you involved in the

10   sale of machines with light curtains?

11        MR. ROBINSON:   I'll object to the form of the

12   question.   With any employer?

13        MR. HARTMAN:   Yes.

14        MR. ROBINSON:   With any machine?

15        MR. HARTMAN:   We'll find out what after?

16        MR. ROBINSON:   I'm just making sure that the

17   Court is appreciable of my objection to the form of

18   that question.

19        THE WITNESS:   I can't specifically think of a

20   particular case where I was involved with a sale of

21   a particular light curtain in that time frame.   It

22   doesn't come to mind.

23   BY MR. HARTMAN:

24        Q.    Would you agree that while you work with
```

1   Clearing you were aware that light curtains could

2   be utilized for point of operation protection?

3       A.   Yes.

4       Q.   Would you agree that in the period of 1970

5   to 1978 that you had seen light curtains in use for

6   point of operation protection?

7       MR. ROBINSON:   I'll object to the form of the

8   question.

9       THE WITNESS:   I believe I saw light curtains,

10  yes.

11  BY MR. HARTMAN:

12      Q.   And would you agree that a light curtain

13  would provide point of operation protection on a

14  press brake?

15      MR. ROBINSON:   Object to the form of the

16  question.

17      THE WITNESS:   Yes, I believe that is true.

18  BY MR. HARTMAN:

19      Q.   And that would be the period of 1970 and

20  1978?

21      A.   Yes.

22      Q.   Does Heim take the position with regard to

23  its manufacturer and sale of press brakes that it's

24  the end user's responsibility to provide point of

1    operation protection?

2         A.    Yes.

3         Q.    Is that why Heim does not provide light

4    curtains as a standard feature to its press brakes?

5         MR. ROBINSON:    I'll object to the form of that

6    question.  If you could answer it, please do.

7         THE WITNESS:    Restate the question again.

8    BY MR. HARTMAN:

9         Q.    Is that why Heim does not provide light

10   curtains as a standard feature with its press

11   brake?

12        A.    We do not provide point of operation of

13   light curtains, no, we do not.

14        Q.    That's why you don't put the light curtain

15   on the press brake as a standard feature?

16        MR. ROBINSON:    What is?

17   BY MR. HARTMAN:

18        Q.    Because you believe it's the employer's

19   responsibility to provide point of operation

20   protection?

21        A.    That's correct.

22        Q.    If you did not believe it was the

23   employer's responsibility with regard to point of

24   operation protection to provide it, could Heim

1    supply as a standard feature light curtains with

2    its press brakes?

3        MR. ROBINSON:   Object to the form of the

4    question.

5        THE WITNESS:   It's kind of vague, I think.

6    It's a general purpose machine tool, couldn't mount

7    it without knowing all the information involved

8    with the product that the customer was producing.

9    BY MR. HARTMAN:

10        Q.    Why could you not mount the light curtain

11    on the press brake without knowing the type of

12    product the customer was producing?

13        A.    To provide for the safety of the operator

14    there has to be a certain distance to braking the

15    beam to stop the press.  Without knowing all of

16    that information as to the dye, where its location

17    with the product and how fast it's going to run,

18    what type of circumstances were involved in a

19    product, you couldn't ascertain that to do what I

20    think provide adequate safety for mounting the

21    light curtain.

22        Q.    If Heim could ascertain the safe place to

23    mount the light curtain on the press brake and it

24    believed it was its responsibility to provide point

 1  of operation protection, could Heim supply the

 2  light curtain as a standard feature to its press

 3  brakes?

 4      MR. ROBINSON:  Yeah, I'll object the form of

 5  that question and instruct the witness not to

 6  answer.  It's too general.  It's too vague, too

 7  many variables involved.  And I think it's an

 8  attempt to mislead the witness and potentially the

 9  Court.

10  BY MR. HARTMAN:

11      Q.   What keeps Heim from providing a light

12  curtain as a standard feature on its press brake?

13      MR. ROBINSON:  I'll object, it's been asked and

14  answered.  He's just indicated a number of reasons

15  why it would not be safe for Heim to supply the

16  light curtains on its press brakes without knowing

