1    MR. ROBINSON:  You're asking him if Heim now

2  that it occurred --

3    MR. HARTMAN:  No, that Heim knows that

4  operators of press brakes get their hands and other

5  body parts caught in the dye area.

6    MR. ROBINSON:  In 1978 when he was not working

7  there, that's what you're asking for?

8    MR. HARTMAN:  He's your designee.

9    MR. ROBINSON:  That has nothing to do with your

10  question.  You're asking if he knows -- you made a

11  big point of indicating on the record that he would

12  not have known Heim's position as to why certain

13  things have occurred because he doesn't work there

14  in the 1970s.  And now you're trying to get

15  information from him on a different issue relative

16  to the 1970s.

17    MR. HARTMAN:  Paul --

18    MR. ROBINSON:  I'm just placing my objection on

19  the record.

20    MR. HARTMAN:  Your objection's noted, but

21  you're the one that appointed the man.

22    MR. ROBINSON:  That has nothing --

23    MR. HARTMAN:  Yes, it does.

24    MR. ROBINSON:  Not with your question and the

101

1  objection.

2  BY MR. HARTMAN:

3      Q.    Okay.  Sir, was it known in the industry

4  in the -- prior to 1978, that operators of press

5  brakes had their hands caught between the dye and

6  the ram area?

7      MR. ROBINSON:  I'll object to the form of the

8  question.

9      THE WITNESS:  I believe that was an awareness.

10 BY MR. HARTMAN:

11     Q.   Well, that's why they invented presence

12 sensing devices and pull back devices and barrier

13 gates, am I correct?

14     MR. ROBINSON:  I'll object and instruct the

15 witness not to answer why some manufacturer may

16 have created those devices.  There's no suggestion

17 that Heim has manufactured those devices and I

18 don't think that's an appropriate question.

19 Instruct the witness not to the answer the

20 question, yes.

21 BY MR. HARTMAN:

22     Q.   Sir, back in 1978 you were aware of

23 presence sensing devices you indicated earlier,

24 correct?

1        A.    Yes.

2        Q.    What was the purpose of a presence sensing

3    devices?

4        MR. ROBINSON:  Objection to the form.

5        THE WITNESS:  I believe the purpose of that is

6    to keep parts, body parts or anything, anything out

7    of the dye area.

8    BY MR. HARTMAN:

9        Q.    Including body parts?

10       A.    Including body parts, yeah.

11       Q.    And with regard to barriers at the point

12   of operation, what was the purpose of a barrier at

13   the point of operation?

14       A.    To keep body parts and foreign objects out

15   of the dye space.

16       Q.    In 1978 what was the purpose of a two hand

17   pull back?

18       A.    To keep -- as the press activated the

19   restraints pulled the operator's arms back away

20   from the ram.

21       Q.    And with regard to the two palm switch

22   control, am I correct that the reason you utilized

23   two hands on the two palm control is so that the

24   operator wouldn't inadvertently have his or her

1    hand in the dye ram area of the press brake, am I

2    correct?

3        A.    That's correct.

4        Q.    Are you aware of what safe distance,

5    safeguarding is?

6        A.    I'm aware of it.

7        Q.    What is that?

8        A.    There is a measurement based upon, I

9    believe, the human motion, which I believe to be 63

10   feet per second, which has to be in conjunction

11   with the ability to stop the press or press back.

12       Q.    You have to keep the operator far enough

13   back so that he or she cannot get -- when they

14   operate the machine can't get their hands in the

15   machine before it cycles or how does that work?

16       MR. ROBINSON:   How does what work.

17       MR. HARTMAN:   The safe distance safeguarding

18   method.

19       THE WITNESS:   In the presence sensing if the

20   light beam was broken, the press has to stop within

21   so many milliseconds to prevent a pinch point.

22   BY MR. HARTMAN:

23       Q.    So when you have a presence sensing

24   device, the presence sensing device has to be far

104

1    enough away from the throat so that when the

2    operator hits the beam it will stop the ram before

3    the operator can get his or her body part into the

4    throat, correct?

5         A.    That's correct.

6         Q.    And all of these devices were being

7    utilized in conjunction with press brakes to

8    protect the operator from inadvertent contact

9    between the dye and the ram area on the press

10   brake, correct?

11        MR. ROBINSON:    I'll object to the form of the

12   question.

13        THE WITNESS:    I believe that's correct.

14   BY MR. HARTMAN:

15        Q.    So operator -- injury to the operator at

16   the point of operation was a concern of the press

17   brake industry in 1978, am I correct?

18        MR. ROBINSON:    I'll object to the form of the

19   question.    I don't know what you mean by concern.

20   BY MR. HARTMAN:

21        Q.    It was something that you all were

22   concerned about?

23        MR. ROBINSON:    That didn't help.    I'll instruct

24   the witness not to answer that question.    You've

105

1    asked about awareness -- hold on.  You've asked

2    about awareness and Mr. Mase has answered your

3    questions.  I now think you're being argumentative,

4    and I don't think that's an appropriate question.

5    BY MR. HARTMAN:

6        Q.   Okay.  Would you agree in 1978 that you

7    knew personally that people were being injured by

8    press brakes at the point of operation because of

9    inadvertently placing a body part between the ram

10   and the dye area and having the machine activated?

11       MR. ROBINSON:  Objection to the form.

12       THE WITNESS:  Yes.

13   BY MR. HARTMAN:

14       Q.   Would you agree that it was known industry

15   wide of that danger?

16       MR. ROBINSON:  Objection to the form.

17   BY MR. HARTMAN:

18       Q.   You can answer that.

19       A.   Yes.

20       Q.   Did Heim in the -- prior to 1978 do any

21   study on the effectiveness of the no hands and dye

22   method of safety --

23       MR. ROBINSON:  I'll object.

24

1    BY MR. HARTMAN:

2        Q.    -- for point of operation protection?

3        MR. ROBINSON:  Objection to the form.

4        MR. HARTMAN:  What's your problem with the

5    form?

6        MR. ROBINSON:  Did Heim do any studies

7    concerning the effectiveness, I don't know what

8    that means.

9    BY MR. HARTMAN:

10       Q.    Does Heim know whether or not the no hands

11    and dye rule for point of operator protection was

12    effective in preventing injuries to the operator?

