1    provided with the 70-6 in 1978?

2        A.    I believe it was orange.

3        Q.    And I would ask you to assume because I

4    have other photographs that the opening of this

5    orange foot pedal is open, you can slide your foot

6    right in and then there's a pedal?

7        MR. ROBINSON:    I'll object to the form of this.

8    BY MR. HARTMAN:

9        Q.    If you assume that would that foot pedal

10   be the type of foot pedal that would have been

11   supplied with the 70-6 in 1978?

12            If you assume that this foot pedal has an

13   opening at the front of it where the operator just

14   slides their foot in and can hit the pedal, would

15   that be the type of foot pedal that would have been

16   supplied with the brake press in 1978?

17       MR. ROBINSON:    I'll object to the form of the

18   question.    Are you asking him if the foot pedal

19   that was supplied with the press brake in 1978 had

20   an opening.

21       MR. HARTMAN:    Okay, yes.

22       THE WITNESS:    I would make that assumption,

23   yes.

24

1  BY MR. HARTMAN:

2      Q.   You testified earlier it did.

3      MR. ROBINSON:  No, he's actually indicated to

4  you earlier that he wasn't working there at this

5  time frame.

6      MR. HARTMAN:  Paul, go ahead.

7      MR. ROBINSON:  He's indicated he doesn't know.

8      MR. HARTMAN:  Raise your right hand and swear

9  in.  I'd love to ask you the questions.

10     MR. ROBINSON:  That's kind of unnecessary.

11     MR. HARTMAN:  Everything you've said in the

12  Paschen half hour --

13     MR. ROBINSON:  There's no need for us to debate

14  this issue now.

15     MR. HARTMAN:  Let's move on.

16     MR. ROBINSON:  Please don't be offended by my

17  need to raise objections to the way you're asking

18  questions.

19     MR. HARTMAN:  I'm not offended.

20     MR. ROBINSON:  Please don't feel the need to

21  make personal comments like you've just made into

22  the smart variety when we raised this objection.

23  You know what the rules permit you to do.

24     MR. HARTMAN:  You're being obstructionist.

1          MR. ROBINSON:  No, I don't think there's --

2     BY MR. HARTMAN:

3          Q.    The original foot pedal was orange?

4          A.    Was what?

5          Q.    Was orange.

6          A.    I believe that was so.

7          Q.    Did it have a yellow cord attached to it?

8          A.    Not certain but I wouldn't be surprised if

9     it was yellow.

10         MR. ROBINSON:  He's asking you if you know if

11    it was orange and if it had a yellow cord in 1978.

12         MR. HARTMAN:  He said he believes it did.

13         MR. ROBINSON:  He's asking if you know these

14    things, Mr. Mase.

15         THE WITNESS:  I don't know.

16    BY MR. HARTMAN:

17         Q.    And in 1978 foot pedals were basically

18    commodities, correct?

19         A.    Yes.

20         Q.    There was no special design utilized by

21    Heim other than it had a cover, it was covered, you

22    slid your foot in, hit the pedal and let it go,

23    correct?

24         MR. ROBINSON:  I object to the form.

1        THE WITNESS:  I believe that's accurate.

2    BY MR. HARTMAN:

3        Q.    It didn't have a device that prevented you

4    from sliding your foot in in 1978?

5        MR. ROBINSON:  Object to the form of the

6    question.

7        THE WITNESS:  Don't know for sure.

8    BY MR. HARTMAN:

9        Q.    The foot pedal you have now does have that

10   type of device, correct?

11       A.    I believe that's correct.

12       Q.    And that device is a safer device,

13   correct?

14       A.    Correct.

15       Q.    And that device prevents someone from

16   accidentally sliding their foot in and activating

17   the press brake?

18       MR. ROBINSON:  I'll object to the form of the

19   question.  What circumstance?

20   BY MR. HARTMAN:

21       Q.    It's designed to protect against the

22   operator from sliding their foot in inadvertently

23   and hitting it?

24       MR. ROBINSON:  That's a different question.

1  Designed to prevent.

2      THE WITNESS:  Correct.

3  BY MR. HARTMAN:

4      Q.   So that I have a clear question, am I

5  correct that the new foot pedal is designed to

6  prevent the operator from accidentally sliding his

7  or her foot into the housing and operating the foot

8  pedal?

9      A.   Correct.

10     Q.   I'm going to show you photograph number

11  38, have you had an opportunity to look at that,

12  sir?

13     A.   I just briefly saw it before, not in a

14  colored version.

15     Q.   Would you agree that that's a tooling set

16  up for the 70-6?

17     A.   Its a tooling set up, but I'm making the

18  assumption it's in the 70-6, yes.

19     Q.   When you look at that, is there anything

20  that you see that is incorrect about the set up of

21  the tooling in that photograph?

22     MR. ROBINSON:  Yeah.  Objection, he's not

23  answering.  Now you have him being an expert in

24  tooling and dyeing and he is not an expert in that

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

1   area and he's not here as an expert in that area.

2   So he will not be answering that question.

3   BY MR. HARTMAN:

4      Q.   Sir, in your years of sales experience,

5   have you worked with manufacturers to determine how

6   to set up dyes and press brakes?

7      A.   No.

8      Q.   You've never -- you have no experience

9   about dye placement and press brake?

10     A.   No.

11     Q.   Okay.  I'm looking at the photograph on

12  Exhibit 3, why is a photo like this taken?

13     A.   For recordkeeping purposes, put in the

14  sales file just as a record.

15     Q.   How is it that we can authenticate that

16  this is an actual photo of the 70-6 that was

17  involved in the accident?

18     MR. ROBINSON:  I'll object to the form of the

19  question.  I don't know what you mean by that.

20  Authentication as a legal meaning?

21  BY MR. HARTMAN:

22     Q.   Okay.  I'll try to correct it.

23          How is it that you know that this is a

24  photo of the 70-6 involved in the accident?

1    A.    Because it's in a sales file and I believe

2    the original or the Polaroid that was used at the

3    time had the serial number written on the bottom of

4    it.

