1    A.    How many different types of applications?

2    Q.    Yes, sir.

3    A.    I couldn't even comprehend.

4    Q.    Can you give us an estimate?

5    A.    I couldn't even give you an estimate.

6    Q.    Can you give us a range?  Are we talking

7  hundreds?

8    A.    Several tens of thousands I would think.

9    Q.    And are certain applications -- well,

10 strike that.

11         When you researched the sales files of

12 Heim from approximately 1970 to 1980 you mention

13 that you reviewed serial numbers 260 to

14 approximately 2600?

15   A.    Correct.

16   Q.    Did you find any sales files that

17 evidenced Heim supplying a light curtain, a barrier

18 or a pull back mechanism to any particular end user

19 with the sale of a press brake?

20   A.    No.

21   Q.    In the industry does the use of a

22 particular press brake change over time?

23   A.    I don't understand the question.

24   Q.    Do employers typically use press brakes

1   for a particular application and then subsequently

2   have a new application that is necessary and so

3   forth and so forth and continuously change the

4   application for the press brakes?

5        A.    I wouldn't be surprised if there was

6   numerous applications for each particular press

7   brake.

8        Q.    I would take it it wouldn't surprise you

9   to know that the Corey Manufacturing employees that

10  we talked to said that there were numerous uses for

11  the press brake that was put during its use of the

12  press brake?

13       A.    I'm not surprised.

14       Q.    Do you have any way of knowing how many

15  different uses Afco Lycomie put to this particular

16  press brake throughout its 20 something years of

17  ownership of this press brake?

18       A.    No.

19       Q.    Did Heim ever receive any type of

20  complaint regarding the point of operation for this

21  particular press brake during Afco Lycomie's

22  ownership of the press brake?

23       A.    Not that I'm aware of.

24       Q.    Has Heim ever received a point of injury

1   from the use of the serial number 2176 press brake

2   while in the ownership of Afco Lycomie?

3       A.   Not that I'm aware of.

4       Q.   In the industry, sir, who selects the

5   appropriate point of operation safety device for

6   any particular application?

7       A.   It's the responsibility of the end user.

8       Q.   Are you aware that the ANSI requirements

9   since at least 1973 have placed that responsibility

10  on the end user?

11      A.   I'm aware of that, yes.

12      Q.   And particularly the employer?

13      A.   Yes.

14      Q.   And are you aware that OSHA also places

15  that responsibility upon the employer?

16      A.   I'm aware of that, yes.

17      Q.   Are you aware of any standard at all

18  governing Heim or any manufacturer of press brakes

19  that places responsibility upon the press brake

20  manufacturer for choosing an appropriate point of

21  operation safety device for a press brake?

22      A.   Not that I'm aware of.

23      Q.   Would that work if the manufacturer were

24  required to choose an appropriate -- strike that.

205

1          Would it work if the manufacturer would be

2     required to choose a point of operation safety

3     device for the press brake?

4          A.   I don't understand your question.  Can you

5     restate that for me?

6          Q.   Would it be practical for the manufacturer

7     of a press brake to choose a point of operation

8     safety device to accompany the sale of a press

9     brake?

10         A.   I wouldn't think so because of the

11    numerous applications they could be subjected to.

12         Q.   And if a manufacturer of a press brake did

13    supply a particular point of operation safety

14    device, can you envision situations where the use

15    to which the press brake was being made would not

16    permit the use of that particular point of

17    operation safety device?

18         A.   I don't know.  I'd say -- unless it was a

19    captive press that would be the only time it would

20    be able to do that.

21         Q.   When you say a captive press, what do you

22    mean?

23         A.   In other words, if it was just going to be

24    one application for the lifetime of that machine

1  and never going anyplace then you could probably

2  make that statement.

3      Q.   Have ever heard of a press brake that has

4  only been used on one application?

5      A.   Not that I'm aware of.

6      Q.   So can you envision if the manufacturer of

7  a press brake supplied a particular point of

8  operation safety device that they may be providing

9  a particular device that didn't work for the end

10 user?

11     A.   It's possible, yes.

12     Q.   And with the numerous potentially

13 thousands of uses to which a press brake is put,

14 would you consider that to be likely that if the

15 manufacturer chose a particular point of operation

16 safety device that during one of the uses or many

17 of the uses that point of operation safety device

18 would not be usable?

19     A.   That would be correct.

20     Q.   Do you know of any manufacturer that has

21 taken the responsibility of providing point of

22 operation safety devices at its choosing without

23 knowing the various uses to which an end user may

24 use a particular press brake?

