# EXHIBIT "C"


**CLOUTIER CONSULTING SERVICES, LLC**

March 15, 2006

Mr. Paul R. Robinson, Esq.
Meyer Darragh Buckler Bebenek & Eck, P.L.L.C.
U.S. Steel Tower, Suite 4850
600 Grant Street
Pittsburgh PA 15219

      Re:    Tina Lindquist v. Heim, L.P.
              Case No: 04-249E
              D/A 9/25/02
              Your File: ALFA-107530

Dear Mr. Robinson:

In response to your request, I provide this report relative to my findings concerning an occurrence involving Ms. Tina Lindquist, while operating a mechanical press brake in the normal course of her employment at Corry Manufacturing, Corry, Pennsylvania. This letter will provide my background knowledge of this occurrence which has been obtained from reviewing documents provided by your office, knowledge obtained from working more than 30 years in the machine tool industry, and referencing appropriate government regulations and industry standards relative to the activity taking place and the equipment in use at the time.

**Document Review**
I have reviewed the following documents, which I received from your office on March 2nd, in preparation of this report.
- Deposition transcript of Tina Lindquist-Ossa (06/28/05);
- Deposition transcript of Gary Dietz (07/21/05)
- Deposition transcript of Gary Merkle (07/21/05)
- Deposition transcript of Kevin Messinger (07/21/05)
- Deposition transcript of Joel Nichols (07/22/05)
- Deposition transcript of Jamie Ossa (09/08/05)
- Deposition transcript of Jan Oviatt (07/22/05)
- Deposition transcript of Dave Phillips (07/22/05)
- Deposition transcript of Robert Rooney (09/08/05)
- Deposition of Zygmund Zajdel (01/23/06)
- Deposition of Anthony Mase (07/27/05)
- Exhibits for all depositions
- Heim's Answers and Objections to Plaintiff's Interrogatories (03/18/05)Heim's Responses and Objections to Plaintiff's Request for Production of Documents (03/18/05)
- Plaintiff's Answers and Objections to Interrogatories and Request for Production of Documents directed to the Plaintiff (06/03/05)

6624 Parkland Avenue, Cincinnati, Ohio 45233-1157
Phone: 513-941-2917   Wireless: 513-349-3880   Fax: 513-941-9727   E-mail: dennis@cloutierconsulting.com
On the Web at: www.cloutierconsulting.com

- Heim's Answers to Plaintiff's 2nd Interrogatories and Request for Production of Documents (10/06/05)
- Defendant's Response to Plaintiff's 1st Request for Admissions (12/13/05)
- Defendant's Response to Plaintiff's 3rd Request for Production of Documents (12/13/05)
- Defendant's Response to Plaintiff's 2nd Request for Admissions, 3rd Set of Interrogatories, and 4th Request for Production of Documents (12/13/05)
- Heim's Supplemental Answers to Plaintiff's 2nd Interrogatories and Request for Production of Documents (12/15/05)
- Material provided in response to subpoena upon PA-OSHA Consulting Program (Indiana University of Pennsylvania)
- PMA Insurance claim notes referencing accident information (PMACNSL 0104-0105)
- Complaint in Civil Action
- OSHA Investigative file
- Instructions and Parts Book for Heim Mechanical Press Brakes (PLTF 0107-0150)
- Sales Documentation
- Corry Manufacturing Company internal Accident Report, including e-mails regarding individual statements (PMACNSL 0076-0080)
- Information received from Hildebrand regarding Heim Press Brake
- Photographs of Heim press brake taken by Mr. Gary Hutter, P.E.
- Photographs of Heim press brake taken at Corry Manufacturing Company by Plaintiff's council
- Expert report of Ralph L. Barnett and Matthew J. Ulmenstine dated 02/13/06
- DVD of machine inspection conducted by Gary Hutter

In addition to the above documents, I referenced the following documents:
- ANSI B11.1 – 1971
- ANSI B11.1 – 1982
- ANSI B11.3 – 1973
- ANSI B11.3 – 1982(R1994)
- ANSI B11.3 – 2002
- Triodyne Inc. Safety Brief Vol. 14, No. 2
- Triodyne Inc. Safety Brief Vol. 12, No. 4
- National Safety Council Accident Prevention Manual 12th Edition
- National Safety Council Power Press Safety Manual 4th Edition
- National Safety Council Data Sheet # 419 – Press Brakes
- OSHA Regulation 29CFR1910.217
- OSHA Regulation 29CFR 1910.212

