# EXHIBIT "D"

IN THE U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT OF PA

* * * * * * * * *

TINA LINDQUIST,
Plaintiff
vs.
HEIM L.P.,
Defendant

Case No. 04-249E

* * * * * * * *

COPY

DEPOSITION OF

GARY DIETZ

JULY 21, 2005

Any reproduction of this transcript is prohibited without authorization by the certifying agency.

Q. Pardon me?

A. Yes.

Q. Tina Lindquist has testified that she never read the operator's manual for this particular machine. If she didn't, that would be in violation of the second warning contained on this machine; wouldn't it?

A. In violation of that, yes, I guess that's the way you've read it.

Q. And then at the very bottom it says it is the employer's responsibility to implement the above and also to provide proper dies, devices or means that may be necessary or required for any particular use, operation, set-up or service. Do you have any trouble understanding that instruction?

A. No.

Q. Is that telling the employer that it's up to the employer to determine what type of use they're going to put to this particular machine and then choose the appropriate safety

device for that use?

A. Yes.

Q. Because you're aware that certain safety devices, such as the two-palm button switch, can't be used for certain applications or press brakes, particularly if you have to hold the product outside of the die area; is that right?

A. Correct.

Q. Have you ever used an operation on any of the presses at Corry that required the use of a tool, a holding tool of some sort?

A. One more time. Say that again.

Q. Has Corry ever performed any processes with their presses where the operator is required to use a tool to hold the product?

A. I'm not --- I don't know.

Q. Have you ever heard of such a process being used before in the use of a press, where the user --- the operator actually holds the product with a tool?

A. Yeah.

Q. And that's another application where the two-palm button switch isn't going to work because the user has to actually hold the tool; is that right?

A. Yes.

Q. Do you know what a light curtain is?

A. Yes.

Q. What is a light curtain?

A. It's a device that has --- we use them on some of our presses. It creates I don't know what kind of light, but there's a light that's almost --- that is emitted from one side, and I think it's reflected back --- it's reflective on one side, and if you put something in there to --- that goes in between the two devices, it will prevent the machine or whatever it is attached to it from operating.

Q. When you first started working at Corry in 1993, were there any light curtains on any of the presses?

A. I don't remember.

Q. Similar to two-palm button switches that are suitable in certain applications and can't be used in some other applications, do you understand that light curtains are appropriate for some applications and can't be used in other applications?

A. It's my understanding, yes, that's the case.

Q. Was a light curtain added to this particular machine for this particular press brake after this accident?

A. Yes.

Q. And who made the decision to add that light curtain?

A. I believe it was maintenance personnel.

Q. Do you know who that would be?

A. Gary Merkle.

Q. Where did Corry get the light curtain from that was added?

A. I don't know.

Q. Do you know if my client, Heim, was ever asked to provide a light

light curtain?

A. I don't know.

Q. Can you give us an estimate as to how long after the accident happened that Corry installed the light curtain on this press brake?

A. My best recollection would be within one week.

Q. And during that one week of waiting for the light curtain, I understand the press was operated with a two-palm button switch; is that right?

A. To the best of my recollection, yes, sir.

Q. Do you know how long the two-palm button switch had been able to be used for this press brake before Tina Lindquist was injured?

A. No, I don't.

Q. Do you know of anyone ever complaining before Tina Lindquist was injured that the two-palm button switch should be used for the operation she was performing?

A. Not that I'm aware of, no.

Q. Did anyone else ever get injured on this particular press brake?

A. Not that I'm aware of.

Q. Have there been any other injuries on any of the other press brakes or presses at Corry?

A. Not that I'm aware of.

Q. Do you know what caused this particular accident to occur?

A. Yes. She had her hands in the die area and inadvertently pushed the foot switch.

Q. How do you know that?

A. That's my understanding of what happened.

Q. Yes. And where did you learn that understanding How did you hear that?

A. She was operating the machine with a foot switch. That's the only way I see that could have happened.

Q. Tina Lindquist has testified recently that she specifically remembers pulling her foot out of that

A. Yes, there were different operations performed on it.

Q. And you've mentioned a number of processes for this particular part. Could a number of those processes be performed utilizing the Heim press brake?

A. Yes.

Q. And was the Heim press brake used for other parts?

A. Yes.

Q. And multiple processes involved with forming other parts?

A. Yes.

Q. Can you give us an estimate as to how many different uses you're aware of that the Heim press brake has been put to by Corry?

