```
1        Q.   Is your assumption on the way this
2   accident happened including an assumption that
3   her foot is dangling in the air?
4        A.   It has nothing to do with dangling in
5   the air.
6        MR. HARTMAN:  That was your assumption.
7        THE WITNESS:  It is outside of the foot
8   pedal.
9   BY MR. ROBINSON:
10       Q.   And outside of the foot pedal is it in
11  the air or is it on the ground?
12       A.   It doesn't make any difference.
13       Q.   I thought you said a little bit ago if
14  it were on the ground the friction from -- that
15  that friction would reduce the likelihood of the
16  foot involuntarily moving forward?
17       A.   If she has to stabilize herself, she
18  will have to pick her foot up and then step down
19  someplace.  And you don't -- if you are riding
20  the pedal, your foot is already resting where
21  you want it and you move forward, you are not
22  moving that foot forward, you know, it is
23  stabilized on the pedal.
24       Q.   How high is the pedal off the ground?
```

215

```
 1      A.    About an inch and a half.
 2      Q.    What makes you think that her foot
 3   would have to raise an inch and a half rather
 4   than just slide forward on the ground?
 5      A.    I don't think I understand the
 6   question.
 7      Q.    This involuntary movement that you have
 8   as her activating the foot control, it requires
 9   her also not only to involuntary move her foot
10   the distance of the control, hit the kick plate
11   and then vertically go down, it also requires it
12   first, if her foot is on the ground to raise up
13   the 1 1/2 inches vertically, then go
14   horizontally that distance that we talked about,
15   and then go back down vertically and activate
16   it, that's what's required by your assumption;
17   right?
18      A.    That's absolutely correct.
19      Q.    And we don't have any evidence that
20   either one of those three events occurred; do
21   we?
22      A.    Well, what happens is --
23      Q.    Do we have any evidence?
24      A.    Well, we don't have any evidence
```

216

```
 1   concerning anything except that the -- one of
 2   the big problems with the footswitch is that
 3   when you walk and you move forward at all, your
 4   normal gate, especially when you are young, is
 5   to raise your foot 1 1/2, 2 inches off the
 6   ground. That's why people are always walking
 7   into these switches and stepping on them where
 8   the old ones were 6 inches off the ground and
 9   you never do that.
10        Q.   She wasn't walking at the time of this
11   accident; was she?
12        A.   If she is in a position and she moves
13   forward, she is taking a step forward, that's
14   the first part of walking.
15        Q.   She was sitting when this happened;
16   wasn't she?
17        A.   We don't know that she is sitting.
18        Q.   You don't know that?
19        A.   She is -- I told you that the evidence
20   apparently is that she was either sitting or
21   leaning against the -- against the -- this
22   stool, but when she moves forward we don't know
23   what she was doing whether she left contact with
24   the stool or not.
```

217

```
 1       Q.    Do you have any -- she has testified
 2   that she was sitting; do you know that?
 3       A.    No, I don't know that.
 4       Q.    The one witness whose deposition you
 5   don't have, the only one to have seen her before
 6   says she was sitting, do you know that?
 7       A.    After the accident, they found her
 8   sit --
 9       Q.    Before the accident, no, before the
10   accident, before the accident.
11       A.    I don't know anything about that.
12       Q.    If she were sitting at the time of the
13   accident --
14       A.    Yes.
15       Q.    -- would that affect your opinion?
16       A.    If she was -- absolutely sitting --
17       Q.    Yes.
18       A.    -- at the time of the accident?
19       Q.    Yes, yes.
20       A.    The -- it has -- you can still from a
21   sitting position, if she is in a sitting
22   position where she is able to activate this
23   machine from the sitting position, that she set
24   it up so that when I lean forward in this seated
```

218

1  position I can activate the pedal, then she is
2  going to be able to step on the pedal any time
3  she leans forward.
4      Q.  Did you do any testing with anyone in
5  the sitting position to see if their foot moves
6  forward like you tried to suggest with your
7  standing test?
8      A.  No, I don't have to do those to
9  understand how that works.
10     Q.  I didn't say you have to.  I said did
11 you do it?
12     A.  No, you saw what -- didn't I send you
13 the videotape?  I thought it was sent to you.
14     Q.  You did.
15     A.  Then if you have seen the video tape,
16 you know that I didn't do that.
17     Q.  So without the argument the answer is,
18 no, you didn't do any testing to see --
19     A.  Why not an argument?
20     THE COURT REPORTER:  Pardon me --
21     THE WITNESS:  Why not an argument?  I don't
22 mind an argument.  You are arguing with me so
23 why not an argument?  I don't mind your arguing
24 with me.

