# EXHIBIT "J"

P0776392.1

IN THE U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT OF PA

\* \* \* \* \* \* \* \* \*

\*

TINA LINDQUIST,            \*

    Plaintiff         \*    Case No.

    vs.               \*    04-249E

HEIM L.P.,                 \*

    Defendant          \*

                      \*    COPY

\* \* \* \* \* \* \* \*

DEPOSITION OF

GARY MERKLE

JULY 21, 2005

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

60

1    Q.      Are you aware of the OSHA

2    regulations that Corry Manufacturing is

3    subjected to to place the

4    responsibility for choosing the

5    appropriate point of operation safety

6    device for mechanical press brakes on

7    the employer?

8    A.      I don't know.

9    Q.      Is there anyone else at Corry

10   who would have familiarity with that

11   rule and know that that is, in fact,

12   the ---

13   A.      No.

14   Q.      --- case?

15   A.      No.

16   Q.      If you don't know it and no one

17   else does it, is it safe to say that no

18   one at Corry Manufacturing knows ---?

19   A.      Time out.  Time out.  We need to

20   go back --- I would have to look at the

21   regulation to answer that question.

22   That's the end.

23   Q.      So as you sit here today, you

24   don't know that; is that fair to say

25   then?

61

1  A.      We're responsible for guarding.

2  That's your question.   We're

3  responsible to put the proper guarding

4  in place.

5  Q.      That isn't my question.   Under

6  OSHA they place that responsibility on

7  the employer?

8  A.      Yes.

9  Q.      Okay.   And I noticed on the

10  warning that was affixed to the

11  machine, it also indicates that it is

12  the employer's responsibility to

13  implement the above and also to provide

14  proper dies, devices or means that may

15  be necessary or required for any

16  particular use, operation, set-up or

17  service.   So that's also contained on

18  the machine itself; is that right?

19  A.      Yes.

20  Q.      Does that make sense to you,

21  that it would be the employer's

22  responsibility to provide the

23  appropriate safety device commensurate

24  with the use to which the press brake

25  is being put?

62

1   A.       Yes.

2   Q.       Do you know of any way that the

3   manufacturer of a product in 1978 could

4   provide a safety device, a point of

5   operation safety device, that is good

6   for every possible use to which a

7   multi-use press brake might be put?  Do

8   you know of any way that could be done?

9   A.       No.

10   Q.       Were you involved in the OSHA

11   investigation?

12   A.       No.  I was not here at the time.

13   Q.       Were you --- where were you?

14   A.       Vacation.

15   Q.       Okay.  Mr. Dietz is on vacation

16   now.  We pulled him from that, but

17   again, it is a serious incident.  Did

18   you have any conversations with any

19   OSHA representative regarding this

20   incident?

21   A.       Yes.

22   Q.       And with whom?

23   A.       I'd have to look at the reports

24   to see who the individual was.  Beverly

25   Spar (phonetic) maybe.

63

```
1   Q.      Corry was cited for this;
2   weren't they?
3   A.      Yes.
4   Q.      What were they cited for?
5   A.      I'd have to look at the
6   documents.  I can't remember.
7   Q.      Okay.  Do you know how this
8   accident happened?
9   A.      Not firsthand.
10  Q.      What have you heard about how it
11  happened?
12  A.      Be more specific.
13  Q.      You said you don't know
14  firsthand, but I'm assuming you've
15  heard something about how it happened?
16  A.      Yeah.  I investigated it after
17  the fact.
18  Q.      Who did?
19  A.      I did.
20  Q.      And what did you find out during
21  your investigation?  I appreciate that
22  request for clarification.
23  A.      Pardon?
24  Q.      I appreciate your request for
25  clarification on my confusing question.
```

64

1    What did you learn in your

2    investigation?

3    A.      That the employee had put her

4    hands inside the die and the press came

5    down.

6    Q.      From what we have seen on the

7    warnings that were affixed to the

8    machine, the operator is instructed to

9    never place their hands inside that die

10   area; is that right?

11   A.      Yes.

12   Q.      So what she was doing was

13   violating the first warning that was

14   affixed to the machine; is that right?

15   A.      Yeah.

16   Q.      And then have you --- I may have

17   asked you this, and I apologize.  Have

18   you ever read the parts and

19   instructions manual to this?

