# EXHIBIT B
# (Part II)

1    partial revolution machine that is slow motion

2    compared to the -- you know, to -- to punch

3    presses and has -- the general purpose of the

4    machine has you migrating and spending lots of

5    time between strokes.

6            The -- it is a completely different

7    animal, and I thought one of your witnesses did

8    a wonderful job of educating you on the

9    differences between the two machines.

10        Q.    Is a -- is riding the pedal the most

11    prevalent cause of accidental activation of

12    power presses?

13        A.    Yes.

14        Q.    And is it true that the more difficult

15    it is to step into and out of a foot control the

16    more likely it is that operators will ride the

17    pedal?

18        A.    Yes.

19        Q.    Is it also true that the -- that

20    85 percent of all machine accidents are caused

21    by the user and only 5 percent of machine

22    accidents are caused by the machine?

23        A.    Yes.  Those were the statistics that I

24    have published.

137

1    relation to gates and the use of gates that your

2    writings and your teachings have indicated that

3    they increase a danger of riding the pedal?

4        A.    They decrease one danger, they increase

5    another one.    That's what the whole purpose of

6    my work is.

7        Q.    My question is very straightforward.

8    Would it be true that your teachings have been

9    that the use of gates move the foot controls

10   over to the right side of your schematic which

11   are more hazardous foot controls?

12       A.    No, no, no, no, that's not what the

13   article says.

14       Q.    Okay.

15       A.    What the article says is the likelihood

16   of riding the pedal increases from left to right

17   as you go to the gated unit.

18            As you go from completely open to

19   completely closed with the mousetrap, the

20   likelihood of riding the pedal goes up.    And

21   that's a bad thing except when you solve the

22   problem like Linemaster has, and if you have

23   a -- if you have the locking plate plus single

24   stroke control on your machine, you have now

141

1    solved the problem. And so you are now able to

2    take care of the accidental stepping onto the

3    pedal which gets better and better as you have

4    the gate in front and you are able to use that

5    wonderful feature of the gate because you

6    haven't introduced a new hazard in the machine.

7        Q.   Does Linemaster continue to sell the

8    ungated foot control?

9        A.   Sure, they sell a full line of controls

10   that do everything from completely unguarded

11   the -- to, you know, this whole menu of things.

12       Q.   Has Linemaster ever indicated to your

13   knowledge in any of their literature that using

14   an ungated foot control on a press brake is

15   dangerous?

16       A.   No, because they are not dummies. They

17   don't tell you what foot control to use for a

18   given machine. They don't do that. They leave

19   that to the manufacturer of the machines to

20   select from their menu and all the other

21   competitors' menus, select the ones that are

22   good for your machine.

23            Linemaster doesn't tell you on a punch

24   press to use this, on a press brake to use that.

                                                      142

1    Q.   -- I thought you said that if the foot

2    control doesn't have a gate on it, you would

3    still consider that foot control to be

4    defective?

5    A.   That's correct.

6    Q.   Okay.  Then I don't know what that

7    diatribe was.  That's my point.  So your -- so

8    the concept you are telling us today is that

9    regardless of whether or not that foot control

10   has a locking plate, if it doesn't have a gate,

11   it is defective?

12   A.   That's correct.

13   Q.   That's what I understood your testimony

14   to be.

15   A.   But that's not enough.

16   Q.   Go ahead.

17   A.   But it is not enough.  I also want the

18   locking plate on the thing.

19   Q.   I understand what you are saying.

20   A.   Okay, but --

21   Q.   I understand what you are saying.

22   A.   Okay, that's what I am saying.

23   Q.   I am -- I was just trying to confirm

24   up, I am not sure why it keeps being said that

147

1      Q.   I understand.  Is that something the

2   end user does when they -- is that something an

3   end user does?

4      A.   If you want to use HOOD, that's what

5   you have to do.

6      Q.   Is HOOD a good philosophy?

7      A.   HOOD is a -- one of the working

8   philosophies, but it is not particularly a good

9   one.

10     Q.   Is HOOD a beneficial philosophy?

11     A.   It -- overall it is not.

12     Q.   Are there more disadvantages to HOOD

13  than there are advantages to HOOD?

