# EXHIBIT "E"

IN THE U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

\* \* \* \* \* \* \* \* \*

\*

TINA LINDQUIST,                 \*

    Plaintiff           \*   Case No.

    vs.                 \*   04-249E

HEIM, L.P.,                     \*

    Defendant           \*

\*

\* \* \* \* \* \* \* \*

DEPOSITION OF

ROBERT ROONEY

September 8, 2005



Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

70

1    use of hand tools by Corry?

2    A.      Not that I know of.  If it was,

3    it was before, you know, I got over

4    there or whatever.

5    Q.      Do you know if Corry changed the

6    electronics at all for this particular

7    Heim press brake?

8    A.      I don't know nothing about that.

9    Q.      Have you ever worked in the

10   maintenance department?

11   A.      Nope.

12   Q.      Does the foot pedal that is

13   shown in pictures 31, 32 appear to be

14   the foot pedal that Tina Lindquist was

15   using at the time of her injury?

16   A.      Yeah, it would be the yellow

17   ---.  It was either yellow or orange.

18   Yeah.

19   Q.      Okay.  You know how long of a

20   cord was on that foot pedal?

21   A.      No, I don't know.  It'll only

22   show to that box.

23   Q.      I see photograph 32 appears to

24   show the entire length of the cord; do

25   you see that?

# EXHIBIT "F"

U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

* * * * * * *

TINA LINDQUIST,            *

    Plaintiff          *    Case No.

    vs.                *    04-249-ENE

HEIM, LP,                  *

    Defendant          *

                * * * * * * * *

DEPOSITION OF

JOEL NICHOLS

July 22, 2005



Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

89

1    the ram could come down on your hands

2    when you were hand-forming the

3    product on the mandrel if you

4    accidentally hit the foot switch; is

5    that right?

6    A.      Yeah.

7    Q.      Has anyone ever indicated if

8    Tina Lindquist was --- accidentally

9    hit the foot switch?

10   A.      No.  It was speculated, but

11   not indicated.

12   Q.      Where's the --- do you know if

13   the foot switch that is shown in

14   Photo Three of Exhibit A is the same

15   foot switch that Tina Lindquist was

16   using at the time of her accident?

17   A.      Yes.

18   Q.      And how can you tell that?

19   A.      Because it was an orange foot

20   pedal.

21   Q.      We've heard from one of the

22   maintenance men that all of the press

23   foot switches were orange?

24   A.      I believe the one that's over

25   on the Niagara should be yellow.

90

1   Q.      Okay.  And how about the ones

2   --- have you ever seen any other foot

3   switches?

4   A.      Yeah, they've got one of them

5   --- I'm trying to think what kind of

6   press it is.  One of the multi-

7   presses downstairs has a foot switch.

8   But it's very rarely used.

9   Q.      What color is that foot

10  switch?

11  A.      Offhand, I'm not sure.  I

12  believe that one would be yellow also

13  downstairs.

                    ATTORNEY HARTMAN:

14

15          And I'm going to object

16          to your statement that all the

17          foot switches were orange.

18          Because I believe that there

19          was testimony there were

20          yellow and black foot switches

21          in use ---

22  A.      Yeah.

                    ATTORNEY HARTMAN:

23

24          --- in other places,

25          Paul.  Correct me if I'm

# EXHIBIT "G"

U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

\* \* \* \* \* \* \*

TINA LINDQUIST,        \*

    Plaintiff        \*    Case No.

    vs.              \*    04-249-ENE

HEIM, LP,              \*

    Defendant        \*

              \* \* \* \* \* \* \* \*

DEPOSITION OF

DAVE PHILLIPS

July 22, 2005



Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

51

1  history of it?

2  A.      No.  No, I have no idea of

3  what the history of that press was.

4  All I know is they bought it at an

5  auction or something and ---.

6  Q.      Do you remember when it was

7  purchased at an auction?

8  A.      I don't remember what year.  I

9  remember the first time it came in

10  the door.

11  Q.      Did it have a foot switch on

12  at that time?

