# EXHIBIT "K"
# (PART I)

1

```
 1              UNITED STATES DISTRICT COURT

 2            WESTERN DISTRICT OF PENNSYLVANIA

 3                      -  -  -

 4   TINA LINDQUIST,            :

 5              PLAINTIFF,  :

 6   -VS-                     : CASE NO. 04-249E

 7   HEIM, LP,                 :

 8              DEFENDANT.  :

 9                      -  -  -

10         Deposition of DENNIS R. CLOUTIER, a

11   witness herein, taken by the plaintiff as upon

12   direct examination pursuant to the Federal Rules

13   of Civil Procedure and pursuant to agreement and

14   stipulations hereinafter set forth at the offices

15   of Dinsmore & Shohl, 1600 Chemed Center, 255 East

16   Fifth Street, Cincinnati, Ohio at 8:22 a.m. on

17   Tuesday, April 11, 2006, before Lisa Conley, RMR,

18   CRR, CCP, a notary public within and for the State

19   of Ohio, and by audio/visual means before Marlene

20   Dori, CLVS.

21                      -  -  -

22

23

24
```

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330   FAX (513) 381-3342

7

1          Q.    And, approximately, what time did

2     you meet with Mr. Robinson?

3          A.    I picked him up at his hotel just

4     before 7:00, and we had breakfast together.

5          Q.    Okay.  What issues did you discuss?

6          A.    The elements of the case, some of

7     the testimony of Mr. Barnett, some of the

8     evidentiary evidence that has been provided

9     through discovery so far.

10         Q.    What elements, what is your

11    understanding of the elements of this case are?

12         A.    I understand that the major

13    complaint that is being alleged against Heim is

14    the type of foot switch that was on the machine at

15    the time of the occurrence and how the machine was

16    being used.

17         Q.    What type of machine -- Strike that.

18               What type of foot control was on the

19    Heim machine at the time of this occurrence?

20         A.    It's my understanding it was a

21    Linemaster foot switch.

22         Q.    Do you know what model number?

23         A.    I believe it was a 511, Model 511.

24         Q.    Would you describe what your

8

1    understanding is, a Linemaster Model 511 switch

2    is?

3            A.    It's an anti-trip type foot switch,

4    which has a toe release type of mechanism.

5            Q.    What's the purpose of the toe

6    release on the Model 511?

7            A.    The toe release latches the

8    actuating pedal in the up position and requires an

9    operator to insert their foot completely into the

10   foot switch to release the toe latch before

11   operating -- or before depressing the operating

12   lever.

13           Q.    What's the purpose of having a toe

14   latch on that foot switch, if you know?

15                 MR. ROBINSON:  Objection to the

16   form.

17           A.    The toe latch is a device that is

18   intended to reduce or minimize the possibility or

19   the probability of inadvertent actuation of the

20   foot switch.

21           Q.    You indicated -- First you said

22   "possibility" and then you said "probability,"

23   what was that change about; would you explain to

24   me what inadvertent activation of the foot switch

35

 1   think the B 11.3 standard provides the needed

 2   guidance to make that machine safe for Tina

 3   Lindquist on the day of her occurrence.

 4             Q.   So your opinion today as it relates

 5   to the press brake that was involved with

 6   Ms. Lindquist is, your analysis begins and ends

 7   with regard to the safety issues with B 11.3?

 8             MR. ROBINSON:  Objection to the

 9   form.

10             A.   Yes.

11             Q.   Are you aware of any manufacturer at

12   anytime in your 29 plus years with Cincinnati,

13   Incorporated that provided a gated foot control

14   with their press brake?

15             MR. ROBINSON:  Objection to the

16   form.

17             A.   Yes, at various times over the

18   years.

19             Q.   Would you identify what

20   manufacturers you're aware of that provided gated

21   foot controls with their press brakes?

22             MR. ROBINSON:  Object.  You mean at

23   anytime?

24             MR. HARTMAN:  During his 29 years.
                 SPANGLER REPORTING SERVICES, INC.

             PHONE (513) 381-3330  FAX (513) 381-3342

1              MR. ROBINSON:  Okay.  Objection to

2     the form.

