# EXHIBIT "K"
# (PART II)

155

1    riding the foot switch and inadvertently depress

2    the actuating pedal as her body position shifted

3    forward as she was reaching into the die area."

4    Did I correctly read that?

5        A.   Yes.

6        Q.   And is it my understanding that

7    your -- Do you believe that she was riding the

8    foot switch?

9        A.   Yes.

10       Q.   Okay.  Is that because of what the

11   other Corry employees have testified to?

12            MR. ROBINSON:  Let me object to the

13   form of that question.

14       Q.   Or is it something else?

15            MR. ROBINSON:  I'll object to the

16   form of that.  I don't know if it's an either/or.

17       A.   It's a combination of the experience

18   that I have over the years and the information

19   that I received reading the discovery material.

20       Q.   What experience do you have over the

21   years that would lead you to believe that on the

22   day of this accident Ms. Lindquist was riding the

23   foot pedal -- the foot control?  I'm sorry.

24       A.   Inadvertent actuations are often the

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330   FAX (513) 381-3342

 1    result of shifting weight where people have their

 2    foot on the foot control and they move from one

 3    position to another, their upper body moves from

 4    one position to another, and their weight shifts

 5    from their heel to their toe on their foot, and as

 6    a result, the foot switch is depressed, and that

 7    only happens when the foot is remaining inside the

 8    foot switch.

 9              Q.    Would you agree, sir, that

10    inadvertent activation can occur as a result of

11    someone's foot going from outside of the foot

12    control inadvertently going inside to the foot

13    control and activating the foot pedal in that

14    mechanism?

15              MR. ROBINSON:    Let me object to the

16    form of that question.

17              A.    That's a possibility, depending upon

18    the type of foot switch that's used for the

19    operation of the machine.

20              Q.    With regard to the foot switch, the

21    Model 511, would you agree, sir, that inadvertent

22    activation can occur by -- when someone's foot is

23    outside of the foot control and inadvertently goes

24    into the foot control as long as it goes far

 1   enough back to hit the latch?

 2             MR. ROBINSON:  Let me object to the

 3   form of the question.

 4        A.   Well, that qualification changes the

 5   situation that I believe was taking place at the

 6   time of Ms. Linquist's occurrence.  Your foot is

 7   not going to go 5 inches into the foot control,

 8   into the housing, release the toe release, and

 9   depress the pedal just by a shifting of the

10   weight.

11             And there was no reason that I could

12   see from the testimony that I reviewed that caused

13   Ms. Lindquist to make any kind of foot movements

14   when she went from one position to another

15   retrieving a part and loading it.  I saw no

16   indication that she was moving anywhere.

17        Q.   You saw no indication that she was

18   not moving either; am I correct?

19             MR. ROBINSON:  Let me object to the

20   form of that question.

21        A.   Well, I think there's sufficient

22   information in the testimony that properly led me

23   to the conclusion that she was staying and

24   remaining in a stationary position.

                SPANGLER REPORTING SERVICES, INC.

         PHONE (513) 381-3330  FAX (513) 381-3342

```
 1          Q.    What testimony did you rely upon to
 2    come to that conclusion that she was remaining in
 3    the station?
 4          A.    The description of where she was
 5    located, and where the foot switch was, and where
 6    the stool was, and just, you know, what she was
 7    doing at the time led me to believe that she
 8    wasn't moving, she wasn't going anywhere, she was
 9    stationary.
10          Q.    Well, explain to me what your
11    understanding is as to what she was doing at the
12    time as to make her stationary.
13          A.    She was retrieving parts from one
14    side of her, either the right or the left, it
15    doesn't specify, putting them into point of
16    operation, which was very close to her, in front
17    of her, and then taking the finished part and
18    moving it to another station to the other side and
19    just going like this.  (Indicating.)  And there
20    was no need for her to move.  Maybe reach to the
21    far side of the pallet to retrieve parts or to
22    discharge parts, but no need -- on the size part
23    that I understand was taking place here, a
24    relatively small part from the photographs that I
```

159

 1   was able to view, there was no need for her to be
 2   mobile at all.
 3           Q.   Do you know whether she was sitting
 4   or standing or leaning?
 5           A.   No.   I think I state this in my
 6   report, that there's no definitive evidence that
 7   shows whether she was standing, leaning or sitting
 8   at the time.
 9           Q.   Would that have any bearing on your
10   understanding as to what she was doing with her
11   foot at the time this accident occurred?
12           A.   It may.   If there's no -- If she's
13   sitting, completely sitting, there's no real
14   weight on her feet.   It's really actually more
15   dangerous that way, but it still doesn't really
16   change the end result.
17           Q.   What is more dangerous?
18           A.   Well, if she leaves her foot inside
19   the HOOD, I think the leaning, shifting of weight,
20   has more of a likelihood to cause that switch to
21   be fully released and then reactivated.
22           Q.   If you're sitting?
23           A.   I think so, yes.
24           Q.   But sitting is an appropriate way to
                     SPANGLER REPORTING SERVICES, INC.

