# EXHIBIT "L"

1          IN THE UNITED STATES DISTRICT COURT

2      FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                                    ORIGINAL

4    TINA LINDQUIST,                )

5          Plaintiff,               )

6          -vs-                     )   No. 04-249E

7    HEIM, L.P.                     )

8          Defendant.               )

9          The videotaped deposition of WILLIAM

10   SWITALSKI called for examination pursuant to Notice

11   and the Rules of Civil Procedure for the United

12   States District Courts pertaining to the taking of

13   depositions, taken before DEANNA AMORE, a notary

14   public within and for the County of Cook and State

15   of Illinois, at 33 North LaSalle Street, Chicago,

16   Illinois, on the 7th day of April, 2006, at the

17   hour of 8:00 a.m.

18

19   CSR No.:  084-0003999

20

21

22

23

24
                                                        1

1   you what type of safety mechanisms to have, it

2   basically tells you a minimum standard of what it

3   wants?

4       MR. ROBINSON:  Object to the form of that

5   question.

6       THE WITNESS:  The standard states that the foot

7   control has to be protected against accidental

8   actuation and specifically must protect against

9   someone stepping onto the pedal which gave rise to

10  the requirement for at least a top shield.

11      ANSI was very specific -- or I should say the

12  code committee that wrote that was very specific

13  about using the word onto the pedal as opposed to

14  into the pedal.  They recognized that normal use of

15  the foot control involved stepping into it.  So

16  there is no way to prevent someone who accidentally

17  actuates it from stepping into it.  So they use the

18  word accidental activation by stepping onto the

19  pedal, in other words, from above again, which gave

20  rise to the top shield.

21      The illustration of an acceptable foot control

22  that's used in the standard shows both a top shield

23  and side shields.  It does not show a toe latch.

24  It does not show a front gate.

66

1    BY MR. HARTMAN:

2        Q.   But if it had a toe latch or a front gate

3    and it had the cover to protect you from stepping

4    onto it, it would be an ANSI-approved shield?

5        MR. ROBINSON:  Objection -- excuse me -- I will

6    object to the form of the question.

7        THE WITNESS:  ANSI does not approve products

8    but it would certainly -- it would certainly

9    include all of the required features.  I don't

10   think the committee would exclude the foot control

11   with additional features.

12   BY MR. HARTMAN:

13       Q.   I am sorry.  So it would be an ANSI, would

14   the term be, acceptable shield then?

15       A.   Yes.

16       Q.   So -- I am going to show you Exhibit

17   No. 4, which has shields from 1 to No. 12.  I would

18   ask you to look at all of those shields.

19       A.   All right.

20       Q.   Is there any shield that's located in

21   Exhibit 1, 1 through 12 that would not be an

22   ANSI-acceptable shield?

23       A.   There is not.  There are no uncovered foot

24   switches shown in this publication.

67

1    BY MR. HARTMAN:

2        Q.    Would you agree that with regard to HOOD

3    requirements, hands-out-of-dye, that is directed at

4    the employer as it relates to setting up the

5    machine and the operation; am I correct?

6        A.    Oh, absolutely, yes.

7            With the advent of the 2002 press brake

8    standard there was one additional requirement

9    placed on foot switch use that wasn't there in

10    earlier additions.  And that is that when safe

11    distance method of safeguarding was used on a press

12    brake, the foot switch also had to be physically

13    anchored into the floor at the safe distance.

14    Prior to that time the foot switch could be placed

15    on the floor at a safe distance; but beginning with

16    2002, it had to be physically anchored to the

17    floor.

18    BY MR. HARTMAN:

19        Q.    And that would be a requirement for the

20    employer in the setup of the operation?

21        A.    Yes.

22        Q.    HOOD is an employer directive with regards

23    to how to operate the press brake?

24        MR. ROBINSON:  I will object to the form.

                                                          70

1    I don't know if you mean that to be exclusive the

2    way you are saying it or not.

3        MR. HARTMAN:  Yes, I do.  I mean it to be

4    exclusive.

5        MR. ROBINSON:  Object to form.

6        THE WITNESS:  Can I hear the question again,

7    please?

8    BY MR. HARTMAN:

9        Q.   Am I correct that HOOD are instructions

10   directed to the employer as to how to set up the

11   press brake?

12       A.   Yes, it is something that only the

13   employer is in a position to carry out.  I will

14   certainly go along with that, yes.

15       Q.   The operator isn't the one to set up the

16   HOOD procedure, it is the employer and the setup

17   individual?

18       MR. ROBINSON:  I will object to the form of the

19   question.

20       THE WITNESS:  Certainly the operator can.  In

21   most press shops, it is somebody that ranks above

22   the press operator is supposed to control that and

23   supervise it.

