# EXHIBIT "W"



# Dallas W. Hartman P.C.

### ATTORNEYS AT LAW

2815 Wilmington Road
New Castle, Pennsylvania 16105
724-652-4081 • 800-777-4081
FAX 724-652-8380

October 27, 2003

Dallas W. Hartman
Esquire**

Thomas W Minett
Esquire°**

Jean S Best
Esquire*

Richard R. Morelli
Esquire**

Barbara J Welton
Esquire*

Brenda A Marino
Esquire*

*   *Licensed in PA*
**   *Licensed in OH and PA*
°* • *of Counsel*

**Pennsylvania**

Sharon/Hermitage
724-346-0616

Butler
724-283-6662

Greenville
724-588-7277

Cranberry
724-742-0070

Mercer/Grove City
724-458-1558

Ellwood City
724-758-2510

Beaver Falls
724-846-8088

**Ohio**

Youngstown
330-757-7707

Warren
330-392-6669

Salem
330-332-8822

Lisbon
330-424-1727


VIA CERTIFIED MAIL

Presses Incorporated
6360 West 73rd Street
Chicago, IL   60638-6127

      RE:   OUR CLIENT:    TINA LINDQUIST
           D/O/A:          09/25/02

To Whom It May Concern:

      This letter is written to advise you that my office has been retained to represent Tina Lindquist in all matters relating to her work-injury of September 25, 2002. Ms. Lindquist was working as a component technician at Corry Manufacturing located at 519 W. Main Street, Corry, PA 16407. Be advised that Ms. Lindquist was seriously injured while working on a machine manufactured by your company. It is our belief that the machine was defective. The model number is 70-6 and the serial number is 2176.

      I would ask that you immediately contact your insurance carrier and notify them of our representation of Ms. Lindquist. Please have your insurance carrier contact our office as soon as possible. No direct communication with Ms. Lindquist is permitted.

      Thank you for your cooperation.

                          Very truly yours,

                          Dallas W. Hartman

DWH/smc

*Lawyers representing accident victims.*
*No Recovery - No Fee*

# EXHIBIT "X"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TINA LINDQUIST,

        Plaintiff,

vs.

HEIM, L.P.,

        Defendant.

Civil Action No: 04-249E

**JUDGE SEAN J. MCLAUGHLIN /
MAGISTRATE JUDGE SUSAN
PARADISE BAXTER**

PAUL R. ROBINSON, ESQUIRE
PA I.D. No. 65581

Meyer, Darragh, Buckler, Bebenek &
Eck, P.L.L.C.
U.S. Steel Tower, Suite 4850
600 Grant Street
Pittsburgh, PA 15219
(412) 261-6600

## ANSWERS TO PLAINTIFF'S INTERROGATORIES - SECOND SET AND REQUEST FOR PRODUCTION OF DOCUMENTS - SECOND REQUEST

AND NOW, comes the defendant, HEIM, L.P., through its attorneys, MEYER, DARRAGH, BUCKLER, BEBENEK & ECK, P.L.L.C., serving their answers to plaintiff's interrogatories - second set and request for production of documents - second request, as follows:

    1.    Describe the relationship between HB Machinery Company and Heim, L.P. and outline the criteria of the method of selection of HB Machinery Company as a distributor including, but not limited to the following:

        (a)    date relationship began;

(b)    date relationship ended;

(c)    number of press brakes sold;

(d)    contact person at HB Machinery Company that communicated with Heim, L.P. with regard to sales of machinery;

(e)    the person at Heim, L.P. that was responsible for maintaining HP Machinery Company as a distributor.

**ANSWER:**    *Objection. This interrogatory is vague and ambiguous. Heim did not select HB Machinery as a distributor. The sales file for the Model 70-6 press brake reveals that HB Machinery Co. was a company with whom Avco Lycoming contracted a particular machine, and that HB Machinery contracted with Heim to purchase the Model 70-6 press brake at issue which HB Machinery requested Heim to ship to Avco Lycoming*

2.    Produce any and all documents evidencing the relationship between HB Machinery Company and Heim, L.P.

**ANSWER:**    *Heim is unaware of any agreements or documents concerning the relationship between Heim and HB Machinery Company at the time of the 1978 sale at issue other than the sales file for the Model 70-6 press brake at issue which has been produced, which file contains documents evidencing the purchase and sale relationship which existed between HB Machinery Company and Heim for this particular press brake.*

3.    Produce any and all documents outlining the agreements between Heim, L.P. and/or distributors and/or franchises utilized during the period from 1970 through 1980.

**ANSWER:**    *Objection. This request is overly broad, vague, unduly burdensome, harassing, and not reasonably calculated to lead to the discovery of admissible evidence. This request would require yet another search of all sales files between 1970 and 1980 and the production of documents relating to the sale of our presses and press brakes. Without waiving these objections, Heim is not a franchisor and therefore has no franchisees. Heim has, throughout the time period requested, sold press brakes to distributors who have purchased press brakes for ultimate shipment to third parties, similar to the sale of the Model 70-6 press brake at issue which was sold to HB Machinery Co., L.P. and shipped to Avco Lycoming pursuant to the*

*request of HB Machinery Co. Please see the deposition transcript of Tony Mase wherein this matter was inquired into at length by the plaintiff.*

4.    Describe the specifications for the foot pedal that was supplied with the subject machine and the specifications for subsequent foot pedals made available by Heim, L.P. with the sale of press brakes.

