# EXHIBIT "A"

**MEDICAL EXPENSE INDEX**
**TINA LINDQUIST**
**DATE OF LOSS:   09/25/2002**
**PAGE 1 of 4**

| PAGE | PROVIDER | DATE OF SERVICE | EXPENSE |
|------|----------|-----------------|---------|
| 001001-02 | Corry Ambulance Service Inc | 09/25/02 | 856.36 |
| 002001-05 | Emergency Div of TSES | 09/25/02 | 6,136.40 |
| 003001-27 | Hamot Medical Center | 09/25/02 thru 10/07/02 | 39,165.10 |
| | | 02/17/03 thru 02/18/03 | 9,250.20 |
| | | 08/11/03 | 2,139.40 |
| | | 09/02/03 | 5,896.00 |
| | | 10/08/03 | 3,393.80 |
| | | 12/08/03 thru 12/12/03 | 26,995.00 |
| 004001-05 | Regional Health Management Services, Inc. | 09/25/02 | 160.00 |
| | | 09/25/02 | 40.00 |
| | | 09/02/03 | 2,081.00 |
| | | 08/11/03 | 199.00 |
| | | 10/08/03 | 444.00 |
| 005001-09 | Anesthesiologist of Erie | 09/25/02 | 2,246.00 |
| | | 09/30/02 | 364.00 |
| | | 10/04/02 | 918.00 |
| | | 04/21/03 | 816.00 |
| | | 02/17/03 | 1,224.00 |
| | | 12/08/03 | 4,998.00 |
| | | 05/03/04 | 364.00 |
| | | 03/07/05 | 660.00 |

MEDICAL EXPENSE INDEX
TINA LINDQUIST
DATE OF LOSS:  09/25/2002
PAGE 2 of 4

| PAGE | PROVIDER | DATE OF SERVICE | EXPENSE |
|------|----------|-----------------|---------|
| 006001-20 | John Hood, M.D. | 09/25/02 | 16,000.00 |
| | | 09/30/02 | 75.00 |
| | | 10/05/02 | 1,675.00 |
| | | 10/15/02 | n/c |
| | | 10/18/02 | 90.00 |
| | | 10/25/02 | n/c |
| | | 11/01/02 | n/c |
| | | 11/06/02 | n/c |
| | | 11/22/02 | n/c |
| | | 12/06/02 | n/c |
| | | 12/27/02 | n/c |
| | | 02/04/03 | 45.00 |
| | | 02/17/03 | 3,400.00 |
| | | 02/21/03 | n/c |
| | | 02/28/03 | n/c |
| | | 03/28/03 | n/c |
| | | 04/21/03 | 3,400.00 |
| | | 04/29/03 | n/c |
| | | 07/22/03 | 90.00 |
| | | 08/19/03 | 90.00 |
| | | 09/17/03 | 45.00 |
| | | 10/10/03 | 45.00 |
| | | 10/17/03 | n/c |
| | | 12/08/03 | 13,800.00 |
| | | 12/15/03 | 130.00 |
| | | 12/23/03 | n/c |
| | | 12/31/03 | n/c |
| | | 01/30/04 | 45.00 |
| | | 04/07/04 | 90.00 |
| | | 05/03/04 | 1,000.00 |
| | | 05/11/04 | 35.00 |
| | | 07/13/04 | 45.00 |
| | | 09/21/04 | 90.00 |
| | | 12/22/04 | 90.00 |
| | | 02/16/05 | 45.00 |
| | | 03/07/05 | 1,320.00 |
| | | 03/16/05 | n/c |
| | | 04/27/05 | n/c |
| | | 08/24/05 | 165.00 |
| | | 01/10/06 | 90.00 |
| | | 01/30/06 | 3,300.00 |
| | | 02/07/06 | n/c |
| | | 04/19/06 | n/c |
| 007001-06 | Erie Pathology | 09/26/02 | 326.00 |
| | | 10/07/02 | 50.00 |
| | | 04/21/03 | 215.00 |
| | | 03/07/05 | 100.00 |

MEDICAL EXPENSE INDEX
TINA LINDQUIST
DATE OF LOSS:   09/25/2002
PAGE 3 of 4

| PAGE | PROVIDER | DATE OF SERVICE | EXPENSE |
|------|----------|-----------------|---------|
| 008001-35 | Helpmates Inc. | 10/07/02 thru 02/26/04 | 44,171.25 |
| | | 03/2004 | 1,332.00 |
| | | 04/2004 | 468.00 |
| | | 05/2004 | 1,629.00 |
| | | 06/2004 | 1,098.00 |
| | | 07/2004 | 1,026.00 |
| | | 08/2004 | 1,089.00 |
| | | 09/2004 | 900.00 |
| | | 10/2004 | 936.00 |
| | | 11/2004 | 1,102.50 |
| | | 12/2004 | 882.00 |
| | | 01/2005 | 801.00 |
| | | 02/2005 | 837.00 |
| | | 03/2005 | 1,332.00 |
| | | 04/2005 | 828.00 |
| | | 05/2005 | 486.00 |
| 009001-02 | Counseling Services Center | 10/17/02 | 95.00 |
| | | 11/04/02 | 85.00 |
| | | 11/11/02 | 85.00 |
| | | 11/18/02 | 85.00 |
| | | 12/02/02 | 0.00 |
| 010001-05 | Hamot Surgery Center | 04/21/03 | 3,640.00 |
| | | 05/03/04 | 3,922.00 |
| | | 03/07/05 | 1,299.00 |
| | | 01/30/06 | 1,782.00 |
| 011001-09 | Great Lakes Home Healthcare | 10/16/02 thru 12/26/02 | 8,572.91 |
| 012001-05 | West-Ten Podiatry Centre, Inc. (Chris Nelson DPM) | 08/12/04 | 111.00 |
| | | 08/19/04 | 1,326.00 |
| | | 09/02/04 | 70.00 |
| | | 09/16/04 | 44.00 |
| 013001-06 | Hand and Arthritis Rehab | 09/28/04 | 400.00 |
| | | 11/15/04 | 471.00 |
| | | 02/07/06 | 153.00 |
| | | 02/28/06 | 77.00 |
| | | 03/24/06 | 121.00 |
| | | 04/24/06 | 113.00 |
| 014001-02 | Exogen | 04/15/04 | 3,237.80 |

MEDICAL EXPENSE INDEX
TINA LINDQUIST
DATE OF LOSS:  09/25/2002
PAGE 4 of 4

| PAGE | PROVIDER | DATE OF SERVICE | EXPENSE |
|------|----------|-----------------|---------|
| 015001-03 | Prescriptions (Rite Aid) | 10/07/02 thru 05/03/04 | 788.00 |
| 016001-02 | Mariano Loveranes, M.D. | 11/07/02 11/14/02 02/24/03 | 75.00 75.00 75.00 |
| 017001-02 | Susan Kaufman, D.O. | 02/10/04 | 80.00 |
| 018001-03 | Ching Wu Hou, M.D. | 01/26/06 03/15/06 | 150.00 95.00 |
| 019001-02 | Erie Women's Health Partners (Francis Tseng, M.D.) | 07/07/05 | 115.00 |
| 020001-03 | Corry Memorial Hospital | 01/27/06 | 66.00 |

**Total Medical Expenses to Date    $240,363.72**

Initial 03/18/04-dlq
Updated 05/17/06-dlq

# EXHIBIT "B"



**KNOX McLAUGHLIN GORNALL & SENNETT**

*A Professional Corporation*

120 West Tenth Street
Erie, Pennsylvania 16501-1461
814-459-2800
Fax 814-453-4530
www.kmgslaw.com

Richard E. Bordonaro
Direct Dial Number
814-459-9886 Ext. 286
rbordonaro@kmgslaw.com

