IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TINA LINDQUIST, | Civil Action No:  04-249E |
| Plaintiff, | **JUDGE SEAN J. MCLAUGHLIN** |
| vs. | |
| HEIM, L.P., | PAUL R. ROBINSON, ESQUIRE |
| Defendant. | PA I.D. No. 65581 |
| | MEYER, DARRAGH, BUCKLER, |
| | BEBENEK & ECK, P.L.L.C. |
| | U.S. Steel Tower, Suite 4850 |
| | 600 Grant Street |
| | Pittsburgh, PA 15219 |
| | (412) 261-6600 |
| | FAX: (412) 471-2754 |

**MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF
RALPH L. BARNETT OR, ALTERNATIVELY, FOR A <u>DAUBERT</u> HEARING**

AND NOW, comes the defendant, HEIM, L.P. (hereinafter "Heim"), through its attorneys, MEYER, DARRAGH, BUCKLER, BEBENEK & ECK, P.L.L.C., filing its motion in limine to exclude the testimony of Ralph L. Barnett or, alternatively, for a <u>Daubert</u> hearing, averring as follows:

1.     The plaintiff, Tina Lindquist, was injured on September 25, 2002 during the course of her employment while operating a Heim mechanical press brake, Model 70-6 (the "press brake").  The plaintiff claims she was injured when she activated the foot control switch while her hands were located between the table and moving ram of the press brake.

P0806665.1

2.     The press brake was sold by Heim in April, 1978 to a Connecticut machine distribution company, HB Machinery Co., which requested that the press brake be shipped directly to a Connecticut manufacturer, Avco Lycoming.

3.     The plaintiff's employer, Corry Manufacturing, purchased the press brake at a machinery auction in 1999, connected a foot control and two-palm button switch to the press brake, and utilized the press brake during its operations through and after the date of the plaintiff's accident.

4.     The plaintiff has asserted claims against Heim for negligence, breach of implied warranties and strict liability pursuant to Restatement (Second) of Torts § 402A. Each of these claims is based upon the sole premise that the foot control was defective because it did not contain a gate at the opening for the operator's foot. (See Ralph Barnett deposition, Appendix Exhibit "A," pp. 19-20; Ralph Barnett post-deposition affidavit, Appendix Exhibit "C," pp. 2-3).

5.     The trial of this case is scheduled for May 14, 2007.

6.     Heim requests that this Honorable Court preclude the testimony of plaintiff's liability expert, Ralph Barnett, because his proposed testimony is junk science prohibited by the Supreme Court of the United States through Daubert v. Merrell Dow Pharmaceuticals, Inc. and its progeny.

7.      Alternatively, in the event the court determines that a <u>Daubert</u> hearing is necessary to develop any additional facts and evidence of record prior to ruling upon this motion in limine, Heim requests that the court schedule a <u>Daubert</u> hearing prior to the trial of this case.

8.      Heim incorporates its contemporaneously filed supporting brief and appendix of exhibits in support of this motion.

## **<u>Daubert Standard</u>**

9.      "[Expert] testimony is admissible only if it is both relevant and reliable." <u>Kumho Tire Company, LTD. v. Carmichael</u>, 526 U.S. 137, 141, 147, 119 S.Ct. 1167, 1171, 1174, 143 L.Ed.2d 238 (1999) (citing <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

10.      An expert's opinion must be based on the "'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" <u>Williams v. CSX Transp., Inc.</u>, 2002 WL 31618455, *5 (E.D. Pa. 2002) (quoting <u>In re Paoli Railroad Yard PCB Litig.</u>, 35 F.3d 717, 742 (3d Cir. 1994)).

11.      Trial judges are charged with the responsibility of acting as gatekeepers to exclude unreliable proffered expert testimony, exclude so-called "junk science," and ensure that expert testimony is based on sound methodology and valid procedures.  <u>See</u> <u>Kerrigan</u>

v. Maxon, Ind., 223 F.Supp.2d 626, 630, 632 (E.D. Pa. 2002) (citing Daubert, 509 U.S. at 589, 113 S.Ct. 2786, 125 L.Ed.2d 469).

