# EXHIBIT A

# PART 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ORIGINAL

TINA LINDQUIST,                    )

     Plaintiff,                    )

  vs.                              ) No. 04-249E

HEIM, L.P.,                        )

     Defendants.                   )

     The video deposition of RALPH L. BARNETT,

called for examination pursuant to the Rules of

Civil Procedure for the United States District

Courts pertaining to the taking of depositions,

taken before Patricia L. Wangler, a notary

public within and for the County of DuPage and

State of Illinois, at 33 North LaSalle Street,

Illinois, on the 6th day of April, 2006, at the

hour of 12:00 o'clock p.m.

Reported By:  Patricia L. Wangler, CSR

License No.:  084-002417

1

```
1    APPEARANCES:

2         DALLAS W. HARTMAN, P.C., by

3         MR. DALLAS W. HARTMAN

4         2815 Wilmington Road

5         New Castle, Pennsylvania 16105

6         (724) 652-4081

7              Representing the Plaintiff,

8

9         MEYER, DARRAGH, BUCKLER, BEBENEK &

10        ECK, P.L.L.C., by

11        PAUL R. ROBINSON

12        U.S. Steel Tower, Suite 4850

13        600 Grant Street

14        Pittsburgh, PA 15219

15        (412) 261-6600

16             Representing the Defendant.

17

18   ALSO PRESENT:

19        MS. KAROLINA TESARSKI, Videographer.

20

21

22

23

24
```
                                                              2

```
1                    I N D E X

2   WITNESS                        EXAMINATION

3   RALPH L. BARNETT

4     By Mr. Robinson                    5

5     By Mr. Hartman                   243

6

7

8

9

10

11

12               E X H I B I T S

13  NUMBER                      MARKED FOR ID

14  Barnett Deposition Exhibit

15     A                           58

16     B                           58

17     C                           87

18     D                          100

19     E                          113

20     F                          163

21     G                          246

22     H                          246

23

24
```

                                                    3

1           THE VIDEOGRAPHER:  My name is Karolina

2     Tesarski, legal video specialist with

3     McCorkle Court Reporters located at

4     200 North LaSalle Street, Suite 300, Chicago,

5     Illinois, 60601.

6           I am the camera operator on

7     April 6, 2006, for the videotaping of the

8     deposition of Ralph L. Barnett being taken at

9     33 North LaSalle, Chicago, Illinois, at the time

10    of 12:06 p.m., in the matter of Tina Lindquist,

11    Plaintiff, versus Heim, L.P., Defendant, filed

12    in the United States District Court,

13    Western District of Pennsylvania,

14    Case No. 04249E.

15          Will counsel please identify themselves

16    for the record beginning with plaintiff's

17    counsel.

18        MR. HARTMAN:  I am Dallas Hartman.  I

19    represent the Plaintiff, Tina Lindquist.

20        MR. ROBINSON:  Good morning, Paul Robinson

21    representing the Defendant Heim, L.P.

22        THE VIDEOGRAPHER:  Will the reporter please

23    identify herself and swear in the witness.

24        THE COURT REPORTER:  My name is Patti

4

1    Wangler, McCorkle Court Reporters.

2            Raise your right hand please.

3            (Witness sworn.)

4            RALPH L. BARNETT,

5    called as a witness herein, having been first

6    duly sworn, was examined and testified as

7    follows:

8                    EXAMINATION

9    BY MR. ROBINSON:

10    Q.   It still is Professor Barnett; is that

11    correct?

12    A.   It is.

13    Q.   Professor Barnett, my name is Paul

14    Robinson.  We met very briefly before we started

15    this deposition.  As you know I represent

16    Heim, L.P., --

17    A.   Yes.

18    Q.   -- a company that has been sued by Tina

19    Lindquist as a result of a very serious, a

20    tragic accident that occurred back in

21    September of 2002 up in Corry, Pennsylvania.

22    A.   Yes.

23    Q.   Do you know where that is, sir?

24    A.   I do.

5

1      Q.    You have been identified as the

2   plaintiff's expert on the liability issues

3   relating to the press brake and foot control at

4   issue in this -- made at issue in this lawsuit

5   by Tina Lindquist and her counsel.

6           And we have asked and I appreciate you

7   coming in to give us a discovery deposition so

8   we can further inquire into the circumstances,

9   facts and opinions set forth in your report.

10          The most important thing I can tell

11  you -- I know you have given many depositions

12  before and testified at trial many times; is

13  that correct?

14     A.    That is correct.

15     Q.    Hopefully the others have told you this

16  too but in all sincerity the most important

17  thing I can tell you is that I want you to

18  understand my questions.

19          Sometimes I speak quickly.  If for any

20  reason you have any trouble understanding my

21  questions, will you stop me and let me know that

22  so that I can do whatever it takes --

23     A.    I will be glad to.

24     Q.    -- to make sure that you understand it?

6

1       A.    Yes.

2       Q.    But I know you are very familiar with

3   the issues, and I have tried to get up to speed

4   myself on your past writings and your past

5   testimony so that I can speed this along as

6   quickly as I can.

