# EXHIBIT A

# PART 4

1    foot control without a locking plate would not

2    be defective on a power press?  Have you ever

3    testified to that?

4         A.    I have advocated the -- that gates not

5    be used on power presses for certain kinds of --

6    for certain kinds of -- you know, of

7    footswitches, so I am actually -- you know,

8    advocated the thing and published it and so

9    forth.  I have the publications here that won't

10   let you do it.

11        Q.    That say that a foot control is

12   actually more dangerous with a gate?

13        A.    That's right, and this is a -- that has

14   to do with the punch press.  And it has nothing

15   to do with a press brake.

16        Q.    Unless the punch press is used

17   similar -- excuse me, unless the press brake is

18   used in a similar fashion as a punch press, is

19   that right?

20        A.    Well, I don't know how this is going to

21   be used in a similar fashion to the -- you know,

22   to the units that I am talking about because I

23   am talking about fast machines that are full

24   revolution machines and this thing here is a

136

1    partial revolution machine that is slow motion

2    compared to the -- you know, to -- to punch

3    presses and has -- the general purpose of the

4    machine has you migrating and spending lots of

5    time between strokes.

6         The -- it is a completely different

7    animal, and I thought one of your witnesses did

8    a wonderful job of educating you on the

9    differences between the two machines.

10    Q.   Is a -- is riding the pedal the most

11    prevalent cause of accidental activation of

12    power presses?

13    A.   Yes.

14    Q.   And is it true that the more difficult

15    it is to step into and out of a foot control the

16    more likely it is that operators will ride the

17    pedal?

18    A.   Yes.

19    Q.   Is it also true that the -- that

20    85 percent of all machine accidents are caused

21    by the user and only 5 percent of machine

22    accidents are caused by the machine?

23    A.   Yes.  Those were the statistics that I

24    have published.

137

1    Q.    And as I mentioned to you --

2    A.    They change --

3    Q.    -- you try to draw your comments into

4    one transcript for use?

5    A.    I think you are accurately representing

6    it.

7    Q.    Have you ever taught at any other

8    location other than the institute here in

9    Chicago?

10    A.    You mean with over 300 seminars around

11    the world?

12    Q.    So there are other times where you have

13    taught?

14    A.    Yes.

15    Q.    And you have taught the industry as

16    well I think?

17    A.    Yes.

18    Q.    Have you ever taught the industry that

19    using an ungated foot control is defective on a

20    press brake?

21    A.    I don't think I have addressed that

22    issue at all.

23    Q.    Have you ever taught in your -- how

24    long have you been teaching at the -- in

138

1    Chicago?

2        A.    47 years.

3        Q.    Have you ever taught in your courses

4    that using an ungated foot control on a press

5    brake is defective?

6        A.    Probably.  The -- because what I am

7    trying to do is minimize accidental activation,

8    and I would have gone through with my class all

9    of the different schemes that we now know about

10   for minimizing accidental activation.

11       Q.    As you sit here today, sir, do you ever

12   remember teaching a class and indicating that

13   the use of an ungated foot control in a foot

14   brake is defective?

15       A.    I don't really think the -- I have ever

16   stated it in that way.

17       Q.    Have you ever written that opinion --

18   because that's the opinion you have here in this

19   case?

20       A.    Right, right.

21       Q.    Have you ever written on that opinion

22   before?

23       A.    No, I think all the things I have

24   written about are power presses, not press

139

1    brakes.

2        Q.    You have never written on a press

3    brake?

4        A.    I have never written about this on a

5    press brake.

6        Q.    You wrote about foot controls you said

7    with use on press brakes or power presses?

8        A.    No, the things that I have done are

9    general.  My work on -- is human factors work on

10   foot controls which allow you to apply this

11   stuff to any machine.

12       Q.    That's my point.  You have written on

13   the use of foot controls on any machine which

14   would include press brakes; is that fair?

15       A.    That's right.

16       Q.    Okay.  Have you ever written that the

17   use of ungated foot control on a press brake is

18   defective?

19       A.    No, you see in here I don't take any

20   machine -- on any of these things I have not

21   taken a machine and said for this machine this

22   is the one you have to use.  I have not done

23   that on press brakes.

24       Q.    Would it be fair to say that in

140

1    relation to gates and the use of gates that your

2    writings and your teachings have indicated that

3    they increase a danger of riding the pedal?

4        A.    They decrease one danger, they increase

5    another one.  That's what the whole purpose of

6    my work is.

7        Q.    My question is very straightforward.

8    Would it be true that your teachings have been

9    that the use of gates move the foot controls

10   over to the right side of your schematic which

11   are more hazardous foot controls?

12       A.    No, no, no, no, that's not what the

13   article says.

14       Q.    Okay.

15       A.    What the article says is the likelihood

16   of riding the pedal increases from left to right

17   as you go to the gated unit.

