# EXHIBIT A

# PART 5

1    A.   Right, absolutely.

2    Q.   That's not the way Tina Lindquist's

3    injury occurred; is it?

4    A.   Of course not.  It has nothing to do

5    with that.

6    Q.   Is there any similarity in the test

7    that you conducted and the manner in which Tina

8    Lindquist was injured?

9    A.   None whatsoever.  That's not what the

10   test was for.

11   Q.   Did Tina Lindquist ever tell you that

12   she accidently put her foot into the foot

13   control?

14   A.   She didn't tell me anything.

15   Q.   Did you ever read anything in her

16   testimony that indicated she accidently put her

17   foot into the foot control?

18   A.   I don't recall her saying that.  I

19   think she said she wasn't riding the pedal and

20   had taken her foot out of the control and

21   then -- but I don't recall her saying anything

22   about what she did.  I don't know that she knew

23   what she did.

24   Q.   Have you assumed -- but you have

180

1    assumed that she accidently put her foot into

2    the foot control; haven't you?

3         A.   That's much of an assumption, you know,

4    the --

5         Q.   Isn't --

6         A.   But that is an accurate statement when

7    you have a one-parameter system.

8         Q.   Do you have any factual evidence or

9    support that she -- other than your assumption

10   do you have any actual evidence, testimony,

11   eyewitness, her, that says that she accidently

12   put her foot into the foot control?

13        A.   The -- yes, we -- I have her accident

14   that she had an accident with a foot control and

15   there is only one way to do it, you have to step

16   onto it.

17        Q.   Do you have any actual factual evidence

18   that she accidently with her foot located

19   outside of the foot control, she accidently

20   stuck it into the foot control and activated the

21   foot pedal?

22        A.   No, I don't.

23        Q.   For that to have occurred -- are you

24   assuming that's what occurred?

181

1      A.    Yes.

2      Q.    And for that to have occurred she would

3    have had to accidently stuck her foot the entire

4    way in such that she activated that lock plate

5    that you mentioned; right?

6      A.    Absolutely right.

7      Q.    Has she ever told you that she stuck

8    her foot all the way in and actuated that kick

9    plate?

10     A.    Everything we know about her we will

11   have to get from her deposition because I didn't

12   interview her.

13     Q.    Okay.  And her deposition testimony did

14   not indicate that she stuck it all the way in

15   and hit that kick plate?

16     A.    Right, I don't think she knows.

17     Q.    Well, did you see that she has

18   indicated she did not accidentally put her foot

19   into that foot control?

20     A.    I don't think she said that either.

21     Q.    Do you have your summary of the --

22     A.    Unfortunately --

23     Q.    Of her testimony?

24     A.    I don't have the summary, and I didn't

                                                    182

1    have the deposition to rereview last night.

2        Q.    Suffice it to say you have not seen the

3    deposition of Gary Dietz?

4        A.    Correct.

5        Q.    Gary Merkle?

6        A.    Correct.

7        Q.    Kevin Messenger?

8        A.    Correct.

9        Q.    Joel Nichols?

10        A.    Correct.

11        Q.    Jan Oviat?

12        A.    Correct.

13        Q.    Dave Phillips?

14        A.    Correct.

15        Q.    Robert Rooney?

16        A.    Correct, he was the setup man; wasn't

17    he.

18        Q.    Or her husband?

19        A.    Wasn't Rooney the setup man?

20        Q.    Yes, for her husband?

21        A.    Correct.

22        Q.    Who she said trained her?

23        A.    I don't remember that.

24        Q.    I guess you wouldn't have if you didn't

183

1    see his deposition testimony?

2        A.    Right.

3        Q.    She has indicated that in her

4    deposition testimony that he trained her.

5        A.    I thought there was something in there.

6        Q.    Have you ever talked to him?

7        A.    No.

8        Q.    Have you ever made any attempt to talk

9    to him?

10       A.    No, I haven't.

11       Q.    I am winding down, so I am going to

12   slow down in my questioning here if you bear

13   with me.

14       A.    You are doing fine.  You are moving

15   right along.

16       MR. HARTMAN:  Can we go off the record for

17   one minute because I want to explain something.

18       THE VIDEOGRAPHER:  Off the record at 3:37 p.m.

19            (Discussion off the record.)

20       MR. ROBINSON:  Mr. -- we took a little break

21   at Mr. Hartman's request, and he has indicated

22   that the file materials which -- all of the file

23   materials I understand are being brought down

24   here to the deposition area, and I have asked

184

1    that Mr. Ulmenstein come back so that we can

2    actually take his deposition after having

3    reviewed the summaries and other information

4    that was prepared by him.

5         And Mr. Hartman has indicated he wants

6    to limit the testimony in some fashion.  And for

7    some reason despite not giving us as ordered by

8    the court the file, all the file materials

9    before today, and I have indicated that I don't

10   have any ability to prevent him from limiting

11   the deposition if he is going to instruct an

12   unrepresented expert in this case not to answer

13   questions, and his response was then that he is

14   not going to bring Mr. Ulmenstein down to

15   complete the deposition at all.

16        MR. HARTMAN:  Once again Mr. Robinson

17   misstates what has taken place and the facts and

18   circumstances of this case.

