# EXHIBIT A

# PART 6

1    to have inadvertently activated the foot pedal

2    as your opinion assumes if her foot was

3    12 inches away from the foot control at resting

4    position, all the way down to 1 inch away from

5    the foot control, is there any difference?

6        A.   It has no -- that actually has no

7    meaning.  The -- it has to do with, you

8    know, when she leans forward, you know, the --

9    is she able to reach the press and, you know, if

10   she is in a home base where she could have

11   reached the pedal comfortably to begin with,

12   that's all that counts.  I don't care whether it

13   is comfortable, you are 2 inches away or

14   12 inches away, as long as you have -- you are

15   in a position where you can activate the unit

16   and still put your hands into the press.

17   Whatever is done advertently can be done

18   inadvertently.

19       Q.   Let's assume that she was in the

20   sitting position before this incident occurred,

21   how far would she have to lean her torso forward

22   for her foot to begin moving in this

23   involuntary --

24       A.   The instant you start to move forward

225

 1   your foot could move.  The instant you go from a

 2   relaxed position and I am going to reach

 3   forward, one of the natural things you do when

 4   you reach forward is step forward to be prepared

 5   to stabilize yourself so you don't fall on your

 6   face.

 7        Q.   From the seating -- seating position?

 8        A.   Right, I mean that's one of the things

 9   that you do.

10        Q.   What are you relying upon in forming

11   that opinion, that your foot --

12        A.   It is the definition of ambulation.

13        Q.   Here I am moving my forward torso, my

14   foot is not moving, and I am moving it the

15   entire way --

16        A.   Every time you move forward you just

17   put pressure on your foot.

18        Q.   Right.

19        A.   And if you are worried that you are

20   going to move so far forward that you have to

21   stabilize yourself.  Let's say you back your

22   feet up and you have it resting on the chair and

23   you move forward like that, I assure you your

24   foot will come forward to make sure that you are

226

1    stable.

2        Q.    Do you have any evidence that her foot

3    was back behind on the chair?

4        A.    I have no evidence of any of this.

5        Q.    Okay, well, here I am --

6        A.    Yes.

7        Q.    -- correct me if I am wrong, I am

8    seated in my chair, my feet are flat; are they

9    not?

10       A.    Yes.

11       Q.    And I am leaning all the way down to

12   my -- such that my chest hits my knees --

13       A.    Right.

14       Q.    -- and my foot hasn't moved; right?

15       A.    Your foot hasn't moved and you put

16   pressure on your feet when you have done that.

17       Q.    Okay.  So what is it about her

18   situation that caused her -- and if I lean

19   forward as far as I can, my foot hasn't moved;

20   is that right?

21       A.    That's right, and you put more pressure

22   on your foot.

23       Q.    Okay.  So what is it about her

24   situation that leads you to conclude that her

227

1    foot is actually moved the distance whatever it

2    is away from the foot --

3        A.    That her foot is not in a stable

4    position in front of her like yours are, they

5    are back.

6        Q.    Okay, this is what I wanted to hear.

7    So you are -- are you saying that it was

8    dangling?

9        A.    Not necessarily dangling.  Her foot

10   could be moved back in a position where you

11   can't stabilize yourself if you move forward.

12   You have pulled it out of the unit, and you are

13   now less stable in the moving forward position

14   because you are out of the unit, and now when

15   you lean forward, it is necessary to step

16   forward to stabilize yourself.

17       Q.    Has she ever indicated that she was

18   unstable?

19       A.    I never -- remember once again I didn't

20   interview her.

21       Q.    Isn't that significant?

22       A.    What's significant?

23       Q.    Whether or not she was unstable when

24   she leaned her torso forward if she was in a

228

1    seating position because as we have just shown,

2    I'm -- my feet are stable, my foot is not

3    moving.  Are you saying if her foot was behind

4    her, you are saying it would move forward.  Now,

5    I can tell you I am doing the same thing with my

6    foot behind me like you are saying and my foot

7    is still not moving.

8         A.   Oh, no, no, no, no, you are not putting

9    your foot behind you or you would be on your

10   face.

