# EXHIBIT C

```
                 UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF PENNSYLVANIA

TINA LINDQUIST                      : NO. 04-249E
          Plaintiff,                :
                                    : JUDGE BAXTER
     v.                             :
                                    :
HEIM, L.P.                          :
          Defendant.                :
```

### AFFIDAVIT OF RALPH L. BARNETT

I, Ralph L. Barnett, do hereby state and swear as follows, in an effort to more concisely set forth and consolidate the testimony of my deposition of April 6, 2006 and my report dated February 13, 2006:

1. Heim, L.P. manufactured the subject press brake involved in Plaintiff's accident of September 25, 2002.

2. Plaintiff, Tina Lindquist, was using the subject press brake at the Corry Manufacturing facility for purposes for which the subject press brake was intended and foreseeable.

3. Operating the subject press brake with the operator in the seated position was foreseeable.

4. A Linemaster ungated footswitch originally accompanied and/or was provided with the subject press brake at the time of the initial sale and/or distribution by Heim, L.P. as the only means of activating the press brake. This same model of foot

switch (an ungated Linemaster footswitch) was the same type and model of footswitch that was involved in Plaintiff's accident of September 25, 2002.

5. Photographs taken after Plaintiff's accident are consistent and illustrate a Linemaster foot switch which is not constructed with a safety gate. This was same type and model of footswitch shipped by Heim, L.P. (at the time of the press brake's initial sale and/or distribution) and used by Plaintiff at the time of her accident of September 25, 2002.

6. The Triodyne report dated February 13, 2006 identified the model of the footswitch as a SWH-532. These references were in error and they have been corrected and a copy of the revised report can be found attached.

7. An ungated footswitch provided with a general purpose press brake makes the press brake (and the press brake system) defective.

8. It is reasonably foreseeable to manufacturers of press brakes that loading and unloading of work pieces on a general purpose press brake (such as the subject press brake involved in Plaintiff's accident) will be done by hand.

9. It is reasonably foreseeable to manufacturers of press brakes that press brakes will be operated and maintained without the use of proper point of operation protection.

10. A foot switch with a safety gate would eliminate accidental activation and clearly would have prevented injury to Plaintiff in this case.

11. The failure by the manufacturer of the press brake (Heim, L.P.) to provide a gated foot control and foot switch caused injury to Plaintiff and rendered the press brake defective.

12. The statements made here and in the corrected report attached are based upon my personal knowledge and experience and will be the substance of the testimony I intend to provide at trial.

5-19-06
DATE

RALPH L. BARNETT

19th day of May, 2006

Notary Public

"OFFICIAL SEAL"
DOLORES G. BARNETT
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 2/9/2008

3



# Triodyne Inc.

Consulting Scientists - Safety Philosophy & Technology

666 Dundee Road, Suite 103
Northbrook, IL 60062-2702
(847) 677-4730
FAX: (847) 647-2047

Officers:
Ralph L. Barnett
Dolores Gildin

e-mail: infoserv@triodyne.com
website: www.triodyne.com

SAFETY SCIENCE:
Triodyne Inc.
(Est. 1969)

Departments
Safety Science
Business Systems
Facilities Management
Graphic Communications
Human Factors
Vehicle Technology
Warning Signs/ Manuals

MODEL LABORATORY:
2721 Alison Lane
Wilmette, IL 60091-2101

SAFETY LABORATORY:
3054 North Lake Terrace
Glenview, IL 60026-1335
(847) 486-9640

BETH HAMILTON
SAFETY LIBRARY:
666 Dundee Rd., Ste. 103
Northbrook, IL 60062-2702

CONSTRUCTION:
Triodyne-Wangler
Construction Company Inc.
(Est. 1993)
666 Dundee Road, Suite 103
Northbrook, IL 60062-2702
(847) 677-4730
FAX: (847) 647-2047

SAFETY PRODUCTS:
Triodyne Safety
Systems, L.L.C.
(Est. 1998)
666 Dundee Road, Suite 103
Northbrook, IL 60062-2702
(847) 647-9291
FAX: (847) 647-2047

