# EXHIBIT E

# PART 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TINA LINDQUIST,                )        ORIGINAL

     Plaintiff,             )

  vs.                           ) No. 04-249E

HEIM, L.P.,                    )

     Defendants.            )

     The video deposition of MATTHEW

ULMENSTEIN, called for examination pursuant to

the Rules of Civil Procedure for the United

States District Courts pertaining to the taking

of depositions, taken before Patricia L.

Wangler, a notary public within and for the

County of DuPage and State of Illinois, at

33 North LaSalle Street, Illinois, on the

6th day of April, 2006, at the hour of

9:00 o'clock a.m.

Reported By:  Patricia L. Wangler, CSR

License No.:  084-002417

1

1          McCorkle Court Reporters, Inc.
              200 N. LaSalle Street Suite 300
2              Chicago, Illinois 60601-1014
3
4    April 10, 2006
     Mr. Dallas W. Hartman
5    2815 Wilmington Road
     New Castle, Pennsylvania 16105
6
     IN RE:  Lindquist v. Heim
7    COURT NUMBER:  04-249E
     DATE TAKEN:  4-6-06
8    DEPONENT:  Matthew Ulmenstein
9    Dear Mr. Hartman,
10   Enclosed is the deposition transcript for the
     aforementioned deponent in the above-entitled
11   cause. Also enclosed are additional signature
     pages, if applicable, and errata sheets.
12
     Per your agreement to secure signature, please
13   submit the transcript to the deponent for review
     and signature.  All changes or corrections must
14   be made on the errata sheets, not on the
     transcript itself.  All errata sheets should be
15   signed and all signature pages need to be signed
     and notarized.
16
     After the deponent has completed the above,
17   please return all signature pages and errata
     sheets to me at the above address, and I will
18   handle distribution to the respective parties.
19   If you have any questions, please call me at the
     phone number below.
20
21   Sincerely,
22   Margaret Setina          Patricia L. Wangler
     Signature Department     Court Reporter
23
     cc:  Mr. Robinson.
24
                                              122

APR 11 2006

```
1      APPEARANCES:

2          DALLAS W. HARTMAN, P.C., by

3          MR. DALLAS W. HARTMAN

4          2815 Wilmington Road

5          New Castle, Pennsylvania 16105

6          (724) 652-4081

7              Representing the Plaintiff,

8

9          MEYER, DARRAGH, BUCKLER, BEBENEK &

10         ECK, P.L.L.C., by

11         PAUL R. ROBINSON

12         U.S. Steel Tower, Suite 4850

13         600 Grant Street

14         Pittsburgh, PA 15219

15         (412) 261-6600

16             Representing the Defendant.

17

18     ALSO PRESENT:

19         MS. KAROLINA TESARSKI, Videographer.

20

21

22

23

24
```

2

```
 1                    I N D E X

 2    WITNESS                      EXAMINATION

 3    MATTHEW ULMENSTEIN

 4      By Mr. Robinson                    5

 5      By Mr. Robinson (Further)         88

 6      By Mr. Hartman                   111

 7      By Mr. Hartman (Further)         112

 8      By Mr. Robinson (Further)        113

 9

10

11

12

13

14

15                  E X H I B I T S

16    NUMBER                     MARKED FOR ID

17    Ulmenstein Deposition Exhibit

18      A                                17

19      B                               112

20

21

22

23

24
                                              3
```

```
 1          THE VIDEOGRAPHER:  My name is Karolina

 2    Tesarski, legal video specialist with

 3    McCorkle Court Reporters located at

 4    200 North LaSalle Street, Suite 300, Chicago,

 5    Illinois, 60601.

 6          I am the camera operator on

 7    April 6, 2006, for the videotaping of the

 8    deposition of Matthew Ulmenstein being taken at

 9    33 North LaSalle, Chicago, Illinois, at the time

10    of 10:27 a.m., in the matter of Tina Lindquist,

11    Plaintiff, versus Heim, L.P., Defendant, filed

12    in the United States District Court,

13    Western District of Pennsylvania, Case No. 04249E.

14          Will counsel please identify themselves

15    for the record beginning with plaintiff's

16    counsel.

17       MR. HARTMAN:  My name is Dallas Hartman.  I

18    represent the Plaintiff, Tina Lindquist.

19       MR. ROBINSON:  And my name is Paul Robinson,

20    and I represent the Defendant, Heim, L.P.

21       THE VIDEOGRAPHER:  Will the reporter please

22    identify yourself and swear in the witness.

23       THE COURT REPORTER:  My name is Patti

24    Wangler, McCorkle Court Reporters.
```

4

1           Will you raise your right hand please.

2                (Witness sworn.)

3                MATTHEW ULMENSTEIN,

4    called as a witness herein, having been first

5    duly sworn, was examined and testified as

6    follows:

7                EXAMINATION

8    BY MR. ROBINSON:

9       Q.   Sir, please pronounce your last name

10   for me so I can make sure I say it correctly.

