# EXHIBIT E

# PART 2

1    A.    It is not -- it really hasn't been a

2    topic of discussion.

3    Q.    Sir, please listen to my question.  Has

4    Professor Barnett told you that he reviewed all

5    of the materials that are included under the

6    heading Materials Reviewed?

7    A.    Not specifically, no.

8    Q.    Has he implied to you in some way that

9    he has reviewed all of those materials?  I am

10   not sure what you mean by not specifically so I

11   have to follow it up.

12   A.    These materials have been given for him

13   to review.

14   Q.    And then you indicated under the

15   accident description, that's yours as well?

16   A.    Yes, sir.

17   Q.    Did you actually author that?

18   A.    Yes.

19   Q.    There is a -- there is a section here,

20   it says it was during this hand fitting of the

21   stock piece that Miss Lindquist's foot

22   inadvertently and unintentionally entered the

23   foot switch and activated the Heim press brake

24   causing devastating injury to Miss Lindquist's

46

1    hands, do you see that?

2        A.    Yes.

3        Q.    Did you include that?

4        A.    I did.

5        Q.    And where did that come from?

6        A.    That came from the description of the

7    accident as I have seen it and the injury I have

8    seen to Miss Lindquist's hands.

9        Q.    And you said -- let's focus on the --

10    not the injury side, no one is questioning the

11    severity of Miss Lindquist's injury.

12        A.    Okay.

13        Q.    But relative to the happening of the

14    accident you said that you have seen it -- where

15    did you see it?

16        A.    I have seen accident descriptions as to

17    how she was there, and I have -- and the only

18    way to activate the switch is to push down the

19    pedal.

20        Q.    Relative to your comment that,

21    "Miss Lindquist's foot inadvertently and

22    unintentionally entered the foot switch and

23    activated the Heim press brake," where does that

24    come from?  Tell the court any piece of paper

47

1    that contains that information.

2         A.    I believe Miss Lindquist indicated that

3    she wasn't intending to activate any footswitch.

4         Q.    Well, where is the information that

5    says that her foot unintentionally entered the

6    footswitch?

7         A.    The full shield -- you would have to

8    enter the full shield in order to activate the

9    footswitch.

10        Q.    What if she were riding the pedal, sir,

11   that would be an intentional placement of the

12   foot in there; wouldn't it?

13        A.    I suppose it might.

14        Q.    It would be; wouldn't it, sir?

15        A.    I answered that question.

16        Q.    If she put her foot inside of the pedal

17   to apply the pedal, if she put her foot inside

18   of the foot control to apply the pedal and did

19   that intentionally, operated the press brake and

20   then kept her foot in there, then there would be

21   no unintentional entering of the footswitch;

22   would there?

23        A.    By the definition of what you just

24   proposed I suppose not.

48

1     Q.   Well, who has told you that her foot

2     unintentionally entered the footswitch as

3     opposed to her riding the pedal?  Where did that

4     information come from?

5     A.   I am not certain.

6     Q.   Do you know that Tina Lindquist said

7     that her foot did not unintentionally enter the

8     footswitch?

9     MR. HARTMAN:  Objection to the form of the

10    question.  You are misstating facts of

11    Miss Lindquist's --

12    MR. ROBINSON:  Okay.

13    MR. HARTMAN:  -- testimony.  Her testimony

14    was specifically contrary to that in that she

15    indicated that she removed her foot from the

16    foot pedal prior to --

17    MR. ROBINSON:  Don't give the testimony,

18    Mr. Hartman.  I object --

19    MR. HARTMAN:  Then don't make statements.

20    MR. ROBINSON:  -- to your speaking

21    objections.

22    MR. HARTMAN:  I am stating what the record

23    actually --

24    MR. ROBINSON:  You object to the form.  Read

49

 1    the rules.  You are not allowed to make an

 2    objection as you just did.

 3        MR. HARTMAN:  You are intentionally

 4    misstating --

 5        MR. ROBINSON:  I am going to back it up,

 6    Mr. Hartman, in our motion --

 7        MR. HARTMAN:  I am glad.  Then do it.

 8        MR. ROBINSON:  -- and you will see it.

 9        MR. HARTMAN:  I am glad.  Then do it.

10        MR. ROBINSON:  So let's ask the question

11    again.

12    BY MR. ROBINSON:

13        Q.   First of all, did you review her

14    deposition transcript?

15        A.   I did.

16        Q.   Did you see where she said that she did

17    not accidently hit the activation device of the

18    foot control?

19        A.   I have not reviewed her transcript for

20    months.  I cannot recall.

21        Q.   So you don't -- as you sit here today

22    you don't know what she said about how that

23    pedal came to be activated?

24        A.   I can't recall.

                                                    50

1    Q.    You don't know if it was an

2    unintentional entering or you don't know if it

3    was riding the pedal; is that fair?

4    A.    I can't recall what she said in her

5    deposition as to how it exactly happened right

6    now.

7    Q.    As you sit here today do you have any

8    way of confirming whether or not she -- her foot

9    unintentionally entered the foot control or if

10   instead she was riding the pedal?