17  the applications, the size of the dyes, everything

18  that the witness has just indicated.  He's already

19  answered that question.

20  BY MR. HARTMAN:

21      Q.   Well, you've answered it, I don't know if

22  you've answered everything to your knowledge as to

23  why you would not provide a point of operation

24  protection light curtain as a standard feature on a

1    press brake.

2           Would you please tell me, my question is,

3    sir, tell me the specific reasons why Heim did not

4    provide a light curtain on the model 70-6 for point

5    of operation protection?

6       MR. ROBINSON:  Beyond what he's already told

7    you?

8       MR. HARTMAN:  No I want to know his reasons

9    specifically.  Explain detail about two reasons,

10   one is he says Heim believes it's the customer's

11   responsibility.  And two, Heim doesn't know where

12   to mount the light curtain.

13      MR. ROBINSON:  No, I disagree.  Go ahead.

14      MR. HARTMAN:  Can I please --

15      MR. ROBINSON:  I thought you were finished.

16      MR. HARTMAN:  You can read back everything

17   said.  And the reason Heim doesn't know where to

18   mount the light curtain is because it doesn't know

19   the pieces and the speed, et cetera.

20      MR. ROBINSON:  Right.  That's the part --

21      MR. HARTMAN:  Various factors, but it comes

22   down to Heim doesn't know where to mount the light

23   curtain to provide safety to the operator?

24      MR. ROBINSON:  That may be your position.

1    BY MR. HARTMAN:

2        Q.    Well, then explain to me the specific

3    reasons why Heim did not provide a light curtain on

4    the model 70-6?

5        MR. ROBINSON:    Objection, asked and answered.

6    Mr. Mase, you can repeat or add whatever you want

7    to do, but it has been asked and answered very

8    clearly.

9        THE WITNESS:    I don't mind answering it.

10        MR. ROBINSON:    Pardon me?

11        THE WITNESS:    I don't mind answering it.

12        MR. ROBINSON:    Please do.

13        THE WITNESS:    Because of the various operations

14    that we have no knowledge of and applications could

15    be as -- go into hundreds of thousands of different

16    types of applications, we would never know which

17    specific application would be used on that press.

18    So we would never be in a position to really

19    provide point of operation guarding for an end

20    user.    There's just way too many variables.

21    BY MR. HARTMAN:

22        Q.    Variables deal with application?

23        A.    Correct.

24        Q.    Anything else?

1      MR. ROBINSON:  Objection, asked and answered on

2   a number of occasions.

3      MR. HARTMAN:  I don't think it has been.

4      MR. ROBINSON:  Well, that's okay, the record is

5   clear.  And Mr. Mase is going to answer your

6   questions a number of times until we get to a

7   number that we're comfortable telling him that he's

8   answered enough.  So you can keep going through

9   this.  Go ahead, please.

10     THE WITNESS:  We build a general purpose

11  machine.  It can do numerous types of applications

12  that we would not have privy of information to.

13  The press that we provide there has to be other

14  items added to the machine for it to perform a

15  function.  And we have no idea what that would be.

16  BY MR. HARTMAN:

17     Q.   What type of items?

18     MR. ROBINSON:  I'm sorry.

19  BY MR. HARTMAN:

20     Q.   What type of items would be added to --

21  give me a general idea of what type of items are

22  added to the machine to make it function?

23     A.   You would need a dye.

24     Q.   But the dye is located under the ram, am I

1    correct?

2        A.    Presumably.

3        Q.    The dye is not located outside of the ram,

4    is it?

5        A.    I do not know.  It could.  Anything's

6    possible.  I mean, in these type of -- this is the

7    point, we don't know.  As much as your mind can

8    comprehend is a possibility for an application.

9        Q.    With regard to the 70-6 press brake, is it

10   Heim's position that it could -- that it knew that

11   the foot pedal would be the only form of point of

12   operation protection that would be utilized in

13   certain operations of the press brake?

14       MR. ROBINSON:  I'll object to the form of the

15   question.

16       THE WITNESS:  I believe they knew that it was a

17   form of actuation of the machine, but not

18   necessarily a point of operation safety.

19   BY MR. HARTMAN:

20       Q.    Sir, earlier you testified that the two

21   types of point of operation protection that were