13       MR. ROBINSON:  Yeah, same objection.  My

14    problem is that you're implying that that is the --

15    are you asking if that's the only method that is

16    used or if there are other methods used by the

17    ultimate user and employers and purchasers of these

18    machines?

19    BY MR. HARTMAN:

20       Q.    I'm talking about Heim had a no hands and

21    dye method of -- they'd communicate to the operator

22    as a means of point of operation protection,

23    correct?

24       A.    Correct.

107

1    MR. ROBINSON:  That point has been asked and

2  answered and that's very clear.

3    MR. HARTMAN:  I understand.

4  BY MR. HARTMAN:

5    Q.   Did Heim ever do a study or read a study

6  to determine whether or not that method of point of

7  operation protection worked?

8    MR. ROBINSON:  Yeah.  And my problem with it is

9  that you're implying that that is the only safety

10  device or safety method that was available to a

11  user and that the employers would have ignored all

12  of their requirements under ANSI and OSHA to

13  provide point of operation safety devices.

14    MR. HARTMAN:  I understand.  I would ask you to

15  answer the question.

16    MR. ROBINSON:  I just want to make sure the

17  Court understands my objection with your question.

18    THE WITNESS:  Can you state the question one

19  more time?

20  BY MR. HARTMAN:

21    Q.   Did Heim ever do a study to determine

22  whether or not the no hands and dye rule worked to

23  protect operators at the point of operation on

24  press brakes?

1        A.    I don't believe there was a study nor am

2    I aware of such a study.

3        Q.    Okay.  What is the length of the cord on

4    the foot pedal?

5        MR. ROBINSON:   When?

6    BY MR. HARTMAN:

7        Q.    In 1978.

8        A.    I don't know the actual length.

9        Q.    Does the length of the foot cord matter?

10        MR. ROBINSON:  Is that the end of the question?

11        MR. HARTMAN:   Yeah.

12        MR. ROBINSON:  Objection to the form.  Matter

13    for what?

14    BY MR. HARTMAN:

15        Q.    Are there different lengths for different

16    foot pedals?

17        A.    No.

18        Q.    So all foot pedals are the same length of

19    cord?

20        A.    I believe they're all relatively the same

21    length.

22        Q.    What would that range be?

23        A.    I don't know the actual length, but I'd

24    make an estimate of 10 to 15 feet.

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

1    Q.   Okay.  Is there a reason they're not 15 to

2  20 feet?

3    A.   I don't know why.

4    Q.   Is there a reason why they're not 5 to 10

5  feet?

6    A.   I would answer that saying that I think

7  the 15 feet would give it the ability to reach

8  around a certain perimeter or place.  I think 5

9  foot would be too short.

10    Q.   Okay.  To the best of your knowledge is

11  the length of the foot -- of the cord for the foot

12  pedal a safety feature?

13    MR. ROBINSON:  Object to the form of the

14  question.

15  BY MR. HARTMAN:

16    Q.   Does the length of the cord have anything

17  to do with safety or is it just so you can hook it

18  up in the back of the machine and bring it around

19  to the front?

20    A.   I believe there would be -- it would have

21  some relevance for operator positioning for any

22  other activation -- I mean, presence sensing to be

23  a certain distance away from the machine.

24    Q.   You'd want it long enough so that you

1  could put a presence sensing device up?

2      A.    Yes.

3      Q.    Other than that is there any safety

4  component to the length of the cord that you're

5  aware of?

6      A.    Not that I'm aware of.

7      Q.    Does Heim have a recommendation as to the

8  proper placement of the foot pedal by the operator

9  when they're using the foot pedal to operate the

10  press brake?

11      MR. ROBINSON:  I keep asking this, you're not

12  limiting your question to any time frame, you're

13  asking him in 1978 or prior to 1978 I should say?

14  BY MR. HARTMAN:

15      Q.    Is there a difference before or after '78

16  as to what Heim would recommend as to the proper

17  placement of the foot pedal?

18      MR. ROBINSON:  Objection to the form.

19      THE WITNESS:  I don't believe there's a

20  specific, it would have to be in compliance with

21  stopping time of the press which is positioning of

22  the operator in that sense.

23  BY MR. HARTMAN:

24      Q.    And I'm sorry.  I understand what you're

1    saying.

2         So Heim has no recommendations as to safe

3    placement of the foot pedal by the operator as --

4    while they're operating the machine except that if

5    there's a presence sensing device it has to be on

6    the outside of the presence sensing device?

7         MR. ROBINSON:  I'll object to the form of the

8    question.

9         MR. HARTMAN:  That was a bad question.  One

10   objection is good, I agree that was a bad question.

11        MR. ROBINSON:  Once in a while I find one.

12        THE WITNESS:  Let me answer the question in

13   this way.  That the reason there's not a specific

14   length because we do not know the specific

15   application that's involved so, therefore, it would

16   be inappropriate of us to make such a positioning

17   statement.  It would depend upon each individual

18   user in that particular application.  And every

19   application changes.

20   BY MR. HARTMAN:

21        Q.   Does Heim -- does Heim -- if an operator

22   has a chair and is utilizing a chair as a seat

23   while they're operating the press brake, is that a

24   potential danger to the operator that you're aware

112

1  of?

2      MR. ROBINSON:  In what situation, Mr. Hartman?

3  BY MR. HARTMAN:

4      Q.   I'm going to ask you to assume, give you

5  the background of the accident, that Ms. Lindquist

6  was sitting on her chair with the foot pedal in

7  front of her to operate the machine, is that

8  something that would concern Heim as a means of

9  operating the foot pedal?

10      MR. ROBINSON:  I'll object to the form.

11      THE WITNESS:  I don't believe so.

12  BY MR. HARTMAN:

13      Q.   So utilizing a chair or standing up isn't

14  a danger that you're aware of?

15      A.   Any position is not a danger as I'm aware

16  of.

17      Q.   Okay.  So Heim has no recommendation as to

18  whether or not you should use a chair or stand up

19  while operating the food pedal for the press brake?

20      A.   No.

21      Q.    In 1978 was there a difference between the

22  type of presence sensing devices that could be

23  utilized on a mobile press as opposed to a

24  stationary press?  And I'm talking about press

1   brake?