5    MR. ROBINSON:  And on the back.

6    MR. HARTMAN:  Okay.

7    MR. ROBINSON:  For the record I've produced the

8    original sales file to Mr. Hartman prior to this

9    deposition.  We previously provided a copy of it

10   and the original is here with us.  And we now have

11   the Polaroid.  Well, we've had the Polaroid

12   available to us since we began the deposition this

13   morning.

14   MR. HARTMAN:  Right.  I did have this photo,

15   but this wasn't on here.

16   MR. ROBINSON:  What were you representing was

17   not on there?

18   MR. HARTMAN:  The 2176.

19   MR. ROBINSON:  Bear with me one second.

20   MR. HARTMAN:  I'm just saying, it doesn't

21   matter.

22   MR. ROBINSON:  I just want to check my sales

23   file that I produced to you.  That may be the case,

24   I just --

1        MR. HARTMAN:  I'm going to ask him a question.

2        MR. ROBINSON:  We're going to wait, please.

3        MR. HARTMAN:  All I want ask --

4        MR. ROBINSON:  I'll only be a couple of

5   seconds.  The copy that I provided to you does, in

6   fact, have 2176 at the bottom of it.

7        MR. HARTMAN:  Does it?

8        MR. ROBINSON:  Yes.

9   BY MR. HARTMAN:

10       Q.   I'm going to show you photographs 1 and 2.

11  Do you recognize the machine in those photographs?

12       A.   I recognize it's a Heim product.  It

13  appears to be a 70-6 that we're talking about,

14  2176.

15       Q.   Other than -- do you see the yellow rods

16  on both sides of the machine?

17       A.   Yes.

18       Q.   Okay.  And you see the dye and tool on

19  the -- in the ram area?

20       A.   Correct.

21       Q.   Other than the rods and the dye in the ram

22  area, is there anything added to that machine that

23  should not be added to the machine that you could

24  determine?

1       MR. ROBINSON:  I'll object to the form of that

2   question.

3       THE WITNESS:  We supply the machine without dye

4   and the dye -- so that's --

5   BY MR. HARTMAN:

6       Q.   Those are light curtains?

7       A.   Light curtains, this was not supplied with

8   the machine.

9       Q.   You're pointing to the Pedistal?

10      A.   To the Pedistal.  The foot switch I can

11  only make an assumption that, you know, it's a

12  typical.  Whether or not it's original or not I

13  cannot answer.  Other than that it appears to be

14  the machine.

15      Q.   When looking at the front of that machine

16  is there anything that's been taken off that

17  machine that you can determine that shouldn't have

18  been taken off?

19      A.   It appears that the tongs are missing.

20      Q.   Okay.

21      MR. ROBINSON:  Are you asking if there's

22  anything else?

23      MR. HARTMAN:  Yes.

24      THE WITNESS:  Not that I can easily recognize

1   from this photo.

2       MR. ROBINSON:  Could we identify that as photo.

3       MR. HARTMAN:  1 and 2.

4   BY MR. HARTMAN:

5       Q.   So other than the light curtain, the tongs

6   missing, the dyes that are in the machine and the

7   Pedistal, the machine appears as it -- in the

8   pictures as it did when it was manufactured?

9       MR. ROBINSON:  Objection, this witness has

10  indicated to you that he can't tell if the foot

11  pedal is what would have been provided with the

12  press brake.  And you have conspicuously left that

13  out of your question, that's the type of game that

14  I've been referring to.

15      MR. HARTMAN:  I'm talking about the machine.

16      MR. ROBINSON:  Well, whatever you want to say,

17  but that's the type of game that I've been seeing

18  played with these questions.

19      MR. HARTMAN:  Well, your witness if we're

20  talking about the foot pedal said it appears to be

21  the type of foot pedal that was provided with the

22  machine.  He said it not once, not twice.

23      MR. ROBINSON:  You can testify all you want as

24  to what his testimony was.  You've never even asked

1  him the question.  I'm going to ask it because you

2  haven't asked it, you've instead tried to get that

3  through means of showing him a photograph,

4  restating his testimony and then leaving out his

5  comment about that he cannot tell you that that is

6  the foot pedal that accompanied the machine at the

7  time of sale.  You've been very misleading.

8      MR. HARTMAN:  No.

9      MR. ROBINSON:  There's no need for us to debate

10  it.

11      MR. HARTMAN:  Then why don't you keep quiet.

12      MR. ROBINSON:  I need to make the objection to

13  preserve later on.

14      MR. HARTMAN:  There's no need to make the type

15  of objections you're making, you know it.

16      MR. ROBINSON:  No, I don't.

17      MR. HARTMAN:  If you need to bill hours that

18  bad, my God.

19      MR. ROBINSON:  Once again that type of comment

20  is very unprofessional, it's very unnecessary and

21  it really doesn't help this process at all.  I

22  don't even know what you're referring to when you

23  say may that there may be some need for me to bill

24  hours.  That doesn't even make any sense to me.

```
 1  But let's continue with your questions.  I just
 2  want to make sure I bring these up so that the
 3  Court is aware of what's taking place here.
 4      MR. HARTMAN:  Paul, be my guest here.
 5  BY MR. HARTMAN:
 6      Q.  With regard to the foot pedal, you've
 7  indicated that you cannot precisely tell that that
 8  is the foot pedal that was supplied with the
 9  machine, correct?
10      A.   Correct.
11      Q.   You did testify that it does appear to be
12  the general type of foot pedal that would have been
13  supplied with this machine, am I correct?
14      A.   Correct.
15      Q.   The original foot pedal would have been
16  orange, this is orange, correct?
17      MR. ROBINSON:  Actually he's indicated to you
18  he wasn't really sure.  He thinks it might have
19  been orange, but he wasn't there and he doesn't
20  know.
21      MR. HARTMAN:  He said it was orange, he doesn't
22  know if the cord was yellow.  Paul, if you want to
23  testify, at least get it right.
24      MR. ROBINSON:  I believe when I raise the
```

1  objection to your comment that he specifically said

2  he doesn't know.