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

1     A.    I'm not aware of that.

2     Q.    And how many different press manufacturers

3 have you worked for -- press brake manufacturers,

4 excuse me?

5     A.    Press brake manufacturers would be Heim

6 and Niagra.

7     Q.    Okay.  And how many different power press

8 manufacturers have you worked for?

9     A.    Clearing, Niagra, Bliss, Heim, Roselle.

10    Q.    Do you know of any power press

11 manufacturers that have chosen to choose point of

12 operation safety devices not knowing the particular

13 end use for which the power press will be used?

14    A.    No.

15    Q.    Are you aware in the press brake industry

16 that certain uses require the operator to manually

17 manipulate the product with his or her hands but

18 outside of the point of operation of the particular

19 press brake?

20    A.    I would suspect on longer sheets that

21 would have to be a requirement where you have to

22 push the sheet into a press brake.

23    Q.    And would the use of the tongs that we

24 have referenced be suitable for a particular use

1    that you've just described where the user has to

2    manually hold the product, again, outside of the

3    point of operation of the press brake?

4        A.    There would be requirements, yes.

5        Q.    Pardon me?

6        A.    There would be requirements, yes.

7        Q.    Do you know whatever happened -- assuming

8    that the tongs did not exist on the day of Tina

9    Lindquist's injury, do you have any idea what

10   happened to it throughout the 24 years or so that

11   the press brake had been in existence?

12       MR. HARTMAN:   Object to it because there's no

13   ability to make that assumption.   But go ahead.

14       THE WITNESS:   No.

15       MR. ROBINSON:   I asked him if he knew.

16   BY MR. ROBINSON:

17       Q.    Has anyone ever provided you with the

18   tongs that accompanied the sale of this particular

19   press brake in 1978?

20       A.    No.

21       Q.    Has anyone ever provided to you the foot

22   pedal that accompanied this particular press brake

23   when sold in 1978?

24       A.    No.

1     Q.    Do you know if the --

2     MR. HARTMAN:    If you want to take the colored

3   ones to look at.

4   BY MR. ROBINSON:

5     Q.    Do you know if the foot pedal shown in

6   photos 1 and 2 of Exhibit 4 show the foot pedal

7   that accompanied the sale of this press brake in

8   1978?

9     A.    I can't say that's the pedal.

10     Q.    Do you know where the foot pedal is today

11   that was being used by Tina Lindquist at the time

12   of her injury?

13     A.    No.

14     Q.    Does Heim employ designers or engineers to

15   determine the appropriate and safest point of

16   operation safety device to be used for various

17   applications on its press brakes?

18     A.    No.

19     Q.    Has Heim ever held itself out as having

20   the expertise to choose the most appropriate and

21   safest point of operation safety device for the

22   uses to which its presses may be put?

23     A.    No.

24     Q.    Has Heim instructed its -- instructed the

1   purchasers of its press brakes that it is their

2   responsibility to choose the appropriate safety

3   device?

4       A.   It's stated in our manuals that point of

5   operation is the responsibility of an end user.

6       Q.   And is there also a warning on the front

7   of the machine that Heim places on its press

8   brakes?

9       A.   Yes, there's a warning that says never,

10  it's a never, never, never warning sign.

11      Q.   And does that warning also indicate that

12  it is the employer's responsibility to implement

13  the above never warnings that you just mentioned

14  and also to provide proper dyes, devices or means

15  that may be necessary or required for any

16  particular use, operation, setup or service?

17      A.   Correct.

18      Q.   And is the warning that is shown in photo

19  18 of Exhibit 4 the warning that was affixed to the

20  front of the press brake facing the operator?

21      A.   I believe that's the case.  I can't see it

22  in this actual photo, but I believe it's the same.

23      Q.   Do you know how that warning is fastened

24  to the press brake?

1       A.   It is -- in this particular case it

2   appears to be riveted as well -- I believe this

3   particular one is a metal plate.  That's riveted to

4   the machine.

5       Q.   Who is in the best position to determine

6   the most appropriate and safest means of providing

7   a point of operation safety device for the model

8   70-6 press brake?

9       A.   The owner/operator.

10      Q.   Was Heim ever requested by anyone,

11  including the original purchaser or any of the

12  ultimate users, to give any type of guidance or

13  input into the appropriate point of operation

14  safety device to be used?

15      A.   Not that I'm aware.

16      Q.   Would it surprise you that the employees

17  who were manufacturing, a number of the employees

18  have acknowledged that it is the employer's

19  responsibility to choose the appropriate point of

20  operation safety device for this particular press

21  brake?

22      MR. HARTMAN:   I'm going to object to the form

23  of the question as mischaracterization of what

24  they've said.  Go ahead and answer.