**Heim Special Duty Press Brake**
Ms. Lindquist was operating a special duty mechanical press brake manufactured by Heim Corporation, Frankfort Illinois. The subject machine is a Model 70-6, Serial number 2176. It was originally sold to H-B Machinery Company, Hartford Connecticut in 1978. The press brake was shipped to H-B Machinery's customer, Avco Lycoming, Stratford, Connecticut on 9/18/78. A foot control, in the form of an electric foot switch, was supplied with the machine.

Avco Lycoming subsequently sold the machine and eventually it ended up at the facilities of Corry Manufacturing after that company bought it at a machinery auction. Shortly after taking possession of the press brake, Corry designed, manufactured and installed a pedestal mounted dual palm button operator station which incorporated all the machine control features including mode selection, operator control selection, motor start and stop buttons, actuating palm buttons and other controls and indicator lights.

**The Occurrence involving Tina Lindquist**
On September 25, 2002, Tina Lindquist was assigned to operate the 70-6 Heim press brake. The part to be formed started as a flat rectangle of perforated stainless steel, and was to be formed into a cylinder. The forming job requires four different set ups of the press brake. Two pre-bends and a "butterfly" operation had been completed on the part and the set up had been changed so the round cylinder forming could be completed. Approximately 200 parts were being formed.

Forming of the cylindrical shape required the operator to manually pre-form the part around a mandrel. This pre-forming was accomplished on the actual mandrel which served as the lower half of the forming die set while it was position in the machine. Therefore it was necessary for Ms. Lindquist to place her hands between the upper and lower die to fit the part around the mandrel.

The press break was set up by Corry employee, Robert Rooney. Mr. Rooney would change dies for each of the four operations on the part after the operator completed each previous operation on the entire lot. With the final die set in the machine to make the round shape, the distance between the upper and lower die components is estimated to be approximately 2 1/4". This is the space within which the operator had to place the part and pre-form it around the mandrel (with her hands).

Ms. Lindquist was positioned in front of the press brake with the tray of parts to her side. She had positioned the foot switch operator control between her and the front of the machine. A stool was positioned behind her. The testimony is unclear relative to weather she was sitting on the stool or leaning against it. It is not clear if Ms. Lindquist was inserting, manually forming or removing a part, but during the time her hands were between the dies, the machine cycled down upon them which resulted in the injuries which form the basis of this lawsuit.

Ms. Lindquist testifies she did not actuate the footswitch. An inspection of the machine immediately following the occurrence indicated the machine was operating properly in all respects. Other Corry employees testified that Ms. Lindquist had to be "riding" the footswitch and inadvertently depressed the actuating pedal as her body position shifted forward as she was reaching into the die area.

**Standards and Regulations**
The American National Standards Institute (ANSI) is a private organization that is in the business of providing procedures and governance for the development of national consensus standards. ANSI seeks out and authorizes other organizations that have special interests in the development of standards for a particular industry or purpose. ANSI appoints Standard Developing Organizations (SDO) who assumes the responsibility of developing standards for

the industry they serve. These SDO's have to follow ANSI rules and procedures in order to maintain their status as an ANSI authorized SDO. ANSI performs regular audits to ensure compliance to their rules.

The Association For Manufacturing Technology is the SDO for machine tool safety standards in the United Stated. Formerly known as the National Machine Tools Builders Association (NMTBA), this organization assumed SDO responsibilities for machine tool safety standards in 1969 or early 1970. There are currently 24 B11 machine tool safety standards. Each one applies to a specific machine type or machine safeguarding. B11.3 – 1973, is the safety standard for Power Press Brakes. It was originally approved as an ANSI standard on February 15, 1973. It has had several revisions since that time. The current revision was approved on February 14, 2002.

Another safety standard which has been identified in the material reviewed for this report is ANSI B11.1 – 1971. This standard was originally approved by ANSI on February 17, 1971 and it applies to Mechanical Power Presses. Although Power Presses and Power Press Brakes are both metal forming machine tools, there exist significant differences in the operation and safety aspects of these machines to justify two different safety standards. The requirements in ANSI B11.1 should not be confused or intermingled with the safety requirements found in B11.3 for Power Press Brakes.