A. I don't know what that number would be. I don't feel I could give you an accurate guess.

Q. Give me a minimum number that you're comfortable with.

A. Number of operations?

Q. Different operations. Different

uses, if you will.

A. Twenty (20).

Q. You're comfortable in thinking it would be at least 20 and who knows however many more?

A. Correct.

Q. And I take it some of those uses were --- well, strike that.

Were some of those uses suitable for certain safety devices and other uses suitable for other safety devices?

A. Not sure. I guess.

Q. Well, we talked about how some processes you can't use certain safety devices.

A. No.

Q. And I'm wondering if the different uses to which the Heim press brake were such that some of those processes required certain safety devices, others you couldn't use certain safety devices, such that the use of the safety device changed, depending upon the use of the press brake. Does that seem accurate?

ATTORNEY HARTMAN:

What do you mean does it seem accurate? I'm sorry, I don't know what the question is.

ATTORNEY ROBINSON:

No, that's okay. Go ahead.

ATTORNEY HARTMAN:

I'm going to object to the form of the question.

ATTORNEY ROBINSON:

That's how I took your comment.

A. Could you just restate that for me?

BY ATTORNEY ROBINSON:

Q. Sure. Did the different uses to which the Heim press brake was put, a minimum of 20, we don't know how many, did those different uses require different safety devices? We know there were two different modes of operation that were at least in existence at the time of the accident.

A. To my knowledge, that was the

two. They would use the palm buttons or foot switch.

Q. And do you understand that both of those were in use and available for the press brake because certain uses required the use of a foot switch and certain uses required the use of the two-palm button switch?

A. Yes.

Q. Did Corry ever report to Heim what type of use they were putting to the press brake?

A. I don't know that.

Q. Has anyone ever suggested at any time that Corry has ever contacted Heim to tell them what they were going to use the press brake for?

A. I don't know.

Q. Has anyone ever suggested that Corry has ever contacted Heim and asked for Heim's advice as to which safety device would be appropriate for any particular uses to which Corry was putting the press brake?

A. I don't know.

inside the die area?

ATTORNEY HARTMAN:

What definition of sit are we using, yours or his?

ATTORNEY ROBINSON:

His.

A. My definition of sit --- I can't recollect seeing anybody sit in a chair at that machine.

BY ATTORNEY ROBINSON:

Q. Do you have a memory of seeing other people leaning their rear ends against the chair in a similar fashion as you described Tina Lindquist doing while placing their hands inside the die area of this press brake?

A. I don't know. I can't give you a definite answer.

Q. Then if you go to the second page, where it says risk control action, do you see that?

A. Yes.

Q. It says a full functionality test of the press was conducted at 3:20 p.m. and again at 4:00 p.m. when I, I

assume that means Graig Filer, arrived at the scene? Do you see that?

A. Yes.

Q. And then it says that all cycles off, auto jog, single switch and continuous and operator buttons, two-hand palm and foot pedal were tested and found to be in good working order. Do you see that?

A. Yes.

Q. Has anyone ever suggested to you that the press brake did not work as it was intended to work?

A. No.

Q. Everything that you've ever heard about the investigation reveals that the press brake worked as it was intended to work; is that correct?

A. Yes.

Q. Has anyone ever identified to you or suggested to you that there's some type of defect in the press brake?

A. No.

Q. Do you believe the press brake is defective in any way?

A. No.

Q. It then goes on to say, we noted that the foot pedal should not have been used in this situation with the employee working at the point of operation. The press should have been set up for the two-hand palm buttons and locked in this mode so that the foot pedal was inoperable. Do you have any opinion on those statements?

A. No.

Q. I think you said previously that this operation could have been performed safely with the foot switch if it had been placed at the proper location; is that right?

A. Yes.

Q. And that the two-palm button switch also could have been used safely and would have avoided this accident; is that right?

A. Yes.

Q. In fact, if you look at the second paragraph, the second sentence says this accident would have been

prevented had the machine been set up in this manner originally. You agree with that; right?

A. Yes.

Q. And then the second to last sentence in that same paragraph says, the company is also --- well, first of all, let me back up and just continue reading from there. It says, training will be conducted as soon as possible for supervisors and employees regarding the proper guarding and set-up of mechanical and other presses. Do you see that?

A. Uh-huh (yes).

Q. You have to answer verbally.

A. Yes.

Q. Did you receive additional training regarding the set-up and operation of presses after this accident?

A. I don't remember.

Q. And it says the company is also considering the installation of light curtains on this and one other