219

```
1    BY MR. ROBINSON:
2        Q.   I don't follow what you are doing right
3    now.  The question simply is did you perform any
4    tests with the subjects seated?  What is the
5    answer, sir?
6        A.   The answer to that is no.
7        Q.   Okay.
8        A.   And I sent you the videotape so that
9    you know that I was not doing simulation tests,
10   I was doing a worst case scenario test.
11       Q.   We are just trying to get some
12   testimony here, sir.
13       A.   No, no, no, that's not what you are
14   trying to do, that's not what you are trying to
15   do.
16       Q.   Did you --
17       A.   You are trying to create new facts that
18   are not available in this case.  And I am not
19   going to introduce facts that I don't know
20   about.  I am not sitting there taking a video of
21   the woman while she is having her accident so
22   everything else becomes speculation.
23       Q.   Did you ask -- it does.  Did you ask
24   her if she was sitting?
```

220

```
 1      A.   I thought I have testified at least
 2 four times that I did not interview this woman.
 3      Q.   I thought you said you talked with her
 4 for -- that Matt Ulmenstein was correct that you
 5 did talk with her for 15 minutes or so?
 6      MR. HARTMAN:   And he also indicated to you
 7 that he did not interview her about the accident
 8 in the same conversation.
 9 BY MR. ROBINSON:
10      Q.   I just want to make sure I know this,
11 did you ask her if she was sitting?
12      A.   I did not ask her what she was doing at
13 the time of the accident.
14      Q.   Are there any authorities that you have
15 utilized in forming your opinion that this
16 accident, this involuntary movement of the foot
17 can occur when she is in the seated position?
18      A.   I didn't refer to any authorities on
19 this.
20      Q.   Is there any support outside of your
21 testimony for that conclusion?
22      A.   No.
23      Q.   Did you perform any type of analysis to
24 determine if that, in fact, could occur, that if
```

221

1  they get -- they get in this way is bad.  They

2  copied from the best.  Just like the student in

3  school that wants to sit in back of the best

4  student, if he copies over his shoulder, he is

5  liable to get an A in the class.

6      Q.   Did they copy from you, is that what

7  you are saying?

8      A.   Of course they copied from me.  That

9  was their job.

10     MR. ROBINSON:  Why don't we take a little

11 break and we will look at the file of materials

12 that have been brought.

13     THE VIDEOGRAPHER:  Off the record at 4:37 p.m.

14             (Recess taken.)

15     THE VIDEOGRAPHER:  Back on the record at

16 4:45 p.m.

17 BY MR. ROBINSON:

18     Q.   Was this Heim press brake intended to

19 be used with the point of operations safety

20 device, sir?

21     A.   I think so.

22     Q.   With regard to the gate, when did the

23 gate come out?

24     A.   The gate that I am talking about was I

238

```
 1   the foregoing deposition was not waived by
 2   counsel for the respective parties.
 3        I further certify that the taking of this
 4   deposition was pursuant to Notice, and that
 5   there were present at the deposition the
 6   attorneys hereinbefore mentioned.
 7        I further certify that I am not counsel
 8   for nor in any way related to the parties to
 9   this suit, nor am I in any way interested in the
10   outcome thereof.
11        IN TESTIMONY WHEREOF:  I have hereunto
12   set my hand and affixed my notarial seal this
13   _10_ day of ___April___, 2006.
14
15
16            Patricia L. Wangler
17   _____
18   NOTARY PUBLIC, DuPAGE COUNTY, ILLINOIS
19   LIC. NO. 084-002417
20
21
22
23
24
                                              249
```