20   A.      I've looked at it, yes.

21   Q.      Throughout the manual it

22   repeatedly warns and instructs the user

23   to never place their fingers or hands

24   inside that die area.  Have you noticed

25   that at all throughout this ---

89

1   Q.      The next one says die designed
2   to eliminate hand in die situations.
3   And what are you referring to then?
4   A.      When they design the die so that
5   you never have to put your hands inside
6   of it.
7   Q.      And that would be something like
8   you thought might have happened ---
9   A.      With a swing arm.
10  Q.      --- with the swing arm for a
11  mandrel?
12  A.      Correct.
13  Q.      And did that ever take place?
14  Did that occur?
15  A.      That's occurring ongoing, as
16  they design the dies.
17  Q.      Even to this day, ---
18  A.      Yes.
19  Q.      --- to avoid, in all situations,
20  where an operator has to put their
21  hands in the die area?
22  A.      That's correct.
23  Q.      Do you know, do all --- what
24  types of presses do you have here?  Who
25  are the makers of the presses besides

91

1   Q.        --- areas at all times, ---

2   A.        Yes.

3   Q.        --- such as instructed on the

4   machine and in the instructions manual?

5                   ATTORNEY ROBINSON:

6                   I don't know if I marked

7             this one exhibit or not.

8   BY ATTORNEY ROBINSON:

9   Q.        I'll show you what we'll mark as

10  Corry Exhibit X.

11                  (Corry Exhibit X marked

12                  for identification.)

13  BY ATTORNEY ROBINSON:

14  Q.        You mentioned the disposal or at

15  least Corry getting rid of the machine

16  the press brake at issue here.  Does

17  this relate to that process?

18  A.        Yes.

19  Q.        And does this tell us when Corry

20  disposes of the machine?

21  A.        Yes.

22  Q.        And when was it?

23  A.        November of 2003.

24  Q.        And does this tell us if the

25  foot switch --- I don't think I asked

92

1   you this.   Did Corry sell the foot

2   switch with the machine?

3   A.      I don't believe so.

4   Q.      You think that Corry kept the

5   foot switch?

6   A.      I think we took the foot switch

7   off that day.

8   Q.      And then what happened to the

9   foot switch?

10  A.      I don't know.

11  Q.      Who would know what happened to

12  the foot switch after it was removed

13  form the press brake?

14  A.      I have no idea.

15  Q.      I see here --- if you look at

16  Exhibit I, does this appear to be an

17  invoice from Pinnacle relative to the

18  purchase of the light curtains that

19  Corry purchased and installed after

20  this incident?

21  A.      It appears that way, yeah.

22  Q.      And is the total price $2,167

23  --- excuse me, $2,196.07?

24  A.      Yeah.

25  Q.      All right.   And then I see

93

1    another --- well, what's Exhibit --- is

2    that a J?  Yes.  What is Exhibit J?

3    A.    It appears like another order

4    for a light curtain.

5    Q.    And this is on Corry

6    Manufacturing's letterhead; right?

7    A.    Yes.

8    Q.    It actually coincides with the

9    Pinnacle letterhead, is that right,

10    Exhibit I?

11    A.    Yes.

12    Q.    Do you know how much this press

13    brake cost new in 1978?

14    A.    No idea.

15    Q.    Do you know if any manufacturers

16    supplied light curtains back in 1978?

17    A.    No.

18    Q.    No, you don't know, or no, they

19    did not?

20    A.    I don't know.

21    Q.    Okay.  Do you know if OSHA

22    considered light curtains to be an

23    acceptable point of operation safety

24    device in the time this press brake was

25    sold in 1978?

94

1  A.        No.  I don't know.

2  Q.        Was the two-palm control sold

3  with the press brake in November of

4  2003?

5  A.        I believe so.

6  Q.        Were you involved in that sale?

7  A.        Yes.

8  Q.        And who did you sell it to?

9  A.        Daylin (phonetic) Solutions.

10  Q.        And where are they located?

11  A.        Indiana, PA.

12  Q.        Is that a warehousing company

13  for industrial equipment?

14  A.        No.

15  Q.        What is it?

16  A.        They're a distributor for

17  various different types of equipment.

18  Q.        Do you recall anything else

19  being sold with the press brake other

20  than the press brake itself in that

21  two-palm control?

22  A.        I'm trying to think if we left

23  the light curtains on there.  I think

24  we did.