14     A.   Well, there are --

15     Q.   I am just trying to figure out what you

16  are saying.  I don't understand.

17     A.   What I am saying is the disadvantages

18  completely outweigh the advantages.  That's why

19  HOOD has been no longer -- remember at one time,

20  I don't have to remind you of it, HOOD was put

21  into OSHA and said you are required to use HOOD

22  and they then after hearing said that was a

23  mistake, we will take it out, and so you no

24  longer have to do that.

                                                    153

1           The -- it destroys Americans.  You

2     can't meet the code of ethics with HOOD.  And

3     the engineers -- the engineering code of ethics

4     says the following, "An engineer shall hold

5     paramount the public safety, health and

6     welfare," meaning their economic welfare, "in

7     the discharge of his professional duties."

8           If you triple the cost of every product

9     that everybody has out there because you are

10    using some dumb manufacturing process like HOOD,

11    that is violating the code of ethics which is

12    supposed to be a trade-off among safety, cost

13    and function.

14          And there are other ways of doing

15    things.  For example, a pull back device which

16    is now illustrated profusely in the -- in the

17    literature for press brakes, you put the things

18    in, your hands are in the die, if it starts to

19    come down, the pull back device pulls your hands

20    out.  It is used in every punch press.

21        Q.   And that's something the end user is

22    best responsible for doing also?

23        A.   I agree, but it is a much better

24    philosophy.  It is much more economical than the

                                                      154

1    thing that you have. Don't have accidents. Use

2    appropriate safety devices. So they were not

3    specific and offered no one any guidance. In

4    1973 OSHA gave no guidance whatsoever.

5        Q.    And you may have misspoken. You

6    mentioned ANSI when you first started saying

7    that.

8        A.    But ANSI did.

9        Q.    Okay, and so it satisfied ANSI?

10       A.    Well, it didn't really satisfy ANSI.

11       Q.    That's what I am trying to figure out,

12   what --

13       A.    Here is the problem that you have with

14   ANSI --

15       Q.    I thought your report said it did, but

16   go ahead.

17       A.    Well, ANSI wants you to inhibit

18   accidental activation, inhibit which means to

19   minimize the accidental activation, and you

20   can't eliminate it. You can inhibit it. So

21   when you have devices out there that minimize or

22   inhibit the thing better than others, you are

23   obligated to use them. I mean, you know, all

24   you have to do is have a foot control and have a

159

1    cover on the thing and say, gee, the cover

2    inhibits the thing; okay?

3        Q.   Do you know of any ANSI provision that

4    was violated by this foot control which she was

5    using?

6        A.   I think that in my view there is one.

7        Q.   Yes, you can give me a verse.

8        A.   It is in my report.

9        Q.   Yes, if you could.  We have marked that

10    as Exhibit C and here it is.

11        A.   Very good.  Here is the number, it is

12    4.2.4.2.4, foot control actuation prevention,

13    "The foot control shall be protected so as to

14    inhibit accidental activation by falling or

15    moving objects or by somebody stepping on it."

16            That's what's been violated because you

17    haven't inhibited it, the -- which should ask

18    you to do the best job you can.  Remember what

19    the name of the things are.

20        Q.   Did you ever testify before that this

21    relates to stepping onto -- whenever you were

22    representing the foot control industry or the

23    press brake industry, have you ever testified

24    under oath that this only relates to stepping

                                                    160

1    a footswitch. And that's what the supervisory

2    key is all about. So if she couldn't do it --

3    if I can't do it, how is she going to do it?

4        Q.    Do you have any indication that the key

5    was lost at the time of her injury?

6        A.    No, no, no, no, I think they

7    deliberately said in order for her to do this

8    thing, they have to turn the key and switch it

9    over to foot and away from, you know, from the

10   two-hand control, the hostage control, so

11   they -- what I am saying is they have

12   deliberately said this is where you want to do

13   it and there is nothing she could do to switch

14   back because they have locked out any point of

15   operation device. She has now got to use the

16   system that she is using.