13  A.      I do believe so.

14  Q.      Did it have any --- a two-palm

15  button switch?

16  A.      No, not that I know of.

17  Q.      Did it have any light curtain

18  on it?

19  A.      No.

20  Q.      Were you involved at all in

21  removing the foot switch after the

22  accident?

23  A.      Yes.  I was told to go down

24  and take it out.

25  Q.      Take the foot switch out?

92

1    Tina Lindquist's injury?

2    A.        No.

3    Q.        Have you ever talked with Tina

4    Lindquist about this accident?

5    A.        No.

6    Q.        Have you ever talked with

7    Jamie about the accident?

8    A.        I've asked Jamie how she was

9    doing.  That's as far as it went.

10   Q.        Do you still see him on

11   occasion?

12   A.        On occasion.  Very seldom.

13   Q.        He works with Waste Management

14   now doesn't he?

15   A.        Yes.

16   Q.        Is he driving truck?

17   A.        Yes.

18   Q.        Do you remember what color the

19   foot switch was that you removed from

20   the machine?  From the day after or

21   so?

22   A.        I do believe it was orange.

23   Q.        Are you certain of that?

24   A.        I do believe.

25   Q.        Are there any other different

136

1    machine Tina Lindquist was on?

2    A.      Right.

3    Q.      Earlier you thought --- your

4    testimony was that you believe that

5    operators set up the machine.  Am I

6    correct that there is a setup person

7    for the machine?

8    A.      Yes.

9    Q.      Earlier your testimony was ---

10   and Mr. Robinson can certainly

11   correct me if I'm wrong --- that with

12   regard to whether or not you use the

13   foot pedal or the two-hand control,

14   the key to that was retained by the

15   setup person.  Do you have any

16   information what was used then?

17   A.      I know they've been taking

18   keys out, because every time I go to

19   do press inspection, I have to go

20   find the keys to switch it over to do

21   my inspections.

22   Q.      And that would be the setup

23   person who has the key?

24   A.      I don't know what they do ---

25   well, I have to go ask for it.  I

137

1   don't know who gives it.

2   Q.      Where they get it from?

3   A.      A lot of time they're just

4   lain on one certain spot.

5   Q.      Okay.  Would it --- am I

6   accurate to say that the setup person

7   sets up the machine for your

8   particular run, not the operator?

9   A.      I guess.

10  Q.      Okay.

11                  ATTORNEY HARTMAN:

12          I have no further

13          questions.  Thank you.

14  REDIRECT EXAMINATION

15  BY ATTORNEY ROBINSON:

16  Q.      You mentioned the distance of

17  the floating blank, the range of the

18  floating blank, may depend on how

19  it's programmed; is that right?

20  A.      Yes.

21  Q.      Who does the programming?  Is

22  that something ---?

23  A.      I don't know who's doing it.

24  It should be a setup probably.

25  Q.      Is that done by Corry?

# EXHIBIT "H"

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

* * * * * * *

TINA LINDQUIST,        *

    Plaintiff        *    Case No.

    vs.              *    04-249E

HEIM L.P.,             *

    Defendant         *

* * * * * * *

DEPOSITION OF

TINA LINDQUIST

June 28, 2005



Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

37

Q.      Was there a two palm button
switch on the press brake that you
were working on at the time of your
injury?

A.      No, I didn't see one.  I
always seen it used with the foot
pedal.

Q.      Do you remember there being a
two palm button pedestal attached to
the press brake on which you were
working at the time of your injury?

A.      There was one beside it, but I
didn't know it went to that machine.
I didn't know if it was just put off
there to be out of the way or if it
did go to it, I didn't know for sure.
There was one off to the side.

Q.      All the investigators have
noted that there was a two palm
button attached to this particular
machine, in fact, able to be used at
the time you were injured.

A.      Well, they told me that the
foot pedal was hooked up and I had to
use the foot pedal.

89

1        There's a very blurry

2      picture that I have --- this

3      is the picture that was

4      supplied to me with a number

5      on top.  It has been marked as

6      number 65 and we will use that

7      for purposes of the

8      deposition, but we're going to

9      mark the other copy as Exhibit

10      C.

11              (Exhibit C marked for

12              identification.)