3     BY MR. HARTMAN:

4              A.   I believe Pacific provided a gated

5     foot switch later on.  Cincinnati, Incorporated

6     provided gated foot switches.  Chicago provided

7     gated foot switches.  Amada provided or provides a

8     gated-type foot switch; that's A M A D A.  I

9     believe LBD, just the letters L B D, provides a

10    gated-type foot switch; and possibly Trumpf, T R U

11    M P F, provides a gated-type foot switch.

12             Q.   Are you aware of any of the

13    manufacturers of press brakes that you've just

14    named that provided gated foot controls with their

15    press brakes having done so in the period of 1971

16    to 1982?

17             MR. ROBINSON:  Objection to the

18    form.

19             A.   '71 to '82 would be Cincinnati,

20    Incorporated, it would be Chicago, it would

21    be -- That's all I can think of.  I know there was

22    another one out there, I can remember the foot

23    switch, but I can't remember the press brake.

24             Q.   Are you aware of any of the
                  SPANGLER REPORTING SERVICES, INC.

           PHONE (513) 381-3330  FAX (513) 381-3342

1    manufacturers of press brakes that you just

2    enumerated that included gated foot controls with

3    their press brakes still doing so, doing so today?

4                MR. ROBINSON:  Objection to the

5    form.

6         A.    Well, the only two that are left are

7    Pacific and Cincinnati, and both of them do, I

8    believe.

9         Q.    Okay.  Are you aware of a press

10   brake manufacturer that offers a gated foot

11   control as standard equipment with their press

12   brakes?

13               MR. ROBINSON:  Objection to the

14   form.

15        A.    I don't know about Pacific, whether

16   it's standard or not.  I believe on some

17   Cincinnati machines it's standard.

18        Q.    Do you know why on some Cincinnati

19   machines it would be standard and others it would

20   not be?

21        A.    No.

22        Q.    Have you ever had discussions with

23   the person responsible at Cincinnati as to why

24   they included gated foot controls with their press

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330  FAX (513) 381-3342

38

1    brakes?

2           A.    It was a corporate decision made

3    early on to provide that type of foot switch.

4           Q.    Do you know why that decision was

5    made?

6           A.    Yes.

7           Q.    Would you tell us?

8           A.    It was anticipated that it would be

9    a requirement in the B 11.3 standard, and the

10   design was changed to accommodate that anticipated

11   change -- or requirement, I should say, but that

12   requirement never did get into the standard.

13          Q.    But Cincinnati continued to use the

14   gated foot control; am I correct?

15          A.    Yes.

16          Q.    Are you aware of any increase in

17   accidents to the operator of Cincinnati press

18   brakes with the incorporation of the gated foot

19   control?

20          A.    No.

21          Q.    Are you aware of any decrease in the

22   accidents to operators of Cincinnati press brakes

23   with the incorporation of the gated foot control?

24          A.    No.
                     SPANGLER REPORTING SERVICES, INC.

              PHONE (513) 381-3330   FAX (513) 381-3342

42

1   population of the machines probably half of them.

2          Q.   How would the population of the

3   machines give you rise to an estimate that half of

4   the cases involved foot controls that were gated?

5          A.   Because of the population of

6   machines that had been manufactured by Cincinnati,

7   Incorporated and were out in the field using gated

8   foot controls or using foot-switch type foot

9   controls, half of them were from an era of gated

10  foot controls and half of them were prior to that

11  time.

12         Q.   Okay.  When did the era of gated

13  foot controls begin at Cincinnati, Incorporated?

14         A.   1973.

15         Q.   Did the gated foot controls at

16  Cincinnati, Incorporated include an anti-trip

17  latch?

18         A.   No.

19         Q.   Okay.  Have they ever included an

20  anti-trip latch?

21         A.   No.

22         Q.   Do you believe the inclusion of an

23  anti-trip latch on the gated foot control utilized

24  by Cincinnati would add to the safety of the gated

61

```
1              MR. ROBINSON:  Objection to the
2    form.
3         A.   Cincinnati made efforts to reduce
4    that probability, yes.
5         Q.   And would you agree, sir, that the
6    reason you reduced that probability of inadvertent
7    activation of press brakes, either by foot control
8    or two-hand control, would be because -- would be
9    so as to protect the operator in the event they're
10   working on a press brake?
11             MR. ROBINSON:  Objection to the
12   form.
13        A.   Yes, yes and no, because, you know,
14   unintended operation of a machine is not a
15   desirable event under any circumstance, so based
16   on that context right there, any measures taken to
17   reduce the possibility of an unintended cycle of a
18   machine goes to an advancement of the overall
19   safety of the operation.
20        Q.   Do you know what HOOD is?
21        A.   Is that with a period after each
22   letter?
23        Q.   Yes.
24        A.   Yes.
```

68

1   out what you know and what you do.