                PHONE (513) 381-3330   FAX (513) 381-3342

160

 1   operate the press brake at the time she was

 2   injured; am I correct?

 3          A.    An acceptable --

 4                MR. ROBINSON:  Objection to form.

 5          A.    I'm not going to -- I'm sorry.

 6                MR. ROBINSON:  That's okay.

 7          A.    I'm not going to say appropriate.  I

 8   don't have a problem with people sitting when

 9   they're operating press brakes, if they are

10   properly safeguarded.

11                MR. ROBINSON:  I'm sorry, if they

12   are what?

13                THE WITNESS:  If they are properly

14   safeguarded.

15                MR. ROBINSON:  Thank you.

16   BY MR. HARTMAN:

17          Q.    Are you relying upon what the other

18   Corry employees have said in their testimony to

19   come to the conclusion that Ms. Lindquist was

20   riding the pedal?

21          A.    Partially.

22                MR. ROBINSON:  Yeah.  Let me object

23   to the form.  You asked that before, and the

24   witness responded that there were a number of
                SPANGLER REPORTING SERVICES, INC.
          PHONE (513) 381-3330  FAX (513) 381-3342

168

1          Q.    Okay.  Did you read Ms. Linquist's
2    deposition where she indicated that she had
3    removed her foot from the foot pedal?
4          A.    Yes.
5          Q.    Okay.  Did you factor that scenario
6    into your conclusions?
7          A.    Yes.
8          Q.    Okay.  And would you agree, sir,
9    that if her foot was outside the foot pedal prior
10   to this accident and inadvertently went into the
11   foot pedal and activated the press brake, that
12   would not have been riding the foot control?
13              MR. ROBINSON:  I'll object to the
14   form of the question.
15         A.    If that's a hypothetical that's
16   based on any kind of fact, yes, but I don't know
17   that there's any evidence that supports that
18   hypothetical.
19         Q.    Well, the evidence is Ms. Lindquist
20   said her foot was outside the foot control after
21   the last time she operated it; am I correct?
22              MR. ROBINSON:  Objection, that's
23   argumentative.  That isn't what you just prefaced
24   your question with.  You had the question, the
              SPANGLER REPORTING SERVICES, INC.

          PHONE (513) 381-3330  FAX (513) 381-3342

1          MR. ROBINSON:  Would you let the

2    witness take the break that he asked for, Mr.

3    Hartman, can you give him that professional

4    courtesy?

5          MR. HARTMAN:  Yeah, I'll do that.

6    I want to prepare my question.  I mean, I want to

7    make sure that it's not misleading.

8          MR. ROBINSON:  We'll have time to

9    do that today.

10          THE VIDEOGRAPHER:  Do you agree to

11   go off the record at the same time?

12          MR. ROBINSON:  Yeah.

13          THE VIDEOGRAPHER:  Then we are

14   going off the record.  One second, please.  We are

15   off.

16                              (Brief recess.)

17          THE VIDEOGRAPHER:  You're back on

18   the record.

19   BY MR. HARTMAN:

20          Q.   Sir, I'm going to restate the

21   question that was proposed to you earlier, and I

22   want you to listen carefully.  I want you to

23   assume that Ms. Linquist's foot was outside of the

24   foot control before she began hand-forming the

                  SPANGLER REPORTING SERVICES, INC.

           PHONE (513) 381-3330  FAX (513) 381-3342

173

1    part on the press brake and that her foot somehow

2    inadvertently activated the foot control so as the

3    die closed in on her hand -- the press closed in

4    on her hand.

5              Would you agree, sir, that under

6    those circumstances there's no indication that she

7    would have been riding the foot control prior to

8    the activation?

9              MR. ROBINSON:  I'll object to the

10   hypothetical, not based upon facts of record.

11        A.    Based upon that hypothetical, I have

12   to say no.

13        Q.    No, what?

14        A.    Or yes.

15        Q.    Yes?

16        A.    Yes.

17        Q.    Okay.  Yes, there's no evidence of

18   riding the foot control in that situation; am I

19   correct?

20        A.    Yes.

21        Q.    On page 3 of your report under

22   "Standards and Regulations," it says:  "The

23   American National Standards Institute is a private

24   organization that is in the business of providing

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330  FAX (513) 381-3342

1   merely say by adopting it that that standard has

2   met their procedural requirements so that they can

3   say it's theirs now?