24
                                                      71

1      Q.    And there is a difference between a foot

2    pedal and foot control?

3      A.    Yes.

4      Q.    Would you tell us what the difference is

5    to your understanding?

6      A.    The code committee drew the distinction

7    when they drafted the definition of these terms.

8    To try and simplify it as much as I can, the foot

9    pedal refers to the older style mechanical lever

10   that one would push down with their foot whereas

11   foot control is making reference to a, perhaps an

12   electric foot control or a pneumatic air-operated

13   foot control that isn't -- doesn't have the

14   mechanical attachment to the press brake.

15     Q.    Okay.  And on a foot pedal when it is

16   attached to a press brake, the mandate is that it

17   shall be protected against inadvertent activation,

18   correct?

19     A.    Yes.

20     MR. ROBINSON:  I will object to the form of the

21   question.

22   BY MR. HARTMAN:

23     Q.    Well, there is a different standard for a

24   foot pedal as opposed to a foot control; am

84

1    I correct?

2        A.    Yes.

3        Q.    And when you have a foot pedal attached to

4    the press brake, it must be protected from

5    inadvertent activation?

6        A.    Yes, and in fact I think the same is true

7    for both foot pedal and foot control.  There are

8    inadvertent actuation requirements placed on both

9    styles.

10       Q.    Well, I believe that foot controls require

11   that shall be protected so as to inhibit accidental

12   actuation on a foot control; am I correct?

13            Do you want to look at the standard?

14       A.    Sure.

15       MR. ROBINSON:  Object to the form of the

16   question.

17       MR. HARTMAN:  Okay.

18       THE WITNESS:  I think I found what confirms

19   what I was saying, both the foot control as well as

20   the foot pedal both have --

21       MR. ROBINSON:  Let him finish.

22       Go ahead.

23       THE WITNESS:  -- both have requirements for

24   preventing, minimizing, however you care to say it,

                                                      85

```
 1        THE VIDEOGRAPHER:  Off the record at 10:00 a.m.

 2                    (A short break was taken.)

 3        THE VIDEOGRAPHER:  This is the beginning of

 4   Tape No. 2.  Back on the record at 10:13 a.m.

 5   BY MR. HARTMAN:

 6        Q.    Now, I asked you -- we started and got off

 7   the track a little bit with regard to ANSI.  But

 8   with regard to the 1973 standard, would you read

 9   the section as it relates to foot controls as

10   opposed to foot pedals?  And I am asking you to

11   read the standard.

12        A.    Yes.

13              Okay.  Foot control, actuation prevention

14   is Section 4.2.4.2.4 of the standard and it reads,

15   the foot control shall be protected so as to

16   inhibit accidental actuation by falling or moving

17   objects or by someone stepping on it.  Means shall

18   be provided for manually locking the foot control

19   to inhibit such accidental actuation.

20        Q.    Now, am I correct that with regard to foot

21   controls, it talks about inhibit accidental

22   actuation and with regard to a foot pedal it talks

23   about prevent accidental activation?

24        A.    Yes.
```

95

1    Q.   There is a difference, would you agree?

2    A.   Yes.

3    Q.   What is your understanding of -- as to the

4    difference as it relates to the ANSI standard on

5    foot pedal as opposed to foot control?

6    A.   With regard to the foot pedal, accidental

7    actuation can be prevented because the older style

8    mechanical foot pedal could physically be removed

9    from the machine or there would be a built-in latch

10   or otherwise that physically prevented the downward

11   depression of the pedals.

12        With the foot control it is asking that

13   accidental actuation be inhibited.  I think the

14   committee recognizes that you cannot prevent

15   actuation of the control when the normal, the

16   normal way of activating the control was also the

17   way one would accidentally activate the controls.

18   It can't be prevented but features can be added to

19   try and inhibit or to decrease the likelihood of

20   the accidental actuation.

21   Q.   So when you have a foot pedal in the

22   normal use of the machine with a foot pedal, there

23   are means by which you could prevent the operator

24   from accidentally activating the foot pedal?

96

1      A.   Yes, as I said, it amounts to the physical

2   removal of the pedal from the machine when you

3   are -- when you are not operating.

4      Q.   Well, how about during the operation of

5   the foot -- of the press brake with the foot pedal,

6   can you prevent accidental activation of the foot

7   pedal under those circumstances?

8      A.   No, you can't.

9      Q.   You cannot?

10     A.   No, you can't.

11     Q.   Now in 1973 do you know what mechanisms

12  were available by the foot control manufacturers

13  that would -- that could be used to prevent or

14  inhibit inadvertent activation of the pedal?