**ANSWER:**    *Objection. This request is overly broad, vague, unduly burdensome, harassing, and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving these objections, Heim has searched its records to determine if any drawings or specifications exist with regard to the foot pedal that was supplied with the Model 70-6 press brake at issue. The attached drawing may be a drawing for the foot switch supplied with the press brake at issue, considering the date of the drawing, but Heim has no ability of verifying this.*

5.    Produce any and all specifications, drawings, sketches and/or diagrams of foot pedals made available by Heim, L.P. with its press brakes for the period from 1970 through 2000.

**ANSWER:**    *Objection. This request is overly broad, vague, unduly burdensome, harassing, and not reasonably calculated to lead to the discovery of admissible evidence. Please see answer to interrogatory number 6.*

6.    Produce any and all specifications, drawings, sketches and/or diagrams relating to said foot pedals.

**ANSWER:**    *Objection. This request is overly broad, vague, unduly burdensome, harassing, and not reasonably calculated to lead to the discovery of admissible evidence. Please see answer to interrogatory number 6.*

7.    In the event defendant, Heim, L.P., did not manufacture said foot pedals, identify all vendors from whom Heim, L.P. purchased said foot pedals for brake presses for he period from 1970 through 2000.

**ANSWER:**    *Objection. The plaintiff is aware through the deposition of Heim's corporate designee, Tony Mase, that Heim did not manufacture the foot pedal which accompanied the Model 70-6 press brake at issue. The plaintiff's request for all vendors who have supplied foot pedals for press brakes from 1970 through 2000 is overly broad, unduly burdensome, harassing, and not reasonably calculated to lead to the discovery of admissible evidence.*

*Without waiving these objections, the present supplier of foot pedals is LineMaster. Prior to purchasing foot pedals from LineMaster Switch Corp., Heim believes that foot pedals were purchased from Electro-Kenetics which was believed to be a dealer for LineMaster*

8.    Identify any and all modifications to the foot pedal from 1978 through the present.

**ANSWER:**    *Objection.   This request is overly broad, vague, unduly burdensome, harassing, and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving these objections, Heim does not have information available to detail any and all modifications to the foot pedal on the Model 70-6 press brake subsequent to its sale to HB Machinery Co. in 1978.  As the plaintiff is aware, it is unknown if the foot pedal which accompanied the Model 70-6 press brake at the time of Tina Lindquist's injury was the foot pedal which accompanied the Model 70-6 press brake at the time of its sale.  As plaintiff also is aware, the foot pedal which accompanied the Model 70-6 press brake at the time of Tina Lindquist's injury has been discarded without notice to Heim.*

*Heim is aware from the depositions of Corry Manufacturing employees that the foot pedal which accompanied the Model 70-6 press brake at the time of Tina Lindquist's injury had been designed and fabricated by Corry Manufacturing employees to permit the operation of the Model 70-6 press brake through use of either the foot pedal or the two-palm button switch which also accompanied the Model 70-6 press brake at the time of Tina Lindquist's injury.*

9.    In the event any modification of the foot pedal that was supplied with press brakes in the period of 1970 through 2000 has taken place, please state in detail, the reasons for such change, alteration or modification.

**ANSWER:**    *Please see objections and answer to interrogatory number 8, which are incorporated by reference.*

10.    Please identify all distributors of Heim, L.P. products for the period from 1970 through 1980.

**ANSWER:**    *Objection. This request is overly broad, vague, and misleading through this use of the term "distributors of Heim, L.P." It furthermore is unduly burdensome, harassing, and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving these objections, as the*

*plaintiff is aware through the corporate designee deposition of Tony Mase, Heim's business involves the sale of press brakes through distributors which are in the business of selling such press brakes and other components, including point of operation safety devices. As plaintiff is aware through the discovery taken to date, a company such as Avco Lycoming oftentimes will request a distributor of manufacturing equipment to provide it with the manufacturing equipment which that company desires to use in its operation. The distributor, in this case HB Machinery Co., then will supply its customer, in this case Avco Lycoming, with the equipment, and one means of obtaining that equipment is through purchasing it from manufacturers. The sales file for the Model 70-6 press brake at issue reveals that this typical sales scenario occurred with regard to the sale of the Model 70-6 press brake and that a distributor of manufacturing equipment, HB Machinery Co., appears to have contracted with Avco Lycoming to supply a press brake, and HB Machinery Co. then contracted with Heim to provide the press brake requested and which was shipped to Avco Lycoming.*

11.    Identify and provide all sales brochures, manuals and advertising materials relating to press brakes for the period from 1970 through the present.

**ANSWER:**    *Objection. This request is overly broad, vague, unduly burdensome, harassing, and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving these objections, please see the instructions and parts manual which plaintiff obtained from Hildebrand Machinery which accompanied the Model 70-6 press brake at the time of Tina Lindquist's injury, and please see the attached brochures.*

12.    Identify the person or entity responsible for the content of the operator's manual for brake presses.

**ANSWER:**    *Objection. This request is overly broad, vague, unduly burdensome, harassing, and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving these objections, and with regard to the instructions and parts manual supplied with the Model 70-6 press brake, Heim does not have information available to it to identify the persons responsible for the content of the Instructions and Parts Book for the Model 70-6 press brake sold in 1978 to HB Machinery Co. The Instructions and Parts Book for the particular press brake at issue indicates that it was compiled and written by Technical Graphics.*