May 19, 2006

*Via fax 833-9415 and U.S. mail*

RICHARD H. ZAMBOLDI
JACK M. GORNALL
HARRY K THOMAS
MICHAEL A. FITZNER
JAMES T. MARNEN
MICHAEL J. VISNOSKY
DONALD R. WRIGHT, JR.
RICHARD W. PERHACS
ROBERT G DWYER
R. PERRIN BAKER
MARK E MIODUSZEWSKI
CARL N MOORE
DAVID M. MOSIER
THOMAS A. TUPITZA
GUY C. FUSTINE
RICHARD E. BORDONARO
BRIAN GLOWACKI
JOHN O. DODICK
FRANCIS J. KLEMENSIC
TIMOTHY M. SENNETT
WILLIAM C. WAGNER
PATRICIA X. SMITH
MARK T. WASSELL
RICHARD A. LANZILLO
JOANNA K BUDDS
PETER A. PENTZ
MARK G. CLAYPOOL
THOMAS C. HOFFMANN
MARK J. KUHAR
CHRISTOPHER J SENNOTT
TIMOTHY M. ZIEZIULA
JENNIFER E. GORNALL-ROUCH
MARK A. DENLINGER
JEROME C. WEGLEY
TRACEY D. BOWES
NEAL R. DEVLIN
NADIA A. HAVARD

OF COUNSEL:
WILLIAM C. SENNETT
EDWIN L. D. McKEAN

Barbara J. Welton, Esquire
2530 Village Common Drive, Suite B
Erie, PA  16505

RE:    Claim No.:    W8902-22438
       Employer:    **Corry Manufacturing Co.**
       Employee:    **Tina Lindquist Ossa**
       D/Loss:    **09/25/02**

Dear Ms. Welton:

As you requested, I am faxing you a copy of the PMA computer run setting forth the amount of its subrogation lien to date. Obviously, this amount will continue to grow since your client receives ongoing weekly indemnity benefits, as well as reasonable, necessary and causally related medical payments. As of Friday, May 19, 2006, however, the total amount of indemnity paid to date is $50,146.70 and medical is $199,739.57, for a total Section 319 subrogation lien of $249,886.27. PMA continues to assert its subrogation rights, in full, over any recovery received by your client in her third party action(s). I trust you and Atty. Hartman will continue to keep me updated regarding the status of the pending third-party case.

Please call if there is anything further you require. Thank you.

Very truly yours,

KNOX McLAUGHLIN GORNALL & SENNETT, P.C.

By: _Richard E. Bordonaro_
      Richard E. Bordonaro

REB:tss
Enclosure
# 672281

Page: 1 Document Name: untitled

```
               WORKERS' COMP PAYMENT DETAIL INFORMATION          12:44:53
---------- 98 EXPENSES ------------------------------- PAGE 034 OF 034 ----
CLAIM NUMBER .: W 89 02 22438              POLICY NUMBER: 200200 122954J
INJURED'S NAME: TINA LINDQUIST-OSS        CORRY MANUFACTURING CO.

F   FORM      RECORD      CHECK    CHECK    LE    PAID     CR    I R S       S
C   NUMBER    DATE        NUMBER   DATE     CD    AMOUNT   CD    N U M B E R  T
                      ************************************
          SUBTOTAL COMP - (LC 1 THRU 6, 20, 21)            50,146.70
          SUBTOTAL COMP - SUPPLEMENTAL (LC 22)                  .00
          SUBTOTAL COMP - VOC/REHAB (LC 50, 51, 52, 53)         .00
          SUBTOTAL MED  - (LC 80, 81)                     199,739.57
          SUBTOTAL ANN  - (LOSS LINE 40)                        .00
          SUBTOTAL EXP  - (LOSS LINE 98)                   18,531.63
          G R A N D   T O T A L   (EXCL. ANNUITY)        268,417.90
             CASH CREDIT CODE 9 TOTAL                           .00
             GRAND TOTAL (EXCL. ANNUITY & CR CODE 9)      268,417.90


--------------------------------------------------------------------------
ENTER=CONTINUE                    PF5=FULL PRINT  PF6=CHK HISTORY   CLEAR=EXIT
```

# EXHIBIT "C"

# FORENSIC HUMAN RESOURCES
413 Sylvania Drive
Pittsburgh, PA 15229

Phone: (412) 260-8000

Fax: (412) 364-7221

November 11, 2005

Mr. Dallas W. Hartman, Esq.
Dallas W. Hartman, PC
2815 Wilmington Road
New Castle, PA 16105

Dear Mr. Hartman:

This report has been prepared and is submitted in response to your request for an economic loss evaluation in the case of your client, Tina Lindquist Ossa.

You asked that we become familiar with your client's background and current circumstances in order to provide an opinion as to the labor economic effects as a result of a workplace accident on September 25, 2002. We interviewed Ms. Ossa and reviewed her educational background and work history. We also reviewed the following documents:
- Discharge summary from Hamot Medical Center, dated October 7, 2002;
- Discharge summary from Hamot medical Center, dated December 12, 2003;
- Copy of transcript of Ms. Lindquist Ossa's deposition conducted June 28, 2005; and,
- Pennsylvania Department of Labor, Bureau of Workers' Compensation Form LIBC-495

Tina Lindquist Ossa was born June 24, 1982, and is currently 23 years old. She graduated from Corry Area High School in 2000. After graduation, she started work at a Pizza Hut but after five months, she changed jobs and began work at Corry Manufacturing. She earned $7.13 per hour, $14,830 per year. She also received employee benefits, including medical insurance, which we estimate have an average value of 29.6% of her wages ("*Employer Costs for Employee Benefits — June 2005,*" US Department of Labor, Bureau of Labor Statistics, USDL 05-1767, September 16, 2005)

Ms. Lindquist Ossa was involved in a workplace accident on September 25, 2002, when she suffered a crush injury to both hands. The October 7, 2002, discharge summary diagnosis was "Crush injury to bilateral hands with amputations of the index, long, ring and small fingers of bilateral hands." The ring and middle fingers of the right hand were reattached. On December 8, 2003, Ms. Ossa underwent an additional surgery at which time a toe from her right foot was transferred to her left hand. She indicated that she has had eleven or twelve surgeries to date.

Ms. Lindquist Ossa is concerned about the impact her physical restrictions will have upon her ability to earn a living. She will no longer be able to work in a job that requires manual dexterity, nor will she be able to work in a sedentary position that requires keyboarding skills, without

*Expert Witness in Matters of Employability, Lost Earnings*
*and Diminished Earning Capacity*

adaptive technological assistance. Also, with her physical restrictions, she will face a number of obstacles in a job search, among them is the fact that "[a]nother possible explanation for the low employment rate [of people with disabilities] is that employers are reluctant to hire people with disabilities because of the perceived risk associated with hiring an individual who may require costly supports or lag behind in productivity." (Bricourt, John C. and Bentley, Kia J., "*Disability Status and Perceptions of Employability by Employers*," Social Work Research, Vol 24, no 2, June 2000, pp 87-95.). The US Census Bureau, using data from the 2000 Census, shows that, in Pennsylvania, 30.2% of those women with a physical disability between 21 and 64 years old are employed and that only 17.2% worked full-time year-round in 1999 (U.S. Census Bureau, *Disability Status of the Civilian Noninstitutionalized Population by Sex and Selected Characteristics for the United States and Puerto Rico 2000 (PHC-T-32)*. In Erie County, PA, 7.2% of the women ages 21 to 64 report a physical disability and of that number, only 31.2% were employed (Houtenville, Andrew J. 2005. "Disability Statistics in the United States." Ithaca, NY: Cornell University Rehabilitation Research and Training Center on Disability Demographics and Statistics (StatsRRTC). www.disabilitystatistics.org Posted April 4, 2005.) The CWIA publication, "Summary of Pennsylvania UC Covered Employment by County and Industry, 1st Quarter, 2005." shows that employment in Erie County grew by 2.1% from the previous year with the majority of that employment growth in the mining (42.0%), transportation (17.0%) and certain manufacturing industry segments (Beverage (14.8%), Petroleum and Coal Products (73.7%) and Machinery Manufacturing (23.5%))