12.     The court's "gatekeeping" obligation applies not only to "scientific" testimony, but to all expert testimony based on "technical" and "other specialized" knowledge (including engineering).  Kumho Tire, 526 U.S. at 141, 147-48, 119 S.Ct. at 1171, 1174, 143 L.Ed.2d 238 (citing Fed. Rule Evid. 702).

13.     In determining whether the methodology for the proffered testimony is reliable, the trial judge must consider the following factors: (1) whether the methodology has been tested and subjected to peer review; (2) the potential rate of error; (3) the general acceptance of the methodology; (4) the degree of the testifying expert's qualifications; (5) the methodology's relationship to more established methods of scientific analysis; and (6) the non-judicial uses of the scientific technique.  See Daubert, 509 U.S. at 592-94, 113 S.Ct. 2786; Kerrigan, 223 F.Supp.2d at 637; United States v. Downing, 753 F.2d 1224, 1238-39 (3d Cir. 1985).

14.     "[T]he test [of admissibility] is whether the 'particular opinion is based on valid reasoning and reliable methodology.'"  Oddi v. Ford Motor Company, 234 F.3d 136, 146 (3d Cir. 2000) (quoting Kannankeril v. Terminix International, Inc., 128 F.3d 802, 806 (3d Cir. 1997)).

15.     It is the plaintiff's burden to "establish the expert's qualifications and the reliability and fit of the proposed testimony by a 'preponderance of proof.'" Kerrigan, 223 F.Supp.2d at 637.

16.     "Although a [Daubert] hearing is sometimes required in order for the Court to properly exercise its gatekeeping function, such a hearing is not necessary in all cases, even where the court decides the motion in the movant's favor and excludes the proposed expert testimony." Id. at 632.

17.     A Daubert hearing only is required "when the record does not clearly explicate the basis of the proffered expert opinion such that the reliability determination cannot be made." Id. at 633 (citing Paddillas v. Stork-Gamco, Incorporated, 186 F.3d 412 (3d Cir. 1999)).

18.     "[W]here the record clearly lays out [the expert's] background, training and experience such that this Court can reach a conclusion regarding his qualifications, and sufficiently and clearly explicates his conclusions and bases for his opinions such that this Court can judge the reliability of his opinions," no Daubert hearing will be required. Kerrigan, 223 F.Supp.2d at 634.  See also, Oddi, 234 F.3d at 152-55 (internal citations omitted).

A.    **PLAINTIFF'S LIABILITY EXPERT, RALPH BARNETT, SHOULD BE PRECLUDED FROM TESTIFYING AT TRIAL BECAUSE HIS OPINIONS LACK ANY ACCEPTED METHODOLOGY AND CONSTITUTE JUNK SCIENCE UNDER <u>DAUBERT</u>.**

1.    **<u>Ralph Barnett's Opinion That All Foot Controls On Press Brakes Should Have Gated Openings.</u>**

19.    Plaintiff's liability expert, Ralph Barnett, intends to offer an opinion in this case which has never been offered before, is contradicted by the controlling industry standard (ANSI B11.3), the controlling government standard (OSHA & 29 CFR 1910.212), Ralph Barnett's prior opinions, and reason.  The proposed opinion is that all foot controls sold with press brakes should contain gates at their opening where the operator inserts his or her foot.  (<u>See</u> Appendix Exhibit A, pp. 19-20; Appendix Exhibit C, pp. 2-3).

20.    Ralph Barnett has represented numerous press brake manufacturers and foot control manufacturers in the prime of his career, and he acknowledges never offering this opinion in the approximately forty (40) years he has worked on press machine cases. (<u>See</u> Appendix Exhibit A, pp. 21-44).

21.    Ralph Barnett concedes that never before has he opined that the use of an ungated foot control attached to a press brake renders the foot control or press brake defective; he never has taught anyone in the press brake industry, or any class during his 47 years of teaching, that the use of an ungated foot control on a press brake renders the foot control or press brake defective; he never has written on the opinion he is rendering

in this case; and he is not aware of anyone else in the industry who has given this opinion. (See Appendix Exhibit A, pp. 19-21, 138-40; p. 143).