7             We could be here for a long time if we

8   talk about all of your prior testimony.  I don't

9   intend to do that.

10            Have you met Tina Lindquist?

11      A.    I have.

12      Q.    And how many times have you met Tina

13  Lindquist?

14      A.    One time.

15      Q.    Was that in Mr. Hartman's office?

16      A.    It was.

17      Q.    We talked with Mr. Ulmenstein this

18  morning and he had told us about a 15-minute

19  meeting or so with Tina Lindquist.

20      A.    That was about it.

21      Q.    Did you talk with her about the

22  accident?

23      A.    Not really.  The -- I was -- she was on

24  the verge of tears for the entire time, so it

7

1    was a -- it was mostly a social introduction so

2    that she would understand, you know, that she

3    had an expert working for her.  The -- but we

4    didn't really go into any of the real testimony,

5    you know, that she -- that she had given.

6            I wasn't even sure at that time whether

7    she had given a deposition herself.  So it was a

8    very tearful and nerve-racking thing for her, so

9    it was just a quiet introduction so that she

10   would understand that there were people who were

11   representing her interests.

12       Q.   Did -- and you were one of those

13   people?

14       A.   I was.

15       Q.   Did she give you any information about

16   the happening of the accident?

17       A.   Not really at that interview.  It was

18   not -- you know, it was not for that purpose.

19       Q.   And you have used the phrase "not

20   really" --

21       A.   Right.

22       Q.   -- and I just want to make sure I

23   understand what your testimony is.  As you sit

24   here today do you remember her saying anything

                                                    8

1    at all?

2        A.   The best that I can do is that she made

3    the statement to me that she doesn't set up the

4    press.  Somebody set the thing up, told her what

5    to do, and to the best of her knowledge she

6    executed exactly what she was told to do and

7    wound up with this -- with this consequence.

8        Q.   Okay.

9        A.   Because I wanted to know whether or not

10   her training would have allowed her to do set up

11   of presses and whatnot.

12          She seemed rather young to be able to

13   do that, but I just wondered whether or not

14   the -- she could serve as a setup person, and,

15   you know, she is absolutely an operator and not

16   a setup person.

17       Q.   And when you say setup person, would it

18   be accurate to say that you are referring to

19   the attachment of the tooling and dies to the

20   table and ram of the press brake?

21       A.   Yes, and the selection of safety

22   devices and how they are set up.

23       Q.   Okay.  Anything else, sir, are you

24   including anything else in your reference to a

9

1    setup person?

2        A.    No.

3        Q.    I appreciate you clarifying the one

4    issue.

5        A.    What happens is setup people deal with

6    the -- developing the infeed system, the outfeed

7    system, you know, for the press, the location of

8    parts, you know, in proximity to the machine,

9    they set up the procedures for operation, they

10   set up the safety devices and the procedures for

11   using the safety devices, and that constitutes

12   setup of the press.

13            They, of course, will make sure that

14   the -- that everything is operational before

15   they turn it over to an operator.

16       Q.    And these -- are these setup people

17   employees of the employer at issue in this

18   particular case, Corry Manufacturing?

19       A.    Yes, I didn't see any real deviation

20   from what is always done in the industry and

21   what was done with Corry.

22       Q.    Did you ever visit the Corry plant?

23       A.    No.

24       Q.    Have you ever talked with any of the

10

1    people that were working with Tina Lindquist

2    that day?

3        A.    No.

4        Q.    Did you ever speak with anyone that was

5    an employee of the plant regarding the setup of

6    this particular press brake?

7        A.    No.

8        Q.    Would you agree that the machine that

9    we are talking about in this lawsuit is

10   preferably referred to a press brake, Corry

11   press brake?

12       A.    I would, yes.

13       Q.    Which -- do you have a preference as

14   to --

15       A.    It a press brake.

16       Q.    And did Tina Lindquist at any time ever

17   tell you how her -- how the machine came to be

18   activated?

19       A.    No.

20       Q.    Did she tell you that she didn't know?

21       A.    No, we just didn't go into it one way

22   or another.

23       Q.    Have you reviewed Tina Lindquist's

24   deposition transcript?

11

1        A.    I did but it has been a while and I

2    couldn't review it again last night because

3    the -- you know, the file was sort of divided up

4    between Mr. Ulmenstein and myself, and that's

5    one of the -- one of the summaries and things

6    and depositions that I didn't get.  I have a

7    part of the file with me that I didn't have that

8    to rereview last night.

9        Q.    And is this a part of the original file

10    so are these original file materials in front of

11    you today?

12        A.    I don't even know what the phrase

13    "original materials" means so you will have to

14    explain that to me.

15        Q.    Are they the first copy of the

16    documents that came into your possession, or

17    have they been copied at some point such that

18    the same documents would exist back in the

19    office?

20        A.    They may be copies of documents we have

21    back in the office.  I -- yesterday when I met

22    with Mr. Hartman, he asked for the B11.3

23    standards which are the standards for press

24    brakes, and another copy was run off for him.