18            As you go from completely open to

19   completely closed with the mousetrap, the

20   likelihood of riding the pedal goes up.  And

21   that's a bad thing except when you solve the

22   problem like Linemaster has, and if you have

23   a -- if you have the locking plate plus single

24   stroke control on your machine, you have now

141

1   solved the problem.  And so you are now able to

2   take care of the accidental stepping onto the

3   pedal which gets better and better as you have

4   the gate in front and you are able to use that

5   wonderful feature of the gate because you

6   haven't introduced a new hazard in the machine.

7        Q.   Does Linemaster continue to sell the

8   ungated foot control?

9        A.   Sure, they sell a full line of controls

10  that do everything from completely unguarded

11  the -- to, you know, this whole menu of things.

12       Q.   Has Linemaster ever indicated to your

13  knowledge in any of their literature that using

14  an ungated foot control on a press brake is

15  dangerous?

16       A.   No, because they are not dummies.  They

17  don't tell you what foot control to use for a

18  given machine.  They don't do that.  They leave

19  that to the manufacturer of the machines to

20  select from their menu and all the other

21  competitors' menus, select the ones that are

22  good for your machine.

23            Linemaster doesn't tell you on a punch

24  press to use this, on a press brake to use that.

142

1    They don't make that recommendation.

2        Q.   Do you know of any press brake

3    manufacturer that has instructed that the use of

4    a gated foot control is dangerous or renders it

5    defective?

6        A.   On a press brake?

7        Q.   Yes, sir.

8        A.   I don't know that anybody has ever said

9    that.  I just know that they use gated controls.

10       Q.   Do you know anyone in the industry

11   besides yourself that have ever -- has ever

12   offered the opinion that using an ungated foot

13   control on a press brake renders the foot

14   control defective?

15       A.   I don't know.  I have no idea what

16   opinions people are rendering.

17       Q.   As you sit here today you are the only

18   person you know that has ever rendered that

19   opinion; is that right?

20       A.   That's right.  And I am probably the

21   most authoritative person that you will ever

22   find in this area.

23       Q.   Have you ever rendered that opinion in

24   any other setting besides this lawsuit?

143

1        A.    I don't think I said it this way.  I

2    think that what I do is I present my data to

3    different people and the -- many of the

4    manufacturers of press brakes now use gated, you

5    know -- sell gated switches.

6            Where do they come from?  Where do they

7    get this information from?  They certainly could

8    have gotten it because they are all on my

9    mailing list to get my research.

10       Q.    Do you know of any press brake

11   manufacturer that presently only sells gated

12   foot controls?

13       A.    That only sells gated foot controls --

14       Q.    Yes, sir.

15       A.    -- this I don't know.  This I don't

16   know.  I know that almost all of them sell the

17   gated ones, but I don't know if that's the only

18   thing that they sell.

19       Q.    Have you ever taught any of your

20   employees that using -- it is a pretty simple

21   concept, what you are testifying about, use of

22   an ungated foot control on a press brake renders

23   the press brake defective; right?  Isn't that

24   what we have been talking about?

                                                    144

1      A.   Well, you know --

2      Q.   Is that --

3      A.   I have to keep -- I have to keep

4   repeating the thing over and over again.

5      Q.   I am sorry.

6      A.   What I am saying is that if you have a

7   locking plate and you have a single stroke

8   capability, then the gated switch is the best

9   switch and the only one that you should sell

10   with a -- you know, with a press brake.

11      Q.   I understand, but I have also asked you

12   to remove the locking gate from the equation and

13   I asked you if the absence of a gate renders it

14   defective, and you clearly said that it does.

15      A.   The absence --

16      Q.   Correct me if I am wrong.

17      A.   Say it again, repeat that please.

18      Q.   Sure.  You had indicated that if we

19   remove the locking plate, the absence of a gate

20   on the foot control still renders that foot

21   control defective.

22      MR. HARTMAN:  You said the absence of the

23   gate in the locking mechanism, Paul.  He --

24      MR. ROBINSON:  Please, don't interrupt my

145

1    questions.  Do you have an objection?

2       MR. HARTMAN:  Yes, I object that you

3    mischaracterize and misrepresent everything

4    that's happened and it is supported by the

5    transcript.

6          You repeatedly have asked this witness

7    about the same question.  You don't like the

8    answer.  He says it was defective because it

9    lacks the trigger, the locking plate and the

10   gate if you supply one that has neither of them.

11         And you keep asking this question and

12   you keep characterizing that he has said that

13   same thing, and he has not said that.  The

14   transcript will bear that out.

15   BY MR. ROBINSON:

16      Q.   Then by all means I want you to --

17   Professor Barnett, you are an educated man.  I

18   want you to correct me if I say something that's

19   wrong.  I thought whenever I said remove the

20   locking plate from this foot control --

21      A.   Yes.

22      Q.   -- in the very use that Tina Lindquist

23   was using it --

24      A.   Yes.

146

1       Q.    -- I thought you said that if the foot

2    control doesn't have a gate on it, you would

3    still consider that foot control to be

4    defective?

5       A.    That's correct.

6       Q.    Okay.  Then I don't know what that

7    diatribe was.  That's my point.  So your -- so

8    the concept you are telling us today is that

9    regardless of whether or not that foot control

10   has a locking plate, if it doesn't have a gate,

11   it is defective?