19        MR. ROBINSON:  Let's just make it simple

20   then, is Mr. Ulmenstein coming down with the

21   file so that I can read it --

22        MR. HARTMAN:  I am not a witness.

23        MR. ROBINSON:  Can you answer that for the

24   court?

185

1        MR. HARTMAN:  I am going to say what I want

2    for the record.  I don't have to answer any of

3    your questions.

4        MR. ROBINSON:  That's the issue,

5    Mr. Hartman.

6        MR. HARTMAN:  Let me state for the record

7    that first off, Mr. Robinson and

8    Mr. Ulmenstein's deposition had indicated that

9    he requested Mr. Ulmenstein's original file

10   which he did.  There is no original

11   Mr. Ulmenstein file.  His notice of deposition

12   specifically asked for -- with regard to

13   Professor Barnett, that Mr. Barnett provide the

14   file which he was not asking for the original

15   file which we provided him with copies of

16   everything we knew.

17        The only things that we have learned

18   today that were missing from the file were

19   deposition summaries of three witnesses which

20   are excerpts of transcripts of the depositions.

21        I have indicated that these materials,

22   as an additional courtesy, the entire file is

23   being sent down by courier for

24   Professor Barnett.

186

1          Mr. Robinson then indicated he wanted

2     to redepose Mr. Ulmenstein after he had already

3     released him and he specifically indicated he

4     wanted to go over excerpts and testimony that

5     Professor Barnett gave.

6          And I indicated at that time that I do

7     not have the control over Mr. Ulmenstein as it

8     relates to this matter, B, I would try to get

9     him here if we could limit the testimony to

10    those items which were inadvertently left out of

11    the file.  That's my position.

12        MR. ROBINSON:  That's quite different,

13    Mr. Hartman, than what you just said that you

14    are not going to bring him down here, quote

15    "then I am not going to bring him down here."

16        MR. HARTMAN:  I am not bringing anybody

17    down.

18        MR. ROBINSON:  I am just telling you you

19    misstate things.  I have very accurately

20    reported what you said.  You concluded, well,

21    then I am not bringing him down here.

22        MR. HARTMAN:  I am not bringing anybody

23    down.  The file is on its way.

24        MR. ROBINSON:  I understand.  Are you

187

1    refusing to give me Mr. Ulmenstein to depose him

2    with the file material?

3        MR. HARTMAN:  You are assuming I have the

4    ability to get him here and he has no other --

5        MR. ROBINSON:  Have you checked?  Would you

6    check?

7        MR. HARTMAN:  I will check.

8        MR. ROBINSON:  Let's take a break and do it

9    now so we can go back on the record because I am

10   going to need to have an answer for this because

11   I am going to ask that we come back.

12       MR. HARTMAN:  Well, we are coming back next

13   Wednesday anyway.

14       MR. ROBINSON:  Right.

15       MR. HARTMAN:  Okay, so we will do it --

16       MR. ROBINSON:  No, I'd like to do it today.

17       MR. HARTMAN:  If you are right, then we will

18   do it next Wednesday.  I am going to try to get

19   him here.

20       MR. ROBINSON:  That would be great.  It is a

21   very simple issue, and that would solve it.

22       MR. HARTMAN:  I told you I would try.

23       THE WITNESS:  What were the summaries that

24   Ulmenstein has made?

188

1          MR. HARTMAN:  You have them right there.

2          THE WITNESS:  Right, I have two of them, but

3     you mentioned three.  Is that just --

4          MR. ROBINSON:  Lindquist.

5          THE WITNESS:  I don't have the plaintiff.

6          MR. HARTMAN:  I am going to find out.

7          MR. ROBINSON:  And he has notes he indicated

8     too on the summaries.

9          MR. HARTMAN:  There are no notes.

10         MR. ROBINSON:  That's what he testified to.

11    I don't know if there are or not.

12         MR. HARTMAN:  Well, why don't you wait and

13    get the material and then see.

14         MR. ROBINSON:  That would be nice.  It would

15    have been great had you complied with the court

16    order.  That's the frustration, Mr. Hartman,

17    that's the frustration.

18         MR. HARTMAN:  And you imply that I didn't

19    comply.

20         MR. ROBINSON:  You didn't.

21         MR. HARTMAN:  I did everything I knew.

22         MR. ROBINSON:  All right.

23         MR. HARTMAN:  You have made mistakes in this

24    case too as far as --

189

1          MR. ROBINSON:  There is no need for us to

2     talk about it.

3                    (Recess taken.)

4          THE VIDEOGRAPHER:  Back on the record at

5     3:47 p.m.

6     BY MR. ROBINSON:

7          Q.   Sir, have you ever designed a foot

8     control for either a punch press or a press

9     brake?

10         A.   I am hesitating because I did some

11    research on the design or evaluation of a design

12    for someone else, but I think the most direct

13    answer is no, but there has been proposals for

14    foot controls and patent work and I have

15    reviewed those professionally.

16         Q.   When a proper point of operation device

17    is used, are all foot controls equally safe?

18         A.   If the -- if the -- if a proper one is

19    used, they all are equally safe because they

20    are -- just activation means and you don't need

21    to have any safety at all.

22         Q.   So had the employer used an appropriate

23    point of operation safety device, the foot

24    control that she was using at the time of the

                                              190

 1    incident would have been safe?