11        Q.   Where -- how far behind you is your

12   foot --

13        A.   Put --

14        Q.   -- needing to be?

15        A.   -- your feet back, way back.

16        Q.   Here it is, all the way back.

17        A.   Right, take your other foot and put it

18   back.

19        Q.   Both of them?

20        A.   Right.

21        Q.   Okay, okay --

22        A.   Now try to lean forward.

23        Q.   Okay.  So you need to have both feet

24   back before this scenario occurs?

                                                    229

1    A.    Right.

2    Q.    Okay, I want to make sure I understand

3    what your scenario is assuming.

4    A.    Now, all I am --

5    MR. HARTMAN:  I am going to object to the

6    form of the question because the scenario is

7    assuming based on your sitting there digging

8    your toes into the floor as you are doing this.

9         There is no indication that he has

10   indicated that he is assuming these for the

11   scenario except for the basic principle of

12   ambulation is applied to any situation.

13   MR. ROBINSON:  I don't understand it but

14   okay.

15   MR. HARTMAN:  Well --

16   THE WITNESS:  Well, if you are standing

17   straight up, you cannot move unless you lean

18   forward and start to fall, and then you need a

19   foot to catch you when you fall.  That's what

20   ambulation is.

21   BY MR. ROBINSON:

22   Q.    I am referring to a seating position

23   right now.  I am only referring to a seating

24   position.

230

1      A.    Well, I understand.  And I have no

2    evidence that she was seated.  I only have

3    evidence that she was either seated or leaning

4    against the seat.  That's the only thing I have

5    seen in the file.

6      Q.    Okay, let's talk about leaning against

7    the seat.  Have you done any type of study to

8    see how far her torso would need to move or

9    where her feet would need to be if she were

10   leaning against the seat?

11     A.    No, I haven't.

12     Q.    Wouldn't it be important for you to

13   know in coming to this assumption that her foot

14   inadvertently moved whether she was seating --

15   seated, leaning, or standing; wouldn't that be

16   an important determination?

17     A.    No, not important to me, it is not

18   important to me.  What is important to me is

19   that she is in a position where she is able to

20   activate the press.

21     Q.    If your feet are -- if your feet are --

22   I don't want to just use me.  If your foot are

23   flat in front of you --

24     A.    Yes.

231

 1     Q.   -- and you lean forward, do your feet
 2    move all the time?
 3     A.   No.
 4     Q.   Do they move ever?
 5     A.   Sometimes.
 6     Q.   Would you -- can you show me.
 7     A.   I don't understand.
 8     Q.   I want to know what you are describing.
 9    Put your feet flat on the floor --
10     A.   Yes.
11     Q.   -- and then lean forward.
12     A.   If I lean forward enough, I am going to
13    have to move my feet forward.
14     Q.   Your foot hasn't moved --
15     A.   Well, let me start further back --
16     THE COURT REPORTER:  Pardon me, pardon me, I
17    can't, I can't.
18     MR. ROBINSON:  Okay.
19     MR. HARTMAN:  Okay.
20     MR. ROBINSON:  Hold on.
21     THE COURT REPORTER:  I need to rest a
22    minute.  I really do.
23     MR. ROBINSON:  Hold on.  I understand.  Go
24    ahead.

232

```
 1          THE COURT REPORTER:  I just -- I can't get
 2     both of you.  I am trying to get every single
 3     word --
 4          MR. ROBINSON:  I understand.
 5          THE COURT REPORTER:  -- and I can't get
 6     every word.
 7          MR. HARTMAN:  Okay, I understand.
 8          THE WITNESS:  We will slow down.
 9          MR. HARTMAN:  Okay, I want to interject
10     something, Mr. Robinson is being extremely
11     argumentative with this witness.  I have let it
12     go on for way too long.  There is a basic
13     principle that's been applied to the situation.
14          MR. ROBINSON:  I object to your speaking
15     comments again, Mr. Hartman.
16          MR. HARTMAN:  Okay, you are entitled to it.
17     At some point in time this has to end.  He
18     cannot become argumentative with the witness.
19     He cannot give a -- sit there and use his body
20     ambulations and configurations to try and
21     distort a well known fact by anyone who knows
22     anything about the subject matter about the
23     theory of ambulation.
24
```

233

1    BY MR. ROBINSON:

2        Q.   Sir, back to what we are talking about,

3    I am talking -- I know you said if you put your

4    feet behind you.  I am talking about if you put

5    your feet flat on the ground, are your feet

6    moving when you lean your torso toward?