SAFETY RESEARCH:
Institute for Advanced
Safety Studies
(Est. 1984)
666 Dundee Road, Suite 103
Northbrook, IL 60062-2702
(847) 656-1258
FAX: (847) 647-2047

February 13, 2006 (Corrected May, 2006)

Dallas W. Hartman
Dallas W. Hartman PC
2815 Wilmington Rd.
New Castle, PA 16105

Re: Lindquist v. Heim

Mr. Hartman:

Pursuant to your request we have reviewed and analyzed the materials provided to us in reference to the above captioned matter. Our initial opinions are contained in this report.

I. Materials Reviewed
- ANSI B11.3-1973
- ANSI B11.3-1982
- ANSI B11.3-2002
- ANSI B11.1-1971
- ANSI B11.1-1982
- Deposition of Tina Lindquist
- Deposition of Anthony Mase Jr.
- Deposition of Zygmund Zajdel
- Answers to Plaintiff's Interrogatories – Second Set and
- Request For Production of Documents – Second Request
- Heim Instructions and Parts Book
- Linemaster Product Literature/Catalogs
- Heim Product Literature
- Photographs
- Videotape

In addition to review of materials, Triodyne has completed an inspection of the Heim press brake as well as conducted footswitch experiments.

II. Accident Description

At the time of her accident, Ms. Tina Lindquist was the operator of a Heim Model 70-6 press brake at Corry Manufacturing. The operation being performed was the

2

bending of a perforated exhaust piece about a mandrel. By mandate of Corry Manufacturing, this operation required the use of the Heim-supplied footswitch rather than the hand controls retrofitted by the employer, and also required that the operator use his or her hands to fit the stock piece to the mandrel. Footswitch control is selected by use of a supervisor's key.

It was during this hand-fitting of the stock piece that Ms. Lindquist's foot inadvertently and unintentionally entered the footswitch and activated the Heim press brake, causing devastating injury to Ms. Lindquist's hands.

III.  Identification

The press brake has been identified as a Heim Model 70-6, Serial 2176, sold in 1978 to HB Machinery and shipped to Avco Lycoming.

The manual for the subject machine illustrates a Linemaster footswitch with a "Full Shield." This is consistent with photographs of the subject footswitch after the accident.

Photographs taken of the accident footswitch illustrate a Linemaster footswitch which is not constructed with a safety gate. It is constructed with an antitrip treadle mechanism, a latch that requires a certain foot insertion into the switch to depress the pedal.

IV.  The Linemaster Safety Footswitch

The Linemaster Switch Corporation introduced a safety footswitch for sale as a special order item in 1976. By May 1977, the safety footswitch was listed as a standard catalog item and consisted of the following features:

- A shield that covered the top and sides of the footswitch and came in two sizes to accommodate large workshoes.
- Anti-trip treadle latch mechanism that latches the pedal against activation by shallow insertions.
- A safety gate that must be raised to permit foot insertion.

The Anti-Trip Foot Control with Gate, which was advertised to prevent accidental activation, is illustrated at the top right in Figure 1, which depicts a page from the 1977 Linemaster catalog.

Case 1:04-cv-00249-SJM   Document 67-9   Filed 04/09/2007   Page 7 of 15
Case 1:04-cv-00249-SJM-SPB   Document 48   Filed 05/22/2006   Page 7 of 15

3



Figure 1: The 1977 Anti-Trip Foot Control with Gate Option

In 1977, Linemaster notified the marketplace of their new Anti-Trip models which included safety gates. They did this in their booth at the 1977 Design Engineering Show and they prepared a letter which they sent to their customers on May 31, 1977. These actions were a continuation of their efforts to produce the switch first produced by special order in 1976.