11      A.   Ulmenstein.

12      Q.   Ulmenstein.  Mr. Ulmenstein, we have

13   met very briefly before we began this

14   deposition.  My name is Paul Robinson.  I

15   represent Heim, L.P., a manufacturer of press

16   brakes that has been sued by Tina Lindquist as a

17   result of an accident that occurred up in Corry,

18   Pennsylvania, near Erie, PA, on

19   September 25th of 2002.

20           Have you ever been to Corry,

21   Pennsylvania, or Erie, Pennsylvania?

22      A.   I don't believe so.

23      Q.   Do you know where it is?

24      A.   I have a good idea.

5

```
 1        Q.    Where do you understand those locations

 2    to be?

 3        A.    I understand them to be in western

 4    Pennsylvania.

 5        Q.    Have you ever met Tina Lindquist?

 6        A.    I have.

 7        Q.    And where did you meet Tina Lindquist?

 8        A.    In Dallas Hartman's office.

 9        Q.    And when was that?

10        A.    That was October I believe.

11        Q.    October of 2005 I am assuming?

12        A.    Yes.

13        Q.    And who was present during that

14    meeting?

15        A.    I think Dallas, Tina Lindquist,

16    Professor Barnett, myself and perhaps there were

17    some other people from Dallas' office.  I am not

18    certain.

19        Q.    And how long -- did you have a chance

20    to talk with Miss Lindquist?

21        A.    I did.

22        Q.    And how long of a time did you have to

23    talk with her?

24        A.    She was in the room with us for perhaps
```

6

1    15 minutes.

2        Q.    Did you interview her?

3        A.    No.

4        Q.    Did Professor Barnett interview her?

5        A.    No, there was no formal interview.  A

6    few questions might have been asked, but I'm --

7    I can't really recall.

8        Q.    Have you brought your file with you

9    here today?

10       A.    I have not.

11       Q.    And why not?  We had specifically

12   requested that you do so in the notice of

13   deposition.

14       MR. HARTMAN:  Paul, we provided you --

15   excuse me, but for the record, Paul, we provided

16   you with the entire file prior to the

17   deposition.

18       MR. ROBINSON:  That's a copy.  I asked for

19   the original file.

20   BY MR. ROBINSON:

21       Q.    My question is why didn't you bring a

22   copy of the original file as requested of you in

23   the official notice of deposition?

24       A.    For one I never received an official

7

1    notice deposition.

2        Q.    Did Mr. Hartman not give you a copy of

3    that?

4        A.    I don't know how it got misdirected,

5    but I didn't receive it.  And I also thought the

6    a copy of the file was sufficient.  I had no

7    idea.

8        Q.    Were you told about -- you just said

9    you had no idea that you were to bring it and

10   you thought a copy of it was sufficient, so did

11   you have a conversation with someone about

12   bringing the original or bringing a copy?

13       A.    No.

14       Q.    Then why did you -- why did you testify

15   that you thought it was sufficient that we were

16   provided with a copy if you didn't even know

17   about the request to bring the original with

18   you?

19       A.    Because I have provided copies or got

20   the file ready to go with Professor Barnett on

21   other cases.

22       Q.    Where is the original file?

23       A.    The original file I believe to be at

24   Triodyne right now.

8

1          MR. ROBINSON:  Okay.  Just so we are clear

2     Mr. Barnett has also been requested to bring the

3     original file, not a copy, and we would expect

4     him to at least comply with the notice of

5     deposition that compelled him and Mr. Ulmenstein

6     to bring the original file.

7          MR. HARTMAN:  Paul, we talked to you and we

8     provided you a complete copy of the entire file

9     as per your request.

10          You never made an indication to us that

11     you wanted us to do anything other than provide

12     you with a complete copy of the file, nor did

13     you indicate to us at any time that it was not

14     sufficient that we provided you a complete copy

15     of the file.

16          In fact, our offices received numerous

17     correspondence from you over the past few days

18     asking for documents and items outside of the

19     file which we provided you with, therefore,

20     there is no indication, I have not had a

21     discussion with Professor Barnett as to whether

22     he had been bringing the file or not.

23          I had no idea that you were expecting

24     him to bring the file at this point in time in

9

1    light of your compliance with your repeated

2    request as it relates to all information.

3    Whether Professor Barnett brings it or not, that

4    would be his issue if he feels it is necessary.

5        MR. ROBINSON:  Then we need to take a break

6    and you need to make a phone call to make sure

7    that he does bring it because the official

8    notice of deposition for which there has been no

9    agreement, even discussion on, the plaintiffs

10   somehow avoiding that notice which required the

11   original file to be brought here today by

12   Mr. Ulmenstein and Mr. Barnett is in force.

13        We have traveled a long way.

14        MR. HARTMAN:  Well --

15        MR. ROBINSON:  And one of the things I

16   wanted to do was see the original file so I can

17   compare it with the file that was provided to

18   make sure that there has been full compliance

19   with the court order that compelled you to

20   produce that file based upon your previous

21   objections.

22        And I intended to ask this witness and

23   Mr. Barnett -- excuse me, Professor Barnett

24   questions about that original file.  And I

10

```
 1    cannot do it if it is not brought, so let's take

 2    a break and you can make a phone call.

 3        MR. HARTMAN:  Well, Paul, unfortunately

 4    because of your being late for the deposition

 5    through no fault of your own Professor Barnett

 6    will be in transit because he is scheduled to be

 7    deposed at 11:00 so he would already be in

 8    transit.  There would be no way to get ahold of

 9    him.

10            If it becomes an issue, I will ask

11    Mr. Ulmenstein at the end of his deposition if

12    he can make -- go and get it and bring it back

13    to us.

14        MR. ROBINSON:  It is an issue.  We can have

15    someone from his office bring it down.  I don't

16    care if it is Professor Barnett necessarily.

17    Someone needs to bring the file.

18        MR. HARTMAN:  I don't know if he has it or

19    he doesn't.

20        MR. ROBINSON:  Well, let's take a break and

21    call and have someone bring the original file

22    please.

23        THE WITNESS:  The original file isn't in its

24    original form right now.  It has been separated.
```
                                                           11

1        MR. ROBINSON:  Well, that does not pertain

2    to you, Mr. Ulmenstein.  There is a formal,

3    legal request for the original, all original

4    materials to be brought here today.