11   A.    As I sit here today I cannot.

12   Q.    What is the number one method of

13   accidental activation of a foot control?

14   A.    I have done no research in this area.

15   I have no idea.

16   Q.    Well, did you read -- I think you said

17   you read Professor Barnett's article on this.

18   A.    Yes, I have.

19   Q.    Do you see where he has indicated that

20   the No. 1 method of accidental activation of a

21   foot control is by riding the pedal?

22   A.    I believe I read that in there.

23   Q.    Do you dispute that?

24   A.    I do not.

51

1      Q.   You have assumed in your report and in

2   your statement of the facts that she was not

3   riding the pedal and that her foot

4   unintentionally entered the foot control; is

5   that right?

6      A.   Yes.

7      Q.   Can you explain to the court any basis

8   for that fact that you have relied upon?  And

9   that's a pretty significant fact; isn't it?

10      A.   Yeah, that's for the -- for it to be

11   decided later.

12      Q.   Well, if she was riding the pedal, sir,

13   the existence of a gate would have no impact on

14   the case; would it?

15      MR. HARTMAN:  I am going to object to the

16   question.  It is outside the scope of this

17   individual's participation in the preparation of

18   the expert.

19           He is not here to offer any opinions.

20   You have been advised that.  I am not going to

21   allow you to ask him to give opinion testimony

22   today.

23           Furthermore, I am going to instruct you

24   that when you ask questions that you be --

1    fairly put them in the context they are and that

2    the articles that you are citing and the act of

3    riding of the pedal do not speak to the machine

4    at hand nor the similar type of machine at hand.

5    So I think it is extremely unfair, this line of

6    questioning that you are going.

7          It goes beyond the scope of discovering

8    this matter for an expert.  He has no opinions

9    to offer as you have been advised in writing

10   before today.

11   BY MR. ROBINSON:

12        Q.   Sir, if she was riding the pedal, the

13   existence of a gate is meaningless because the

14   gate would already be up; right?

15        A.   I have no opinion to offer in this

16   matter.

17        Q.   As a layperson do you understand what I

18   am talking about and as someone who is studying

19   to be an engineer?  Do you at least know what I

20   am talking about?

21        A.   I believe so.

22        Q.   So would it be true as a layperson, as

23   a person studying to be an engineer that if she

24   was riding the pedal, the existence of a gate is

                                                      53

```
 1    absolutely meaningless to this case; isn't it?
 2         A.   I can't offer any opinion on that.
 3         Q.   Can you explain any reason why -- any
 4    justification as to why the gate would have any
 5    meaning in this case if she were, in fact,
 6    riding the pedal as opposed to an unintentional
 7    entering?
 8         A.   I have no opinion to offer on that.
 9         Q.   Were you involved with the experiment?
10    What do you call what you did with those people
11    that were standing up and sticking their foot
12    into the foot control?
13         A.   I believe that was testing designed by
14    Professor Barnett.
15         Q.   Were you involved in that at all?
16         A.   I instructed a technician as to what we
17    wanted to build, that fixture with the
18    footswitch and the light.
19         Q.   Who were the people that were actually
20    the subjects of the testing?
21         A.   At the time they were employees of
22    Triodyne.
23         Q.   Were all of the test subjects employees
24    of Triodyne?
```

54

1       A.    Yes, sir.

2       Q.    And Triodyne is making money on this

3    case; right?  You have submitted --

4       A.    Yes.

5       Q.    -- bills, you are making money for your

6    time; right?

7       A.    Yes.

8       Q.    Why were the subjects in that testing,

9    the employees of Triodyne standing up during

10   that testing?

11      A.    The testing was performed -- was

12   designed by Professor Barnett.  That's not a

13   question I can answer.

14      Q.    Did Tina Lindquist -- did you hear Tina

15   Lindquist say she was not standing at the time

16   of her injury?  Do you know that she was

17   sitting?

18      A.    I don't know whether she was sitting or

19   standing, sir.

20      Q.    Did you or Professor Barnett ever ask

21   her that when you talked with her?

22      A.    No.

23      Q.    Does that seem like something

24   significant that you would want to know before

55

1    you conducted a test and constructed the

2    materials on the makeup for that test which

3    required the subjects to be standing?  Does it

4    seem like you would want to know if the actual

5    person who was injured was standing or sitting?

6        A.    Could you repeat the question?

7        Q.    Sure.  When you are investigating a

8    case and preparing to perform a test and

9    particularly preparing to perform this test

10   where you had these subjects standing up which

11   is correct; right, you had them standing up?

12       A.    Yes, sir.

13       Q.    Wouldn't you want to know if the person

14   that was injured through the use of -- through

15   her use of the machine was sitting or standing

16   at the time of her injury?

17       A.    I believe it would depend on the

18   purpose of the experiment, sir.

19       Q.    Do you know of any reason why you would

20   want to conduct a test in this case of subjects

21   that were standing up if Tina Lindquist as she

22   has testified was sitting down?

23       A.    I believe that I have stated the

24   testing was designed by Professor Barnett.

                                                    56

1      Q.   I am just asking you if you know of any

2    reason why you would want to conduct a test with

3    subjects standing up if Tina Lindquist was

4    sitting down as she has testified?