22   available for press brakes were the foot pedal and

23   the two palm switch, that's why I'm using the term

24   foot pedal and point of operation protection.

1       MR. ROBINSON:  That statement has nothing to do

2  with his answer that he just gave you that you

3  appear to be dissatisfied with.  He's indicated

4  that Heim would certainly know when a foot pedal is

5  sold, that it could be used as a means of

6  activating it.  But he is -- that Heim would not

7  believe that that is the only means of activation

8  or that there would not be some point of operation

9  safety device.

10      MR. HARTMAN:  He never said that, Paul, you're

11  putting words in his mouth.  You're putting words

12  in his mouth.

13      MR. ROBINSON:  Read back his last answer,

14  please.

15                    (Record read as requested.)

16      MR. HARTMAN:  Your statement of what he said

17  that he said that each machine had two types of

18  actuation, which would be a two palm switch and a

19  foot pedal, that's what I was disagreeing with that

20  he did not say.

21      MR. ROBINSON:  I don't follow where you're

22  going, but I guess you should ask the next

23  question.

24

1  BY MR. HARTMAN:

2      Q.    Does the foot pedal provide point of

3  operation protection to the operator?

4      MR. ROBINSON:   Object to the form of the

5  question.

6      THE WITNESS:   No.

7  BY MR. HARTMAN:

8      Q.    Is the foot pedal designed to provide a

9  form of foot operation protection to the -- is the

10  foot pedal designed to provide a form of operation

11  protection -- operator protection at the point of

12  operation?

13      MR. ROBINSON:   I'll object to the form of the

14  question.

15      THE WITNESS:   I would answer that in a sense

16  that's means of activation of the machine.

17  BY MR. HARTMAN:

18      Q.    So the foot pedal did is designed so you

19  don't have inadvertent activation?

20      A.    Correct.

21      Q.    In the manual that we have identified as

22  Exhibit No. 2 on Page 19, it says, foot pedal

23  control, and it states, the manual says that a foot

24  pedal control is furnished as standard equipment on

1  all Heim press brakes.  Is this an accurate

2  statement?

3     MR. ROBINSON:  Was it accurate back in 1978, is

4  that what you're asking?

5  BY MR. HARTMAN:

6     Q.   Yes.

7     A.   I believe so.

8     Q.   And am I correct that Heim --

9     MR. ROBINSON:  Were you going read the rest of

10  it?

11    MR. HARTMAN:  Not right now I wasn't.

12    MR. ROBINSON:  I just want to make sure, you've

13  left off the next two sentences which directly

14  relate to your prior question.  It is on a long

15  cord and can be moved around into the -- let me

16  finish this for the Court.

17    MR. HARTMAN:  I'm going to ask my questions.

18    MR. ROBINSON:  Mr. Hartman.

19    MR. HARTMAN:  You keep interrupting.

20    MR. ROBINSON:  Mr. Hartman just ripped the

21  money annual out of my hands.  I'd like to finish

22  reading --

23    MR. HARTMAN:  It's my manual.

24    MR. ROBINSON:  -- finish reading into the

1   record for the Court because I object to what

2   you're doing -- may I have the manual back so this

3   I can read it back then.

4       MR. HARTMAN:  I'm working on my questions.

5       MR. ROBINSON:  I'm going to get my own copy and

6   we'll finish reading it in for the Court so that

7   the Court can understand what type of misleading

8   technique is being used in this deposition.

9       MR. HARTMAN:  Yeah, Paul.

10      MR. ROBINSON:  What page was that?

11      MR. HARTMAN:  18.

12      MR. ROBINSON:  Is there any reason why you're

13  not giving me Exhibit D to read this -- or

14  Exhibit --

15      MR. HARTMAN:  2.

16      MR. ROBINSON:  Exhibit 2 to read this.  Is

17  there a reason why you're engaging that type of

18  child-like behavior ripping it out of my hand?  If

19  you rip another piece of paper out of my hand,

20  Mr. Hartman, we're going to complete the deposition

21  and you're going to have some other issues to deal

22  with.

23      MR. HARTMAN:  Be my guest.

24      MR. ROBINSON:  Just to complete the reading of

1    the partial reference that Mr. Hartman was

2    referencing, it says -- after it says, a foot pedal

3    control is furnished as standard equipment on all

4    Heim press brakes.  It then goes on to say it is on

5    a long cord and can be moved around to the safest

6    and most convenient place for the operator.  It has

7    a cover guard over the top of it to prevent an

8    object from falling on it and activating the press