2       A.    I'm not familiar with a mobile press.

3       Q.    Is the 70-6 press brake considered a

4   mobile press?

5       MR. ROBINSON:  I'll object to the form.

6       THE WITNESS:  I'm not familiar with the term, I

7   would say, no, it's a stationary machine.

8   BY MR. HARTMAN:

9       Q.    Is there such a thing as a mobile press?

10      MR. ROBINSON:  Object to the form.  He said he

11  doesn't know what you mean.

12  BY MR. HARTMAN:

13      Q.    Are any of Heim's press brakes deemed

14  mobile presses?

15      A.    I'm not aware of such a machine.

16      Q.    So they're all supposed to be put at a

17  particular spot, utilized at that spot and then if

18  you need to move it to another room you have to go

19  through all of the process of completely moving it,

20  it's not meant to be here one day, moved three

21  inches to the right the next, et cetera?

22      A.    I don't believe that's the intent.

23      Q.    Okay.  With regard to this mobile press

24  stationary press, the reason I'm using it your

1  counsel has utilized that term in defining this

2  press, I'm just wondering where it came from, I've

3  never seen it.

4      MR. ROBINSON:   I don't think I did use the term

5  mobile myself, but the record will speak for

6  itself.   I think I used some other term.

7      MR. HARTMAN:   I thought you used mobile.   I

8  thought --

9      MR. ROBINSON:   I'm pretty certain I did not.   I

10 hadn't heard that term until today, I believe.

11     MR. HARTMAN:   Well, I wrote it during your

12 deposition of all of the people.

13     MR. ROBINSON:   You wrote mobile?

14     MR. HARTMAN:   Because I never heard it.

15 BY MR. HARTMAN:

16     Q.   All brake presses manufactured by Heim are

17 stationary?

18     A.   Correct.

19     MR. ROBINSON:   I'll object to the form of that

20 question.   I don't know what you mean.   The witness

21 has indicated he doesn't know what you mean by

22 mobile.   Can it be moved?   Are they moved by

23 employers?   I think we have evidence in this case

24 that the employer moved it on an occasion.   I don't

1  understand how you're using the term mobile.  Is it

2  capable of being moved?  If that's how you're

3  defining it, I would bet that there's a different

4  answer.

5      MR. HARTMAN:  I'm sorry.  I was using it as you

6  were using it.

7      MR. ROBINSON:  No, you certainly were not using

8  it how I was using it.

9      MR. HARTMAN:  I didn't know, I was trying to

10  find out --

11      MR. ROBINSON:  He said he does not understand

12  how you're using the term.

13      MR. HARTMAN:  It's a stationary press is what

14  he said.  I'm happy with that.  I'm not calling it

15  anything.  I'm calling it what you call it.

16      MS. REPORTER:  My paper is running out, my disk

17  is running out and I need to have a break.

18               (Whereupon, a short break was taken.)

19      MR. HARTMAN:  Paul, I'm going to refer you to

20  Interrogatory No. 13 in your answer as well, okay?

21      MR. ROBINSON:  I don't have.  You have to -- I

22  don't know what you're referring to.

23      MR. HARTMAN:  I have it.

24

1    BY MR. HARTMAN:

2        Q.    My question is earlier we had talked about

3    interchanging the word brake presses and power

4    presses together.  And you had indicated that you

5    specifically distinguish between a brake press and

6    a power press, am I correct?

7        A.    Yes.

8        Q.    Interrogatory No. 13 states, please

9    describe any reports of injury, malfunction or

10   unusual occurrences experienced by the user or

11   other individual which may have allegedly occurred

12   in conjunction with the product or similar

13   products, including a description of the facts and

14   dates.  Did you hear that?

15       A.    Yes, I heard you.

16       Q.    Part of the answer that Heim gave says

17   without waiving these objections the power press

18   was manufactured pursuant to the request of HB

19   Machinery Company and to Heim's knowledge was put

20   to its intended use for over 20 years without any

21   injury or injury or malfunction of any kind.  Would

22   you agree that I have read that accurately?

23       A.    Yes.

24       Q.    Would you agree that at least with regard

1  to Katherine Heim, who's the vice president of

2  Heim, she's interchanged the term press brake and

3  power press?

4      MR. ROBINSON:  I'll object to the form of the

5  question.  May I see these?  If it says power press

6  that would be my error.  And I would suggest, in

7  fact, I do see -- well, in the following one we

8  talk about press brake.  In 14 we talk about press

9  brake.  15 press brake.  So that would just be a

10  typographical error on my part.  12 is press brake.

11  If I went through these I would suggest that you

12  pulled out the only interrogatory that has

13  referenced power press and now are suggesting to

14  this witness that Heim uses those terms

15  interchangeably.

16      MR. HARTMAN:  I made no suggestion.  I've read

17  exactly the answer to that particular

18  interrogatory.  And Katherine Heim signed the

19  verification and has indicated and called the

20  product in question a power press.

21      MR. ROBINSON:  Okay.

22      MR. HARTMAN:  It may have been called different

23  things at different times, I'm just indicating that

24  this interrogatory utilizes the term power press.

1     MR. ROBINSON:  It does in one location, which

2     is my typographical error.  And, in fact, the very

3     first one we were asked to describe the product we

4     go through the model 70-6 mechanical press brake

5     and, in fact, it looks like in every single one

6     that I've reviewed so far, this would be every

7     single answer, 2 as I go through it, 3 as I go

8     through it, every single one is referred to as a

9     press brake.  So there's no need for you to answer

10    that question as posed.  That was very misleading

11    and inappropriate.  I want to bring that up to the

12    Court.

13        MR. HARTMAN:  What to the Court?

14        MR. ROBINSON:  I said I want to bring that up

15    to the Court as to the other answers that all

16    reference press brake and one typographical error

17    that you're attempting to create some issue with.

18        MR. HARTMAN:  Well, A, your response to my

19    question is entirely inappropriate.

20        MR. ROBINSON:  I don't follow you.

21        MR. HARTMAN:  Well, if you would let me finish,

22    then maybe you will.  With regard to my reading of

23    the answer that was verified according to Katherine

24    Heim, it's in black and white.  I see no notation

                                                        119

1    in the entire document that there's a typographical

2    error there, and until such time I did not know it

3    was a typographical error.