3  BY MR. HARTMAN:

4      Q.    What color do you understand the foot

5  pedal to be that accompanied the 1978 70-6?

6      A.    I believe it would be orange.

7      Q.    And you think the cord may have been

8  yellow, am I correct?

9      A.    Correct.

10     Q.    And the foot pedal that would have been

11 supplied with this particular machine would have

12 had an opening such as the opening that exists in

13 photograph 2, am I correct?

14     A.    Correct.

15     Q.    So that you can slide your foot in and

16 out, am I correct?

17     A.    Correct.

18     Q.    And when you slide your foot in there

19 would have been a switch that you would depress to

20 operate the press brake, am I correct?

21     A.    It would activate the press brake, yes.

22     Q.    Do you know on the 70-6 the time it takes

23 to stop the ram as it's going down?

24     A.    No.

1      Q.   Am I correct that that's a calculation

2   that you can get from Heim when you purchase the

3   machine?

4      MR. ROBINSON:   At what height, Mr. Hartman?

5      MR. HARTMAN:   Just let me --

6      MR. ROBINSON:   I object to the form of the

7   question.

8   BY MR. HARTMAN:

9      Q.   Am I correct that can you get stopping

10  times?

11     A.   Correct.

12     Q.   And when I say stopping times, sir, I'm

13  talking about like the time it takes -- how far the

14  ram moves if you hit the emergency stop, boom?

15     A.   Correct.

16     Q.   I'm not talking about stopping time --

17  stopping time is once you get the signals stop, how

18  long it takes to stop, correct?

19     A.   Correct.

20     Q.   And that's not dependent on height, is it?

21     A.   No.

22     Q.   It's dependent on the response to the

23  signal to stop and how quick the machine can

24  respond to that, am I correct?

1      A.   Yes.  It's a function of all the

2   associated mechanism --

3      Q.   Right.

4      A.   -- for the press brake, yes.

5      Q.   Once it gets the signal stop, how long it

6   takes from getting that signal -- how long it takes

7   for pressing that signal button to the time it

8   stops, correct?

9      A.   Correct.

10      Q.   It has no function of how high it is, does

11   it?

12      A.   Correct.

13      Q.   Do you know how many claims -- how many --

14   strike that.

15           Do you know how many people have alleged

16   to have been injured by Heim's press brakes?

17      MR. ROBINSON:  At any time?

18   BY MR. HARTMAN:

19      Q.   For the whole thousand that have been

20   manufactured, do you know?

21      A.   No.

22      Q.   Do you know how many people have claimed

23   to have been injured by press brakes manufactured

24   before 1979?

1   A. No.

2   Q. When you were working for Clearing, as I

3 believe it was the sales manager, am I correct?

4   A. Correct.

5   Q. Were you aware of individuals being

6 injured in power presses?

7   A. Yes.

8   Q. Okay.  When you were working for Clearing,

9 were you aware of people being injured in brake

10 presses?

11   A. On Clearing brakes or just general brakes

12 anywhere?

13   Q. Brake presses anywhere.

14   A. Yes.

15   Q. Okay.  And would you agree that most of

16 the people that are injured on either power presses

17 or brake presses are injured at the point of

18 operation?

19   MR. ROBINSON:  Object to the form of the

20 question.  I don't know if this witness has done

21 any type of analysis of all brake press or power

22 press injuries.

23 BY MR. HARTMAN:

24   Q. In your personal history and

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

 1  understanding.

 2       A.   I would believe most cases were point of

 3  operation related.

 4       Q.   You've testified earlier I think it was

 5  that when we talk about safeguarding by distance,

 6  I'm going from recall, I'm not trying to put words

 7  in your mouth, but was it 63 or 66 inches per

 8  second?

 9       A.   I'm not accurate.  I'm -- here, my

10  estimate would be 63 feet per second seems to be

11  the number that sticks in my mind.

12       Q.   63 feet per second?

13       A.   Yes, which is human motion, I believe.

14       Q.   And is that a standard number used in the

15  industry for safeguarding by distance?

16       MR. ROBINSON:  Hold on.  Object to the form.

17  He's just indicated he's not sure.  He believes

18  that's sticking in his mind and now you're trying

19  to ask it as if that's the way it is.

20  BY MR. HARTMAN:

21       Q.   Am I correct, sir, that there's a

22  recognized number that's utilized for safeguarding

23  by distance?

24       A.   Correct.

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

1      MR. ROBINSON:  We have been through this at

2  length.

3      MR. HARTMAN:  That's fine.  Maybe I want to

4  clear up a couple of things, and I'm allowed to do

5  that, thank you.

6      MR. ROBINSON:  Objection, asked and answered is

7  the problem.  We've been through this.

8      MR. HARTMAN:  Not exactly we haven't.

9      MR. ROBINSON:  Okay.

10  BY MR. HARTMAN:

11      Q.   What is the maximum throat opening of the

12  70-6?

13      A.   I don't know.

14      Q.   Okay.  And on Deposition Exhibit No. 2 is

15  this press brake a 70-6 or is this a generic

16  picture of a press brake?

17      A.   It's a generic picture of a press brake on

18  this cover.

19      Q.   And the reason you know that -- the reason

20  you're testifying that Exhibit No. 3 is a 70-6 is

21  because there's a serial number that's been

22  associated with that press brake, that picture, am

23  I correct?

24      A.   Correct.

1      Q.   Looking at it is there a way can you tell

2   if it's a 70-6 other than the handwritten number?

3      A.   No.

4      Q.   This instruction book that's marked as

5   Exhibit No. 2, is this the instruction book that

6   would accompany all mechanical press brakes

7   manufactured by Heim?

8      A.   Yes.

9      Q.   So you don't have a different book for a

10  200 ton as opposed to an 80 ton?

11     A.   No.

12     Q.   It says on Page 2 of the manual that the

13  book was compiled and written by Technical

14  Graphics.  Who is Technical Graphics?

15     A.   I do not know.

16     Q.   When it says compiled and written by, do

17  you know what that means?