1    MR. ROBINSON:  That's as far from the truth as

2  I can imagine anyone saying.

3    THE WITNESS:  I believe they're aware it's

4  their responsibility.

5  BY MR. ROBINSON:

6    Q.    Would it surprise you to know that the

7  specific employees of Corey Manufacturing have

8  indicated that they're aware that it is the

9  employer's responsibility to provide the

10  appropriate point of operation safety device for

11  this particular press brake?

12    A.    I'm not surprised by that statement.

13    Q.    Is that consistent with what you

14  understand to be the custom in the industry?

15    A.    Yes.

16    Q.    Considering the many uses to which a press

17  brake can be made, would it be feasible for the

18  manufacturer to select a point of operation safety

19  device for one of its press brakes?

20    A.    I don't believe it would be feasible.

21    Q.    Do you know of any press brake

22  manufacturer that has decided that it would be

23  feasible to unilaterally select a particular point

24  of operations safety device on a press brake that

213

1    it has sold?

2        A.    I don't believe so.

3        Q.    Are you aware of any other lawsuits

4    involving the model 70-6 press brake manufactured

5    by Heim?

6        A.    No.

7        Q.    Are you aware of any other personal

8    injuries resulting from the use of a model 70-6

9    press brake?

10       A.    No.

11       Q.    Have you sold press brakes did you say for

12   Clearing?

13       A.    Clearing didn't -- not while I was there.

14       Q.    Niagra, did you sell press brakes for

15   Niagra?

16       A.    I wasn't involved with the sales

17   department with Niagra, I was aftermarket sales.

18       MR. ROBINSON:  Those are all of the questions

19   that I have.

20       MR. HARTMAN:  I just have a couple of

21   follow-up, I promise you I'll be short.

22                  FURTHER EXAMINATION

23   BY MR. HARTMAN:

24       Q.    When you said that you don't know of any

1    other injuries occurring with the model 70-6 press

2    brake, you don't know whether there were or there

3    weren't, am I correct?

4        A.    That's correct.

5        Q.    Okay.  You're not saying there weren't any

6    or you're not saying there were, you just don't

7    have that information?

8        A.    I'm not aware of any, right.

9        Q.    I looked through all of the invoices and

10   shipping documents that were included in Exhibit

11   No. 5.  It appears to me that with regard to the

12   original purchase of the press brake, it was

13   shipped directly to the end user, am I correct?

14       A.    I would have to double-check but that

15   would normally be the case, we would get shipping

16   instructions, yes.

17       Q.    Distributor, is that kind of like the

18   franchise like the Chevy dealer he basically sells

19   a product that someone else makes it, is that how a

20   distributor network is worked out?

21       MR. ROBINSON:  I object to the form of the

22   question.  He's not going to answer that general

23   question where you try to tie Heim to one of its --

24   to a distributor to an agent dealership, franchisee

1    of a car dealership.  He's not answering the

2    question.

3        MR. HARTMAN:  Fine.

4        MR. ROBINSON:  Okay.

5    BY MR. HARTMAN:

6        Q.   Can a distributor be an exclusive

7    distributor of Heim products, may he sell just Heim

8    products?

9        MR. ROBINSON:  I'll object that's been asked

10   and answered.  He said he's not aware of any such

11   situations.

12       THE WITNESS:  Not exclusively.

13   BY MR. HARTMAN:

14       Q.   Not exclusively?

15       A.   We don't have any exclusive dealerships.

16       Q.   Now, do you know of any -- in 1978 did you

17   have exclusive dealerships?

18       A.   I don't believe so.

19       Q.   Do you now?

20       A.   No.

21       Q.   Do you know who HB Machinery is?

22       A.   No.

23       Q.   Do you know the distributor of this

24   particular product?

1      A.   Say that again.

2      Q.   Do you know anything about the distributor

3  of this particular press brake?

4      A.   Meaning HB?

5      Q.   Yes.

6      A.   No.

7      Q.   Are they still a distributor of Heim

8  products?

9      A.   No.

10     Q.   When did it end?  When did the

11 relationship end?

12     A.   I'll not aware of when it ended.

13     MR. ROBINSON:  I'm going to object to your

14 characterization of a distributor of Heim products.

15 I don't know how that sounds.  They're a

16 distributor that actually purchased a Heim product

17 here.  I don't know if it's a big issue or not, but

18 I can see that being read by the plaintiff in some

19 other lights subsequent to this litigation.

20     MR. HARTMAN:  You can try to mold unfavorable

21 testimony any way you want with your

22 communications.