The ANSI B11.3-1973 Press Brake safety standard establishes the responsibility for the construction, care and use of these machines. Safety requirements for Construction (design and manufacture) are assigned to the machine manufacturer (supplier). Safety requirements for Care and Use (operation and maintenance) are assigned to the user of the machine. Language in Section 6 of this standard establishes the user's requirements to safeguard the point of operation of press brakes. The point of operation is the area between the upper and lower dies where forming takes place. Presence Sensing Devices (PSD) and Two Hand Control Devices are two of the six types of safeguards described in section 6 of ANSI B11.3 - 1973. This section also mandates the employer to complete within three years of the approval of the standard a program to procure new dies and/or modify existing dies in order to make it unnecessary for operators to place their hands in the point of operation while operating a press brake. This requirement has become known as the "Hands Out Of Die" principle. These same requirements are also in the B11.3 – 1982(R1994) standard that was in circulation at the time of the occurrence to Ms. Lindquist.

The Occupational Safety and Health Administration was established in 1970 when congress passed the William Steiger Act. OSHA was directed to develop laws that would improve safety in the factories and other workplaces in the United States. OSHA regulations are identified by their Code of Federal Regulation number. Title 29 applies to Labor, and part 1910 is Occupational Safety and Health. The section of the regulation applying to General Requirements for all machines is 212. There is no specific regulation in the OSH Act pertaining to the safety of press brakes. Therefore 29 CFR 1910.212 is the regulation general industry has to follow for safeguarding machinery, unless there exists another section of the regulation specific to a machine type. As a matter of fact, 1910.212 is the section under which Corry Manufacturing was cited by OSHA following the occurrence to Ms. Lindquist. The citation was for the employer failing to provide proper safeguarding at the point of operation of the Heim press brake at the time of the occurrence.

**Evaluation**
The ANSI B11.3-1973 safety standard provided the first authoritative document written on press brake safety. The document was developed by individuals representing manufacturers and users of press brakes, and reflects the custom and practice of the industry at the time of approval in 1973. As mentioned above, the document included strong language addressing "Hands Out Of Die" (HOOD) operation. The industry felt strongly back then, and still does today that if press brakes are operated in this manner, no injuries, or very few injuries will occur at the point of operation. This language is found on safety signs mounted on press brakes through out the industry. It is found in machine manuals and the Accident Prevention Manual published by the National Safety Council. Data Sheet # 419 from the National Safety Council echoes the same philosophy. To suggest that HOOD is ineffective is a discredit to the many safety professionals, designers and die builders who have worked to this end over the past 30 years. The data gathered by the Bureau of Labor Statistics show the effectiveness of HOOD with the continually decreasing hand and finger injury rates over the past 20 years.

The dissertation provided by plaintiff's expert concerning HOOD completely misstates the historical facts. The reality is the ANSI B11.1-1971 safety standard contained language on HOOD. OSHA's adoption of the B11.1-1971standard into its regulation included the requirement for HOOD operations and made it Federal Law, (rather than a requirement in a voluntary consensus safety standard). The metal stamping industry, which consists primarily of power press users, filed suit against OSHA demanding that the HOOD requirement be removed from the regulation. The suit cited the extreme economic damage the requirement would bring upon the industry because of the tens of thousands of power press dies that would have to be modified or redesigned/remanufactured, which translated into millions of dollars, in order to comply with the law. Obviously the industry won and OSHA modified the requirement in the regulation. The committee revising the B11.1 safety standard in 1982 acted to keep the standard consistent with its sibling OSHA regulation. It should be noted, the B11.1 safety standard continued to urge the use of HOOD even after its 1982 revision.

The facts of this case require us to return to the discussion of press brakes. Ms. Lindquist was not injured while operating a power press. The Heim press brake Ms. Lindquist was operating was originally manufactured in 1978. At some point between the time the machine was delivered to Avco Lycoming, the original user, and its use at Corry Manufacturing on September 25, 2002 a palm button station, mounted on a pedestal, had been installed on the machine by Corry Manufacturing maintenance personnel.