25  Q.        You think you left the light

# EXHIBIT "K"

# U. S. Department of Labor
Occupational Safety and Health Administration



# Worksheet

Tue Mar 25, 2003 9:00am

| | |
|---|---|
| Inspection Number | 113172563 |
| Opt. Insp. Number | 7C |

| | | | | | |
|---|---|---|---|---|---|
| Establishment Name | **Corry Manufacturing Company** | | | | |
| Type of Violation | **S Serious** | Citation Number | **01** | Item/Group | **001** |
| Number Exposed | **1** | No. Instances | **1** | REC | **R Referral** |
| Std. Alleged Vio. | **1910.0212( a)( 3)( ii)** | | | | |

| Abatement Period | MultiStep Abatements | | | Final Abatement | Action Type/Dates |
|---|---|---|---|---|---|
| | PPE Period | Plan | Report | | |
| **0** | | | | **Corrected During Inspection** | |
| Abatement Documentation Required | | | | **N**  Date Verified | |

Substance Codes

AVD/Variable Information:

29 CFR 1910.212(a)(3)(ii): Point(s) of operation of machinery were not guarded to prevent employee(s) from having any part of their body in the danger zone(s) during operating cycle(s):

(a) Building #3; Heim mechanical press brake, Model #70-6, Serial # 2176.  On or about September 25, 2002, an employee sustained amputation to eight fingers while operating a foot pedal actuated, unguarded press brake.

| Penalty Calculations | | | | Adjustment Factors | | | Proposed Adjusted Penalty |
|---|---|---|---|---|---|---|---|
| Severity | Probability | Gravity | GBP | Size | Good Faith | History | |
| | | | 8 X 5 | | | | |
| Repeat Factor | | | | | | | |

| Employee Exposure: | | | | | |
|---|---|---|---|---|---|
| Occupation | **Component Tech 1** | | Employer | **Corry Manufacturing Company** | |
| Nr of Employees | **1** | | Duration | **12 weeks** | Frequency **daily** |
| Employee Name | | | | | |
| Address | 7C | | Phone | | |

Instance Description:    A. Hazard    B. Equipment    C. Location    D. Injury/Illness    E. Measurements

| 4. Date/Time |
|---|
| 9-25-03 |

20. Instance Description -  Describe the following:
   a) Hazards-Operation/Condition-Accident:  An employee placing a part on a mandrel accidentally activated the press brake by stepping on the foot pedal.  Both hands were on the part at the time the press cycled.  The four fingers on each hand were amputated in the accident. Surgery performed immediately after the accident allowed them to reattach 3 of the 4 fingers

on each hand. Both pinky fingers are permanently amputated. The press brake was equipped with two-hand pedestal control buttons but were not in use at the time of the accident. See company's "Internal Accident Report" and "Injury Investigation Report". The foot pedal was properly guarded at the time of the accident. This was a hands-in-die operation.

b) Equipment: Heim 6' Mechanical Press Brake, Model No. 70-6, Serial No. 2176, and Company Machine No. 820.

c) Location : Building #3, Corry Manufacturing Company, Corry, PA

d) Injury/Illness: Multiple finger amputations.

e) Measurements: AT THE POINT OF OPERATION

| 21. Photo Number | Location on Video |
|---|---|
| | y |

23. Employer Knowledge : The Company is on EAO's "Amputation" strategic initiative list and was sent the letters/information last July. The Company had the two-hand controls available and were not in use. This mechanical press brake and one other mechanical press brake are the only two pieces of equipment not equipped with light curtains.

24. Comments (Employer, Employee, Closing Conference) : The mechanical press brake has had the foot pedal removed and is now locked in the two-hand control mode. Also, a light curtain has been installed and electrically interlocked with the two-hand pedestal control buttons.

25. Other Employer Information :

| 26. Classification: | | | | |
|---|---|---|---|---|
| Serious | Knowledge | S or O | Repeat? | Willful? |
| Y | Y | S | N | N |

| First Repeat | Second Repeat | Repeat Penalty |
|---|---|---|
| | | |

| Event Date | Event Code | Action Code | Citation Type | Penalty | Abate Date | Final Order |
|---|---|---|---|---|---|---|
| 03/25/03 | Z Add transaction | A Add | S Serious | 1575.00 | | |

# EXHIBIT "L"

P0776392.1

U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

\* \* \* \* \* \* \* \*

TINA LINDQUIST,          \*

    Plaintiff          \*     Case No.

    vs.                    \*     04-249-ENE

HEIM, LP,                    \*

    Defendant          \*

\* \* \* \* \* \* \* \*


DEPOSITION OF

JAN OVIATT

July 22, 2005




Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

8

1   information from people who are

2   represented by Counsel to sit them in

3   a room and ask questions.  And

4   everything is under oath and recorded

5   by our court reporter here.  The most

6   important thing that I can tell you

7   is please let me know if I ask any

8   question that is unclear.  I only

9   want to ask questions as you

10  understand them and can accurately

11  answer; okay?