17       Q.    Did you read the --

18       A.    It is tragic.

19       Q.    Did you read the testimony from the

20   employees that said she did have access to the

21   key and that when they operated the press brake

22   and performed the same function that she was

23   operating that they used the two-palm button

24   switch?

                                                    166

1    something that could cause her fingers to be cut

2    off?

3         A.   I don't know one way or the other.  I

4    have not seen any of that testimony.

5         Q.   Have you ever been told by Mr. Hartman

6    as to -- that you haven't been provided with all

7    of the deposition transcripts?

8         A.   How would I know that I haven't been

9    provided with them all?

10        Q.   I said has he ever told you that he

11   didn't give you all the deposition transcripts?

12        A.   No, he didn't say one way or the other.

13        Q.   Have you ever heard any explanation as

14   to why you would not have been provided with

15   those employees' --

16        A.   No, we --

17        Q.   -- deposition transcripts?

18        A.   -- just never discussed it.

19        Q.   Is that something you would want to

20   see?

21        A.   I don't know.  I mean I don't need to

22   see anything based on the opinions I am giving

23   you.

24        Q.   Is that something you would want to see

                                                      168

1    as an expert testifying in front of the jury?

2        A.    Not with the testimony that I am giving

3    you.  I have one, the one defect which is

4    completely independent of what those employees

5    have to say.

6        Q.    Well, wouldn't her ability to choose

7    the point of the two-palm button switch have

8    some impact on your decision making?

9        A.    Absolutely not because she doesn't know

10    anything about choosing point of operation.  She

11    has been told to do something and she has done

12    exactly what she has been told to do.

13        Q.    My point is there is contrary testimony

14    to that --

15        MR. HARTMAN:  I am going to object and --

16        THE WITNESS:  I don't believe --

17        MR. HARTMAN:  -- indicate for the record

18    that Mr. Robinson is mischaracterizing the

19    testimony.  I am not going to go into detail so

20    he does -- says I don't taint this witness.  But

21    he is clearly mischaracterizing the testimony in

22    such a way to formulate these questions which is

23    not supported by the depositions he has taken.

24    No one has indicated that she had the ability to

169

1    report somebody to them, I am not allowed to

2    find out the disposition of the case, you know,

3    so you can't get the feedback you need to

4    evaluate them.

5        Q.   And you believe you can represent

6    Linemaster relative to a foot control that was

7    sold with the Heim product or Rousselle product

8    and then represent a plaintiff against Heim or

9    Rousselle --

10       A.   Oh, sure.

11       Q.   -- relative to a foot control case?

12       A.   Sure.

13       Q.   Have you ever testified that you can't

14   do such a thing, it would be unethical to do so?

15       A.   No.

16       Q.   Do you remember addressing with a

17   number of attorneys these -- this ethical issue

18   of representing one company and then

19   representing a party adverse to that same party

20   you represented?

21       A.   Oh, I am sure, I am sure that has been

22   part of my presentations on occasion.

23       Q.   Is there any situation where an ungated

24   foot control in use with a press brake is not

                                          176

1    defective?

2        A.    No.

3        Q.    The testing that you did --

4        A.    Yes.

5        Q.    -- relative to this case, I understand

6    through Mr. Ulmenstein that all of the test

7    subjects were employees at one time of Triodyne;

8    is that correct?

9        A.    That is correct.

10       Q.    Have you ever -- why didn't you go try

11   to find someone that's neutral?

12       A.    They were neutral.  It is a

13   double blind test.  Ulmenstein doesn't know what

14   I was doing nor did the people know what I was

15   doing.  Nobody knew what I was after and the

16   concepts behind it including Ulmenstein.

17       Q.    Did you never tell them who you were

18   representing?

19       A.    Oh, it has nothing to do with

20   representing.

21       Q.    Did you tell them who you were

22   representing?

23       A.    I don't think so, but that has nothing

24   to do with it.

                                            177

1    when she was injured?

2        A.   The best I can determine is that she

3    was either seated or leaning against the -- a

4    seat, that's the best.  I have not interviewed

5    her, you know, to find out more.