13  BY ATTORNEY ROBINSON:

14  Q.      And I'll ask you, does that

15  appear to be the foot switch that you

16  were using on the date that you were

17  injured?

18  A.      Yes.

19  Q.      And do you see that it has an

20  enclosed pedal?

21  A.      Yes.

22  Q.      Does that refresh your memory

23  that the pedal that you were using

24  was an enclosed pedal?

25  A.      Yes.

140

1  doing those steps one and two.  Is

2  that the same as this step that you

3  were performing when you were

4  injured?

5  A.    I would sit and stand, I mean,

6  I don't know if I would've sit more

7  than I would stand.  I would switch

8  back and forth.  I would sit for a

9  little bit, then if my legs get

10  tired, I'd move the chair and I'd

11  stand and do it.

12  Q.    You were sitting at the time

13  of this incident, weren't you?

14  A.    Yeah, I was sitting at the

15  time of the incident.

16  Q.    So you were actually

17  performing this step while you were

18  sitting in front of the press brake.

19  Was your foot inside the foot switch,

20  the housing of the foot switch that

21  we saw in one of those photographs?

22  A.    It wasn't inside of it.  I

23  took it away from it after I had

24  finished the last part, to get the

25  other part to put it on there.

142

```
1            records say.  If they say what
2            you say they said, I would ask
3            you to produce it.  Otherwise,
4            ask your question as to what
5            happened.
6  BY ATTORNEY ROBINSON:
7  Q.        Is that what you were doing?
8  A.        No, it wasn't resting on the
9  pedal, it was away from it.
10 Q.        Do you know of any way you can
11 apply the pedal if your foot is not
12 inside the housing?
13 A.        If it got --- if it would slip
14 or something into it, it wasn't like
15 the thing you pushed was way up off
16 the ground and you had to lift your
17 foot up all the way to put it in
18 there.  It was wide enough, the hole
19 was, to be able to fit it, you know,
20 slide it in there.
21 Q.        How high up was the pedal off
22 of the ground?
23 A.        It was right on the ground.
24 The whole foot pedal was right on the
25 ground.
```

143

1    Q.        Isn't there a space between

2    the actual foot switch, the actual

3    foot lever and then the ground?

4    A.        A little bit, I don't know.    I

5    never got on the ground to see how

6    far off of it it was.

7    Q.        Can you give any estimate as

8    to how far off the ground the foot

9    lever was?

10   A.        No, because you can't see it

11   from when you're sitting or standing.

12   You'd have to get on the ground, eye

13   level with it to see.

14   Q.        Was there a piece of metal

15   that acted as a door for the foot

16   switch, so that if you wanted to put

17   your foot in, you'd actually have to

18   push back the piece of metal and then

19   push down?

20   A.        No, I don't think so.

21   Q.        Do you know the answer to that

22   question?

23   A.        No, what do you mean?    I'm

24   confused, a door that would close it?

25   Cover the hole?

144

1  Q.      Yes.

2  A.      Oh no, there wasn't one of

3  those.

4  Q.      Do you have any memory of your

5  foot slipping into the foot switch

6  housing?

7  A.      No, I don't know how it

8  happened or anything.

9  Q.      When you were using the press

10  brake for the first step, when you

11  would press the foot switch, how many

12  times would the press brake operate?

13  How would it operate?

14  A.      It would come down and go back

15  up.

16  Q.      And then stop?

17  A.      I don't know, after it would

18  come up, I would take my foot off of

19  it, I don't know if you would've kept

20  it on there if it would've kept on

21  going.

22  Q.      Did you ever have it keep

23  going?

24  A.      No.

25  Q.      Okay.  And when you would

152

1    Q.    And do you have any

2    explanation as to how the press brake

3    operated?

4    A.    What do you mean, how it got

5    hit?

6    Q.    How it activated, how it

7    started?

8    A.    No, I don't know.  My foot

9    slipped or something, I don't know.

10   You used oil, so there could have

11   been oil or something, I don't know.