2           A.   I'm sure Ralph probably told you

3   that, though.

4           Q.   We've talked about a lot of things.

5                Is HOOD feasible for use with power

6   press brakes a hundred percent of the time?

7                MR. ROBINSON:   Objection to the

8   form.

9           A.   Yes.

10          Q.   One hundred percent of the time HOOD

11  is feasible?

12               MR. ROBINSON:   Objection, asked and

13  answered.

14          A.   Yes.

15          Q.   Okay.  Can you see situations where

16  HOOD has been applied to the use of a power press

17  brake but the operator still becomes injured at

18  the point of operation?

19          A.   Can I foresee?

20          Q.   Yes.

21          A.   If it's incorporated in the

22  operation of the machine, no, there's no way that

23  I could predict that that would happen.

24          Q.   What happens if there's a failure in

                 SPANGLER REPORTING SERVICES, INC.

            PHONE (513) 381-3330  FAX (513) 381-3342

1   the HOOD process, meaning let's say would one of

2   the ways be a light current that you could achieve

3   HOOD?

4               MR. ROBINSON:  Objection to the

5   form.

6          A.    No.

7          Q.    A light current does not -- is not a

8   HOOD mechanism?

9          A.    There is, there is no HOOD

10  mechanism.  HOOD is a philosophy.  HOOD is a way

11  of operating these machines that says design the

12  dies, design the operation, design the particular

13  part so the operator does not have to reach

14  between the dies to load the part or to remove the

15  part or to in any way form the part.

16         Q.    Would you agree that there are also

17  numerous ways that operators interact with

18  machines where they do have their hands in the die

19  area and it's understood by the industry that

20  operators will have their hands in the die area?

21              MR. ROBINSON:  Objection to the

22  form.

23         A.    Which industry are you talking

24  about?  Are you talking about in general; yes.

                    SPANGLER REPORTING SERVICES, INC.

              PHONE (513) 381-3330  FAX (513) 381-3342

1          Q.   Press brake industry.

2          A.   Oh, press brake industry.

3               MR. ROBINSON:  Same objection.

4          A.   Yes.

5          Q.   So the press brake industry

6    understands that operators will work with their

7    hands in the die area; am I correct?

8               MR. ROBINSON:  Objection to the

9    form.

10         A.   I believe that's a fair evaluation,

11   that that acknowledgment or recognition is there.

12   It does nothing to diminish the need to continue

13   to promote hands off die operation.

14         Q.   And I understand that the hands out

15   of die operation is something that the industry is

16   promoting, but I need to know what they understand

17   actually happens at the ground level with

18   operators of press brakes.

19              Am I correct, sir, that the press

20   brake manufacturers know that operators will work

21   with their hands in the die area of press brakes?

22              MR. ROBINSON:  Objection to the

23   form.

24         A.   Yes, I believe that's a fair
                    SPANGLER REPORTING SERVICES, INC.

              PHONE (513) 381-3330  FAX (513) 381-3342

```
 1          A.   Yes.

 2          Q.   Are you aware that industry-wide

 3   it's known that operators of press brakes will

 4   have injuries to their hands and fingers at the

 5   point of operation while operating press brakes?

 6          A.   Yes.

 7               MR. ROBINSON:  Objection.

 8          Q.   Would you agree, sir, that that

 9   knowledge of injuries happening to the hands of

10   operators operating power -- press brakes would

11   allow you to make a determination that those

12   operators are not using point of operation safety

13   mechanisms?

14               MR. ROBINSON:  Objection to the

15   form.

16          A.   No.

17          Q.   What does that information allow you

18   to conclude?

19          A.   That individuals are getting injured

20   at the point of operation.

21          Q.   Okay.  How are they getting injured?

22          A.   That's what the investigation is all

23   about, to determine how the injuries are taking

24   place.
```

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330  FAX (513) 381-3342

1          Q.   Well, have you ever investigated

2    accidents involving point of operation -- injuries

3    at the point of operation by press brake operators

4    where there was no HOOD procedure in place and no

5    point of operation protection?