4          A.   The operative term is "approve," not

5   adopt, approve.

6          Q.   Okay.  So when ANSI approves a

7   standard, they're not approving the substance of

8   the standard, they're approving the procedure by

9   which the standard was developed?

10         A.   Correct.

11         Q.   ANSI doesn't write standards and

12  evaluate the standards from a substantive basis?

13         A.   Correct.

14         Q.   Are you aware that ANSI now is

15  moving further away from their standards?

16              MR. ROBINSON:  Object to the form

17  of the question.

18         A.   I don't understand what you mean by

19  that question.

20         Q.   Mr. Switalski indicated that ANSI is

21  now trying to move out of the standards business

22  because they don't want liability for standards

23  that have been approved by them; are you aware of

24  that?

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330  FAX (513) 381-3342

1          A.    No.

2          Q.    Was it more dangerous?

3          A.    No.

4          Q.    Would it be safer in circumstances?

5                MR. ROBINSON:  Object to the form

6     of the question.

7          A.    Yes.

8          Q.    Was the gated foot control to --

9     utilized to prevent inadvertent activation of the

10    foot control?

11         A.    Yes.

12         Q.    If the gate is in place and the

13    operator is not riding the pedal, does the gate

14    work to inhibit inadvertent activation of the foot

15    control?

16         A.    Yes.

17                MR. ROBINSON:  Objection to the

18    form.

19         A.    Yes, but, you know, sistering to

20    your previous question, is it safer, yes, in some

21    respects; it's more dangerous also in some

22    respects, too.  So they balance itself -- it

23    balances itself.

24         Q.    It's more dangerous because of why?
                 SPANGLER REPORTING SERVICES, INC.
            PHONE (513) 381-3330  FAX (513) 381-3342

1    machine, but if the machine is properly

2    safeguarded, you're not going to get an individual

3    injured.

4          Q.   Is it your testimony today that a

5    properly safeguarded machine cannot cause injury

6    to anyone through an inadvertent activation?

7          A.   Of course not.  That's not what I've

8    said all day long.

9          Q.   Okay.  So a properly guarded machine

10   can cause injury to the operator in certain

11   circumstances; am I correct?

12               MR. ROBINSON:  I'll object to the

13   form.

14         A.   Not only the operator.  You just

15   said it before, you said it could be anybody, and

16   that's a true statement.

17         Q.   The operator --

18         A.   So don't just narrow it down to the

19   operator.

20         Q.   Okay.  Or the operator could be

21   injured; am I correct?

22         A.   Yes.

23         Q.   The person -- A coworker could be

24   injured, correct?

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330  FAX (513) 381-3342

196

1              MR. ROBINSON:  What does it do?

2              MR. HARTMAN:  Yes.

3              MR. ROBINSON:  It preserves the

4    objection to asked and answered.

5              MR. HARTMAN:  Oh, okay.

6              MR. ROBINSON:  So once you've

7    already gotten your answer that you're not

8    satisfied with, if you ask it again and the

9    witness says something different, then the law

10   doesn't allow that trap to occur, to answer your

11   legal question.

12             MR. HARTMAN:  It wasn't a trap.

13             THE VIDEOGRAPHER:  Excuse me, can

14   we go off the record for one second, please.

15                          (Brief recess.)

16             THE VIDEOGRAPHER:  You're back on

17   the record.

18   BY MR. HARTMAN:

19        Q.   Sir, are you aware of individuals

20   being injured when there was proper point of

21   operation protection on press brakes?

22             MR. ROBINSON:  Same objection.

23        A.   Yes.

24        Q.   Do you -- Today can you describe any
                SPANGLER REPORTING SERVICES, INC.

             PHONE (513) 381-3330  FAX (513) 381-3342

198

1          Q.   Would you agree that with regard to

2    the brake press, when it's sold in conjunction

3    with a foot control, that both the brake press and

4    the foot control should be designed so as to

5    inhibit to the extent feasible inadvertent

6    activation?

7               MR. ROBINSON:  I'll object to the

8    form of that question.

9          A.   No.  There's no practical way for a

10   supplier of a press brake to do that and ensure

11   that that is -- ensure that that gets done once

12   the machine is put in operation.

13         Q.   Okay.  Would you agree that, when a

14   foot control is supplied with a press brake, that

15   the foot control should be designed so as to

16   inhibit to the extent feasible inadvertent

17   activation?

18              MR. ROBINSON:  Objection to the

19   form.

20         A.   That's part of the requirements in

21   the ANSI standard.  Yes.