15     MR. ROBINSON:   I will object to the form of the

16  question.  You have included prevent and inhibit,

17  which is contrary to I think the testimony that was

18  just given.

19     MR. HARTMAN:   I am sorry.

20  BY MR. HARTMAN:

21     Q.   Okay.  In 1973 do you know what foot

22  controls were available that would inhibit

23  accidental activation of the foot control?

24     A.   Yes, I think we have already touched on

                                                        97

1    every one of these features, the top guard, the

2    side guards.  I think Linemaster alone has the toe

3    latch, and eventually all of the major foot switch

4    manufacturers came out with some form of a front

5    gate.

6        Q.    And the front gate was available in 1973

7    as well?

8        MR. ROBINSON:  I am going to object -- is that

9    a question or is that just a statement?

10   BY MR. HARTMAN:

11       Q.    Do you agree with that statement?

12       A.    It was certainly available with some

13   manufacturers.  I don't know the specific date that

14   all of the different manufacturers came out with

15   their version of front gate is unknown to me.

16       Q.    But in 1973 the front gate was available

17   on foot controls by some manufacturers?

18       MR. ROBINSON:  Object to the form.  I will

19   object to the form of that question.

20       THE WITNESS:  Yes.

21   BY MR. HARTMAN:

22       Q.    And in 1977, 1978, the front gate was

23   available on a foot control manufactured by

24   Linemaster; am I correct?

                                                   98

1       A.    Yes.

2       Q.    And a foot control with a front gate would

3   be approved by ANSI, that ANSI standard that you

4   just read?

5       MR. ROBINSON:    I will object.    This has been

6   asked and answered.    He said they don't approve for

7   certain things.    All of this has been asked and

8   answered.    You are now trying to get what you

9   couldn't get before from his answers into a quick,

10  well, let me just say it again, maybe he will say

11  yes.    It is inappropriate.

12      MR. HARTMAN:    I am not trying to do that.

13      MR. ROBINSON:    That's the result that gets

14  reached if there is an answer that's inconsistent

15  with what he has already answered on.    So let's

16  please ask some new questions.

17      MR. HARTMAN:    Paul, I will ask whatever

18  questions I feel like asking.    And if you have a

19  problem with my question -- every time you have

20  asked me to rephrase something, if the witness

21  hasn't understood it, I am more than willing to do

22  it.    This is not about the sharp practice of law.

23  This is trying to find out --

24      MR. ROBINSON:    Well, you and I disagree on the

                                                    99

1      THE WITNESS:  Style of machine is good.

2   Individual press brakes are better.  If the

3   manufacturer of the machine tool knows more detail

4   about the customer's application, then it is better

5   still.

6   BY MR. HARTMAN:

7      Q.   With regard to providing a pedal as

8   standard equipment with a press brake, would you

9   agree it would be best to understand, make an

10  individual determination with regard to the

11  particular press brake?

12     MR. ROBINSON:  Objection to the form.

13     THE WITNESS:  Yes, generally the more

14  information the machine tool manufacturer has, the

15  better position they are in to select the best foot

16  control.

17  BY MR. HARTMAN:

18     Q.   There would be a different analysis with

19  regard to a multi-purpose press brake than one

20  would have as opposed to a multi-purpose punch

21  press; am I correct?

22     MR. ROBINSON:  Objection to the form.

23     THE WITNESS:  Both machines being multi-purpose

24  in nature makes the distinction very difficult

105

1    because the machine tool manufacturer simply isn't

2    going to know enough about all the different

3    purposes that either form of machine are going to

4    be put to to select one type of foot switch over

5    another.

6    BY MR. HARTMAN:

7        Q.    Well, if they are providing a foot switch

8    as standard equipment, wouldn't it be the

9    manufacturer's job to provide a foot switch that

10   provides the most protection for the highest number

11   of applications?

12       MR. ROBINSON:  Let me object to the form of the

13   question.  It is misleading.  It also ignores his

14   last statement and his last answer to the question

15   where he explained to you why the distinction would

16   not be there that you want to be there.

17       MR. HARTMAN:  I don't think he said that.

18   I think you are mischaracterizing his testimony.

19       MR. ROBINSON:  You can suggest whatever you

20   want but the record is the record.

21       MR. HARTMAN:  Right.  I said I think

22   I understand and heard something different.

23       THE WITNESS:  It is certainly desirable but

24   when we preface a machine as being multi-purpose,

                                                    106

1    it is virtually impossible for the machine tool

2    manufacturer to make a selection because the

3    ultimate use, the type, size, style of parts being

4    manufactured is simply not going to be known.

5    BY MR. HARTMAN:

6        Q.   So am I correct that it is your testimony

7    today that it is impossible to make the selection

8    of the best foot control for -- the safest foot

9    control for a multi-purpose machine by the

10   manufacturer?