13.    Identify where the operator's manuals were printed.

**ANSWER:** *Please see objections and answers to interrogatory no. 12 which are incorporated.*

14.    Identify the person at Heim, L.P. responsible for review of the manual for changes and updates.

**ANSWER:** *Please see objections and answers to interrogatory no. 12 which are incorporated.*

15.    Provide an original of the operator's manual that is applicable to the Heim 70-6 brake press.

**ANSWER:** *The original of the operator's manual that was supplied with the Model 70-6 press brake is not in the possession of Heim and, instead, left the possession and control of Heim at the time of the sale of the Model 70-6 press brake at issue. Plaintiff's counsel previously advised Heim's counsel that plaintiff's counsel obtained a copy of the operator's manual from Corry Manufacturing and, following the request of Heim's counsel, plaintiff's counsel provided Heim's counsel with a copy of that operator's manual. The operator's manual produced by plaintiff's counsel is a copy of the owner's manual for the Model 70-6 press brake.*

16.    Please identify if any subsequent modification that has taken place to the manual included with press brakes. To the extent such alteration or change has taken place with regard to said manual, please provide a copy of the manual and identify the changes or modifications.

**ANSWER:** *Objection. This interrogatory is overly broad, vague, unduly burdensome, harassing, and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving these objections, please see a copy of the Instructions and Parts Book which is attached.*

17.    Identify the person(s) responsible for the design of the POINT OF OPERATION protection such as the foot pedal and/or the two palm button switch utilized by Heim, L.P. or made available in conjunction with the sale of Heim, L.P. press brakes for the period of 1970 through 2000.

**ANSWER:** *Objection. This interrogatory is overly broad, vague, unduly burdensome, harassing, and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving these objections, Heim did not design or manufacture the foot pedals which accompanied its press brakes, and a*

*two-palm button switch was not requested, and therefore not supplied, for the Model 70-6 press brake sold to HB Machinery Co.*

18.    Provide any design engineering criteria utilized by the design engineers relating to the design and manufacture of press brakes as it relates to POINT OF OPERATION protection such as foot pedals or two palm button activation mechanism.

**ANSWER:**    *Please see objection and answer to interrogatory number 17 which are incorporated by reference.*

19.    Produce for inspection a representative sample of each model of foot pedal made available by Heim, L.P. in conjunction with the sale of its press brakes for the period of 1970 through the present.

**ANSWER:**    *This request is overly broad, unduly burdensome, harassing, and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving these objections, Heim does not possess representative samples of each foot pedal which accompanied the sale of its press brakes, including the foot pedal which accompanied the sale of the Model 70-6 press brake at issue.*

Respectfully submitted,

MEYER, DARRAGH, BUCKLER,
BEBENEK & ECK, P.L.L.C.

By: _____
PAUL R. ROBINSON, ESQUIRE
Attorney for Heim, L.P
PA I.D. No. 65581

U.S. Steel Tower, Suite 4850
600 Grant Street
Pittsburgh, PA 15219
(412) 261-6600

P0748453 1

## PROOF OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been served upon all parties on the date and in the manner listed below:

|  |  |
|---|---|
| ___x___ | First Class Mail, Postage Prepaid |
| _____ | Certified Mail - Return Receipt Requested |
| _____ | Hand Delivery |
| _____ | Facsimile Transmission |

at the following address:

> Dallas W. Hartman, Esquire
> Dallas W. Hartman P.C.
> 2815 Wilmington Road
> New Castle, PA 16105
> *(Counsel for Plaintiff)*

> MEYER, DARRAGH, BUCKLER,
> BEBENEK & ECK, P.L.L.C.

Date: __16 - 6__, 2005

PAUL R. ROBINSON, ESQUIRE

P0748453 1

# EXHIBIT "Y"

CATALOG 77

# LINEMASTER®

### AMERICA'S FOOT SWITCH LEADER



Foot Switches

Air Valves

Molded Plugs
Cordsets

# LINEMASTER®

## ANTI-TRIP FOOT CONTROL advanced design prevents Accidental Actuation

PATENT PENDING





ALL MODELS UL & CSA LISTED                PATENTED

Painted Alert Orange

Dual mechanism and springs for treadle return and latching.

¼"-14 pipe thread conduit opening

Anti skid rubber feet and 3 holes for rigid mounting to floor or equipment.



Driptight          Dusttight
Watertight        Oiltight
NEMA Types 2, 4 & 13

Dimensions 9" x 5¼" x 4¾"

Weight—Approximately 7 lbs.

- New heavy duty foot switch features an anti-trip treadle mechanism that prevents accidental actuation through unintentional stepping on foot treadle.
- Will withstand sudden shock force from kicking or dropping. Tested for 3 foot drops on cement floor without actuation of switch contacts.
- Switch operation requires that the latch trip lever be released prior to depressing the foot treadle. An in-line foot pressure is applied to the latch trip lever located at the rear of the foot treadle.
- Smooth trip lever release and treadle depression motion results in good rate of operation.
- Complies with Occupational Safety & Health Act provisions for full shielding of foot controls.
- Oversize "O" Shield models accept oversized safety shoes and metatarsal foot guards
- Dual ½"-14 pipe thread conduit opening models available.

| EXAMPLE OF CIRCUIT DESCRIPTIONS | | |
|---|---|---|
| CIRCUIT | TREADLE UP | TREADLE DOWN |
| SPDT | | |
| SPDT DB (Double Break) | | |