These data are general in nature, addressing a wide range of disabilities and the impact on employment. They do not focus on a specific type of work disability. The most specific study on how injuries impact earning capacity was published by the US Department of Veteran's Affairs. *The Code of Federal Regulations, 38 Part 4* contains a Schedule of Disability Ratings in which the VA rates the impact on earning capacity that a particular injury is projected to have. The CFR percentage ratings "represent as far as can practicably be determined the average impairment in earnings capacity resulting from such diseases and injuries and their residual conditions in civil occupations" (§4.1). Amputation of multiple fingers (§4.71A. Code 5131) carries a loss rating of 80% (d) of that section states:

> Amputation or resection of metacarpal bones (more than one-half the bone lost) in multiple finger injuries will require a rating of 10 percent added to (not combined with) the ratings, multiple finger amputations, subject to the amputation rule applied to the forearm

*The New Worklife Expectancy Tables, Revised 2002.* (Vocational Econometrics, Inc., Louisville, KY, 2002) cites the future worklife expectancy of a female who graduated high school, age 23, who is unimpaired, that is with no work disability, as 30.3 years

In calculating Ms. Lindquist-Ossa's future lost earnings capacity, we take into account the fact that she was at the beginning of her career and that this career opportunity was eliminated. Had she been able to continue to work in manufacturing, it is reasonable to expect that her wages would increase over the course of her worklife expectancy. To reflect that increase in her knowledge, skills and ability and the resultant increase in wages she would have enjoyed, we

Tina Lindquist Ossa                                                           Page 3

used data from the Pennsylvania Department of Labor and Industry website,
http://www.paworkstats.state.pa.us/, that show the median wage for employees in the
manufacturing segment of the Erie County economy is $12.93 per hours ($26,897 per year)
Another scenario to consider is that Ms. Lindquist-Ossa may move to other locations within
Pennsylvania to pursue better paying job opportunities  The median wage for the manufacturing
sector in the Commonwealth is $30,948 per year

Past Lost Income:   (September 25, 2002 – November 3, 2005)

| | | |
|---|---|---|
| Wages: | ($14,830 X 3 1 years) | $46,057 |
| Benefits: | ($46,057 X 29 6%) | $13,633 |
| | | |
| Total past lost income: | | $59,689 |

Future Lost Earnings Capacity:

Median manufacturing wage in Erie County:
Wages:    ($26,897 X 30 3 years)    $814,979

| | | |
|---|---|---|
| Loss rating: | ($814,979 X 80%) | $651,983 |
| Lost benefits: | ($651,983 X 29 6%) | $192,987 |
| | | |
| Total future lost earnings capacity: | | $844,970 |

Median manufacturing wage in Commonwealth of Pennsylvania:
Wages:    ($30,948 X 30.3 years)    $937,724

| | | |
|---|---|---|
| Loss rating: | ($937,724 X 80%) | $750,180 |
| Lost benefits: | ($750,180 X 29.6%) | $222,053 |
| | | |
| Total future lost earnings capacity: | | $972,233 |

Ms. Lindquist Ossa's total lost income, both past lost wages and benefits and future lost earnings
capacity, is in the range $904,660 to $1,031,922. to a reasonable degree of professional certainty

We reserve the right to amend this report should additional information be made available.

Very truly yours,

Donal F  Kirwan. SPHR

# EXHIBIT "D"



Hand, Microsurgery and Reconstructive Orthopaedics, LLP

December 12, 2005

John D. Lubahn, MD, FACS
Mary Beth Cermak, MD
John M. Hood, MD
D. Patrick Williams, DO

300 State Street, Suite 205
Erie, PA 16507

Phone: 814/456-6022
FAX: 814/ 456-7040
e-mail: hmro@erie.net

Board Certified
Specialty Trained

Dallas W. Hartman, Esquire
2815 Wilmington Road
New Castle, PA 16105

RE: Tina Lindquist Ossa

Dear Attorney Hartman:

My original diagnosis of Tina on the day that I first saw her was amputations of both hands of her index, long, ring and small fingers both left and right hand

The course of her treatment was, initially, several hours of surgery under general anesthetic for an attempt at replantation of multiple digits  Out of the mangled mess of digits that we were given we attempted to replant four of them two on each hand. Out of those the two digits on the left hand, I believe, survived and the two digits on the opposite hand did not survive. She was in the hospital for several weeks.  She had blood transfusions and multiple operations for debridement of the necrotic tissues.

She was home as an outpatient and under direct care and needed 24 hour care because of the inability of taking care of herself since both hands were severely involved.  She had quite a bit of pain and discomfort throughout this time frame, which we treated, with oral analgesics  As the healing continued and signs of bony fusion took place we were able to start increasing the activity levels of the hands.

It was soon evident, however, that the hand in which the digits failed to survive needed more length to make it a somewhat reasonable hand  In an effort to improve function we proceeded with a second toe to third metacarpal transfer. This, again, was several hours of surgery, about 6 to 8 as I recall, requiring several days of inpatient hospitalization, significant pain and potentially risky anticoagulation to maintain the viability of the transplanted toe to the hand  This faired reasonably well except for failure of the bone to

Dallas W. Hartman, Esquire
RE: **Tina Lindquist Ossa**
December 12, 2005
Page 2

heal at which point we proceeded with procedures to try to encourage and entice the bone to heal. This finally was successful.

She has, at this point, short digits on the one hand in the long and ring position which have poor flexibility but can be used in gross grasping  No fine manipulative maneuvers are really possible with this hand and this is the better of her two hands.  The contra lateral side having the toe to hand transfer is somewhat useful for activities requiring a small amount of pinch force in a relatively small size of objects, because anything too large does not fit between the span of her thumb and toe.

She is going to have severe limitations in her ability to perform even daily activities such as washing herself and clothing herself will be an arduous chore and difficult in the form of having difficulty zippering, buttoning, and tying

She may need further surgical intervention for the possibility of either a bone lengthening of the remnant of the index finger of the hand that has the toe transposed or the possibility of another second toe to hand transfer to try to improve the power on that hand.

If those are the case, the cost of those surgeries will be in the $10,000.00 to $20,000.00 dollars  category for physician cost and probably close to a $100,000.00 dollars or so for  cost of intensive care units and hospital stays, medication and such.

I do not believe that she will be prone to arthritic conditions secondary to this per se,  because she doesn't have any fingers or joints associated with those fingers.  Nor is she capable of performing activities to the level to where out the joints in a significantly quickened fashion.

She also has significantly lost her ability to perform gainful employment activities at her level of education. She has probably lost close to 70% of her

Dallas W. Hartman, Esquire
RE: Tina Lindquist Ossa
December 12, 2005
Page 3

ability to use the upper extremities in an effective fashion secondary to her bilateral multiple amputations.

Sincerely,

John M. Hood, M.D.