22.    Plaintiff's other liability expert, Matthew Ulmenstine, testified that he has worked with plaintiff's expert for eleven (11) years but never at any time (outside of this lawsuit) has Ralph Barnett taught him that an ungated foot control renders a foot control or press brake defective.  (See Matthew Ulmenstine deposition, Appendix Exhibit "E," p. 39).  Ulmenstine also testified that he took a course while in college at the Illinois Institute of Technology which was taught by Ralph Barnett, entitled "Design for Safety in Machines," and that Barnett never taught the class that an ungated foot control renders the foot control or a press brake defective.  (See Appendix Exhibit E, pp. 37-39).

23.    Heim's liability expert, Gary M. Hutter, Ph.D., P.E., C.S.P., testified that OSHA, ANSI and National Safety Council publications allow, endorse, and encourage the use of the foot control at issue in conjunction with the press brake involved in plaintiff's accident as being reasonably safe.  (See Gary Hutter deposition, Appendix Exhibit "F," pp. 31-34, 54-55).

24.    Ralph Barnett concedes he does not even know if an ungated foot control satisfies OSHA regulations.   An OSHA publication, however, entitled "Safeguarding Equipment and Protecting Workers from Amputations," includes an illustration of an ungated foot control as an example of a "properly guarded foot control."  (See Appendix

Exhibit A, pp. 162-63; OSHA 3170 – "Safeguarding Equipment and Protecting Workers from Amputations" publication excerpts, Appendix Exhibit "R," p. 14, Figure 22). Significantly, the OSHA 3170 publication only requires that "foot controls must be guarded to prevent accidental activation by another worker or by falling material" as the intended use of the foot control involves the user depressing the pedal and therefore it is not possible to prevent the same person from inadvertently stepping into it.  (See Appendix Exhibit R, p. 14; William Switalski expert report, Appendix Exhibit "I," p. 5).  Further, compliance with 29 CFR 1910.212(a)(3)(ii), the regulation under which OSHA regulates power press brakes, is achieved by adherence to the mandates of ANSI B11.3, as discussed below.  (See Gary Hutter expert report, Appendix Exhibit "G," pp. 8-9; 29 CFR 1910.212(a)(3)(ii), Appendix Exhibit "V").

25.     The press brake met or exceeded all requirements of the controlling 1973 ANSI (American National Standard Institute) standard applicable to press brakes (ANSI B11.3-1973).  ANSI B11.3 was first adopted in 1973 and then revised in 1982 and again in 2002.  (See Appendix Exhibit I, p. 4).  ANSI B11.3-1973 expressly recognizes the use of an electric "foot control" as an acceptable and appropriate means of operating a press brake and only requires that the foot control "be protected so as to inhibit accidental actuation by falling or moving objects, or by someone stepping on (rather than into) it.  (See ANSI B11.3-1973 excerpts, Appendix Exhibit "S," p. 31).  Only a guard covering the top of the pedal pad, and not a gate at the opening of the foot control, is required in order for the foot control to comply with the standard.  (See Appendix Exhibit S, p. 31; p. 25,

Illustration 15).  The illustration contained in ANSI B11.3-1973 shows a foot control with no gate.  (See Appendix Exhibit S, p. 25).  In the 1982 and 2002 revisions / versions of ANSI B11.3, a foot control with a top and side guarding arrangement (the equivalent of the Linemaster "Full Shield"), but still no gate, is illustrated.  (See ANSI B11.3-1982 excerpts, Appendix Exhibit "T," p. 23, Illustration 15; ANSI B11.3-2002 excerpts, Appendix Exhibit "U," p. 60, Figure 20).


26.    Dr. Gary Hutter, who previously worked with Ralph Barnett, testified that Barnett, in forming his opinions in this case, failed to follow the very safety philosophies and protocol which Barnett himself developed and continually has promoted for purposes of assessing whether a candidate safeguard (i.e. a gated foot control) should be used. (See Appendix Exhibit F, pp. 67-73; Appendix Exhibit G, p. 9).  Dr. Hutter also testified that, according to Barnett's "machine supplier safeguard decision tree," which plaintiff's expert failed to even address in his report, the use of the gated foot control being advocated by plaintiff's expert would be prohibited because the addition of a gated foot control to the press brake would create a new hazard or aggravate existing hazards.  (See Appendix Exhibit F, pp. 67-73, 180-82, 184-85, 200; Appendix Exhibit G, p. 9).  Dr. Gary Hutter also testified that it is well documented that the placement of a door (gate) on foot controls associated with press brakes encourages "riding of the pedal."  (See Appendix Exhibit F, pp. 37-40; p. 56; pp. 57-59).