                                                    12

```
 1    And I think I have one of the copies that was

 2    run off, you know, yesterday, so I am sure I

 3    have both documents that were originally

 4    furnished and copies of documents.  I am sure it

 5    is a combination.

 6        Q.   Okay.  Do you have a memory -- strike

 7    that.

 8             Did you read the entire deposition

 9    transcript of Tina Lindquist?

10        A.   Yes, I did, at one time.

11        Q.   Did you prepare a summary of that

12    transcript?

13        A.   No, Matt Ulmenstein did the summary.

14        Q.   And the plaintiffs were under a court

15    order to bring -- to provide us with a copy of

16    the -- all of the file materials.  And we have

17    learned today that certain materials were not

18    provided to us before today.

19        A.   Well, I am a little surprised to hear

20    that because yesterday when I was asking Matt,

21    you know, what is it that I should bring --

22        Q.   For the record Matt --

23        A.   -- he said -- Matt Ulmenstein, he said

24    you don't have to bring anything because I made
```

                                                    13

1    a copy of the entire file and sent that on.  And

2    I questioned him about only one item.  I said,

3    since we did the file, we had discovered a case

4    in our billing, there was a notation in our

5    billing records about something that I had

6    looked at for Rousselle and that you had made a

7    request for that.

8         I said was that sent ahead or do I have

9    to bring that now?  He said, No, that was also

10   sent.  So I am under the impression that our

11   entire file has been sent to you.

12      Q.   Okay, well, that impression is

13   incorrect, and it is now known by everyone in

14   the room to be incorrect.

15      A.   Okay.

16   MR. ROBINSON:  Do you have Exhibit A from

17   Mr. Ulmenstein's deposition.  Thank you very

18   much, Patti.

19   BY MR. ROBINSON:

20      Q.   What we have marked as Exhibit A is a

21   complete copy of all of the materials that have

22   been sent to me exclusive of the videotape of

23   the inspection of the machine that has been

24   represented to be a complete copy of all the

14

1    file materials less discovery that has been

2    submitted between the parties and deposition

3    transcripts, things that we certainly would have

4    in our file already.

5        A.   I see.

6        Q.   And in this packet of documents that

7    are no deposition summaries.  That's one item

8    that we know has not been provided to us.

9        A.   I see.  Well, what happens is he gave

10   me two deposition summaries last night and -- of

11   the corporate designees, so I have two

12   deposition summaries, but I don't have the

13   deposition summary of the plaintiff, so I have

14   those with me, the -- and I assume those were

15   sent to you.

16       Q.   Okay.  One other thing I noticed that

17   was not in here are notes.  And I had asked

18   Mr. Ulmenstein whether he takes notes, he

19   mentioned he may have had a dozen or so

20   conversations with Mr. Hartman and whether or

21   not he takes notes, and he said he will on

22   occasion, he has no memory one or the other

23   doing it in this case.  It may have been

24   disposed of if he did.

15

1           How about yourself, do you typically

2    take notes?  I personally as you can see here

3    take many, many notes in the life of a case.

4        A.   No, I don't normally take notes, but I

5    sometimes make notations.  And -- for example,

6    when you read the deposition summaries of

7    Mr. Z-A-J-D-E-L and Mr. Mase, there are places

8    where I put stars and things in red, and so

9    that's a typical thing that I do on deposition

10   summaries.

11          And the -- normally if I will read an

12   expert's report, I will make notes on an

13   expert's report.  And I have not done this, but

14   Matt Ulmenstein has made notations on the expert

15   reports, and I have his reports with the

16   notations with me.

17       Q.   Okay, that's something else we haven't

18   been provided with.  And this is part of what

19   the topic I am addressing as you probably can

20   tell, is I am trying to find out what we have

21   not been provided with following the court's

22   order for the plaintiffs to produce all of the

23   file materials.  Did you know that Tina

24   Lindquist's attorney objected to producing the

                                                        16

1    entire file of Triodyne?

2        A.    I have no knowledge one way or the

3    other.

4        Q.    Do you know any of reason why there

5    would be an objection to producing the entire

6    file of Triodyne?

7        A.    Absolutely not.  As a matter of fact,

8    one of the reasons why I like to have the

9    depositions at my facility rather than yours is

10   because I instantly straighten all that out.  If

11   you need something that somebody has overlooked,

12   I have it there.  There is three Bankers Boxes

13   of stuff, and I will always have it there.

14       Q.    Okay, that's typically done, you

15   produce your entire file; isn't it?

16       A.    I would say that's not typically done.

17   I normally never produce the depositions.  You

18   know, I will have 25 depositions in a case, you

19   know, that are this big, and I don't fly to

20   California with them.

21       Q.    I misspoke.  It is typically the case

22   that you would produce all nondiscovery type

23   items that were generated by your firm to the

24   other side before your deposition?

17

1      A.    Absolutely.  What happens in the

2  discovery process that all parties are entitled

3  to see everything.  And we -- we support that

4  notion and usually when it is not done, it is

5  because of procedural things, it is not because

6  somebody doesn't want you to see something.