12      A.    That's correct.

13      Q.    That's what I understood your testimony

14   to be.

15      A.    But that's not enough.

16      Q.    Go ahead.

17      A.    But it is not enough.  I also want the

18   locking plate on the thing.

19      Q.    I understand what you are saying.

20      A.    Okay, but --

21      Q.    I understand what you are saying.

22      A.    Okay, that's what I am saying.

23      Q.    I am -- I was just trying to confirm

24   up, I am not sure why it keeps being said that

147

1    you are not saying this, that without that

2    locking plate you are saying it still needs a

3    gate?

4        A.    Still needs a gate.

5        Q.    Yeah, I hear you.

6        MR. HARTMAN:  He says it needs a gate and it

7    needs a locking plate, Paul.  Don't --

8        MR. ROBINSON:  Mr. Hartman --

9        MR. HARTMAN:  You are playing all your

10   games, Paul.  You are sitting there playing

11   games and mischaracterizing things.  And I am

12   not going to let you continue with this witness

13   without me pointing it out.

14       MR. ROBINSON:  I really don't know what you

15   are doing, Mr. Hartman.

16       MR. HARTMAN:  Paul --

17       MR. ROBINSON:  You may have this illusion

18   that something is taking place.  I am trying to

19   understand this gentleman's opinions, that's

20   all.

21       MR. HARTMAN:  Then why don't you ask him

22   what he said as to --

23       MR. ROBINSON:  Do you think there is some

24   kind of motivation involved with me trying to

148

1    find out?

2        MR. HARTMAN:  Yes.

3        MR. ROBINSON:  Then do that, but please

4    leave your comments to yourself.

5        MR. HARTMAN:  Well, I think it is only fair

6    that you characterize what he said accurately

7    and completely as opposed to giving some bites

8    that you would like to read back to a jury at

9    some point in time and mischaracterize it out of

10   context.

11   BY MR. ROBINSON:

12       Q.   We have indicated that the use of the

13   two-palm button switch would have prevented this

14   accident and the use of the appropriately

15   installed light curtain would have prevented

16   this accident?

17       A.   Right, if you do them right.

18       Q.   I understand.  Would the -- what else

19   could have avoided this accident, besides the

20   gate issue and besides those two things, what

21   else could have avoided this accident, what

22   other features or conduct?

23       A.   Well, what you could do is you can

24   develop a feeding and -- mechanisms and

149

1    unloading mechanisms that will support the HOOD

2    philosophy.

3         Q.   And that would be the die design; would

4    that be correct?  Is that what you are referring

5    to?

6         A.   Well, it is not HOOD design.  It is

7    hands out of die, so you have to have mechanisms

8    for putting workpieces into a die and getting

9    the workpieces out of the die, the -- and --

10        Q.   That don't require use of the hands?

11        A.   Right.

12        Q.   And one of the ways to do that would be

13   to design the dies in such a way that you don't

14   have to have your hands inside the mechanism;

15   isn't -- that's what I have seen throughout the

16   literature.

17        A.   Well, it is not designing the dies.

18   You know, that's just an oversimplification.

19   You know, you could -- I can make a robot, use

20   the same die as you have now and I have a robot

21   that picks up the part, puts it in the machine,

22   you make the stroke, picks the part, takes it

23   out of the machine and puts in a new part.

24        Q.   And that's a different way, but at

150

1    least design of the die is one way you can

2    support -- did you know that Corry Manufacturing

3    designed -- made an attempt to design the dies

4    such that the hands were kept out of the die

5    area?

6        A.    I don't know what it means to design

7    the die.  I only know what it means to design

8    the system.

9        Q.    Yeah, I will give you an example.  They

10   designed the die, at least made some drawings

11   such that the mandrel of the die, do you know

12   what I am referring to?

13       A.    Yes.

14       Q.    Do you know that she was hand-forming a

15   metal around the mandrel?

16       A.    I do.

17       Q.    They designed the mandrel such that it

18   was on a swing gate that could be swung out away

19   from the point of operation so that when she was

20   hand-forming it, she could have done that

21   outside of the die area.  That's what I mean by

22   die design.

23       A.    Well, don't say that.  Just talk about

24   the system because it is more --

151

1      Q.   That's the way Corry -- in our facts,

2    sir, that's the way they referred to it.

3      A.   I don't care how they refer to it.  It

4    is not general.

5      Q.   Do you know what I am talking about

6    now?

7      A.   I know what you are talking about.

8      Q.   That's what's important.

9      A.   That's exactly what you are supposed to

10   do with the HOOD philosophy, design a system of

11   infeed and outfeed so that you don't have to

12   reach into the point of operation.

13          So one way to do this is to have a

14   lazy Susan and you do things here and then you

15   rotate the part into the machine.  You have a

16   slide, you put things over here, you slide it

17   into the machine, the machine makes it stroke.

18          You have a robot that puts the thing

19   in, takes the things out.  It is a system that

20   may involve die design, but it is an infeed,

21   outfeed system.