 2        A.    Absolutely.  You are, of course,

 3    focusing on her accident and not on all things

 4    that can happen.

 5        Q.    Yes, that's for our purposes today and

 6    in this lawsuit that's what's significant.

 7              What is an arch press?

 8        A.    It is -- just -- it is a frame, and it

 9    has to do with how the frame is made on the

10    press, but it has no special attributes other

11    than that.

12        Q.    Is it -- does it fall under the

13    category of a punch press or a press brake?

14        A.    Punch press.

15        Q.    Do people -- do users use punch presses

16    in ways that are -- let me back up and preface

17    my question.  You are talking about the

18    differences -- let me ask it even more

19    generally.

20              What is the difference between the

21    punch press and the press brake relative to your

22    comment that you need a gated foot control on

23    the press brake and you don't need a gated foot

24    control on the punch press?

                                                      191

1       A.    The --

2       Q.    Please list all of the differences that

3    are relevant in your consideration.

4       A.    Well, the punch press, there is a need

5    to rapidly stroke -- make rapid cycles and so

6    the -- there is very little time if you set it

7    up correctly for taking apart, putting it into

8    the machine, making the press, removing the part

9    and then starting that cycle over, so there are

10   very short cycle times on punch presses and very

11   long cycle times relatively speaking on press

12   brakes.

13         The -- if you have short cycle times,

14   it takes time to get your foot out and place it

15   on the ground properly.  It is much faster if

16   you can ride the pedal.  The --

17      Q.    What was the activation times for Tina

18   Lindquist?

19      A.    It is 35 strokes per minute on her

20   machine.  The -- it is about half of the average

21   punch press.

22      Q.    How quickly was she applying the -- how

23   frequently was she applying the foot control?

24      A.    I don't think I can tell you.  I just

192

1    tell you the -- you know, you know that she had

2    to do a number of things and put a new part in

3    and mold the part and then come back out.

4         There is a whole group of activities

5    that she is doing that are time consuming

6    relative to a punch press where I put it in,

7    bang, take it out, put it in, bang, and you

8    don't do any business of molding and -- you

9    know, around, you know, mandrels and all of

10   those kinds of things.  You don't do any of

11   that.

12        Q.    Would you let the court know what you

13   understand to be the process that she was

14   performing relative to the part she was making?

15        A.    Well, she had a part that I think she

16   was at the -- at the time were three previous

17   operations that had already been performed on

18   the part.

19        Q.    Do you recall what those were?

20        A.    No, I don't.

21        Q.    Were those a frequent use of the press

22   brake?

23        A.    If -- they used press brakes, but I

24   don't know what the timing was on the previous

                                              193

1    three operations.

2        Q.    You don't know if it was as you

3    described being a quick process, stick it in,

4    bend up -- did you read her testimony on this?

5        A.    I don't remember the testimony on this.

6        Q.    Okay.

7        A.    The -- on the part that she was working

8    on and that she was then required, she will pick

9    up a part, probably located on her right side,

10   and she will put this on the mandrel and with

11   her hand she will squeeze and deform it so that

12   it is fixed onto the mandrel.

13          Then she will remove herself, step on

14   the foot pedal and then go in to retrieve that

15   part, place that part in some other basket that

16   would indicate, you know, that this is the part

17   with the completed parts are done.  She would

18   repeat that cycle again, and the -- that's a lot

19   of time.  By the time she is doing that on a

20   punch press you have made 15, 20 parts.

21       Q.    Is there -- do you have in forming your

22   opinion relative to the differences between a

23   press brake and a punch press when a gate should

24   be used on the foot control, what is the cutoff?

194

1    What's the frequency cutoff of the activation of

2    that machine?

3        A.    Well, I don't think I have a frequency

4    cutoff because that is only one of a number of

5    operations.  I have never seen a press brake --

6    this press brake is fast.

7        Q.    Which press brake?

8        A.    The one that is involved here, it is

9    35 strokes per second.

10       Q.    Is that relevant in determining whether

11   or not a gate should be used, the speed of the

12   press brake?

13       A.    The -- it is -- the -- it is relevant

14   because it is much slower.  Even with this speed

15   it is much slower than the average power press.

16       Q.    I understand.  My question and I

17   apologize if I worded it incorrectly, the faster

18   the press brake, the more likely you would want

19   to see the absence of a gate; is that fair?

20       A.    I would -- let me see, I think that's

21   probably true, that's in the same -- they seem

22   to be in the same direction.

23       Q.    I thought that's what you --

24       A.    The next thing is that -- in my

195

1    declarations about the -- about the use of the

2    gate the power presses that I was specifically

3    worried about are what was called full

4    revolution clutches.  And that means you start

5    the cycle and you can't stop it until it

6    makes -- goes from 12:00 o'clock all the way

7    down to 6:00 o'clock and back up to 12:00.  And

8    the -- no press brake has ever been made that

9    way.  All press brakes are partial revolution

10   machines, you can stop them at any point in the

11   cycle.

12       Q.    And how do you stop them?

13       A.    You just take your foot off of the

14   actuating device, either hand controls or foot

15   controls, just take off --

16       Q.    Do you know if the press brake that was

17   existing at Corry and that was being used by

18   Tina Lindquist was set up by Corry such that it

19   had a full revolution?