7        A.   If I already have my feet in a stable

8    position that would allow me to reach forward --

9        Q.   Yes.

10       A.   -- with my feet in that position --

11       Q.   Yes.

12       A.   -- then I don't have to move them

13   forward anymore.

14       Q.   So how far back do your feet need to be

15   before they begin to move with the forward

16   movement of the torso in a seated position?

17       A.   You can't -- there is no way to answer

18   the question.  There is no way to answer that

19   question.

20       Q.   Aren't those significant --

21       A.   You haven't given me the parameters to

22   answer.

23       Q.   Aren't those significant questions to

24   know answers to when formulating an opinion as

234

1    to what Tina Lindquist did?

2       A.    Absolutely not.  I am not going to

3    speculate on what she did.  She is going to be a

4    human being that you can ask all the questions

5    you want.

6          The fact that you are not skillful

7    enough to get the information when you took her

8    deposition doesn't mean you are going to get it

9    from me on the basis of speculation.  I am not

10   going to do that.

11          I will give you principles, but I am

12   not going to speculate what she was doing.  If I

13   ask her the questions, then I would take

14   responsibility for all these -- all the

15   questions you are asking, but I haven't

16   interviewed her.

17      Q.    Aren't you speculating that her foot

18   moved forward?

19      A.    She said that she had her foot outside

20   of the unit.

21      Q.    I said aren't you speculating that her

22   foot moved forward?

23      A.    It is not speculation.  That is a

24   scientific fact.  If she has her foot outside of

235

1    the unit and she has made the unit activate to

2    hurt her hands, this is a one-note samba.  It is

3    not like there is 11 different things that can

4    happen.

5            She has to step into the switch far

6    enough to push the pedal in, to push the lock

7    plate in, push down on the unit in order to have

8    a stroke that will hurt her so that we know this

9    working backwards.

10   Q.   Do you know that OSHA in investigating

11   this accident indicated the foot control was

12   properly guarded?

13   A.   I don't know anything of the kind.

14   Q.   Did you review the OSHA?

15   A.   You are certainly not going to try to

16   impress me with what OSHA knows about foot

17   pedals.  I hope you are not going to try --

18   Q.   I am --

19   A.   -- to do that.

20   Q.   -- not sure what you mean by that.

21   What do you mean by that?

22   A.   Well, first of all, I have had 19

23   contracts with OSHA where I developed a training

24   program that OSHA uses for their compliance

236

1    officers in different fields.

2            I am an authority.  OSHA is not an

3    authority.  They don't do any research at OSHA.

4    All of the work that's done, the research that's

5    done in safety is done in the Department of the

6    Interior by the -- by NIOSH, not by OSHA.  They

7    don't do any testing.  They copy the standards

8    that Ralph Barnett and people like me make.

9            And since I am the one, for example,

10   that ran the A14 committee, you know, as a

11   technical secretariat on ladders, everything we

12   do on ladders they copy word for word and put

13   into OSHA.  They don't do any original work on

14   their own.

15   Q.   You don't have much respect for OSHA it

16   sounds like?

17   A.   I have no respect for OSHA at all.

18   What they do is they copy.  They started in

19   business by copying and plagiarizing every

20   wonderful standard that we have in the

21   United States and copied it down and said this

22   is our regulation.  They didn't do a scintilla

23   of work of their own.

24           Now, that doesn't mean the work that

237

1    they get -- they get in this way is bad.  They

2    copied from the best.  Just like the student in

3    school that wants to sit in back of the best

4    student, if he copies over his shoulder, he is

5    liable to get an A in the class.

6        Q.   Did they copy from you, is that what

7    you are saying?

8        A.   Of course they copied from me.  That

9    was their job.