4

V.   History

The Heim press brake which is the subject of the above captioned litigation was manufactured as a General-Purpose Mechanical Press Brake in 1978. The machine was designed to be activated by an electric foot control. At the time of manufacture the minimum requirements for the safety of press brakes were set forth in the American National Standard Safety Requirements for the Construction, Care, and Use of Power Press Brakes, ANSI B11.3-1973. This document is the first ANSI standard developed specifically for press brakes. As such, it only addressed mechanical foot pedals. Every illustration in ANSI B11.3-1973 that depicts a foot control has been assembled in Appendix A of this report.

It may be observed in Appendix A that Illustrations 1, 3, 12, 13, and 23 show a horizontal foot treadle shaft that allows the foot pedal to be located anywhere along the bed of the press brake. Illustration 14 indicates that the pedal is both removable and adjustable. Furthermore, a locking lever is depicted that will prevent any activation of the press. A locking pin is shown in Illustration 15 that serves the same purpose as the locking lever.

Paragraph 4.2.4.1.4 from the standard sets out the philosophical position of the industry with respect to accidental activation of foot-pedals:

> *4.2.4.1.4   Foot-Pedal Actuation Prevention*
> **When a foot pedal is furnished with the press brake, a means shall be provided for preventing any accidental operation of the press brake.**

With the explanation E 4.2.4.1.4 next to it as:

> E 4.2.4.1.4 Foot-Pedal Actuation Prevention.
> Two methods of fulfilling this requirement are:
> (1) Removing the foot pedal and placing it in a safe location
> (2) Providing a locking pin or locking lever, as noted in Illustration 14. These locking mechanisms should be designed to inhibit accidental actuation, but not to allow locking in the operating position. For additional operator safety in foot-pedal-type operations, it is recommended that the locking device (pin or lever) be used to prevent actuation of the press brake when not in operation.

5

Illustration 15, in addition to the locking pin, portrays a barrier guard disposed around the foot pedal. The guard serves to minimize accidental activation of the foot control which is called for in paragraph 4.2.4.2.4:

> **4.2.4.2.4  *Foot-Control Actuation Prevention.***
> **The foot control shall be protected so as to inhibit accidental activation by falling or moving objects, or by someone stepping on it. Means shall be provided for manually locking the foot control to inhibit such accidental actuation.**

With the accompanying explanation E 4.2.4.2.4:

> E 4.2.4.2.4  Foot-Control Actuation Prevention
> One way of preventing or inhibiting accidental actuation of the foot control would be to provide a key-operated selector switch. Another way of providing against accidental activation is shown in Illustration 15.

As a final observation, Appendix A suggests that the undepressed foot pedals are elevated 5 to 7 inches above the floor surface. This implies that an operator can never walk onto the foot pedal. Vintage 1970 mechanical foot pedals required an activation force between 25 and 40 lbs. Further, the activation stroke of the pedal at that time was between 2 and 3 inches.

In summary, classical press brakes minimized accidental activation of their mechanical foot controls through their high activation force thresholds and large activation displacements coupled with restricted locations near the bed, barrier protection and large elevations above the work/walking surface. Every one of these features were radically compromised by the introduction of electric foot controls. These foot switches were tethered on long electric cords which enabled them to be under foot anywhere in front of the press brake. They present a "hair trigger" with activation resistance between 5 and 12 lbs together with a ¼ inch activation displacement. The electric foot switch pedal is usually 1 to 1 ½ inches above the floor which enables most people to walk directly onto the pad. A normal walking gait lifts the toe from 1 ¼ to 2 ½ inches above the walking surface.

VI.   Human Factors Investigation of Accidental Footswitch Activation

To study the characteristics of the Linemaster footswitch that was adopted by Heim, a number of male and female candidates were

called upon to adopt resting positions in front of a footswitch that would normally be used for activating a machine, a Linemaster 511-B2.

Specifically, an operator was requested to put his or her right foot into the switch in an activation position while the left foot equilibrated in a position even with the activating foot. This results in an effective activation geometry so that balance can be maintained while activation and deactivation proceeds. In periods where the footswitch is not to be activated, the foot is removed from the footswitch and placed on the working surface while leaving the stabilizing left foot in position. Consequently, two equilibrium positions were developed: a rest equilibrium and an activation equilibrium with the left foot in a fixed position.