5        THE WITNESS:  Okay.

6        MR. ROBINSON:  I put it in two separate

7    notices of depositions, and all I am hearing

8    right now are comments as to how that can be

9    avoided.

10        MR. HARTMAN:  No, I am not.

11        MR. ROBINSON:  Well, then let's take a break

12    and have you make a request of Triodyne, Inc.,

13    to get that file down here now, please.

14        MR. HARTMAN:  We are off the record.

15        THE VIDEOGRAPHER:  Off the record at 10:33 a.m.

16              (Recess taken.)

17        MR. HARTMAN:  For the record we had provided

18    Mr. Robinson pursuant to the court order a

19    complete copy of the entire file exclusive of

20    those materials that were generated in the

21    course of discovery in this matter between the

22    parties such as deposition transcripts and

23    discovery requests and responses provided by the

24    defendant in this matter.

12

1          At no time has Mr. Robinson ever

2     indicated to us that that was insufficient.

3     We -- because of the voluminous nature of the

4     transcripts and the documents that have been

5     exchanged in this matter which, you know, are in

6     the thousands of pages, we felt there would be

7     no need to bring them today.

8          It was not requested of us as

9     Mr. Robinson had indicated.  He had sent us

10    numerous correspondence prior to this asking for

11    us to provide him with material all of which

12    have been provided to him.

13          Mr. Ulmenstein and Mr. Barnett are here

14    to testify as to the completeness of the

15    documents and the completeness of the transfer

16    of the file.

17          If Mr. Robinson chooses to question

18    them on it, that's up to him.  We have complied

19    with all of his requests to this date.  There

20    has been no failure to comply with his request.

21    It is only another one of his late moment

22    attempts to try to obstacate the truth in this

23    matter and delay this matter.

24          We will, however, as a courtesy to

13

1   Mr. Robinson, if he would like to come to

2   Triodyne during his stay in Chicago, make

3   available to him whatever he would like to see

4   as it relates to this matter in the file in its

5   original form.

6       MR. ROBINSON:  Very quickly in response, I

7   am not really sure what all of that meant.  We

8   had requested the original file be brought to

9   both Mr. Ulmenstein's and Mr. Barnett's

10  depositions so that we can check the accuracy of

11  the production and see what documents are in the

12  file as we know the court had to impose an order

13  upon plaintiffs to have the plaintiff's counsel

14  agree to produce any aspects of the file

15  materials generated by Triodyne, Inc.

16          And to suggest that it wasn't requested

17  when it was clearly spelled out in the notices

18  of depositions and amended notices of

19  depositions, I just do not understand it.

20      MR. HARTMAN:  Well, subsequent -- I am

21  sorry, I am sorry.

22      MR. ROBINSON:  No, if you wanted to say

23  something else, Mr. Hartman, please go right

24  ahead.

14

```
1        MR. HARTMAN:  Well, subsequent to the notice

2    of depositions we supplied copies of the

3    materials in lieu of bringing the voluminous

4    files here.

5        MR. ROBINSON:  Mr. Hartman --

6        MR. HARTMAN:  It was never -- please.

7        MR. ROBINSON:  -- have we ever had a

8    discussion -- or did we ever have a discussion

9    or agreement that you did not have to produce

10   the original files here today?

11       MR. HARTMAN:  No.  But we did provide you

12   complete copies, and you never made it known to

13   us during our numerous conversations that you

14   expected us to bring in all the deposition

15   transcripts, all the discovery responses that

16   you yourself were provided in this matter.

17       MR. ROBINSON:  It makes no sense,

18   Mr. Hartman.  It was included in a formal

19   request in the notice of deposition.  That's as

20   formal of a request as I can make.

21          You and I have had problems

22   communicating in -- over the telephone.  You

23   constantly say that we have indicated things

24   that we did not say.
```

15

1             The safest way to approach this

2     litigation is to include it in a formal notice

3     of deposition.  We did that.

4             We had no discussion or agreement to

5     waive any aspect of that formal notice of

6     deposition.  Your response does not make any

7     legal sense.

8         MR. HARTMAN:  Well, it does, Paul.  Go

9     ahead.

10    BY MR. ROBINSON:

11        Q.   Sir, do you have a memory of every

12    piece of paper that's in the original file that

13    wasn't brought with you here today?

14        A.   No, I did not.

15        Q.   So you couldn't --

16        MR. HARTMAN:  Paul, he is not on video.

17        MR. ROBINSON:  Oh, I am sorry.

18        THE VIDEOGRAPHER:  Back on the record at

19    10:41 a.m.

20    BY MR. ROBINSON:

21        Q.   Just to reask that, sir, do you have a

22    memory of every piece of paper that's in the

23    original file that you did not bring with you

24    here today?