5      A.   I don't believe the test was

6    necessarily about the sitting or standing.

7      Q.   And I want you to explain to the court

8    what relevance -- why a decision would be made

9    to have this -- the test subjects standing up.

10     A.   Again, this wasn't my decision.  This

11   Professor Barnett's decision.  He designed the

12   question.  I can't answer this question.

13     Q.   As you -- and that's a fair answer.  As

14   you sit here today can you offer any explanation

15   either a layperson, the person that set up the

16   test itself, as a person studying to be an

17   engineer, as an employee of Triodyne, can you

18   offer any explanation as to any favorable aspect

19   of the test that you conducted with the subjects

20   standing up --

21     MR. HARTMAN:  Objection.

22   BY MR. ROBINSON:

23     Q.   -- when we know that Tina Lindquist was

24   sitting down?

57

1      MR. HARTMAN:  Objection to the form of the

2   question in that it misstates this witness'

3   prior testimony in that you indicated that he

4   oversaw the test.  I believe that this witness'

5   testimony was specifically --

6      MR. ROBINSON:  We don't need you to say what

7   the testimony was, Mr. Hartman.  It is illegal

8   what you are doing.

9      MR. HARTMAN:  I am not --

10      MR. ROBINSON:  It is a violation of our

11   rules of court.

12      MR. HARTMAN:  Well, I am going to say it --

13      MR. ROBINSON:  I just want you to know.  You

14   have done it a number of times.  The only thing

15   I can ask you to do is stop.

16      MR. HARTMAN:  Okay.  And the reason I am

17   pointing this out is the witness has

18   testified --

19      MR. ROBINSON:  I don't need you to tell me

20   the reason.  All you need to do is make your

21   objection and move on.  Tell the court.

22      MR. HARTMAN:  I need to.

23      MR. ROBINSON:  Why?  You are not allowed.

24      MR. HARTMAN:  That's the way I am going to

58

1   do it.

2       MR. ROBINSON:  That's the way you are going

3   to do it.  Okay, let's hear it.

4       MR. HARTMAN:  This witness indicated earlier

5   that he oversaw the construction of a testing

6   mechanism.  You indicated that he oversaw the

7   testing, and that was the error in your

8   question.  So if you want to repeat the question

9   so that it makes sense based on the testimony I

10  would ask you to do so.

11  BY MR. ROBINSON:

12      Q.   Do you remember the question?

13      A.   No, I do not.

14      Q.   Do you know of any favorable thing that

15  could be gleaned from a test in this case that

16  was conducted with subjects standing up when

17  Tina Lindquist was sitting down at the time of

18  her injury?

19      A.   I do not.

20      Q.   The next section of -- did you even

21  bring a copy of your report?

22      A.   I did.

23      Q.   You did?

24      A.   Yes, sir.

                                              59

1    Q.   Great.  There is one more piece of

2  paper there with you.  What all did you bring?

3    A.   Just that and the note of where to be.

4    Q.   May I see it please.

5    A.   Sure.

6    Q.   You are hesitating.  Do you have any

7  reason to hesitate in giving me that piece of

8  paper that relates to this case?

9    A.   No.

10    Q.   Okay.

11    A.   I just didn't know you would be asking

12  for it.

13    Q.   No, because you weren't provided with a

14  copy of my notice of deposition; right?

15    A.   I have no idea.

16    Q.   Okay.  If we look at 3, Section 3, it

17  says identification.

18    A.   Yes, sir.

19    Q.   Who provided that?

20    A.   That was both Professor Barnett and

21  myself.

22    Q.   And I note here that the second

23  paragraph indicates that we were dealing with a

24  Model 532-SWH Hercules heavy duty footswitch

60

1    with a full shield provided at the time of the

2    sale of this press brake; is that right?

3        A.    That is what the report states.

4        Q.    Do you have any reason to dispute that?

5        A.    Yes.

6        Q.    And what is that?

7        A.    That is that that was my error in

8    indicating the model number that was provided on

9    a drawing supplied by Heim that they cannot

10   determine if it was the correct drawing or

11   not -- or the correct specification.

12       Q.    Do you know what footswitch was

13   supplied with the press brake back in 1978?

14       A.    I do not.

15       Q.    Does Professor Barnett know?

16       A.    I have no idea as to what he knows or

17   does not know.

18       Q.    Do you know of anyone that's ever -- do

19   you know of anyone that knows what footswitch

20   was provided with the press brake back in 1978?

21       A.    I have no idea.

22       Q.    I take it you saw the 1974 drawing that

23   was produced by Heim which identifies a 532-SWH?

24       MR. HARTMAN:  It is a 1982 drawing.

61

1        MR. ROBINSON:  Counsel, 1974 drawing, thank

2    you.

3        THE WITNESS:  But it is -- there was scratch

4    marks on it.

5    BY MR. ROBINSON:

6        Q.   Did you see the 1974 drawing that

7    identifies the 532-SWH?

8        A.   I saw a page that was barely readable

9    and Model 532-SWH was noted on there and then

10   scratched off for a replacement model I believe

11   in '82 I believe the date was.