9    or an accidental stepping on it.

10            I regret that Mr. Hartman does not have a

11   professional capacity to let me read out of the

12   particular exhibit that's being used.  I have used

13   my copy so that we can let the Court know the

14   misleading nature of these questions.

15       MR. HARTMAN:  What's misleading?

16       MR. ROBINSON:  Please continue to ask these

17   questions.  I can see -- I'm not going to engage in

18   a conversation like this.

19   BY MR. HARTMAN:

20       Q.   Sir, was there anything misleading about

21   my question?

22       MR. ROBINSON:  Objection.  Don't answer the

23   question.

24

1    BY MR. HARTMAN:

2        Q.    Did I accurately state what the manual

3    said as it relates to the foot pedal being standard

4    equipment?

5        A.    You read the statement out of the manual,

6    yes.

7        Q.    Did I accurately repeat your statement in

8    the beginning of this deposition when I asked the

9    point of operation protection where you said there

10   were two types of point of operation protection

11   provided, one was the foot pedal and one was the

12   two palm switch?

13       A.    Correct.

14       Q.    You said that?

15       A.    Yes.

16       Q.    I didn't misstate anything, did I?

17       A.    No.

18       Q.    And did I accurately state that with

19   regard to the foot pedal switch that when you're

20   referring to point of operation protection you're

21   talking about a means to activate the machine, but

22   the foot pedal switch protects against inadvertent

23   activation?

24       A.    Correct.

1      Q.   So I haven't misstated anything to you

2   with regard to the foot pedal, have I?

3      A.   I don't believe so.

4      Q.   And I've accurately throughout this

5   repeated what your testimony was as it relates to

6   the foot pedal switch, am I correct?

7      A.   Correct.

8      Q.   Sir, when you talk about Heim's reasons

9   for not putting point of operation protection on

10  the press brake in the 1970s, you don't know why

11  Heim did not provide point of operation protection

12  in the 1970s, do you?

13     MR. ROBINSON:   I'll object to the form of the

14  question.   He's already answered that questioned

15  and given you a number of reasons why the

16  manufacturer does not provide point of operation

17  safety devices.   Other than what he's indicated.

18  BY MR. HARTMAN:

19     Q.   Sir, have you discussed with anyone at

20  Heim why they did not put light curtains on the

21  press brakes for the 1970s?

22     A.   I don't know.

23     Q.   You did not?

24     A.   I did not.

1      Q.    Did you work for Heim in the 1970s?

2      A.    No.

3      Q.    Okay.  Did you talk to any representative

4  of Heim who told you they had knowledge as to why

5  they did not put light curtains on press brakes for

6  the 1970s?

7      A.    No.

8      Q.    So the reason you say Heim did not put

9  press brakes -- strike that.

10          The reason why you have indicated that

11 Heim did not put light curtains as point of

12 operation protection on its press brakes in the

13 1970s, are your reasons, not Heim's reasons, am I

14 correct?

15     MR. ROBINSON:  I'll object to the form of the

16 question.  They may also be Heim's reasons.

17 BY MR. HARTMAN:

18     Q.    Are they your reasons or are they Heim's

19 reasons?

20     A.    They're my reasons.

21     Q.    You can't testify today as to Heim's

22 reasons for not putting light curtains on press

23 brakes for the 1970s, am I correct?

24     A.    Only in the sense I wasn't employed there

1    at the time.

2        Q.    So you don't know what Heim's reasons

3    were?

4        A.    Correct.

5        Q.    Now, if a customer -- am I correct that

6    Heim has made approximately 50,000 different types

7    of presses and press brakes total?

8        A.    Under the umbrella of Heim, yes.

9        Q.    Okay.

10        A.    To expand on that statement there has been

11    approximately, I would estimate, maybe 15,000 under

12    the brand name Heim.

13        Q.    And how many -- what is the brand name for

14    the other 35,000?

15        A.    Roselle.

16        Q.    Would it be fair that Heim owns Heim and

17    Roselle?

18        A.    Yes.

19        Q.    It's just a different brand name?

20        A.    Yes.

21        MR. ROBINSON:    I'll on object to the form of

22    the question.    Heim Group is what is used to

23    designate both the Heim L.P. separate entity and

24    the Roselle, I'm not sure if it's L.P. or Corp or