4        MR. ROBINSON:  So you just chose the one out of

5    all the others.  I understand what you're doing.

6        MR. HARTMAN:  Furthermore, you're testifying as

7    to what goes on as inappropriate.

8        MR. ROBINSON:  What do you mean?

9        MR. HARTMAN:  In reviewing the entire document

10   you have your opportunity --

11       MR. ROBINSON:  No, I can't sit here like a

12   potted plant.  I need to bring up this tactic that

13   you're using with this witness to the Court.  ANSI

14   recognizes the distinction, you are familiar with

15   the distinction, every employee that we have talked

16   with at Corey Manufacturing has referenced the

17   distinction between press brakes and power presses.

18   You've chosen to try to use one answer to suggest

19   that Heim uses the terms interchangeably.  You have

20   now been informed that that was a typographical

21   error on my part so we can move on.

22       MR. HARTMAN:  Unfortunately you didn't verify

23   the answer.

24       MR. ROBINSON:  I'm telling you that's what it

1  indicates and you know that's the case,

2  Mr. Hartman.

3      MR. HARTMAN:  I don't know anything.  I will

4  take your word at it, the fact that your office

5  made the typographical error.  We all do that.  All

6  you had to do was say it was yours.

7      MR. ROBINSON:  Then you continued to make it

8  sound as though the verification makes this machine

9  a power press as opposed to a press brake.  I don't

10  know what you're doing.

11      MR. HARTMAN:  You don't have to know.

12      MR. ROBINSON:  I think it's important for me to

13  know what you're doing.  You may disagree with

14  that.  Let's continue, please.

15      MR. HARTMAN:  I think it is important for you

16  to represent -- I have no obligation to tell you.

17      MR. ROBINSON:  Okay.  I don't follow.  Let's

18  continue.

19  BY MR. HARTMAN:

20      Q.  With regard to press brakes, press brakes

21  are meant for bending, am I correct?

22      MR. ROBINSON:  I'm going to object.  We have

23  gone through this testimony as to the differences

24  between press brakes and power presses.  You've

121

1    asked this witness those questions earlier and now

2    after the lunch break we're beginning to rehash.

3    BY MR. HARTMAN:

4        Q.    Are press brakes made for bending

5    material?

6        A.    Primarily for bending.

7        Q.    So press brakes are made primarily for

8    bending?

9        A.    Yes.

10       Q.    Would forming be another function of the

11   press brake, forming material?

12       A.    If you presume bending was forming, it

13   would be pretty much interchangeable statements.

14       Q.    Can a press brake be used for piercing if

15   the dyes are set up?

16       A.    Yes.

17       Q.    Can it be set up for cutting material if

18   the proper dyes are utilized?

19       A.    If proper dyes are utilized I suspect it

20   would be.

21       Q.    What is blanking material, what does that

22   mean?

23       A.    Blanking is -- it would be like punching a

24   hole through metal and the piece that falls out is

1    known as the blank.

2        Q.    Do you agree that with regard to your OBI

3    presses that they're a general purpose machine for

4    work involving blanking, bending and shallow

5    drawing?

6        A.    I would, yes.

7        Q.    Can an OBI machine be used as a press

8    brake?

9        MR. ROBINSON:    Say that again.

10   BY MR. HARTMAN:

11       Q.    Can an OBI power press be used as a press

12   brake?

13       MR. ROBINSON:    I'll object to the form.    I

14   don't know what that means be used as a press

15   brake.

16   BY MR. HARTMAN:

17       Q.    For forming material.

18       A.    I presume it could be, yes.

19       Q.    Are OBI machines and press brake uses

20   interchangeable?

21       MR. ROBINSON:    Object to the form of the

22   question.

23   BY MR. HARTMAN:

24       Q.    Can you use an OBI machine for the same

1   types of things that you can utilize a press brake

2   for?

3       MR. ROBINSON:  Same objection.

4       THE WITNESS:  You're making a very general

5   statement.

6   BY MR. HARTMAN:

7       Q.   Explain to me what's the problem with my

8   question that you don't understand.

9       A.   The -- my opinion would be a punch press

10  is used for applications for punching, stamping,

11  shallow draw forming, not so much for bending,

12  although it could be done as a bending operation in

13  there.  But I would believe the intent of a press

14  brake is bending materials over a longer length,

15  which is not typically found in an OBI or OBS

16  press.

17      Q.   When you say longer length, meaning the

18  width of the machine or longer length away from the

19  machine going in?

20      A.   The bed area of the machine, typically a

21  press brake is a narrow bed that's, you know, 4

22  foot, 6 foot in length to bend narrow material over

23  that type of thing, not typically used in a punch

24  press operation.

1      Q.   So if an OBI machine has a 4 foot, 6 foot

2   or 8 foot bed, would that be considered a brake

3   press then because the bed width performs the

4   ramming operation?

5      A.   It would not be considered that.  It would

6   still be considered a punch press.

7      Q.   Punch press.

8          When you talk about the bed, we're talking

9   about the width, am I correct, not the depth or the

10  forefoot, it's the width or is it the length, what

11  do you call it?

12      MR. ROBINSON:  Object to the form.

13  BY MR. HARTMAN:

14      Q.   Could you tell me what 70-6, what is the

15  6, is it considered a width or a length?

16      A.   It's considered a -- the right to left

17  dimension of the press.

18      Q.   Okay.  What is that called?

19      A.   The length of the press.

20      Q.   The length of the press from right to

21  left?

22      A.   Right.

23      Q.   Is there a certain size of part that is

24  being utilized with regard to a brake press that

1  would be considered too long to be put into the

2  brake press?

3      MR. ROBINSON:  I'll object to the form.  Any

4  particular --

5  BY MR. HARTMAN:

6      Q.   Otherwise when you're going -- at the

7  throat?

8      A.   You're talking about front to back?

9      Q.   Yes.  Is there a certain size of material

10 that you would not utilize a brake press for --

11 from front to back of the piece that's going into

12 the machine as too wide?