18     A.   No.

19     Q.   Okay.  Do you know if Heim supplied the

20  information to them or they wrote this up and Heim

21  just bought a book?

22     A.   I do not know.

23     Q.   On Page 3 at the top of the page, it says,

24  although these instructions are written

1    specifically for press brakes, the same general

2    rule is applied to punch presses and other

3    machinery in this category.  Do you agree with

4    that?

5        A.   Yes.

6        Q.   Okay.  What are the other machines in this

7    category that it refers to?

8        A.   I would say it would be typical of an

9    ironworker, which is a similar type of punching

10   machine, just as an example.

11       Q.   Could this book -- would this book --

12   strike that.

13            Would this book accompany punch presses

14   sold by Heim?

15       A.   Say that again.

16       Q.   Would this book accompany punch presses

17   sold by Heim?

18       A.   No.

19       Q.   There's a different book?

20       A.   Yes.

21       Q.   On Page 5 it discusses point of operation

22   safety devices.  Do you see that?

23       A.   Yeah.

24       Q.   Do you see where it's blanked out in

1    certain areas, the black lines?

2        A.    I think it's a -- not typically blacked

3    out, there's a shading on the original copy as

4    opposed to a reproduction.

5        Q.    That's the information I need, that's part

6    of the information I need.

7        MR. ROBINSON:   That's what I told you before we

8    began the deposition I would be pleased to look for

9    it and see if I can get it for you.

10       MR. HARTMAN:   I'm just pointing it out to him.

11       MR. ROBINSON:   I understand that.

12   BY MR. HARTMAN:

13       Q.    On Page 9 the last paragraph in the middle

14   of the page talks about --

15       A.    In the interest of both.

16       Q.    In the interest of both present and

17   prospective press users, we your attention to some

18   of these modern safety packages, incorporate them

19   into your new machines or use them to replace

20   original equipment on your older models.   What

21   safety packages are being referred to?

22       A.    The intent here is pre-OSHA machines,

23   those machines built before ANSI and OSHA

24   standards, 1972, that we would encourage people to

1  update those machines in compliance.

2      Q.   What are the modern safety packages that

3  were available?

4      A.   Complete new control panels.  The other

5  machines -- pre-1972 machines would have not met

6  those standards, such as redundancy, dual valves,

7  palm buttons, current operation, spacing all of

8  that.

9      Q.   Are there any of the safety devices point

10 of operation protects other than the dual palm

11 switches?

12     A.   No, we're talking about control

13 reliability for the press.

14     Q.   On and off, up and down?

15     A.   All of those that relate to the press, not

16 point of operation.

17     Q.   Protection?

18     A.   Protection, yes.

19     Q.   I'm trying to remember not to do this.

20          On Page 18 at the bottom of the right

21 there's a picture of a foot pedal?

22     A.   Page 18, yes.

23     Q.   Is that the basic type of foot pedal that

24 would have been offered for the machine in 1978?

173

1      A.    It appears to be.

2      Q.    Have you ever operated a press brake?

3      A.    You need to be a little more specific.  As

4   an operator for?

5      Q.    Just once, one time.

6      A.    Certainly push the buttons on a press

7   brake, yes.

8      Q.    Have you ever put a piece in the machine?

9      A.    No.  Take it back, yes.

10      Q.    Have you ever had your hand in the dye

11   area of the machine?

12      A.    No.

13      Q.    Is that because you follow the no hands

14   and dye area method of operator protection?

15      A.    Yes.

16      Q.    Have you seen anybody place their hands in

17   the dye area of a press brake?

18      A.    Not that I recall.

19      Q.    What is a motion detector indicator light?

20      A.    A motion detector indicator light is a

21   visual for an operator or maintenance, it would be

22   a red light, it would more than likely shut down

23   the piece of equipment we're talking about and the

24   indication would be that the press over travel the

1    top stop.

2        Q.   So it determines that there's an over

3    traveling of the press stops the machine and a

4    light comes on?

5        A.    Correct.

6        Q.   What is a point of operation guard

7    interlock?

8        A.    That would be an electrical device that,

9    for example, would be perhaps under an expanded

10   metal guard as a point of operation, if the gate

11   was opened that it would make the press

12   inoperative.

13       Q.    Am I correct that light curtains have such

14   a point of operation guard interlock as well, that

15   if the light curtain is not on it will prevent the

16   device from -- the press brake from operating, am I

17   correct?

18       MR. ROBINSON:   I'll object to the form.

19       THE WITNESS:   The intent if you break the beam

20   it renders the press inoperative -- press brake

21   rather.

22   BY MR. HARTMAN:

23       Q.    If it's set up to operate on a light

24   curtain, and the light curtain for some reason

                                                      175

1    fails to operate, isn't there -- am I correct that

2    the machine will not function in that situation?

3        A.    I believe that's correct.

4        Q.    And that would be a point of operation

5    guard interlock as well, am I correct?

6        A.    Correct.

7        Q.    Are you aware of any analysis done by Heim

8    to study accidents involving inadvertent operation

9    of a machine by hitting the foot pedal?

10       A.    No.

11       Q.    Are you aware of any studies done anywhere

12   that evaluate that type of situation?

13       A.    Not that I'm aware of.

14       Q.    Are you aware of inadvertent contact with

15   the foot pedal causing an accident?

16       A.    I believe it's possible.

17       Q.    Have you ever heard of such an accident

18   occurring?

19       A.    I'm not aware of a particular incident.

20       Q.    What is the purpose of the manual?

21       MR. ROBINSON:   Object to the form of the

22   question.

23   BY MR. HARTMAN:

24       Q.    Okay.  You can answer.

176

1      A.    I believe the manual is to give

2  information to the owner of the purchase of a

3  machine on its operation and good practices for

4  maintenances and operation of the machine.

5      Q.    Is the manual to contain -- strike that.

6          Has Heim evaluated any ergonomic studies

7  with regard to the use of the press brake?

8      A.    Not that I'm aware of.

9      Q.    Has Heim done any ergonomic studies with

10  regard to the design and use of any of its press

11  brakes?