23     MR. ROBINSON:  If you think that testimony was

24 unfit -- for you to even suggest that that

217

1   testimony was unfavorable was absurd and then for

2   you to categorize my objection on that basis is

3   also absurd.

4       MR. HARTMAN:  You're constantly trying to mold

5   the testimony that you don't like.

6       MR. ROBINSON:  I don't understand what you're

7   talking about there's nothing wrong with that.  My

8   point was that you said distributor of Heim

9   products, that isn't the testimony.  You added that

10  yourself.  There are distributors and in this

11  particular case this distributor was the purchaser

12  of a Heim product that ultimately made its way to

13  an end user.  So I don't know why you feel a need

14  to continuously making your smart comments in the

15  face of a valid objection or even an invalid

16  objection if you think that's the case.

17  BY MR. HARTMAN:

18      Q.   This product was never shipped to HB

19  Machinery, was it?

20      A.   I believe it was shipped to the end user.

21      Q.   Correct.  And the end user purchased the

22  machine, am I correct?

23      A.   Through HB.

24      Q.   They paid HB, but it was shipped -- HB

1    never had possession of this machine, did they?

2        A.    I don't believe so.

3        Q.    Okay.  And you don't know what role HB had

4    in the selection process of this machine, do you?

5        MR. ROBINSON:  I'll object to the form of that.

6    He's already indicated what they have -- what they

7    requested according to the sales documents.  So

8    you're now wanting to erase that testimony and

9    suggest that he does not know what role they

10   played, when, in fact, he testified to that.

11   BY MR. HARTMAN:

12       Q.    Other than the fact that you had an order

13   from HB to ship a machine to Afco Lycomie, do you

14   know what communications took place between HB and

15   Afco Lycomie?

16       MR. ROBINSON:  Same objection, he's indicated

17   what communications would have taken place by

18   looking at the sales documents.

19   BY MR. HARTMAN:

20       Q.    Go ahead, you can answer the question.

21       A.    I wasn't there at the time.  I'm basing my

22   information from my review of the file.

23       Q.    What documents in Exhibit No. 5 tell you

24   the communications between HB and Afco Lycomie?

1    A.    Between HB --

2    Q.    And Afco Lycomie?

3    MR. ROBINSON:  For the record I don't believe

4    that was a question previously referenced.  He's

5    asking about HB Machinery and Afco Lycomie as

6    opposed to HB and Heim.

7        MR. HARTMAN:  You finally have me confused on

8    that.

9        MR. ROBINSON:  I don't know what you mean by

10    that.  Your previous questions were about

11    communications between HB Machinery and Heim.  Now

12    you've just changed the question to be HB Machinery

13    and Afco Lycomie.

14    BY MR. HARTMAN:

15    Q.    My question is what communications took

16    place between HB and Afco Lycomie?

17    A.    I would make this document a communication

18    that appeared to be a communication from HB as the

19    letter to Heim Group about some equipment.

20    Q.    And you're referring to the post quick

21    reply message dated August 31st, 1979?

22    A.    Correct.

23    Q.    Subject, Heim Invoice --

24    A.    That's HB to Heim Group about a

220

1   communication HB had with Afco.

2       Q.   Right.  And it says here that when Afco

3   was following up on delivery, they called Heim

4   direct, am I correct?

5       A.   That's what that says, that's correct.

6       Q.   So it appears that Afco communicated

7   directly with Heim with regard to missing pieces?

8       MR. ROBINSON:  Missing pieces?

9       THE WITNESS:  I believe it was about a

10  delivery.

11  BY MR. HARTMAN:

12      Q.   Missing a delivery of pieces that weren't

13  shipped?

14      MR. ROBINSON:  Object to the form of the

15  question.

16  BY MR. HARTMAN:

17      Q.   Okay.  The subject of this is the fact

18  that you never shipped the manual front operated

19  back gauge, correct?

20      A.   The communication was with Afco was to

21  Heim asking about the delivery of the press brake.

22  And the response was we would be able to ship

23  without the back gauge.

24      Q.   Okay.  So Afco contacted Heim about

1  getting the press brake shipped to them without the

2  back gauge?

3      A.    Correct.   That's what that document

4  implies.

5      Q.    So this document implies that there was

6  communication between Afco and Heim with regard to

7  the shipping of the product they purchased?

8      A.    That's correct.

9      Q.    Heim manufactured it?

10     A.    Correct.

11     Q.    Now, HB from the documents I have never

12 received possession of any of the pieces of this

13 machinery, all of the pieces went directly to the

14 end user, am I correct?

15     MR. ROBINSON:   I'm going to object to the form

16 of the question.