The original machine met all the construction requirements of the ANSI B11.3-1973 standard. The evidence shows that a footswitch was provided with the machine in 1978. There is no evidence to indicate what make or model foot switch was provided at that time. Plaintiff's expert assumes a Linemaster Cat # 532-SWH was the originally provided foot switch. However, the footswitch on the Heim press brake at the time of the occurrence in 2002 was a Cat. # 511. Also, the evidence does not give us any indication if the original user, Avco Lycoming, utilized the originally provided foot switch or added its own, or installed a palm button station or other control device on the press brake when incorporating it into its production operations.

Foot controls are widely utilized throughout the metal fabricating industry. In 1978 there was no requirement in the press brake standard, or any other safety standard that required an electrical foot switch to have a gate, or flap over its opening. Additionally, experience has shown that foot switches that are difficult to access encourage "riding" of the foot control. A

Case 1:04-cv-00249-SJM   Document 32-6   Filed 03/16/2006   Page 7 of 16

Tina Lindquist v. Heim. L.P.                                                                     Page 6 of 7

Triodyne Inc. Safety Brief in 1997 examined 12 different types/styles of footswitch and did not find significant safety advantage among the test specimens.

The function of the foot control is to provide the operator of the press brake with a means to control the motion of the ram when it is necessary to have the hands available to control the part that is being formed. Point of operation safeguarding is required at all times when operating a press brake in production operations, and a foot switch is not a point of operation safeguarding device unless it is permanently fixed at a distance far enough away from the point of operation that an operator cannot reach this area and still cycle the machine. This is an impractical requirement for all but the rarest press brake applications.

A dual palm button control requires the simultaneous actuation of two push buttons by both hands in order to initiate machine motion. The buttons are usually located approximately 27" apart to prevent "bridging" by using the elbow and the finger tips of the same arm. Dual palm buttons can be utilized as a point of operation safeguarding device when properly located relative to the point of operation. The location is a function of the stopping ability of the machine. The subject machine was equipped with a dual palm button station which could have been utilized as a point of operation safeguarding device for the forming operation Ms. Lindquist was performing. All that was required was for Mr. Rooney, or Ms. Lindquist to move the palm button station into position and select "Hand" using the key operated selector switch located on the pedestal station itself.

Another type of point of operation safeguarding device which could have been utilized on this press brake and incorporated into the forming process being performed by Ms. Lindquist is the presence sensing device (PSD). The machine was not equipped with such a device at the time of the occurrence, but one was ordered and installed shortly thereafter. Additionally, there is testimony in the depositions reviewed that there was an unused PSD in the maintenance department at Corry Manufacturing at the time. The testimony of the Corry employees has indicated the Heim press brake continues to be operated today with the PSD in place and operating, and the operator utilizing the duel palm button control to cycle the machine.

**Conclusion**
Based upon my education and training in the machine tool industry, the experience from working in the metal fabricating industry for more than 33 years with 24 of those years directly related to the safe operation and use of machinery, having fulfilled the requirements and testing to earn the designation of Certified Safety Professional, and with a reasonable degree of certainty, I provide the following opinions.

The Heim 70 – 6 mechanical press brake, manufactured in 1978 was not defective. The footswitch, as a component of the metal forming system on the day of the occurrence was not defective. There are no safety standards against which to measure footswitches, and there is continuous debate within the safety community regarding the efficiency of the various designs commonly found throughout the manufacturing world. The Triodyne Safety Brief Vol. 12 No. 4 "Foot Controls: Riding the Pedal" concludes with this statement: IV. 9. "The proper selection of a foot control is not straightforward. It involves many considerations including knowledge of operator movement in the work space, steadiness requirements for part insertion, the use of point of operation safeguards, technology transfer, maximum or continuous stroke rate of the controlled machine, and the various anticipated uses of the foot control on multi-mode machinery." In 1978, when Heim selected the footswitch that was originally provided with the

Case 1:04-cv-00249-SJM   Document 32-6   Filed 03/16/2006   Page 8 of 16

Tina Lindquist v. Heim. L.P.                                      Page 7 of 7

press brake, there is no possible way they would be able to foresee any of the above considerations outlined in the above Safety Brief conclusion.