12  A.      Okay.

13  Q.      And if I ask you a question

14  that's unclear, will you let me know

15  that and don't answer it?

16  A.      Sure.

17  Q.      Okay?  What is your current

18  position here at Corry?

19  A.      Group leader of maintenance.

20  Q.      And where does that fall in

21  the ranking of ---?

22  A.      Just under Gary.

23  Q.      Just under Gary Merkle

24  (phonetic)?

25  A.      Which would be my supervisor.

12

1  A.      Recently, yes.

2  Q.      --- served as an operator on

3  those machines?

4  A.      Yes.

5  Q.      And why were you working in

6  that capacity?

7  A.      To meet production.

8  Q.      They needed more help, sounds

9  like?

10  A.      Correct.

11  Q.      Okay.  Had you ever operated

12  any other presses before Tina

13  Lindquist's injury for any purpose,

14  whether it be for operation or for

15  maintenance purposes?

16  A.      Yes, and to say specifically

17  which ones, I can't, because --- you

18  know, without going back and checking

19  history and which ones I worked on, I

20  couldn't tell you.

21  Q.      The particular one we're

22  involved with in this lawsuit is a

23  Heim model 70-6 press brake.  Are you

24  familiar with that press brake?

25  A.      Yep.

13

1  Q.      Do you know the capacity of

2  that press brake?

3  A.      Pounds wise?

4  Q.      Yes.

5  A.      I'm not sure.

6  Q.      Okay.  Have you ever operated

7  the Heim press brake before?

8  A.      Yes.  As far as --- I

9  installed the two-hand control and

10  the foot pedal on it.

11  Q.      When did you install the two-

12  hand control and the foot pedal on

13  it?

14  A.      I couldn't give you a date.

15  Shortly after we purchased it.  I

16  don't know if you have that date or

17  not.  I'm not even sure.

18  Q.      Now, my client sold it to a

19  different company back in 1978.  It

20  was used for 20 years out in

21  Connecticut without any problem.  And

22  then it was ultimately sold, I

23  understand, at an auction, and it was

24  purchased by Corry, perhaps in 1999,

25  February, 1999.  At least, that's

14

1    when they purchased the parts and

2    operations book for it.

3    A.        That could be.

4    Q.        But I don't have a specific

5    purchase date for Corry's purchase of

6    that press brake.  But in any event,

7    you installed the foot switch and the

8    two-palm button pedestal after it was

9    purchased?

10   A.        Correct.

11   Q.        Where did you obtain the foot

12   switch from?

13   A.        I believe that was the one

14   that was already on it.  I'm not

15   going to swear to that.  But just by

16   memory, I think that was already

17   attached to it, because that's all it

18   had on it was a foot pedal.

19   Q.        Okay.  Do you know if the foot

20   pedal that may have come with the

21   machine when Corry purchased it was

22   the original foot pedal that was sold

23   with the machine over 20 years

24   previously in 1978?

25   A.        I'd be surprised if it was,

15

1    just because of the condition.

2    Q.      And what do you mean by that?

3    A.      Well, it was a fairly newer

4    model, from what I've seen around.

5    Q.      Okay.

6    A.      It had the toe guard in it.

7    You know, you had to activate that

8    part before the foot lever would go

9    down.

10   Q.      And what feature is that?

11   A.      I assume it's a safety

12   feature.  Your foot has to be in so

13   far before you can push the pedal

14   down.

15   Q.      Right.  So there's no

16   accidental tripping of the

17   footswitch?

18   A.      Correct.

19   Q.      And was there also a housing

20   over the foot switch ---

21   A.      Correct.

22   Q.      --- so that something couldn't

23   fall on it or you couldn't step on it

24   accidentally?

25   A.      Yes.

16

1  Q.      Okay.  And based upon those

2  features, and the appearance of the

3  foot switch, you believe that that

4  would not have been the original 1978

5  ---?

6  A.      Correct.

7  Q.      Okay.  Do you know who the

8  manufacturer of that foot switch was?