6        Q.   Your test involved standing people?

7        A.   Right.

8        Q.   Dissimilar to the seated or leaning.

9        A.   Of course they are dissimilar.  I am

10   not trying to simulate what she is doing.  I am

11   trying to do something much more effective.

12       Q.   And what would that be?

13       A.   I am trying to develop a worst case

14   scenario, the -- and that's what I did.  I --

15   and I am really pleased that it worked almost

16   perfectly the first time, developed a scenario

17   that you almost 100 percent of the time will

18   accidently activate a switch.  And as soon as I

19   put the gate on, it is 100 percent of the time

20   you will never activate the switch.

21       Q.   You had people watch the video, you had

22   people standing there and stepping into the foot

23   control, one of which had a gate and one of

24   which did not; is that an accurate description?

179

1      A.    Right, absolutely.

2      Q.    That's not the way Tina Lindquist's

3   injury occurred; is it?

4      A.    Of course not.  It has nothing to do

5   with that.

6      Q.    Is there any similarity in the test

7   that you conducted and the manner in which Tina

8   Lindquist was injured?

9      A.    None whatsoever.  That's not what the

10   test was for.

11      Q.    Did Tina Lindquist ever tell you that

12   she accidently put her foot into the foot

13   control?

14      A.    She didn't tell me anything.

15      Q.    Did you ever read anything in her

16   testimony that indicated she accidently put her

17   foot into the foot control?

18      A.    I don't recall her saying that.  I

19   think she said she wasn't riding the pedal and

20   had taken her foot out of the control and

21   then -- but I don't recall her saying anything

22   about what she did.  I don't know that she knew

23   what she did.

24      Q.    Have you assumed -- but you have

180

1    A.    Yes.

2       Q.    And for that to have occurred she would

3    have had to accidently stuck her foot the entire

4    way in such that she activated that lock plate

5    that you mentioned; right?

6       A.    Absolutely right.

7       Q.    Has she ever told you that she stuck

8    her foot all the way in and actuated that kick

9    plate?

10      A.    Everything we know about her we will

11   have to get from her deposition because I didn't

12   interview her.

13      Q.    Okay.    And her deposition testimony did

14   not indicate that she stuck it all the way in

15   and hit that kick plate?

16      A.    Right, I don't think she knows.

17      Q.    Well, did you see that she has

18   indicated she did not accidentally put her foot

19   into that foot control?

20      A.    I don't think she said that either.

21      Q.    Do you have your summary of the --

22      A.    Unfortunately --

23      Q.    Of her testimony?

24      A.    I don't have the summary, and I didn't

182

1    Q.   You indicated that she would have had

2    to hit the kick plate to activate that press

3    brake?

4    A.   Yes.

5    Q.   Isn't it possible for her to have been

6    riding the pedal and for I think some of the

7    instances you mentioned were sneezing to have

8    occurred where you then hit the -- in the same

9    way if your foot was outside the foot control

10   but your foot is inside the foot control; isn't

11   that possible?

12   A.   It is possible.  The best I can tell

13   you it is possible.  It is really unlikely that

14   that's going to happen.

15   Q.   Yeah, why would that be?

16   A.   Because anyplace where you -- see, the

17   other pedals on the punch press, anyplace you

18   touch down on the pedal you get a stroke.

19       On this one you can't just push down

20   anywhere.  You have to first push your foot all

21   the way back in and then come down on the thing

22   and that the likelihood of doing this is

23   diminimus compared to the punch press where if

24   you ride the pedal, anyplace you touch it, you

205

1    are in trouble.

2        Q.    How much force was necessary on this

3    particular foot control to push that lock plate?

4        A.    I don't think I measured the force.

5        Q.    I guess you couldn't have because you

6    never saw the foot control; right?

7        A.    No, no, no, no, I have duplicate, you

8    know, I have my own --

9        Q.    No --

10       A.    -- things.  I don't think I have ever

11   measured it.

12       Q.    I meant -- okay, you never measured on

13   any exemplar?

14       A.    Right.

15       Q.    -- with anyone whatsoever?

16       A.    Right.

17       Q.    What -- your opinion is that she

18   accidently stuck the foot in, hit the kick plate

19   and pushed down?