12   Q.    So you don't know if your foot

13   slipped and hit the foot switch or

14   not?

15   A.    No.

16   Q.    Has anyone ever given you any

17   ideas as to how the press brake may

18   have activated?

19   A.    No.

20   Q.    At the time of your injury?

21   A.    No.

22   Q.    Do you remember your foot

23   slipping at all?

24   A.    No.

25   Q.    Do you know if somebody else

# EXHIBIT "I"

1          UNITED STATES DISTRICT COURT

2        WESTERN DISTRICT OF PENNSYLVANIA

3

4   TINA LINDQUIST,              )       ORIGINAL

5          Plaintiff,            )

6      vs.                       ) NO. 04-249E

7   HEIM L.P.,                   )

8          Defendant.            )

9

10      The discovery deposition of ANTHONY ROBERT

11   MASE, JR., taken in the above-entitled cause,

12   before Kyla Elliott, a notary public of Cook

13   County, Illinois, on the 27th day of July, 2005, at

14   33 North LaSalle Street, Chicago, Illinois,

15   pursuant to Notice.

16

17

18

19

20

21   Reported by:  Kyla Elliott, CSR, RPR

22   License No :  084-004264

23

24

1    MR. ROBINSON:  Objection, asked and answered on

2  a number of occasions.

3    MR. HARTMAN:  I don't think it has been.

4    MR. ROBINSON:  Well, that's okay, the record is

5  clear.  And Mr. Mase is going to answer your

6  questions a number of times until we get to a

7  number that we're comfortable telling him that he's

8  answered enough.  So you can keep going through

9  this.  Go ahead, please.

10    THE WITNESS:  We build a general purpose

11  machine.  It can do numerous types of applications

12  that we would not have privy of information to.

13  The press that we provide there has to be other

14  items added to the machine for it to perform a

15  function.  And we have no idea what that would be.

16  BY MR. HARTMAN:

17    Q.   What type of items?

18    MR. ROBINSON:  I'm sorry.

19  BY MR. HARTMAN:

20    Q.   What type of items would be added to --

21  give me a general idea of what type of items are

22  added to the machine to make it function?

23    A.   You would need a dye.

24    Q.   But the dye is located under the ram, am I

1    objection.

2    BY MR. HARTMAN:

3        Q.    Okay.    Sir, was it known in the industry

4    in the -- prior to 1978, that operators of press

5    brakes had their hands caught between the dye and

6    the ram area?

7        MR. ROBINSON:    I'll object to the form of the

8    question.

9        THE WITNESS:    I believe that was an awareness.

10   BY MR. HARTMAN:

11       Q.    Well, that's why they invented presence

12   sensing devices and pull back devices and barrier

13   gates, am I correct?

14       MR. ROBINSON:    I'll object and instruct the

15   witness not to answer why some manufacturer may

16   have created those devices.    There's no suggestion

17   that Heim has manufactured those devices and I

18   don't think that's an appropriate question.

19   Instruct the witness not to the answer the

20   question, yes.

21   BY MR. HARTMAN:

22       Q.    Sir, back in 1978 you were aware of

23   presence sensing devices you indicated earlier,

24   correct?

1    provided with the 70-6 in 1978?

2        A.   I believe it was orange.

3        Q.   And I would ask you to assume because I

4    have other photographs that the opening of this

5    orange foot pedal is open, you can slide your foot

6    right in and then there's a pedal?

7        MR. ROBINSON:  I'll object to the form of this.

8    BY MR. HARTMAN:

9        Q.   If you assume that would that foot pedal

10   be the type of foot pedal that would have been

11   supplied with the 70-6 in 1978?

12            If you assume that this foot pedal has an

13   opening at the front of it where the operator just

14   slides their foot in and can hit the pedal, would

15   that be the type of foot pedal that would have been

16   supplied with the brake press in 1978?

17       MR. ROBINSON:  I'll object to the form of the

18   question.  Are you asking him if the foot pedal

19   that was supplied with the press brake in 1978 had

20   an opening.