6          A.   Yes.

7          Q.   How many times?

8          A.   I have no recollection.

9          Q.   Can you give me an estimate?

10         A.   No.

11         Q.   Can you tell me how long ago it was?

12         A.   I believe my earliest accident

13   investigation was in 1976, '75 maybe, yeah, that's

14   the earliest one.

15         Q.   So was that investigation involving

16   an operator who injured his or her hands at the

17   point of operation while using a press brake where

18   there was no point of operation protection?

19         A.   No.  There was protection in place.

20         Q.   How did the operator get injured in

21   that situation, if there was protection in place?

22         A.   Somebody else operated the controls,

23   that I recall.

24         Q.   Would you agree, sir, that operators
                SPANGLER REPORTING SERVICES, INC.

             PHONE (513) 381-3330  FAX (513) 381-3342

1   are known to have been injured at the point of

2   operation while operating a press brake where

3   there's been a HOOD procedure in place?

4                    MR. ROBINSON:  Objection to the

5   form.

6            A.   I can't, I cannot respond

7   specifically yes, but over the years, I would -- I

8   can't imagine that I have not investigated an

9   accident where the employer had incorporated a

10  hands out of die practice, but I can't

11  specifically name one.

12           Q.   Okay.  Have you ever investigated an

13  accident where the operator was injured while

14  operating a press brake at the point of operation

15  when the point of operation mechanism failed and

16  that was the cause of the injury?

17                   MR. ROBINSON:  Objection to the

18  form.

19           A.   No.

20           Q.   Have you ever operated point of

21  operation failure causing injury to an operator of

22  a press brake?

23                   MR. ROBINSON:  Objection to the

24  form.

1  control to be provided as standard equipment?

2              MR. ROBINSON:  Objection to the

3  form.

4         A.   I don't know what you mean by

5  "proper."  Most OEMs, if they provide a foot

6  control, make the selection based upon what's

7  available from the suppliers of those types of

8  foot controls.

9         Q.   OEM is what?

10         A.   Original equipment manufacturer.

11         Q.   So Cincinnati, if they're

12  manufacturing a press brake, makes the selection

13  of the foot control to be supplied with its press

14  brake?

15              MR. ROBINSON:  Objection to the

16  form.  Are you asking at all times?

17              MR. HARTMAN:  When it's supplied as

18  standard equipment, yes.

19              MR. ROBINSON:  I just want to make

20  sure I understood.  That could be read a couple of

21  different ways.  Objection to the form.

22  BY MR. HARTMAN:

23         A.   With regard to Cincinnati,

24  Incorporated and it providing foot controls on its
              SPANGLER REPORTING SERVICES, INC.

              PHONE (513) 381-3330  FAX (513) 381-3342

1    the foot control that it supplied with its press

2    brake?

3                    MR. ROBINSON:  Object to the form.

4          A.    I've not seen any evidence either

5    way on that.

6          Q.    Okay.  Well, did you read the manual

7    and the parts book that came with the Heim?

8          A.    Yes, I did, I believe.

9          Q.    Okay.  Do you recall where it said

10   it supplied a foot control as standard equipment

11   with the press brake?

12         A.    Yes.

13         Q.    Would that indicate to you that Heim

14   supplied a foot control as standard equipment with

15   the press brake involved in this accident?

16                    MR. ROBINSON:  Objection to the

17   form.

18         A.    A foot control, yes.

19         Q.    Did you see anywhere in the

20   materials where Heim indicated that the purchaser

21   had the right or the opportunity to select a foot

22   control for the press brake?

23                    MR. ROBINSON:  Objection to the

24   form.

 1          A.    I didn't see either way, one way or

 2    the other.

 3          Q.    Didn't speak to it at all in the

 4    materials?

 5          A.    I don't remember seeing anything

 6    that spoke to it.

 7          Q.    And on the first page of your March

 8    15th, 2006 report, you indicate that you "relied

 9    upon 30 years in the machine tool industry and

10    referencing appropriate governmental regulations

11    and industry standards relative to the activity

12    taking place and equipment in use at the time"; am

13    I correct?

14          A.    Yes.

15          Q.    Okay.  The industry standards

16    relative to the activity taking place, would that

17    be the ANSI B 11.3 standard?