22         Q.   And is inadvertent activation of a

23   foot control ever a good thing?

24              MR. ROBINSON:  Objection to the

199

1    form.

2            A.    No.

3            Q.    Would you agree, sir --

4            A.    I think that's a -- No, I have to

5    say no to that question, but -- yeah, that's no.

6            Q.    Would you agree that, had not

7    Ms. Lindquist inadvertently activated the foot

8    control on the date of her accident, she wouldn't

9    have suffered the injuries she had?

10            MR. ROBINSON:    Objection to the

11    form.

12            A.    Say that again.

13            Q.    Would you agree, sir, that had not

14    Ms. Lindquist inadvertently operated the foot

15    control on the day of her accident, she wouldn't

16    have sustained the injuries she sustained?

17            MR. ROBINSON:    Same objection.

18            A.    If she had not inadvertently

19    actuated the foot switch, the machine would not

20    have cycled, no.

21            Q.    And she wouldn't have been injured,

22    correct?

23            A.    Correct.

24            Q.    And if there was a gate on the foot
                    SPANGLER REPORTING SERVICES, INC.
            PHONE (513) 381-3330   FAX (513) 381-3342

1    control that she was utilizing that day and that

2    gate had operated so as to prevent her from

3    inadvertently activating the foot control, she

4    wouldn't have had the injuries she has today; am I

5    correct?

6              MR. ROBINSON:  I'll object to the

7    form of the question.

8              A.   No, I don't believe that.  The gate

9    serves the same purpose as the toe release.  We

10   really don't know whether the foot switch on the

11   day of the operation had a toe release or not.  A

12   lot of people are speculating about that, but, you

13   know, whether there was a toe release or whether

14   there was a gated foot switch or whether it was a

15   foot switch with neither, I think the likelihood

16   of it happening is all the same because I think

17   her foot was there inside the switch.

18             Q.   Sir, if you assume that

19   Ms. Lindquist testified accurately when she said

20   her foot was outside of the foot control before

21   the activation of the machine that caused her the

22   injury, and there was a gate on the foot control,

23   and the gate served its purpose so as to prevent

24   or inhibit inadvertent activation, would you agree

 1    under that set of circumstances this accident

 2    would not have occurred?

 3                 MR. ROBINSON:  Objection to the

 4    form of the question.

 5         A.    Well, there's no arguing that.  I

 6    mean, given that very narrow, specific set of

 7    circumstances and assuming that the gate performed

 8    its function, you're making a lot of assumptions,

 9    but you have to agree with that, yes.

10         Q.    Well, the gate's intended function

11    is to prevent the foot from going in the foot

12    control inadvertently; am I correct?

13         A.    Yes, and we know that that doesn't

14    always happen to do that.

15         Q.    But it does work in a majority of

16    the situations; am I correct?

17                 MR. ROBINSON:  Objection.

18         A.    But it doesn't always do that.

19                 MR. ROBINSON:  Please, objection.

20         Q.    But I'm asking --

21                 MR. ROBINSON:  Hold on.

22                 MR. HARTMAN:  Go ahead.

23                 MR. ROBINSON:  I want to make sure

24    there's an objection to the form of that question.

                 SPANGLER REPORTING SERVICES, INC.

            PHONE (513) 381-3330  FAX (513) 381-3342

202

 1  BY MR. HARTMAN:

 2           Q.    Well, would you agree, sir, that

 3  nothing always happens?

 4           A.    That's right.

 5                 MR. ROBINSON:  I'll object to the

 6  form of that question, and it's also argumentive.

 7           Q.    Would you agree that no safety

 8  feature always works?

 9                 MR. ROBINSON:  Objection to the

10  form.

11           A.    I can't answer that question.

12  That's a pretty broad -- Given time, I could

13  probably come up with some safety feature that's

14  always functional, always works.

15           Q.    But none off the top of your head

16  today, correct?

17           A.    Not right off the top of my head,

18  no.

19           Q.    Okay.  And the intended function of

20  the --

21           A.    Acknowledging that you guys need to

22  get airplanes out of here too.

23           Q.    Well, I'm going to ask you, the

24  intended function of the gate on the foot control
                  SPANGLER REPORTING SERVICES, INC.

           PHONE (513) 381-3330  FAX (513) 381-3342

 1    is to prevent the foot from inadvertently sliding

 2    into the foot control, correct?

 3                    MR. ROBINSON:  I'll object to the

 4    form of the question and the term "prevent."

 5          A.    The intent is to minimize

 6    inadvertent actuation of the foot switch, the same

 7    as the toe release is to minimize inadvertent

 8    actuation.

 9          Q.    And if you have a toe release and a

10    foot control -- Strike that.