11       MR. ROBINSON:  I will object to the form of the

12   question.

13       THE WITNESS:  It is -- it is not impossible but

14   it is something the manufacturer is going to have

15   to do based on prior experience with similar

16   machines rather than anticipated future use of the

17   machine they are selling.

18   BY MR. HARTMAN:

19       Q.   What does that mean?

20       A.   Well, when you have a multi-purpose

21   machine --

22       Q.   Let's talk about a multi-purpose press

23   brake.

24       A.   Okay.  What the machine tool manufacturer

                                                        107

1    is going to know is --

2       MR. ROBINSON:  Hold on.  I didn't make an

3    objection before.  The implication that has just

4    been made by reference to the press brake suggests

5    that there is a distinction when the witness has

6    already indicated there wouldn't be a distinction

7    for multi-purpose power presses, mechanical power

8    presses versus mechanical press brakes.  So the

9    question as phrased suggests that there is.  And

10   the answer now being given only relates to press

11   brake.  I think that is very misleading.

12   BY MR. HARTMAN:

13      Q.   Sir, I think Mr. Robinson is suggesting

14   that you testify a particular way.  My

15   understanding is that you said there would be

16   distinctions based on a machine-by-machine basis.

17   If you get down to the individual machines, there

18   would be a distinction with regard to types of

19   machine and then there would be a distinction --

20   meaning press brake versus punch presses, and then

21   there would be a further distinction with regard to

22   the types of uses the manufacturer knew.  So there

23   are multiple distinctions in this decision-making

24   tree; is there not?

108

1       MR. ROBINSON: Hold on. Objection to the form.

2    You threw a lot of things in there that were not

3    stated. I think you indicated different uses of

4    the manufacturers as opposed to uses by the

5    end-user? Very misleading.

6       MR. HARTMAN: Would you read the question?

7       MR. ROBINSON: You trailed off some but

8    I thought I heard manufacturer. Would you read

9    that question back?

10                   (Whereupon, the record was

11                    read.)

12      MR. ROBINSON: Objection, compound, misstates

13   prior testimony and misleading.

14   BY MR. HARTMAN:

15      Q.   Do you understand that question, sir?

16      A.   I think so.

17      Q.   Okay.

18      A.   When the press brake manufacturer decides

19   to include a foot switch, what they have at their

20   disposal for making that decision is prior

21   experience with all the press brakes they have sold

22   in the past. And they make a selection of a foot

23   switch based on that prior experience because the

24   press brake is a multi-functional machine by its

                                                      109

1    Q.   OSHA does not govern manufacturer conduct,

2  manufacturer's conduct; am I correct?

3    A.   Only as far as manufacturing operations

4  within a manufacturer's plant would go.

5    Q.   So OSHA is not applicable to Heim in the

6  way it designs the press brake involved in this

7  case; am I correct?

8    MR. ROBINSON:  Objection to the form of the

9  question.

10    THE WITNESS:  Correct.

11  BY MR. HARTMAN:

12    Q.   Do you understand what my question was,

13  sir?

14    A.   I think so.

15    Q.   Tell me what your understanding was of my

16  question so we can clarify the record.

17    MR. ROBINSON:  Please don't get confused.  When

18  I object to form, that doesn't mean that I don't

19  understand it or that he doesn't understand it,

20  I think it can be interpreted in various different

21  ways.  Actually, there are a number of different

22  form objections, so don't assume that means that

23  I thought that he didn't understand it.  I don't

24  want you to waste your time going through that.

                                                    115

1        THE WITNESS:  Yes.

2    BY MR. HARTMAN:

3        Q.    Let me ask it.

4        A.    Including the foot switch selection.

5        Q.    So am I correct that OSHA does not govern

6    how Heim designs its products and the foot

7    selection process?

8        A.    Yes, that's also my understanding.

9        Q.    Thank you.

10            Would you agree that exceeding as it

11    relates to the foot controls, that if you exceed

12    the ANSI requirements of foot controls included

13    with the press brakes, that that's a good thing?

14        MR. ROBINSON:  Objection to the form of the

15    question.  Very broad, it doesn't have any

16    limitations.

17    BY MR. HARTMAN:

18        Q.    You can answer.

19        A.    I think any manufacturer is free to try

20    and exceed regulatory requirements when it is

21    possible to exceed them.  The requirements simply

22    establish what is reasonably safe.  There is no

23    prohibition against trying to do better.

24        Q.    Would you agree that that's a good thing

                                                    119

1     A.   Yes, and the other were side guards.

2     Q.   And side guards.  Okay.  I should have

3  said the full cover.  When I said cover, I thought

4  a cover was side guards included but okay.