## SPECIFICATIONS     WARNING   See page 2

| | FULL SHIELD | "O" SHIELD | WITH GATE | STAGE | CIRCUIT | ELECTRICAL RATINGS & COMMENTS |
|---|---|---|---|---|---|---|
| UL CSA | 511-B | 511-BO | 511-BG | Single | SPDT | 20 Amps 125-250 VAC 1 HP 125-250 VAC Heavy Pilot Duty 250 VAC Max |
| UL CSA | 511-B2* | 511-B20* | 511-B2G* | Single | DPDT | |
| UL CSA | 511-B2A | 511-B20A | 511-B2GA | Two | SPDT | |
| UL CSA | 511-B3 | 511-B30 | 511-B3G | Single | SPDT DB† | 15 Amps 125-250 VAC ½ HP 125 VAC  1 HP 250 VAC Heavy Pilot Duty 250 VAC Max. †Must be wired to equal voltage sources and the same polarity  The loads should be on the same sides of the line. |
| UL CSA | 511-B4* | 511-B40* | 511-B4G* | Single | DPDT DB† | |
| UL CSA | 511-B4A | 511-B40A | 511-B4GA | Two | SPDT DB† | |

*One pole of these models has an adjustable actuating mechanism that enables you to make or break one pole before the other  EXAMPLE: You can break the N O. Circuit long before you would remake an N.C. Circuit in a 511-B2.

# HERCULES Heavy Duty Foot Switch



**WITHOUT GUARD**
Weight Approx. 6½ lbs.



**FULL SHIELD MODEL**
Weight Approx. 8 lbs

*Shielded cover cast aluminum



**ADJUSTING SCREWS**

**EASY TO WIRE AND ADJUST**



**MAINTAINED LATCH UNDER GUARD**

▷ **Driptight**  ▷ **Dusttight**
▷ **Watertight**  ▷ **Oiltight**
**NEMA Types 2, 4 & 13**

DIMENSIONS* 8¹/₁₆″ × 4⁵/₁₆″ × 4½″

Weight Approx 7¼ lbs.

*"O" SHIELD cover available for field installation on standard models Catalog No. 534-E7, painted alert orange.*

The rugged cast iron enclosure has sufficient weight to keep the switch from sliding across the floor when being operated. All Hercules switches have a ¾″–14 pipe thread conduit opening. Oiltight-watertight models have a neoprene cover gasket, plus a seal around the activating shaft. Separate #8 ground screw provided in all models. Alert orange finish. In all Maintained Contact Models the release is accomplished by simply pressing the latch with a light forward movement of the toe. This release is placed under the safety guard so falling objects cannot easily release it. In the two and three stage switches the sequence of latching can be selective if desired. In the standard models they are progressive.

**SPECIFICATIONS    WARNING  See page 2**

Dual ½″–14 pipe thread conduit opening models available.

| OILTIGHT-WATERTIGHT | | | STAGE | CIRCUIT | ELECTRICAL RATINGS | COMMENTS |
|---|---|---|---|---|---|---|
| **FULL SHIELD** | **"O" SHIELD** | **WITHOUT GUARD** | | | | |
| 531-SWH 571-DWH | 531-SWHO 571-DWHO | 531-SWN 571-DWN | Single | SPDT | 20 Amps 125–250 VAC 1 HP 125–250 VAC Heavy Pilot Duty 250 VAC Max. | Simple start and stop foot switch. Can be wired N.O., N.C. or SPDT |
| 532-SWH 572-DWH | 532-SWHO 572-DWHO | 532-SWN 572-DWN | Single | DPDT | | DPDT switch can also be adjusted so one circuit operates before the other. |
| 533-SWH 573-DWH | 533-SWHO 573-DWHO | 533-SWN 573-DWN | Single | TPDT | | TPDT switch can also be adjusted so 1 or 2 circuits operate before the 3rd |
| 534-SWH 574-DWH | 534-SWHO 574-DWHO | 534-SWN 574-DWN | Two | SPDT | | Distinct "feel" between the two stages. Each stage SPDT. |
| 535-SWH 575-DWH | 535-SWHO 575-DWHO | 535-SWN 575-DWN | Three | SPDT | | Distinct "feel" between the three stages. Each stage SPDT. |
| 536-SWH 576-DWH | 536-SWHO 576-DWHO | 536-SWN 576-DWN | Single | SPDT DB* | 15 Amps 125–250 VAC ½ HP 125 VAC 1 HP 250 VAC Heavy Pilot Duty 250 VAC Max. | *See comments above for adjustments and operational characteristics of similar models.* *DB Double Break models have (4) four terminal interior snap switches and must be wired to equal voltage sources and the same polarity. The loads should be on the same sides of the line.* |
| 537-SWH 577-DWH | 537-SWHO 577-DWHO | 537-SWN 577-DWN | Single | DPDT DB* | | |
| 538-SWH 578-DWH | 538-SWHO 578-DWHO | 538-SWN 578-DWN | Two | SPDT DB* | | |

S Denotes MOMENTARY CONTACT—Press to Start—Release to Stop.
D Denotes MAINTAINED CONTACT—Press to Start—Press Latch to Stop.