JMH/bas

# Hand Microsurgery and Resconstructive Orthopaedics, LLP
### 300 State Street, Suite 205 Erie, Pennsylvania, 16507
### Phone (814) 456-6022Fax (814) 456-7040
### Email: hmro@erie.net

John D Lubahn, MD, FACS                    Mary Beth Cermak, MD
John M. Hood, MD                           D. Patrick Williams, DO

February 21, 2006


Dallas W Hartman, Esquire
2815 Wilmington Road
New Castle PA 16105

RE: Tina Lindquist-Ossa

Dear Attorney Hartman:

My opinions in my previous letter dated December 12, 2005 were delivered within a reasonable degree of medical certainty

In regard to what effect the loss of eight fingers has on Tina Lindquist's life; with this severe nature of her loss and the incomplete return of function of those parts that we were able to save, she has marked difficulty with the simplest tasks. Opening a door is a very difficult, turning a key is difficult, brushing her teeth, trying to get a small cap off of the tube and then holding the toothbrush took months for her to learn how to do Things like buttons are nearly impossible for her to do Tying her shoes is something that is extremely difficult to do due to the extreme nature of the loss that she has sustained with her hands Doing anything that requires any amount of reasonable degree of force with something along the lines of mixing batter for brownies is extremely difficult because she cannot grasp and pull a spoon through a thick batter Taking care of a child; the fine snaps and small buttons are going to be extremely difficult if not impossible for her to deal with and to function with a small baby. These are the types of things that most of us take for granted, but in this case are very difficult if not impossible for her to do on her own.

These opinions are given within a reasonable degree of medical certainty

Sincerely,

John M Hood, M D.

JMH/bas

EXHIBIT "E"



**Triodyne Inc.**

Consulting Scientists - Safety Philosophy & Technology

666 Dundee Road, Suite 103, Northbrook, IL 60062-2702
(847) 677-4730 FAX: (847) 647-2047
e-mail: triodyne@triodyne.com
www.triodyne.com

February 13, 2006

Dallas W. Hartman
Dallas W. Hartman PC
2815 Wilmington Rd.
New Castle, PA 16105

SAFETY SCIENCE:
Triodyne Inc.
(Est. 1969)
*Officers*
Ralph L. Barnett
Dolores Gildin

*Departments*
Safety Research
Library Services
Information Products
Expert Transcript Center (ETC)
Graphic Communications
Training and Editorial Services
Vehicle Laboratory
Business Systems
Facilities Management
Model Laboratory
2721 Alison Lane
Wilmette, IL 60091-2101


CONSTRUCTION:
Triodyne-Wangler
Construction Company Inc.
(Est. 1993)
666 Dundee Road, Suite 103
Northbrook, IL 60062-2702
(847) 677-4730
FAX: (847) 647-2047

*President*
Ralph L. Barnett


SAFETY PRODUCTS:
Triodyne Safety
Systems, L.L.C.
(Est. 1998)
666 Dundee Road, Suite 103
Northbrook, IL 60062-2702
(847) 677-4730
FAX: (847) 647-2047

*Officers/Directors*
Ralph L. Barnett
Paula L. Barnett
Joel I. Barnett

*President*
Peter W. Warner


SAFETY RESEARCH:
Institute for Advanced
Safety Studies
(Est. 1984)
666 Dundee Road, Suite 103
Northbrook, IL 60062-2702
(847) 559-1266
FAX: (847) 647-2047

*Chairman*
Ralph L. Barnett

Re:  Lindquist v. Heim

Mr. Hartman:

Pursuant to your request we have reviewed and analyzed the materials provided to us in reference to the above captioned matter.  Our initial opinions are contained in this report.

I.    Materials Reviewed
- ANSI B11.3-1973
- ANSI B11.3-1982
- ANSI B11.3-2002
- ANSI B11.1-1971
- ANSI B11.1-1982
- Deposition of Tina Lindquist
- Deposition of Anthony Mase Jr.
- Deposition of Zygmund Zajdel
- Answers to Plaintiff's Interrogatories – Second Set and
- Request For Production of Documents – Second Request
- Heim Instructions and Parts Book
- Linemaster Product Literature/Catalogs
- Heim Product Literature
- Photographs
- Videotape

In addition to review of materials, Triodyne has completed an inspection of the Heim press brake as well as conducted footswitch experiments.

II.    Accident Description

At the time of her accident, Ms. Tina Lindquist was the operator of a Heim Model 70-6 press brake at Corry Manufacturing.  The operation being performed was the

bending of a perforated exhaust piece about a mandrel. By mandate of Corry Manufacturing, this operation required the use of the Heim-supplied footswitch rather than the hand controls retrofitted by the employer, and also required that the operator use his or her hands to fit the stock piece to the mandrel. Footswitch control is selected by use of a supervisor's key.

It was during this hand-fitting of the stock piece that Ms. Lindquist's foot inadvertently and unintentionally entered the footswitch and activated the Heim press brake, causing devastating injury to Ms. Lindquist's hands.

III.    Identification

The press brake has been identified as a Heim Model 70-6, Serial 2176, sold in 1978 to HB Machinery and shipped to Avco Lycoming.

The manual for the subject machine illustrates a Linemaster footswitch, which, based upon the interrogatories/document production of Heim is a Model 532-SWH, a Hercules Heavy Duty Footswitch with a "Full Shield." This is consistent with photographs of the subject footswitch after the accident.

Photographs taken of the accident footswitch illustrate a Linemaster footswitch which is not constructed with a safety gate. It is constructed with an antitrip treadle mechanism, a latch that requires a certain foot insertion into the switch to depress the pedal. Figure 1 below is a page from the 1977 Linemaster catalog which illustrates the Linemaster model shipped by Heim and used by Ms. Lindquist at the time of her accident.



**Figure 1:  The 1977 Hercules Heavy Duty Footswitch**

## IV.    The Linemaster Safety Footswitch

The Linemaster Switch Corporation introduced a safety footswitch for sale as a special order item in 1976.  By May 1977, the safety footswitch was listed as a standard catalog item and consisted of the following features:

- A shield that covered the top and sides of the footswitch and came in two sizes to accommodate large workshoes.

- Anti-trip treadle latch mechanism that latches the pedal against activation by shallow insertions.
- A safety gate that must be raised to permit foot insertion.

The Anti-Trip Foot Control with Gate, which was advertised to prevent accidental activation, is illustrated at the top right in Figure 2, which depicts a page from the 1977 Linemaster catalog. As seen by the page numbers, Figure 2 is the page directly preceding the page shown in Figure 1.



Figure 2: The 1977 Anti-Trip Foot Control with Gate Option

In 1977, Linemaster notified the marketplace of their new Anti-Trip models which included safety gates. They did this in their booth at the 1977 Design Engineering Show and they prepared a letter which they sent to their customers on May 31, 1977. These actions were a continuation of their efforts to produce the switch first produced by special order in 1976.

V.    History

The Heim press brake which is the subject of the above captioned litigation was manufactured as a General Purpose Mechanical Press Brake in 1978. The machine was designed to be activated by an electric foot control. At the time of manufacture the minimum requirements for the safety of press brakes were set forth in the American National Standard Safety Requirements for the Construction, Care, and Use of Power Press Brakes, ANSI B11.3-1973. This document is the first ANSI standard developed specifically for press brakes. As such, it only addressed mechanical foot pedals. Every illustration in ANSI B11.3-1973 that depicts a foot control has been assembled in Appendix A of this report.

It may be observed in Appendix A that Illustrations 1, 3, 12, 13, and 23 show a horizontal foot treadle shaft that allows the foot pedal to be located anywhere along the bed of the press brake. Illustration 14 indicates that the pedal is both removable and adjustable. Furthermore, a locking lever is depicted that will prevent any activation of the press. A locking pin is shown in Illustration 15 that serves the same purpose as the locking lever.