27.    William G. Switalski, P.E., who worked closely with Barnett, testified that the use of a gated foot control creates a new hazard – an increased likelihood that the user will misuse the product by "riding the pedal" and an amputation injury will occur.  (See William Switalski deposition, Appendix Exhibit "H," pp. 154-55; p. 126).  Additionally, Mr. Switalski has opined that there is unequivocal agreement in the safety literature that the safeguarding of one hazard never should create another hazard.  (See Appendix Exhibit I, p. 7; Appendix Exhibit H, p. 149).  William Switalski also testified that it is well documented in the scientific literature of the field that there is a strong correlation between the practice of "riding the pedal" on inadequately guarded power presses and press brakes and amputation injuries.  (See Appendix Exhibit H, pp. 78-79; Appendix Exhibit I, pp. 7-8).  William Switalski was a proctor for and participated in Ralph Barnett's foot control research and test studies (which particularly addressed the effectiveness of the "front gate concept") and testified that the result of and conclusion drawn from this research and testing was that the use of a gated foot control led to "riding the pedal" misuse.  (See Appendix Exhibit H, pp. 31-35; Appendix Exhibit I, p. 10).

28.    Dennis R. Cloutier, CSP, testified that the gate on a foot control does not always stop someone's foot from inadvertently entering the foot control.  (See Dennis Cloutier deposition, Appendix Exhibit "J," pp. 201).  Mr. Cloutier also testified that foot control safety features such as gates and anti-trip latches (also known as "toe releases"), and the combination of both features on the same foot control, increase the likelihood of and encourage rather than inhibit "riding of the pedal" on press brakes.  (See Appendix

Exhibit J, pp. 42-44; p. 101; pp. 203-04).  Mr. Cloutier further testified that in his 30 years
of "walking factory floors" during the course of his employment in the operational, safety
and field service arenas of the metal fabricating industry (which includes press brakes), he
personally has observed that gated foot controls (as well as those containing only toe
releases) do not inhibit accidental or inadvertent actuation of press brakes but rather
increase "riding of the pedal."  (See Appendix Exhibit J, pp. 103-07; p. 11; pp. 203-04).

29.     Ralph Barnett will testify that a gated foot control does not need to be used
in conjunction with a power press because a power press uses a full stroke clutch and
makes more rapid cycles than a press brake, which results in less time for user injury to
occur.  (See Appendix Exhibit A, pp. 44-51, 191-92, 195-96).  Barnett, however, concedes
that the press brake at issue here is "fast" and is of the opinion that the faster the press
brake is, the more likely you would want to not have a gated foot control (because of the
increased likelihood of "riding of the pedal").  (See Appendix Exhibit A, pp. 194-95).
Although, Barnett concedes he does not know of or have any opinion as to any particular
speed to be used for determining when a gated foot control should or should not be used
on a press brake.  (See Appendix Exhibit A, pp. 194-95).  Barnett also concedes he did not
know the timing of the operations which plaintiff was performing on the press brake during
the time leading up to the accident.  (See Appendix Exhibit A, pp. 192-95).

30.     Barnett also wrote articles concerning foot controls, and they contradict his
present opinion.  Barnett's article entitled "Foot Controls: Riding the Pedal" does not make

any distinction between power presses and press brakes with respect to his conclusion that the use of a gate on a foot control leads to "riding of the pedal" misuse.  (<u>See</u> "Foot Controls: Riding the Pedal" article, Appendix Exhibit "K"; Appendix Exhibit H, pp. 189-90).

31.     Dr. Gary Hutter testified that literature pertaining to the press brake as well as to power presses shows that the cycle speed capabilities of the press brake <u>overlap</u> with those of power presses.  (<u>See</u> Appendix Exhibit F, pp. 59-62, 63-64).