7           It is just because requests, you know,

8  there is one document, five people want to look

9  at it, the -- and so it is always things of that

10 type that you don't get it all at one time.

11          And it is not because anything is

12 hidden.  The -- you know, we have now gone, you

13 know, three or four decades into this business,

14 and full discovery, you know, is where we have

15 all come to in this process and I support that.

16     Q.    So you don't have any explanation as to

17 why there was a refusal to produce the entire

18 file?

19     A.    I didn't know that there is a refusal,

20 but there is certainly nothing that I would not

21 show you.

22     Q.    Do you have a copy of your report?

23     A.    Yes, I do.

24     Q.    I will be going through that at various

18

1    points today as well as some other documents

2    that I will show to you.  I want to see if I can

3    state the gist of your opinion --

4        A.    All right.

5        Q.    -- so that we can have a working

6    knowledge of what that is.  Is it your opinion

7    that the foot control that was being used by

8    Tina Lindquist at the time of her injury was

9    defective because it did not have a gate on the

10   front of the foot control?

11       A.    I think that's a complete statement of

12   the -- of my opinion.

13       Q.    In reviewing your report I didn't

14   notice any other areas of defect that you were

15   claiming other than the one I just stated.

16       A.    That's correct, but it is -- with the

17   only thing I would add to that is that I want

18   the same footswitch that was involved in this

19   accident with the addition of the gate because

20   Linemaster makes the -- everything else should

21   be there and the gate also should be -- you

22   know, should be added, and that's part of the

23   testing I did was with the full -- with the

24   Linemaster switch with the gate on it.

19

1      Q.    So is it fair to say that the opinion,

2    the only opinion that you have expressed so far

3    in your report and the only opinion that you

4    intend to express to a jury and to the court

5    would be the one that I just stated relative to

6    the foot control that was being used by Tina

7    Lindquist being defective because it did not

8    have a gate on the front of it?

9      A.    Right, and whatever ancillary things

10   support that, you know, the -- support that

11   opinion.

12     Q.    And I want to make sure I understand --

13     A.    Because I have done testing and I would

14   want to show them the testing, but it is all

15   based on that one conclusion.

16     Q.    So you are saying that there are other

17   facts --

18     A.    Yes.

19     Q.    -- that you have gleaned that support

20   that opinion, that there is testing that you

21   have performed that supports that opinion.  Is

22   there anything else that is ancillary that

23   supports that opinion?

24            And I want to make sure I include your

                                                    20

1    review of materials.  I certainly understand

2    that you have reviewed materials in coming to

3    your opinion.  I just want to make sure that

4    there is no misunderstanding at any time after

5    today that I fully know the -- and my client

6    fully knows the opinion that you are expressing.

7    And that's the one I have already stated.

8        A.    Look, I will just quickly go through

9    the -- my opinion thing that I think you have

10   stated it.

11       Q.    I don't want you to read into your

12   report.  I want to make this go a little more

13   quickly than that.  I have read your report.  I

14   just want to make sure we are on the same page

15   with regard to your opinion.

16       A.    I think we -- you stated it very

17   succinctly.

18       Q.    Thank you, sir.  Have you ever given

19   that opinion before?

20       A.    I don't really think so.

21       Q.    Okay.  We have been looking into your

22   prior testimony to make sure that we understand

23   your history and your knowledge and it is

24   overwhelming, may be an appropriate word, but

                                                    21

1     there is a lot of it.

2            One of the items I saw was that you

3     have testified for the past 30 years?

4         A.    Yes, since 1969.

5         Q.    Approaching 40 years.

6         A.    Yes.

7         Q.    37 I suppose?

8         A.    Right, right.

9         Q.    Over 3,000 deposition -- depositions?

10        A.    Right, it is between now 3,000 and

11    4,000 depositions.

12        Q.    Do you keep track of them all?

13        A.    Well, in a vague way.  When I started,

14    we didn't do that.  But now what happens is that

15    there is a federal rule that has asked experts

16    to keep track of their deposition and trial

17    testimony.  So in the last year since that has

18    been in effect we have complete details of all

19    of the -- of all of that.

20        Q.    And that's more recent, is it four

21    years -- the time period escaped me.  Have you

22    kept them throughout all of your profession --

23        A.    No.

24        Q.    -- and opinion testimony?

                                                    22

1        A.    No, I haven't.  And the --

2        Q.    I am wondering how you get to the

3    number?

4        A.    Well, because what was happening is

5    that I have been asked the question at every

6    deposition and every trial since I began, you

7    know, 37 years ago, and so I keep accumulating

8    the number, and although I can't give you the --

9    you know, the number it is 3,122, it is over

10    3,000, the -- and there is not a question about

11    that.

12        You can't physically house them because

13    the testimony is a couple inches thick on each

14    document and you multiply that by 3,000, the

15    room we are in is not large enough to hold all

16    the testimony.

17        Q.    Have you ever thought of compiling it

18    onto computer disks?