22     Q.   I see what you are saying.

23     A.   And that's a more general way to say

24   it.

                                                     152

1      Q.   I understand.  Is that something the

2   end user does when they -- is that something an

3   end user does?

4      A.   If you want to use HOOD, that's what

5   you have to do.

6      Q.   Is HOOD a good philosophy?

7      A.   HOOD is a -- one of the working

8   philosophies, but it is not particularly a good

9   one.

10      Q.   Is HOOD a beneficial philosophy?

11      A.   It -- overall it is not.

12      Q.   Are there more disadvantages to HOOD

13   than there are advantages to HOOD?

14      A.   Well, there are --

15      Q.   I am just trying to figure out what you

16   are saying.  I don't understand.

17      A.   What I am saying is the disadvantages

18   completely outweigh the advantages.  That's why

19   HOOD has been no longer -- remember at one time,

20   I don't have to remind you of it, HOOD was put

21   into OSHA and said you are required to use HOOD

22   and they then after hearing said that was a

23   mistake, we will take it out, and so you no

24   longer have to do that.

153

1          The -- it destroys Americans.  You

2   can't meet the code of ethics with HOOD.  And

3   the engineers -- the engineering code of ethics

4   says the following, "An engineer shall hold

5   paramount the public safety, health and

6   welfare," meaning their economic welfare, "in

7   the discharge of his professional duties."

8          If you triple the cost of every product

9   that everybody has out there because you are

10   using some dumb manufacturing process like HOOD,

11   that is violating the code of ethics which is

12   supposed to be a trade-off among safety, cost

13   and function.

14          And there are other ways of doing

15   things.  For example, a pull back device which

16   is now illustrated profusely in the -- in the

17   literature for press brakes, you put the things

18   in, your hands are in the die, if it starts to

19   come down, the pull back device pulls your hands

20   out.  It is used in every punch press.

21   Q.    And that's something the end user is

22   best responsible for doing also?

23   A.    I agree, but it is a much better

24   philosophy.  It is much more economical than the

                                                    154

1    HOOD philosophy.

2        Q.   And maybe there is a miscommunication

3    in my question -- with my question.

4           Is having HOOD in addition to

5    appropriate point of operation safety devices

6    beneficial?

7        A.   You can't -- there is no general answer

8    to the thing because what happens is in my

9    practice on power presses, for example, when we

10   tried to use HOOD we will have a mechanism that

11   feeds the press.

12          Now we no longer have anybody get hurt

13   with the press.  But the mechanism happens to

14   take both of your arms off.  You know, you need

15   mechanisms to do this.  And these powered

16   mechanisms introduce all kinds of brand new

17   hazards in the thing.  You have to look at each

18   situation.  But it is one of the concepts.

19          If you could arrange things so that you

20   never reach in, I have a barrier guarding thing

21   that I stick things through a mail slot, put the

22   workpiece in and I could never get my hands in,

23   clearly this is a wonderful thing if you have a

24   part that allows you to do that, and so it is

155

1    one of the menus of safety concepts that we use.

2        Q.    HOOD?

3        A.    HOOD is one of them.

4        Q.    That's my point.  That's my question --

5        A.    No question about it.

6        Q.    -- that as long as you are using

7    appropriate point of safety devices, HOOD is an

8    excellent thing to teach?

9        A.    Well, if you use HOOD, you don't need

10   any other safety devices.  It does it by itself.

11       Q.    It can't hurt it; can it?  It can only

12   be beneficial --

13       A.    No, it can hurt.  It can hurt you

14   economically.  And the methods you use to feed

15   the machine, let's take my robot, I am going to

16   have a whole practice of robots killing people.

17   You don't just put a robot on there and not take

18   the -- accept the risks involved in having a

19   robot.  They are a dumb thing with huge power

20   and they beat your brains out.

21       Q.    Do you think you should get rid of

22   HOOD?

23       A.    No, no, no, no, you want HOOD to be in

24   your tool case as one of the safety devices that

156

1  you might use.

2      Q.   Okay.  Do you know of other ways that

3  this accident could be -- could have been

4  avoided other than what we have indicated?

5      A.   I think you could have had a -- pull

6  back devices.  I think you could have had a pull

7  back device on there.

8      Q.   Any other ways?

9      A.   That's what it -- comes to mind,

10  when we got light curtains, two hand controls,

11  you could have taken the stand that they had

12  there and moved the whole thing away from the

13  machine although it is very impractical to do

14  that and so gotten away with exactly what you

15  had.  And the pull back device is an effective

16  way to do it.

17          I don't think you could use tongs and

18  whatnot because she is actually forming the

19  part, you know --

20      Q.   Couldn't she have moved the pedal away,

21  a safe distance away from the point of

22  operation?  Would that be another way?