20       A.    It can't be set up for a full

21   revolution.

22       Q.    And why is that?

23       A.    The -- because -- it is the name of the

24   clutch.  This clutch is capable of stopping any

196

1    time you take power off of the unit, and the --

2    and that's a big difference in the -- you know,

3    in having an accident all you have to do is

4    touch the other one and you have a cycle, and

5    you just touch the press brake and you just get

6    a little movement.  If you just do what I just

7    said, you just get a little movement.

8        Q.    On the foot pedal?

9        A.    If it was your foot pedal or your hand

10   control, it is just do this and you get a little

11   movement.  And we have all demonstrated that

12   over and over again.

13           I am not the only one that has made a

14   video of the machine, but I make that in my

15   video where I will just touch it quickly and I

16   have watched another video where you touch it

17   quickly, just get a little movement.

18       Q.    Is that the only mode of operation for

19   that press brake?

20       A.    Yes, the -- that has this -- when I

21   went there, the controls that they had on there

22   had continuous, as long as you put your hand on

23   it, it would keep going up and down and up and

24   down.

197

1          And continuous operations on press

2     brakes practically have no meaning.  You

3     shouldn't really have continuous.  These are

4     things where you do all the work on one stroke.

5     You don't have automatic feeding systems.

6          Q.   How about with the foot control that

7     was set up by Corry, do you know if it was set

8     up that if you touched it, that -- such that the

9     only method of operation was that if you touched

10    the foot pedal and left off that it would stop?

11         A.   It would stop.  That's the way it

12    works.

13         Q.   So in your opinion as to how her injury

14    was caused, what are you saying, that she

15    activated the foot pedal and kept it down?

16         A.   Right, until she got the full stroke,

17    right, absolutely.

18         Q.   Did you notice the different

19    application methods for the press brake on the

20    pedestal?

21         A.   Well, I noticed what they had on the

22    pedestal.  They had single stroke capability,

23    they had a continuous capability, the --

24         Q.   What is the continuous capability?

198

1      A.    That's the sewing machine, you hold

2   your foot down, it keeps bobbing up and down.

3   In single stroke you put your foot down, I don't

4   care if you leave it forever, you get one stroke

5   period, that's it.

6      Q.    Okay.  I think you said you never got

7   to test it with the -- with any foot pedal; is

8   that right?

9      A.    Right.

10      Q.    Did you bring a foot pedal?

11      A.    No, I didn't.

12      Q.    Whose -- were you intending to use a

13   particular foot pedal?

14      A.    No, whatever foot pedal they had at the

15   plant I was going to use.

16      Q.    Do you know -- did you ever learn that

17   they did have one there?

18      A.    They said they had one.  They just

19   couldn't switch it over to the foot mode.

20      Q.    So your testimony is that the press

21   brake was not set up such that if you hit the

22   foot pedal, that it would just perform

23   one revolution and stop?

24      A.    No, you have to put your foot on and

199

1    hold it down and you only get one.  It is a

2    single stroke control.  You then have to remove

3    your foot from the pedal, put it back to get the

4    next stroke.

5         But it is the way all press brakes are

6    set up, you -- is the movement you remove your

7    pressure from the control, it freezes.  That

8    makes it much safer incidentally than a power

9    press.

10   Q.    You were -- I took us off that path

11   that I was going down.  You were describing the

12   differences, all the differences between a punch

13   press and the press brake that leads you to

14   conclude that press brakes should always have

15   the gated foot control.

16   A.    The -- there is a menu of safety

17   devices that you can use for power presses that

18   is much easier to put on and very prevalent that

19   people will put them on and they are very clumsy

20   and difficult to use.

21        For example, barrier guarding which is

22   one of the most popular methods in the building

23   a fence in front of the machine is very popular

24   on a punch press, it is almost impossible to use

200

1    on a press brake because in a press brake you

2    have parts that are -- come out of the machine.

3            And as you do your operation, the

4    bending takes place and moves the workpiece in

5    front of the -- in front of the unit and you can

6    crush your fingers between the workpiece and the

7    ram, not the bottom of the ram, just the side,

8    or if you put on a barrier guard between the

9    barrier guard and the workpiece, so you have a

10   barrier guard introduces -- can introduce a

11   brand new pinch point that you never had before.

12           You don't have this on a punch press,

13   you know, the -- there is a compactness to

14   the -- to punch presses.  Most of them all the

15   operation is done within the platen, the table

16   on the punch press.

17           And the -- most of the classical

18   operations on press brakes are all done --

19   the -- with workpieces hanging out of the press.

20   The punch press has a problem of you have to not

21   only get rid of the workpiece itself that's

22   already been formed, but you also are left with

23   scrap.

24           You are almost never left with scrap on

201

1    a press brake because it is bending things.  It

2    is not punching them.  It doesn't mean you can't

3    do something funny, you know, on the -- on a

4    press brake.

5         But the ordinary press brake operations

6    bend things.  They don't put holes into them,

7    you know, the -- and punch, you know, like a

8    paper punch, punch out -- you know, put holes in

9    things where you will have scrap from the holes.