10       MR. ROBINSON:  Why don't we take a little

11   break and we will look at the file of materials

12   that have been brought.

13       THE VIDEOGRAPHER:  Off the record at 4:37 p.m.

14              (Recess taken.)

15       THE VIDEOGRAPHER:  Back on the record at

16   4:45 p.m.

17   BY MR. ROBINSON:

18       Q.   Was this Heim press brake intended to

19   be used with the point of operations safety

20   device, sir?

21       A.   I think so.

22       Q.   With regard to the gate, when did the

23   gate come out?

24       A.   The gate that I am talking about was I

238

1    think first introduced in '76 and then put into

2    the catalogues in '77.

3        Q.   Do you know if Heim ever received the

4    catalogue before the sale of this particular

5    press brake?

6        A.   I don't know specifically what they

7    received, but, you know, Linemaster had a

8    campaign to send this notification about this

9    switch to everybody.  And Heim would have -- the

10   best I could tell you Heim would have been a

11   really good customer of Linemaster.

12       Q.   And --

13       A.   And that I know from my own.  That's

14   not speculation on my part.  I know this.

15       Q.   No, my question is simply do you have

16   any information that Heim was aware of the

17   existence of a gated foot control at the time it

18   sold this one, this press brake in 1978?

19       A.   I think they should have been because I

20   am sure that they received the notice from

21   Linemaster.

22       Q.   Should have been is something we will

23   get into it.  Do you have any evidence that they

24   actually knew?

239

```
 1        A.    I have no evidence.

 2        Q.    And when you say that they should have

 3   been, you are saying that because of the

 4   publication by Linemaster that Linemaster would

 5   have given that to Heim?

 6        A.    Right, and they also at the shows, you

 7   know, the -- if Heim went to any of the shows

 8   they would have seen it because they were

 9   displaying -- they were displaying this new

10   device at their shows.

11        Q.    Do you have any evidence that Heim was

12   at a show where it has been displayed?

13        A.    No, I don't.

14        Q.    Have you ever talked with anyone from

15   Linemaster to see if they provided Heim with

16   notice of a gate --

17        A.    No.

18        Q.    -- a gated foot control?

19        A.    I have not.

20        Q.    Your entire file I believe has been

21   brought down here.  It is getting late in the

22   day, ten to 5:00.  I'd like an opportunity to

23   view that file.  I had suggested that it be left

24   here for the evening since we are coming back
```

240

1    tomorrow.  Do you have any issue with leaving it

2    here, sir?

3        A.   I have -- the only issue I have is its

4    security.  If you represent to me that nothing

5    is going to happen to it, you know, the -- there

6    is certainly nothing in there that I don't want

7    you to see.

8        Q.   Okay.  Well, Mr. Hartman, you had heard

9    him say that he wasn't going to leave it here --

10       A.   He is not as trusting as I am.  That's

11   not his business to be trusting.  Mine is.

12       Q.   Well, I would appreciate that because I

13   don't really have the opportunity right now

14   to -- as you know we are going to ask

15   Mr. Ulmenstein a few questions about some of the

16   new materials you had produced and new

17   notations.  And I just don't want to have to

18   take -- I was asked if I reviewed it.  How large

19   is the file?  It is three Bankers Boxes; right?

20       A.   Exactly.

21       Q.   Right, so --

22       MR. HARTMAN:  If he doesn't have an

23   objection and you guarantee the security of it,

24   I don't have an objection either.

241

1        MR. ROBINSON:  Yeah, I'm not sure what that

2    means.  I am going to guarantee the security?  I

3    am not going to guarantee, guarantee from a fire

4    loss or a tornado, I can't guarantee that.

5        THE WITNESS:  No, I don't mean that.  I mean

6    I have had files where they picked up the file

7    from the file room and filed it in the wrong

8    place and every report disappeared, never to be

9    found again, you know, $35,000 for a report

10   which we could never find again and could never

11   get back into the plant to redo it.  I mean

12   that's the kind of stuff that worries me.

13       MR. HARTMAN:  Okay.

14       MR. ROBINSON:  And my plan would most likely

15   be to come here very early tomorrow morning.