To study the propensity of the footswitch for accidental activation, operators were asked to begin in the activation position, step rearward with their right foot to the rest position, and then to move forward from the rest equilibrium position without looking at the footswitch or intending to activate the footswitch. If the switch was activated by this stepping forward, a light was illuminated and counted as an accidental activation.

Five males and five females were tested and videotaped for an arbitrary amount of equilibrium shifts. In 93 forward motions, there were 87 accidental activations.

Using the same method and candidates, a Linemaster 511-BG, a footswitch with a safety gate, was tested. All 96 forward motions were universally unsuccessful in causing an accidental activation.

The subject Heim press brake was unreasonably dangerous because the original Linemaster footswitch which was shipped with the press brake allows accidental activation under a reasonably foreseeable operating profile. On the other hand, the Linemaster switch with the safety gate, of the Anti-Trip G series, eliminates accidental activation by a blind stepping motion, and would clearly have prevented the injury of Ms. Lindquist.

Recall that Linemaster offered the gated footswitch by special order in 1976, and as a regular catalog item in 1977 while the subject machine was sold by Heim in 1978.

The Heim press brake is not capable of continuous operation and requires the footswitch to be activated in order to cause the machine to cycle. When the operator places a part into the die or removes a

part from the die, it is necessary to reach forward, and/or step forward to promote this activity. Unfortunately it is this forward motion that gives rise to accidental activation of the ungated switch at the very time that the hands are in jeopardy.

VII.  Punch Press vs. Press Brake

Unlike the punch press, the press brake almost always has the workpiece manually set and the finished product removed without the aid of mechanical contrivances. It is reasonably foreseeable to manufacturers of press brakes that the loading and unloading of workpieces will be done by hand.

One of the characteristics of press brakes that differ from punch presses is the notion that very few press brakes have point of operation guards or devices. The standard gives permission to use pullback devices, restraining devices, barrier guards and presence sensing devices. In 1973, at the time the B11.3 standard was written, almost no press brakes were equipped with point of operation devices. Even today these machines are primarily protected by two-hand controls or light curtains when they are compatible with the operation. For this reason, accidental activation of the foot control on press brakes is particularly devastating.

As a historical note, on a properly guarded punch press, accidental activation of a foot control will not lead to an injury.

VIII.  Accidental Activation

Because machines magnify the strength of humankind, it is imperative that they remain under control. The machine should go only when we want it to go, and should stop and remain stopped when so desired. Obviously, accidental activation of a control violates the basic control philosophy for machines.

The ANSI B11.3-1973 standard is very clear that they want accidental activation eliminated where possible and minimized where elimination is not possible. This notion is entirely consistent with the general field of safety which speaks to this issue. Appendix B contains annotations from various sources that make it very clear that the safety community wants accidental activation brought under strict control.

8

IX.   "Hands Out Of Die" (HOOD)

It is our understanding that Heim has taken a position that HOOD (Hands Out Of Die) is an effective safety concept. Indeed, an on-product warning sign mounted on the front of the press brake contains the following admonition:

> NEVER PLACE ANY PART OF YOUR BODY UNDER THE RAM
> OR WITHIN THE DIE AREA

The warning sign also states that it is the employers responsibility to implement this.

In B11.3-1973, the first press brake standard adopted the HOOD. philosophy as one of their four objectives. Indeed, this was a general idea proposed throughout the B11 committees with all their respective machinery.

The difficulty in implementing this concept was so overwhelming that the B11.1-1982 standard for power presses placed the following disclaimer in the forward:

> The philosophy underlying the 1971 standard was HOOD (Hands Out Of Die) operation. After the adoption of the 1971 standard by ANSI and its incorporation into OSHA regulations, many employers documented an absolute inability to meet the HOOD objective. Accordingly, OSHA in 1974 modified that as a requirement, and this version of the standard incorporates that modification.