                                                    16

1      A.   I do not.

2      Q.   So there is no possible way for you to

3   compare what was produced to us to say if this

4   document is a group of documents which we will

5   mark as Exhibit A to the transcript is, in fact,

6   a complete copy of all the file materials from

7   Triodyne?

8      A.   No, sir.

9               (Whereupon, Ulmenstein

10              Deposition Exhibit No. A was

11              marked for identification.)

12  BY MR. ROBINSON:

13     Q.   So you heard the suggestion that I

14  could ask you questions if I so chose to

15  determine the accuracy of all file materials

16  being previously produced to us and you agree I

17  believe you just stated on the record that there

18  is no way for us to do that today without the

19  original file; is there, sir?

20     A.   I don't believe so, not for me to

21  answer accurately.

22     Q.   When we took a break, did you call the

23  office and ask that they bring down the original

24  file materials?

17

 1      A.   I did not.

 2      Q.   And that's what we took the break for.

 3   Why not?

 4      A.   I didn't take any break.  Mr. Hartman

 5   took a break.  You can ask him.

 6      Q.   I don't follow you, sir.  We went off

 7   the record.  We took a break from the

 8   deposition.  I asked you folks to get the

 9   materials down here.  What do you mean we didn't

10   take a break -- you didn't take a break?

11      A.   Mr. Hartman asked to take a break.  I

12   did not call anyone there.  The file is in

13   separate rooms, broken down in different places,

14   and nobody else who is there can get the file

15   together and bring it here.

16      Q.   Okay, well, if you were unwilling or

17   your -- is Mr. Hartman representing you here

18   today?

19      A.   No.

20      Q.   Okay, well, I am asking you as the

21   representative of Triodyne that is in front of

22   me today to get me a complete -- I have already

23   asked Mr. Hartman, he has refused and told me

24   off the record that it would not be physically

                                                    18

1    possible to get the file down here to us before

2    your deposition and before Mr. Barnett's

3    deposition, so I am asking you to bring the file

4    down here or have someone bring the file down

5    here when your deposition is concluded so that

6    we can at least have the opportunity to review

7    it during Mr. Barnett's deposition which we

8    expect to last the remainder of the day.

9         A.   Okay.

10        MR. HARTMAN:  Paul, I told you we would do

11   that.  I said that before we went off break.  I

12   said I would send him back so that he can pull

13   the file together for you.

14        Now, I have a question for you that I

15   think is important for the record, do you expect

16   him to bring all the deposition transcripts and

17   all the discovery materials?

18        MR. ROBINSON:  Yes, I do.  I want to see

19   everything.  I am troubled by the position that

20   has been taken.  I would like to see everything.

21   BY MR. ROBINSON:

22        Q.   How big of a file is it?

23        A.   I am not certain.  There are separate

24   Bankers Boxes.

19

1    Q.   How many Bankers Boxes?

2    A.   At least two, and there is another

3    smaller box and just stacks of materials.

4    Q.   How is the -- why is the file now

5    segregated -- or I should say separated?

6    A.   There are certain things that were

7    reviewed by Professor Barnett to prepare I

8    believe.

9    MR. ROBINSON:  I am going to need my copy

10   back, Mr. Hartman, of what you produced to us.

11   BY MR. ROBINSON:

12   Q.   Say that again as to why it has been

13   separated?

14   A.   I believe that certain materials were

15   reviewed by Professor Barnett to prepare.

16   MR. HARTMAN:  And, Paul, I am going to

17   instruct him that with regard to deposition

18   transcripts that have been provided that you

19   have a list of as well as the discovery

20   responses that you have provided and we have

21   identified that, I don't believe there is a need

22   to compel this individual to carry them in.

23   MR. ROBINSON:  Mr. Hartman, would you stop

24   interrupting my deposition.  We have a limited

20

1    amount of time.  Please stop making your

2    comments.  You have made it clear through

3    numerous comments that you do not want to bring

4    that original file here.  That troubles me.

5        MR. HARTMAN:  I told you that we go could

6    out there and get it.  I told you before --

7        MR. ROBINSON:  When are we going to go out

8    there and get it?

9        MR. HARTMAN:  This afternoon.

10       MR. ROBINSON:  And take a break from Mr. --

11   do you want to bring Mr. Barnett back in for

12   another deposition?  Would you agree to that?

13       MR. HARTMAN:  No, not another deposition.

14   We can continue it.  And I also --

15       MR. ROBINSON:  No, we have a certain period

16   of time scheduled for today starting at 11:00,

17   you have indicated he would stay for the entire

18   seven hours and you would as well --

19       MR. HARTMAN:  Right.

20       MR. ROBINSON:  -- and now you want to

21   interrupt that because you did not bring the

22   file with you and Mr. Ulmenstein and Mr. Barnett

23   did not bring the file with them to go out to

24   the office and waste that time but you will not

                                              21

1    agree to reschedule the remaining time for the

2    deposition of Ralph Barnett.

3        MR. HARTMAN:  No.

4        MR. ROBINSON:  That's unreasonable,

5    Mr. Hartman.

6        MR. HARTMAN:  Paul, Paul, first of all, we

7    have lost an hour of time because of your not

8    being here.

9        MR. ROBINSON:  We need not go into that.

10   You have already mentioned it once.  It has

11   nothing to do with the current issue before the

12   court.