12       Q.   Yes, okay.  And the last sentence of

13   that identification section indicates -- where

14   it indicates -- let me -- that was a horrible

15   beginning of my question.

16            The first sentence identifies it as a

17   Model 532-SWH; is that right?

18       A.   That is what the report states.

19       Q.   And the second sentence says, "This is

20   consistent with photographs of the subject

21   footswitch after the accident"?

22       A.   Which is incorrect.

23       Q.   That's incorrect as well?

24       A.   No, the -- it -- it -- the model number

62

 1    is inconsistent with the photographs of the

 2    footswitch after the accident.

 3        Q.   Well, who wrote that, that, "This is

 4    consistent with photographs of the subject

 5    footswitch after the accident"?

 6        A.   I believe I did.

 7        Q.   Did Professor Barnett read this before

 8    he signed it?

 9        A.   I have no idea as to what he did or

10    not.

11        Q.   Do you think that he would do that?

12        A.   I cannot speculate as to what he would

13    do or would not do.

14        Q.   Does he typically read things that he

15    signs?

16        A.   I believe so.

17        Q.   If you turn to Page 7, it is again

18    indicated it was a 532-SWH sold with the subject

19    press brake; doesn't it?

20        A.   Yes, sir.

21        Q.   Who wrote this section?

22        A.   I believe I inserted the model number

23    in the report section that was dictated to me by

24    Professor Barnett.

63

1       Q.    Well, who indicated -- back to our

2    first section where it says, This is consistent

3    with photographs of the subject footswitch, how

4    did that error occur?  Why is that wrong I guess

5    is a better way to say?  Why are you testifying

6    that that's now wrong?

7       A.    No, I am testifying that the

8    consistency with the photographs and the

9    Model 532 is incorrect.

10      Q.    Yeah, and how did that happen?  I

11   assume you looked at the photographs.  I assume

12   either you or Professor Barnett looked at the

13   photographs and then looked at the 532 and said

14   they look to be the same because that's what

15   this says, that's what this says; right?

16      A.    That is -- I believe it says that it is

17   consistent with the photographs of the subject

18   footswitch.

19      Q.    Yeah, it says the 532 is consistent

20   with -- the Model 532-SWH is consistent with the

21   photographs of the subject footswitch; is that

22   right.

23      A.    Yes, and I said that's incorrect

24   several times now.

                                                    64

1       Q.    Yes, okay, I want to make sure the

2    record has your -- your -- the errors in your

3    report identified.  And how did that error

4    occur?

5       A.    The error occurred because I -- we had

6    already written the -- I believe the section was

7    already written in terms of the -- describing

8    the footswitch as it does in the following

9    paragraph.  And then I came upon the one page,

10   the Drawing A-470 was it?  I believe that's the

11   number.

12      Q.    I believe it is.

13      A.    The specification of the footswitch.

14   And I saw the model number and just inserted it

15   into the report and didn't do the proper

16   research into what the Model 532 entailed.

17      Q.    If you were to rewrite your report

18   would you include a different number?

19      A.    If I were to rewrite the report, I

20   wouldn't include the Model 532.

21      Q.    That's the same one you have included.

22      A.    Yes, I would not include that number.

23      Q.    What would you include, what number,

24   what model number?

                                                      65

1      A.    I wouldn't specify a model number.

2      Q.    Well, how do you know if Tina Lindquist

3   was using the foot control that was sold with

4   the machine in '78?

5      A.    Personally I have no idea as to an

6   opinion on that.

7      Q.    That's not -- okay.

8          Have you talked with Mr. Hartman about

9   this issue, about identifying the food switch

10   that Tina Lindquist was using as being the same

11   as the one that was sold in '78?  Have you

12   talked with him at all about that issue?

13      A.    The subject might have been broached in

14   terms --

15      Q.    Might have been broached?  When would

16   that have been broached?

17      A.    Perhaps on a phone call and he might

18   have said such things to Professor Barnett.  I

19   have no idea.

20      Q.    Do you remember those conversations,

21   Mr. Ulmenstein?

22      A.    I do not.

23      Q.    Why do you say they might have been

24   broached, and they might have been broached in a

66

1    phone call and they might have been broached in

2    a conversation with Professor Barnett?

3        A.   Because I believe that the

4    identification in this case is fairly important.

5        Q.   Have you heard of anyone -- have you

6    heard anyone indicate that the foot control that

7    Tina Lindquist was using at the time of the

8    accident was the one that was sold with the

9    machine at the time in 1978?  Has anyone said

10   that to you?

11       A.   No one has said that this footswitch

12   was specifically the one sold with the machine

13   to me.

14       Q.   I lost you.  I am a little hard of

15   hearing.  I am sorry.  Say that again.

16       A.   Sorry.  No one has said to me that this

17   footswitch was specifically the one that was --

18   that came with the machine.

19       Q.   Has anyone told you that it is not?

20       A.   No one has told me specifically that it

21   is not.

22       Q.   Have you read the deposition

23   transcripts of some of the employees of Corry

24   Manufacturing that have given their opinions

67

1    that they would not be the same?