 1  what it is.  So it depends how you're using Heim.

 2  BY MR. HARTMAN:

 3      Q.    Okay.  I guess that's a fair question.

 4            I've got to figure out who I sue in this

 5  case .

 6      MR. ROBINSON:  We worked this out in the

 7  beginning, I think you included Heim Group and I

 8  told you this particular group is Heim L.P.

 9      MR. HARTMAN:  Heim L.P. is a different

10  corporation than Heim Group.

11      MR. ROBINSON:  Heim Group from my

12  understanding, you can correct me if I'm wrong, is

13  not a corporate entity, it is a trade name used to

14  designate both entities.

15      MR. HARTMAN:  The only reason I'm belaboring

16  this is I need to know how this Roselle relates.

17  Is Roselle just a brand name of Heim L.P.'s

18  machines?

19      MR. ROBINSON:  That's what we've said, no.  Go

20  ahead.

21      THE WITNESS:  Roselle is a trademark name used

22  for presses, only presses for the Roselle product

23  line.

24

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

1    BY MR. HARTMAN:

2        Q.    And that's owned --

3        A.    They're in the press brakes.

4        Q.    And that's owned by Heim L.P.?

5        A.    I believe it is.

6        Q.    And Heim L.P. has 15,000 machines?

7        A.    I believe that's correct.

8        Q.    And of the 15,000 machines do you have any

9    idea how many are press brakes as opposed to other

10   types of presses?

11       A.    I'd have to estimate.

12       Q.    Can give me an estimate?

13       A.    A rough estimate, 1,000.

14       Q.    Am I correct that the life expectancy of a

15   press brake is 100 years or so, they just don't

16   break, am I correct?

17       MR. ROBINSON:    I'll object to the form of the

18   question.  You said they just don't break.  You're

19   saying they don't break in a 100 years.

20   BY MR. HARTMAN:

21       Q.    I'm sorry.  These machines -- would you

22   agree that essentially all of the press brakes that

23   Heim has made are still in use today?

24       A.    I don't know that.

1    Q.    Would you have any idea?

2    A.    They have a long life expectancy.

3    Q.    What would be the life expectancy?

4    MR. ROBINSON:  I'll object to the form of the

5    question.  What circumstance?  In what application?

6    I don't think that's a fair question.

7    MR. HARTMAN:  Okay.  That's a difficult

8    question, I agree.

9    MR. ROBINSON:  Just to complete it I don't know

10   what you mean by life expectancy.  I understand

11   that things can be repaired if you own a lot of

12   older cars.  I don't know if that's standard life

13   expectancy if you can repair a product such that it

14   would last for a certain number of years or if

15   you --

16   MR. HARTMAN:  I can get what I need in another

17   way.

18   MR. ROBINSON:  Okay.

19   BY MR. HARTMAN:

20   Q.    Would it be a fair statement that Heim

21   still services all of the press brakes its

22   manufactured?

23   MR. ROBINSON:  All of them?

24   MR. HARTMAN:  Yes.

1        THE WITNESS:  All -- it's a mature product, I

2    don't believe all of them are in existence today.

3        MR. ROBINSON:  I don't know what you mean by

4    servicing them.

5    BY MR. HARTMAN:

6        Q.    What I mean by servicing, if somebody

7    called and had a 70-6 that was made in the '60s,

8    '70s, '80s, '90s, they could still get replacement

9    parts for it, you still have the technical journals

10   for it, you still have the manuals for it, am I

11   correct?

12       A.    Yes.

13       Q.    So what I mean is that you're still able

14   to provide all the support for all of the press

15   brakes you've manufactured, am I correct?

16       A.    Yes.

17       Q.    So with regard to the foot pedal, if

18   someone lost the foot pedal, they would be able to

19   contact you and order a replacement foot pedal?

20       A.    It's available.

21       Q.    And would you agree that a foot pedal that

22   was used in 1967 when they were first made is

23   similar to the foot pedal that's used today?

24       MR. ROBINSON:  I'll object to the form of the

1   question.  Similar in what way, that it's activated

2   by pushing down on a level with your foot or

3   another in other features?

4   BY MR. HARTMAN:

5       Q.   Is there any additional safety feature in

6   the foot pedals manufactured today that was not in

7   place in 1978?

8       A.   I believe so.

9       Q.   And what would that be?

10      A.   And I believe there's a kick plate today.

11      Q.   What's a kick plate?