13     MR. ROBINSON:  Which press brake?

14 BY MR. HARTMAN:

15     Q.   A 70-6.

16     A.   It would depend upon the dye that's in the

17 press.  I can't answer -- the availability to the

18 dye space would be any length that's from the front

19 of the press brake to right to left to the throat

20 of the machine or I know I would expect that you

21 could put a piece as long as you wanted that would

22 fit through the throat of the machine.  I mean, I

23 don't think there's a limit to it.  You obviously

24 couldn't work the part back there, you're only

126

1  limited to the dye.

2      Q.   So the size of the part being used on the

3  machine is limited to the dye size?

4      A.   I would expect that to be the case.

5      MR. ROBINSON:   I'll object to the form of that.

6  I'm not sure I follow what that means or how it

7  could be read later on.

8  BY MR. HARTMAN:

9      Q.   The front to back piece, the front to back

10 depth of a piece that is being formed by the press

11 brake is limited by the size of the dye?

12     A.   Correct.

13     Q.   You wouldn't take a 10-foot piece and put

14 it in the machine if you had a dye that was a foot

15 and a half?

16     MR. ROBINSON:   Hold on.   I'm going to object.

17 That's not what he said.   He said he doesn't think

18 there would be any limitation to the length of the

19 product, but the actual operation is limited to the

20 dye.

21 BY MR. HARTMAN:

22     Q.   Is that correct?

23     A.   That's correct.

24     Q.   Okay.   So when you talk about operation,

                                                        127

1  you're talking about the depth of the piece that's

2  being worked on by the press?

3      A.   That's correct.

4      Q.   The piece could be extended beyond the

5  machine as far as infinity to be practical?

6      A.   Right.

7      Q.   Got you.

8      A.   Limited to the dye area that the work is

9  going to be performed.

10      Q.   So you were distinguishing that by the

11  area that the dye is being worked on as opposed to

12  the size of the piece?

13      A.   Correct.

14      Q.   Okay.  Mr. Robinson indicated in one of

15  his statements earlier that the machine was

16  supplied with a tool to hold work pieces while they

17  were being formed in the machine?

18      MR. ROBINSON:  I didn't say that.  I object to

19  the form of the question.

20      MR. HARTMAN:  Are you saying that you didn't

21  say that?

22      MR. ROBINSON:  I just said that I did not say

23  that.

24      MR. HARTMAN:  You did?

1    MR. ROBINSON:  Not in the way you said it.  And

2  you don't need to put that into the question

3  anyways.  It's misstating my statements.

4    MR. HARTMAN:  I'm trying to accurately state

5  it.  I have no reason to misstate it.  My

6  understanding of your statement was is that when

7  you had a problem with my discussion of point of

8  operation protection on a 70-6, you said that there

9  are many things that could provide point of

10  operation protection.

11    MR. ROBINSON:  Why don't you just ask your

12  question.

13    MR. HARTMAN:  I want to clarify the record.

14  Including a device that's used to hold the part in

15  the machine while it's being formed.

16    MR. ROBINSON:  That's more accurate as to what

17  I said before.  I'm sorry, you said something

18  different, Mr. Hartman, than I said on the record.

19  You can smile all you want.  Let me finish.

20    MR. HARTMAN:  I'll let you finish, Paul.

21    MR. ROBINSON:  So please don't take it in any

22  way other than me correcting what you said.  I

23  didn't mention on the record what you initially

24  prefaced your question with, and that's all I did

1    was correct that.  And now you've indicated

2    something different that I said that's not

3    accurate.

4        MR. HARTMAN:  I haven't indicated anything

5    different.  I'll get back to the question.

6    BY MR. HARTMAN:

7        Q.    Was there a work piece holding device

8    supplied with the 70-6?

9        A.    It's called a dye block.

10       Q.    And what is a dye block?

11       A.    A dye block is a piece of steel that has a

12   slot in it or a dye would be able to be placed into

13   it to hold it, otherwise there would be no means to

14   attach a dye to the press.

15       Q.    It holds the dye to the press?

16       A.    It provides positioning -- a place where

17   you can place a dye into the press.

18       Q.    Okay.  Is there anything that's supplied

19   with the 70-6 that the operator would use to hold a

20   piece while it's being worked on in the machine,

21   like tongs, for example, that's what I'm talking

22   about, something like a tong?

23       A.    We do provide tongs for the press brake.

24       Q.    I looked through all of the sales

                                                    130

1  material.  Can you show me in the sales material

2  where it indicates that tongs are being supplied or

3  is it something that is standard with every press

4  brake?

5      A.    I believe it's standard with every press

6  brake that's in this photo.

7      Q.    Would you show me where the tongs --

8      A.    You can see the chain here and the tongs

9  are on the top of the press.  If you look at the

10 service manual as well, you'll see that here's the

11 chains and the tongs.

12     MR. ROBINSON:  Why don't we mark this if we can

13 as Exhibit 3?

14                         (Whereupon, Deposition

15                         Exhibit No. 3 was marked for

16                         identification.)

17     MR. ROBINSON:  For the record what we have

18 marked as Exhibit 3 is a blowup of the photograph

19 that was taken of the particular press brake at

20 issue prior to its delivery and that is contained

21 in the sales file for this particular serial number

22 2176 press brake.

23 BY MR. HARTMAN:

24     Q.    When I call it the 70-6, that means the

                                                    131

1    particular press brake in question, you understand

2    that?

3        A.    That's what my assumption is, yes.

4        Q.    On the photograph that you've provided me

5    the chain set up appears different -- in the

6    photograph of Exhibit 3 and the photograph on the

7    cover of Exhibit 2 indicated different chain set up

8    or is it the same chain set upset up just located

9    differently?

10       A.    I believe it's the same chain set up, it's

11   just that it's just laying on top of the bed.

12       Q.    What is the purpose of the tongs?

13       A.    To be in consistent with our no hands and

14   dye that if you're going to handle a piece part for

15   a press brake you should use the tong instead of

16   any part of your body to go into the dye space.

17       Q.    Okay.  So Heim's no hands and dye point of

18   operation protection includes the provision of

19   tongs so that the worker does not operate the

20   machine holding the particular work piece with

21   their hands, rather they use the tongs?

22       A.    We provide a hand tool, yes.

23       Q.    So it's Heim's position that the worker

24   should not hold the work piece while its being

1  worked on in the press with utilizing your hands?

2      MR. ROBINSON:  I'll object to the form of that

3  question, that's different than what he has just

4  said.