12      A.    Not that I'm aware of.

13      Q.    Has Heim ever consulted or reviewed any

14  such -- ergonomic studies as it relates to safe

15  operation of press brakes?

16      A.    Not that I'm aware of.

17      Q.    With regard to the duties placed on the

18  manufacturer under the ANSI code for press brakes,

19  does Heim consider it its obligation to follow

20  those requirements?

21      A.    I believe it's an obligation, yes.  The

22  obligation is to build the best machine that we can

23  and obviously the safest machine using whatever the

24  latest technology is.

1      Q.    So Heim's good manufacturing processes

2  would require that Heim comply with the ANSI

3  standard as it applies to the manufacturer's

4  duties, correct?

5      A.    Correct.

6      Q.    Did Heim have any input into the creation

7  of the ANSI standard for press brakes?

8      A.    I don't believe so.

9      Q.    Did it comment, did it provide any

10  comments to ANSI?

11      A.    Not that I'm aware of.

12      MR. ROBINSON:  Which ANSI -- which one are you

13  referring to, which year?

14      MR. HARTMAN:  The press brake standard.

15  BY MR. HARTMAN:

16      Q.    Any year?

17      A.    I don't believe so.

18      Q.    From 1973 to the present?

19      A.    I don't believe so.

20      Q.    Is there an individual that is assigned

21  the responsibility at Heim to monitor the ANSI

22  standard that applies to press brakes?

23      A.    It's pretty much an engineering function,

24  falls under design criteria.

1    Q.    Do you know what a floating blank is in a

2  light curtain?

3    A.    I believe it to be a muting of certain

4  lights in the bank of lights.

5    Q.    Have you ever seen a floating blank work

6  in a light curtain?  Have you ever seen it at work

7  in a light curtain?

8    A.    Where the light curtain is muted and a

9  piece put in?

10    Q.    Yes.

11    A.    Yes.

12    Q.    Does it work?

13    A.    I believe it does.

14    Q.    Would it work with regard to light presses

15  put into a press brake?

16    MR. ROBINSON:  Object to the form.  What use?

17  BY MR. HARTMAN:

18    Q.    When you have a piece of material that

19  extends out beyond the light curtain, would it

20  work?

21    A.    The intent is to mute the distance of the

22  material to enter the dye.

23    Q.    Correct.  So if the piece is too long it

24  would extend out beyond the light curtain, you

1    slide it in through that muted spot --

2        A.    It would break the beam.

3        Q.    It doesn't break the beam?

4        A.    The material would not break the beam.

5        Q.    If your hand --

6        A.    Correct.

7        Q.    By muting that allows you to put in a

8    piece of material that extends beyond a light

9    curtain without breaking the beam, having the

10   machine work and providing operator protection?

11       A.    Correct.

12       Q.    Does Heim sell press brakes to purchasers

13   in countries other than the United States?

14       A.    We have sold equipment in other parts of

15   the world, yes.

16       Q.    Europe?

17       A.    I can't remember.  I believe so.

18       Q.    Has Heim always sold to jurisdictions --

19   its products to jurisdictions other than the United

20   States?

21       A.    Say that again.

22       Q.    Has Heim always sold its product to

23   purchasers in places other than the United States?

24       MR. ROBINSON:   I'll object to the form.   What

1  do you mean always?  Since it began?

2      MR. HARTMAN:  Yeah, since it began.

3      THE WITNESS:  We will take orders anywhere in

4  the world, yes.

5  BY MR. HARTMAN:

6      Q.   Does Heim ship press brakes to Europe?

7      A.   I'd have to look at the records.  I don't

8  recall of a specific one, but I wouldn't be

9  surprised if there was.

10     MR. ROBINSON:  He's asking you if you know if

11 one occurred.

12     THE WITNESS:  No.

13 BY MR. HARTMAN:

14     Q.   Is there a compliance officer at Heim that

15 evaluates the European standards for press brakes?

16     A.   They're -- I'm aware of a European

17 standard, yes.

18     Q.   Do Heim press brakes conform to the

19 European standard?

20     MR. ROBINSON:  Object to the form of the

21 question.

22     THE WITNESS:  I do not know.  I don't have a

23 copy of the original -- of the European standards.

24

1  BY MR. HARTMAN:

2      Q.    Who would know that?

3      A.    We probably would have a copy in the

4  engineering.

5      MR. HARTMAN:  I would ask that you provide me.

6      MR. ROBINSON:  Put that in your writing.  If

7  you're asking for standards presently for today I

8  can't imagine how that would be relevant.  Please,

9  I should say, Mr. Hartman, I did not mean to be

10  rude in the way that I asked him to put that in a

11  formal request.  I don't even need it in a formal

12  request, just a letter request.

13  BY MR. HARTMAN:

14      Q.    Do you know what ISO is?

15      A.    It escapes me at the moment.

16      Q.    It's a standard, I believe.

17      A.    Yeah, I can't remember what the initials

18  are.

19      Q.    Has Roselle always been part of the Heim

20  Corporation?

21      A.    No.

22      Q.    When did Heim and Roselle form -- join

23  together?

24      A.    It goes back to historical.  Roselle was a

1  press product that -- I don't recall, but -- let's

2  see, the Heim Corporation bought Roselle in 1984.

3  You need to go to the family for its history.

4      Q.    Is Roselle a foreign corporation or

5  European company or is it a US company?

6      A.    Domestic.

7      Q.    Domestic?

8      A.    Yes.

9      Q.    Was it domestic at the time of the

10  purchase?

11      A.    Yes.

12      Q.    Roselle seems to be kind of like a

13  European name.

14      A.    French.

15      Q.    With regard to my Notice of Corporate

16  Designated Deposition, your attorney -- I should

17  say Heim has appointed you to testify as behalf.

18  I'm going to go over each of the areas that are

19  outlined.  I'm going to have to read them for the

20  court reporter.