17     THE WITNESS:   I believe that's correct.

18 BY MR. HARTMAN:

19     Q.    So you don't know what initiated the

20 selection of the Heim press, whether it was Afco

21 calling up HB as the local distributor saying, hey,

22 we read about these Heim presses and we want one or

23 whether HB recommended a Heim press, am I correct?

24     MR. ROBINSON:   Objection to the form or

1   something else for you to suggest two examples.

2   BY MR. HARTMAN:

3       Q.    Okay.  You don't know --

4       A.    I don't know what communication, no.

5       Q.    And you don't know whether HB was just an

6   order taken for your product or whether or not they

7   gave consulting services, correct?

8       A.    Correct.

9       Q.    Now, am I correct that Heim now provides

10  consulting services with regard to press brakes it

11  sells?

12      A.    I'm not aware of that.

13      Q.    You're not aware of that?

14      A.    That we provide consulting services?

15      Q.    Yeah.  If someone calls up and wants to

16  talk to you about what type of press brake they

17  want use for its particular use, will Heim talk to

18  that person?

19      A.    We'll speak to them, yes.

20      Q.    Is there ever a time that you know of that

21  Heim would not have consulted with a prospective

22  customer about the particular type of press brake

23  best suits that customer's needs?

24      MR. ROBINSON:  If they called up in that

1    situation and asked questions about it?

2        MR. HARTMAN:  Right.

3        THE WITNESS:  We would answer questions about

4    our product, yes.

5    BY MR. HARTMAN:

6        Q.   Do you know whether that call was ever

7    made to Heim by Afco Lycomie as it relates to this

8    particular press brake?

9        A.   Obviously, I can't -- I wasn't there at

10   the time if that's where you're going with that,

11   no.

12       Q.   So you don't know?

13       A.   No, I do not.

14       Q.   Am I correct that my understanding, and

15   correct me if I'm wrong, is that even if an

16   individual contacts Heim directly about the

17   purchase of a press brake, they still must go

18   through the local distributor in their area to

19   acquire that press brake?

20       MR. ROBINSON:  When, presently?

21       MR. HARTMAN:  Yes.

22       THE WITNESS:  Not necessarily.

23   BY MR. HARTMAN:

24       Q.   No, that's not the typical way that Heim

1    does it?

2        A.    We would prefer them going to a

3    distributor but it's not absolutely necessary.

4        Q.    Am I correct that if someone calls up Heim

5    and inquires about the purchase of a press brake

6    you would refer them first to the local

7    distributor?

8        A.    Yes.   That's a good practice, yes.

9        Q.    Because you want keep your distributors

10   happy and out there selling your product?

11       A.    Absolutely.

12       Q.    And you don't want them to think you're

13   approaching their territory, correct?

14       A.    You don't want some competition.

15       Q.    Correct.   So it's to your advantage,

16   Heim's advantage as well that they go through the

17   local distributor?

18       A.    Correct.

19       Q.    You keep your Heim sales force

20   distributors happy?

21       A.    Correct.

22       Q.    Now, at the time of the sale of the punch

23   press -- I'm sorry, press brake.

24       A.    No.   I understand.

1     Q.   I'm talking about press brakes.  At the

2  time of the sale of the press brake, am I correct

3  that once it's mounted on the -- attached to the

4  floor and energized, the ram will go up and down?

5     A.   I believe that's correct.  If everything

6  was in place, the pneumatics and the electrics and

7  properly hooked up, the normal -- that would be the

8  normal case of sequence of operation, yes.

9     Q.   Once you energize and -- energize the

10  brake press and have it fixed to a -- stationary to

11  the floor, then the foot control and if it has a

12  two palm switch will operate it to go up and down,

13  am I correct?

14     A.   Correct.

15     MR. ROBINSON:  I'm going to object to the form.

16  You included the foot switch in that question.  I

17  have not heard who installs that foot switch and I

18  don't want it to be implied.  Maybe it's attached

19  at the sale, maybe it's not.  I'll ask if you're

20  not going to.

21     MR. HARTMAN:  That's fine.  I will.

22  BY MR. HARTMAN:

23     Q.   The foot pedal to be attached is an easy

24  function that anyone can do if they follow the

1    instructions; is that correct?

2        MR. ROBINSON:  I'll object to the form of that

3    question.

4        THE WITNESS:  Correct.

5    BY MR. HARTMAN:

6        Q.    It's just basically you plug it in in the

7    back, correct?

8        A.    Simplicity, yes.

9        MR. ROBINSON:  You plug it into the back, is

10   that what you're saying?