It is universally recognized that the users of power press brakes are in the best position to determine the correct type of point of operation safeguarding for the variety of work they perform on these machines on any given day. It is normal for a press brake set up to be changed several times a shift. The job Ms. Lindquist was performing required 4 different set ups within a couple of hours. Each set up may have required unique safeguarding, or adjustment to existing safeguarding. Point of operation safeguarding is required for all press brake production operations. The OSHA law and the American National Safety Standard both require some form of safeguarding. Unless the footswitch is permanently fixed at a sufficient distance away from the point of operation, the footswitch with or without a front flap, is not a recognized safeguarding device in the ANSI standard.

A duel palm button operator station could have provided the necessary safeguarding. The accident would not have happened had the palm button station that was already on the machine been moved into position and turned on by Mr. Rooney when he set the dies up, or by Ms. Lindquist before she started the forth operation. Additionally, the accident would not have happened had a PSD been ordered and installed on the press break the same time the palm button station was manufactured and installed by Corry Manufacturing maintenance personnel, and then turned on and used on September 25, 2002.

The press brake was not being properly used at the time of the occurrence. The requirement to reach into the die area to hand form a part around a mandrel is a misuse of this machine. The procedure established by the employer required the operator to place both her hands in a very high risk area. Procedures should have provided for the hand forming to be performed outside the point of operation on a secondary mandrel so it would be unnecessary to reach between the dies.

I have prepared this report based on the materials reviewed as outlined at its beginning. I reserve the opportunity to modify or add to my opinions herein should additional information become available.

If you have any questions or require additional information, please do not hesitate to contact me.


Very Truly Yours,
Cloutier Consulting Services

*Dennis R. Cloutier* CSP
Dennis R. Cloutier CSP
President

# CURRICULUM VITAE

\*\*\*\*\*

## Dennis Roger Cloutier CSP
6624 Parkland Avenue
Cincinnati, Ohio 45233
513-941-1225(H) 513-941-2917(W)

**PROFESSIONAL BACKGROUND:**

<u>Employment:</u>

    10/2001 - Present    **Cloutier Consulting Services**
        Technical and Expert Services for Industry and Business
        Technical services in: Technical Writing, Product Safety, Machine Safeguarding, OSHA Compliance, Instruction Sheets, Safety Manuals, Technical Data Sheets, and Risk Assessment/Risk Reduction
        Expert services in: Accident Investigation, Litigation Support
        OSHA authorized General Industry 10 hour & 30 hour course instructor

    1973 - 9/2001    **Cincinnati Incorporated, Cincinnati Ohio**
        1982 - 9/2001    Product Safety Coordinator
        Provide Product Safety support to the various departments in the company responsible for design, manufacturing, marketing, parts and service of the products. Maintain familiarity with applicable national consensus safety standards and other regulations affecting the products and customers. Maintain active involvement in safety related organizations. Provide management on product liability litigation.
        1978 - 1982    District Service Manager
        Responsible for the operation of a service district, including the professional development of six to ten service representatives, customer relations and the overall administrative business of the district.
        1973 - 1978    Field Service Representative
        Responsibilities included the start-up and demonstration, instruction of customers and warranty service of new products; routine service and repair of existing products; customer relations and the administrative duties of the assigned service area.

    10/1972 - 12/1972    **The Hartford Insurance Group**
        Heating, Ventilating and Air Conditioning Mechanic. Responsibilities include ensuring the proper operation of facilities HVAC equipment; Perform routine maintenance on all the various types of air moving and temperature and humidity control equipment; respond to user complaints concerning temperature, humidity, draft, noise, etc.

    9/1972 - 10/1972    **Berkin Manufacturing Company**
        Refrigeration Technician. Responsibilities include the assembly, testing and shipping of mobile refrigeration units used in boats, mobile homes, and other similar applications.

    9/1971 - 8/1972    **Combustion Engineering**
        Heating, Ventilating and Air Conditioning Mechanic. Responsibilities include ensuring the proper operation of HVAC equipment in 21 buildings on a large business campus and additional remote locations; Perform routine maintenance on all the various types of air moving and temperature/humidity control equipment; respond to user complaints concerning temperature, humidity, draft, noise, etc.

    7/1964 - 7/1971    **United States Navy**
        See below for service details.