9  A.      No, sir.

10  Q.      Who was involved with

11  purchasing that press brake, the Heim

12  press brake?

13  A.      To the best of my knowledge it

14  would be Gary Merkle, and I'm not

15  sure of that.  That's when my

16  involvement first got started with it

17  was through Gary.

18  Q.      Do you know who installed and

19  got this particular press brake up

20  and running after it was purchased?

21  Besides your work, which you

22  mentioned being involved to some

23  extent?

24  A.      Probably maintenance got it

25  ready to run, but as far as any

41

1   Q.      Okay.  Do you have any

2   involvement with preparing the work

3   instructions for any particular

4   parts?

5   A.      No.

6   Q.      If we assume that Tina

7   Lindquist was instructed to place her

8   hands inside the die area under the

9   ram to hand-form this part on the

10  mandrel, do you know of any

11  explanation as to why Corry would

12  have instructed her to do that if

13  it's directly contrary to the

14  warnings of the manufacturer of the

15  machine?

16  A.      No, I don't.

17  Q.      Do you understand that Corry

18  was cited for this by OSHA for this

19  incident?

20  A.      I know OSHA was here.  I know

21  they were cited.  Exactly what, I

22  don't know.

23  Q.      Have you spoken with Tina

24  Lindquist?

25  A.      No.

42

1  Q.      At all since this accident?

2  A.      I don't think at all before or

3  after.

4  Q.      Okay.  You didn't know her?

5  A.      I know who she is.  I'm not

6  the most sociable person.

7  Q.      You seem fairly sociable

8  today.  We must have you on a good

9  day.

10  A.      I have to be.

11  Q.      Your attorney maybe told you

12  that, I don't know --- I'm just

13  joking.  Mr. Nichols told us a little

14  while ago and reported shortly after

15  the accident, that about 15 minutes

16  before the accident, he told --- he

17  suggested to Tina Lindquist not to

18  sit at her chair because she might

19  accidentally hit that foot switch.

20  Have you heard that?

21  A.      Yeah.

22  Q.      And how did you hear that?

23  A.      Hearsay from whoever --- I

24  couldn't --- because typically, I

25  wouldn't think you'd want to be

43

1    running it sitting down.

2    Q.      Why do you think that?

3    A.      That same reason.  Because you

4    lean forward, what's your foot do?

5    Q.      It goes forward also; doesn't

6    it?

7    A.      Correct.

8    Q.      And if you have your foot

9    inside the housing of the foot

10   switch, and you lean forward to hand-

11   form the part, you could accidentally

12   activate the switch.

13   A.      Correct.

14   Q.      That could be avoided by

15   positioning the foot switch somewhere

16   else; right?  It had a long cord on

17   it?

18   A.      It had a cord, you know,

19   'cause --- I don't know if this is a

20   fact, but I would assume there's been

21   positions where you had to have a

22   lengthy cord to set it up, you know,

23   jog it into position and whatnot.

24   Q.      An operator could have moved

25   the foot switch to a position where

44

1    they wouldn't have been able to have

2    their hands in the die area and hit

3    the foot switch at the same time;

4    right?

5    A.      Yes.

6    Q.      And that would have avoided

7    this accident; couldn't it?

8    A.      If she wasn't where she could

9    reach it, yeah.

10    Q.      And then, by using the two-

11    palm button switch for this

12    particular run, that would have

13    avoided the accident; right?

14    A.      Yep.

15    Q.      And by her following the

16    instructions to keep her hands out of

17    the die area, that would have avoided

18    the accident; wouldn't it?

19    A.      I'm assuming you're talking

20    about that warning on the front of

21    the machine, yes.

22    Q.      And all throughout the

23    instruction manual that accompanied -

24    -- that was fastened to the machine

25    as well.  Is that a yes?

45

1    A.        Yes, yes.

2    Q.        Have you ever heard of Tina

3    Lindquist making any type of safety

4    complaints before this accident?

5    A.        To my recollection, no.

6    Before this accident, no.

7    Q.        After the accident?

8    A.        Well, I heard she questioned

9    whether she should be having her

10   hands in it or not, and again, like I

11   said, it's hearsay.  Who from, don't

12   know.  You know how word travels when

13   something like that happens.

14   Q.        What did you hear about that?

15   I didn't get the full gist of ---.

16   A.        Well, she questioned whether

17   she should be running it with her

18   hands in it.  You know, putting her

19   hands in it to pre-form it, let's

20   say.  Pre-form the part.