20       A.    Yes.

21       Q.    She went horizontally and then

22   vertically.

23       A.    Right.

24       Q.    What caused her to do that in your

                                                    206

1    opinion?

2        A.    The -- what happens is all you have to

3    do is reach for the part and reaching for the

4    part will shift your body forward to do this.

5        Q.    Do you have any indication that that's

6    actually what happened here?

7        A.    It has to have happened.

8        Q.    How far did she move her body to reach

9    for the part?

10       A.    The -- I don't know how far she moved

11   her body, but she is going to step up the

12   control in a convenient location so that she can

13   reach the -- put parts in and parts out and hit

14   the control in the most convenient way.

15       Q.    How far does the foot -- what's the

16   minimum distance the foot would have to move to

17   enter the control, the foot control, activate

18   the kick plate, and then depress the pedal?

19       A.    Well, it would be the distance that her

20   foot has to move into the unit before it touches

21   the kick plate.

22       Q.    Right.

23       A.    It has to move in that much.  I think

24   it is 4 or 5 inches.  You know, I will get a

                                                    207

1    pedal and I will measure it.

2        Q.   Has she ever said that her foot moved

3    4 or 5 inches?

4        A.   Oh, she doesn't have a clue what her

5    foot is doing.  If she knew that, she would not

6    have had the accident.  I mean she doesn't want

7    to reach into the pedal.  She wants to reach her

8    hands into the machine.

9        Q.   Well, would leaning -- would the --

10   this, do you call this an involuntary movement

11   of the foot?

12       A.   It is probably -- I think it is

13   involuntary.  I don't think it is a voluntary.

14   Voluntary, you know, you are advertently trying

15   to activate the machine.  She doesn't want to

16   activate the machine.  She wants to reach in

17   with her hands and doesn't want to put her foot

18   on the foot pedal, she doesn't want to do that.

19       Q.   Why couldn't this involuntary movement

20   of the foot occur if her foot was already inside

21   resting on the pedal?  What's the difference?

22       A.   It is -- it is so unlikely that that

23   would happen.

24       Q.   I am just trying to hear as to why.

                                                      208

1        A.    Because --

2        Q.    All --

3        A.    -- you have --

4        THE COURT REPORTER:  Pardon me, I can only

5    get one at a time.

6        MR. ROBINSON:  Sorry.

7        THE COURT REPORTER:  So we have to wait for

8    the answer to be finished and the same --

9        THE WITNESS:  There is a very large movement

10    you have to make with your foot to get to that

11    back plate.  You got to get -- you know, you

12    have to do something to get to the back plate

13    where on the punch press I don't care where you

14    touch it, you touch it the front, the middle,

15    anyplace.  There is only one place that you can

16    do it, you have got to get your foot in and then

17    put the pressure down.

18    BY MR. ROBINSON:

19        Q.    I wanted you to explain it, all the

20    reasons that you know as to why her foot also

21    couldn't have involuntarily moved forward while

22    she was riding the pedal as opposed to moving

23    the extra distance with the foot outside of the

24    foot control?

209

1      A.    The -- if she is really riding the

2    pedal, she has already established an

3    equilibrium.  And when she moves forward, it is

4    just like my foot on the ground, it will

5    actually resist movement.

6           You put your foot down, the friction

7    stops the thing from sliding forward.  If she

8    has her foot resting on this pedal, the -- it

9    actually will stop her from moving forward into

10   this kick plate.

11     Q.    Do you know where her foot was before

12   it began this involuntary movement forward?

13     A.    She -- I think that she is reporting

14   her foot was not in the pedal at all.

15     Q.    Do you know if it was on the ground?

16     A.    Don't know where it is.

17     Q.    Well, if it was on the ground, then

18   that would also suggest as you just indicated

19   that that friction would minimize the likelihood

20   of the involuntary movement forward; right?