21       MR. HARTMAN:  Okay, yes.

22       THE WITNESS:  I would make that assumption,

23   yes.

24

1    But let's continue with your questions.  I just

2    want to make sure I bring these up so that the

3    Court is aware of what's taking place here.

4        MR. HARTMAN:  Paul, be my guest here.

5    BY MR. HARTMAN:

6        Q.  With regard to the foot pedal, you've

7    indicated that you cannot precisely tell that that

8    is the foot pedal that was supplied with the

9    machine, correct?

10       A.  Correct.

11       Q.  You did testify that it does appear to be

12   the general type of foot pedal that would have been

13   supplied with this machine, am I correct?

14       A.  Correct.

15       Q.  The original foot pedal would have been

16   orange, this is orange, correct?

17       MR. ROBINSON:  Actually he's indicated to you

18   he wasn't really sure.  He thinks it might have

19   been orange, but he wasn't there and he doesn't

20   know.

21       MR. HARTMAN:  He said it was orange, he doesn't

22   know if the cord was yellow.  Paul, if you want to

23   testify, at least get it right.

24       MR. ROBINSON:  I believe when I raise the

163

1   objection to your comment that he specifically said

2   he doesn't know.

3   BY MR. HARTMAN:

4       Q.   What color do you understand the foot

5   pedal to be that accompanied the 1978 70-6?

6       A.   I believe it would be orange.

7       Q    And you think the cord may have been

8   yellow, am I correct?

9       A.   Correct.

10      Q.   And the foot pedal that would have been

11  supplied with this particular machine would have

12  had an opening such as the opening that exists in

13  photograph 2, am I correct?

14      A.   Correct.

15      Q.   So that you can slide your foot in and

16  out, am I correct?

17      A.   Correct.

18      Q.   And when you slide your foot in there

19  would have been a switch that you would depress to

20  operate the press brake, am I correct?

21      A.   It would activate the press brake, yes.

22      Q.   Do you know on the 70-6 the time it takes

23  to stop the ram as it's going down?

24      A.   No.

1   it has sold?

2       A.   I don't believe so.

3       Q.   Are you aware of any other lawsuits

4   involving the model 70-6 press brake manufactured

5   by Heim?

6       A.   No.

7       Q.   Are you aware of any other personal

8   injuries resulting from the use of a model 70-6

9   press brake?

10      A.   No.

11      Q.   Have you sold press brakes did you say for

12  Clearing?

13      A.   Clearing didn't -- not while I was there.

14      Q.   Niagra, did you sell press brakes for

15  Niagra?

16      A.   I wasn't involved with the sales

17  department with Niagra, I was aftermarket sales.

18      MR. ROBINSON:  Those are all of the questions

19  that I have.

20      MR. HARTMAN:  I just have a couple of

21  follow-up, I promise you I'll be short.

22                  FURTHER EXAMINATION

23  BY MR. HARTMAN:

24      Q.   When you said that you don't know of any

214

1    other injuries occurring with the model 70-6 press

2    brake, you don't know whether there were or there

3    weren't, am I correct?

4        A.    That's correct.

5        Q.    Okay.  You're not saying there weren't any

6    or you're not saying there were, you just don't

7    have that information?

8        A.    I'm not aware of any, right.

9        Q.    I looked through all of the invoices and

10   shipping documents that were included in Exhibit

11   No. 5.  It appears to me that with regard to the

12   original purchase of the press brake, it was

13   shipped directly to the end user, am I correct?

14       A.    I would have to double-check but that

15   would normally be the case, we would get shipping

16   instructions, yes.

17       Q.    Distributor, is that kind of like the

18   franchise like the Chevy dealer he basically sells

19   a product that someone else makes it, is that how a

20   distributor network is worked out?

21       MR. ROBINSON:  I object to the form of the

22   question.  He's not going to answer that general

23   question where you try to tie Heim to one of its --

24   to a distributor to an agent dealership, franchisee

1  question.  He's indicated assuming other things

2  such as the air is hooked up, you've left that out

3  of the equation.  I want to make sure that the

4  record is clear that there are other processes

5  involved other than simply putting electricity to

6  it, which is how I could see the term energize be

7  read.  And that there is, in fact, an air line,

8  there is an electrical line, there is a foot

9  switch, there is a point of operation safety

10  device, all the things that he's already said.