18          A.    Yes.

19          Q.    Are there any other standards that

20    you relied upon relative to industry standards?

21          A.    No, not that I can recall at this

22    time.

23          Q.    And you indicate that the government

24    regulations, would that be the OSHA regulations in
               SPANGLER REPORTING SERVICES, INC.

          PHONE (513) 381-3330  FAX (513) 381-3342

1          Q.   Do you know how many pieces of sheet

2   metal in a day?

3          A.   No.

4          Q.   Would Avco-Lycoming be putting that

5   press brake to a general use?

6          A.   From my experience at Avco-Lycoming,

7   my opinion would be that they would probably be

8   using it in a maintenance function.

9                MR. ROBINSON:  In what, sir, I'm

10  sorry?

11                THE WITNESS:  A maintenance

12  function.

13  BY MR. HARTMAN:

14          Q.   And what would a maintenance

15  function be?

16          A.   The machine located in the

17  maintenance department where maintenance workers

18  would fabricate various components or pieces out

19  of sheet metal for application and repair

20  operations within the facility.

21          Q.   Would you agree, sir, that they

22  would be using it for a wide breadth of uses in

23  the maintenance department?

24          A.   Oh, absolutely, yes.
                    SPANGLER REPORTING SERVICES, INC.

                PHONE (513) 381-3330  FAX (513) 381-3342

115

1    verified that it was operating properly in all

2    respects and the only way that the machine could

3    have cycled is if Ms. Lindquist depressed the foot

4    switch.

5             Q.    Do you agree with the conclusion --

6    Strike that.

7             Do you agree with the statement that

8    the only way this machine could have cycled is by

9    activation of the foot switch?

10            A.    Yes, I do.  There's a possibility --

11   or a probability, excuse me, of a phantom cycle,

12   but these machines don't generally phantom cycle

13   without something breaking, and when something

14   breaks, it's generally discovered in an

15   investigation following that breakage and that

16   phantom cycle.

17            Q.    You have no evidence that something

18   broke; am I correct?

19            A.    Correct.

20            Q.    And the only evidence that exists as

21   of this date is that the machine was operating by

22   using a foot control?

23            A.    And properly in all respects.

24            Q.    And that activation of the foot

```
 1   it is possible that it could have taken place with

 2   Tina Lindquist.  I just want to make sure that

 3   it's not misleading, as it sounds.

 4              MR. HARTMAN:  It's not misleading.

 5   It's absolutely crystal clear that I used Tina

 6   Lindquist.  There's no, there's no -- It's a

 7   different question.  The witness has the ability

 8   to think and hear my questions, and if he has

 9   problems with the questions, he can certainly

10   straighten me out, as he's done on several

11   occasions, specifically when I misstated the

12   number of years.

13              I have no problem in restating

14   anything you ask me to restate, sir.

15   BY MR. HARTMAN:

16         Q.   Is it possible that Ms. Lindquist

17   could have been injured performing the same

18   functions she did on the day of the accident with

19   a two palm button switch as the point of operation

20   safety?

21         A.   Not injured in the same manner.  I

22   can -- Not knowing the stopping ability of this

23   particular machine, how long it takes it to stop,

24   there is the potential for the hand to get off of
```

1    a palm control and into a hazardous area before

2    the ram has an opportunity to completely stop and

3    result in an injury.  That is a very low

4    probability because of the short stroke of this

5    machine being less than -- only 3 inches of total

6    stroke.

7                    I doubt seriously if she could have

8    gotten off of a hand control and into a hazardous

9    area fast enough to get herself injured.  She

10   certainly could not have gotten both hands in the

11   point of operation if she were using palm button

12   controls to form this particular part.

13           Q.   There are situations where people

14   have been injured by secondary activation by a

15   co-employee, though; am I correct?

16           A.   That's correct.

17                    MR. ROBINSON:  Objection,

18   argumentative.

19           A.   But that is the scenario most often

20   experienced when palm buttons are used as point of

21   operation safeguarding.  It's not the people who

22   are operating the palm buttons, but it's somebody

23   else who is getting hurt.

24           Q.   It happens when there is concurrent

138

1    simultaneous; is there not?