11                    If you have a toe release and a gate

12    on a foot control, there's two means that would be

13    utilized to prevent inadvertent activation of the

14    foot control; do you agree?

15                    MR. ROBINSON:  Object to the form.

16          A.    Yes, just like there's two means to

17    encourage riding of the foot switch.

18          Q.    But you have no evidence or no

19    research that shows that that occurs on that

20    particular foot switch; do you?

21                    MR. ROBINSON:  I'll object to the

22    form of the question.  It ignores all of his prior

23    testimony.  It's been asked and answered.

24                    THE WITNESS:  I'm sorry?
                       SPANGLER REPORTING SERVICES, INC.

                  PHONE (513) 381-3330  FAX (513) 381-3342

```
 1          Q.   I understand that.  But if the foot
 2    switch was defective, assuming that it was, OSHA
 3    wouldn't cite Heim; would they?
 4               MR. ROBINSON:  Object to the form
 5    of the question.
 6          A.   No.
 7          Q.   OSHA just cites the employer, they
 8    don't go cite the manufacturers of machinery; do
 9    they?
10          A.   No.  We talked about that earlier
11    this morning.
12          Q.   Just clarifying it with regard to
13    this specific provision.  So the fact that OSHA
14    cited Corry for certain violations is not an
15    indication that the Heim press brake was safe or
16    not safe --
17               MR. ROBINSON:  I'll object to
18    the --
19          Q.   -- in its design?
20               MR. ROBINSON:  I apologize for
21    interrupting.  I'll object to the form of the
22    question.
23          A.   That's correct.  It's relative to
24    the use of the machine on the day of the Lindquist
```

```
 1   safer means of operating the machinery, correct?

 2        A.   Correct.

 3        Q.   Next paragraph, you say:  "The facts

 4   of this case require us to return to the

 5   discussion of press brakes.  Ms. Lindquist was not

 6   injured while operating power press."  Did I

 7   correctly read that?

 8        A.   Yes.

 9        Q.   And that was an important

10   distinction to you in analyzing this accident, is

11   that she was operating a press brake, not a power

12   press; am I correct?

13        A.   Yes.

14        Q.   Next paragraph, you indicate that

15   "The evidence shows that a foot switch was

16   provided with the machine in 1978," correct?

17        A.   Yes.

18        Q.   Is that still your testimony today?

19        A.   Yes.

20        Q.   Next sentence says that, "There is

21   no evidence to indicate what make or model foot

22   switch was provided at that time"; am I correct in

23   your statement?

24        A.   Yes.
```

1    operation safeguarding device for press brakes,

2    and when properly adjusted, it prevents the

3    operator from reaching into the die area.  It does

4    not allow him to get between the dies.

5            Q.   So even utilizing that type of

6    safety device, you would not expect an operator to

7    put his or her hands in the die area?

8            A.   If the pull-back is properly

9    adjusted, his hands -- his or her hands should not

10   be able to get between the dies.

11           Q.   Would you agree that there are a lot

12   of -- that there are numerous reports of injuries

13   occurring to operators who get their hands caught

14   in the point of operation area?

15                MR. ROBINSON:  I'll object to the

16   form of the question.  It's also been asked and

17   answered.  "Numerous" is vague and broad.

18           A.   Point of operation injuries do occur

19   on press brakes.

20           Q.   Would you agree that point of

21   operation injuries occur most typically when a

22   body part is placed in the die area?

23                MR. ROBINSON:  Objection to form of

24   the question.

                SPANGLER REPORTING SERVICES, INC.

            PHONE (513) 381-3330  FAX (513) 381-3342

223

1          A.   Yes.

2          Q.   And would you agree that most point

3   of operation injuries occur when an operator

4   places his or her hands or fingers into the die

5   area?

6          A.   By definition, that's what's going

7   to happen, yes.

8          Q.   What is the National Safety Council?

9          A.   It's an organization that's

10  committed to safety of the -- I can't even say, I

11  can't really say the average worker in America

12  because they go into highway safety, and campus

13  safety, and off-the-job safety.  They address all

14  different kinds of safety-related issues.

15         Q.   Is it an authoritative organization?

16              MR. ROBINSON:  I'll object to the

17  form of the question.

18         A.   No.  I've indicated back earlier

19  this morning that I didn't feel that National

20  Safety Council publications are authoritative.

21         Q.   Are you aware of any National Safety

22  Council articles relating to press brake safety

23  that you would deem authoritative?

24         A.   No.  The data sheets and the
                SPANGLER REPORTING SERVICES, INC.

            PHONE (513) 381-3330  FAX (513) 381-3342