5  I wasn't trying to mislead you.

6         Do you know whether or not the toe latch

7  provides protection from riding the pedal?  And it

8  is if you know, sir.

9     MR. ROBINSON:  I am not sure what that means.

10  If he has an opinion on it then --

11     THE WITNESS:  I think in some instances it does

12  and in some instances it does not.  If the operator

13  rides the pedal in such a way that the foot is kept

14  fully inserted into the foot switch housing, it

15  does not provide protection against riding the

16  pedal.  If the operator keeps their foot partially

17  inserted into the foot switch housing, then the

18  latch will in effect latch the pedal in the

19  unactivated position and provide protection against

20  riding the pedal.

21  BY MR. HARTMAN:

22     Q.   Your next paragraph says the 2002 safety

23  standard for press brakes additionally recognizes

24  the hazard associated with unattended actuation of

                                                    134

1    the foot operating means; am I correct?

2        A.   Yes.

3        Q.   Is that an accurate statement?

4        A.   Yes.

5        Q.   Was that hazard also known in 1978?

6        MR. ROBINSON:  Objection to the form.

7        THE WITNESS:  I believe it was, yes.

8    BY MR. HARTMAN:

9        Q.   With the adoption -- strike that.

10            In 1973 was it known to the industry as a

11   whole that there was a hazard associated with the

12   unintended actuation of the foot operating means?

13       MR. ROBINSON:  Objection to the form.

14       THE WITNESS:  I am sorry.  Was it known to who?

15   BY MR. HARTMAN:

16       Q.   Industrywide.

17       A.   Industrywide?

18            I don't know I wasn't around in 1978 what

19   the industry knew or didn't know.  What I do know

20   is when the safety standard addressed the need or a

21   requirement to have a supervisory key selector

22   switch between hand and foot and that was in 2002.

23       Q.   Do you know of whether or not there is a

24   hazard associated with accidental activation of a

                                                      135

1   foot control in conjunction with the use of a press

2   brake?

3        MR. ROBINSON:  Objection to the form.

4        THE WITNESS:  Can I hear that question once

5   more, please?

6                          (Whereupon, the record was

7                           read.)

8        THE WITNESS:  Yes, there is a hazard associated

9   with accidental activation of any kind of control

10  including foot controls; and it doesn't matter what

11  kind of machine it is associated with.

12  BY MR. HARTMAN:

13       Q.   And how long have you known that?

14       A.   Probably most of my life.  I can't put a

15  specific time or date on it.  It seems like a

16  rather obvious statement.

17       Q.   Okay.  So it is almost an intuitive

18  statement to you?

19       A.   Yes.

20       Q.   When did you graduate college?

21       A.   1980 the first time.

22       Q.   When you graduated college, did you know

23  that there was a hazard associated with the

24  unintended activation of a machine?

                                                    136

1       A.   I suspect I did.

2       Q.   It is my understanding that there are two

3   general classifications of people that will work on

4   press brakes.  One is a setup individual and one is

5   an operator; am I correct?

6       MR. ROBINSON:  Objection to the form.

7       THE WITNESS:  Larger press shops will also have

8   a maintenance department but very -- setup is

9   considered a subset of maintenance.  So if we say

10  maintenance and operation, I go with you a hundred

11  percent.

12  BY MR. HARTMAN:

13      Q.   How about if we go maintenance, setup and

14  operator; is that easier?

15      A.   That's fine.

16      Q.   Do you have an opinion as to whether or

17  not a press brake manufacturer has an obligation to

18  manufacture the press brake so as to protect all

19  three individuals, types of individuals that will

20  come in contact with the machine?

21      MR. ROBINSON:  Objection to the form, asked and

22  answered.

23      THE WITNESS:  I think basically the same

24  regulations that apply to the press operator also

137

1    apply to setup and maintenance personnel. However,

2    because the setup and maintenance personnel because

3    of the nature of what they are doing, have to have

4    their hands in the dye area because they are the

5    ones installing and removing the dyes, there is a

6    little bit higher degree of care that one has to

7    exercise to protect themselves.

8    BY MR. HARTMAN:

9        Q.    But the machine manufacturer's

10   responsibilities to your understanding extend to

11   the setup individual, the maintenance man and the

12   operator to the extent the machine operator -- the

13   machine manufacturer has responsibility?

14       MR. ROBINSON:  Objection to the form.

15       THE WITNESS:  Yes.

16   BY MR. HARTMAN:

17       Q.    Now, am I correct that with regard to

18   press brakes, it is foreseeable that operators will

19   have their hands in the dye area?