Oversize "O" SHIELD models available to accept oversized safety shoes and metatarsal foot guards

# EXHIBIT "Z"

# Switalski Engineering, Inc.

**Dearlove Office Center**
**4228 Commercial Way**
**Glenview, IL  60025**

Tel.:  847-297-8447

Fax:  847-297-6615

March 13, 2006

Mr. Paul R. Robinson
Meyer Darragh Buckler Bebeneck & Eck
U.S. Steel Tower – Suite 4850
600 Grant Street
Pittsburgh, PA  15219

**Re:  Lindquist, Tina v. Heim, L.P.**
      Your file no.:  ALFA-107530

Dear Mr. Robinson:

In accordance with your request, I have completed my review of the documents provided by your office and summarize my opinions and conclusions relative to the foot control provided by Heim for use with the Mechanical Press Brake involved in Tina Lindquist's accident on September 25, 2002.

**Documents Reviewed**

1. Complaint in Civil Action
2. OSHA Investigation file
3. Instructions and Parts Book for Heim Mechanical Press Brakes
4. Sales documentation for the Heim Press Brake
5. Corry Manufacturing Accident report file
6. Deposition testimony
   a. Tina Lindquist, taken on June 28, 2005
   b. Gary Dietz, taken on July 21, 2005
   c. Gary Merkle, taken on July 21, 2005
   d. Kevin Messinger, taken on July 21, 2005
   e. Jan Oviatt, taken on July 22, 2005
   f. Dave Phillips, taken on July 22, 2005
   g. Joel Nichols, taken on July 22, 2005
   h. Anthony Mase, Jr., taken on July 27, 2005
   i. Robert Rooney, taken on September 8, 2005
   j. Jamie Ossa, taken on September 8, 2005
   k. Zygmund Zajdel, taken on January 23, 2006

1

7. Post-accident photographs and videotape of the Heim Press Brake and tooling
8. Interrogatories and Responses
9. Document Production Requests
10. PA-OSHA Consultation Program file
11. PMA Insurance claims notes
12. Codes and Standards
    a. Safety Requirements for Power Press Brakes, ANSI B11.3- 1973, 1982 and 2002
    b. Safety Requirements for Mechanical Power Presses, ANSI B11.1-1971 and 1982
13. Linemaster Switch Corp.
    a. current product literature
    b. patent no. 2,957,960
14. Safety Literature
    a. Philosophical Aspects of Dangerous Safety Systems; Barnett and Hamilton; December, 1982
    b. Safeguard Evaluation Protocol; Barnett and Schmid; May, 1995
    c. Foot Controls – Riding the Pedal; Barnett; July, 1997
    d. Foot Control Activation – Reciprocating vs. Pivoting; Barnett and Barroso; September, 1998
    e. Safeguarding Workers and Protecting Workers from Amputations; U.S. Department of Labor, OSHA 3170, 2001

**Accident Description**

On the day of the accident, Tina Lindquist was employed at Corry Manufacturing in Corry, Pennsylvania as a press operator. She was assigned to operate the Heim power press brake, model 70-6, serial no. 2176, using a hands-in-die parts feeding and removal procedure. The press brake was equipped with a dual hand control as well as an electric foot control. The operating method was selected through the use of a supervisory key lock selector switch mounted on the dual hand control pedestal. The foot control activation method was selected and in use at the time of the injury.

Ms. Lindquist indicated she was not aware the dual hand control was available for use on the subject press brake nor was she trained to avoid reaching into the point of operation of the press. She stated she was specifically instructed to reach into the point of operation region to pre-form the workpiece around a mandrel before actuating the foot control. Indeed, reaching into the point of operation region was the only way to introduce the work into the tooling of the press.

Ms. Lindquist had a chair available to her while operating the press brake and was found seated on the chair following the accident. From her operating position at the chair, Ms. Lindquist was able to reach into the press. The foot control was positioned on the floor in front of her to the right such that she was able to access it from her operating position using her right foot.

2

While hand forming the workpiece on the mandrel, Ms. Lindquist activated the foot control causing the press brake to cycle and crushing her fingers.

## Foot Control Identification

It is understood that the foot switch control in use at the time of Mrs. Lindquist's accident was lost or disposed of following the sale of the Heim press brake by Corry Manufacturing after the accident.

According to the file documentation, the foot control originally supplied with the Heim press brake cannot be determined. However, it appears that the foot control in use at the time of the accident had a Linemaster Hercules Full Shield protecting the pedal from the top and both sides. The Full Shield is clearly shown in several photographs taken after the accident occurred. However, it is unclear whether the foot control shown in the post-accident photographs is a Linemaster product. To my knowledge, Linemaster Hercules pedals and shields, regardless of style, were painted orange. The pedal depicted beneath the shield in the photographs appears to be black.

Dave Phillips, a witness employed in Corry Manufacturing's maintenance department, indicated there are different colors of foot switches in use at Corry. There were black foot switches for the alloy machines and orange ones for the presses:

Phillips, pg. 92 to 93:

> Q. Are there any other different colors of foot switches in place at Corry?
> A. For certain machines, yes.
> Q. What other colors are there?
> A. There's little black ones for like alloy machines.
> Q. How about for the presses?
> A. They're all orange.

Hence, it is inconclusive whether the foot control assembly depicted in the photographs is a genuine Linemaster product or, perhaps, a hybrid of two different foot switch products.

On the other hand, Corry witnesses as well as the report prepared by Barnett and Ulmenstine identify a foot control equipped with a maintained latch mechanism. This feature requires full insertion of the users foot into the pedal housing to push the latch forward with the toe before the pedal can be depressed. Linemaster patented this feature in 1960 and, to my knowledge, manufactures the only foot switch with this safety feature. This foot control, currently called the "Hercules Anti-Trip Footswitch Full Shield Model"[1] is intended to help prevent accidental actuation.