Paragraph 4.2.4.1.4 from the standard sets out the philosophical position of the industry with respect to accidental activation of foot-pedals:

> *4.2.4.1.4    Foot-Pedal Actuation Prevention*
> **When a foot pedal is furnished with the press brake, a means shall be provided for preventing any accidental operation of the press brake.**

With the explanation E 4.2 4.1.4 next to it as:

> E 4.2.4.1.4 Foot-Pedal Actuation Prevention.
> Two methods of fulfilling this requirement are:
> (1) Removing the foot pedal and placing it in a safe location
> (2) Providing a locking pin or locking lever, as noted in Illustration 14. These locking mechanisms should be designed to inhibit accidental actuation, but not to allow

locking in the operating position. For additional operator safety in foot-pedal-type operations, it is recommended that the locking device (pin or lever) be used to prevent actuation of the press brake when not in operation.

Illustration 15, in addition to the locking pin, portrays a barrier guard disposed around the foot pedal. The guard serves to minimize accidental activation of the foot control which is called for in paragraph 4.2.4.2.4:

> **4.2.4.2.4 Foot-Control Actuation Prevention.**
> **The foot control shall be protected so as to inhibit accidental activation by falling or moving objects, or by someone stepping on it. Means shall be provided for manually locking the foot control to inhibit such accidental actuation.**

With the accompanying explanation E 4.2.4.2.4:

> E 4.2.4.2.4 Foot-Control Actuation Prevention
> One way of preventing or inhibiting accidental actuation of the foot control would be to provide a key-operated selector switch. Another way of providing against accidental activation is shown in Illustration 15

As a final observation, Appendix A suggests that the undepressed foot pedals are elevated 5 to 7 inches above the floor surface. This implies that an operator can never walk onto the foot pedal. Vintage 1970 mechanical foot pedals required an activation force between 25 and 40 lbs. Further, the activation stroke of the pedal at that time was between 2 and 3 inches.

In summary, classical press brakes minimized accidental activation of their mechanical foot controls through their high activation force thresholds and large activation displacements coupled with restricted locations near the bed, barrier protection and large elevations above the work/walking surface. Every one of these features were radically compromised by the introduction of electric foot controls. These foot switches were tethered on long electric cords which enabled them to be under foot anywhere in front of the press brake. They present a "hair trigger" with activation resistance between 5 and 12 lbs together with a ¼ inch activation displacement. The electric foot switch pedal is usually 1 to 1 ½ inches above the floor which enables most people to walk directly onto the pad. A normal

walking gait lifts the toe from 1 ¼ to 2 ½ inches above the walking surface.

VI.    Human Factors Investigation of Accidental Footswitch Activation

To study the characteristics of the Linemaster footswitch that was adopted by Heim, a number of male and female candidates were called upon to adopt resting positions in front of a footswitch that would normally be used for activating a machine, a Linemaster 511-B2.

Specifically, an operator was requested to put his or her right foot into the switch in an activation position while the left foot equilibrated in a position even with the activating foot. This results in an effective activation geometry so that balance can be maintained while activation and deactivation proceeds. In periods where the footswitch is not to be activated, the foot is removed from the footswitch and placed on the working surface while leaving the stabilizing left foot in position. Consequently, two equilibrium positions were developed: a rest equilibrium and an activation equilibrium with the left foot in a fixed position.

To study the propensity of the footswitch for accidental activation, operators were asked to begin in the activation position, step rearward with their right foot to the rest position, and then to move forward from the rest equilibrium position without looking at the footswitch or intending to activate the footswitch. If the switch was activated by this stepping forward, a light was illuminated and counted as an accidental activation.

Five males and five females were tested and videotaped for an arbitrary amount of equilibrium shifts. In 93 forward motions, there were 87 accidental activations.

Using the same method and candidates, a Linemaster 511-BG, a footswitch with a safety gate, was tested. All 96 forward motions were universally unsuccessful in causing an accidental activation

The subject Heim press brake was unreasonably dangerous because the original Linemaster 532-SWH footswitch which was shipped with the press brake allows accidental activation under a reasonably foreseeable operating profile. On the other hand, the Linemaster switch with the safety gate, of the Anti-Trip G series, eliminates accidental activation by a blind stepping motion, and would clearly have prevented the injury of Ms. Lindquist.

8

Recall that Linemaster offered the gated footswitch by special order in 1976, and as a regular catalog item in 1977 while the subject machine was sold by Heim in 1978.

The Heim press brake is not capable of continuous operation and requires the footswitch to be activated in order to cause the machine to cycle. When the operator places a part into the die or removes a part from the die, it is necessary to reach forward, and/or step forward to promote this activity. Unfortunately it is this forward motion that gives rise to accidental activation of the ungated switch at the very time that the hands are in jeopardy.

VII    Punch Press vs. Press Brake

Unlike the punch press, the press brake almost always has the workpiece manually set and the finished product removed without the aid of mechanical contrivances. It is reasonably foreseeable to manufacturers of press brakes that the loading and unloading of workpieces will be done by hand.

One of the characteristics of press brakes that differ from punch presses is the notion that very few press brakes have point of operation guards or devices. The standard gives permission to use pullback devices, restraining devices, barrier guards and presence sensing devices. In 1973, at the time the B11.3 standard was written, almost no press brakes were equipped with point of operation devices. Even today these machines are primarily protected by two-hand controls or light curtains when they are compatible with the operation. For this reason, accidental activation of the foot control on press brakes is particularly devastating.

As a historical note, on a properly guarded punch press, accidental activation of a foot control will not lead to an injury.

VIII    Accidental Activation

Because machines magnify the strength of humankind, it is imperative that they remain under control. The machine should go only when we want it to go, and should stop and remain stopped when so desired. Obviously, accidental activation of a control violates the basic control philosophy for machines.

The ANSI B11.3-1973 standard is very clear that they want accidental activation eliminated where possible and minimized where elimination is not possible. This notion is entirely consistent with the general field of safety which speaks to this issue. Appendix

B contains annotations from various sources that make it very clear that the safety community wants accidental activation brought under strict control.

IX.    "Hands Out Of Die" (HOOD)

It is our understanding that Heim has taken a position that HOOD (Hands Out Of Die) is an effective safety concept. Indeed, an on-product warning sign mounted on the front of the press brake contains the following admonition:

> NEVER PLACE ANY PART OF YOUR BODY UNDER THE RAM
> OR WITHIN THE DIE AREA

The warning sign also states that it is the employers responsibility to implement this.

In B11.3-1973, the first press brake standard adopted the HOOD philosophy as one of their four objectives. Indeed, this was a general idea proposed throughout the B11 committees with all their respective machinery.

The difficulty in implementing this concept was so overwhelming that the B11.1-1982 standard for power presses placed the following disclaimer in the forward:

> The philosophy underlying the 1971 standard was HOOD (Hands Out Of Die) operation. After the adoption of the 1971 standard by ANSI and its incorporation into OSHA regulations, many employers documented an absolute inability to meet the HOOD objective. Accordingly, OSHA in 1974 modified that as a requirement, and this version of the standard incorporates that modification.

The shortcomings of the HOOD philosophy were outlined by OSHA as part of their revocation of HOOD as an OSHA requirement in 1974. For example, excerpts from the Federal Register, Vol. 39, No 233, on December 3, 1974:

> Those supporting revocation of mandatory 'no hands in dies' based their support upon: (1) the lack of statistical evidence showing that 'no hands in dies' is necessary or appropriate to protect employees from point of operation hazards; (2) the availability of safeguarding devices which will protect employees from point of operation hazards, while permitting 'hands in dies'; (3) the additional hazards created by the devices which would be substituted for

manual feeding; (4) the high cost associated with implementing 'no hands in dies'; and (5) the technological infeasibility of 'no hands in dies' on some production runs.

...