32.     William Switalski also testified to the existence of overlap in the speeds of press brakes and power presses and opined that it is typical for power presses to operate at the same cycle speed as the press brake at issue was capable of operating.  (<u>See</u> Appendix Exhibit H, pp. 18-20).  He also testified that there are many power presses which have cycle speed capacities which are <u>less</u> than that of the press brake.  (<u>See</u> Appendix Exhibit H, pp. 186-87).  Mr. Switalski further testified that, based upon ANSI standards in existence in 1971 that power presses were being manufactured with <u>both full and partial</u> revolution clutches.  (<u>See</u> Appendix Exhibit H, pp. 26-28).

33.     William Switalski testified that, in the twenty-plus (20+) years he worked with Barnett, Barnett never indicated to Switalski any distinction between power presses and press brakes with respect to Barnett's present opinion regarding the use of a gate on a foot control.  (<u>See</u> Appendix Exhibit H, p. 189).

34.    Dennis Cloutier testified that the existence of a gate on the foot control being used by the plaintiff at the time of the accident would <u>not</u> have prevented the plaintiff from actuating the foot control because he believes, in his expert opinion based upon the facts, information and testimony of record as well as his 30 years of experience and training, that the plaintiff was "riding the pedal" and therefore her foot already would have bypassed the gate and been inside the foot control.  (<u>See</u> Appendix Exhibit J, pp. 199-200; pp. 155-58).

35.    It is clear that Barnett's opinion, that a press brake requires a gated foot control, whereas a power press does not, is unsupported and impermissible junk science. <u>See</u> <u>Oddi</u>, 234 F.3d at 146; <u>Kannankeril</u>, 128 F.3d at 802.  Barnett's opinion is devoid of any reliable or generally accepted methodology or reasoning, has no support in the governing standards, has no support in the industry, has not been tested in any manner, and has not been the subject of any peer review or publication.

36.    Barnett's opinion furthermore is contrary to his own previously promoted safety philosophies and testing conclusions, the generally accepted safety standards and authoritative literature in the applicable field, and the testimony and evidence of record in this case.

37.    As a result, the proposed testimony from Ralph Barnett on the issue of whether the press brake should have been sold with a gated foot control should be

precluded as unreliable, unscientific junk testimony which should be excluded from the trial of this case.

## 2.    Ralph Barnett's Opinion Regarding Product Identification.

38.    The foot control being used by the plaintiff at the time of her accident was discarded after the plaintiff's representatives inspected and photographed the press brake.

39.    No evidence exists that the plaintiff was using the foot control purchased by HB Machinery from Heim in 1978. To the contrary, the evidence of record establishes that the foot control which the plaintiff was using at the time of her accident was not the same foot control which a third party, HB Machinery, purchased 24 years prior to this accident.

40.    The press brake being used by Tina Lindquist was sold in 1978 and Heim's business records establish that Linemaster Model 532-SWH foot controls were sold with "all presses" from 1974 through 1982 and that Heim did not change to the Linemaster Model 511-B until 1982. (See Heim Drawing A-470-D, Appendix Exhibit "L"; Anthony Mase Deposition excerpts, Appendix Exhibit "M," p. 30-31; Assembly Order and Inspection Sheet, Appendix Exhibit "N").

41.    Ralph Barnett originally opined that the foot control Tina Lindquist was using at the time of her injury was a Linemaster Model 511-B, which would mean she was using a different foot control from the Model 532-SWH sold by Heim. In an attempt to remedy

this fatal admission, Ralph Barnett testified that his reference in his report to a Linemaster Model 532-SWH foot control being sold by Heim in 1978 was an error, but tellingly neither Barnett nor his associate, Matthew Ulmenstine, could testify that the foot control Tina Lindquist was using was sold by Heim and neither could explain how they concluded that the previous reference to a Linemaster Model 532-SWH was in error.  (See Appendix Exhibit A, pp. 91-94; Matthew Ulmenstine deposition, Appendix Exhibit "E," pp. 60-70, 89-111).  Matthew Ulmenstine did acknowledge speaking with plaintiff's counsel about their opinion that the foot control being used by Tina Lindquist was a Model 511-B before they advised Heim they were changing this earlier fatal admission.  (See Appendix Exhibit E, pp. 66-67).