19        A.    When we did decide to do that, it was

20    already -- you know, when I started out, there

21    wasn't even such a thing as a computer disk, so

22    it is too late for that.

23        Q.    Well, you understand there are scanning

24    capabilities --

23

1      A.    But I don't have the things to scan is

2    the problem.

3      Q.    That's what I wanted to know.

4            Now, on the prior depositions do you

5    have any type of summary of the substance of

6    your opinions or the products that you were

7    addressing throughout that testimony?

8      A.    No, I haven't.

9      Q.    It is up here?

10     A.    It is up here.

11     Q.    And I have seen you answer the types of

12   questions about your past testimony in other

13   cases, and I will refer you to similar type of

14   questions.

15           One of my goals here as you might

16   expect is for me not to have to pull out all

17   those transcripts at a later point but to amass

18   them altogether and hopefully get everything out

19   that you have testified under oath before, put

20   into one workable transcript so we can have --

21     A.    Right.

22     Q.    -- something manageable.

23     A.    We would have to always make an

24   estimate of the things because there is no

24

1    possible way that that could be done, you know,

2    in an exact fashion.

3        Q.   No, I understand.  We mentioned the

4    deposition -- the depositions.  I also

5    understand you have testified at trial in excess

6    of 500 times?

7        A.   Yes.

8        Q.   Do you have a current tally of that

9    number?

10       A.   No, I don't.  It is just an estimate.

11   But, you know, since this thing -- since this

12   federal rule has been put in, we now keep real

13   track of that and so the -- I produce that at

14   every deposition, at least a four year -- see, I

15   have in front of me April 5th, 2006, back to

16   April 9th, 2002.  And between those two dates I

17   have every trial and every deposition listed.

18   And that's now done for all of my people and for

19   myself and so now we keep track of it.

20       Q.   Well, is there any discussion as to

21   what the product was in your summary?

22       A.   No.

23       Q.   Okay.  And is there any reference to

24   the opinion that you addressed?

25

1      A.    No.

2      Q.    Okay.  That's up here and in your prior

3    depositions?

4      A.    Pretty much.

5      Q.    I take it you have also in addition to

6    depositions and in addition to trial testimony

7    have submitted reports?

8      A.    Right.

9      Q.    That as we know typically precede your

10   deposition?

11     A.    Right.

12     Q.    And certainly precede the trial.

13           Would it be fair to say that you

14   authored more reports than the number of

15   depositions you have given?

16     A.    If I had to make an estimate, I would

17   say there is 20,000 reports.  We have done

18   32,000 cases at Triodyne.  I have other people

19   who have written reports, but I certainly have

20   authored 20,000 I would guess.

21     Q.    And I understand you have given

22   testimony concerning a number of different

23   machines?

24     A.    Right, because I am -- I am -- my firm

26

1    and my background is all mechanical engineering,

2    and so in the field of mechanical engineering I

3    have testified on several thousand products

4    because I cover 2,000 products as a professor.

5    In order to get out of Illinois Institute of

6    Technology with a bachelor's degree in

7    mechanical engineering you see 2,000 products,

8    so certainly every one of those, you know,

9    the -- I have testified about, have done

10   research on most of them, but it is a larger

11   number than that, but they are all mechanical

12   products.

13       Q.   I understand you have testified for the

14   plaintiffs' side of the cases and for the

15   defense side of the cases?

16       A.   Yes.

17       Q.   I didn't see an easy reference.  Have

18   you broken it down?  Have you any idea as to

19   percentages?

20       A.   50/50, we hold it at that.

21       Q.   What do you mean you hold it at that?

22       A.   We make sure that we stay 50/50 in

23   terms of representation.  And if I find we are

24   drifting off of that, I call my friends either

27

1    in the plaintiffs' bar or the defense bar and I

2    ask them for more cases, you know, the -- so

3    that it comes up to 50/50.

4           You go through my -- this list that I

5    am going to give you today, you know, you will

6    probably find it is really close to 50/50.

7       Q.   And I believe this list that you

8    referred to would have been already provided to

9    us as required by the rules.  Actually it

10   wasn't, we then asked for it because we are

11   typically used to seeing it and then it was

12   subsequently provided to us.

13      A.   Okay.

14      Q.   You have represented press brake

15   manufacturers before?

16      A.   Oh, yes.

17      Q.   How many different press brake

18   manufacturers?

19      A.    I tried to put together some summary

20   yesterday, Cincinnati, 12 cases;

21   Drayson Crump (phonetic), 36 cases; Pacific, 13

22   cases; Verson, 22 cases; Dearco, one case;

23   Wieson and Myles (phonetic), 1.  There is a --

24   Federal Machinery, 2; YMG, a press company, 1;

                                                    28

1    and then a lot of press cases where I don't

2    represent the manufacturer, but I represent a

3    footswitch manufacturer or some component, but I

4    have done 111 press brake cases that I could

5    find.

6        Q.    When you mentioned there are other

7    entities other than press brake manufacturers,

8    would that also include distributors?

9        A.    Yes.

10       Q.    Would those include --

11       A.    An aircraft company will have an

12   accident on a press brake and I will represent

13   the aircraft company.