23      A.   That's what I said, that's one of the

24  things.  You could move --

157

1      Q.    I didn't know if you meant the pedestal

2    that contained the two-palm buttons or --

3      A.    Either one.

4      Q.    Okay, so she could have moved the --

5      A.    Yes, right.

6      Q.    -- the pedal as well.

7      A.    Right.  And so stomp it over here, it

8    is called the hostage control, you hit it here

9    and you walk to the machine and do your thing

10   and walk over.  You have got to worry about

11   somebody else stepping on the pedal which is

12   basically out of your control when you do that.

13     Q.    Did the foot control that was being

14   used by Tina Lindquist at the time of her injury

15   satisfy all government requirements?

16     A.    I think so.

17     Q.    Did it satisfy ANSI?

18     A.    Yes.

19     Q.    Did it satisfy OSHA?

20     A.    Well, I am not sure it satisfies ANSI.

21   OSHA at the time of this accident did not

22   address press brakes so you had 1910.212 which

23   is the motherhood statement that says, help old

24   ladies across the street, so that's the kind of

158

1     thing that you have.  Don't have accidents.  Use

2     appropriate safety devices.  So they were not

3     specific and offered no one any guidance.  In

4     1973 OSHA gave no guidance whatsoever.

5          Q.   And you may have misspoken.  You

6     mentioned ANSI when you first started saying

7     that.

8          A.   But ANSI did.

9          Q.   Okay, and so it satisfied ANSI?

10         A.   Well, it didn't really satisfy ANSI.

11         Q.   That's what I am trying to figure out,

12    what --

13         A.   Here is the problem that you have with

14    ANSI --

15         Q.   I thought your report said it did, but

16    go ahead.

17         A.   Well, ANSI wants you to inhibit

18    accidental activation, inhibit which means to

19    minimize the accidental activation, and you

20    can't eliminate it.  You can inhibit it.  So

21    when you have devices out there that minimize or

22    inhibit the thing better than others, you are

23    obligated to use them.  I mean, you know, all

24    you have to do is have a foot control and have a

                                                    159

1    cover on the thing and say, gee, the cover

2    inhibits the thing; okay?

3        Q.   Do you know of any ANSI provision that

4    was violated by this foot control which she was

5    using?

6        A.   I think that in my view there is one.

7        Q.   Yes, you can give me a verse.

8        A.   It is in my report.

9        Q.   Yes, if you could.  We have marked that

10    as Exhibit C and here it is.

11        A.   Very good.  Here is the number, it is

12    4.2.4.2.4, foot control actuation prevention,

13    "The foot control shall be protected so as to

14    inhibit accidental activation by falling or

15    moving objects or by somebody stepping on it."

16            That's what's been violated because you

17    haven't inhibited it, the -- which should ask

18    you to do the best job you can.  Remember what

19    the name of the things are.

20        Q.   Did you ever testify before that this

21    relates to stepping onto -- whenever you were

22    representing the foot control industry or the

23    press brake industry, have you ever testified

24    under oath that this only relates to stepping

                                            160

1    onto, not into a foot control?

2        A.    What is -- you know, this is a very

3    confusing subject, so let's -- let me define,

4    you know, what I am talking about here.

5        Q.    Yes, my question is very simple.  Have

6    you ever indicated the opposite that it doesn't

7    relate to a step-into situation, this 4.2.4.2.4

8    but instead relates to stepping on top of it?

9        A.    The only time I have given testimony

10   about that has to do with punch presses and

11   there is a confusion everywhere.  The question

12   that I have is if the foot pedal or the foot

13   control is considered to be the entity that you

14   are talking about, you can't step into it.  You

15   could only step onto it.

16           If you consider the foot pedal to be

17   the one that has a shield over the top, for the

18   first time you have something that you can step

19   into, see.  But if that's not considered to be

20   the foot control, if the foot control is just

21   the part that has the pedal or the foot -- the

22   foot pedal or the foot control or even the

23   treadle, if that is the entity that we are

24   talking about, you can't step into it.  There is

161

1    no into.  You can only step onto it.

2         Q.   Did you ever testify that the section

3    that we have cited only relates to stepping onto

4    the foot control in the context of a fully

5    housed -- let me just say it this way, a

6    top housed foot control?

7         A.   Yes, and in every case that I have

8    testified that way I am referring to the entire

9    enclosed foot control, not the foot control as I

10   have just defined it.

11        Q.   How about presently, does the ungated

12   foot control satisfy OSHA?

13        A.   OSHA doesn't -- the OSHA doesn't apply

14   to press brakes.  They don't have a specific

15   section on press brakes at the time this machine

16   was manufactured.  If they have included it

17   now --

18        Q.   I said presently.

19        A.   I don't know what it is presently.

20        Q.   You don't know?

21        A.   I don't know.

22        Q.   You don't know if OSHA specifically --

23        MR. ROBINSON:  Let's mark this specific

24   Exhibit, what are we up to E?  No F.

162

```
 1                    (Whereupon, Barnett Deposition

 2                    Exhibit F was marked for

 3                    identification.)

 4    BY MR. ROBINSON:

 5        Q.   We have located some publications from

 6    OSHA, safeguarding equipment in protecting

 7    workers from amputations, have you ever seen

 8    this before?

 9        A.   No.

10        Q.   Where they actually give a -- what they

11    have quoted as a properly guarded foot control

12    and there is some discussion about --

13        A.   For what machine?  And how is it

14    configured?

15        Q.   Have you ever seen this before?

16        A.   I have seen that picture before but not

17    in this document, and they can't make a

18    statement like that if you don't talk about the

19    machine.

20        Q.   Okay.  Do you know that OSHA

21    investigated this?

22        A.   I did hear that they did.  I thought

23    there was a citation for not having a point of

24    operation device.
```

163

1    Q.    Would you agree with that?

2    A.    I would.

3    Q.    If you were testifying for the

4    manufacturer, that would be something that you

5    would be pointing out, that it would have been

6    the employer's responsibility to have included a

7    point of operation safety device?