10        You don't have that on the press brake.

11   And that means that you spend more time -- you

12   have to get rid of two different things on a

13   punch press.  There is only -- you have to get

14   rid of one thing and that's shift the workpiece

15   out of the machine.

16        The -- another difference is that you

17   can take a single die in a press brake and make

18   an infinite number of parts.

19        In a punch press one die is generally

20   one die, one part.  And the -- you can only use

21   that die and the punch press to do one and only

22   one thing.  And it's, you know, in general, you

23   know, every die that you put into a press brake

24   will do an infinite number of things, so, you

202

1    know, that's among the things that are different

2    in the -- that make the thing so that you are

3    doing a rapid work where keeping your foot

4    riding the pedal is something that is easy to

5    do, desirable to do, is you are motivated to do

6    it.  See, on the punch press, not true on the

7    press brake.

8          The press brake operations you are

9    sometimes walking extensively in front of the

10   machine.  You know, this is a 6 foot machine.

11   It is a relatively small machine.

12         We have got press brakes that are

13   20 feet, you know, 20 feet long.  There is a

14   huge apron in front of it and people walk around

15   on that apron to pick up parts and, you know,

16   bring new material, new workpieces and so this

17   makes a difference with a modern foot control

18   which confines itself anywhere on the floor, you

19   have a problem of bystanders and other people

20   stepping and accidently activating your

21   footswitch which could be deployed anywhere on

22   the floor, where the original machines you

23   couldn't do that.  You only had a foot pedal or

24   treadle.  It was right on the face of the

203

1  machine or the apron of the machine.  And so we

2  have introduced all kinds of new problems with

3  the so-called modern footswitch.  So these are

4  the reasons why riding the pedal is not

5  particularly important in the press brake.  It

6  is very important in the punch press.

7       And then this particular, you know,

8  design of the Linemaster has this wonderful

9  device that if you have single stroke control

10  which this machine has and which was certainly

11  the -- on the original Heim was set up for it,

12  in working in conjunction with this kick plate

13  it absolutely minimizes the business of

14  accidently stepping on -- riding the pedal.  And

15  so what, so you ride the pedal, it doesn't make

16  any difference, you don't get a stroke.

17       And so the problem of riding the pedal

18  completely becomes diminimus on the press brake

19  and because it does you now have an opportunity

20  to stop the step-in contact, you know, stepping

21  onto this piece accidently.  You have now many

22  more devices available to you to minimize that

23  like the gate with all the different types of

24  gates they have.

204

1      Q.    You indicated that she would have had

2    to hit the kick plate to activate that press

3    brake?

4      A.    Yes.

5      Q.    Isn't it possible for her to have been

6    riding the pedal and for I think some of the

7    instances you mentioned were sneezing to have

8    occurred where you then hit the -- in the same

9    way if your foot was outside the foot control

10   but your foot is inside the foot control; isn't

11   that possible?

12     A.    It is possible.  The best I can tell

13   you it is possible.  It is really unlikely that

14   that's going to happen.

15     Q.    Yeah, why would that be?

16     A.    Because anyplace where you -- see, the

17   other pedals on the punch press, anyplace you

18   touch down on the pedal you get a stroke.

19           On this one you can't just push down

20   anywhere.  You have to first push your foot all

21   the way back in and then come down on the thing

22   and that the likelihood of doing this is

23   diminimus compared to the punch press where if

24   you ride the pedal, anyplace you touch it, you

205

1    are in trouble.

2        Q.   How much force was necessary on this

3    particular foot control to push that lock plate?

4        A.   I don't think I measured the force.

5        Q.   I guess you couldn't have because you

6    never saw the foot control; right?

7        A.   No, no, no, no, I have duplicate, you

8    know, I have my own --

9        Q.   No --

10        A.   -- things.  I don't think I have ever

11    measured it.

12        Q.   I meant -- okay, you never measured on

13    any exemplar?

14        A.   Right.

15        Q.   -- with anyone whatsoever?

16        A.   Right.

17        Q.   What -- your opinion is that she

18    accidently stuck the foot in, hit the kick plate

19    and pushed down?

20        A.   Yes.

21        Q.   She went horizontally and then

22    vertically.

23        A.   Right.

24        Q.   What caused her to do that in your

206

1    opinion?

2        A.    The -- what happens is all you have to

3    do is reach for the part and reaching for the

4    part will shift your body forward to do this.

5        Q.    Do you have any indication that that's

6    actually what happened here?

7        A.    It has to have happened.

8        Q.    How far did she move her body to reach

9    for the part?

10       A.    The -- I don't know how far she moved

11   her body, but she is going to step up the

12   control in a convenient location so that she can

13   reach the -- put parts in and parts out and hit

14   the control in the most convenient way.

15       Q.    How far does the foot -- what's the

16   minimum distance the foot would have to move to

17   enter the control, the foot control, activate

18   the kick plate, and then depress the pedal?

19       A.    Well, it would be the distance that her

20   foot has to move into the unit before it touches

21   the kick plate.

22       Q.    Right.

23       A.    It has to move in that much.  I think

24   it is 4 or 5 inches.  You know, I will get a

207

1   pedal and I will measure it.

2        Q.   Has she ever said that her foot moved

3   4 or 5 inches?