16       THE WITNESS: `If the room is dedicated to

17   your efforts, then that's probably going to be

18   fine.

19       MR. HARTMAN:  I have no objection.

20       MR. ROBINSON:  Okay, great.

21            That's all the questions I have, sir.

22   Thank you very much.

23       THE WITNESS:  Thank you.

24

                                                242

```
 1                    EXAMINATION

 2   BY MR. HARTMAN:

 3        Q.   I am sorry, I just have a couple.  I

 4   normally wouldn't ask questions, but at one time

 5   and I think it is a mistake, but just clarify it

 6   for me, you indicated that the Heim machine was

 7   a 35 stroke per minute machine?

 8        A.   Yes.

 9        Q.   And then another time you indicated

10   that it was a 35 stroke per second machine.  I

11   think it is a 35 stroke per minute?

12        A.   It is per minute.

13        Q.   Okay.

14        A.   If it was per second, let me tell you

15   something, it is -- they have a name for it.  It

16   is called a hummingbird.

17        Q.   I just -- I just don't want it to come

18   back that you --

19        A.   Right.

20        Q.   -- stated on the record --

21        A.   Thank you.

22        Q.   The other issue I have is with regard

23   to -- I will grab my note, give me a second, I

24   had it, you indicated that the -- is it ever
```
                                                     243

1    safe to have an unguarded foot pedal associated

2    with the press brake?

3        MR. ROBINSON:  Object to the form of the

4    question.

5        THE WITNESS:  On a general purpose machine

6    it is never safe because the number of scenarios

7    that you have when you have a tethered

8    footswitch that could find itself anyplace on

9    the floor, it means that the folks delivering

10   the new parts to the machine to be processed,

11   the folks that are picking up the finished

12   parts, the people who are doing adjustments and

13   lubrication of the machine, there is an army of

14   people who walk in the area where the footswitch

15   is located, any of these people can step

16   inadvertently into this machine and produce a

17   stroke and so, you know, the rule is to minimize

18   the probability of accidental activation for the

19   environment that the -- that these switches find

20   themselves.

21        And the -- there is no such thing when

22   you have a switch that is meant to be activated

23   by a human being as making it so that you could

24   never activate it because then you could never

244

1    run the machine.

2         So what we are trying to do is get

3    controls such that they are sensitive to when we

4    want them to work, they work.  When we don't

5    want them to activate, they don't.

6         And that is a real challenge for the

7    technical community and, you know -- you know, I

8    am very proud of the fact that some of the

9    people who make footswitches have been improving

10   their menu of potential devices so that

11   machinery manufacturers can pick ones that come

12   closer to this goal of minimizing accidental

13   activation.

14        MR. HARTMAN:  No further questions.

15        THE WITNESS:  I do -- I think I have to add

16   something to the thing.  Remember I told you

17   that I also have made a mistake in the report

18   and you didn't ask me what that was.  But if we

19   would -- if you could give me the Triodyne

20   report, it is one word.

21        MR. ROBINSON:  The illustrated?

22        THE WITNESS:  Yes.  Did you see that in

23   there?

24        MR. ROBINSON:  I did.  And that's why I

245

1    didn't ask about it, but I did see it.  That's

2    the actual original report, and I appreciate

3    that, sir.

4         THE WITNESS:  I just wanted to make sure you

5    did see it.

6         MR. HARTMAN:  Okay, we want to read.  We are

7    not waiving.  Thank you.

8         THE WITNESS:  Thank you.

9         THE VIDEOGRAPHER:  Off the record at 4:52 p.m.

10                   (Whereupon, Barnett Deposition

11                    Exhibit G and H were marked for

12                    identification.)

13              (FURTHER DEPONENT SAITH NAUGHT.)

14

15

16

17

18

19

20

21

22

23

24
                                                    246

1    STATE OF ILLINOIS        )

2                            )    SS:

3    COUNTY OF DuPAGE         )

4         I, Patricia L. Wangler, a notary public

5    within and for the County of DuPage and State of

6    Illinois, do hereby certify that heretofore,

7    to-wit, on the 6th day of April, 2006,

8    personally appeared before me, at

9    33 North LaSalle Street, Illinois, RALPH L.