The shortcomings of the HOOD philosophy were outlined by OSHA as part of their revocation of HOOD as an OSHA requirement in 1974. For example, excerpts from the Federal Register, Vol. 39, No. 233, on December 3, 1974:

> Those supporting revocation of mandatory 'no hands in dies' based their support upon: (1) the lack of statistical evidence showing that 'no hands in dies' is necessary or appropriate to protect employees from point of operation hazards; (2) the availability of safeguarding devices which will protect employees from point of operation hazards, while permitting 'hands in dies'; (3) the additional hazards created by the devices which would be substituted for manual feeding; (4) the high cost associated with implementing 'no hands in dies'; and (5) the technological infeasibility of 'no hands in dies' on some production runs.
> ...

9

> This requirement would not have prohibited or prevented employees from actually placing their hands in the point of operation. Indeed, point of operation injuries occur where 'no hands in dies' is in effect.
>
> ...
>
> In addition to the potential for point of operation injures which exists even with 'no hands in dies,' additional hazards are created in 'no hands in dies' operations. Thus serious additional pinch points are created by feeding apparatus.
>
> ...
>
> Technologically, 'no hands in dies' does not appear to be universally possible in the near future....Therefore, it clearly appears that a universal requirement of 'no hands in dies' would be infeasible.
>
> We also believe that the costs associated with attaining 'no hands in dies' are prohibitive....
>
> It has further been suggested, and we agree that the costs of instituting 'no hands in dies' would make many short production runs economically infeasible....
>
> For the above reasons, we have revoked the requirement of 'no hands in dies.'

In summary, it is reasonably foreseeable that the HOOD philosophy would not have prevented the injury to Ms. Lindquist.

X. Conclusions

    A.    It can be expected that an operator can accidentally move his or her feet in a trajectory that could inadvertently contact the footswitch. That is, the same motion for deliberate action using the open faced footswitch is easily performed accidentally through a normal forward stepping motion.

    B.    The adoption of an electric foot control was a major departure from the mechanical foot pedal which displayed so many important features for minimizing accidental activation. Specifically, mechanical foot pedals operated in a somewhat restricted location close to the bed; they had large activation resistance and required large pedal movements to activate the ram.

        The mechanical controls were disposed over 6 inches off of the working surface, minimizing the chance of accidentally walking onto a pedal. These controls could be deactivated

    by locking levers, locking pins and by physical removal of the pedal itself.

C.  The electric foot controls in general, and specifically the Linemaster full shield model selected by Heim, were tethered on electric cords which allow them to be placed anywhere in front of the press.

   The Linemaster 511B2 used in our human factors testing can be characterized as having a 6 ½ lb. activating force and an activating displacement of ¼ inch. The pedal rests 1 ½ inches from the floor.

   These combined characteristics make an electric footswitch extremely sensitive to accidental activation.

D.  At the time the subject press brake was delivered, there were gated electric footswitches available on the market specifically intended to prevent accidental actuation. This includes the Linemaster Switch Corporation's Anti-Tip Footswitch with Gate.

   This protected switch was available two years before the sale of the machine, and could be found in the Linemaster catalog page directly opposite of the switch that was improperly selected by Heim.

   Heim elected to continue incorporating the less expensive and less safe foot control into their press brake system.

E.  Human factors experiments conclusively demonstrate the efficacy of a gated Linemaster footswitch.

   Head to head comparisons of a Linemaster open front "Full Shield" model and a gated Linemaster safety footswitch indicated a 0% accidental activation rate for the gated control, and a 93.5% accidental activation rate for the ungated model.

F.  The Heim press brake system that was sold in 1978 was defective and unreasonably dangerous and proximately caused the brutal injury suffered by Ms. Tina Lindquist.

This report contains initial opinions, and we reserve the right to amend this report in the face of further information.

11

Please do not hesitate to contact Triodyne, Inc. if we can be of further assistance.

Respectfully submitted,

Ralph L. Barnett
Professor, Mechanical and
Aerospace Engineering

Matthew J. Ulmenstine
Project Engineer