13       MR. HARTMAN:  Secondly, I have indicated to

14   you at the very beginning of this that I would

15   ask Mr. Ulmenstein to go out and get a cop --

16   bring the original file in which you indicated

17   that that was not suitable to you in the

18   beginning, now you are saying it was.  And --

19       MR. ROBINSON:  No, it is not suitable

20   because it doesn't give me the opportunity to

21   ask Mr. Ulmenstein about them.

22       MR. HARTMAN:  Well, when he comes back --

23       MR. ROBINSON:  But if that's the only way I

24   can get the original of it, then certainly,

22

1    certainly I want to get it.  And if the only way

2    I can see the actual original is to go out

3    there, then I certainly want to go out there.

4         MR. HARTMAN:  Well --

5         MR. ROBINSON:  But I do not -- but I am

6    going to reserve the right to bring Mr. Barnett

7    back in so that I could ask him the questions

8    that I would normally have asked.

9         MR. HARTMAN:  It is going to be here.

10   Mr. Ulmenstein --

11        MR. ROBINSON:  That would be great.

12        MR. HARTMAN:  If you want Mr. Ulmenstein, he

13   will go out and get it.

14        MR. ROBINSON:  Okay.

15        MR. HARTMAN:  We are not bringing in

16   deposition transcripts.

17        MR. ROBINSON:  You can bring in whatever it

18   is you want, Mr. Hartman.  The notice required

19   you to produce everything.  If you don't want to

20   comply with that and comply with my repeated

21   requests here and continue to say that you don't

22   want to bring any portions of the file, that is

23   your prerogative.  That is not the way we do

24   things in the Western District Federal Court,

23

1    but if you want to make that decision, you have

2    made it very clear that that's the decision you

3    are making.

4         MR. HARTMAN:  Fine.

5         MR. ROBINSON:  So please let me continue

6    with this deposition.

7         MR. HARTMAN:  Go ahead.

8    BY MR. ROBINSON:

9         Q.   Did you ever make any notes at any time

10   during Triodyne's retention regarding any issue

11   during your investigation?

12        A.   Not personally, not that I can

13   remember.

14        Q.   Not one note?

15        A.   It wasn't my case to begin with.

16        Q.   I just want you to testify under oath

17   whether you made even one note.

18        A.   I can't be certain.

19        Q.   You can't be certain?

20        A.   No.

21        Q.   Would the -- would the -- if you made

22   such a note, it would be in the original file

23   materials I would assume --

24        A.   Or disposed of.

24

1      Q.    -- or would it not be?  I am sorry?

2      A.    Or disposed of.

3      Q.    Do you recall disposing of anything

4    from the original file?

5      A.    No, I don't recall disposing of

6    anything.

7      Q.    Why do you say that it would either be

8    in the original file or disposed of?  Why would

9    you possibly dispose of anything?

10     A.    If it was just a -- something on a

11   scratch sheet of paper it wouldn't matter.

12     Q.    It wouldn't matter to whom, sir?

13     A.    It wouldn't matter to myself or

14   Professor Barnett or for the matter at hand.

15     Q.    Do you know of any materials that have

16   been disposed of, sir?

17     A.    I do not.

18     Q.    Have you ever had any discussions with

19   anyone about disposing of any documents?

20     A.    No.

21     Q.    I just want to make sure you answered

22   this question and understood my question, did

23   you make -- do you have any memory today, sir,

24   of making any handwritten notations regarding

25

1    any aspect of this case?

2        A.    I can't recall.

3        Q.    What I'd like to do since we have you

4    on the record and since the original file was

5    not brought here was to look into that issue, to

6    see if any -- if you did make any notes --

7        A.    Okay.

8        Q.    -- and if you did dispose of any notes

9    or if Mr. Professor Barnett disposed of any

10   notes, and then please let Mr. Hartman know

11   about that so that we can have a response in

12   writing to that request; okay?

13       A.    Certainly.

14       Q.    We would like that to be notarized as

15   well please.

16             Have you inspected the press brake at

17   issue in this case?

18       A.    I was present at the inspection.

19       Q.    Where was the press brake located at

20   that time?

21       A.    The press brake was located in a

22   machine shop.  I am not exactly certain as to

23   the location.  Mr. Hartman brought us there to

24   inspect the press brake.

                                                    26

1        Q.    And who was present during that

2    inspection?

3        A.    Mr. Hartman, Professor Barnett and

4    myself.

5        Q.    Was Tina Lindquist present?

6        A.    She was not.

7        Q.    Did -- were you present during all of

8    Professor Barnett's discussions with Tina

9    Lindquist, or do you know of him discussing

10   things with her separately away from you?

11       A.    I believe I was present for that

12   15-minute meeting I previously discussed.  I am

13   not certain as to any other discussions he might

14   have had with her by phone or otherwise, but --

15       Q.    Has --

16       A.    -- for that one discussion I believe I

17   was there the whole time.

18       Q.    I apologize for interrupting.  If I

19   interrupt you at any time, please let me know

20   that, and I will give you all the time that you

21   need to respond.

22            Has Professor Barnett ever indicated to

23   you that he has had any type of other

24   conversations with Tina Lindquist when you were

                                                    27

1    not present?

2        A.   He has not.

3        Q.   Has -- have you spoken separately with

4    Mr. Hartman outside of that 15-minute meeting?

5        A.   Certainly, yes.

6        Q.   About what issues?

7        A.   About anything he desired to be done

8    with the case.  I -- as the project engineer I

9    was basically the contact to -- if he wanted

10   something from us or if he was going to be

11   sending something to us, he would -- they would

12   give me a call and let me know.