2        A.    I have not.

3        Q.    That's a pretty significant issue did

4    you say to make sure we have the same footswitch

5    used by Tina Lindquist as the one sold back in

6    1978; right?

7        A.    I am not certain.

8        Q.    Sorry?

9        A.    I am not certain.  I can't --

10       Q.    I think you just said it a moment ago.

11   It is a pretty significant question; isn't it?

12   You wouldn't want to sue Heim for providing a

13   dangerous footswitch that wasn't even in use at

14   the time of the accident; would you?

15       A.    I have no idea, sir.

16       Q.    Does that make sense to you, sir, that

17   you would author a report or your employer or

18   Mr. Barnett would author a report trying to hold

19   Heim liable for supplying a footswitch back in

20   1978 that wasn't even in use at the time of the

21   plaintiff's injury?

22       A.    I can't give --

23       Q.    Does that make any sense to you, sir?

24       A.    I can't give any opinion on it, sir.

68

1      Q.    You can't even say if that makes sense

2    to you?

3      A.    Not in this venue in terms of I cannot

4    make a statement to that.

5      Q.    What foot control was used for the

6    testing that you have described?

7      A.    I believe one of the foot controls was

8    indicated towards the end of the report, 511, I

9    believe they are both 511's.

10     Q.    When you say both 511's, what do you

11   mean by that?

12     A.    The -- the Linemaster Model 511B2 I

13   believe was one of the models.

14     Q.    I want you to check your report because

15   this is something I want to make sure we

16   don't --

17     A.    On Page 11 in C the -- it indicates

18   that the Linemaster 511B2 used in our human

19   factors testing.  They were both Linemaster 511

20   models I believe, one with the gate, one

21   without, both with the antitrip treadle latch.

22     Q.    And was a 511 chosen?

23     A.    I believe that was what we had in

24   Triodyne's selection of footswitches from

                                                    69

1    Linemaster.

2         Q.   Why wasn't a 532 chosen?

3         A.   I have no idea.

4         Q.   You can still buy a 532 from Linemaster

5    today; can't you?

6         A.   I am not certain.

7         Q.   Have you looked at any of their

8    literature that has been identified in the

9    report that you saw?

10        A.   I have not looked at any of the current

11   literature whether you can buy a 532 today, sir.

12        Q.   Do you have any reason to believe you

13   cannot go out to Linemaster and buy a 532 today?

14        A.   I have no reason to believe that I can.

15        Q.   Why wasn't there -- was there any

16   attempt made by Triodyne employees to obtain a

17   532 for testing purposes since that's what was

18   identified in the report as being provided back

19   in 1978 with the machine?

20        A.   No, sir.

21        MR. HARTMAN:   I am going to object to the

22   form of the question and that the witness has

23   indicated that that 532 number is an incorrect

24   number --

                                              70

1    BY MR. ROBINSON:

2        Q.    You can answer the question, sir.

3        MR. HARTMAN:  -- but go ahead.

4        THE WITNESS:  No, sir.

5    BY MR. ROBINSON:

6        Q.    I am sorry?

7        A.    No, sir.

8        Q.    And why not?

9        A.    I believe the -- finding the model

10   number was towards the end of the collection of

11   the report materials and it was simply inserted

12   at the end.

13       Q.    Have you ever been involved in any

14   other cases where Triodyne has represented a

15   foot control manufacturer?

16       A.    Not personally, no, sir.

17       Q.    Have you had any discussion with

18   Professor Barnett about Professor Barnett

19   previously representing Heim in a case?

20       A.    No, sir.

21       Q.    You have had no conversations about

22   that issue?

23       A.    No, sir.

24       Q.    There was a quote unquote "old Heim

                                                      71

1    file" that was referenced in the billing

2    records --

3        A.   Yes, sir.

4        Q.   -- of Triodyne.  Have you ever seen

5    that old Heim file?

6        A.   Yes, sir.

7        Q.   And is that a case where Triodyne

8    represented Heim or spoke on behalf of Heim at

9    some point?

10       A.   I am not certain.  I believe that we

11   received the request for that mention out of the

12   billing.  That was before I was involved in the

13   case.  And it was found and I had someone make

14   copies to send it.  That was my only involvement

15   with that material.

16       Q.   My question was did you understand that

17   Triodyne was representing the interests of Heim?

18       A.   I have no idea as to whom Triodyne was

19   representing in that matter.

20       Q.   Is there a code of ethics for

21   engineers?

22       A.   I believe so.

23       Q.   Does it talk to the issue of

24   representing a company as an engineer and then

72

1    some later point representing an adverse party

2    for that same company?

3        A.    I am not certain as to any statement to

4    that effect.

5        Q.    Professor Barnett has testified

6    previously that there is such a prohibition --

7        A.    Okay.

8        Q.    -- and that he would never do that.

9        A.    All right.

10       Q.    Have you ever heard anyone talk about

11   that issue before?

12       A.    Yes, sir, as in terms of a conflict.

13       Q.    Yes, sir.  And why is that a conflict?

14       A.    If you glean materials that otherwise

15   you would not have on your own in the course of

16   working for a corporation, you shouldn't be

17   allowed to use those same materials later in any

18   matter against them.