12      A.   It's a device so you can't accidentally

13  just step on the pedal that, you have to lift a

14  plate to get your foot in.

15      Q.   And when did Heim start making the kick

16  plate?

17      A.   We don't manufacture the kick plate.

18      Q.   Who manufactures them?

19      A.   I don't know specifically who the -- it's

20  a commercial available item.

21      MR. ROBINSON:  Are we talking about presently

22  or back in '78?

23      MR. HARTMAN:  I'm going to work my way back.

24      MR. ROBINSON:  What were you asking about?

1  BY MR. HARTMAN:

2      Q.   Well, now who manufactures the foot pedal?

3      A.   We do not manufacture the foot pedal, it's

4  a purchasing.

5      Q.   I think you said earlier that it was a

6  commodity?

7      A.   Commercially available item.

8      Q.   Has your vendor changed since 1978 as to

9  who provides your foot pedals?

10     A.   I don't know the answer to that question.

11     Q.   Would that information be available?

12     A.   I believe it would be.

13     Q.   Would there be foot pedals available of

14  the style that were made in -- that were

15  accompanied in 1978, brake press?

16     MR. ROBINSON:  I'll object to the form.  I

17  don't understand the question.

18     THE WITNESS:  They would be similar.

19  BY MR. HARTMAN:

20     Q.   Yes?

21     A.   Yes.

22     Q.   Meaning it doesn't have a kick plate?

23     A.   It would be similar for that version, yes.

24     Q.   Right.  The foot pedals that were

1    available until '78 that accompanied the machine

2    Ms. Lindquist was involved in according to the

3    picture does not have a kick plate?

4        A.    Correct.

5        Q.    What protects the operator from

6    inadvertent actuation is the cover, am I correct?

7        A.    The shield, yes.

8        Q.    Is there anything inside the pedal once

9    you stick your foot in that prevents the operator

10   from inadvertently activating the machine?

11       MR. ROBINSON:  Which one are we talking about.

12       MR. HARTMAN:  The 70-6.

13       MR. ROBINSON:  The 1978 foot pedal.

14       MR. HARTMAN:  Correct.

15       MR. ROBINSON:  All right.  If you know.

16       THE WITNESS:  I don't believe there's anything

17   else in there.  It's a shielded cover.

18   BY MR. HARTMAN:

19       Q.    The shield covers it so you don't step on

20   it so you just slide your foot in, push down and it

21   activates the machine, correct?

22       A.    I believe that's correct.

23       Q.    And back then those foot pedals were again

24   a commodity, you can buy just about any type of

94

1    food pedal that had a shield and hook it up to the

2    Heim press, am I correct?

3         A.    I believe that's the case, yes.

4         Q.    Do you know why the foot pedal has changed

5    to where there's a kick plate?

6         A.    Additional product safety.

7         Q.    And does Heim agree that it does provide

8    additional product safety?

9         A.    I believe it does.

10        Q.    Okay.  Do you know what no hands and dye

11   means?

12        A.    Yes.

13        Q.    Okay.  Am I correct it's a procedure for

14   safeguarding the operator from inadvertent injury

15   at the point of operation?

16        A.    Correct.

17        Q.    In 1978 did Heim practice and promote the

18   no hands and dye method of operator protection?

19        A.    Yes.

20        MR. ROBINSON:    I'll object to the form of the

21   question.

22   BY MR. HARTMAN:

23        Q.    Okay.  The no hands and dye method of

24   operator protection is evidenced in the warnings on

1    the machine, am I correct?

2         A.    Yes.

3         Q.    And in the warnings in the manual, am I

4    correct?

5         A.    Yes.

6         Q.    What studies did Heim do to ascertain

7    whether or not the no hands and dye method was a

8    viable method to protect the operator from point of

9    operation protection?

10        MR. ROBINSON:   I'll object to the form of the

11   question.   This is what I was going on in the last

12   question.   The question as asked gives the

13   impression that it is the only point of operation

14   or the only safety device that would be available

15   to an operator using a model 70-6 in 1978.  And I

16   think that's misleading.

17   BY MR. HARTMAN:

18        Q.    Okay.   Other than the no hands and dye

19   method of operator protection on the 70-6 press

20   brake, did Heim provide any type -- any additional

21   type of point of operation protection with regard

22   to that particular press brake in '78?