5      THE WITNESS:  I believe the intent is to have

6  the operator holding up the piece part rather than

7  placing his hands in any proximity to the dye

8  space.

9  BY MR. HARTMAN:

10     Q.   Holding the piece part with the tongs?

11     A.   With the tongs, that's correct.

12     Q.   So it's Heim's position that tongs are to

13  be utilized to hold the piece part in the machine

14  at all times?

15     A.   We don't insist on it, it's up to the

16  customer's preference.

17     Q.   But that's Heim's position?

18     MR. ROBINSON:  I'll object to the form of the

19  question.

20     THE WITNESS:  I'm not sure it's a position as

21  more of a devices to -- a device to prevent getting

22  into the dye space.  What else can I say?

23  BY MR. HARTMAN:

24     Q.   Accidentally?

1       A.    Yeah, that's what I believe.

2       Q.    So part of the no hands and dye

3  operational safety -- strike that.

4            As part of the no hands in the dye space

5  point of operation protection, you provide tongs so

6  that the operator never holds the work piece while

7  its being operated in the dye, am I correct?

8       MR. ROBINSON:  Object to the form of the

9  question.

10      THE WITNESS:  I believe that's correct.

11      MR. HARTMAN:  Would you please tell me what

12  your -- what's the problem with the form of my

13  question?

14      MR. ROBINSON:  You're implying that there's

15  never a situation where a worker would hold the

16  product itself which you know to be inaccurate.

17  And your question prefaces that by suggesting that

18  every product that runs through this machine is

19  held with the tongs rather than with the operator's

20  hands, and what Mr. Mase has indicated is that the

21  tongue is provided to not necessarily hold the

22  product at all times but to keep one's hands out of

23  the dye space.  That was the problem I had with

24  your question.

1      MR. HARTMAN:  That's not what he testified to.

2  BY MR. HARTMAN:

3      Q.  But sir, again, the tongs are utilized to

4  hold the product, am I correct?

5      MR. ROBINSON:  Object to the form.  Are you

6  asking on all occasions or on some occasions?

7      MR. HARTMAN:  Let's erase what Mr. Robinson

8  just said.  I stick to my prior question, but I

9  want to ask you a couple of things.

10  BY MR. HARTMAN:

11      Q.  Does Heim recommend -- strike that.

12          Does Heim see a situation where a worker

13  should hold the work piece while it's being

14  operated on by the ram on the dye with their hands

15  as opposed to utilizing tongs.

16      A.  We believe that's a possibility for that.

17  And we would prefer someone to use a tong if that

18  was the case.

19      Q.  The tongs make sure that the hands don't

20  go into the work space, am I correct?

21      A.  That's what I believe the superior intent

22  is, yes.

23      Q.  The no hands and dye point of operation

24  protection system requires the use of tongs if the

135

1    piece needs to be supported outside of the dye

2    area, am I correct?

3        A.    If the operator chooses to do that.   Like

4    I said, we're not involved with every specific

5    application, it's difficult to know every specific

6    application.   But if the application was a case

7    where an operator was going to be operating with

8    his hands close to the dye in the dye space,

9    obviously we'd prefer them to use the tongs.

10        Q.    Okay.   Now, sir, at lunchtime did you have

11    the opportunity to make a determination as to

12    whether or not you can find the information

13    relating to the supplier of the foot pedal in

14    question that was supplied with this machine?

15        A.    During lunch?

16        Q.    Yeah.

17        A.    No.   No, I did not.

18        Q.    Would you provide me with either -- with

19    the supplier, a sample of the foot pedal that was

20    supplied or the drawings of the foot pedal that was

21    supplied?

22        MR. ROBINSON:   Say that again.   What are you

23    asking for?   He's not going to provide you

24    anything, I'll be providing you with it.   So what

136

1  are you asking for?

2      MR. HARTMAN:  I would like the supplier's name,

3  who supplied the foot pedal.

4      MR. ROBINSON:  The foot pedal that came with

5  the press brake at the time of the sale?

6  BY MR. HARTMAN:

7      Q.   The same foot pedal came with all of the

8  machines, am I correct?

9      A.    It's my belief it's a commercially

10  available item.  During that time frame we were

11  buying the product from someone, I don't know who

12  that was, but I imagine through the certain time

13  frames that was appropriate.

14      MR. ROBINSON:  What is it you want, Dallas?

15  Tell me what you want.

16      MR. HARTMAN:  I want to see what the foot

17  pedal?

18      MR. ROBINSON:  What are you requesting from me

19  so that I can provide it?

20      MR. HARTMAN:  I want to know who supplied it,

21  if you have a spec as to what the foot pedal was,

22  meaning length of cord, size.

23      MR. ROBINSON:  You're saying a lot.  Why don't

24  you put that in letter to me and I'll see what we

137

1  have.  If you limit it to something that I can make

2  some notes on, now you're saying a whole litany of

3  issues.  Let me know what it is you want and we

4  will do our best to make sure that we provide it

5  for you.

6      MR. HARTMAN:  My request for production of

7  documents and things included that.  I'll work it

8  out and get you more specifics now that we know.

9  Would you be willing to provide me with the foot

10  pedal that accompanies the current 70-6 brake

11  press?

12      MR. ROBINSON:  Put that in a request.

13      MR. HARTMAN:  Okay.

14      MR. ROBINSON:  Tell me what relevance that

15  would have in the 2005 foot pedal to this case.

16      MR. HARTMAN:  This witness doesn't know when

17  they first started using the modified foot press,

18  am I correct?

19      MR. ROBINSON:  Pardon me?  What testimony are

20  you giving now?  That this witness doesn't know

21  when the modified foot pedal was --

22      MR. HARTMAN:  Being utilized on a 70-6.

23      MR. ROBINSON:  I don't know if that was the

24  prior testimony or not, I apologize.

1    BY MR. HARTMAN:

2        Q.    Do you know when they changed the foot

3    pedal that accompanied the model 70-6 after this

4    70-6 was manufactured?

5        A.    I don't know the time frame, no.

6        Q.    Have you seen the foot pedal that I'm

7    discussing, the new foot pedal?

8        MR. ROBINSON:  Which one, the current 2005 foot

9    pedal?