21          Number one says, ask them to appoint an

22  individual to testify regarding the design,

23  manufacture, assembly, sale, including the purpose

24  that the product was to be used and the foreseeable

183

1  uses of the product and distribution of the product

2  or similar product.

3        Am I correct, sir, that you have no

4  information today as to the design process of this

5  particular machine?

6        MR. ROBINSON:  I'm going to object to the form

7  of the question.  The witness has given a lot of

8  information that may be considered design related

9  and that wasn't -- do you plan on going -- reading

10  each of the 37 areas that are set forth in the

11  notice of deposition and asking these types of

12  questions?

13        MR. HARTMAN:  The ones I think are important.

14        MR. ROBINSON:  Pardon me?

15        MR. HARTMAN:  The ones I think are important.

16        MR. ROBINSON:  I object.  And I'm instructing

17  him not to answer.  He's given you a lot of

18  information on the breadth of that question, and

19  now to suggest that he hasn't given you any

20  information on the substance of that question is

21  inappropriate.  So I'm instructing him not to

22  answer the question.

23        MR. HARTMAN:  I'm not suggesting, I'm asking

24  the question.  He says yes or no, I mean, it's real

1   simple.

2       MR. ROBINSON:  So is my instruction.

3                   (Whereupon, a short break was taken.)

4   BY MR. HARTMAN:

5       Q.   Prior to '78 did Heim ever undertake to do

6   an analysis as to what types of uses of the press

7   brake would be lost by the installation of a light

8   curtain?

9       A.   No.

10      Q.   Has any study been done to your knowledge

11  as to how a light curtain would impact the uses of

12  a press brake?

13      A.   No.

14      Q.   Has any study been done that would analyze

15  the loss of types of uses on a press brake once a

16  light curtain has been installed?

17      A.   By Heim?

18      Q.   By anyone that you know of.

19      A.   No.

20      MR. ROBINSON:  Not that you know?

21      THE WITNESS:  Not that I know.

22      MR. ROBINSON:  I want to make sure that when

23  you answer we know that you're saying, no, none

24  have been done or you're not aware of any.

185

1        THE WITNESS:  I'm not aware of any.

2    BY MR. HARTMAN:

3        Q.    The reason I'm asking that question

4    instead of going through all of them, I'm going to

5    try to cut this short, is No. 31 of my notice of

6    deposition asks Heim to appoint somebody that can

7    testify to all information, research, testing and

8    development, analysis or compilation of data

9    regarding any risk benefits analysis concerning the

10   implementation, design, manufacturer, production

11   and/or availability of point of operation

12   protection mechanisms on press brakes.  So Heim has

13   appointed you to testify regarding that today, am I

14   correct?

15       MR. ROBINSON:  No, Heim has appointed him to

16   testify on how we can read some of these

17   objection -- some of these areas of inquiry.  By

18   appointing someone on an area that you have

19   identified does not mean that there is such an area

20   that you have identified.  If you have a study that

21   exists and you want to show it to Mr. Mase, then by

22   all means.  But to sit here and to suggest that

23   because he doesn't have any information on the

24   research and testing in this area and, therefore,

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

1    we've appointed someone that doesn't have

2    information on that, it's wrong.

3        MR. HARTMAN:  No, I've asked you to -- my

4    notice of corporate designee deposition

5    specifically outlines the areas I'm going to

6    request and ask information on.

7        MR. ROBINSON:  Sure.

8        MR. HARTMAN:  That's one of the areas you've

9    brought this gentleman here to talk about that

10   area.  Now I'm asking a question.

11   BY MR. HARTMAN:

12       Q.   Do you have information relating to the

13   items in paragraph 31?

14       MR. ROBINSON:  Well, I'll object to that.

15   You're asking it differently.  31 is almost

16   unintelligible as written, but you've asked your

17   question and he's given you the answer that he is

18   not aware of any such testing.  You've asked him

19   for testing performed by Heim, and you've asked him

20   for testing performed by anyone, and he's indicated

21   he is not aware of it.  So what else can we do but

22   move on?

23       MR. HARTMAN:  Well, Paul, I need to know --

24   have someone from Heim say that what Heim knows as

1    a corporation, and that's what he's here for.

2        MR. ROBINSON:  What testing are you talking

3    about?

4        MR. HARTMAN:  I don't know.

5        MR. ROBINSON:  So we're engaging in this

6    fantasy land discussion of testing that we don't

7    know exists.  So how can I tell you here's someone

8    from Heim to talk about an issue and we don't even

9    know if that issue exists?

10       MR. HARTMAN:  Because Heim would know whether

11   or not it did research testing or development or

12   analyze the compilation of data regarding this.

13       MR. ROBINSON:  I would suggest that you and I

14   can have that discussion outside of this

15   deposition.

16       MR. HARTMAN:  Well, no, I'm here, I've spent

17   money to be here.

18       MR. ROBINSON:  No, you really didn't, you're

19   out here on your daughter's basketball event and we

20   were kind enough to schedule it at the same time.

21   You've twice now said that this is on your personal

22   dime and, in fact, you are combining the trips,

23   which is completely appropriate, but to suggest

24   that you've come out here at our expense when

1    you're saying for 4 days for a basketball event,

2    don't make it sound like we made you spend money on

3    something that you didn't need to.

4            And additionally, you're required under

5    the rules to come to Chicago, where the principle

6    place of business is, which you initially fought me

7    on, until you ultimately did the research and found

8    out I was right.  I just think you're -- the things

9    that you continuously say are just inappropriate.

10   So anyways would you continue to ask your

11   questions.

12       MR. HARTMAN:  I'm here an extra day.  I

13   cancelled a flight that I had to be here just for

14   the record if it matters.  I did pay for this

15   out-of-pocket to be here for this deposition.  You

16   were to appoint somebody to testify regarding that.

17   This is the gentleman you've produced.

18   BY MR. HARTMAN:

19       Q.   Does Heim have information relating to a

20   what impact a light curtain would have on the uses

21   of its brake presses?

22       MR. ROBINSON:  What time, Mr. Hartman, in what

23   time frame?