11       THE WITNESS:  It would be attached.  It would

12   be attached -- the foot switch is usually shipped

13   separate so it's not lost in transit.  And it does

14   require it to be connected to the control panel.

15       MR. ROBINSON:  He said plugged in as opposed to

16   direct wire, there's a big distinction there and I

17   don't want this to be confusing later on.  He's

18   acting like there's a receptacle that you plug it

19   in.

20       THE WITNESS:  I'd have to take a look at this

21   particular press.

22   BY MR. HARTMAN:

23       Q.    I think there is a receptacle.

24       A.    I'd have to double-check.

1      Q.    But it's something that you expect the end

2   user to take the foot pedal, hook it up and it

3   would be operational, am I correct?

4      A.    That would be a requirement, yes.

5      Q.    And there's instructions on how to do

6   that, correct?

7      A.    Correct.

8      Q.    Now, when you talk about that there's --

9   it's not functional in the sense that it requires

10   additional work, you mean it won't begin forming

11   parts because you need to put the dye in the

12   machine to form the parts, am I correct?

13      A.    Yes.

14      Q.    And dyes come in all various sizes and

15   shapes.  So the machine is operational, it just

16   won't mold the part the way you want it without the

17   dye, am I correct?

18      A.    Correct.

19      Q.    And that's at the time it's shipped, it's

20   basically operational but deenergized?

21      MR. ROBINSON:  I'll object to the form of that.

22   He's indicated that the foot switch would be

23   shipped separately.  It would not be operational,

24   you may want to make it operational at the time,

```
 1  but that isn't what the testimony has been.  He's
 2  also indicated in his prior testimony that the end
 3  user would have to choose the appropriate point of
 4  operation safety device.  You left that out of the
 5  equation.
 6  BY MR. HARTMAN:
 7      Q.   When I say operational, I mean, the ram
 8  will go up and down as it's intended to do?
 9      MR. ROBINSON:  I appreciate that clarification,
10  now we just have the foot switch issue?
11  BY MR. HARTMAN:
12      Q.   When it's shipped once it's energized and
13  you hook up the foot pedal, if you hit the foot
14  pedal it goes up and down, am I correct?
15      A.   Correct.  In principal assuming everything
16  else is properly attached and hooked up with the
17  air and everything.
18      Q.   As it's shipped and sold and once it's
19  assembled with the foot pedal and energized, your
20  press brake is operational, once it reaches --
21      A.   It can go up and down.  It has movement --
22      MR. ROBINSON:  Hold on.
23      MR. HARTMAN:  Can I please --
24      MR. ROBINSON:  You're actually starting another
```

```
 1   question.  He's indicated assuming other things
 2   such as the air is hooked up, you've left that out
 3   of the equation.  I want to make sure that the
 4   record is clear that there are other processes
 5   involved other than simply putting electricity to
 6   it, which is how I could see the term energize be
 7   read.  And that there is, in fact, an air line,
 8   there is an electrical line, there is a foot
 9   switch, there is a point of operation safety
10   device, all the things that he's already said.
11   BY MR. HARTMAN:
12        Q.   Your press brakes will function without a
13   point of operation protection device; is that
14   correct?
15        A.   It will go up and down, yes.
16        Q.   They're designed to do that, am I correct?
17        A.   That's correct.
18        Q.   The only thing that the employer has to do
19   to make it other than what we've already talked
20   about, energize, affix and attach a foot pedal to
21   make it begin molding parts or bending parts to put
22   the dyes in, am I correct?
23        A.   The dye would be a requirement to make any
24   part, yes.
```

1      Q.    So you put the dyes in and then it works?

2      MR. ROBINSON:    I'll object to the form of the

3  question.

4  BY MR. HARTMAN:

5      Q.    Correct?

6      A.    The spirit and intent, yes.

7      Q.    There are many different types of

8  distributor relationships that Heim has; is that

9  correct?

10      A.    We have many distributors, yes.

11      Q.    And with regard to this particular

12  distributor, HB Machinery, you have no information

13  today as to what role it undertook other than to

14  place the order with Heim in the purchase of the

15  press brake 70-6?

16      MR. ROBINSON:    I'll object, he's answered the

17  question, he doesn't have personal knowledge, what

18  he's learned is through the sales documents that

19  you've attached as Exhibit 5.

20  BY MR. HARTMAN:

21      Q.    Is there anything in the sales documents

22  that tell you what role HB machinery had other than

23  accepting the order for this machine?

24      A.    No.

1    Q.    And would I be correct that you don't know

2    what type of ancillary equipment or services HB

3    machinery provides with regard to the sale of press

4    brakes?