**Affiliations:**

    American Society Of Safety Engineers
        Professional Member – Membership since 1987
            Standards Development Committee –Member 1996-2001
            ISO/IEC Guide 51 Task Force – Past Member

    American National Standards Institute
        Association For Manufacturing Technology
            Project Leader of U.S. delegation to ISO TC199 WG5 – Revision of ISO 14121;
                Safety of Machinery, Risk Assessment
            Co-Chair Writing Subcommittee  - ANSI B11.1, Safety Requirements, Mechanical Power Presses
            Member Writing Subcommittee   - ANSI B11.3, Safety Requirements, Power Press Brakes
            Chairman Writing Subcommittee - ANSI B11.4, Safety Requirements, Power Squaring Shears
            Chairman Writing Subcommittee - ANSI B11.13, Safety Requirements, Single & Multi spindle screw bar/chucking machines
            Chairman Writing Subcommittee - ANSI B11.16, Safety Requirements, Powder Metal Compacting Presses
            Member Writing Subcommittee   - ANSI B11.18 (&14), Safety Requirements, Coil Processing Systems
            Chairman Writing Subcommittee - ANSI B11 TR 3, Risk Assessment and Risk Reduction
            Chairman Writing Subcommittee - ANSI B11 TR 5, Sound Level Measurement Guidelines
            Voting Delegate               - B11 Accredited Standard Committee representing the Metal Powder Industries Federation
        American Society of Mechanical Engineers
            Member Main Committee         - ANSI B15.1, Safety Requirements for Power Transmission Apparatus

    National Safety Council
        A 2005 recipient of the National Safety Council's highest individual recognition– <u>The Distinguished Service To Safety Award</u> (DSSA)
        Member;  1982 - Present
            Business and Industry Division
                Member - Executive Committee
                Member - Administrative Affairs Committee
                Chairman - Procedures Committee
                Chairman – Communication and Training Committee
            Automotive, Metals and Power Press Section
                General Chairman, 2000 to 2003
                Chairman – Education and Training Committee
            Power Press Forging and Metal Fabricating Section
                General Chairman, 1997, 1998
                1st Vice Chairman, 1996
                2nd Vice Chairman, 1995
                Secretary, 1992 - 1994; 1999
                Engineering Committee member, 1992 - 1999
                Education and Training Committee member, 1999
                Membership Chairman, 1995 – 1999

**Teaching Experience/Technical Presentations:**

    American National Standards Institute – Presentation to 3-A Sanitary Standards Association on benefits of ANSI Accreditation
    Oregon OSHA – Training on machine safeguarding and associated ANSI standards – 8/2003
    National Institute for Occupational Safety and Health (NIOSH) – Training seminar on Risk Assessment and Risk Reduction – 07/2004 & 10/2002
    International Conference on Environmental Management, Brugge, Belgium, 10/2001
        Paper on Important New Guidance for Evaluating and Reducing the Risk of New Technologies
    Industrial Accident Prevention Association

      International Metalworking Machine Safety Conference, 2000
         Presentation on Press Brake Safeguarding

<u>Alliance Of American Insurers</u>
         Machine Safeguarding Seminar Presenter for Shear, Press Brake, Coil Processing and P/M Press Safety; Twice Annually, 1983 - 1987

<u>Junior Achievement of Cincinnati</u>
         Project Business Consultant to local schools, 1989 - Present

<u>Metal Powder Industries Federation - P/M Press Tooling Seminars (annual)</u>
         Presentation on P/M Press Safety Requirements, 1993 - 1996

<u>American Society of Safety Engineers - Professional Development Conference</u>
         Presentation – Risk Assessment and Risk Reduction - 2002
         Presentation - Standards Development and Liability Implications - 1996

<u>Precision Metal Forming Association - Exposition and Symposium – 1996, 2000, 2001</u>
         Laser Safety Presentation to the Metal Fabricating and Small Lot Stamping Division
         Lock Out/Tag Out for Industrial Operations