21   Q.        Do you know of anyone at Corry

22   who presently thinks that it was

23   appropriate for her to be placing her

24   hands inside that machine in the die

25   area?

63

```
 1              I think those are all
 2        the questions I have, sir.
 3        Mr. Hartman, I'm sure, has ---
 4              ATTORNEY HARTMAN:
 5              I'm just going to be
 6        here for a minute.
 7  CROSS EXAMINATION
 8  BY ATTORNEY HARTMAN:
 9  Q.      With regard to the foot pedal,
10  you had indicated that you thought it
11  might be a newer version of foot
12  pedal ---
13  A.      Uh-huh (yes).
14  Q.      --- of its design; am I
15  correct?
16  A.      Safety design.
17  Q.      And appearance.
18              ATTORNEY ROBINSON:
19              Objection to form.
20  BY ATTORNEY HARTMAN:
21  Q.      The appearance, it involved
22  the fact that it had a cover and that
23  you had to stick your foot in and hit
24  it; am I correct?
25              ATTORNEY ROBINSON:
```

64

1          Hold on, this is

2     misleading.  I'm going to tell

3     you right now.  This is

4     misleading, I'm not going to

5     let it go on.  He's indicated

6     --- hold on.  He's indicated

7     that the design features in

8     addition to the new look of

9     it, which you have

10    conspicuously kept out of your

11    question.  So it's misleading

12    and the only thing I can do is

13    try to correct it.  But he's

14    indicated a couple of reasons

15    and he left out one

16    significant one.

17  BY ATTORNEY HARTMAN:

18  Q.      Did --- absent the design of

19  it, the way it looked to you from the

20  design, did the fact that it was new

21  and shiny or the way the paint looked

22  make you think it was new?

23  A.      It was fairly new in

24  appearance.  The safety features, the

25  design looks.  The paint wasn't all

65

1   scuffed off.  It wasn't dragged

2   through a pile of crap.  It didn't

3   have a lot of chips in it.  You know,

4   it was fairly clean, fairly new.

5   Q.      Okay.

6   A.      Appearing.

7   Q.      Appearing.  That's fine.

8   That's what I needed to know.  Now,

9   with regard to the appearance, let's

10  look at the design element.

11  A.      Okay.

12  Q.      If you would come to learn

13  that in 1978, the design was similar

14  to what you saw, would that change

15  your opinion as to if the foot pedal

16  was new?

17                  ATTORNEY ROBINSON:

18                  Object to the form of

19          the question.  Don't concern

20          yourself with my objection.  I

21          don't understand it.

22  A.      Can you repeat that?

23  BY ATTORNEY HARTMAN:

24  Q.      Okay.  You talk about the

25  safety features.  If in 1978, the

66

1    foot pedal had those types of safety

2    features that you saw, would that

3    change your opinion that this foot

4    pedal was a newer design as opposed

5    to it could have been a 1978 one that

6    was well maintained?

7    A.      No.  Simply because the wear

8    of the machine, the condition of the

9    machine, compared to the foot pedal.

10    Q.      Well, can you paint a foot

11    pedal?

12    A.      Not as good as --- you can't

13    paint nothing factory color.  I don't

14    care how you try.  I can't.  I mean,

15    you'd have to have pretty good --- I

16    mean, the decals were still on it.

17    Q.      Okay.  Would you look at the

18    pictures here of the foot pedal and

19    --- I'm sorry, I don't see the

20    decals.

21                    ATTORNEY ROBINSON:

22                    Yeah, it's on there.

23            You have to look through ---.

24    A.      That's ---.

25                    ATTORNEY ROBINSON:

67

1            I could help you if you
2        want me to.
3    A.        Yeah.  See, there's a decal
4    across the top ---
5    BY ATTORNEY HARTMAN:
6    Q.        Okay, the silver ---
7                ATTORNEY ROBINSON:
8                What are we looking at
9        here, sir?
10                ATTORNEY HARTMAN:
11                We're looking at
12        Exhibit N, Corry N, picture
13        number 32.
14    BY ATTORNEY HARTMAN:
15    Q.        And you're pointing to what
16    appears to be like a silver patch of
17    ---?
18    A.        Silver and black decal on top
19    of some sort.
20    Q.        Okay.  So that's the decal
21    that you're concerned about?
22    A.        Right.  And now this is today,
23    or on this date, when I installed it,
24    the condition was obviously newer
25    than that because it hadn't been run