21     A.    It is.  It would do that if her foot

22   was on the ground.  But if she is stepping

23   forward and needs equilibrium because she is

24   reaching forward, you know, if you are standing

                                                    210

1       THE COURT REPORTER:  I just -- I can't get

2    both of you.  I am trying to get every single

3    word --

4       MR. ROBINSON:  I understand.

5       THE COURT REPORTER:  -- and I can't get

6    every word.

7       MR. HARTMAN:  Okay, I understand.

8       THE WITNESS:  We will slow down.

9       MR. HARTMAN:  Okay, I want to interject

10   something, Mr. Robinson is being extremely

11   argumentative with this witness.  I have let it

12   go on for way too long.  There is a basic

13   principle that's been applied to the situation.

14      MR. ROBINSON:  I object to your speaking

15   comments again, Mr. Hartman.

16      MR. HARTMAN:  Okay, you are entitled to it.

17   At some point in time this has to end.  He

18   cannot become argumentative with the witness.

19   He cannot give a -- sit there and use his body

20   ambulations and configurations to try and

21   distort a well known fact by anyone who knows

22   anything about the subject matter about the

23   theory of ambulation.

24                                                233

1    BY MR. ROBINSON:

2        Q.   Sir, back to what we are talking about,

3    I am talking -- I know you said if you put your

4    feet behind you.  I am talking about if you put

5    your feet flat on the ground, are your feet

6    moving when you lean your torso toward?

7        A.   If I already have my feet in a stable

8    position that would allow me to reach forward --

9        Q.   Yes.

10       A.   -- with my feet in that position --

11       Q.   Yes.

12       A.   -- then I don't have to move them

13   forward anymore.

14       Q.   So how far back do your feet need to be

15   before they begin to move with the forward

16   movement of the torso in a seated position?

17       A.   You can't -- there is no way to answer

18   the question.  There is no way to answer that

19   question.

20       Q.   Aren't those significant --

21       A.   You haven't given me the parameters to

22   answer.

23       Q.   Aren't those significant questions to

24   know answers to when formulating an opinion as

                                                    234

1    to what Tina Lindquist did?

2        A.    Absolutely not.  I am not going to

3    speculate on what she did.  She is going to be a

4    human being that you can ask all the questions

5    you want.

6            The fact that you are not skillful

7    enough to get the information when you took her

8    deposition doesn't mean you are going to get it

9    from me on the basis of speculation.  I am not

10    going to do that.

11            I will give you principles, but I am

12    not going to speculate what she was doing.  If I

13    ask her the questions, then I would take

14    responsibility for all these -- all the

15    questions you are asking, but I haven't

16    interviewed her.

17        Q.    Aren't you speculating that her foot

18    moved forward?

19        A.    She said that she had her foot outside

20    of the unit.

21        Q.    I said aren't you speculating that her

22    foot moved forward?

23        A.    It is not speculation.  That is a

24    scientific fact.  If she has her foot outside of

235

1    the unit and she has made the unit activate to

2    hurt her hands, this is a one-note samba.  It is

3    not like there is 11 different things that can

4    happen.

5         She has to step into the switch far

6    enough to push the pedal in, to push the lock

7    plate in, push down on the unit in order to have

8    a stroke that will hurt her so that we know this

9    working backwards.

10        Q.   Do you know that OSHA in investigating

11   this accident indicated the foot control was

12   properly guarded?

13        A.   I don't know anything of the kind.

14        Q.   Did you review the OSHA?

15        A.   You are certainly not going to try to

16   impress me with what OSHA knows about foot

17   pedals.  I hope you are not going to try --

18        Q.   I am --

19        A.   -- to do that.

20        Q.   -- not sure what you mean by that.

21   What do you mean by that?

22        A.   Well, first of all, I have had 19

23   contracts with OSHA where I developed a training

24   program that OSHA uses for their compliance

236

```
1                    EXAMINATION

2   BY MR. HARTMAN:

3        Q.   I am sorry, I just have a couple.  I

4   normally wouldn't ask questions, but at one time

5   and I think it is a mistake, but just clarify it

6   for me, you indicated that the Heim machine was

7   a 35 stroke per minute machine?

8        A.   Yes.

9        Q.   And then another time you indicated

10  that it was a 35 stroke per second machine.  I

11  think it is a 35 stroke per minute?

12       A.   It is per minute.

13       Q.   Okay.

14       A.   If it was per second, let me tell you

15  something, it is -- they have a name for it.  It

16  is called a hummingbird.

17       Q.   I just -- I just don't want it to come

18  back that you --

19       A.   Right.

20       Q.   -- stated on the record --

21       A.   Thank you.

22       Q.   The other issue I have is with regard

23  to -- I will grab my note, give me a second, I

24  had it, you indicated that the -- is it ever
```

243

1    safe to have an unguarded foot pedal associated

2    with the press brake?