11  BY MR. HARTMAN:

12      Q.    Your press brakes will function without a

13  point of operation protection device; is that

14  correct?

15      A.    It will go up and down, yes.

16      Q.    They're designed to do that, am I correct?

17      A.    That's correct.

18      Q.    The only thing that the employer has to do

19  to make it other than what we've already talked

20  about, energize, affix and attach a foot pedal to

21  make it begin molding parts or bending parts to put

22  the dyes in, am I correct?

23      A.    The dye would be a requirement to make any

24  part, yes.

# EXHIBIT "J"

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TINA LINDQUIST,                    )    ORIGINAL

      Plaintiff,               )

      -vs-                     )    No. 04-249E

HEIM, L.P.                         )

      Defendant.               )


    The videotaped deposition of MR. GARY

HUTTER, called for examination pursuant to Notice

and the Rules of Civil Procedure for the United

States District Courts pertaining to the taking of

depositions, taken before DEANNA AMORE, a notary

public within and for the County of Cook and State

of Illinois, at 33 North LaSalle Street, Chicago,

Illinois, on the 12th day of April, 2006, at the

hour of 8:14 a.m.


    CSR No.:  084-0003999

1

1    wasn't used for 30-some years because the foot

2    control that was there at the time of the accident

3    is different than the foot control that was sold by

4    Heim.

5        But certainly I would expect the foot control

6    might change its color to some extent.  I don't

7    know that I would even expect, depending on the

8    production, that a foot control pedal would

9    necessarily survive for 30 years.

10        I believe the testimony of one of the people

11    for the maintenance for Cory said it looked new to

12    him and he wouldn't be surprised if that was the

13    original equipment.

14        But that's what I was referring to in this

15    sentence was the fact that the pedal itself appears

16    to be dark, and I think Linemaster did not sell

17    them that way.

18    BY MR. HARTMAN:

19        Q.   If it was a Linemaster, is it your

20    testimony you would expect to see orange on the

21    inside?

22        A.   That's correct.

23        Q.   The next paragraph you indicate, the

24    self-inflicted injury appears to have occurred when

97

1    they were injured, that's correct.

2        Q.    Do you believe it was an inadvertent or

3    advertent pressing down on the foot control?

4        A.    You know, that's an interesting question.

5    I don't believe it was inadvertent in that she had

6    a muscle twitch necessarily that caused it.

7    I believe that it is probably that she is leaving

8    her foot on the foot control and that she is

9    familiar with cycling the machine, and she cycles

10   it probably by some mental signal going through her

11   nervous system causing her foot to move.

12       But we will never know that because no one

13   took a photograph or documented it at the time or

14   there is no way to properly document that.  So

15   I guess that's my opinion about that.

16       Q.    Do you have any evidence that she intended

17   to operate the foot control while her hands were in

18   the dye?

19       A    No, I don't think she was intending on

20   maiming herself or amputating fingers.

21       Q.    What evidence do you have that

22   Ms. Lindquist left her foot in the foot control at

23   the time of her accident immediately prior to the

24   operation of the foot control?

99

1    anything that I would think that's material to my

2    opinions that I would like to change.

3        Q.   Is there anything that when you read it

4    the last time, you felt was inaccurate even if it

5    wasn't material?

6        A.   I can't think of anything.

7        Q.   In the second paragraph you indicate,

8    referring to press brakes, that it is usually

9    considered a multi-purpose machine typically able

10   to produce long V-type bends through the use of

11   owner-supplied dyes; am I correct?

12       A.   Yes.

13       Q.   Is that a distinguishing characteristic of

14   a press brake?

15       MR. ROBINSON:  Object to the form of the

16   question.

17       THE WITNESS:  Only in that they tend to have

18   longer, narrower beds than mechanical presses but

19   you could put a long, narrow bed on a mechanical

20   press.