2         A.    Yes.

3         Q.    Okay.  The difference as you

4    understand it to be is simultaneous means to you

5    less than .5 seconds between the depression of the

6    pedals -- the palm buttons on a two palm button

7    switch; am I correct?

8         A.    Yes, it could be palm button

9    stations, yes.

10        Q.    Concurrent means a time greater than

11   .5 seconds with regard to --

12        A.    It doesn't have to.

13             MR. ROBINSON:  Objection.

14        A.    No.  It could be greater, it could

15   be less.

16        Q.    But it would -- But concurrent

17   includes the permission to allow it to be greater,

18   whereas, simultaneous says it must be less than .5

19   seconds, to you?

20        A.    Yes.  But show me where that's

21   required in any standard, Mr. Hartman.

22        Q.    Sir, I'm not --

23        A.    What I feel --

24        Q.    I'm not the witness today.
                SPANGLER REPORTING SERVICES, INC.

                PHONE (513) 381-3330  FAX (513) 381-3342

146

 1          Q.   And you indicate that,

 2    approximately, 200 parts were being formed?

 3          A.   That's what I gleaned from the

 4    testimony.

 5          Q.   Is your understanding of the job

 6    that Ms. Lindquist was performing on the day of

 7    her accident a job that you would typically expect

 8    to be performed by press brakes?

 9               MR. ROBINSON:   I'll object to the

10    form of the question.

11          A.   I can't really say.  I've not seen

12    the actual part, drawing of the part or the actual

13    shape of the part at the beginning or at the end.

14    My presumption was that the part was a flat blank

15    to begin with and that it was a round cylinder

16    when it finished the four operations.  Whether

17    that could be done on some type of other machine,

18    I've not had the opportunity to make that

19    evaluation.

20          Q.   But my question is -- Let me be a

21    little bit more clear.  Would you agree, sir, that

22    the forming of the parts as you understand them to

23    be formed would be a use of the press brake that

24    was expected?
                SPANGLER REPORTING SERVICES, INC.

            PHONE (513) 381-3330  FAX (513) 381-3342

147

```
 1            MR. ROBINSON:  I'll object to the

 2    form of the question.

 3            A.   Yes, it could very well be;

 4    although, I don't, I don't know what the butterfly

 5    operation encompassed.  I didn't see any specific

 6    information in the testimony describing that.

 7            Q.   How about the final forming the

 8    piece on the mandrel and letting the press

 9    interface with the piece then to make it a

10    complete cylinder, is that something that you

11    would expect a press brake to be utilized in

12    doing?

13            A.   Yes.  I've seen that type of forming

14    work on press brakes in the past.

15            Q.   The next paragraph, you indicate,

16    "Forming of the cylindrical shape required the

17    operator to manually preform the part around the

18    mandrel."  Is that an accurate statement?

19            A.   Yes, that's what I said there.

20            Q.   Do you still hold true to that?

21            A.   That's the way I understand what was

22    happening from the testimony I reviewed.

23            Q.   "This pre-forming was accomplished

24    on the actual mandrel which served as the lower
```

148

```
 1   half of the forming die set while it was position

 2   in the machine"; am I correct?

 3           A.    Yes.

 4           Q.    Do you still hold to that statement?

 5           A.    I have not received any information

 6   to contradict that from the testimony I've

 7   reviewed.

 8           Q.    Your next sentence is:  "Therefore

 9   it was necessary for Ms. Lindquist to place her

10   hands between the upper and lower die to fit the

11   part around the mandrel"; is that an accurate

12   statement?

13           A.    Yes.

14           Q.    And you still believe that to be

15   true?

16           A.    Yes.

17           Q.    Do you know the capacity of the

18   press brake involved in this accident?

19           A.    My understanding, it was a 70-ton

20   capacity machine.

21           Q.    Do you know how many parts it could

22   form in a day or is there any way to determine

23   that or how many parts would you expect to be

24   formed in a day?
```

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330  FAX (513) 381-3342

150

 1              MR. HARTMAN:  That's fine.

 2              MR. ROBINSON:  When you read it and

 3   you say "correct," I don't know what that means.

 4   It's not really a question.

 5   BY MR. HARTMAN:

 6         Q.   It says:  "The press brake was set

 7   up by Corry employee Robert Rooney.  Mr. Rooney

 8   would change dies for each of the four operations

 9   on the part after the operator completed each

10   previous operation on the entire lot."  Did I

11   correctly read your statement?