20       MR. ROBINSON:  Objection to the form.

21       THE WITNESS:  Yes, I think there is a pattern

22   of operators reaching into the dye space or point

23   of operation.

24

                                                    138

1    BY MR. HARTMAN:

2        Q.   In fact some of the operator protective

3    systems are designed so that while a worker's hands

4    are in a dye area, if the dye begins closing,

5    mechanically their hands are removed from that

6    area; am I correct?

7        A.   Yes, I believe you are referring to the

8    pull-back or pull-out device.

9        Q.   A present sensing device would work in a

10   way that would allow a worker to put their hand in

11   the dye area, do some work and remove it before the

12   machine could be activated; am I correct?

13       A.   That's correct.  The present sensing

14   device, however, does not have the ability to pull

15   the hands out.

16       Q.   Correct, correct.

17            I would refer you to your report on

18   page 6, please, first full paragraph beginning with

19   the fourth line down it says, as OSHA 3170 has

20   correctly pointed out, the electric foot control

21   works best when the operator is in a sitting

22   position.  Did I accurately read your report?

23       A.   Yes.

24       Q.   Would it be a correct statement to say

                                                        139

1    that the sitting position is the best position for

2    which an operator should utilize a foot control?

3        MR. ROBINSON:  Object to the form.

4        THE WITNESS:  It is not necessarily the best.

5    It is certainly an acceptable means of using a foot

6    control.  But if balance is the concern -- and

7    I think balance is something that Professor Barnett

8    focused on in his report -- then sitting is the

9    best.

10   BY MR. HARTMAN:

11       Q.   So if Ms. Lindquist was operating the

12   press brake at the time of her injury by sitting

13   down with the foot control by her side, that is not

14   something that you would find fault with?

15       MR. ROBINSON:  Object to the form.

16       THE WITNESS:  I would not.

17   BY MR. HARTMAN:

18       Q.   And your next sentence says, the sitting

19   position all but eliminates the problem of

20   balancing one's self on one foot and reduces the

21   physical fatigue associated with high pedal

22   activation forces and large pedal movements,

23   correct?

24       A.   Yes.

                                                    140

1      Q.   Do you agree with that statement?

2      A.   Yes, of course, I wrote it.

3      Q.   Sometimes experts in my experience have

4   had changes or misstated or misread something or

5   have found something, I am just clarifying your

6   status as of today.  I am not implying that you

7   should.  I just want to make sure we know what the

8   status of your opinions are as of today.

9      A.   Okay.  Understood.

10      Q.   Your next sentence says, the electric foot

11   control can also be utilized by standing as well as

12   a seated operator; am I correct?

13      A.   Yes.

14      Q.   So am I correct if Ms. Lindquist was using

15   the foot pedal and it had by her side when she was

16   working on her machine on the day of the accident,

17   the fact she was standing and using the foot pedal

18   would not be a problem to you?

19      MR. ROBINSON:  Objection to the form.

20      THE WITNESS:  No.

21   BY MR. HARTMAN:

22      Q.   Okay.  Your next paragraph says, there are

23   acceptable applications for both the electric foot

24   controls as well as the mechanical foot pedal.

141

McCorkle Court Reporters, Inc.
Chicago, Illinois (312)263-0052

1    co-employee's depositions?

2        A.   Yes, I have.

3        Q.   Is there anything that you have read in

4    any of the co-employee's depositions that led you

5    to believe that Ms. Lindquist was a setup person?

6        MR. ROBINSON:  Object to the form.  I don't

7    know how you are referencing setup.  It seems you

8    are attempting to include the ability to move the

9    switch from two palm to foot control in setup.

10   I think that is misleading the way it is asked.

11   BY MR. HARTMAN:

12       Q.   Is it my leading the way I asked it?

13       MR. ROBINSON:  I didn't say he thought it was

14   misleading.

15       MR. HARTMAN:  I think the --

16       THE WITNESS:  The answer to the question you

17   asked me is no.

18   BY MR. HARTMAN:

19       Q.   No, there is nothing that you have read

20   that indicates Ms. Lindquist was a setup person,

21   correct?

22       A.   Correct.

23       Q.   Is there anything that you have read that

24   leads you to believe Ms. Lindquist could make the

                                                    146

1   decision to utilize the key function to switch the

2   machine from foot control to two palm button

3   switch?

4       A.   I believe she testified she wasn't even

5   aware of the existence of the key.  So she is not

6   in a position to make that decision.

7       Q.   Is there anything that you have read about

8   Ms. Lindquist's ability and decision-making process

9   that would lead you to believe that she should be

10  entitled to make that decision as to utilize the

11  supervisory switch to make a change from foot

12  control to two palm button switch?

13      A.   Not unless she was a -- qualified to

14  participate in setup of the press, she is not the

15  one that's supposed to be making the decision.