**Acceptance of the Model 532-SWH Foot Control in Safety Standards**

The first safety standard that specifically addressed mechanical power press brakes was adopted in 1973, revised in 1982, reaffirmed twice, and revised again in 2002. The standard is identified as ANSI B11.3, *American National Standard for Machine Tools – Power Press Brakes – Safety Requirements for Construction, Care, and Use.*

In the report authored by Barnett and Ulmenstine, the claim is made that ANSI B11.3-1973 "is the first ANSI standard developed for press brakes. As such, it only addressed mechanical foot pedals." This claim is not accurate.

Not only does the standard recognize both mechanical and electric foot operating means, it provides terminology to distinguish each type. Note the published definitions of "Foot Control" and "Foot Pedal" in the 1973 standard[2]:

> *3.23 Foot Control.* A foot control is the foot-operated control mechanism (other than foot pedal) designed to control the movement of the ram on mechanical, hydraulic, or special-purpose power press brakes.

> *E3.23 Foot Control.* This control usually takes the form of an electrical switch that operates a solenoid or solenoid valve.

> *3.24 Foot Pedal.* A foot pedal is the foot-operated lever designed to operate the mechanical linkage that directly engages the clutch and disengages the brake on a mechanical power press brake while the pedal is held depressed.

The 1973 safety standard required that the foot control be protected against inadvertent actuation[3]:

> 4.3.4.3 *Foot Control.* A foot control, if used, shall be protected so as to inhibit accidental actuation by falling or moving objects, or by someone stepping on it.

A guard covering the top of the pedal pad was sufficient to comply with this requirement. Note that the code committee addressed the hazard of accidental actuation by using the language "stepping on" the pedal rather than "stepping into the pedal." Note that the only foot control illustration in the 1973 safety standard (Illustration 15)[4] shows an open front pedal design.

4

A foot control equipped with a top and side guarding arrangement, the equivalent to Linemaster's "Full Shield," is illustrated in the 1982[5] and 2002[6] revisions of the ANSI B11.3 safety standard.

A Linemaster "Full Shield" foot control is illustrated in the U.S. Department of Labor publication OSHA 3170, *Safeguarding Workers and Protecting Workers from Amputations.*[7] The foot control has no front lift gate and the illustration is captioned, "Properly Guarded Foot Control." Equally significant is the statement:

> "Foot controls must be guarded to prevent accidental activation by another worker or by falling material and not allow continuous cycling. They work best when the operator is in a sitting position. Always avoid the hazard of riding the pedal (keeping the foot on the pedal while not actively depressing it.)"

Note that OSHA does not require the foot control to prevent accidental activation by the foot control user, but rather "by another worker." It is correctly recognized that since the intended use of this control involves the user depressing the pedal, it is not possible to prevent the same person from inadvertently stepping into it.

The foot control involved in Ms. Lindquist's accident had two additional features to protect against inadvertent actuation of the pedal. The pedal was equipped with side guards as well as a toe latch feature that required the operator to fully insert their foot into the pedal guard and push a toe latch rearward before the pedal could be depressed. This safety feature exceeds any requirement for protection against inadvertent actuation expressed by any safety standard, past or present.

The 2002 safety standard for press brakes additionally recognizes the hazard associated with unattended actuation of the foot operating means. The supervisory key lock switch on the operator's control pedestal fulfills this requirement. When the press brake is unattended, the foot control can be disabled by turning the key in the control pedestal and removing it from the selector.

### The Modern Foot Control vs. the Mechanical Foot Pedal

As Barnett and Ulmenstine point out in their report, the mechanical foot pedal of years past is characterized by locations close to the bed of the press, large activation resistance, and large pedal movements.

The modern foot control in use at the time of the accident was tethered on a long cord estimated to be 10 to 12 ft in length. This enables the foot control to be located at a "Safe Distance" from the press. In other words, if the press is utilized with no other point of operation guarding, the foot control can be located sufficiently far from the hazard that the press operator cannot reach the hazard from the operating position. In the case of a press

5

brake, the long cord also enables the foot control to be utilized while handling large work pieces that prevent the operator from being positioned near the bed of the press. The older style of mechanical foot pedal cannot accommodate this need.

The large activation resistance and pedal height associated with the mechanical foot pedal restricts the use of this device to standing operators. Balancing on one foot is required when activating a control of this nature, not to mention the operator fatigue associated with multiple activations over many hours of press brake work. As OSHA 3170 has correctly pointed out, the electric foot control works best when the operator is in a sitting position. The sitting position all but eliminates the problem of balancing oneself on one foot and reduces the physical fatigue associated with high pedal activation forces and large pedal movements. The electric foot control can also be utilized by a standing as well as a seated operator. It is simply a more versatile control means.

There are acceptable applications for both the electric foot control as well as the mechanical foot pedal. Only the press user is capable of making an appropriate decision regarding which style of control is the best and safest to use for a given production run.

Neither the mechanical foot pedal nor the electric foot control were adequate, by themselves, to satisfy the power press brake safety standard given the tooling and operating arrangement chosen by Corry Manufacturing at the time of Ms. Lindquist's injury. Additional point of operation guarding was needed, and required, to adequately protect Ms. Lindquist.