This requirement would not have prohibited or prevented employees from actually placing their hands in the point of operation. Indeed, point of operation injuries occur where 'no hands in dies' is in effect

. .

In addition to the potential for point of operation injures which exists even with 'no hands in dies,' additional hazards are created in 'no hands in dies' operations. Thus serious additional pinch points are created by feeding apparatus.

...

Technologically, 'no hands in dies' does not appear to be universally possible in the near future....Therefore, it clearly appears that a universal requirement of 'no hands in dies' would be infeasible.

We also believe that the costs associated with attaining 'no hands in dies' are prohibitive....

It has further been suggested, and we agree that the costs of instituting 'no hands in dies' would make many short production runs economically infeasible....

For the above reasons, we have revoked the requirement of 'no hands in dies.'

In summary, it is reasonably foreseeable that the HOOD philosophy would not have prevented the injury to Ms. Lindquist.

X.    Conclusions

A.    It can be expected that an operator can accidentally move his or her feet in a trajectory that could inadvertently contact the footswitch. That is, the same motion for deliberate action using the open faced footswitch is easily performed accidentally through a normal forward stepping motion.

B.    The adoption of an electric foot control was a major departure from the mechanical foot pedal which displayed so many important features for minimizing accidental activation. Specifically, mechanical foot pedals operated in a somewhat restricted location close to the bed; they had large activation resistance and required large pedal movements to activate the ram.

The mechanical controls were disposed over 6 inches off of the working surface, minimizing the chance of accidentally walking onto a pedal. These controls could be deactivated by locking levers, locking pins and by physical removal of the pedal itself.

C.  The electric foot controls in general, and specifically the Linemaster full shield model selected by Heim, were tethered on electric cords which allow them to be placed anywhere in front of the press.

The Linemaster 511B2 used in our human factors testing can be characterized as having a 6 ½ lb. activating force and an activating displacement of ¼ inch. The pedal rests 1 ½ inches from the floor.

These combined characteristics make an electric footswitch extremely sensitive to accidental activation.

D.  At the time the subject press brake was delivered, there were gated electric footswitches available on the market specifically intended to prevent accidental actuation. This includes the Linemaster Switch Corporation's Anti Tip Footswitch with Gate.

This protected switch was available two years before the sale of the machine, and could be found in the Linemaster catalog page directly opposite of the switch that was improperly selected by Heim.

Heim elected to continue incorporating the less expensive and less safe foot control into their press brake system.

E.  Human factors experiments conclusively demonstrate the efficacy of a gated Linemaster footswitch.

Head to head comparisons of a Linemaster open front "Full Shield" model and a gated Linemaster safety footswitch indicated a 0% accidental activation rate for the gated control, and a 93.5% accidental activation rate for the ungated model.

F.  The Heim press brake system that was sold in 1978 was defective and unreasonably dangerous and proximately caused the brutal injury suffered by Ms. Tina Lindquist.

12

This report contains initial opinions, and we reserve the right to amend this report in the face of further information.

Please do not hesitate to contact Triodyne, Inc. if we can be of further assistance.

Respectfully submitted,

Ralph L. Barnett
Professor, Mechanical and
Aerospace Engineering

Matthew J. Ulmenstine
Project Engineer

# Triodyne Inc.

Consulting Scientists - Safety Philosophy & Technology

666 Dundee Road, Suite 103
Northbrook, IL 60062-2702
(847) 677-4730
FAX: (847) 647-2047

Officers:
Ralph L. Barnett
Dolores Gildin

e-mail: infoserv@triodyne.com
website: www.triodyne.com

SAFETY SCIENCE:
Triodyne Inc.
(Est. 1969)

Departments
Safety Science
Business Systems
Facilities Management
Graphic Communications
Human Factors
Vehicle Technology
Warning Signs/ Manuals

MODEL LABORATORY:
2721 Alison Lane
Wilmette, IL 60091-2101

SAFETY LABORATORY:
3054 North Lake Terrace
Glenview, IL 60026-1335
(847) 486-9640

BETH HAMILTON
SAFETY LIBRARY:
666 Dundee Rd., Ste.103
Northbrook, IL 60062-2702

CONSTRUCTION:
Triodyne-Wangler
Construction Company Inc.
(Est. 1993)

666 Dundee Road, Suite 103
Northbrook, IL 60062-2702
(847) 677-4730
FAX: (847) 647-2047

SAFETY PRODUCTS:
Triodyne Safety
Systems, L.L.C.
(Est. 1998)
666 Dundee Road, Suite 103
Northbrook, IL 60062-2702
(847) 647-9291
FAX: (847) 647-2047

SAFETY RESEARCH:
Institute for Advanced
Safety Studies
(Est. 1984)
666 Dundee Road, Suite 103
Northbrook, IL 60062-2702
(847) 655-1256
FAX: (847) 647-2047

February 13, 2006 (Corrected May, 2006)

Dallas W. Hartman
Dallas W. Hartman PC
2815 Wilmington Rd.
New Castle, PA 16105

Re:  Lindquist v. Heim

Mr. Hartman:

Pursuant to your request we have reviewed and analyzed the materials provided to us in reference to the above captioned matter. Our initial opinions are contained in this report.

I.      Materials Reviewed
- ANSI B11.3-1973
- ANSI B11.3-1982
- ANSI B11.3-2002
- ANSI B11.1-1971
- ANSI B11.1-1982
- Deposition of Tina Lindquist
- Deposition of Anthony Mase Jr.
- Deposition of Zygmund Zajdel
- Answers to Plaintiff's Interrogatories – Second Set and
- Request For Production of Documents – Second Request
- Heim Instructions and Parts Book
- Linemaster Product Literature/Catalogs
- Heim Product Literature
- Photographs
- Videotape

In addition to review of materials, Triodyne has completed an inspection of the Heim press brake as well as conducted footswitch experiments.

II.     Accident Description

At the time of her accident, Ms. Tina Lindquist was the operator of a Heim Model 70-6 press brake at Corry Manufacturing. The operation being performed was the

bending of a perforated exhaust piece about a mandrel. By mandate of Corry Manufacturing, this operation required the use of the Heim-supplied footswitch rather than the hand controls retrofitted by the employer, and also required that the operator use his or her hands to fit the stock piece to the mandrel. Footswitch control is selected by use of a supervisor's key.

It was during this hand-fitting of the stock piece that Ms. Lindquist's foot inadvertently and unintentionally entered the footswitch and activated the Heim press brake, causing devastating injury to Ms. Lindquist's hands.

III.    Identification

The press brake has been identified as a Heim Model 70-6, Serial 2176, sold in 1978 to HB Machinery and shipped to Avco Lycoming.

The manual for the subject machine illustrates a Linemaster footswitch with a "Full Shield." This is consistent with photographs of the subject footswitch after the accident.

Photographs taken of the accident footswitch illustrate a Linemaster footswitch which is not constructed with a safety gate. It is constructed with an antitrip treadle mechanism, a latch that requires a certain foot insertion into the switch to depress the pedal.

IV.    The Linemaster Safety Footswitch

The Linemaster Switch Corporation introduced a safety footswitch for sale as a special order item in 1976. By May 1977, the safety footswitch was listed as a standard catalog item and consisted of the following features:

- A shield that covered the top and sides of the footswitch and came in two sizes to accommodate large workshoes.
- Anti-trip treadle latch mechanism that latches the pedal against activation by shallow insertions.
- A safety gate that must be raised to permit foot insertion.

The Anti-Trip Foot Control with Gate, which was advertised to prevent accidental activation, is illustrated at the top right in Figure 1, which depicts a page from the 1977 Linemaster catalog.