    42.    Ralph Barnett now unbelievably opines, after submitting a report that specifically contradicts this claim, that the plaintiff was using "the same type and model" of foot control which was sold by Heim in 1978, and this product identification opinion also must be excluded.  (See Appendix Exhibit C, p. 2; Appendix Exhibit D, p. 2, 7; Appendix Exhibit A, pp. 81-85).

    43.    The plaintiff, Tina Lindquist, does not know if the foot control she was using was the foot control which was sold with the Press Brake in 1978.  (See Tina Lindquist deposition excerpts, Appendix Exhibit "B," p. 88).

44.    There is no dispute that the foot control the plaintiff was using at the time of her accident contained an anti-trip mechanism which required the user to fully insert their foot into the foot control housing and de-activate a lock plate before the foot control pedal could be activated.  (See Appendix Exhibit A, pp. 52, 57, 72; Robert Rooney Deposition, Appendix Exhibit "O," pp. 38-40; Jan Oviatt Deposition, Appendix Exhibit "P," p. 15).

45.    The Linemaster Model 532-SWH did not contain this anti-trip mechanism, and no evidence exists that the foot control which accompanied Heim's 1978 sale of the press brake contained the anti-trip mechanism which was contained on the foot control the plaintiff was using at the time of the accident.  (See 1977 Linemaster Catalog excerpts, Appendix Exhibit "Q," p. 8; Appendix Exhibit A, p. 92; William Switalski expert report, Appendix Exhibit "I," p. 6).

46.    Additionally, the Group Leader of Maintenance for Corry Manufacturing, Jan Oviatt, who installed the foot control which the plaintiff was using at the time of her accident when Corry Manufacturing purchased the press brake in 1999, testified that the foot control the plaintiff was using did not appear to be the original foot control that Heim would have sold with the press brake in 1978.  (See Appendix Exhibit P, p. 8; pp. 13-16, 63-67).

47.    Furthermore, the plaintiff and her co-employee who set up the press brake to be operated, Robert Rooney, both have testified that the foot control Tina Lindquist was using at the time of her accident was yellow; however, there is no dispute that the

Linemaster Model 532-SWH foot control was <u>orange</u>.  (<u>See</u> Appendix Exhibit B, pp. 86-87, 210-211; Appendix Exhibit O, p. 40; Appendix Exhibit Q, p. 8).

48.    The only evidence that exists in this case is that the foot control being used by Tina Lindquist was <u>not</u> the foot control which Heim sold to a Connecticut machinery distributor in 1978, and the plaintiff herself, and both of her liability experts, concede there is no evidence that the foot control the plaintiff was using at the time of her accident was sold by Heim.  (<u>See</u> Appendix Exhibit B, p. 88; Appendix Exhibit A, pp. 91-94; Appendix Exhibit E, pp. 60-70; 83, 89-111).

49.    As such, there simply is no evidence to support plaintiff's expert's speculation that plaintiff was using "the same type and model" of foot control sold by Heim and plaintiff's expert should be precluded from offering this testimony, or any testimony regarding what foot control Heim sold in 1978, at the time of trial.

3.    <u>Ralph Barnett's Opinion Regarding How The Accident Occurred.</u>

50.    Plaintiff's expert assumes Tina Lindquist's foot accidentally entered the protective housing of the foot control, accidentally activated the anti-trip lock plate, and accidentally depressed the pedal of the foot control which the plaintiff's employer had wired onto the press brake.  (<u>See</u> Appendix Exhibit A, pp. 52-53, 180-83, 206-08, 216-17; Ralph Barnett expert report, Appendix Exhibit "D," p. 2).  The plaintiff has testified that she does not know how the press brake activated and has no memory of her foot accidentally

entering the protective housing of the foot control.  (See Tina Lindquist deposition, Appendix Exhibit "B," pp. 140-52).

51.    Acknowledging that a gated foot control would not have prevented plaintiff's accident if the plaintiff was "riding the pedal," by already bypassing any safety aspect of a gate, Barnett surmises that the plaintiff's foot must have been located completely outside of the foot control prior to the presumed accidental activation and thereafter accidentally and involuntarily moved a number of ways so as to permit an accidental activation of the foot control pedal.  (See Appendix Exhibit A, pp. 180-83; p. 216).