14       Q.    Would those be included in the 111

15   or would those be in addition?

16       A.    111, 111 is the best that I could put

17   together.

18       Q.    And how did you do that exercise?

19       A.    The -- I asked my staff, you know,

20   to -- from whatever sources they have.  We have

21   no buttons we can push to do this, so this

22   number could be larger, but it can't be smaller

23   than this.

24       Q.    Those are the ones you located --

29

1      A.    Right.

2      Q.    -- or your staff located?

3      A.    Exactly.

4      Q.    How about cases where you represent

5    plaintiffs against press brake manufacturers,

6    let's use the 111, against those entities, how

7    many cases have you had where you were opposed

8    to the manufacturers, distributors, other

9    entities in the industry I think is how you said

10   it?

11     A.    I don't know how it is broken up, but

12   in the 111 there are both plaintiff and defense

13   cases.

14     Q.    Do you have any idea as to the ratio?

15     A.    It will be a -- predominantly defense

16   cases because the code of ethics, you know,

17   the -- won't allow you to -- if you have the

18   same concept, you know, if I do a concept for

19   Verson Press, I can't testify against Verson

20   Press on that same concept.

21           So when I represent Ford Motor Company

22   on tires, I don't take cases against them on

23   tires.  I could take it against them, you know,

24   on roof crushing, which I haven't done any work

                                                    30

1    on roof crushing, but I can't take a case

2    against tires.  That's how the engineer code of

3    ethics works.

4        Q.   Do you know of any press brake

5    manufacturers that you have been adverse to

6    because of your involvement on behalf of a

7    plaintiff?

8        A.   I just haven't got the memory of --

9    there is a number of foreign machines that I

10   have not represented and so I have -- I think

11   Dearco is a plaintiff's case, against Dearco, I

12   think Wieson and Myles is a plaintiff's case

13   against the manufacturer, there is a German

14   company M-U-H-E, and then O-N-D, Bender and

15   Machine, and that's a plaintiff's case against

16   them.  I think the YMG case is against that

17   company, so the --

18       Q.   Those are the single cases I think you

19   are pointing out from your list?

20       A.   Yes, exactly.

21       Q.   So there are 4 there of the 111?

22       A.   Right.

23       Q.   Have you ever represented a plaintiff

24   in a case adverse to an American manufacturer of

31

1    press brakes?

2        A.    I just -- I don't remember.  I don't

3    remember.

4        Q.    You can't think of any today?

5        A.    Right, I would have to really look at

6    that to see.

7        Q.    Would you have any records available to

8    you?  When you say I have to look at it, do you

9    just assume there are records?

10        A.    Well, I have to talk to the project

11    engineers and see what they remember because I

12    don't have this computerized, this is not

13    computerized.

14        Q.    And I am just trying to learn how it

15    would be that you would go about doing such a

16    thing.

17        A.    Right.  At one time we were going to

18    put together a system like this and it was

19    $2 1/2 million to put that together and it is

20    $2 1/2 million that doesn't serve any real

21    purpose except to make defense and plaintiff's

22    attorneys happy at depositions of this kind.

23        Q.    What was 2 1/2 million?

24        A.    2 1/2 million to put together my work

32

1    so that you could go ahead and answer questions,

2    what was the plaintiffs, what were the defense,

3    what was your position on the cases, who can

4    you -- you know, that sort of strategic

5    information.

6        Q.    Did you get more than one quote on that

7    number?

8        A.    It was from Beth Hamilton who did the

9    work and said, you have to be kidding.  You

10   know, the -- and said it is $2 1/2 million to

11   do this.

12       Q.    Did you get more than one quote?

13       A.    No, that's from my head librarian at

14   that time.

15       Q.    Is she still with you?

16       A.    She is not with any of us.

17       Q.    Yeah, okay.

18             Have you also represented foot control

19   manufacturers?

20       A.    Oh, yes.

21       Q.    And can you list for us.  I have seen a

22   list.  I could probably go through it and

23   make -- see -- let's do it that way.

24       A.    I can could try and help you.

                                                    33

1    Linemaster, you know, Allen-Bradley, Reese,

2    Square D, the -- those are ones that I can

3    remember now.

4         Q.    Clark Controller?

5         A.    What's that again?

6         Q.    Clark Controller?

7         A.    Absolutely.

8         Q.    Allen-Bradley, Linemaster, Clark

9    Controller, Square D, Reese, anyone else?

10        A.    I am sure there is others, but that's

11   what I can think of.

12        Q.    If you think of any today, feel free if

13   it pops into your mind to let me know.

14        A.    I will do that, I will do that.

15        Q.    Have you ever represented a plaintiff

16   adverse, similar question as I did with the

17   press brakes, adverse to a foot control

18   manufacturer?

19        A.    I don't really recall, a plaintiff

20   against a switch manufacturer.

21        Q.    Do you call them footswitches or foot

22   controls?