8    A.    I am testifying for the plaintiff and I

9    am saying it.  I don't represent -- I represent

10   the field of safety.  I don't care whether it is

11   plaintiff or defense.  I represent the truth.

12   Q.    So you would be regardless of who you

13   are representing indicating that it was the

14   employer should have had an appropriate point of

15   operation safety device on this press brake?

16   A.    Absolutely.  On this particular

17   operation, absolutely.

18   Q.    Do you know why she wasn't using the

19   two-palm button switch?

20   A.    Yes, I do.

21   Q.    Why is that?

22   A.    Because her employer had told her to do

23   this hand thing, had used the switch and said --

24   which would -- you know, a supervisory switch

164

 1    where she cannot use the hand button, she has to

 2    use the foot control.

 3          I mean they absolutely forced her into

 4    this situation saying here is what you are going

 5    to do and you are going to reach in by hand and

 6    you are going to use the foot control.

 7          When I went out to look at the machine,

 8    somebody lost the key for the footswitch.

 9    Q.    When you went out to where?

10    A.    When I made the inspection of this

11    machine.

12    Q.    At Mr. Hartman's location?

13    A.    Right, I couldn't use the footswitch

14    because it was on hand control and they lost the

15    key and they could not open it.  So it was a

16    perfect application to show you here you have,

17    you know, an international expert on presses and

18    I am frustrated I can't use the foot control

19    because they have lost the key.

20    Q.    Who lost it?

21    A.    The company couldn't locate the key.

22    And they came out with picking, you know, they

23    had a lock pick.  It is in my video, and they

24    couldn't pick the lock so I was not able to use

165

1    a footswitch.  And that's what the supervisory

2    key is all about.  So if she couldn't do it --

3    if I can't do it, how is she going to do it?

4        Q.   Do you have any indication that the key

5    was lost at the time of her injury?

6        A.   No, no, no, no, I think they

7    deliberately said in order for her to do this

8    thing, they have to turn the key and switch it

9    over to foot and away from, you know, from the

10   two-hand control, the hostage control, so

11   they -- what I am saying is they have

12   deliberately said this is where you want to do

13   it and there is nothing she could do to switch

14   back because they have locked out any point of

15   operation device.  She has now got to use the

16   system that she is using.

17       Q.   Did you read the --

18       A.   It is tragic.

19       Q.   Did you read the testimony from the

20   employees that said she did have access to the

21   key and that when they operated the press brake

22   and performed the same function that she was

23   operating that they used the two-palm button

24   switch?

166

1    A.    I didn't read anything of a kind.

2    Q.    You weren't provided with that

3    testimony?

4    A.    I have never read that.  And the -- and

5    her testimony is that this is what she was told

6    to do.

7    Q.    Did you read all of the --

8    A.    You understand I don't even -- what you

9    just said to me sounds as phoney technically as

10   you can get because I don't know how you do it.

11   Q.    Did you read all of the deposition

12   transcripts in this case?

13   A.    I don't know how many there are.  I

14   just -- there is just three.

15   Q.    Oh.  Did you read any of the

16   depositions of the coworkers?

17   A.    No, I just have the three that you have

18   there.

19   Q.    Did you know that there were a number

20   of depositions of the coworkers including the

21   people that set up the press brake --

22   A.    No, I didn't know one way or the other.

23   Q.    -- that witnessed her conduct ten

24   minutes before and she was warned not to do

                                              167

1    something that could cause her fingers to be cut

2    off?

3        A.   I don't know one way or the other.  I

4    have not seen any of that testimony.

5        Q.   Have you ever been told by Mr. Hartman

6    as to -- that you haven't been provided with all

7    of the deposition transcripts?

8        A.   How would I know that I haven't been

9    provided with them all?

10       Q.   I said has he ever told you that he

11   didn't give you all the deposition transcripts?

12       A.   No, he didn't say one way or the other.

13       Q.   Have you ever heard any explanation as

14   to why you would not have been provided with

15   those employees' --

16       A.   No, we --

17       Q.   -- deposition transcripts?

18       A.   -- just never discussed it.

19       Q.   Is that something you would want to

20   see?

21       A.   I don't know.  I mean I don't need to

22   see anything based on the opinions I am giving

23   you.

24       Q.   Is that something you would want to see

168

1    as an expert testifying in front of the jury?