4        A.   Oh, she doesn't have a clue what her

5   foot is doing.  If she knew that, she would not

6   have had the accident.  I mean she doesn't want

7   to reach into the pedal.  She wants to reach her

8   hands into the machine.

9        Q.   Well, would leaning -- would the --

10  this, do you call this an involuntary movement

11  of the foot?

12       A.   It is probably -- I think it is

13  involuntary.  I don't think it is a voluntary.

14  Voluntary, you know, you are advertently trying

15  to activate the machine.  She doesn't want to

16  activate the machine.  She wants to reach in

17  with her hands and doesn't want to put her foot

18  on the foot pedal, she doesn't want to do that.

19       Q.   Why couldn't this involuntary movement

20  of the foot occur if her foot was already inside

21  resting on the pedal?  What's the difference?

22       A.   It is -- it is so unlikely that that

23  would happen.

24       Q.   I am just trying to hear as to why.

208

1    A.    Because --

2    Q.    All --

3    A.    -- you have --

4    THE COURT REPORTER:  Pardon me, I can only

5    get one at a time.

6    MR. ROBINSON:  Sorry.

7    THE COURT REPORTER:  So we have to wait for

8    the answer to be finished and the same --

9    THE WITNESS:  There is a very large movement

10   you have to make with your foot to get to that

11   back plate.  You got to get -- you know, you

12   have to do something to get to the back plate

13   where on the punch press I don't care where you

14   touch it, you touch it the front, the middle,

15   anyplace.  There is only one place that you can

16   do it, you have got to get your foot in and then

17   put the pressure down.

18   BY MR. ROBINSON:

19   Q.    I wanted you to explain it, all the

20   reasons that you know as to why her foot also

21   couldn't have involuntarily moved forward while

22   she was riding the pedal as opposed to moving

23   the extra distance with the foot outside of the

24   foot control?

209

1      A.    The -- if she is really riding the

2    pedal, she has already established an

3    equilibrium.  And when she moves forward, it is

4    just like my foot on the ground, it will

5    actually resist movement.

6           You put your foot down, the friction

7    stops the thing from sliding forward.  If she

8    has her foot resting on this pedal, the -- it

9    actually will stop her from moving forward into

10    this kick plate.

11      Q.    Do you know where her foot was before

12    it began this involuntary movement forward?

13      A.    She -- I think that she is reporting

14    her foot was not in the pedal at all.

15      Q.    Do you know if it was on the ground?

16      A.    Don't know where it is.

17      Q.    Well, if it was on the ground, then

18    that would also suggest as you just indicated

19    that that friction would minimize the likelihood

20    of the involuntary movement forward; right?

21      A.    It is.  It would do that if her foot

22    was on the ground.  But if she is stepping

23    forward and needs equilibrium because she is

24    reaching forward, you know, if you are standing

210

1    up and you want to reach forward, you have to be

2    careful because if you reach too far forward,

3    you need to put your foot out to stabilize

4    yourself.

5        Q.    We don't have any evidence that she did

6    that though; do we?

7        A.    We don't know.  She is moving forward,

8    it is in a direction --

9        Q.    Watch your microphone.

10       A.    It is in a direction where you -- you

11   know, if I establish that how your foot is

12   located like if you take the test that I did

13   with the standing tests, a standing test start

14   off where I have my foot activating the pedal

15   all the way forward activating the pedal and I

16   go backwards to reach a different equilibrium

17   position outside, I will be careful, your body,

18   if it ever wants to go into ordinary equilibrium

19   again in the first position, you don't have to

20   think about it.  It goes back in there and it is

21   now in activating position.

22            You can do the same thing when you are

23   seated.  You know, you get yourself seated and

24   everything positioned so that your foot is on

211

1    the pedal up against the back plate so it is in

2    a perfect position for you to activate the

3    press.

4          Now, you take your foot off, you have

5    already got an equilibrium position established

6    where your foot is all the way into the pedal,

7    an activating position.

8    Q.    Do you know if her foot would have been

9    able to be inside the foot control and not

10   necessarily resting on the pedal?

11   A.    It would -- it can go inside, not rest

12   on the pedal at all and just in one stroke which

13   is what you will see my people doing and one

14   stroke you hit the back plate and push down

15   simultaneously.

16   Q.    I am saying the possibility also exists

17   that she had her foot inside the foot control,

18   not actually resting on the pedal so she doesn't

19   have that friction --

20   A.    Just dangling in the air?

21   Q.    Dangling inside the housing --

22   A.    Yes.

23   Q.    -- and that by leaning forward she does

24   the same thing, activates the kick plate, that

212

1    is a possibility; isn't it?

2        A.    That is a possibility that she can do

3    that.  It is the -- if you have the gate on the

4    front, the -- you can't stop somebody that has

5    opened up the gate, put their foot in there,

6    poised the thing in a position that you just

7    described, then you bypassed all of the safety

8    devices we are talking about, so you are ready

9    to -- you know, you are ready to go ahead and

10   make a stroke.  It is almost everything you have

11   done is advertent to make a stroke.

12        But if you are not making a stroke and

13   you take your foot out and don't have the plate

14   resting on your foot, you know, which is not a

15   desirable thing to have a plate resting on your

16   foot, the -- then you are outside, you are not

17   going to get in.  I don't care what you do, you

18   won't get in unless you are advertently getting

19   in.