10   BARNETT, in a cause now pending and undetermined

11   in the United States District Court, wherein

12   TINA LINDQUIST is the Plaintiff, and HEIM, L.P.,

13   is the Defendant.

14        I further certify that the said witness

15   was first duly sworn to testify the truth, the

16   whole truth and nothing but the truth in the

17   cause aforesaid; that the testimony then given

18   by said witness was reported stenographically by

19   me in the presence of the said witness, and

20   afterwards reduced to typewriting by

21   Computer-Aided Transcription, and the foregoing

22   is a true and correct transcript of the

23   testimony so given by said witness as aforesaid.

24        I further certify that the signature to

248

1    the foregoing deposition was not waived by

2    counsel for the respective parties.

3         I further certify that the taking of this

4    deposition was pursuant to Notice, and that

5    there were present at the deposition the

6    attorneys hereinbefore mentioned.

7         I further certify that I am not counsel

8    for nor in any way related to the parties to

9    this suit, nor am I in any way interested in the

10   outcome thereof.

11        IN TESTIMONY WHEREOF:  I have hereunto

12   set my hand and affixed my notarial seal this

13   _10_ day of __APRIL____, 2006.

14

15

16                    _Patricia L. Wangler_

17   _____

18        NOTARY PUBLIC, DuPAGE COUNTY, ILLINOIS

19        LIC. NO. 084-002417

20

21

22

23

24
                                              249

| 1 | STATEMENT OF CHANGE OR CORRECTION |
| 2 | Page and Line Number 13,13   Ulmenstein → Ulmenstine |
| 3 | Reason |
| 4 | Page and Line Number 47,7   gated → mousetrap |
| 5 | Reason  Trick question |
| 6 | Page and Line Number 48,11   gated → mousetrap |
| 7 | Reason  Trick question; mousetrap is the subject |
| 8 | Page and Line Number 49,7   gated → mousetrap |
| 9 | Reason  Trick question — discussing Allen Bradley 205 |
| 10 | Page and Line Number 50,3   startled → startle |
| 11 | Reason |
| 12 | Page and Line Number 96, 20   out with → with out |
| 13 | Reason  What I'm talking about! |
| 14 | Page and Line Number 136,12   gate → mousetrap |
| 15 | Reason  Properly characterizes my publications. |
| 16 | Page and Line Number 150, 18   Yes → No |
| 17 | Reason  See p 159, 17 |
| 18 | Page and Line Number 165, 22   pinking → picks |
| 19 | Reason  Misspoke |
| 20 | Page and Line Number 181, 3   Insert "not" between |
| 21 | Reason  That's and much. |
| 22 | Page and Line Number 213, 13 & 15   plate → gate |
| 23 | Reason  Plate cannot rest on foot |
| 24 | _Ralph L. Barnett_  5/3/06 |

05/05/2006 07:23 FAX 847 647 2047          TRIODYNE INC.                                    002/003
Case 1:04-cv-00249-SJM          Document 67-7          Filed 04/09/2007          Page 27 of 27

APR-24-2006 02:42PM   FROM-

                                                                    T-727   P.002/004   F-035

1                    IN THE UNITED STATES DISTRICT COURT

2               FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3

4       TINA LINDQUIST,                    )

5               Plaintiff,                 )

6       vs.                                ) No. 04-249E

7       HEIM, L.P.,                        )

8               Defendants.                )

9            This is to certify that I have read the

10      transcript of my deposition taken in the

11      above-entitled cause by Patricia L. Wangler,

12      Certified Shorthand Reporter, on the 6th day of

13      April 2006, and that the foregoing transcript

14      accurately states the questions asked and the

15      answers given by me as they now appear.

16

17                      RALPH L. BARNETT

18      SUBSCRIBED AND SWORN TO

19      Before me this ___4___ day

20      of May, 2006.

21

22      Notary Public

23

24

"OFFICIAL SEAL"
DOLORES G. BARNETT
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 2/9/2008

247