13       Q.   Tell me what actual conversations you

14   recall occurring between you and Mr. Hartman.  I

15   don't have your notes.  I don't have any file

16   materials here to know so unfortunately I have

17   to ask you what you remember.

18       MR. HARTMAN:  You have all the file

19   materials.

20       MR. ROBINSON:  I don't understand --

21   Mr. Hartman, please stop interrupting the

22   deposition.  We do not have all the file

23   materials as was gone over ad nauseam earlier.

24       MR. HARTMAN:  You do you have all the file

28

1    materials.

2        MR. ROBINSON:  Okay.

3        MR. HARTMAN:  You have copies of all the

4    file materials, just for the record.

5    BY MR. ROBINSON:

6        Q.    What conversations do you recall

7    occurring with Mr. Hartman?

8        A.    In total?

9        Q.    Yes, sir, in total.  First of all, how

10   many do you recall there being?

11       A.    I have probably spoken to Mr. Hartman

12   perhaps a dozen times by phone or in person.

13       Q.    Do you keep separate billing records

14   from Professor Barnett, or are they included in

15   the same invoice?

16       A.    They should be included.  Any billing

17   that goes through the client, my time should be

18   on there the same.

19       Q.    Who -- who sends out the billing?

20       A.    I am not exactly certain as to who was

21   in charge of that.

22       Q.    Okay, yeah, so back to our initial

23   question, what conversations do you recall

24   having with Mr. Hartman during this dozen or so

                                                    29

1    times?

2        A.    I am going back from right now, we

3    spoke personally out here in the lobby just

4    socially last night.  He came into town

5    yesterday evening, and he told me -- he gave me

6    a quick preparation for how a deposition works,

7    what to expect, and to just tell the truth.

8        Q.    Where was this meeting?

9        A.    This was at Triodyne, and we then had a

10   social dinner.

11       Q.    You had a social what?

12       A.    Dinner together.

13       Q.    What substantive conversations did you

14   have regarding the opinions that you and

15   Professor Barnett have set out in your letter,

16   your report?

17       A.    I don't recall having discussions with

18   Mr. Hartman about any opinions aside from him

19   asking for things to be clarified for

20   Professor Barnett, but I can't even recall what

21   issues those were.

22       Q.    Well, what did you talk about during

23   those previous 12 conversations, approximately

24   dozen conversations?

30

1      A.    What materials were going to be sent to

2   us, what materials he had, what he needed from

3   us in terms of the copy of the file that has

4   been mentioned over and over again.  I can't

5   recall what else I have discussed with

6   Mr. Hartman.

7      Q.    What do you do in your role as the

8   project engineer?

9      A.    Normally I would be the client contact,

10  I would -- I -- I might receive the new case

11  call when it first came in, at which point I

12  take down information as to the person who is

13  calling us, their case that they have that they

14  would like us to discuss with them, and I would

15  make notes on this and --

16     Q.    You would make notes on what, sir?

17     A.    On the new case call that came in.

18     Q.    Where would you make those notes?

19     A.    On a pad of paper.

20     Q.    And where -- that pad of paper -- those

21  notes haven't been produced.  Where would those

22  be?

23     A.    Again, I was not the original engineer

24  on this case, I was not the original engineer on

31

1    this case, so there would be no opening notes

2    from myself.

3        Q.    Who was the opening engineer?

4        A.    Peter Poczynok.

5        Q.    Where are his notes?

6        A.    I have no idea.  He has left the firm.

7        Q.    Would he also -- is that the protocol

8    at Triodyne for someone to make those

9    preliminary notes so you can open up a case if

10   you will?

11       A.    There is no protocol as to what exactly

12   you need to do.  You might just take down a name

13   and a number and call them back later with

14   Professor Barnett there.

15       Q.    Were you involved with putting together

16   a copy of what was sent to us on March 27th in

17   response to the court order being a complete

18   copy of the file materials less the deposition

19   transcripts and --

20       A.    Yes, less the list of that material,

21   yes.  Sorry for interrupting.

22       Q.    That's okay.  Did you try to locate any

23   notes that would have been generated by the

24   initial project engineer?

32

1        A.    I went directly to the file that we had

2    on hand and copied everything that was in it.

3        Q.    Did you -- spell the last name of the

4    initial project engineer.

5        A.    Poczynok, P-O-C-Z-Y-N-O-K, I believe.

6    It should be in the copy of the file there.

7        Q.    And where did that individual go?

8        A.    He joined a firm by the name of

9    Arca Incorporated.  It is an engineering firm

10   here in Chicago.

11       Q.    Did you make any contact with Mr. -- is

12   it Mr. Poczynok?

13       A.    Yes.

14       Q.    -- Mr. Poczynok to locate any originals

15   of their -- of his notes so that we could have

16   those and there could be compliance with the

17   court order?

18       MR. HARTMAN:  I am going to object to the

19   form of the question.

20   BY MR. ROBINSON:

21       Q.    You can answer, sir.

22       A.    I was requested to provide a copy of

23   the file to Mr. Hartman.

24       Q.    Sir, my question was very simple.  Did

                                                     33

1     you contact Mr. Poczynok to get whatever he had?

2          A.    The end of your question was not very

3     simple.