19       Q.    Have you ever worked on -- have you

20   ever known Professor Barnett to represent any

21   other -- any foot control manufacturers?

22       A.    I believe that he has, but I don't have

23   any personal knowledge of that.

24       Q.    I understand you are not going to be

73

1    testifying at the trial concerning any opinions

2    whatsoever; is that true?

3        A.   That was the intention.

4        Q.   And why is that?

5        A.   I have no opinions to offer.  That is

6    not my role in my work at Triodyne.

7        Q.   Do you have the opinion that a foot

8    control that does not have a gate is defective?

9        A.   Sir, I am not here to express any

10   opinions.

11       Q.   Do you have that opinion?

12       A.   I am not here to express any opinions.

13       Q.   I am asking you if you have that

14   opinion.

15       MR. HARTMAN:  He has answered and that's it.

16       MR. ROBINSON:  No, no, no, I am hearing a

17   different answer.

18   BY MR. ROBINSON:

19       Q.   I am not asking if you are here to

20   express that opinion.  I am asking if you have

21   that opinion?

22       MR. HARTMAN:  You can't compel him to give

23   an opinion.

24       THE WITNESS:  I am not giving opinions in

74

1    this case, sir.

2    BY MR. ROBINSON:

3        Q.    And why aren't you giving opinions?  I

4    am sorry if I asked that, and I want to make

5    sure I understand your reasoning for the court.

6        A.    That isn't my role, sir, at Triodyne.

7    I assist, I act as a contact, I help prepare

8    materials, review materials.  I have never

9    testified before in any matter and I was not

10   intending to in this one.

11       Q.    You said you had reviewed this old Heim

12   file?

13       A.    I -- I said I had it copied, and that

14   was pretty much the extent of my --

15       Q.    I am sorry, I thought you testified

16   that the -- and the record will correct me, I

17   thought you said that you had reviewed it.

18       A.    I have -- I might have glanced through

19   it when it was being copied, but I haven't paid

20   much attention to it.

21       Q.    Are you familiar with ANSI standards

22   relative to power presses and press brakes?

23       A.    I have reviewed them somewhat.

24       Q.    For purposes of this case?

75

1      A.    I believe I have looked at them for

2   this case.

3      Q.    Did you notice anything in the ANSI

4   standards that makes it -- makes a foot control

5   defective if it doesn't have a gate?

6      A.    I don't believe ANSI specifies anything

7   that's defective in their standards, sir.

8      Q.    Do you know if Professor Barnett has

9   previously testified that foot controls that do

10   not have gates are safe?

11      A.    I have no idea as to all of

12   Professor Barnett's previous testimony, sir.

13      Q.    I didn't ask about all of his previous

14   testimony.

15      A.    I have no idea as to any of his

16   previous testimony certainly.

17      Q.    Any of his previous testimony?

18      A.    No, I have never read any of his

19   depositions that I can recall nor have I been

20   present for any of them.

21      Q.    How familiar are you with the point of

22   operation guard and safety device requirements

23   of ANSI?

24      A.    It is something I never studied nor

76

1    researched.

2        Q.    Do you have any familiarity with

3    warnings and the adequacy of warnings?

4        A.    I can't give opinions to the adequacy

5    of warnings.

6        Q.    Do you have any experience or expertise

7    in the accuracy of the tests that you conducted

8    as -- I apologize.

9            Do you have any experience or expertise

10   in the adequacy of the test that was conducted

11   by Triodyne when you compare that test to what

12   Tina Lindquist was doing?

13       A.    I believe it would depend on the

14   purpose of the test, sir, but I can't speak to

15   the purpose of the test nor what it was intended

16   to show.

17       Q.    Do you know if there would be any

18   effect on testing a subject on the inadvertent

19   placement of a foot into a foot control if there

20   were a big press in front of them that cut off

21   their hands?

22       A.    I couldn't say.

23       Q.    You didn't put a press in front of

24   these test subjects; did you?

77

 1      A.   No, sir.

 2      Q.   As you sit here, sir, and as you are

 3   testifying, do you know of any similarity

 4   between the test that was conducted by Triodyne

 5   and the injury that was received by Tina

 6   Lindquist?

 7      A.   I don't necessarily believe that the

 8   test was -- I can't speak --

 9      Q.   Can you identify any similarity?  When

10   you look at the test that was conducted by

11   Triodyne and the manner in which Tina Lindquist

12   was injured, can you identify any similarity for

13   the court between those two issues?

14      A.   I can't speak to the purpose of that

15   testing, sir.

16      Q.   I am just asking if you can identify

17   any similarity?

18      A.   I believe it was footswitch testing.

19      Q.   So the only similarity you can identify

20   is that there was a footswitch used in both?  Is

21   that what you are saying?  I think --

22      A.   That's not what I am saying.  I am

23   saying that it was footswitch testing that was

24   conducted and designed by Professor Barnett

78

1    and --

2        Q.    Please listen to my question.  As you

3    sit here, sir, do you know of any similarity

4    between that foot control testing that was

5    performed by Triodyne and Tina Lindquist's

6    injury in the way she was injured?