23        MR. ROBINSON:   And I'll object to the form of

24   the question.   The point of operation safety device

1  can be interpreted in a number of ways.  And I

2  think the witness has already referenced other --

3  well, I leave it at that.

4  BY MR. HARTMAN:

5      Q.    Again, sir, my question is, other than the

6  no hands and dye method of point of operation

7  protection, did Heim provide any other mechanism

8  for point of operation protection with the model

9  70-6 press brake that was involved in this lawsuit?

10     MR. ROBINSON:  Same objection.

11     THE WITNESS:  Other than the foot switch and

12  the palm button station, no.

13  BY MR. HARTMAN:

14     Q.    Sir, the sales records I have, it's I

15  believe agreed upon by Mr. Robinson and myself, one

16  of the few things we agree on, is that a two palm

17  switch did not accompany this machine at the time

18  of the original sale.  Do you agree or disagree

19  with that statement?

20     A.    The file indicates a palm button station

21  was not furnished.

22     MR. ROBINSON:  I think your last question said

23  70-6.

24     MR. HARTMAN:  That was involved in this.

1      MR. ROBINSON:  I didn't catch that.  And

2    perhaps he was referencing it, we all know it was

3    available to the user here -- I shouldn't say the

4    user, the employer and therefore the user.

5      MR. HARTMAN:  I mean, there's a whole bunch of

6    things that you're going to want to bring in, and

7    feel free to do so.  I'm going to ask my questions,

8    I'm not trying to mislead you.  I'm trying to find

9    out discrete, distinct things.  Let's go back to

10    the question.

11    BY MR. HARTMAN:

12      Q.    With regard to the 70-6 press brake that

13    Ms. Lindquist was injured on, other than the no

14    hands and dye method of point of operation

15    protection and the foot switch, am I correct that

16    there was no other type of point of operation

17    protection provided with that machine?

18      MR. ROBINSON:  Object to the form.

19      THE WITNESS:  I believe that's correct.

20      MR. HARTMAN:  Would you tell me what problem

21    you have with the form of my question so I can

22    repeat it or ask it.

23      MR. ROBINSON:  I think that your reference to

24    point of operation safety devices is so broad in

1    that Mr. Mase may be thinking of certain things,

2    you may be thinking of things.  I can see a number

3    of other different methods, particularly the length

4    of the cord that's referenced in the manual that

5    you would not permit me to read, particularly the

6    hand tool that accompanied the sale of the press

7    brake may be considered a point of operation safety

8    device by however you're using that phrase.

9    BY MR. HARTMAN:

10        Q.   When we're talking about point of

11    operation protection, what is your understanding of

12    point of operation protection as I use that term?

13        A.   I believe it to be a barrier guard, a

14    light curtain, a pull back restraint or something

15    like that that would provide additional safety to

16    access a dye space as opposed to a palm button

17    station or a foot switch that provides more

18    activation of the press rather than some type of

19    barrier where I can't reach into something.

20        Q.   Your understanding of it and my

21    understanding are the same so that's how I'm

22    referring to it as well.

23        A.   Okay.  Okay.

24        Q.   Sir, am I correct that Heim was aware in

1   1978 when it manufactured the press brake that

2   operators of the press brake may have parts of

3   their body in the dye ram area?

4       MR. ROBINSON:  Object to the form.  What are

5   you asking that it's a possibility?

6       MR. HARTMAN:  That it happens.

7       MR. ROBINSON:  Pardon me?

8       MR. HARTMAN:  That Heim knows it occurs.

9       THE WITNESS:  I would answer that question

10  saying, yes, and that's why we have the sign on the

11  press.

12  BY MR. HARTMAN:

13      Q.  I understand.  But being a manufacturer of

14  press brakes, Heim understands that one of the

15  dangers of the press brake is that operators will

16  have parts of their body or could have parts of

17  their body in the dye area?

18      MR. ROBINSON:  Yeah, objection.  Are you asking

19  if it's possible, if it's possible?

20      MR. HARTMAN:  Yes.

21  BY MR. HARTMAN:

22      Q.  Did you know it was possible?

23      A.  Yes, it's possible.

24      Q.  And did you know that it occurs?

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052