10       MR. HARTMAN:  We don't know if it's on '05.

11       MR. ROBINSON:  What are you asking for.

12       MR. HARTMAN:  I'm asking if he has personally

13   observed the foot pedal that accompanies the 70-6

14   now.

15       MR. ROBINSON:  That's 2005.  I don't understand

16   why you had a problem with my request for

17   clarification.  Go ahead, Mr. Mase.

18       THE WITNESS:  I've seen it, yes.

19   BY MR. HARTMAN:

20       Q.    Are they stocked by Heim?

21       A.    Yes.

22       Q.    Okay.  Is the older version stocked by

23   Heim that accompanied the 70-6 that's part of this

24   lawsuit witness?

1      A.    I don't know.  I don't know if they have

2  any.

3      Q.    Have you had the opportunity to see the

4  pictures of the machine that was involved in Tina

5  Lindquist's accident as it existed at the time of

6  the accident?

7      A.    I saw a couple of pictures.  There was

8  only like three or four pictures that I saw.

9      Q.    Did you have the opportunity to see the

10  two palm button control system?

11      A.    In a photo, yes.

12      Q.    Okay.  Is there anything in that photo

13  that you saw that would cause you concern with

14  regard to the safety of the operator at the point

15  of operation?

16      MR. ROBINSON:  I'll object to the form of the

17  question.  Don't answer that.  I don't know what

18  photo you're talking about.  You just used a whole

19  bunch of terms there that I have no idea what

20  you're asking.  We're not answering that question.

21  If you want to show him a picture.

22      MR. HARTMAN:  I'll be glad to, Paul.

23      MR. ROBINSON:  I mean, that question would not

24  be used without a foundation of what picture we're

140

1   referring to.

2       MR. HARTMAN:  I would assume that you would say

3   your client --

4       MR. ROBINSON:  You shouldn't assume -- you

5   can't make that assumption in establishing a

6   foundation.

7       MR. HARTMAN:  Can I please finish?

8       MR. ROBINSON:  Sure.

9       MR. HARTMAN:  You want the courtesy, I'd like

10  it too.  I would assume you would show him accurate

11  photos of the control device as you saw it or it

12  existed.  Those are the photos I provided.

13      MR. ROBINSON:  For the record you have produced

14  to me 70 or 80 photographs of the press brake at

15  some point that I wasn't present and asked to be

16  present so I don't know what photographs you're

17  talking about.

18      MR. HARTMAN:  Would you mark this -- do you

19  have an objection to marking this as 4 and then

20  referring to the pictures by number.

21      MR. ROBINSON:  No, I don't have any objection

22  to that.

23      MR. HARTMAN:  Would you mark that?

24                          (Whereupon, Deposition

1                         Exhibit No. 4 was marked for

2                         identification.)

3    BY MR. HARTMAN:

4         Q.    I want to show you photograph No. 32.

5         A.    Okay.

6         Q.    Okay.  Can you make out the consul that's

7    in picture 32?

8         A.    The black?

9         Q.    The consul with the button.

10        A.    Yes.

11        Q.    Does that look similar to the consul that

12   Heim supplies with its 70-6 if the customer so

13   desires?

14        A.    No.

15        Q.    What type of functions are on the consul

16   supplied by Heim if a customer would have ordered

17   the two palm consul for the 70-6 involved in this

18   accident?

19        A.    It would be two run buttons, they stop on

20   the top button, emergency stop button and the key

21   lock selector switch.

22        Q.    And the key lock selector would be for

23   what?

24        A.    To -- to supervisory switch for this

1   consul.

2        Q.    And that would be so you could switch it

3   from foot pedal to two palm button?

4        A.    That would be correct.

5        Q.    And you called it a supervisory?

6        A.    Selector switch.

7        Q.    Because the supervisor is supposed to

8   control that, am I correct?

9        A.    That's correct.

10       MR. ROBINSON:    I'll object to the form of the

11  question.    What supervisor are we referring to?

12  BY MR. HARTMAN:

13       Q.    What level of supervisor are you aware of

14  is supposed to control this supervisor switch?

15       MR. ROBINSON:    Are you referring to a

16  supervisor of any employer which may purchase these

17  press brakes at any time?    Is that what you're

18  asking as opposed to a supervisor at Heim?

19       MR. HARTMAN:    Paul, in all candor, if you knew

20  and read about this you'd understand that a

21  supervisory switch is a term of art and there's a

22  person that's designated under the rules for doing

23  that.

24

1  BY MR. HARTMAN:

2     Q.   Sir, would you tell Mr. Robinson and

3  myself what a -- what level of supervisor is

4  supposed to control the switch?

5     MR. ROBINSON:  No, he's not going to answer the

6  question as phrased, Mr. Hartman?

7  BY MR. HARTMAN:

8     Q.   What is a supervisory switch?

9     A.   A supervisory switch is a selector switch

10  that does not primarily let the operator choose an

11  operation for the press.

12    Q.   Who's to choose that?

13    A.   I would suspect it would be the person

14  that the operator reported to, and usually it would

15  be at least a shop foreman, I would think.

16    Q.   And am I correct that OSHA requires the

17  supervisory switch on that control?

18    A.   Correct.

19    Q.   And OSHA discusses what a supervisor is,

20  am I correct?

21    A.   Correct.

22    Q.   And a supervisor has different functions

23  than the operator, am I correct?

24    MR. ROBINSON:  Under OSHA.

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

1        MR. HARTMAN:  Yes.  Correct.

2        MR. ROBINSON:  If you know, go ahead.

3        THE WITNESS:  I don't know that.  I would

4    assume so.

5    BY MR. HARTMAN:

6        Q.    Okay.  But --

7        A.    Someone in authority.

8        Q.    Right.  Right.  It's not operator though?

9        A.    Right.

10       Q.    What's the purpose of the supervisor

11   switch as opposed to it being an operator switch?

12       A.    To prevent the operator to stop any mode

13   of operation that he chooses that would be under

14   the direction of his supervisor or her supervisor

15   to choose what the application to be used for that

16   particular day or time.

17       Q.    With regard to a two palm consul, two palm

18   button consul, am I correct that other than the

19   supervisor switch and the emergency stop switch,

20   the only issue of concern as how the buttons are

21   laid out is that the two palm buttons are far

22   enough apart that a worker cannot operate both with

23   an elbow and a hand, am I correct?