24

1  BY MR. HARTMAN:

2      Q.    Prior to 1978.

3      A.    I'm not aware of any.

4      MR. ROBINSON:   That's what he said before.

5  Would you please ask another question?

6  BY MR. HARTMAN:

7      Q.    Does Heim have any information from 1978

8  to the present relating to the effect a light

9  curtain would have on the utilization of its brake

10 presses?

11     A.    I don't believe so.

12     MR. ROBINSON:   I'll object to the form of the

13 question.

14     MR. HARTMAN:   What's the problem with the

15 question?

16     MR. ROBINSON:   Do they have any information?

17 What does that mean do they have any information?

18 He's already indicated that the -- well, never

19 mind.  I think there's a significant problem with

20 your question when you say does it have any

21 information.  What does that mean?  Has anyone at

22 Heim ever heard that you not being able to use a

23 light curtain for certain applications.  You and I

24 heard that from the manufacturing employees

1    themselves.

2        MR. HARTMAN:  We're deposing Heim today, Paul.

3        MR. ROBINSON:  That comment really doesn't

4    apply, I understand that.  Would you ask your

5    questions, please?

6    BY MR. HARTMAN:

7        Q.   Sir, would it be a fair statement that

8    Heim doesn't know whether the use of a light

9    curtain on a press brake would effect the

10   versatility of the press brake?

11       MR. ROBINSON:  Object to the form of that

12   question.  In what application?  What press brake?

13       MR. HARTMAN:  All the press brakes you're aware

14   of.

15       MR. ROBINSON:  What type of product?  There's

16   so many variables.

17   BY MR. HARTMAN:

18       Q.   Across the board.

19       A.   Since we manufacture general purpose

20   machines we're never involved with application so

21   there would be no reason for to us do a study on

22   particular applications, we're not a light curtain

23   manufacturer.  Point of operation safety has always

24   been the responsibility of the end user to provide

191

1    for a particular application.  And since we don't

2    provide equipment for specific applications, it

3    seems to be a moot point for us.

4        Q.    Does Heim now provide light curtains with

5    its press brakes if a customer so requests?

6        A.    If a customer asks us to provide a light

7    curtain?

8        Q.    Yes.

9        A.    I would say that we would provide it but

10   not mount it.

11       Q.    Why not mount it?

12       A.    Because we wouldn't know the specific

13   application which it was going to be used.

14       Q.    If you knew the application was going to

15   be used, would you mount it then?

16       MR. ROBINSON:  Object to the form of the

17   question.

18   BY MR. HARTMAN:

19       Q.    Would you have the ability to mount a

20   light curtain if you knew the application for which

21   the press brake was going to be used?

22       A.    We'd decline.

23       Q.    You'd decline?

24       A.    (Nonverbal response.)

1      Q.    You would never do it?

2      A.    Never.

3      MR. ROBINSON:  You've answered -- you've said

4   that you would decline it and you've indicated

5   before that that's not something that you do or set

6   up to do.  I'm not sure why we keep asking

7   follow-up questions that have just been asked.

8   BY MR. HARTMAN:

9      Q.   Has Heim ever done an analysis as to

10  whether or not -- strike that.

11     MR. HARTMAN:  I'm going to let Mr. Robinson ask

12  his questions while I review my information.

13                      EXAMINATION

14  BY MR. ROBINSON:

15     Q.   I'm going to attach as Exhibit 5 a copy of

16  the sales file pertaining to 70-6, serial number

17  2176, press brake sold to H B machinery co-in 1978?

18                      (Whereupon, Deposition

19                      Exhibit No. 5 was marked for

20                      identification.)

21  BY MR. ROBINSON:

22     Q.   And Mr. Mase, we have the original file,

23  the original sales file with us that you brought

24  with you today pertaining to this particular press

1    brake at issue, is that right?

2        A.    Correct.

3        Q.    And you also brought the copy that I've

4    marked.  Is the copy that has been marked as

5    Exhibit 5 a true and correct copy of the original

6    sales file contained in this original folder?

7        A.    I believe so.

8        Q.    And have you reviewed this sales file in

9    preparation for this deposition?

10       A.    Yes.

11       Q.    I note here in the sales file that there

12   is a document entitled Assembly Order for Press

13   Brake, do you see that?

14       A.    Correct.

15       Q.    Does Heim continue to use a similar type

16   document when manufacturing a press brake at a

17   customer's request?

18       A.    Yes.

19       Q.    And on this particular assembly order

20   there is a location to indicate whether or not a

21   palm button has been requested by the purchaser, is

22   that right?

23       A.    Correct.

24       Q.    And was a palm button requested by this

194

1    particular purchaser HB Machinery Co?

2        A.    It says no.

3        Q.    And does this document tell us whether or

4    not HB Machinery Co requested a foot switch for

5    activation of this press brake?

6        A.    It's itemized as yes.

7        Q.    And would that mean that HB Machinery Co

8    requested a foot switch for -- to accompany the

9    sale of this particular press brake?

10       MR. HARTMAN:  I'm going to object to the form

11   of the question because there's nothing in that

12   document that indicates that there's a request, it

13   indicates what has been provided with it.  The

14   witness has already testified as a piece of

15   standard -- a standard piece of equipment that

16   accompanies all of the press brakes.  Go ahead.

17   I've noted my objection for the record.

18   BY MR. ROBINSON:

19       Q.    Does this sales document tell you that the

20   purchaser, HP Machinery Co, has requested a foot

21   switch to accompany its purchase of this press

22   brake?

23       A.    Yes.

24       MR. HARTMAN:  Are you saying, sir --

                                                    195

1    MR. ROBINSON:  Hold on, you're not asking

2  questions.  He's not answering your questions.

3    MR. HARTMAN:  You asked questions when I was

4  asking questions.

5    MR. ROBINSON:  I really didn't.  You're going

6  to give me the opportunity to ask him questions,

7  he's not going answer questions you interject to

8  right after mine.  That's inappropriate in every

9  sense of a taking of a deposition.