5    A.    Correct.

6    Q.    And you don't know whether HB Machinery

7    offered any ancillary services with regard to the

8    sale of this particular press brake?

9    A.    Other than the back gauge, no.

10    Q.    What's the back gauge?

11    A.    The back gauge is a device here that moves

12    in one plane so you could take a sheet, put it in

13    the press brake and it would have a stop so you can

14    make your bend in a specific place.

15    Q.    Okay.  Okay.  But their role was to follow

16    up to see that the back gauge that you manufacture

17    for the machine was shipped?

18    A.    Correct.

19    Q.    In fact, Afco Lycomie contacted Heim

20    specifically to, according to the note, to find out

21    what's going on with regard to the back gauge, am I

22    correct?

23    A.    Correct.

24    Q.    You talk about -- would you expect that

1    when a product is protruding out from the machine

2    that the operator has to hold that it would be in

3    sheet metal form?

4        A.    For press brake operation that would

5    probably be a common assumption.

6        Q.    What other types of forms are you aware of

7    the metal -- do you have any idea?

8        A.    It could already be preshaped.

9        Q.    Okay.  Am I correct your testimony was

10   that there are no engineers employed by Heim

11   that -- whose job duties it is is to evaluate point

12   of operation protection for press brakes?

13       A.    Specifically appointed, no.

14       Q.    As an ancillary duty do they do that?

15       A.    No.

16       Q.    Is there anyone at Heim who has studied

17   and evaluated the conclusion of a point of

18   operation protection device on a press brake?

19       A.    Not that I'm aware of.

20       Q.    Is there sales literature that Heim

21   distributes with regard to its press brakes?

22       A.    Yes.

23       Q.    In what form does that take?

24       A.    There is a four-page leaflet.

1       Q.    And how long has Heim had sales literature

2    that they distribute with regard to its press

3    brakes?

4       A.    I presume since 1968 or since they

5    started.

6       MR. ROBINSON:   He's asking how long you know of

7    that they've done that.   We don't want you to guess

8    or assume that then that opens up a whole ball of

9    wax here.

10      THE WITNESS:   I don't know the specific dates.

11      MR. HARTMAN:   If you provide me with the sales

12   literature, I'd appreciate that.   If I have to send

13   a letter --

14      MR. ROBINSON:   What does that mean?   You want

15   me to provide you with sales literature for press

16   brakes, I don't know that that means, Mr. Hartman.

17      MR. HARTMAN:   Whatever sales literature you

18   have.

19      MR. ROBINSON:   From day one to 2005 you asked

20   for that and the Court said that that's crazy.

21      MR. HARTMAN:   No, they haven't said that.

22      MR. ROBINSON:   You're going to have to put in a

23   request for 40 something years of literature if

24   that's the time frame that existed.

```
 1   BY MR. HARTMAN:

 2       Q.   Let me ask you this, sir, is there

 3   different sales literature with regard to each of

 4   your press brakes or is there one pamphlet that

 5   covers all of your press brakes?

 6       A.   Existing today or from this period of

 7   time?

 8       Q.   No, today.

 9       A.   The product line has one leaflet today.

10       Q.   Okay.  And prior do you know if there were

11   multiple leaflets or would you --

12       A.   I don't know specifically.

13       Q.   Would you think that it would be one

14   leaflet to cover all the line of press brakes?

15       MR. ROBINSON:  Object to the form of the

16   question.  He said to the best of his knowledge he

17   doesn't know.

18   BY MR. HARTMAN:

19       Q.   Does Heim place in magazines sales

20   literature -- advertisements with regard to press

21   brakes?

22       A.   Ever or --

23       Q.   Ever.

24       A.   I've seen advertising, yes.
```

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

1        Q.    Do they do TV or radio for press brakes?

2        A.    No.

3        Q.    Would it be mostly trade journals?

4        A.    Most likely.

5        Q.    Are there multiple advertisements you use

6    or is it the same advertisement in all of the

7    journals?

8        A.    From the beginning of time?

9        Q.    That you know of know now.

10       A.    We haven't advertised lately.

11       Q.    So you did it before, you don't do it now?

12       A.    Right.

13       Q.    You don't know the period of time that you

14   did the advertising?

15       A.    No.

16       Q.    Would it be before '80, after '80,

17   straddling '80?

18       A.    Probably prior to '80.

19       MR. ROBINSON:    Remember that you promised you'd

20   be a short period of time.

21   BY MR. HARTMAN:

22       Q.    Why are there different sizes of press

23   brakes?

24       A.    To meet a function of the capacity

1    required to bend certain materials and in different

2    lengths.