<u>National Safety Council - Congress and Exposition</u>
         Professional Development Specialty Session
            Presentation – Risk Assessment/Risk Reduction; 2000
            Presentation – Shear Safety; 1991, 1992, 1993, 1994,1997, 1999.
            Presentation – Press Brake Safety; 1992, 1995, 1996.
            Presentation – Laser Cutting System Safety; 1994, 1995, 1996, 1997, 1999.
         Power Press, Forging and Metal Fabricating Section Machine Tool Safeguarding Seminar (conducted 1 to 2 times annually)
            Presentation on Press Brake and Shear Safety; 1992 - 1999
            Presentation on Laser Cutting System Safety; 1994 – 1999

**Publications:**

    <u>Risk Assessment for Maintenance Work, design safety engineering, inc., 2003</u>
    <u>National Safety Council Accident Prevention Manual;</u>
         Contributor - 11th Edition, 10th Edition, 9th Edition
    <u>National Safety Council Newsletters;</u>
         Product Safety  Up-To-Date, M/A 97
            Foreign Regulations: Know what your Product Safety Program Is Up Against
               Article on EC Regulations and their effect on US Standards
         Safety Focus  M/J 97
            Halt! Who Goes There? Friend or Foe?
               Article on Risk Assessment
         Power Press, Forging and Metal Fabricating Section
            S/O 92 Newsletter;  Look Out For Lasers (Part 2)
            J/A 92 Newsletter;  Cut Steel With Light?
            M/J 92 Newsletter;  Operate Power Squaring Shears Safely.
            M/A 92 Newsletter;  How to Safely Operate Press Brakes.
            M/J 95 Newsletter;  More on Safeguarding Power Squaring Shear.

**Education:**

    <u>University of Cincinnati</u>
         Bachelor of Science - Administrative Management 1986
         Bachelor of Science - Information Processing Systems 1987

    <u>United States Navy</u>
         Machinist Mate 'A' School, Great Lakes Training Center, Great Lakes, IL. 1964
            Curriculum: Steam generation theory, Thermodynamics, Turbine theory and design, Pump theory and design, Fluid dynamics-system design and operation.
         Basic Submarine School, U.S. Naval Submarine Base, New London, CT. 1965
            Curriculum: Hydraulic theory and design/operation, pneumatic systems theory and design/operation, Electrical theory, Motor design/operation, Generator theory/operation, Fluid system design and

function, Internal communication systems, Environmental control systems, Ballast Control Systems, etc.

    Nuclear Power School, U.S. Naval Base, Bainbridge, MD. 1965
        Curriculum: Nuclear physics, Reactor theory, Thermodynamics-Heat Transfer and Fluid Flow, Radiology, Chemistry, Metallurgy, Electronic control systems design and operation and advanced electrical theory.
    Nuclear Power Operator Training School, Combustion Engineering, Windsor, CT. 1966
        Continuation of the above Nuclear Power School curriculum with hands on experience with an operating nuclear reactor prototype.
    Propulsion Shaft Components School, U.S. Naval Submarine Base, New London CT. 1966
        Specialized curriculum including shaft seals, journal and thrust bearings, propeller and clutch design and operation.
    Vibration and Analysis School, U.S. Naval Submarine Base, New London CT. 1968
        Theory of sound generation and measurement.

University of Michigan
    Management Fundamentals for the Newly Assigned Manager (Seminar) 1979
    Management of Time (Seminar) 1979
University of Syracuse
    Managerial and Leadership Skills for the Newly Assigned Manager (Seminar) 1980
University of Wisconsin
    Product Liability and Control (Seminar) 1985
National Safety Council and The American Society of Safety Engineers
    Numerous courses, seminars and self study guides in preparation for and passing the exam requirements for the Certified Safety Professional classification 1994-1998
Dale Carnegie Training Programs
    Human Relations and Effective Speaking 1980
Defense Research Institute
    Pre-Trial Tactics (Seminar) 1984;   Trial Tactics (Seminar) 1988
Alliance of American Insurers
    Machine Safeguarding Seminar 1984
Metal Powder Industries Federation
    P/M Tooling Seminar 1993
Commercial Trades Institute
    Refrigeration, Heating and Air Conditioning Diploma 1970
Xerox Corporation
    Customer Satisfaction Skills (Seminar) 1981
Rexroth Corporation
    Logic Element Manifolds and Proportional 4-Way Valves - Design Engineering Course 1981