3        MR. ROBINSON:  Object to the form of the

4    question.

5        THE WITNESS:  On a general purpose machine

6    it is never safe because the number of scenarios

7    that you have when you have a tethered

8    footswitch that could find itself anyplace on

9    the floor, it means that the folks delivering

10   the new parts to the machine to be processed,

11   the folks that are picking up the finished

12   parts, the people who are doing adjustments and

13   lubrication of the machine, there is an army of

14   people who walk in the area where the footswitch

15   is located, any of these people can step

16   inadvertently into this machine and produce a

17   stroke and so, you know, the rule is to minimize

18   the probability of accidental activation for the

19   environment that the -- that these switches find

20   themselves.

21        And the -- there is no such thing when

22   you have a switch that is meant to be activated

23   by a human being as making it so that you could

24   never activate it because then you could never

244

1    run the machine.

2         So what we are trying to do is get

3    controls such that they are sensitive to when we

4    want them to work, they work.  When we don't

5    want them to activate, they don't.

6         And that is a real challenge for the

7    technical community and, you know -- you know, I

8    am very proud of the fact that some of the

9    people who make footswitches have been improving

10   their menu of potential devices so that

11   machinery manufacturers can pick ones that come

12   closer to this goal of minimizing accidental

13   activation.

14        MR. HARTMAN:  No further questions.

15        THE WITNESS:  I do -- I think I have to add

16   something to the thing.  Remember I told you

17   that I also have made a mistake in the report

18   and you didn't ask me what that was.  But if we

19   would -- if you could give me the Triodyne

20   report, it is one word.

21        MR. ROBINSON:  The illustrated?

22        THE WITNESS:  Yes.  Did you see that in

23   there?

24        MR. ROBINSON:  I did.  And that's why I

                                              245

# EXHIBIT "C"

IN THE U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT OF PA

* * * * * * * *

*

TINA LINDQUIST,           *

    Plaintiff         *    Case No.

    vs.               *    04-249E

HEIM L.P.,                *

    Defendant          *    COPY

                  *

* * * * * * * *

DEPOSITION OF

KEVIN MESSINGER

JULY 21, 2005

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

25

1   A.      No.  No.

2   Q.      If you look at Exhibit A, Corry

3   Exhibit A, photograph number three, ---

4   A.      Uh-huh (yes).

5   Q.      --- it shows as pedestal and it

6   shows a foot switch.  Do you see that?

7   A.      Yes.

8   Q.      Were those the pedestal and the

9   foot switch that were existing at the

10  time of Tina Lindquist's injury?

11  A.      Yes.

12  Q.      Do you know where this foot

13  switch came from?

14  A.      That came with the press.

15  Q.      Are you certain of that?

16  A.      Yes.

17  Q.      And how do you know that?

18  A.      Because at the time that's the

19  only thing that was on the press.  We

20  added the pedestal to the two-hand

21  control.

22  Q.      Were you involved with

23  installing this press brake?

24  A.      No.

25  Q.      Were you present when it was

26

1    delivered?

2    A.      Yes, I was here.

3    Q.      Did you see it come with this

4    foot switch which is shown in this

5    photo?

6    A.      Yes.

7    Q.      Who was involved with installing

8    it?

9    A.      I don't remember.

10   Q.      Okay.

11   A.      I can't really remember.  At the

12   time --- we had so many machines come

13   through.

14   Q.      If you think of it later, you

15   can let us know?

16   A.      Yeah.  That one there I've got

17   to think about.

18   Q.      Do you know who manufactured

19   this foot switch?