21   BY MR. HARTMAN:

22       Q.   You indicate that the machine does not

23   have a pinch plate that caused the plaintiff's

24   injuries when it left the control time; am

                                                    124

1    mandated by OSHA.  It is what's mandated by ANSI.

2    It is what the custom and practice is for

3    safeguarding the point of operation.

4    BY MR. HARTMAN:

5       Q.   OSHA was silent in its report as to

6    whether or not Heim supplied a defective foot

7    control with its machine; am I correct?

8       MR. ROBINSON:  I object to the form of the

9    question.

10      THE WITNESS:  I guess --

11      MR. ROBINSON:  Also asked and answered.

12      THE WITNESS:  Taken in context of what

13   I said, I guess.

14   BY MR. HARTMAN:

15      Q.   Is it reasonably foreseeable that

16   operators of press brakes would place their hands

17   in the dye area?

18      MR. ROBINSON:  Objection to the form.

19      THE WITNESS:  It is foreseeable that under

20   certain circumstances operators will put their

21   hands in the dye areas with the proviso that it is

22   recommended by OSHA, by ANSI and other safety

23   organizations that that not be done.  And it is

24   recommended and required by OSHA and ANSI that

                                                    149

1    in more recent standards you see the recommendation

2    or requirement that foot controls be anchored in a

3    specific location depending on what's being

4    processed and how the dyes are being used and how

5    big or the shape of the piece part.

6         But for this particular accident where it

7    is small and the way the accident occurred, I don't

8    have a problem with the foot pedal or foot control

9    being where it was described.

10    Q.    I refer you to page 13 of your report,

11    please.

12    A.    Sure

13    Q.    Paragraph 2.

14    A.    The one that starts out one?

15    Q.    Yes.  It says, one of the other safety

16    concepts used in offering add-on safety features is

17    that the application of an add-on safeguard itself

18    should not cause a new or aggravated hazard.  The

19    application of a front cover to a foot control for

20    this type of equipment causes a new or aggravated

21    hazard, that of riding the foot control.

22         Did I correctly read your report?

23    A.    Yes, I think so.

24    Q.    And is that your testimony today?

157

1        A.    Sure.

2        Q.    With regard to training and the safety

3    hierarchy, would HOOD be a training method of

4    safeguarding machines?

5        MR. ROBINSON:  Object to the form.

6    BY MR. HARTMAN:

7        Q.    Do you know what HOOD is?

8        A.    Yes.

9        Q.    What is HOOD?

10       A.    HOOD is an abbreviation or acronym that

11   stands for Hands Out of Dyes.

12       Q.    Is part of the Hands Out of Dyes method of

13   safeguarding the machine, the operator, involve

14   training of the operator?

15       MR. ROBINSON:  Objection to the form.

16       THE WITNESS:  That's two questions really.

17       Hands Out of Dyes is a recommended practice

18   that currently is not a complete adequate way of

19   safeguarding most machines in most operations but

20   it is something that's embraced by ANSI.  It is

21   something embraced by OSHA.  It is something

22   embraced by the safety community.

23       It relies heavily on supervision, training and

24   worker's ability to perform their function with the

                                                    186

1    were being written around hardware kinds of things.

2        Today, if HOOD was introduced today, it might

3    be more likely to be embraced and accepted because

4    we have many more procedural standards that are

5    accepted now.

6        The problem with HOOD was that employers

7    started to use it in place of safeguarding.  They

8    started to rely too heavily on it.  And when they

9    could have easily provided point-of-operation

10   safeguarding, they would say, well, we will just

11   train the guy or train the person and rely on that

12   when it probably was better to do it other ways.

13       HOOD also had some application for small

14   production runs where point-of-operation

15   safeguarding may have been impractical.  And under

16   those circumstances it was decided that you could

17   run a machine and put your hands in the point of

18   operation as long as there was a lot of

19   supervision, administrative controls and it cost

20   production which meant money.

21   BY MR. HARTMAN:

22       Q.   On the first full paragraph of page 14

23   beginning with additionally --

24       A.   Yes.

                                                    188