12         A.   Yes.

13         Q.   Do you still hold true to that

14   opinion after reviewing the evidence?

15         A.   Yes.

16              MR. ROBINSON:  Let me object to the

17   reference to the term opinions, but --

18         Q.   Okay.  Is that accurate still today?

19         A.   This is the information -- I've not

20   received any information to contradict that

21   statement.

22         Q.   This is the information that you're

23   utilizing to make your opinions, though, correct?

24         A.   The information here is from what I

                    SPANGLER REPORTING SERVICES, INC.

              PHONE (513) 381-3330  FAX (513) 381-3342

 1   learned reading the discovery information.

 2          Q.   But this is your understanding of

 3   what you've learned in reading the discovery

 4   information that you're relying upon to make your

 5   opinions in your report; am I correct?

 6          A.   Yes.

 7          Q.   Let's go down to the next sentence.

 8   It says:  "With the final die set in the machine

 9   to make the round shape, the distance between the

10   upper and lower die components is estimated to be

11   approximately 2-and-one-quarter inch.  This is the

12   space within which the operator had to place the"

13   parts -- "the part and preform it around the

14   mandrel," and then have you in parentheses, "with

15   her hands" close paren, period.  Did I accurately

16   read that statement?

17          A.   Yes.

18          Q.   Is that the information that you

19   pulled out of the materials sent to you by

20   Mr. Robinson that you utilized to make your

21   opinion?

22          A.   Except for the estimate, that

23   estimate was my own conclusion based upon the

24   material I read.

                SPANGLER REPORTING SERVICES, INC.

            PHONE (513) 381-3330  FAX (513) 381-3342

152

```
 1              Q.   But these are the facts that you
 2    relied upon in making your -- reaching your
 3    conclusions, correct?
 4              A.   I don't understand what you're
 5    asking.
 6              Q.   This is your understanding as to
 7    what happened on the day of the accident --
 8              A.   What Ms. Lindquist was doing at the
 9    time.
10              Q.   -- and what Ms. Lindquist was doing
11    and what her responsibilities were for you to
12    formulate your opinions; am I correct?
13              A.   Yes.
14              Q.   Next it indicates that:
15    "Ms. Lindquist was positioned in front of the
16    press brake with a tray of parts to her side.  She
17    had positioned the foot switch operator control
18    between her and the front of the machine.  A stool
19    was positioned behind her."  Did I accurately read
20    your report?
21              A.   Yes.
22              Q.   Are those the facts that you pulled
23    from the discovery materials sent to you by
24    Mr. Robinson upon which you relied upon in making
```

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330  FAX (513) 381-3342

153

1   your opinion?

2        A.   Yes.

3        Q.   It's your understanding that there

4   was a stool at the point of operation; am I

5   correct?

6        A.   No.

7        Q.   There was a stool positioned behind

8   her?

9        A.   Yes.

10       Q.   Do you find any fault with having a

11  stool located in proximity to Ms. Lindquist while

12  she's operating the press brake?

13       A.   No.

14       Q.   You indicate that the foot switch

15  operator control was between her and the front of

16  the machine; am I correct?

17       A.   Yes.

18       Q.   Do you find any fault with the

19  location of the foot control as it being placed

20  between Ms. Lindquist and the machine?

21       A.   No.

22       Q.   Is that something that you would

23  expect a typical operator to do when operating a

24  press brake?

154

1          A.   Yes.

2          Q.   Let's go to the next paragraph,

3    please.  It says, "Ms. Lindquist testified that

4    she did not activate the foot switch," correct?

5          A.   Yes.

6          Q.   You disagree with that; am I

7    correct?

8          A.   Yes.

9          Q.   You believe that she did activate

10   the foot switch?

11         A.   Yes.

12         Q.   Do you agree that it was an

13   inadvertent activation of the foot switch?

14         A.   Yes.

15         Q.   There's nothing to indicate that she

16   intended to activate the foot switch with her

17   hands in the machine; is there?

18         A.   Yes -- No, correct.

19         Q.   You don't believe that she intended

20   to do this; am I correct?

21         A.   I have no information to determine

22   that one way or another.

23         Q.   You indicate that, "Other Corry

24   employees testified that Ms. Lindquist had to be

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330  FAX (513) 381-3342