16      Q.   And I appreciate that.  Is there anything

17  that you read that indicated that she was qualified

18  to be that person?

19      A.   No.

20      Q.   I need to see those three articles,

21  please, wherever they are.

22      A.   Right here.

23      MR. ROBINSON:  Make sure we keep those

24  separate.

                                              147

1  riding the pedal with a foot cover is mitigated by

2  the trip latch?

3      MR. ROBINSON:  Objection to the form.

4      THE WITNESS:  I think I responded to a question

5  earlier about how the toe latch addresses some

6  riding-the-pedal scenarios, and it had to do with

7  how far the operator's foot is inserted into the

8  switch.  So, again, I think I am basically going to

9  give the same answer.

10     Yes, it does help to mitigate

11  riding-the-pedal-type accidents because it does

12  prevent those that are associated with the

13  operator's foot not being inserted fully into the

14  foot switch.

15  BY MR. HARTMAN:

16     Q.   You state next that individual designers

17  and manufacturers should not adopt a safety device

18  that creates a new hazard, correct?

19     A.   Yes.

20     Q.   And those examples when a downside exists

21  with the use of a safety device, a value system

22  must weigh the upside and downside effect of the

23  particular safeguarding system, correct?

24     A.   Yes.

156

1    Q.    Is that a reasonable value system?

2    A.    Yes.

3    Q.    Is that a value system that you have ever

4    used?

5    A.    I don't know that I have been in the

6    position to have to choose whether or not to

7    include a new proposed safety device other than in

8    the framework of litigation matters like we are

9    doing here today.

10        But, yes, I would say I have used it

11    because in effect that's what I am doing with

12    regard to the front gate that Barnett is proposing

13    for press brake foot controls.

14    BY MR. HARTMAN:

15    Q.    Okay.  What is the cost of the front gate?

16    A.    I don't know.

17    Q.    No.  I am saying what is the cost that you

18    factored in?

19    A.    What is the cost -- I haven't factored in

20    any cost.

21    Q.    Okay.  What is the benefit of the front

22    gate?

23    A.    The benefit of the front gate is that it

24    will reduce the likelihood of inadvertently

169

1    stepping into a foot control.

2        Q.    Okay.  On page 9, Item No. 2, the last

3    sentence of your report, you indicate it is not

4    possible to prevent someone from inadvertently

5    stepping into the pedal when the intended use of

6    the pedal involves stepping on it.  This holds true

7    for the proposed front gate.  Its use is not a

8    guarantee that an inadvertent activation will not

9    or cannot occur.

10        Would I be correct in indicating that

11    there is no guarantee with any safety device that

12    injury will not occur?

13        A.    Yes, that is true.  And I think it is

14    especially true for the foot switch gate because

15    intending to activate the foot switch involves in

16    effect getting past that gate.

17        Q.    But if you are not intending to activate

18    the foot switch and somehow your foot gets in

19    there, the gate does protect you if there is no

20    intent?

21        MR. ROBINSON:  I will object to the form.

22        THE WITNESS:  If you are not intending to

23    activate the foot switch and your foot gets in,

24    then by definition the gate hasn't protected you.

                                                    170

1    provides that are not found on a foot pedal are

2    contained in paragraph 6.

3    BY MR. HARTMAN:

4        Q.   Am I correct, sir?

5        A.   Yes, I tried to be all-inclusive in

6    paragraph 6; and I see I have included the safe

7    distance, the ability for the operator to be

8    seated, the reduction of operator fatigue and the

9    reduction in the need for an operator to stand

10   balanced on one leg are all safety features

11   associated with the foot control that are not

12   common to the older foot pedal.

13   BY MR. HARTMAN:

14       Q.   Right.  That's the difference between a

15   foot control and a foot pedal as it relates to

16   safety is in paragraph 6?

17       MR. ROBINSON:  I will object to the form of

18   that question.

19       THE WITNESS:  Yes.

20   BY MR. HARTMAN:

21       Q.   Sir, if -- I want you to assume for me

22   that Ms. Lindquist was not riding the pedal and did

23   not intend to activate the foot pedal at the time

24   of her accident.

175

1     A.    Well, I certainly agree that she did not

2     intend to activate it.

3     Q.    Would you agree that if there was a gate

4     on the foot control and her foot was outside of the

5     foot control at the time of this unintended

6     activation and the gate worked as it was expected

7     to, meaning preventing her foot from going into the

8     foot control, that this accident would not have

9     occurred?

10     MR. ROBINSON:  I object to the form of the

11     question and the hypothetical.