### Foot Switch Utilized at the Time of the Accident

In their report, Barnett and Ulmenstine make reference to the footswitch in use at the time of the accident. They describe a Linemaster product

> "...constructed with an antitrip treadle mechanism, a latch
> that requires a certain foot insertion into the switch to
> depress the pedal."

This product could not have been the Linemaster Model 532-SWH originally supplied with the Heim press since the 532-SWH was not equipped with the antitrip treadle mechanism and latch trip lever. The Model 532-SWH was protected with a Full Shield covering the top and both sides of the treadle only. Indeed, according to Heim engineering drawing A-470-D, the anti-trip foot controls with latch trip lever (Linemaster Models 511-B2 and 511-B4) were not utilized by Heim until after November 9, 1982, four years after the date of manufacture of the product involved in the accident.

### The Proposed Front-Gated Foot Control

Plaintiff's experts, Barnett and Ulmenstine, have proposed that a foot control with a front gate be utilized in an effort to avoid inadvertent tripping of the foot control.

Although research conducted on foot controls concludes that a front gate further reduces the probability of an inadvertent foot insertion, the same research also demonstrates that a critical undesirable "side effect" is created by the presence of the lift gate. In his July, 1997 publication, *Foot Controls: Riding the Pedal*[8], Barnett writes:

> "...manufacturers have introduced a variety of concepts for minimizing inadvertent activation arising from 'stepping contact.' For example, top barrier guards, side shields, pedal locks, and front gates are used in various combinations. Unfortunately, as the intervention strategies become increasingly successful preventing 'stepping contact,' the foot control becomes more prone to the really insidious problem of 'riding the pedal.'"

In another publication by Barnett and Hamilton, *Philosophical Aspects of Dangerous Safety Systems*[9], December, 1982, the authors use a front-gated foot control as an example of a dangerous safety system. Originally intended to address the hazard of inadvertent foot switch actuation, the front gate resulted in encouraging the practice of riding the pedal due to the added difficulty of inserting one's foot into the pedal. In an effort to compensate for the difficulty associated with inserting one's foot into the pedal housing, the user simply held the front gate open continuously with the foot thereby riding the pedal at those times when the foot should otherwise be removed entirely from the foot control. Barnett and Hamilton wrote[9]:

> "Recently completed research has confirmed what some press manufacturers hypothesized – the mousetrap design is unsafe for most punch press operations since it encourages the practice of 'riding the pedal'"

When a safety system offers an accident hazard potential of its own, there is unequivocal agreement in the safety literature against the use of the safety system. This safety philosophy is highlighted in the December, 1982 publication by Barnett and Hamilton. For example, the National Safety Council wrote in 1975[9]:

> "It is a cardinal rule that safeguarding one hazard should not create an additional hazard."
> [Handbook of Occupational Safety and Health]

Numerous other safety organizations and publication authors have written similar admonitions including:

- Occupational Safety Management and Engineering, Willie Hammer, 1981
- Concepts and Techniques of Machine Guarding, OSHA 3067, 1980
- Motor Operated Appliances, UL 73, Underwriters Laboratories, 1978

- Accident Prevention Manual for Training Programs, American Technical Society, 1975
- Code of Practice: Safeguarding of Machinery, British Standards Institution, 1975
- Machine Guarding, National Safety News, 1971
- General Requirements for All Machines, 29 CFR 1910.212(a)(2), OSHA, 1971
- Supervisors' Safety Manual, National Safety Council, 1970
- Industrial Safety, 3rd ed., Roland P. Blake, 1963
- Guards Illustrated, 1st ed., National Safety Council, 1962
- The Principals and Techniques of Mechanical Guarding, Bureau of Labor Statistics No. 197, U.S. Dept. of Labor, 1959
- Safety Manual for the Graphic Arts Industry, National Safety Council, 1953
- Model Code of Safety Regulations for Industrial Establishments for the Guidance of Governments and Industry, International Labour Office, 1949
- Mechanical Power transmission Apparatus, National Safety Council, 1949
- American Safety Standard Code for Power Presses and Foot and Hand Presses, ANSI B11.1-1948, American National Standards Institute, 1948
- Accident Prevention Manual for Industrial Operations, 1st ed., National Safety Council, 1946
- Occupational Accident Prevention, Judson and Brown, 1944
- Safety Subjects, Bulletin 67 of Division of Labor Standards, U.S. Dept. of Labor, 1944
- Foremanship and Safety, Macmillan, 1943
- Practical Safety Methods and Devices, Cowee, 1916

The undersigned was both a participant and proctor in the foot switch experiments conducted by Barnett in reaching the above-stated conclusion regarding the "riding the pedal" problem.

In February, 1988, Barnett and the undersigned co-authored a publication entitled, *Principles of Human Safety*[10]. The philosophical problem of how to treat safety devices which have a downside is considered. Individual designers and manufacturers should not adopt safety devices that create a new hazard. In those instances when a downside exists with the use of a safety device, a value system (for example, the judicial value system, safety standards committee, etc.) must weigh the upside and downside effect of the particular safeguarding system. If the upside effects are sufficiently compelling, permission is granted to use the safeguard. It is acceptable for an educated consensus group (value system) to make a decision about the use of a safety system that includes a downside, but it is not acceptable for an individual person or individual manufacturer to make a decision of this nature.

The seatbelt is a classic example of a safety device that includes downside effects which has been adopted by a value system and is required on all modern automobiles. The Food and Drug Administration is a classic example of a value system that routinely approves products that involve adverse side effects when the positive effects are judged to sufficiently outweigh the negative side effects.