**Figure 1: The 1977 Anti-Trip Foot Control with Gate Option**

In 1977, Linemaster notified the marketplace of their new Anti-Trip models which included safety gates. They did this in their booth at the 1977 Design Engineering Show and they prepared a letter which they sent to their customers on May 31, 1977. These actions were a continuation of their efforts to produce the switch first produced by special order in 1976.

4

V.    History

The Heim press brake which is the subject of the above captioned
litigation was manufactured as a General-Purpose Mechanical Press
Brake in 1978. The machine was designed to be activated by an
electric foot control. At the time of manufacture the minimum
requirements for the safety of press brakes were set forth in the
American National Standard Safety Requirements for the
Construction, Care, and Use of Power Press Brakes, ANSI B11.3-
1973. This document is the first ANSI standard developed
specifically for press brakes. As such, it only addressed mechanical
foot pedals. Every illustration in ANSI B11.3-1973 that depicts a
foot control has been assembled in Appendix A of this report.

It may be observed in Appendix A that Illustrations 1, 3, 12, 13, and
23 show a horizontal foot treadle shaft that allows the foot pedal to
be located anywhere along the bed of the press brake. Illustration 14
indicates that the pedal is both removable and adjustable.
Furthermore, a locking lever is depicted that will prevent any
activation of the press. A locking pin is shown in Illustration 15 that
serves the same purpose as the locking lever.

Paragraph 4.2.4.1.4 from the standard sets out the philosophical
position of the industry with respect to accidental activation of foot-
pedals:

> *4.2.4.1.4    Foot-Pedal Actuation Prevention*
> **When a foot pedal is furnished with the press brake, a
> means shall be provided for preventing any accidental
> operation of the press brake.**

With the explanation E 4.2.4.1.4 next to it as:

> E 4.2.4.1.4 Foot-Pedal Actuation Prevention.
> Two methods of fulfilling this requirement are:
> (1) Removing the foot pedal and placing it in a safe location
> (2) Providing a locking pin or locking lever, as noted in
>     Illustration 14. These locking mechanisms should be
>     designed to inhibit accidental actuation, but not to allow
>     locking in the operating position. For additional operator
>     safety in foot-pedal-type operations, it is recommended
>     that the locking device (pin or lever) be used to prevent
>     actuation of the press brake when not in operation.

Illustration 15, in addition to the locking pin, portrays a barrier guard disposed around the foot pedal. The guard serves to minimize accidental activation of the foot control which is called for in paragraph 4.2.4.2.4:

> **4.2.4.2.4    *Foot-Control Actuation Prevention.***
> **The foot control shall be protected so as to inhibit accidental activation by falling or moving objects, or by someone stepping on it. Means shall be provided for manually locking the foot control to inhibit such accidental actuation.**

With the accompanying explanation E 4.2.4.2.4:

> E 4.2.4.2.4  Foot-Control Actuation Prevention
> One way of preventing or inhibiting accidental actuation of the foot control would be to provide a key-operated selector switch. Another way of providing against accidental activation is shown in Illustration 15.

As a final observation, Appendix A suggests that the undepressed foot pedals are elevated 5 to 7 inches above the floor surface. This implies that an operator can never walk onto the foot pedal. Vintage 1970 mechanical foot pedals required an activation force between 25 and 40 lbs. Further, the activation stroke of the pedal at that time was between 2 and 3 inches.

In summary, classical press brakes minimized accidental activation of their mechanical foot controls through their high activation force thresholds and large activation displacements coupled with restricted locations near the bed, barrier protection and large elevations above the work/walking surface. Every one of these features were radically compromised by the introduction of electric foot controls. These foot switches were tethered on long electric cords which enabled them to be under foot anywhere in front of the press brake. They present a "hair trigger" with activation resistance between 5 and 12 lbs together with a ¼ inch activation displacement. The electric foot switch pedal is usually 1 to 1 ½ inches above the floor which enables most people to walk directly onto the pad. A normal walking gait lifts the toe from 1 ¼ to 2 ½ inches above the walking surface.

VI.    Human Factors Investigation of Accidental Footswitch Activation

To study the characteristics of the Linemaster footswitch that was adopted by Heim, a number of male and female candidates were

called upon to adopt resting positions in front of a footswitch that would normally be used for activating a machine, a Linemaster 511-B2.

Specifically, an operator was requested to put his or her right foot into the switch in an activation position while the left foot equilibrated in a position even with the activating foot. This results in an effective activation geometry so that balance can be maintained while activation and deactivation proceeds. In periods where the footswitch is not to be activated, the foot is removed from the footswitch and placed on the working surface while leaving the stabilizing left foot in position. Consequently, two equilibrium positions were developed: a rest equilibrium and an activation equilibrium with the left foot in a fixed position.

To study the propensity of the footswitch for accidental activation, operators were asked to begin in the activation position, step rearward with their right foot to the rest position, and then to move forward from the rest equilibrium position without looking at the footswitch or intending to activate the footswitch. If the switch was activated by this stepping forward, a light was illuminated and counted as an accidental activation.

Five males and five females were tested and videotaped for an arbitrary amount of equilibrium shifts. In 93 forward motions, there were 87 accidental activations.

Using the same method and candidates, a Linemaster 511-BG, a footswitch with a safety gate, was tested. All 96 forward motions were universally unsuccessful in causing an accidental activation.

The subject Heim press brake was unreasonably dangerous because the original Linemaster footswitch which was shipped with the press brake allows accidental activation under a reasonably foreseeable operating profile. On the other hand, the Linemaster switch with the safety gate, of the Anti-Trip G series, eliminates accidental activation by a blind stepping motion, and would clearly have prevented the injury of Ms. Lindquist.

Recall that Linemaster offered the gated footswitch by special order in 1976, and as a regular catalog item in 1977 while the subject machine was sold by Heim in 1978.

The Heim press brake is not capable of continuous operation and requires the footswitch to be activated in order to cause the machine to cycle. When the operator places a part into the die or removes a

part from the die, it is necessary to reach forward, and/or step forward to promote this activity. Unfortunately it is this forward motion that gives rise to accidental activation of the ungated switch at the very time that the hands are in jeopardy.

VII.    Punch Press vs. Press Brake

Unlike the punch press, the press brake almost always has the workpiece manually set and the finished product removed without the aid of mechanical contrivances. It is reasonably foreseeable to manufacturers of press brakes that the loading and unloading of workpieces will be done by hand.

One of the characteristics of press brakes that differ from punch presses is the notion that very few press brakes have point of operation guards or devices. The standard gives permission to use pullback devices, restraining devices, barrier guards and presence sensing devices. In 1973, at the time the B11.3 standard was written, almost no press brakes were equipped with point of operation devices. Even today these machines are primarily protected by two-hand controls or light curtains when they are compatible with the operation. For this reason, accidental activation of the foot control on press brakes is particularly devastating.

As a historical note, on a properly guarded punch press, accidental activation of a foot control will not lead to an injury.

VIII.   Accidental Activation

Because machines magnify the strength of humankind, it is imperative that they remain under control. The machine should go only when we want it to go, and should stop and remain stopped when so desired. Obviously, accidental activation of a control violates the basic control philosophy for machines.

The ANSI B11.3-1973 standard is very clear that they want accidental activation eliminated where possible and minimized where elimination is not possible. This notion is entirely consistent with the general field of safety which speaks to this issue. Appendix B contains annotations from various sources that make it very clear that the safety community wants accidental activation brought under strict control.

IX.    "Hands Out Of Die" (HOOD)

It is our understanding that Heim has taken a position that HOOD (Hands Out Of Die) is an effective safety concept. Indeed, an on-product warning sign mounted on the front of the press brake contains the following admonition:

> NEVER PLACE ANY PART OF YOUR BODY UNDER THE RAM
> OR WITHIN THE DIE AREA

The warning sign also states that it is the employers responsibility to implement this.