52.    Barnett concedes that the number one reason for accidental activation of a foot control is when the user misuses the foot control by "riding the pedal" between applications.  (See Appendix Exhibit A, p. 137; pp. 51-53).

53.    Barnett also concedes he has written articles which conclude that the addition of a gate on a foot control increases the likelihood of a user "riding the pedal" because a gate makes a foot control more cumbersome and tiring to use.  (See Appendix Exhibit A, pp. 136-41).

54.    Plaintiff's expert further concedes that his gated foot control theory requires numerous underlying events to have occurred and that he has no evidence of any such events actually occurring and that he performed no testing to suggest that these events

would or could have taken place. (See Exhibit A, pp. 180-183, 206-08, 215-17, 219; Exhibit B, pp. 152-154, 163-164).

55.    Barnett did not utilize any type of methodology to surmise that the accidental involuntary movements of the plaintiff's foot would have occurred, or could have occurred, while the plaintiff was <u>sitting</u> in front of the press brake. The "test" conducted by plaintiff's expert involved subjects who were <u>standing</u> and who were stepping into a foot control, and plaintiff's expert conceded <u>no</u> similarities existed between his test and the plaintiff's incident. (See Appendix Exhibit A, pp. 218-22; pp. 178-80). Plaintiff testified that she was <u>sitting</u> at the time of the accident. (See Appendix Exhibit B, p. 140).

56.    Barnett concedes that he did not utilize or refer to any authorities in forming his opinions concerning the involuntary foot movements which he has assumed plaintiff must have exhibited from a seated or leaning position. (See Appendix Exhibit A, p. 180, 221).

57.    Barnett also concedes that there is no support for his opinions, outside of his testimony, concerning these assumed involuntary foot movements by the plaintiff. (See Appendix Exhibit A, p. 221).

58.    Barnett's opinion regarding how this accident occurred, and the involuntary accidental movements of the plaintiff's foot necessary to support his opinion, are not based

upon any facts of record, are unsupported by any accepted methodology, and should be excluded.

**B.    A DAUBERT HEARING SHOULD BE SCHEDULED IF THE COURT DETERMINES THAT THE CURRENT RECORD IS INSUFFICIENT TO ALLOW THE COURT TO RULE UPON HEIM'S MOTION IN LIMINE.**

59.    In the event the court determines that the current record is insufficient to allow it to rule upon Heim's motion in limine, a Daubert hearing should be scheduled prior to the trial of this case so that any additional facts and evidence of record deemed necessary by the court can be developed which would properly allow the court to rule upon Heim's motion in limine.  See Kerrigan, 223 F.Supp.2d at 632-33; Padillas, 186 F.3d at 418.

WHEREFORE, Heim, L.P. respectfully requests that this Honorable Court grant its motion and issue an order precluding plaintiff's liability expert, Ralph L. Barnett, from testifying at trial.  Alternatively, it is requested that this Honorable Court schedule a Daubert hearing to assess whether plaintiff's liability expert should be precluded from testifying at the trial of this case.

Respectfully submitted,

MEYER, DARRAGH, BUCKLER,
BEBENEK & ECK, P.L.L.C.


By: /s/ Paul R. Robinson
    PAUL R. ROBINSON, ESQUIRE
    PA I.D. No. 65581
    Counsel for defendant, Heim, L.P.

**PROOF OF SERVICE**

      This is to certify that a true and correct copy of the foregoing document has been

served upon all parties on the date and in the manner listed below:

| | |
|---|---|
| _____ | First Class Mail, Postage Prepaid |
| _____ | Certified Mail - Return Receipt Requested |
| _____ | Hand Delivery |
| _____ | Facsimile Transmission |
| \_\_\_X\_\_\_\_ | Electronic Transmission |

at the following address:

        Dallas W. Hartman, Esquire
        Dallas W. Hartman P.C.
        2815 Wilmington Road
        New Castle, PA 16105
          *(Counsel for Plaintiff)*

            MEYER, DARRAGH, BUCKLER,
            BEBENEK & ECK, P.L.L.C.

Date: April 9, 2007         /s/ Paul R. Robinson_____
               PAUL R. ROBINSON, ESQUIRE

P0806665.1