23        A.    I call them both, but the standard for

24   press brakes call the switches that are electric

34

1    and pneumatic, they call them foot controls, and

2    then there is foot pedals, you know, that

3    they --

4        Q.    Treadles?

5        A.    -- which we call pedals for mechanical,

6    and treadles is another mechanical, but they are

7    really long bars in front of the machine as

8    opposed to a thing that's about the size of your

9    shoe.

10       Q.    What do you call the device that you

11   believe Tina Lindquist was using at the time of

12   her injury?

13       A.    That would be a foot control.

14       Q.    I want to make sure I have the -- we

15   use the same terminology because as you point

16   out, there are differences depending upon which

17   term you use; right?

18       A.    Absolutely.  And you will have to watch

19   me because the formalism imposed by standards

20   has -- is -- does not mean the entire industry

21   calls everything by the same -- by the same

22   names.

23       Q.    In this case alone I have heard many,

24   many different terminology used.

35

 1         A.    Right, foot actuating devices, and we

 2    have a whole group of things, but so that the

 3    jury can follow what we are dealing with, you

 4    and I will do our best to try to call things by

 5    one name that everybody is using so as not to

 6    confuse anybody more than we have to.

 7         Q.    Right, I appreciate that.

 8               Have you ever in the -- just to

 9    complete I guess the similar types of questions,

10    how many cases do you estimate, sir, that you

11    have handled on behalf of the foot control

12    industry?

13               You mentioned the companies involved

14    now, the similar question with the 111 and the

15    press brakes, how many times have you defended

16    foot controls?

17         A.    I didn't make an attempt to find that

18    out.  I just looked at punch presses, you know,

19    mechanical presses and press brakes is all I

20    looked at, but I don't know.

21         Q.    Give it to me this way then, for

22    Allen-Bradley give me a minimum number that you

23    know that you represented them on.

24         A.    A dozen.

                                                        36

1      Q.    And when I say represented them on, I

2    am referring to performed any work, not

3    necessarily been deposed but been retained.

4      A.    Yes, certainly a dozen.

5      Q.    Linemaster?

6      A.    I would also guess a dozen.

7      Q.    Clark Controller?

8      A.    I would think that would be a

9    half a dozen.

10     Q.    Square D?

11     A.    I would guess a half a dozen.

12     Q.    Do you know Norm Wetlan (phonetic)?

13     A.    I know who he is.

14     Q.    How about Reese?

15     A.    Reese, I think it is about -- also

16   about a half a dozen, maybe four.

17     Q.    Roughly I have 42, over --

18     A.    Oh, sure.

19     Q.    Do you feel very comfortable?

20     A.    Oh, absolutely.

21     Q.    Have you represented foot control

22   manufacturers against claims of defects with

23   those foot controls where the foot control at

24   issue did not have a gate on the front?

37

1      A.   Oh, certainly, certainly.

2      Q.   And how many times would that be

3  approximately?

4      A.   I don't know.  I have no way of

5  knowing.

6      Q.   Do you recall maybe the converse, how

7  many times of those 40 plus you represented a

8  foot control manufacturer where there was a

9  gate?

10     A.   Well, I think in almost every

11  Allen-Bradley case there was a gate, so I

12  represented, you know, because of the mousetrap

13  design.  I have represented a lot of people with

14  the gate.

15          But my position -- see, I have a

16  position that doesn't allow -- that doesn't hold

17  a footswitch manufacturer responsible for

18  selecting the right footswitch for a piece of

19  machinery.

20     Q.   What do you mean by that?

21     A.   Well, what happens is is that somebody

22  will have a piece of machinery and blame a

23  footswitch manufacturer for furnishing the wrong

24  footswitch for that machine.  And it turns out

38

1    the footswitch manufacturers have absolutely no

2    idea what it is that they have to do for a

3    particular machine.  It is completely outside of

4    their purview.  And so what I have done is

5    represented what those manufacturers do, the

6    menu that they provide and that it is the

7    responsibility of the machine manufacturers to

8    select from their menu those footswitches --

9    footswitches or foot controls or foot pedals or

10   foot treadles which are -- you know, which makes

11   some sense for their machine.

12        It is a drop forge, you know, if it is

13   a sewing machine, if it is a press brake or a --

14   a punch press, all of these things require

15   different kinds of switches or pedals or foot

16   controls depending on what it is.

17        And there is not a chance -- you know,

18   when -- Allen-Bradley is one of the largest

19   manufacturers of electrical devices in this

20   country, you know.  I met with their staff and

21   so many occasions that, you know, I can't even

22   bring to tell you.  And that's just a joke, they

23   have not a clue what kind of a foot, you know,

24   control, that they shouldn't send out for a

39

1    given machine.  That's why they retain me.

2       Q.   Is part of that reason because it

3    depends on what type of use is being put to that

4    machine?

5       A.   Exactly, but it is more than that, is

6    that they are experts on the manufacturer of

7    foot controls.  They are not experts on every

8    machine that we have extent in the

9    United States, you see, so they just don't have

10   the expertise to do a power press, the expertise

11   to do a press brake, the expertise to do a

12   sewing machine.