2        A.    Not with the testimony that I am giving

3    you.  I have one, the one defect which is

4    completely independent of what those employees

5    have to say.

6        Q.    Well, wouldn't her ability to choose

7    the point of the two-palm button switch have

8    some impact on your decision making?

9        A.    Absolutely not because she doesn't know

10   anything about choosing point of operation.  She

11   has been told to do something and she has done

12   exactly what she has been told to do.

13       Q.    My point is there is contrary testimony

14   to that --

15       MR. HARTMAN:  I am going to object and --

16       THE WITNESS:  I don't believe --

17       MR. HARTMAN:  -- indicate for the record

18   that Mr. Robinson is mischaracterizing the

19   testimony.  I am not going to go into detail so

20   he does -- says I don't taint this witness.  But

21   he is clearly mischaracterizing the testimony in

22   such a way to formulate these questions which is

23   not supported by the depositions he has taken.

24   No one has indicated that she had the ability to

                                                       169

 1   make the change herself, no one.

 2        MR. ROBINSON:  Wow, Mr. Hartman, let's take

 3   a break.  I see your sandwich is here,

 4   Mr. Barnett.

 5        THE WITNESS:  That's great.

 6        MR. ROBINSON:  I would ask that you continue

 7   to not speak with Mr. Hartman about the case

 8   during the break.

 9        THE WITNESS:  Sounds good to me.

10        THE VIDEOGRAPHER:  Off the record at 3:04 p.m.

11             (Recess taken.)

12        THE VIDEOGRAPHER:  Back on the record at

13   3:24 p.m.

14   BY MR. ROBINSON:

15        Q.   Feel better?

16        A.   I do.  That was wonderful.

17        Q.   Sure thing.  That is not an issue.

18   Anyone that wants to take a break, by all means.

19             When we started, you were referring to

20   representing Rousselle in a prior case?

21        A.   Yes.

22        Q.   And you understand Rousselle to be an

23   affiliated company with Heim?

24        A.   Yes.

                                              170

1      Q.   What did you represent them on?

2      A.   Rousselle I don't remember whether it

3    was a press brake or a -- probably a punch

4    press, and my firm has represented Heim on a

5    punch press but never on a press brake.

6      Q.   Now, let me make sure I understand your

7    reference to the punch press --

8      A.   I think both of them, I have done punch

9    press -- my firm has done punch press cases for

10   them.  The Heim case that we did on a punch

11   press was -- the project engineer was Peter

12   Barroso, B-A-R-R-O-S-O.

13     Q.   He is with your company?

14     A.   He was with my company.

15     Q.   Where is he now?

16     A.   He has his own firm.  He has been gone

17   for 20 some odd years.

18     Q.   Okay, punch press, you reference, what

19   are you referring to when you say punch press?

20     A.   It is a -- the mechanical press B11.1

21   type of press, you know, the --

22     Q.   Okay.

23     A.   And --

24     Q.   And when you say press brake --

171

1      A.    Press brake, I don't think we have

2    represented either Rousselle or Heim on press

3    brakes.

4      Q.    Okay.  Whenever you use the term "power

5    press," what are you referring to?

6      A.    To a punch press.

7      Q.    To a punch press only?

8      A.    Yes.

9      Q.    You are not combining a press brake and

10    a punch press --

11      A.    No.

12      Q.    -- to equate to power press?

13      A.    No, power press --

14      Q.    Did I understand?  I just want to make

15    sure I understand your terminology.  I

16    understand the ANSI.

17      A.    Okay.

18      Q.    Have you or your firm ever represented

19    Heim or Rousselle relative to any foot control

20    issues?

21      A.    I don't think so.

22      Q.    In your billing records in this file

23    there is a reference to the old -- reviewing of

24    an old Heim file?

172

1    A.    Yes.

2    Q.    Were you aware of that?

3    A.    I did but I think I represented

4    Linemaster on that file that I sent to you.

5    Q.    Was that on -- that was a case in which

6    Heim was the conduit for selling a Linemaster

7    foot control?

8    A.    Yes.

9    Q.    Linemaster's liability would be Heim's

10   liability?

11   A.    I think that they were both sued

12   independently.

13   Q.    And that was a foot control case?

14   A.    Yes.

15   Q.    And now you are -- despite your company

16   representing Heim and Rousselle in prior cases,

17   you are now representing a plaintiff against

18   Heim?

19   A.    Right, but you remember, our codes --

20   attorneys' code of ethics and my codes of ethics

21   are different in this regard.  You wouldn't have

22   been able to take a case.

23         But an engineer, if it is on a

24   different subject, we can take cases.  You know,

173

1    I have, you know, 50 percent of the cases

2    against U.S. Steel, 50 percent cases for, but

3    they are all on different divisions, you know,

4    the -- of U.S. Steel where you wouldn't be able

5    to take it at all having represented U.S. Steel.

6            As long as I am working on different

7    technology where nothing I learned can be used

8    against the company, that's ethical.

9        Q.   It actually may be very similar with

10   lawyers.  I don't think the prohibition is as

11   strong as you have indicated.