20        Q.    Would you agree that if she was riding

21   the pedal, if her foot was inside the foot

22   control and for whatever reason her foot

23   voluntarily moved -- involuntarily moved forward

24   and hit that kick plate, accidently activated

213

1    the pedal, that the gate would be meaningless --

2    the absence of a gate would be meaningless?

3        A.   Oh, right, because she has already

4    bypassed the gate.  In order to do -- what you

5    have done with your question is you have

6    eliminated the gate and then we start off with

7    no gate.

8            She has already opened the gate, put

9    her foot into the thing, and she is now -- if

10   she is contacting the pedal at that point,

11   leaning forward is not going to get her up

12   against that plate.

13           That's just like being on the floor,

14   just because you lean forward, your foot doesn't

15   slide forward when you do this, it would be

16   stabilized.  So she needs to do something which

17   is really weird, she is lifting up on the gate

18   and balancing the gate upward and she has got

19   her foot off the pedal, so she actually has --

20   supporting the weight of the gate on a foot

21   that's not on the pedal itself to ride it.  And

22   then because she moves forward she now, you

23   know, activates the thing.  It is just too many

24   unlikely things.

214

1      Q.    Is your assumption on the way this

2    accident happened including an assumption that

3    her foot is dangling in the air?

4      A.    It has nothing to do with dangling in

5    the air.

6      MR. HARTMAN:    That was your assumption.

7      THE WITNESS:    It is outside of the foot

8    pedal.

9    BY MR. ROBINSON:

10     Q.    And outside of the foot pedal is it in

11   the air or is it on the ground?

12     A.    It doesn't make any difference.

13     Q.    I thought you said a little bit ago if

14   it were on the ground the friction from -- that

15   that friction would reduce the likelihood of the

16   foot involuntarily moving forward?

17     A.    If she has to stabilize herself, she

18   will have to pick her foot up and then step down

19   someplace.  And you don't -- if you are riding

20   the pedal, your foot is already resting where

21   you want it and you move forward, you are not

22   moving that foot forward, you know, it is

23   stabilized on the pedal.

24     Q.    How high is the pedal off the ground?

215

1       A.    About an inch and a half.

2       Q.    What makes you think that her foot

3    would have to raise an inch and a half rather

4    than just slide forward on the ground?

5       A.    I don't think I understand the

6    question.

7       Q.    This involuntary movement that you have

8    as her activating the foot control, it requires

9    her also not only to involuntary move her foot

10   the distance of the control, hit the kick plate

11   and then vertically go down, it also requires it

12   first, if her foot is on the ground to raise up

13   the 1 1/2 inches vertically, then go

14   horizontally that distance that we talked about,

15   and then go back down vertically and activate

16   it, that's what's required by your assumption;

17   right?

18      A.    That's absolutely correct.

19      Q.    And we don't have any evidence that

20   either one of those three events occurred; do

21   we?

22      A.    Well, what happens is --

23      Q.    Do we have any evidence?

24      A.    Well, we don't have any evidence

                                                216

1    concerning anything except that the -- one of

2    the big problems with the footswitch is that

3    when you walk and you move forward at all, your

4    normal gate, especially when you are young, is

5    to raise your foot 1 1/2, 2 inches off the

6    ground.  That's why people are always walking

7    into these switches and stepping on them where

8    the old ones were 6 inches off the ground and

9    you never do that.

10        Q.   She wasn't walking at the time of this

11    accident; was she?

12        A.   If she is in a position and she moves

13    forward, she is taking a step forward, that's

14    the first part of walking.

15        Q.   She was sitting when this happened;

16    wasn't she?

17        A.   We don't know that she is sitting.

18        Q.   You don't know that?

19        A.   She is -- I told you that the evidence

20    apparently is that she was either sitting or

21    leaning against the -- against the -- this

22    stool, but when she moves forward we don't know

23    what she was doing whether she left contact with

24    the stool or not.

217

1      Q.    Do you have any -- she has testified

2    that she was sitting; do you know that?

3      A.    No, I don't know that.

4      Q.    The one witness whose deposition you

5    don't have, the only one to have seen her before

6    says she was sitting, do you know that?

7      A.    After the accident, they found her

8    sit --

9      Q.    Before the accident, no, before the

10   accident, before the accident.

11     A.    I don't know anything about that.

12     Q.    If she were sitting at the time of the

13   accident --

14     A.    Yes.

15     Q.    -- would that affect your opinion?

16     A.    If she was -- absolutely sitting --

17     Q.    Yes.

18     A.    -- at the time of the accident?

19     Q.    Yes, yes.

20     A.    The -- it has -- you can still from a

21   sitting position, if she is in a sitting

22   position where she is able to activate this

23   machine from the sitting position, that she set

24   it up so that when I lean forward in this seated

218

1    position I can activate the pedal, then she is

2    going to be able to step on the pedal any time

3    she leans forward.

4        Q.   Did you do any testing with anyone in

5    the sitting position to see if their foot moves

6    forward like you tried to suggest with your

7    standing test?

8        A.   No, I don't have to do those to

9    understand how that works.

10       Q.   I didn't say you have to.  I said did

11   you do it?