4          Q.    Are you having any problems

5     understanding me?

6          A.    No.

7          Q.    Okay, would you please answer the

8     question.  Did you make any contact with

9     Mr. Poczynok to find out if he had any original

10    file materials?

11         A.    I did not.

12         Q.    All right.  Did you know there was a

13    court order compelling Mr. Hartman and Triodyne

14    to produce a copy of all of their file

15    materials?

16         A.    I did not.

17         Q.    Mr. Hartman did not tell you about

18    that?

19         A.    I had no idea as to exactly why I was

20    providing the file materials.

21         Q.    Did Mr. Hartman tell you that he

22    initially refused to give us the file materials

23    from Triodyne?

24         MR. HARTMAN:  I am going to object to the

34

1    form of that question in that there was a

2    dispute as to what you were entitled to and not

3    we went to the court, the court indicated that

4    you were correct --

5        MR. ROBINSON:  Please no speaking

6    objections.  Please, let's just make the

7    objection.

8        MR. HARTMAN:  Paul --

9        MR. ROBINSON:  Do you have an objection to

10   the form?  I have limited time here.  I would

11   appreciate if we can move on.

12       MR. HARTMAN:  Paul, next time we have

13   limited time you should make sure you are on

14   time.

15       MR. ROBINSON:  That's the third time you

16   have mentioned it had, Mr. Hartman.

17       MR. HARTMAN:  Well --

18       MR. ROBINSON:  The issue on the table is you

19   making a speaking objection.  It is not about my

20   plane being late.

21       MR. HARTMAN:  Quit talking about limited

22   time.

23       MR. ROBINSON:  No.

24       MR. HARTMAN:  We have limited time in that I

35

1    am here for you as long as you need either of

2    these witnesses subject to the provisions of the

3    Western District of Pennsylvania.

4    BY MR. ROBINSON:

5        Q.    Did Mr. Hartman ever explain to you

6    that he had refused to produce all of the file

7    materials that were generated by Triodyne?

8        A.    No, sir.

9        Q.    Do you have any explanation as to why

10   Mr. Hartman would refuse to produce all of the

11   file materials by -- prepared by Triodyne at any

12   time?

13       A.    I can't explain anything like that.

14       Q.    How did -- are you a professional

15   engineer?

16       A.    I am not.

17       Q.    Is Professor Barnett a professional

18   engineer?

19       A.    I don't believe so.

20       Q.    Are you attempting to become a

21   professional engineer?

22       A.    I will once -- there is a time that you

23   have to be working in a profession before you

24   can become one.

                                                    36

```
 1        Q.    And I didn't even ask you much

 2   background.  What is your date of birth, sir?

 3        A.    January 2nd, 1976.

 4        Q.    So you are 30 years old.

 5        A.    Yes, sir.

 6        Q.    Are you from the Chicago area?

 7        A.    Yes.

 8        Q.    Married?

 9        A.    No.

10        Q.    How long have you worked with Triodyne?

11        A.    11 years this month.

12        Q.    So since you were 19?

13        A.    Yes.

14        Q.    What position did you start out at

15   there?

16        A.    Lab technician, general laborer.

17        Q.    Do you have a college degree?

18        A.    Yes.

19        Q.    And did you obtain that degree while

20   you were working at Triodyne?

21        A.    Yes, sir.

22        Q.    Where is that degree from?

23        A.    Illinois Institute of Technology.

24        Q.    So were you a student of
```

37

```
 1    Professor Barnett's?
 2         A.   I did have him as a professor for one
 3    of my classes.
 4         Q.   Is he still teaching there?
 5         A.   Every other semester or so.
 6         Q.   And does he teach a full course, or
 7    does he come in on a seminar type basis?
 8         A.   It is a full course.
 9         Q.   And what is the course that he -- that
10    he teaches now?
11         A.   The last course that I have known him
12    to teach is design for safety on machines, I
13    believe is the course title.
14         Q.   Which course did you have with him?
15         A.   That was the course.
16         Q.   Design for safety --
17         A.   In machines.
18         Q.   -- in machines.
19         A.   I believe that to be the title.  I
20    can't be sure though.
21         Q.   Did Professor Barnett ever teach you
22    when you were a student of his that a foot
23    pedal, that a foot control that does not contain
24    a gate is defective?
```
                                                        38

 1       A.    I don't remember any discussion of foot

 2    controls in the class.

 3       Q.    In all of your years at Triodyne has

 4    Professor Barnett ever taught you that a foot

 5    control does not have a gate renders the foot

 6    control defective?

 7       A.    I don't remember working on any foot

 8    control matters before this one.

 9       Q.    Please listen to my question.

10       A.    Pardon me.

11       Q.    At any time during your involvement

12    with Triodyne in the past 19 years --

13       A.    11, pardon me.

14       Q.    I am sorry.

15       A.    11.

16       Q.    11, you were 19.  My apologies.

17             In the past 11 years has

18    Professor Barnett ever taught you that a foot

19    control that lacks a gate is defective?

20       A.    Only in this case.

21       Q.    Only in this case.

22             Have you ever heard of him giving that

23    opinion in any -- how old is Professor Barnett?

24       A.    I can't be certain.  I believe he is in

                                                        39

1    his early 70's.

2        Q.    Have you ever heard of

3    Professor Barnett giving that opinion in any

4    other case until this one?

5        A.    I have no other idea as to what other

6    opinions he has rendered.