7        A.    I can't say for certain, sir.

8        Q.    I am not concerned about certain.  If

9    there is something you are not certain about, I

10   don't want to hear about it.

11       MR. HARTMAN:  He has answered.

12       MR. ROBINSON:  I am going to get an answer,

13   Mr. Hartman.

14       MR. HARTMAN:  You have got it four times.

15   You just don't like it.

16       MR. ROBINSON:  That doesn't make any sense.

17   BY MR. ROBINSON:

18       Q.    You can answer, sir.  Do you know of

19   any similarity between that testing and the

20   manner which Tina Lindquist was injured?

21       A.    I can't say.

22       Q.    Now I have an answer.  I appreciate

23   that.

24       A.    Whatever you need.

79

1      Q.   You mentioned earlier you had a -- and

2   I appreciate it, you and I may disagree on some

3   things and maybe we won't.  One thing you had

4   mentioned you disagree with my terminology about

5   adding a danger, and you said it didn't add a

6   danger to put a gate according to

7   Professor Barnett's safety brief.

8      A.   Yes.

9      Q.   But it increases the risk of riding the

10   pedal I believe is what you said; is that right?

11      A.   I believe I was trying to correct you

12   as to your indication that that paper said that

13   the gate introduces the riding the pedal

14   phenomenon.

15          And I tried to describe the manner in

16   which the paper states that as you go from one

17   side to the other the inclination to ride the

18   pedal increases.

19      Q.   Yeah, and there must have been

20   miscommunication.  I never suggested that it

21   introduces riding the pedal.

22      A.   It was the word that was used.  You

23   might not have intended it.

24      Q.   Increases -- creates an additional

80

1   danger which I meant because it increases the

2   likelihood of riding the pedal.  With all that

3   said why is that, that if you have a gate, it

4   increases the likelihood of someone riding the

5   pedal?  I think I understand what -- what -- why

6   that is, but tell me why that is.

7        MR. HARTMAN:  He is --

8        THE WITNESS:  I can't speak to that.  I have

9   done no footswitch research, no testing.

10  BY MR. ROBINSON:

11       Q.   What has Professor Barnett said about

12  that as to why a gate increases the likelihood

13  of riding a pedal?

14       A.   I believe that the paper states that

15  the -- in the testing that was done in that

16  matter that the operator doesn't remove his foot

17  when it is too hard to get it back in in the

18  cases that he was describing.

19       Q.   Do you anticipate -- strike that.

20            Will you be testifying as a fact

21  witness in this case?

22       A.   I have no intention of testifying in

23  this case in any manner.

24       Q.   And why is that?

81

1     A.    It is not my role.  It's -- I assist.

2    I review documents.  I summarize documents.  And

3    I assist with the preparation of report.  I have

4    no opinions to offer.

5     Q.    I am not talking about opinions.  I can

6    appreciate what you are saying there, and I am

7    just asking about in any way.  For instance --

8    not even for instance.

9          What do you remember -- tell me

10   everything you remember Tina Lindquist telling

11   you about the accident, not the injuries, not

12   the injuries, about the happening of the

13   accident.

14    A.    I don't believe she spoke much to us in

15   that 15-minute time span that I have described

16   earlier.  She -- we couldn't talk about the

17   accident with her.  She -- and we were told that

18   she gets upset while speaking it so we didn't

19   talk to her about the accident so --

20    Q.    So did all of the information that you

21   gleaned about the happening of the accident come

22   from Mr. Hartman?

23    A.    No, Tina Lindquist's deposition as

24   previously stated and then as noted on the

82

 1    report.

 2        Q.   And did you say you did or did not read

 3    all of that transcript?

 4        A.   I believe I did.  It was several months

 5    ago, and I have not reviewed it in the mean

 6    time.

 7        Q.   Were summaries prepared in any of the

 8    depositions?

 9        A.   I believe so, yes.

10        Q.   Where are those?

11        A.   I can't say.

12        Q.   We haven't been provided any --

13        A.   Deposition summaries?

14        Q.   I am not sure.  Hold on.  Let's --

15        A.   I swear they were copied.

16        Q.   They might have been, and I don't want

17    to misspeak.  Hold on.  There may have been

18    some.  I am -- I will let you look --

19        A.   If not, I will get them to you today.

20        Q.   I am sorry?

21        A.   If not, I will get them to you today.

22        Q.   No, I am not concerned about giving

23    them to me today.  I was concerned about

24    preparing for this deposition and knowing -- and

83

 1    Mr. Hartman has represented on a number of

 2    occasions that they were supplied.

 3          Maybe they are.  I want you to look

 4    through Exhibit A and tell me if the deposition

 5    summaries that were prepared by Triodyne are

 6    contained within that packet of information

 7    that's been represented on a number of occasions

 8    as being the complete file less the depositions

 9    and the discovery that's been taken in this

10    case.

11        A.    I do not see any deposition summaries

12    in this Exhibit A.

13        Q.    Were there summaries prepared for all

14    of the depositions?

15        A.    Summaries were prepared for the

16    depositions that were used that were noted on

17    the front page of the report, the -- Tina

18    Lindquist, Anthony Mase and Zygmund Zajdel.

19        Q.    Where are they?  Where are the

20    summaries?