24       MR. ROBINSON:  I'll object to the form of the

1    question.   The only area of concern, I have no idea

2    what you mean by that.

3        THE WITNESS:   The spirit and intent is to avoid

4    any anti tie downs and put the switches in position

5    to make it extremely difficult for an average

6    person to have both buttons to press concurrently

7    to actuate the machine.

8    BY MR. HARTMAN:

9        Q.   With the same hand or arm?

10       A.   Or any device, foot, nose.

11       Q.   So it would be far enough apart?

12       A.   Right.   Right.

13       Q.   Are you aware of anything on the consul

14   that was attached to the 70-6 involved in this

15   accident that caused or contributed to

16   Mrs. Lindquist's accident?

17       A.   There was not a consul provided.

18       Q.   I'm talking about a particular consul.

19   Are you aware of anything related to this consul

20   that contributed to the accident Ms. Lindquist was

21   in?

22       MR. ROBINSON:   I'll object and instructing him

23   not to answer.  You're asking expert opinion

24   testimony, now it's something that he has not

146

1  evaluated.  The press brake we all understand was

2  accompanied by a two palm button switch on a

3  Pedistal.  And Mr. Mase has indicated that it was

4  not supplied by Heim and now you're seeking expert

5  opinion testimony and we're not here to provide

6  that.

7      MR. HARTMAN:  Paul, the rules and the case law

8  indicates that a corporate designee can give

9  opinion testimony as it relates to issues involved

10 in their area of expertise.

11     MR. ROBINSON:  You haven't established anything

12 along his expertise in telling you about two palm

13 buttons that he knows anything about the particular

14 Pedistal.  He's not answering your question,

15 Mr. Hartman, as you phrased it.

16     MR. HARTMAN:  Paul, you've established his

17 expertise because your client picked him to testify

18 today.

19     MR. ROBINSON:  You're misconstruing the Rules

20 of Civil Procedure.

21     MR. HARTMAN:  I did not pick him, you picked

22 him and he's here, he's indicated he's here to

23 testify with regard to all matters outlined.

24     MR. ROBINSON:  No, that is not true either.  We

147

1  raised a number of issues with your notice similar

2  to the interrogatories and request for production

3  that were filed, he's not going to give you expert

4  testimony on this issue.  So you might as well --

5      MR. HARTMAN:  I'm asking with regard to his

6  specific knowledge.

7  BY MR. HARTMAN:

8      Q.    Do you see anything -- do you have any

9  knowledge -- with regard to you, do you have any

10  knowledge that the consul caused or contributed to

11  Ms. Lindquist's accident?

12      A.    Can I see the picture again?

13      Q.    Yeah.

14      A.    I haven't seen this picture, but it

15  appears to be that the two round buttons are placed

16  in such a position that would prevent one hand or

17  one arm operating both buttons concurrently.

18      Q.    In fact, at the time of the accident

19  Ms. Lindquist wasn't using the two palm switch?

20      A.    I don't know that.

21      Q.    If I tell you that then it would preclude

22  the consul from being a cause?

23      MR. ROBINSON:  Why are you going through this

24  whole exercise of the two palm button switch?  It

1    wasn't in use.

2        MR. HARTMAN:  Because I'm free to determine all

3    the issues that I think are necessary.

4        MR. ROBINSON:  How is this issue arguably

5    relevant or likely to lead to discovery of

6    admissible evidence?

7        MR. HARTMAN:  Are you stipulating on the record

8    that you're not contending that the consul had any

9    involvement in this particular accident?

10       MR. ROBINSON:  No, I'm not making any

11   stipulations.  I wanted you to explain to me,

12   regardless what your theories may be, why this line

13   of inquiry is relevant or discoverable.

14       MR. HARTMAN:  Because you're maintaining the

15   open door to contend that this consul may have

16   caused or contributed to the accident.  If you shut

17   that door then I'll quit my questions with regard

18   to it.

19       MR. ROBINSON:  You're making up theories,

20   you're making up doors, let's just continue

21   forward, please.

22       MR. HARTMAN:  I will continue.

23       MR. ROBINSON:  He's not going to answer any

24   questions on the appropriateness of the two palm

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

1    Pedistal and two palm switch that was not in use at

2    the time of this accident that he hasn't seen until

3    you've shown him these photographs.

4    BY MR. HARTMAN:

5        Q.    On photograph number 31 and 32 there's a

6    foot switch, a foot pedal.  Can you see that?

7        A.    Yeah.

8        Q.    Okay.  From what is depicted in that

9    photograph does that foot pedal look like the basic

10   type of food pedal that was in circulation in 1978?

11       MR. ROBINSON:  I'll object to the form of the

12   question.  Are you asking him if -- are you asking

13   him if that's the foot switch that was supplied

14   with this particular press brake?

15       MR. HARTMAN:  My question is clear.

16       MR. ROBINSON:  No, your question isn't clear,

17   that's the problem.  Does it have the appearance,

18   the basic appearance of the type that was in use in

19   the trade in 1978?

20       MR. HARTMAN:  Yeah.

21       MR. ROBINSON:  Object to the question.  You

22   don't need to answer that question.

23   BY MR. HARTMAN:

24       Q.    Can you answer that question?

150

```
 1        MR. ROBINSON:  He's not going to.  I think that

 2   question is too broad, too vague and misleading.

 3   Why don't you --

 4        MR. HARTMAN:  We're going to be here until

 5   7:00.

 6        MR. ROBINSON:  You've used that threat before,

 7   Mr. Hartman.  If you truly think we will be here

 8   we'll this play out.  I think it's a threat to try

 9   to get us to answer questions that are

10   objectionable.

11        MR. HARTMAN:  I'm trying to get things done.

12        MR. ROBINSON:  You've mentioned that belief.

13   BY MR. HARTMAN:

14        Q.   With regard to the length of the cord

15   depicted on the photographs 31 and 32 that's

16   attached to the foot pedal, is that basically the

17   size of the cord that you had seen utilized in foot

18   pedals in the past?

19        MR. ROBINSON:  Object to the form.  You can

20   answer.

21        THE WITNESS:  It appears to be a typical

22   length.

23   BY MR. HARTMAN:

24        Q.   What color were the foot pedals that were
```