10  BY MR. ROBINSON:

11    Q.  Was the press brake that was sold -- all

12  of my questions relate to the particular press

13  brake that was sold to HB Machinery Company.  Was

14  it a completed product when sold to HB Machinery?

15    A.  A completed product in the sense that as

16  far as we're concerned does not have -- could not

17  form a function.

18    Q.  Okay.  Was it a completed product in the

19  sense that you could ship it to a company and that

20  they could begin using it as is?

21    A.  No.

22    Q.  And what types of work, what types of

23  additions needed to be added to the press brake by

24  the purchaser or by the entity to whom it was

196

1   shipped before it could function?

2       A.    I would suspect that the end user would

3   require a dye for it and would also provide the

4   point of operation safety required in conjunction

5   with the operation of that dye and any other

6   ancillary equipment that the end user would choose,

7   you know, such as barrier mounts or isolation pads

8   or certain ancillary equipment such as barrier

9   mounts, point of operation safety, whatever else,

10  feeding equipment.

11      Q.    Is there any indication in the sales file

12  that Heim was ever notified as to what particular

13  uses to which the purchaser or the entirety to whom

14  it was shipped was going to put to this particular

15  press brake?

16      A.    No indication.

17      Q.    Do you understand from your review of the

18  sales file that the press brake ultimately came

19  into the possession of Corey Manufacturing a

20  subsequent purchaser of the press brake?

21      A.    Only aware of it through the documents in

22  the file that would indicate that they were not the

23  first owner/operator of the machine.

24      Q.    Okay.  And is there any indication in the

1    files of Heim that would suggest that Heim ever was

2    notified about the uses to which Corey

3    Manufacturing was put in this particular press

4    brake?

5         A.   Not that I'm aware of.

6         Q.   Is the product -- is the press brake

7    capable of being used in performing a workable

8    function at the time it leaves Heim's possession

9    and without those additions that you've indicated?

10        A.   No.

11        Q.   Is there a point of operation on the press

12   brake when it leaves the control of Heim?

13        A.   Other than a foot switch or a run bar

14   station, no, or tongs if you want to consider that.

15        Q.   Is there any molding mechanism that

16   accompanies the press brake at its sales and at the

17   time the press brake leaves the possession of Heim?

18   Are there any dyes accompanying the sale?

19        A.   No.

20        Q.   Are there any tools, tooling dyes

21   accompanying the sale?

22        A.   Not that I'm aware of.

23        Q.   Are there any components provided with the

24   sale of the product that would enable the purchaser

1    to begin forming metal, as you've indicated is the

2    typical use?

3        A.    No.

4        Q.    Was that a direct purchase by Afco Lycomie

5    when the press brake was sold?

6        A.    No.

7        MR. HARTMAN:    What do you mean by direct

8    purchase?

9        MR. ROBINSON:    You can raise your objection.

10   BY MR. ROBINSON:

11       Q.    Did Heim engage in direct sales to end

12   users in 1978 that you're aware of?

13       A.    Sold through distributor network.

14       Q.    So is the answer to my question, no, that

15   they did not directly sell to end users?

16       A.    I would say it would be an exception

17   rather than a rule.

18       Q.    Do you know of any situation where that

19   occurred?

20       A.    Not off the top of my head, no.

21       Q.    When you say that Heim sold through

22   distributors, can you describe that process?    I

23   know you alluded to it briefly with Mr. Hartman's

24   questions, but can you describe that in greater

1  detail as to how that process works?

2     A.    What a distributor is?

3     Q.    That's a good question.  Yes, what a

4  distributor is.

5     A.    A distributor is a sales force that would

6  be -- in our industry would be a machinery related

7  company that would have its own sales force that

8  would call on a customer base in an area of primary

9  responsibility and they would have the relationship

10  with an end user to sell product.  They would

11  represent typically in this end of the business

12  perhaps a brake, a shear, a punch press, feeding

13  equipment, isolator pads, point of operation safety

14  devices, numerous ancillary type of equipment.

15     Q.    Now, are you familiar with the industry

16  into your work with numerous manufacturers of press

17  brakes and familiar with the use of distributors to

18  act as a middle man for press brakes or presses or

19  other machinery to go through the distributor and

20  then ultimately to the end user?

21     A.    That would be the typical set up in our

22  interrogatory.

23     Q.    Do the distributors only sell press brakes

24  manufactured by one particular manufacturer or do

1    they have the entire field, if you will, the entire

2    trade at their disposal?

3        A.    It would be a combination of all.  Some

4    would just represent one, some would have different

5    types.

6        Q.    Has Heim ever had an agreement with the

7    distributor such that the distributor only sell

8    Heim products?

9        A.    Not that I'm aware of.

10       Q.    And did you say that the distributors also

11   can provide to the end user the point of operation

12   safety devices?

13       A.    It would not be uncommon.

14       Q.    And do you know, in fact, that

15   distributors do sell and supply point of operation

16   safety devices to end users?

17       A.    Distributors, like I said, it would not be

18   uncommon for distributors to represent a line of

19   light curtains, barrier guards.

20       Q.    And is it the general practice for the end

21   user to advise the distributors of its needs and

22   then for the distributor to go out in the industry

23   and request products that will meet those needs?

24       A.    I believe a distributor's goal is to

1  supply a customer all his needs.

2      Q.    Is it set up such that a distributor is

3  sort of lick a one-stop shopping, that the end user

4  will go to that distributor and obtain all of its

5  needs for a particular product, including a press

6  brake?

7      A.    I think that would be convenient for the

8  end user.

9      Q.    And is that how you've seen it work

10  before?

11      A.    Typically.

12      Q.    Has Heim ever selected a point of

13  operation safety device for an end user?

14      A.    Say that again.

15      Q.    Has Heim ever selected the appropriate

16  type of point of operation safety device that an

17  end user should use for its particular application?

18      A.    Not that I'm aware of.

19      Q.    Does Heim even learn of the end use for

20  the particular press brake during the normal sale?

21      A.    Typically not.

22      Q.    How many bending and molding functions is

23  the model 70-6 serial number 2176 press brake

24  capable of performing?