3        MR. HARTMAN:  I have no further questions.

4    Thank you.

5                    FURTHER EXAMINATION

6    BY MR. ROBINSON:

7        Q.    Very briefly.

8             There is a two-page sheet, inspection

9    sheet press brake in the sales file that we've

10   marked as Exhibit 5, is this a Heim document?

11       A.    Yes.

12       Q.    Does this detail all of the different

13   types of inspections that would be performed prior

14   to the delivery of the press brake?

15       A.    Yes.

16       Q.    And who is Gemple Machinery Corp?

17       A.    He's our agent -- excuse me, our

18   distributor in Pittsburgh.

19       Q.    And what type of services does Gemple

20   provide?

21       A.    He's a typical distributors, sales

22   organization, sells machine tool equipment.

23       Q.    And did you notice in the sales file that

24   Gemple was the distributor for various parts,

1   including the parts and instructions manual that

2   Corey had purchased?

3       A.   Correct.

4       Q.   Does Gemple sell presses and press brakes

5   from various manufacturers?

6       A.   I'm not sure.

7       Q.   Does Gemple sell point of operation safety

8   devices?

9       A.   I'm not sure.

10      MR. ROBINSON:   Those are all the additional

11  follow-ups.

12                  FURTHER EXAMINATION

13  BY MR. HARTMAN:

14      Q.   One last question.

15          Earlier in your testimony Mr. Robinson

16  indicated that there was -- when looking at this

17  document No. 5 that there was a request for the

18  foot pedal indicated?

19      A.   Request for the foot pedal.

20      MR. ROBINSON:   The assembly order is what he's

21  referring to.

22  BY MR. HARTMAN:

23      Q.   The assembly order.

24          Does this indicate it was a request or

1    that it was shipped with the foot pedal?

2        MR. ROBINSON:  Object, it's been asked and

3    answered.

4        THE WITNESS:  It's shipped with the equipment.

5    BY MR. HARTMAN:

6        Q.    This does not indicate that someone

7    requested the foot pedal, does it?

8        A.    It would imply that the order stated they

9    wanted a foot pedal.

10       Q.    Well, please, I'm not trying to be

11   argumentative.

12       MR. ROBINSON:  He's giving you his answer.  He

13   says this document says that it would have been

14   requested.  I don't know you don't like that

15   answer, but that's what he's told you.

16   BY MR. HARTMAN:

17       Q.    Well, if it was shipped standard with it,

18   wouldn't this document also indicate that it was

19   shipped with it?

20       A.    Yes.

21       Q.    So can you tell from looking at this

22   document whether the yes by the foot pedal means

23   that there was a request for it or if it was

24   shipped standard with it?

1       A.    Not from this document, no.

2       Q.    So you don't know, am I correct?

3       A.    Right.

4       MR. HARTMAN:   Thank you.   You have the right

5   to --

6       MR. ROBINSON:   We will read the transcript.

7               FURTHER DEPONENT SAITH NAUGHT.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

1  STATE OF ILLINOIS    )

2                       )   SS:

3  COUNTY OF C O O K    )

4      I, Kyla Elliott, a notary public within and for

5  the County of Cook County and State of Illinois, do

6  hereby certify that heretofore, to-wit, on the 27th

7  day of July, 2005, personally appeared before me,

8  at 33 North LaSalle Street, Chicago, Illinois,

9  ANTHONY ROBERT MASE, JR., in a cause now pending

10  and undetermined in the United States District

11  Court, wherein TINA LINDQUIST is the Plaintiff, and

12  HEIM CORPORATION is the Defendant.

13      I further certify that the said witness was

14  first duly sworn to testify the truth, the whole

15  truth and nothing but the truth in the cause

16  aforesaid; that the testimony then given by said

17  witness was reported stenographically by me in the

18  presence of the said witness, and afterwards

19  reduced to typewriting by Computer-Aided

20  Transcription, and the foregoing is a true and

21  correct transcript of the testimony so given by

22  said witness as aforesaid.

23      I further certify that the signature to the

24  foregoing deposition was reserved by counsel for

1   the respective parties.

2       I further certify that the taking of this

3   deposition was pursuant to Notice, and that there

4   were present at the deposition the attorneys

5   hereinbefore mentioned.

6       I further certify that I am not counsel for nor

7   in any way related to the parties to this suit, nor

8   am I in any way interested in the outcome thereof.

9       IN TESTIMONY WHEREOF:  I have hereunto set my

10  hand and affixed my notarial seal this _31_ day

11  of _____, 2005.

12

13

14

15

16      _____

17      NOTARY PUBLIC, COOK COUNTY, ILLINOIS

18

19

20

21

22

23

24

243