**Military Service:**

    United States Navy 1964 - 1971
        Honorable Discharge - July 21, 1971
    Decorations
        National Defense Service Medal
        Good Conduct Medal
        Meritorious Unit Commendation - Second Award
        Navy Unit Commendation
    Shipboard Service
        USS Skate SSN 578, July 1966 to April 1968
        USS Sturgeon SSN 637, April 1968 to July 1971

**Community Service:**

    Sayler Park representative to Lanxess (formerly Bayer Polymer Plastics) Public Advisory Group
    Sayler Park representative to Greater Cincinnati-Northern Kentucky International Airport Public Advisory Committee's Airport Noise Abatement Committee
    Cincinnati Police Citizens-on-Patrol Community Coordinator
    Saint Aloysius-on-the-Ohio Parish Administrative Assistant

Cloutier Consulting Services
6624 Parkland Avenue
Cincinnati Ohio 45233

April 6, 2005

The below list is of cases in which I have provided evidence in the form of deposition or trial testimony since 1999.

| Date | Case/Retained by/Result | Location/Number | Attorney/Phone | Testimony |
|---|---|---|---|---|
| May, 2005 | Petersen v. Berendsen Fluid Power, Pacific Press Brake Mfg. Co., et al<br>Defense/Settled | U.S. District Court Montana; Missoula Division<br>CV-04-095-M-DWM | Scott Gratton<br>406-248-2611 | Deposition |
| February, 2003 | Sexton v. Cincinnati Incorporated<br>Defense/Settled during trial | NY Supreme Court-Chautauqua #K1-2000-602 | Brian Crosby<br>716-856-4200 | Deposition |
| December, 2002 | Murillo v. Sandvik Systems<br>Defense/Plaintiff | USDC Northern District-Illinois # 98C372 | John O onnell<br>312-360-9500 | Trial and deposition |
| August, 2002 | Stack v. Milacron<br>Defense/Settled | USDC District of Minnesota # 01-1850 | Fred Morris<br>612-335-1530 | Deposition |
| March, 2002 | Anderson v. Cincinnati Incorporated<br>Defense/Defense | Circuit Court St. Louis Mo. #992-08665 | Pactrick Phillips<br>314-231-8844 | Deposition |
| June, 1999 | Norris v. Cincinnati Incorporated<br>Defense/Defense | USDC Eastern District Arkansas #LRC-98-574 | Roger Glasgow<br>501-212-1269 | Trial |
| March, 1999 | St. George v. Cincinnati Incorporated<br>Defense/Defense | Worcester Ma. Superior Court 93-1230 | Chris Duggan<br>617-248-1900 | Trial and Deposition |
| January, 1999 | Trzaska v. Cincinnati Incorporated<br>Defense/Defense(MSJ) | NY Supreme Court - Erie | Jeff Wilkins<br>716-454-6480 | Deposition |

Sincerely,
Cloutier Consulting Services

Dennis R. Cloutier CSP

President

Cloutier Consulting Services
Fee Schedule

Effective October 1, 2001

Cloutier Consulting Services (CCS) charges one rate for all work performed for a client. It is lower than the average of other individuals who provide occurrence investigation and expert services as litigation support, but is much more straight forward and less confusing.

Service rate:
The service rate is $185.00 per hour and is charged for services necessary to fulfill obligations of the agreement including:
    File and document review,
    Report preparation,
    Deposition and trial testimony preparation,
    Deposition and trial testimony,
    Travel time,
    Conference call and meeting time,
    Other time as may be reasonably necessary to fulfill CCS' obligations.

This rate is subject to change on a calendar year basis without other notice.

Expenses:
CCS passes to the client all "out of pocket" expenses necessary for CCS to fulfill its obligation under this contract. These include, but are not limited to, travel (air, rail, car, etc.), meals and lodging, special delivery charges (FedEx, UPS, DHL, USPS), reproduction and photo processing / printing charges. Actual expenses are charged back  there is no markup.

Lost time and penalty fees:
CCS reserves the right to bill for lost time in the event of a cancellation of events requiring travel, whether the cancellation is caused by the Client or other entity not a party to this contract. If cancellation occurs after prepaid - nonrefundable travel arrangements are made, Client will be responsible to reimburse CCS for cost associated with travel change fees or the forfeiture of any travel expense.