20   A.      No, I don't.

21   Q.      Do you know if it was sold with

22   the press brake when Heim sold it in

23   1978?

24   A.      To my understanding, yes.

25   Q.      Do you know?

27

1   A.      No.  I actually don't know.  I

2   know it came in with it.

3   Q.      But you don't know if the

4   auctioneer or any type of middle person

5   supplied that with the press brake to

6   Corry Manufacturing?

7   A.      No, I can't say.

8   Q.      Do you remember any markings on

9   that foot switch that might identify

10  its manufacturer?

11  A.      I can remember the plate, but I

12  cannot remember the maker of it.

13  Q.      Did the plate say Heim on it or

14  some other name?

15  A.      No.  That's a --- it would be

16  --- just got a foot switch that's put

17  on many machines.  That I do know.

18  Q.      You do know that it did not say

19  Heim?

20  A.      It did not say Heim.

21  Q.      Okay.  Do you know if this foot

22  switch had been used on any other

23  machines at Corry?

24  A.      No, only on that machine.

25  Q.      Are foot switches unique to

# EXHIBIT "D"

IN THE U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT OF PA

\* \* \* \* \* \* \* \*

\*

TINA LINDQUIST,                    \*

    Plaintiff            \*    Case No.

    vs.                  \*    04-249E

HEIM L.P.,                         \*

    Defendant            \*

                                   \*        COPY

\* \* \* \* \* \* \* \*

DEPOSITION OF

GARY MERKLE

JULY 21, 2005

Any reproduction of this transcript
is prohibited without authorization
      by the certifying agency.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

10

1    switched the operation of the press

2    brake from the foot switch to the

3    two-palm button switch after the

4    accident; is that right?

5    A.      No.  We went --- rephrase that.

6    Q.      Do you remember Corry changing

7    the foot switch application to this

8    press brake to the two-palm button

9    switch before the light curtains

10   arrive?

11   A.      What I remember is the machine

12   came in with only the foot switch.  We

13   added the palm buttons.

14   Q.      And that was before the

15   accident?

16   A.      That's correct.

17   Q.      I was actually talking about

18   after the accident.  Do you remember

19   the foot switch being deactivated?

20   A.      Yes.

21   Q.      In any event, your point is well

22   take.  Corry did all of that; right?

23   They installed the two-palm button

24   switch before the accident?

25   A.      That's correct.

44

1    Q.      Why did Corry purchase the parts

2    and instruction manual back in February

3    of 1999?

4    A.      I don't know precisely, but all

5    I can gather is that we didn't get one

6    with the machine when it came in.

7    Q.      And you mentioned that the

8    machine was purchased at an auction?

9    A.      Correct.

10   Q.      And do you know from whom the

11   machine was purchased?

12   A.      I believe it was Allied, an

13   Allied auction.

14   Q.      Yes.  That's what the paperwork

15   shows as well, too.  Do you know if the

16   machine was purchased by Corry at that

17   auction with the foot switch?

18   A.      I believe so, but I'm not sure.

19   Q.      Who would know that, if the

20   press brake came with a foot switch at

21   the time it was purchased by Corry at

22   the auction?

23   A.      Whoever installed it here.

24   Possibly Jan Oviat.

25   Q.      What is Jan's title?

111

1    out at the plant the key is not in the

2    two-palm switch console.  Who keeps the

3    key?

4    A.      The supervisor would keep it.

5    Q.      So the supervisor ---?

6    A.      Set-up person, supervisor.

7    Q.      So the supervisor would take the

8    key and place it in either the

9    two-prong switch or the foot pedal mode

10   and then take the key and that's how it

11   would operate?

12   A.      The set-up person.

13   Q.      But it's someone other than the

14   operator?

15   A.      Yes.

16                    ATTORNEY ROBINSON:

17                    Are you saying the key

18        would not ---?

19                    ATTORNEY HARTMAN:

20                    May I finish?

21                    ATTORNEY ROBINSON:

22                    I thought you were done.

23        I'm sorry.

24   BY ATTORNEY HARTMAN:

25   Q.      So the key is not just left in