12     THE WITNESS:  The gate is not designed to

13     prevent her foot from getting into the foot

14     control.  It is specifically designed to allow an

15     operator to get their foot into the foot control

16     otherwise the foot control is a useless piece of

17     equipment.  So, no, it is not -- the presence of a

18     gate on that foot control does not guarantee that

19     this accident would not have happened.

20     BY MR. HARTMAN:

21     Q.    I am not asking that.

22     Would you agree that a gate is intended to

23     prevent unintended activation of the foot control?

24     A.    That's the only reason the gate is there,

176

1    was not -- that she was riding the foot pedal.

2            I guess the only reason a suspicion to the

3    contrary may remain in my mind is that no

4    explanation was ever offered or given as to how the

5    inadvertent actuation took place.

6        Q.   Would you expect that someone who loses

7    eight of her, all eight of her fingers in a machine

8    would know how the activation took place?

9        MR. ROBINSON:  I will object to the form of

10   that question.  That's quite improper.  You are

11   asking him to speculate as to what she would know.

12       THE WITNESS:  I guess I investigated enough

13   injuries to know that sometimes there is total

14   amnesia on the part of the victim.  Certainly this

15   injury is extremely traumatic; and I guess, no,

16   I wouldn't be surprised that Mrs. Lindquist would

17   be unable to determine how her foot contacted the

18   pedal.  And again simply because no explanation has

19   been offered as to how the inadvertent activation

20   took place at least leaves some suspicion in my

21   mind with regard to whether there was riding the

22   pedal going on.

23   BY MR. HARTMAN:

24       Q.   You have -- you are aware that there is

                                                      178

1   nothing mechanically wrong with regard to the press

2   brake, correct?

3       A.   Correct.

4       Q.   Okay.  And would you agree that this

5   accident occurred by use of the foot control?

6       MR. ROBINSON:  I will object to the form of

7   that question.

8   BY MR. HARTMAN:

9       Q.   By activation of the foot control?

10      A.   Yes, there was no other activation means

11  that anyone has identified to cause the press to

12  cycle.

13      Q.   So your opinions and your -- strike that.

14           Your investigation of this accident leads

15  you to believe that there was activation of the

16  machine by the foot pedal that caused this

17  accident?

18      A.   Yes.

19      MR. HARTMAN:  Can we go off the record for a

20  minute?

21      THE VIDEOGRAPHER:  Off the record at 12:01 p.m.

22                (A short break was taken.)

23      THE VIDEOGRAPHER:  This is the beginning of

24  Tape No. 3.  Back on the record at 12:06 p.m.

                                                    179

```
 1      Q.   But Heim would be the expert in selecting
 2   the foot pedal that would be standard equipment
 3   with its press brake?
 4      MR. ROBINSON:  Objection to the form of the
 5   question.
 6      THE WITNESS:  Yes.
 7      MR. HARTMAN:  Sir, thank you for your time.
 8   I have no further questions.
 9                        EXAMINATION
10   BY MR. ROBINSON:
11      Q.   Sir, would the end-user be in the best
12   position to select a foot control for a press
13   brake?
14      A.   Yes.
15      Q.   And was that a conclusion reached in
16   Professor Barnett's Exhibit 4, Foot Controls:
17   Riding the Pedal in No. 9 where he lays out the
18   factors that Professor Barnett yesterday indicated
19   that on a number of them would be known by the
20   end-user?
21      A.   Yes, I think he neatly summarizes many of
22   the different factors that go into foot pedal
23   selection; and the machine tool manufacturer is
24   just not in a position to know things that are
```

185

# EXHIBIT "M"

IN THE U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT OF PA

\* \* \* \* \* \* \* \* \*

\*

TINA LINDQUIST,            \*

    Plaintiff           \*    Case No.

    vs.                 \*    04-249E

HEIM L.P.,                 \*

    Defendant           \*    

                  \*

\* \* \* \* \* \* \*

DEPOSITION OF

GARY DIETZ

JULY 21, 2005

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

46

1    A.      Yes.

2    Q.      And how do you know that?

3    A.      I was there.

4    Q.      You were working at the time of

5    her accident; were you not?

6    A.      Yes, I was.

7    Q.      And how far away were you when

8    the accident happened?

9    A.      Approximately 30 feet.

10   Q.      Who made the decision to use the

11   foot switch for activating this press

12   brake at the time that Tina Lindquist

13   was injured?

14   A.      It would be the set-up person.

15   Q.      Bob Rooney?

16   A.      Yes.

17   Q.      And did Bob Rooney have

18   authority then to decide which safety

19   device would be used for any particular

20   process of the press?

21   A.      Which press?

22   Q.      This particular one.  Did he

23   have that authority to decide which

24   safety device to use?

25   A.      Yes.  I would say at that time