8

No value system, i.e. no safety code or standard committee, to date, has made a judgment, recommendation or requirement that foot controls must include a front gate. Clearly, using the method outlined above for evaluating the proposed front gate for foot controls, the safety device must be rejected by an individual designer or product manufacturer due to the new hazard introduced (i.e. riding the pedal and the associated potential for inadvertent control actuation).

**Further Evaluation of the Proposed Front Gate**

In May, 1995, Barnett and Schmid published a paper entitled, *Safeguard Evaluation Protocol – A decision Tree for Standardizing, Optionalizing, Prohibiting, Ignoring, Enhancing, or Characterizing Safeguards*[11]. The publication describes a protocol developed for assessing whether a candidate safeguard should be prohibited. Barnett and Schmid wrote:

> "This decision making process intellectually disposes of the judicial position that a manufacturer has a nondelegable duty to include safety devices with his machines. It further challenges the advocacy pronouncement that 'safety should not be optional.'"

Utilizing the Machine Supplier Safeguard Decision Tree described in the paper, the proposed safety feature is the front gate for a foot switch control. Next, it is noted that there is no Value System Approval for the proposed safeguard. Next the proposed safeguard must be classified with regard to helping, hurting and/or doing nothing. The foot control gate either helps (reduces the probability of inadvertent pedal actuations) or hurts (increases the potential for riding the pedal thereby increasing the probability of inadvertent actuation).

The decision tree is abundantly clear. The proposed safeguard must not be used.

**Conclusions and Opinions**

1.  The Linemaster Hercules foot control exceeded the safety requirements of the governing safety standard, ANSI B11.3-1973 at the time the accident occurred. In addition to the top guard protecting the pedal from the required hazard of inadvertent actuation from falling objects or stepping onto the pedal, the Linemaster foot control was also equipped with side guards and a toe latch feature. The side guards and toe latch features further decrease the probability of inadvertent pedal actuation.

2.  It is not possible to prevent someone from inadvertently stepping into the pedal when the intended use of the pedal involves stepping into it. This holds true for the proposed front gate. Its use is not a guarantee that an inadvertent actuation will not or cannot occur.

9

3. A top guard alone adequately addresses the ANSI B11.3 requirement of preventing inadvertent actuation due to stepping onto the pedal.

4. A foot control with top and side guard is illustrated in both the 1982 and 2002 revisions of the power press brake safety standard. This style of foot control is acceptable for selection by a reasonable machine tool manufacturer. Heim's choice of foot control, i.e. covered on the top and both sides) exceeded what was considered reasonably safe by the B11.3 safety code committee. The foot control in use at the time of the accident, i.e. with top and side guards and toe latch feature further exceeded the code requirement for protection against inadvertent actuation.

5. The addition of a lift gate onto the front of a foot control does not eliminate the probability of inadvertent actuation of the pedal.

6. The teathered cord feature of the electric foot control allows it to be utilized at a "Safe Distance" from the point of operation. It also allows for its use by a seated operator. The older mechanical foot pedal does not share either of these features. In addition, the electric foot control significantly reduces operator fatigue due to lower actuation forces and reduction of the need to stand balanced on one leg when compared to the older mechanical foot pedal.

7. The work being conducted by Ms. Lindquist at the time of her injury was compatible with either a mechanical foot pedal or an electric foot control. However, neither style of foot actuating means alone was adequate to protect Ms. Lindquist from the point of operation. Corry Manufacturing should have selected a two-hand control device of provided additional barrier guarding to prevent Ms. Lindquist from accessing the point of operation during the press brake operating cycle.

8. The anti-trip Linemaster footswitch product with latch trip lever in use at the time the accident occurred could not have been the foot control product supplied by Heim with the press brake in 1978. Heim did not begin to utilize the foot control with latch trip lever until late in 1982.

9. According to foot control research conducted by Barnett, the addition of a lift gate onto the front of a foot control creates a new hazard by encouraging the user to ride the pedal thereby increasing the potential for inadvertent actuation.

10. An individual manufacturer such as Heim has a responsibility to reject safeguards which create new hazards such as the proposed lift gate on a foot control.

11. There is unequivocal agreement in the safety literature against the use of safeguards that create a new hazard.

12. No value system has weighed the upside and downside effects of the proposed foot control lift gate and found the upside effects to be sufficiently compelling to grant permission to use the safeguard or to make its use mandatory.

10

13. Utilizing the *Safeguard Evaluation Protocol* published by Barnett and Schmid, the proposed lift gate feature for foot controls must be rejected.

14. The presence of a lift gate on a foot control has no effect on the misuse of riding the pedal since an operator who is committing this unsafe act has already bypassed the lift gate through failing to remove the foot after each pedal actuation. There is no foot control or foot pedal design that prevents the misuse of riding-the-pedal.

15. The foot control in use at the time of Ms. Lindquist's accident was reasonably safe for its intended use on the Heim press brake.

All of my opinions outlined above are stated to within a reasonable degree of engineering and scientific certainty.

**Future Consulting Activities**

The undersigned reserves the right to amend this report in the event additional information becomes available. For example, it is anticipated that a copy of the videotaped foot control testing by Barnett and Ulmenstine will be supplied. Commentary and opinions regarding this information will be forthcoming after the tests are reviewed.

Very truly yours
Switalski Engineering Inc.

*William G. Switalski*

William G. Switalski, P.E.
Mechanical Engineering Safety & Design Consultant

11