In B11.3-1973, the first press brake standard adopted the HOOD philosophy as one of their four objectives. Indeed, this was a general idea proposed throughout the B11 committees with all their respective machinery.

The difficulty in implementing this concept was so overwhelming that the B11.1-1982 standard for power presses placed the following disclaimer in the forward:

> The philosophy underlying the 1971 standard was HOOD (Hands Out Of Die) operation. After the adoption of the 1971 standard by ANSI and its incorporation into OSHA regulations, many employers documented an absolute inability to meet the HOOD objective. Accordingly, OSHA in 1974 modified that as a requirement, and this version of the standard incorporates that modification.

The shortcomings of the HOOD philosophy were outlined by OSHA as part of their revocation of HOOD as an OSHA requirement in 1974. For example, excerpts from the Federal Register, Vol. 39, No. 233, on December 3, 1974:

> Those supporting revocation of mandatory 'no hands in dies' based their support upon: (1) the lack of statistical evidence showing that 'no hands in dies' is necessary or appropriate to protect employees from point of operation hazards; (2) the availability of safeguarding devices which will protect employees from point of operation hazards, while permitting 'hands in dies'; (3) the additional hazards created by the devices which would be substituted for manual feeding; (4) the high cost associated with implementing 'no hands in dies'; and (5) the technological infeasibility of 'no hands in dies' on some production runs.
>
> ...

This requirement would not have prohibited or prevented employees from actually placing their hands in the point of operation. Indeed, point of operation injuries occur where 'no hands in dies' is in effect.

...

In addition to the potential for point of operation injures which exists even with 'no hands in dies,' additional hazards are created in 'no hands in dies' operations. Thus serious additional pinch points are created by feeding apparatus.

...

Technologically, 'no hands in dies' does not appear to be universally possible in the near future.... Therefore, it clearly appears that a universal requirement of 'no hands in dies' would be infeasible.

We also believe that the costs associated with attaining 'no hands in dies' are prohibitive....

It has further been suggested, and we agree that the costs of instituting 'no hands in dies' would make many short production runs economically infeasible....

For the above reasons, we have revoked the requirement of 'no hands in dies.'

In summary, it is reasonably foreseeable that the HOOD philosophy would not have prevented the injury to Ms. Lindquist.

X.    Conclusions

A.    It can be expected that an operator can accidentally move his or her feet in a trajectory that could inadvertently contact the footswitch. That is, the same motion for deliberate action using the open faced footswitch is easily performed accidentally through a normal forward stepping motion.

B.    The adoption of an electric foot control was a major departure from the mechanical foot pedal which displayed so many important features for minimizing accidental activation. Specifically, mechanical foot pedals operated in a somewhat restricted location close to the bed; they had large activation resistance and required large pedal movements to activate the ram.

The mechanical controls were disposed over 6 inches off of the working surface, minimizing the chance of accidentally walking onto a pedal. These controls could be deactivated

by locking levers, locking pins and by physical removal of the pedal itself.

C.    The electric foot controls in general, and specifically the Linemaster full shield model selected by Heim, were tethered on electric cords which allow them to be placed anywhere in front of the press.

The Linemaster 511B2 used in our human factors testing can be characterized as having a 6 ½ lb. activating force and an activating displacement of ¼ inch. The pedal rests 1 ½ inches from the floor.

These combined characteristics make an electric footswitch extremely sensitive to accidental activation.

D.    At the time the subject press brake was delivered, there were gated electric footswitches available on the market specifically intended to prevent accidental actuation. This includes the Linemaster Switch Corporation's Anti-Tip Footswitch with Gate.

This protected switch was available two years before the sale of the machine, and could be found in the Linemaster catalog page directly opposite of the switch that was improperly selected by Heim.

Heim elected to continue incorporating the less expensive and less safe foot control into their press brake system.

E.    Human factors experiments conclusively demonstrate the efficacy of a gated Linemaster footswitch.

Head to head comparisons of a Linemaster open front "Full Shield" model and a gated Linemaster safety footswitch indicated a 0% accidental activation rate for the gated control, and a 93.5% accidental activation rate for the ungated model.

F.    The Heim press brake system that was sold in 1978 was defective and unreasonably dangerous and proximately caused the brutal injury suffered by Ms. Tina Lindquist.

This report contains initial opinions, and we reserve the right to amend this report in the face of further information.

11

Please do not hesitate to contact Triodyne, Inc. if we can be of further assistance.

Respectfully submitted,

Ralph L. Barnett
Professor, Mechanical and
Aerospace Engineering

Matthew J. Ulmenstine
Project Engineer

# EXHIBIT "F"

# Verzilli & Verzilli and Consultants, Inc.
## Consulting Economists

Andrew G. Verzilli, Ph.D.
Emeritus Professor of Economics, Drexel University
Andrew C. Verzilli, M.B.A.
Managing Principal

Office Address:
411 North Broad Street
Lansdale, PA 19446

(215) 368-7797
Fax: (215) 368-9006

February 7, 2006

Dallas W. Hartman, Esquire
Law Offices of Dallas Hartman, P.C.
2815 Wilmington Road
New Castle, PA 16105

Re:   Tina Lindquist

Dear Mr. Hartman:

The following is our analysis of the economic values of the reduction in household services relative to Tina Lindquist. Ms. Lindquist was seriously injured in a work-related accident on September 25, 2002.

## Background

Tina Lindquist was born on June 24, 1982. She is presently 23.7 years of age, with an average statistical life expectancy of an additional 56.8 years (Life Tables, 2002).

Ms. Lindquist had her fingers severed in both hands. She had one finger transplanted in her left hand (from a toe) and two of her right hand fingers were re-attached.

The injuries have had a negative impact on her ability to perform household activities. Specifically, 1) she has to take a break after starting tasks (i.e vacuuming), 2) her hands start to hurt after she starts an activity, 3) she has difficulty carrying things (laundry baskets), 4) it takes her longer to complete tasks, and 5) completed tasks are not at the pre-accident level (i.e. dishes not as clean).

## Methodology

Based on data from The Dollar Value of a Day, the economic value of the reduction in services has been estimated to be in the range of 10 to 15 hours per week until age 65

Tina Lindquist
Page 2

As of age 65, the reduction in services has been estimated to be in the range of 16 to 24 hours per week. This range assumes that Ms. Lindquist has experienced a 50% to 75% reduction in the ability to perform household services. The values of the reduction in household services have been estimated based on an average hourly rate of $11.50 (The Dollar Value of a Day, PA Department of Labor and Bureau of Labor Statistics) to the date that Ms. Lindquist will be age 70. The total offset method has been utilized to estimate future household services (Kaczkowski v. Bolubasz).

**Summary of Estimates**

Based on the methodology discussed and the information provided to date, we have calculated the values of the reduction in household services, relative to Tina Lindquist, to be in the range of $315,300 to $473,000.

The calculations and methodology we utilize are consistent with Pennsylvania damage guidelines and our opinions are presented within a reasonable degree of economic certainty.

The following page is a detailed summary table of the estimates. If you have any questions, please contact us

Sincerely,

Andrew G. Verzilli, PH.D.

Andrew C. Verzilli, M.B.A.

Tina Lindquist

## Table 1 : Reduction in Household Services

|  | 50% Reduction | 75% Reduction | 9/2002 to Present |
|---|---|---|---|
| Past Services | $ 20,511 | $ 30,767 | |
| Future Services | $ 294,814 | $ 442,221 | To Age 70 |
| **Total Reduction** | **$ 315,325** | **$ 472,988** | |