13          They don't know how you are going to

14   use, what the machines -- how you are going to

15   use the machines and what are the requirements

16   for every machine.

17          And there are -- it's really amazing.

18   I have -- you know, if I show you a foot control

19   that has absolutely no guard on it at all, and I

20   will show you it is the optimum control because

21   it is used for an emergency stop, you want to be

22   able to hit it from every direction, sort of

23   like the control we use in San Francisco on

24   those -- the streetcars where a man is clanging,

40

```
 1    he keeps hitting the control, you know, as a

 2    clanging thing, he wants to be able to hit it

 3    from every direction, you don't put a cover on

 4    such a control, you want him to be able to get

 5    to it.

 6            And if you use that, for example, in a

 7    punch press operation, it would be the most

 8    dreadful control in the world.  The -- it

 9    depends on what you are trying to do.

10    Q.    What -- can you give me a percentage of

11    the number of cases that -- of the ones where

12    you have represented the foot control industry,

13    the number of cases that would include a gate,

14    the number of cases that would not involve a

15    gate?

16    A.    I have no idea.

17    Q.    I take it from what you are saying that

18    you have claimed in your representation of the

19    injury that --

20    A.    Excuse me, I do have an idea.

21    Q.    Great.

22    A.    In almost every case that I have had

23    against the foot control people every one of

24    them wants the mousetrap device.  I don't care
```

41

1    what they furnished, they all say it should have

2    been the mousetrap design which is the one by

3    Allen-Bradley with this drawbridge concept.

4        Q.    Who said they wanted it?

5        A.    That's the plaintiff's bar.

6        Q.    And you have been on the industry side

7    representing the foot control industry's

8    position?

9        A.    Right.

10       Q.    Saying it was not necessary?

11       A.    Well, it depends on what, you know,

12   what machine is involved.

13       Q.    And what use is being involved of that

14   machine?

15       A.    Exactly, exactly.

16       Q.    Okay.  Have you represented press brake

17   manufacturers where the claim being made against

18   them is that they supplied a defective foot

19   control with their press brake?

20       A.    I don't recall that being the issue in

21   the press brake cases that I have done.

22       Q.    Have you represented -- by the way,

23   111, is that purely press brakes, or is that

24   power presses included?

                                                    42

1      A.    Only press brakes.  Power presses is a

2   much, much bigger number.

3      Q.    What would that number be?

4      A.    644.  Obviously I looked that up, you

5   know.  I had my staff work on that yesterday.

6   There is no way in the world I would remember

7   that by myself.

8      Q.    And would the same be true that the

9   significant number of those would also be for

10  the power press manufacturers and not for the

11  plaintiffs?

12     A.    That's right.  The -- but it's -- the

13  majority of them are, but I have done a huge

14  number of, you know, plaintiffs' cases on power

15  presses.  I have active cases now.

16     Q.    Have you represented the power press

17  industry in defense of claims that the foot

18  control that was supplied with those power

19  presses was defective?

20     A.    Absolutely.

21     Q.    Have you ever defended in that

22  situation where you were representing either a

23  press brake manufacturer or a power press

24  manufacturer where the claim is that the foot

                                              43

1    control that was supplied renders it defective?

2        A.   Yes.

3        Q.   Have you ever defended a foot control

4    that did not have a gate?

5        A.   Often.

6        Q.   Give me a number of occasions.

7        A.   I can't --

8        Q.   Just general.  I just want to see if we

9    can break it down at all.

10       A.   The -- in the power press things it has

11   got to be hundreds of times where the people,

12   when they have a -- an accidental activation of

13   a foot control would -- the plaintiff's position

14   was that you should use the Allen-Bradley

15   mousetrap design.

16            And on those the -- in every one of

17   those cases I would argue that the -- unless you

18   are using the machine on continuous, the single

19   stroke applications it is the absolute worst

20   possible design that you can have.

21       Q.   Can you tell us why that is.

22       A.   Yes, because it -- it almost forces you

23   to ride the pedal and that's the --

24       Q.   Go ahead.

44

1          A.    Riding the pedal means that -- it is

2     like carrying a gun around with your finger on

3     the trigger all the time.  And the -- so if I am

4     standing in front of a machine and I have my

5     foot over the pedal so I have raised my foot up

6     and I sneeze or I reach forward or I get tired

7     or somebody pushes me from the back, every one

8     of those things puts pressure on the pedal.

9               And when we started with this thing,

10    those machines, those power presses were a full

11    revolution, what is called a full revolution

12    clutch.  You touch the pedal and you get a full

13    stroke.  You just touch it, just like this, and

14    you get a full stroke.  So it was devastating.

15    It was devastating.

16              The full stroke is so fast that it is

17    beyond your reaction time.  There is no chance

18    that you could escape because by the time you

19    perceive what's going on, cognitively figure out

20    what you want to do and then execute, you get a

21    removal of your hand or some dodging method that

22    you have, your hand is already cut off.  So

23    the -- it is not just that I have written on

24    this thing, but I advised every one of the press

45