12           What is your understanding then of the

13   code of ethics in engineering?  Is that what it

14   is called --

15       A.   Yes.

16       Q.   -- the code of ethics in engineering?

17       A.   Yes, right.

18       Q.   Are you engineer?

19       A.   No, I am not.  I am a scientist, but I

20   belong to the American Society of Mechanical

21   Engineers, Civil Engineers, you know,

22   Agricultural Engineers.  I belong and have all

23   the codes of ethics from these companies.

24       Q.   And I believe that's why you have

174

1    indicated in previous testimony that you believe

2    you are bound by the code of ethics in

3    engineering?

4        A.   Absolutely.

5        Q.   Have you testified before that once you

6    represent a manufacturer of a piece of equipment

7    you cannot represent someone adverse to that

8    manufacturer, do you recall giving that

9    testimony before?

10       A.   Yes, but it is always on the same -- it

11   is always on the -- on a topic -- a topic -- I

12   can go against any manufacturer if it is a

13   different topic.

14       Q.   Who -- is there a decision making body

15   that addresses ethical issues for engineers?

16       A.   There is only -- each society has their

17   own, and it's -- I think you would characterize

18   them as just the most dreadful capability you

19   ever saw in your life.

20           You know, the -- but the codes of

21   ethics on every engineering society are almost

22   word for word identical.  The people who

23   administer it, you know, are a strange group of

24   people.  You get no feedback, so it is -- when I

175

1    report somebody to them, I am not allowed to

2    find out the disposition of the case, you know,

3    so you can't get the feedback you need to

4    evaluate them.

5         Q.    And you believe you can represent

6    Linemaster relative to a foot control that was

7    sold with the Heim product or Rousselle product

8    and then represent a plaintiff against Heim or

9    Rousselle --

10        A.    Oh, sure.

11        Q.    -- relative to a foot control case?

12        A.    Sure.

13        Q.    Have you ever testified that you can't

14   do such a thing, it would be unethical to do so?

15        A.    No.

16        Q.    Do you remember addressing with a

17   number of attorneys these -- this ethical issue

18   of representing one company and then

19   representing a party adverse to that same party

20   you represented?

21        A.    Oh, I am sure, I am sure that has been

22   part of my presentations on occasion.

23        Q.    Is there any situation where an ungated

24   foot control in use with a press brake is not

176

1    defective?

2        A.   No.

3        Q.   The testing that you did --

4        A.   Yes.

5        Q.   -- relative to this case, I understand

6    through Mr. Ulmenstein that all of the test

7    subjects were employees at one time of Triodyne;

8    is that correct?

9        A.   That is correct.

10       Q.   Have you ever -- why didn't you go try

11   to find someone that's neutral?

12       A.   They were neutral.  It is a

13   double blind test.  Ulmenstein doesn't know what

14   I was doing nor did the people know what I was

15   doing.  Nobody knew what I was after and the

16   concepts behind it including Ulmenstein.

17       Q.   Did you never tell them who you were

18   representing?

19       A.   Oh, it has nothing to do with

20   representing.

21       Q.   Did you tell them who you were

22   representing?

23       A.   I don't think so, but that has nothing

24   to do with it.

177

1      Q.   I know you have said that a couple

2    times.  Keep away from that please.

3          My question is --

4      MR. HARTMAN:  Wait, wait, let him answer

5    your question.

6    BY MR. ROBINSON:

7      Q.   Oh, I am sorry, if I interrupted.  Go

8    ahead.

9      A.   Well, go ahead.  You think that has

10    something to do with it, you know, you can

11    harbor that misconception if you like.

12      Q.   I don't understand that comment.  Why

13    do you say that?

14      A.   This testing, no one knows whether it

15    is for or against somebody.  They are all

16    thinking that I am trying to find out something

17    about technology.

18      Q.   My question is very simple is, it is

19    did you -- I am asking you did you advise any of

20    the test subjects to who you were representing

21    in the case?

22      A.   No, no, or that there wasn't

23    necessarily a case.

24      Q.   Was Tina Lindquist sitting or standing

178

1    when she was injured?

2        A.    The best I can determine is that she

3    was either seated or leaning against the -- a

4    seat, that's the best.  I have not interviewed

5    her, you know, to find out more.

6        Q.    Your test involved standing people?

7        A.    Right.

8        Q.    Dissimilar to the seated or leaning.

9        A.    Of course they are dissimilar.  I am

10    not trying to simulate what she is doing.  I am

11    trying to do something much more effective.

12        Q.    And what would that be?

13        A.    I am trying to develop a worst case

14    scenario, the -- and that's what I did.  I --

15    and I am really pleased that it worked almost

16    perfectly the first time, developed a scenario

17    that you almost 100 percent of the time will

18    accidently activate a switch.  And as soon as I

19    put the gate on, it is 100 percent of the time

20    you will never activate the switch.

21        Q.    You had people watch the video, you had

22    people standing there and stepping into the foot

23    control, one of which had a gate and one of

24    which did not; is that an accurate description?

179