12       A.   No, you saw what -- didn't I send you

13   the videotape?  I thought it was sent to you.

14       Q.   You did.

15       A.   Then if you have seen the video tape,

16   you know that I didn't do that.

17       Q.   So without the argument the answer is,

18   no, you didn't do any testing to see --

19       A.   Why not an argument?

20       THE COURT REPORTER:  Pardon me --

21       THE WITNESS:  Why not an argument?  I don't

22   mind an argument.  You are arguing with me so

23   why not an argument?  I don't mind your arguing

24   with me.

219

```
1    BY MR. ROBINSON:
2         Q.   I don't follow what you are doing right
3    now.  The question simply is did you perform any
4    tests with the subjects seated?  What is the
5    answer, sir?
6         A.   The answer to that is no.
7         Q.   Okay.
8         A.   And I sent you the videotape so that
9    you know that I was not doing simulation tests,
10   I was doing a worst case scenario test.
11        Q.   We are just trying to get some
12   testimony here, sir.
13        A.   No, no, no, that's not what you are
14   trying to do, that's not what you are trying to
15   do.
16        Q.   Did you --
17        A.   You are trying to create new facts that
18   are not available in this case.  And I am not
19   going to introduce facts that I don't know
20   about.  I am not sitting there taking a video of
21   the woman while she is having her accident so
22   everything else becomes speculation.
23        Q.   Did you ask -- it does.  Did you ask
24   her if she was sitting?
```

220

1    A.    I thought I have testified at least

2    four times that I did not interview this woman.

3    Q.    I thought you said you talked with her

4    for -- that Matt Ulmenstein was correct that you

5    did talk with her for 15 minutes or so?

6    MR. HARTMAN:  And he also indicated to you

7    that he did not interview her about the accident

8    in the same conversation.

9    BY MR. ROBINSON:

10    Q.    I just want to make sure I know this,

11    did you ask her if she was sitting?

12    A.    I did not ask her what she was doing at

13    the time of the accident.

14    Q.    Are there any authorities that you have

15    utilized in forming your opinion that this

16    accident, this involuntary movement of the foot

17    can occur when she is in the seated position?

18    A.    I didn't refer to any authorities on

19    this.

20    Q.    Is there any support outside of your

21    testimony for that conclusion?

22    A.    No.

23    Q.    Did you perform any type of analysis to

24    determine if that, in fact, could occur, that if

221

1  she were in the seated position, that her foot

2  could involuntary move vertically upwards high

3  enough to get above the pedal, horizontally into

4  the foot control far enough to hit the toe plate

5  and then back down vertically well enough to

6  bring the ram onto her hands?

7        A.   Not necessary to do anything.  If she

8  is able to advertently, you know, step and

9  operate this press, that she wants to get a

10  stroke on the press, then you can get that same

11  exact motion involuntarily.

12        Q.   I am just asking if there is any other

13  support that we can go to to say someone else

14  agrees with Professor Barnett on this or that

15  Professor Barnett has done something to show

16  that someone in a seated position will actually

17  move their foot in those dimensions?

18        A.   I have given you the rationale.

19        Q.   Is there anything else that you haven't

20  given us that supports your conclusion that her

21  foot assuming she was seated would move

22  vertically up 1 1/2 inches minimum, back

23  4 inches or so and -- horizontally and then back

24  down vertically to depress the pedal?

222

1      A.   No, I have given you the full technical

2    argument.

3           Let's have Steve in.  Those are the

4    records.

5      MR. ROBINSON:  Okay, do you want to take a

6    break and get those in here?

7      THE WITNESS:  Open the door up, let's do

8    that.

9      THE VIDEOGRAPHER:  Off the record at 4:23 p.m.

10          (Recess taken.)

11     THE VIDEOGRAPHER:  It is the beginning of

12   Tape No. 3.  Back on the record at 4:25 p.m.

13   BY MR. ROBINSON:

14     Q.   Does the distance that the foot control

15   was located away from Miss Lindquist's foot play

16   any role in your assumptions and opinions?

17     A.   No.

18     Q.   Does it matter at all?

19     A.   No, it doesn't.

20     Q.   It could be 5 feet away or it could be

21   1 inch away?

22     A.   As long as she is able, if she is going

23   to testify that from whatever position, whether

24   she is standing, leaning or seated, if she can

223

1    activate the unit and reach into this, you know,

2    reach into this machine and activate the foot

3    pedal, as long as she can do that advertently,

4    she can do this inadvertently.

5    Q.    So is one scenario more likely or less

6    likely if her foot is literally 12 inches away

7    from the foot control at its resting unapplied

8    position versus 2 inches away from the foot

9    control?

10    A.    No, it has nothing to do with that.

11    Q.    It is exactly the same situation?

12    A.    It is not exactly the same.  All you

13    have to do is set the pedal up so that you can

14    activate the machine and that you can -- from

15    that same position you can reach into the

16    machine.

17          If you can do that, then what you can

18    do is what you did advertently to activate the

19    machine, you can do inadvertently.  And if you

20    are close enough to the machine where your hands

21    can be in there while you are doing this, you

22    are in big trouble is there.

23    Q.    And maybe my question was poorly asked

24    and I apologize.  Is it equally likely for her

224