7        Q.    Please listen to my question.  Have you

8    ever heard of Professor Barnett ever giving the

9    opinion at any time before this case that a foot

10   pedal -- excuse me, that a foot control does not

11   have a gate is defective?

12       A.    I haven't heard anything.

13       Q.    Have you ever heard any engineer

14   provide that opinion?

15       A.    No, sir.

16       Q.    Have you ever known of any governmental

17   entity give any type of information to the

18   public or to the press industry that a foot

19   control that does not have a gate is defective?

20       A.    No, sir.

21       Q.    Have you ever heard of

22   Professor Barnett teaching that the inclusion of

23   a gate on a foot control adds a danger to the

24   gate -- or excuse me, adds a danger to the foot

                                                      40

1    control?

2        A.   I have heard this from him in regards

3    to a punch press.

4        Q.   So the only thing you have ever heard

5    him say -- is it true that the only thing you

6    have ever heard him say relative to the

7    inclusion of a gate on a foot control is that it

8    adds a danger?

9        A.   No.

10       Q.   Okay.  What else have you heard him say

11   outside of this case relative to the inclusion

12   of a gate on a foot control?

13       A.   I am sorry if I answered incorrectly

14   earlier.  There is no addition of a danger

15   there.  He has never taught that it adds a

16   danger to put the gate on.

17       Q.   Have you ever read his publications

18   where he specifically said that?

19       A.   It doesn't add a danger.  It increases

20   as you -- if you read the publications, that

21   chart that has the foot switches on there, it

22   increases from one side to the other, the

23   tendency to ride the pedal on a punch press.

24       Q.   What does it increase?

41

1     A.    The tendency to ride the peddle.  It

2     doesn't introduce riding the pedal.  That's what

3     the -- I believe the paper states, and you can

4     question Professor Barnett about that.

5     Q.    No, I want to ask you about it.  Have

6     you read that article?

7     A.    I have read that paper.

8     Q.    So your understanding is that it

9     increases the danger associated with riding the

10    pedal?

11    A.    No, it increases the tendency to ride

12    the pedal.

13    Q.    Do you consider riding the pedal to be

14    a danger?

15    A.    I have no opinion on that.

16    Q.    Do you consider riding the pedal to be

17    a favored method of using a foot control on

18    either a power press or a press brake?

19    A.    I have no opinion on that.  I have

20    never worked on such.

21    Q.    You signed off on the March -- excuse

22    me, the February 13, 2006, report --

23    A.    Yes, sir --

24    Q.    -- that was provided in this case; did

42

1    you?

2        A.   -- I did.

3        Q.   And this report concludes that -- let

4    me just make sure that I have your signature.

5        A.   You do.

6        MR. HARTMAN:  And while you are looking at

7    that, for the record I want to indicate that you

8    were advised, Mr. Robinson, that Mr. Ulmenstein

9    had no input into the formulation of the

10   opinions, he is not giving any opinion testimony

11   in this matter, prior to this deposition.  In

12   fact, it was in writing at your request.

13       MR. ROBINSON:  You are wasting the time

14   involved with the deposition, Mr. Hartman.  I

15   see now that it is your goal, and we will take

16   it up with the court later.

17       MR. HARTMAN:  Paul, I am not wasting --

18       MR. ROBINSON:  Please, there is no need to

19   have the conversations any longer.

20       MR. HARTMAN:  I am going to make my

21   objections as I see fit.

22       MR. ROBINSON:  That wasn't even an

23   objection.

24       MR. HARTMAN:  And I am going to clarify the

43

```
 1    record every time you try to distort it.  It is

 2    not wasting time.  It is representing my client.

 3    BY MR. ROBINSON:

 4         Q.    Is this your signature, Mr. Ulmenstein?

 5         A.    It is.

 6         Q.    And by signing it -- first of all, did

 7    you read this before you signed it?

 8         A.    Yes.

 9         Q.    Did you attempt to include in any

10    portion of this letter or in any other type of

11    writing what opinions you were supporting that

12    are set forth in the document you signed and

13    which ones you were not supporting?

14         A.    I signed the document because I

15    prepared certain sections of it.  I did not

16    prepare any opinions nor intend to.

17         Q.    And my question was have you

18    brought any type -- when I received this, it was

19    signed by two individuals.  I have no way of

20    knowing that -- what you are now saying is that

21    you didn't subscribe to any of these opinions.

22              I am saying did you prepare any type of

23    letter or any type of memoranda that would

24    indicate which comments that were included in
```

44

 1    this February 13, 2006, letter you were

 2    supporting and which ones you were not

 3    supporting?

 4        A.    I have not.

 5        Q.    What portion of this letter is your

 6    thinking and your work?

 7        A.    My work was the first section of

 8    materials reviewed, the accident description --

 9        Q.    Did you -- by the way, did you read all

10    of the materials that are under the heading

11    Materials Reviewed?

12        A.    I have read most of those materials,

13    yes.

14        Q.    Have you read all of them was my

15    question.

16        A.    Personally, no.

17        Q.    Has anyone read all of them?

18        A.    I can't answer that question.

19        Q.    Do you know of anyone at Triodyne that

20    has read all of the materials that are included

21    under the heading Materials Reviewed?

22        A.    I believe that Professor Barnett has

23    reviewed all of those materials.

24        Q.    Has he told you that?

                                                     45