21        A.    I believe that Mr. Mase and Mr. Zajdel

22    are currently with Professor Barnett.  The Tina

23    Lindquist deposition summary might have been

24    kept with -- the deposition summaries were

84

1    usually kept with the depositions, and I believe

2    that's -- that would be my fault why they didn't

3    get copied in this, and I apologize for that.

4        Q.   That's not your issue.  It is

5    Mr. Hartman's.  We have a court order that

6    required them to be produced before today.  You

7    can at least confirm for the court that we don't

8    have the complete file materials; isn't that

9    true?

10       A.   I confirm that your Exhibit A here

11   doesn't have deposition summaries provided by

12   Triodyne.

13       Q.   In reviewing Exhibit A can you identify

14   anything else that we haven't been provided?

15   I'd like you to take your time please and look

16   at it.  By the way, while you are looking who

17   prepared those deposition summaries?

18       A.   I summarized the depositions.

19       Q.   And you are the one that prepared these

20   materials as well for copying and forwarding to

21   us; right?

22       A.   I believe so.

23       MR. ROBINSON:  I am reserving the right to

24   bring back both witnesses.

85

 1        MR. HARTMAN:  With regard to the deposition

 2    summaries and anything else that --

 3        MR. ROBINSON:  Well, Mr. Hartman, you were

 4    ordered to do that before we came out to

 5    Chicago.

 6        MR. HARTMAN:  Well, if such summaries exist,

 7    they were already --

 8        MR. ROBINSON:  He has already said they do.

 9        MR. HARTMAN:  I am just saying, if such

10    summaries exist and they were requested.

11        THE WITNESS:  With the exception of the

12    deposition summaries as previously stated the

13    videotape of both the testing and --

14    BY MR. ROBINSON:

15        Q.   The video was provided?

16        A.   Yes, and the documents provided by --

17    in the discovery I believe that is the complete

18    file.

19        Q.   Does Professor Barnett -- have you ever

20    seen him take any notes when he is involved with

21    the case?

22        A.   I believe so.

23        Q.   Did you see any notes in there?

24        A.   I did not see any notes in Exhibit A.

86

1      Q.    Did you ever inquire of

2    Professor Barnett if he took any notes?

3      A.    I did not ask.

4      Q.    Did you make any notes during your 12

5    or so conversations with Mr. Hartman?

6      A.    I can't recall.

7      Q.    Is that something you would normally

8    do?

9      A.    It's -- apparently wasn't something

10   that was in the file.

11     Q.    I am not -- we know that I haven't been

12   provided with the whole file.  I am beyond that

13   issue.

14     A.    No.

15     Q.    I am saying that's something you would

16   normally do when you speak with an attorney on a

17   case is make some notes of that conversation?

18     A.    I might, I might not.

19     Q.    Do you ever remember making any note

20   regarding any conversation that you had, any of

21   the dozen or so conversations that you had with

22   Mr. Hartman at any time, because we know the

23   number provided, do you ever remember making any

24   note?

87

1     A.    I cannot specifically recall writing

2     anything down while speaking to Mr. Hartman.

3         MR. ROBINSON:  Okay.  I really can't ask

4     much more.  If we can't really confirm the

5     remains of the remaining aspects of the file

6     materials are here and I appreciate your time,

7     Mr. Ulmenstein.

8         MR. HARTMAN:  We are not going to waive.  We

9     want to review it.

10        THE VIDEOGRAPHER:  Off the record at 11:44 a.m.

11                    (Recess taken.)

12        THE VIDEOGRAPHER:  It is the beginning of

13    the Tape No. 2.  Back on the record at 5:00 p.m.

14                  FURTHER EXAMINATION

15    BY MR. ROBINSON:

16        Q.    Okay, sir, thank you for coming back

17    with the -- I guess following the delivery of

18    the file materials.  Were you involved with

19    putting those file materials together?

20        A.    Yes, sir.

21        Q.    Professor Barnett also brought some

22    file materials, and I wanted to ask you a couple

23    of questions on some of the items.  Barnett

24    Exhibit A, what do you understand these

88

```
 1    photographs to be?

 2         A.   I believe those photographs are of a

 3    footswitch that was at Mr. Hartman's office.

 4         Q.   Okay.  Who took these photographs?

 5         A.   I believe Christopher Ferrone.

 6         Q.   Who is that?

 7         A.   He was an engineer for Triodyne at the

 8    time, and he is currently -- he followed Peter

 9    Poczynok as previously mentioned to Arca.

10         Q.   Can you spell his last name for the

11    court reporter.

12         A.   F-E-R-R-O-N-E.

13         Q.   Okay.  And in another document that we

14    were given is the original report --

15         A.   Yes.

16         Q.   -- that Professor Barnett brought with

17    him.  He indicated on here that on Page 2 there

18    is some handwriting and he said it was yours.

19         A.   Yes, sir.

20         Q.   Is that your handwriting?

21         A.   It is.

22         Q.   And when did you write that on that

23    report?

24         A.   I believe it was yesterday afternoon.
```
89