# EXHIBIT F

# PART 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TINA LINDQUIST,                    )

      Plaintiff,                 )

      -vs-                       )   No. 04-249E

HEIM, L.P.                         )

      Defendant.                 )

COPY

 

The videotaped deposition of MR. GARY HUTTER, called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before DEANNA AMORE, a notary public within and for the County of Cook and State of Illinois, at 33 North LaSalle Street, Chicago, Illinois, on the 12th day of April, 2006, at the hour of 8:14 a.m.

CSR No.:  084-0003999

1

```
 1        APPEARANCES:

 2              DALLAS W. HARTMAN, P.C., by,

 3              MR. DALLAS W. HARTMAN

 4              2815 Wilmington Road

 5              New Castle, Pennsylvania 16105

 6              (724) 652-4081

 7                    Representing the Plaintiff;

 8              MEYER, DARRAGH, BUCKLER, BEBENEK & ECK,

 9              P.L.L.C., by,

10              MR. PAUL R. ROBINSON

11              U.S. Steel Tower, Suite 4850

12              600 Grant Street

13              Pittsburgh, Pennsylvania 15219

14              (412) 261-6600

15                    Representing the Defendant.

16   ALSO PRESENT:

17      Karolina Tesarski, Videographer

18

19

20

21

22

23

24
```

                                                                    2

```
 1                    I N D E X

 2   WITNESS                        EXAMINATION

 3   GARY HUTTER

 4       By Mr. Hartman                  5

 5

 6

 7               E X H I B I T S

 8   NUMBER                      MARKED FOR ID

 9   HUTTER Deposition Exhibit

10       No. 1                          60

11       No. 2                          60

12       No. 3                          61

13       No. 4                          62

14       No. 5                          79

15       No. 6                          81

16       No. 7                          82

17       No. 8                         116

18       No. 9                         117

19       No. 10                        117

20       No. 11                        211

21

22

23

24
                                            3
```

1           THE VIDEOGRAPHER:  My name is Karolina

2     Tesarski, legal video specialist with McCorkle

3     Court Reporters located at 200 North LaSalle

4     Street, Suite 300 Chicago, Illinois 60601.  I am

5     the camera operator on April 12, 2006, for the

6     videotaping of the deposition of Gary Hutter being

7     taken at 33 North LaSalle, Chicago, Illinois at the

8     time of 8:14 a.m. in the matter of Tina Lindquist,

9     plaintiff, versus Heim L.P., defendant, filed in

10    the United States District Court, Western District

11    of Pennsylvania, Case No. 04-249E.

12         Will counsel please identify themselves for the

13    record beginning with the plaintiff's counsel?

14         MR. HARTMAN:  Yes, my name is Dallas Hartman.

15    I represent the plaintiff, Tina Lindquist.

16         MR. ROBINSON:  Good morning, my name is Paul

17    Robinson.  I represent Heim, L.P.

18         THE VIDEOGRAPHER:  Will the court reporter

19    please identify herself and swear in the witness?

20         THE COURT REPORTER:  Deanna Amore.

21                        (Witness sworn.)

22                        GARY HUTTER,

23    called as a witness herein, having been first duly

24    sworn, was examined and testified as follows:

4

```
 1                          EXAMINATION

 2    BY MR. HARTMAN:

 3        Q.   For the record would you please state your

 4    name?

 5        A.   My name is Gary M. Hutter.  The last name

 6    is spelled H-u-t-t-e-r.

 7        Q.   Mr. Hutter, will you give us your current

 8    business address?

 9        A.   My office is at 4228 Commercial Way in

10    Glenview, Illinois.  The zip code there is 60025.

11        Q.   And how long have you been at that

12    address?

13        A.   Oh, probably about seven years.

14        Q.   Do you share office space with anyone at

15    that address?

16        A.   Yes, occasionally.

17        Q.   And who do you share space with?

18        A.   Different people.  Currently there is a

19    William Switalski who uses part of the office.

20        Q.   Is that the same William Switalski who is

21    an expert in this case?

22        A.   I believe so, yes.

23        Q.   Do you know how Mr. Switalski became

24    involved in this case involving Ms. Lindquist?
```

5

1      A.    Probably was a referral from me.

2      Q.    What was the purpose of the referral from

3   you to Mr. Switalski for involvement in this case?

4      A.    I think in the course of my involvement in

5   this case, there were discussions about some of the

6   publications and philosophies and involvement that

7   the plaintiff's expert has been associated with in

8   the past on things like presses, press brakes, foot

9   controls, the safety philosophy that he has been

10  involved with.  And I think Mr. Switalski had a lot

11  of familiarity with that.  There was another

12  gentleman also who had a lot of familiarity with

13  that that I think I may have also mentioned.

14     Q.    Who was that?

15     A.    Peter Barroso.

16     Q.    Mr. Barroso?

17     A.    Uh-huh.

18     Q.    Was there a dividing up of the

19  responsibilities between you and Mr. Switalski in

20  formulating opinions in this case?

21     A.    I never got a document or mandate that

22  said we are going divide it along, exactly along

23  some lines.  I know that there is a third defense

24  expert in this case, Dennis Cloutier.

                                              6

1          I think Bill and I have opinions about

2     some of the same kinds of things, maybe we are

3     approaching it from different experiences or

4     different basis.  I actually looked at the machine

5     in person.  Mr. Switalski didn't.  Mr. Switalski,

6     I think, was involved in some of the testing and

7     evaluations that were part of some of the

8     publications that Professor Barnett generated and

9     had some more intimate familiarity with that.  So

10    he might have more deeper, stronger opinions about

11    some of those things than I would.

12          Dennis, Mr. Cloutier, he is on a committee

13    I am involved with; and I know he has worked for

14    many years for manufacturers of metal working tools

15    and had perhaps more field experience in servicing

16    their equipment.  So there might be differences

17    along those lines.

18    Q.   Well, I would like to know what your --

19    why it is that you recommended Mr. Switalski as

20    necessary to be involved in this case?

21    A.   I don't know that I recommend --

22    MR. ROBINSON:  Excuse me one second.

23          Object to the form of the question.  And

24    I believe that you just asked that question and

                                                    7

1    received an answer.

2        Please disregard for your purposes, Dr. Hutter,

3    my objections.  Please go ahead and answer.

4        THE WITNESS:  I didn't recommend that he be

5    involved.  I think there was a question of maybe

6    something along the lines of do you know anyone who

7    is familiar with some of the writings of Ralph

8    Barnett, are you familiar with anyone who was

9    involved in some of this testing that might have

10    gone on used in the generations of these safety

11    philosophies, are you aware of anyone who would

12    have been involved with Professor Barnett in prior

13    cases having to do with foot controls.

14        Professor Barnett has defended many of the --

15    or at least Linemaster, for example, the

16    manufacturer of foot controls.  I know he has

17    defended many manufacturers of presses and press

18    brakes.  But I think Mr. Switalski, having worked

19    closer to Ralph Barnett on some of these matters,

20    had more information in that regard, likewise Peter

21    Barroso did too.

22    BY MR. HARTMAN:

23        Q.    You used the term presses and press

24    brakes.  Would you distinguish for us what the

8

1    difference is between a press and a press brake?

2        A.    Well, I really think the distinguishing is

3    mechanical presses and a press brake.  Mechanical

4    presses have certain regulations by OSHA and ANSI,

5    and press brakes have certain regulations by OSHA

6    and ANSI and other kind of supportive documents.

7        Typically a mechanical power press is

8    probably going to be used for more drawing

9    operations and punching operations and shearing

10   operations, perhaps longer production runs whereas

11   -- and maybe more two- and three-dimensional kinds

12   of changes of shapes and metals whereas a press

13   brake mostly for bending operations or folding

14   operations.

15       Usually it has a working surface that's

16   long and narrow whereas a mechanical power press,

17   the working area may be as deep as it is long.

18   Press brakes may be used for shorter production

19   runs perhaps.

20       Q.    It has been represented by different

21   experts that have been retained by the defendant in

22   this case that mechanical presses and press brakes

23   are two different entities; do you agree with that

24   statement?

9

1          MR. ROBINSON:  Let me object to the form of the

2     question, your introductory statement of what the

3     witnesses have indicated.

4          THE WITNESS:  Yeah, I don't know what other

5     people have indicated.  They are -- they do have

6     different codes.  They do have different code

7     requirements.  There have different supportive

8     documents.  They can overlap in making the same

9     part.  They could be used in many operations to

10    produce the exact same part, and you couldn't tell

11    if it was made on a mechanical press or press

12    brake.

13         But press brakes do have certain functional

14    characteristics that are unique to them.  For

15    example, a lot of times in a press brake you are

16    making a bend or a fold in a piece of metal where

17    that piece of metal is significantly going to be

18    outside of the point of operation.  You do not

19    traditionally see that with a mechanical power

20    press.  But, again, you could in certain operations

21    make the same part on both pieces of equipment and

22    you couldn't tell the difference which machine it

23    was made by.

24

                                                    10

1    BY MR. HARTMAN:

2        Q.    Would you agree that substantial

3    differences exist between press brakes and punch

4    presses?

5        MR. ROBINSON:  I will object to the form of the

6    question.

7        THE WITNESS:  I would say that functionally

8    they overlap but they do have some things, some

9    characteristics that are more predominant with one

10   than with the other.

11   BY MR. HARTMAN:

12       Q.    And what are the characteristics that are

13   more predominant with one than the other?

14       MR. ROBINSON:  Objection, asked and answered.

15       THE WITNESS:  I have already listed those.  For

16   example, typically longer production runs are with,

17   I would say with mechanical presses.  More folding

18   operations, especially long folding, bending

19   operations are more traditionally done with press

20   brakes.  Larger pieces that need to be bent where

21   they stick outside of the point of operation can be

22   done on a press brake, typically are not done on

23   mechanical power presses although under certain

24   circumstances they possibly could be done.

11

1    BY MR. HARTMAN:

2        Q.    Do press brakes have full revolution

3    cycles?

4        A.    Both mechanical presses and press brakes

5    can be full revolution or part revolution devices.

6        Q.    In 1978 are you aware of any full

7    revolution press brakes?

8        A.    I don't know.  I wouldn't be surprised if

9    there were.  I didn't check to see if there were or

10   weren't.  I wouldn't be surprised if there were

11   full and part revolution press brakes at the time

12   this machine was made.

13       Q.    Prior to coming here for your deposition

14   today did you have the opportunity to discuss your

15   testimony with Mr. Robinson?

16       MR. ROBINSON:  Object to the form of the

17   question.

18       THE WITNESS:  Yes, briefly.

19   BY MR. HARTMAN:

20       Q.    What time did you meet Mr. Robinson this

21   morning?

22       A.    About a little after 7:00.

23       Q.    Did you meet Mr. Robinson last night?

24       A.    No.

                                              12

1    Q.    Have you met Mr. Robinson since the taking

2    of Professor Barnett's deposition?

3    A.    Well, this morning.

4    Q.    Other than this morning have you talked to

5    Mr. Robinson since the taking of Mr. Barnett's --

6    Professor Barnett's deposition?

7    A.    No.

8    Q.    Have you had the opportunity to review

9    Professor Barnett's deposition testimony?

10   A.    No, I have not.

11   Q.    Have you had the opportunity to review

12   Mr. Switalski's deposition testimony?

13   A.    No, I have not.

14   Q.    What did you and Mr. Robinson talk about

15   at 7:00 o'clock this morning?

16   A.    We talked about his flight in, what time

17   you guys were going to leave.  I asked him how long

18   the depositions had gone for my own scheduling

19   purposes.

20        He mentioned that there were several

21   significant changes in Professor Barnett's

22   deposition compared to his report, that there were

23   some mistakes in the prior report about -- I think

24   about whether or not foot controls were or were not

13

1    allowed by standards.

2         I think we talked about the fact that he

3    never mentioned in his report that the door on a

4    foot pedal -- I think he is now taking the

5    position, the unique position that there should be

6    a door on the foot pedal or foot control for a

7    press brake and that that would not be required on

8    a mechanical power press.

9         I think he mentioned the fact that Ralph

10   Barnett agrees that if the proper

11   point-of-operation guarding had been provided on

12   this press that this accident would not have

13   happened.

14   I think those kinds of things.

15        Q.   Anything else?

16        A.   Oh, I think those are the subject areas.

17        Q.   You worked with Professor Barnett at

18   Triodyne for quite some while; am I correct?

19        A.   I worked with Professor -- well, I worked

20   for a company that he owned called Triodyne, Inc.

21   Then I worked for a company that he also was a part

22   owner called Triodyne Taussig; and then I was his

23   partner for several years in a company that he,

24   myself and another gentleman, Carl Uzgaris, were

                                                      14

1    all shareholders called Triodyne Environmental

2    Engineering, Incorporated.

3        Q.   During your years -- and I am going to use

4    all three and just call it Triodyne.  Do you have

5    any problem with me referring to the three entities

6    as Triodyne?

7        A.   Not at the current moment.  I guess if

8    something comes up --

9        Q.   You will let me know?

10        A.   I will try to.

11        Q.   During your period working at Triodyne,

12    did you have the occasion to evaluate foot control

13    usage in conjunction with press brakes?

14        MR. ROBINSON:  Object to the form of the

15    question.

16        THE WITNESS:  Yes.

17    BY MR. HARTMAN:

18        Q.   Can you tell me what your involvement was?

19        A.   Primarily through some activity with the

20    company, the firm, primarily through Professor

21    Barnett, had defended several foot control

22    manufacturers and had defended several press brake

23    manufacturers and several press manufacturers.  And

24    my office was immediately adjacent to the

15

1    conference room, and Dr. Barnett would quite often

2    be debriefed there and explain his theories to

3    either the project engineer or the client and just

4    by being in close proximity would hear those

5    things.

6              There was some activity within the office

7    on those kinds of devices and equipment.  There

8    were several publications that came out of that

9    firm having to do with philosophies associated with

10   that kind of equipment, general safety philosophy

11   or tests or observations, theories that had been

12   generated about that equipment.

13             I also was a member of the National Safety

14   Council during those years and still am a member of

15   the National Safety Council, the committee that's

16   responsible for that kind of equipment, both

17   presses and mechanical presses, hydraulic presses

18   and press brakes in addition to a lot of other

19   metal working equipment.

20             And I was on two ANSI committees having to

21   do with B-11 equipment, one having to do with

22   ergonomics or human factors of that general

23   category of equipment and another one having to do

24   with more production, missed control kinds of

16

1    problems associated with that kind of equipment.

2        Q.    Did you ever work with Professor Barnett

3    on a case where it was alleged that the foot

4    control caused an accident on a press brake?

5        A.    That's really testing my memory.

6    I wouldn't be surprised that I did; but as I sit

7    here today, I can't specifically say there was a

8    case of A versus B that specifically had to do with

9    that issue.

10        Q.    So today you have no recollection as to

11    whether you did or did not work with Professor

12    Barnett on a case where someone was injured on a

13    press brake and they alleged that the foot control

14    was defective?

15        A.    Yeah, I can't remember a case caption,

16    that's correct.

17        Q.    Can you remember a case?

18        A.    I remember there being discussions about

19    those issues.  I remember hearing those and hearing

20    counterarguments and discussions and the

21    circumstances surrounding cases.  I can't

22    distinguish as I sit here if those were matters

23    that I was actually participating in or as a

24    project engineer or assisting Ralph or if it was

                                                   17

1    just the fact that I was called into the room to be

2    supportive in discussing things or the fact that my

3    office was immediately adjacent to the conference

4    room and these kind of discussions were usually

5    quite boisterous and be filling your room with all

6    of the discussion.

7        Q.    Today do you have a specific recollection

8    as to whether or not you worked with Professor

9    Barnett on a case where it was alleged the foot

10   control caused an accident with the press brake?

11       A.    I don't -- as I said, I don't have a

12   recollection of any case, specific case that I did

13   that on.

14       Q.    Do you have a factual scenario in your

15   mind where it seems that you recall having worked

16   with him on a case where it was alleged the foot

17   control caused an accident on a press brake?

18       A.    Do I have a factual basis, is that what

19   you just said?

20       Q.    Factual scenario in your mind, a mental

21   picture of working on a case with Professor Barnett

22   where it was alleged the foot control caused an

23   accident with a press brake?

24       A.    I don't remember one as I sit here.

                                                          18

1    Q.    Do you recall working with Professor

2    Barnett on a factual scenario where it was alleged

3    the foot control caused an accident on a punch

4    press?

5    A.    I don't remember one way or the other.

6    Q.    Have you ever testified in any case where

7    it was alleged that the foot control caused an

8    accident with a press brake?

9    A.    I know I had a press case.  I think it was

10   a mechanical press.

11   Q.    A mechanical press would be a punch press,

12   what we call --

13   A.    Well, you know, what you call a punch

14   press and someone else calls a punch press may be

15   different things.  I try to use the term mechanical

16   power press or mechanical press and press brake.

17   Q.    What does when you just say press because

18   several times you say press and then press brake.

19   What does just the term press mean?

20   A.    If I said that, I should go back and

21   clarify.  Typically I am trying to talk about power

22   presses and press brakes and typically I think for

23   some reason mechanical power presses have been

24   brought up in this case although the accident

19

1    didn't involve a mechanical power press.  But those

2    I see are two overlapping categories of machinery.

3        Q.   Well, how do we -- what is the press that

4    we are talking about that is not a press brake?

5        A.   Well, there have been a lot of presses

6    that have been talked about in this case.  I think

7    probably the ones that have been talked about the

8    most are mechanical power presses.

9        Q.   And does a mechanical power press include

10   press brakes?

11       A.   No.

12       Q.   So mechanical power press is one type of

13   press; a press brake is another type of press,

14   correct?

15       A.   Yeah, but some of their functions overlap.

16       Q.   I understand what you are saying but I am

17   trying to distinguish for clarity of the record

18   when you say mechanical power press, you are not

19   including in that category a press brake?

20       A.   That's correct.

21       Q.   And a press brake is different than a

22   mechanical power press when you talk?

23   MR. ROBINSON:  Let me object to the form of the

24   question, also asked and answered repeatedly.

                                                      20

1    BY MR. HARTMAN:

2        Q.    Am I correct?

3        A.    It is different although some of their

4    functions overlap.

5        Q.    And some of their functions don't overlap;

6    am I correct?

7        A.    That's correct.

8        Q.    Now, you indicated that Mr. Switalski

9    was -- when you left Professor Barnett, was it on

10   good terms?

11       A.    I think so, yes.

12       Q.    Okay.  Do you two still have a

13   professional relationship?

14       A.    I don't know when you say a professional

15   relationship.  For some reason he and I probably

16   really haven't communicated in the last five or six

17   years.  I know his company has been under a lot of

18   stress.  A lot of people have left and that may be

19   part of it.  He no longer has an engineering

20   company.  But I would say that we are -- you know,

21   I occasionally use their library.  I don't think we

22   are at odds with each other.

23       Q.    Did you leave -- what was the reason for

24   your leaving Triodyne?

21

1      A.    There were several reasons.  One was I was

2    in a three-way partnership.  I knew what Ralph

3    Barnett was contributing to that partnership.

4    I knew what I was contributing to that partnership,

5    and the third person really wasn't contributing

6    anything to the partnership.  And that was part of

7    the breakdown.

8          The company, the companies and that

9    company had gotten to a point in their development

10   where there needed to be some line of succession,

11   some people starting to take over some of the reins

12   of controls and Dr. or Professor Barnett is a very

13   powerful personality.  And I don't think he really

14   wanted to give more authority and responsibility to

15   individuals who were very entrepreneurial.  So a

16   lot of people left to start their own firms.

17         It was a good time in my life to be more

18   independent of another firm, another entity.  And

19   it just made sense to do it at that point in time.

20     Q.    I have to ask these because there has been

21   a long history, and I don't want to be surprised by

22   anything that Mr. Robinson might ask you.  I am not

23   trying to get involved about your relationship with

24   Mr. Barnett.  I am not trying to get personal with

                                                    22

1    you.  I apologize if I am getting into personal

2    areas.

3           Was any part of your leaving because of a

4    difference in the way you saw your roles as experts

5    in cases?

6    A.   I, in my very early years at Triodyne, did

7    some work with Ralph Barnett where I was maybe what

8    I would characterize as the project engineer.

9    Typically the way things worked at Triodyne was an

10   engineer would workup a case and debrief Ralph

11   Barnett on the particulars and then he would

12   testify, go to trial, give depositions, those kind

13   of things.

14          But that only lasted in my career probably

15   the first few years and after that it would be rare

16   that he and I would work collaterally on the same

17   case unless we were both identified as experts.

18   So, I really didn't have that kind of working

19   relationship with him probably for 80 percent of

20   the time I was there, 90 percent of the time I was

21   there.

22   Q.   Do you have an opinion as to his

23   objectiveness in evaluating cases based on your

24   experience and exposure to Professor Barnett?

                                                    23

1          MR. ROBINSON:  Objection to the form.

2          THE WITNESS:  Can you explain what you mean by

3     that?

4     BY MR. HARTMAN:

5          Q.    Have you ever seen Professor Barnett

6     change his testimony based on the client's wishes?

7          A.    I don't know that he ever changed his

8     opinion.  Sometimes he seemed to be an advocate for

9     a position that would I think would be inconsistent

10    with other positions he may have taken or things

11    that he may have published.

12              For example, in this case I think he is

13    advocating positions that are 180 degrees out of

14    phase with things that he has published and

15    promoted over the years, quite often published as

16    part of a series of safety briefs.

17              So he may be advocating positions that are

18    inconsistent with my position or may have advocated

19    positions I think might be inconsistent with things

20    he has published.  I don't know that he has changed

21    his testimony or position based on a client's

22    request.

23         Q.    So the two of you have had differences on

24    the opinion you reached and that would be the

24

1    extent of your disagreement on how an opinion

2    should be reached on a case?

3         MR. ROBINSON:  I will object to the form of the

4    question.

5         THE WITNESS:  I don't think we ever had a

6    project where we were both identified as experts

7    and I would have an opinion that would be at odds

8    with his or he would have an opinion that would be

9    at odds with mine.

10        There might have been situations where I was a

11   project engineer and I would have come up with

12   Opinions 1, 2 and 3 and that would have been all

13   the opinions I would have felt comfortable with and

14   he might have come up with Opinions 4, 5 and 6.

15   BY MR. HARTMAN:

16        Q.   Are you aware of any case that Professor

17   Barnett gave testimony in on behalf of a machine

18   manufacturer where he gave testimony as to whether

19   or not a foot control caused or contributed to an

20   accident?

21        A.   I know that those cases were in the

22   office.  I know that the company when we would do a

23   case conflict check could not take cases against

24   certain press manufacturers, whether they be press

25

1    brake or mechanical or hydraulic power presses.

2    I know we couldn't take cases against certain foot

3    pedal control actuating devices because they had

4    been our clients.  And I know we had defended them

5    in a lot of situations, we, as a company.  I guess

6    that's the best I can answer that.

7        Q.    Well, Professor Barnett makes a

8    distinction between mechanical power presses and

9    press brakes; are you aware of that?

10       A.    He doesn't always make that distinction.

11   I mean for this particular case I think I just

12   learned because of his deposition that he is now

13   taking some unique position about the

14   appropriateness of certain kinds of foot controls

15   on press brakes versus mechanical power presses.

16   I am aware of that unique and new position that he

17   has taken.

18       Q.    I am sorry.  I thought I asked you earlier

19   if you had reviewed his deposition and you

20   indicated not.

21       A.    I hadn't.  This is just my understanding.

22       Q.    And how did you reach that understanding?

23       A.    You asked me before what the attorney and

24   I had talked about this morning and that was one of

26

1    the issues that we talked about.

2        Q.    So in your mind do you know specifically

3    whether any of the -- do you have a specific

4    recollection today of a case that Professor Barnett

5    had discussed in your presence where it was alleged

6    that a foot control caused an accident on a press

7    brake?

8        A.    I believe that when I was in my office at

9    Triodyne I probably heard discussions about that

10   but I don't remember the case name, the particulars

11   of the accident, the particulars of the injury,

12   what product was being made on either the press

13   brake or mechanical power press but I remember

14   discussions about those issues.

15       Q.    In conjunction with press brakes?

16       A.    Either/or -- either and/or press brakes or

17   presses, mechanical or hydraulic presses.

18       Q.    Is there a distinction in your mind

19   between evaluating the foot control usage on a

20   power press, mechanical power press versus the use

21   of a foot control on a press brake?

22       MR. ROBINSON:  Object to the form.

23       THE WITNESS:  You mean the press brake involved

24   in this accident or the universe of press brakes?

                                                    27

1    BY MR. HARTMAN:

2        Q.    Well, let's just go universe first.

3        A.    Well, I think it is very difficult to make

4    some kind of profound statement about the universe

5    of press brakes and the universe of mechanical

6    power presses.

7            But if we look at this press brake, if we

8    look at the part that's being made and the process

9    being worked on, this press brake is almost being

10   used as a mechanical power press.

11           It is a small piece that's being worked

12   on.  The employer is not using point-of-operation

13   safeguarding.  There is a hands-in-dyes allowance

14   by this employer that the employee is using.

15           So even though it is a press brake, in

16   many ways it is being used very similar to the

17   production that might be run off of a mechanical

18   power press.  But it is a press brake and probably

19   should be evaluated based on press brake standards

20   and criteria.

21           Now, as far as foot controls, it is my

22   belief that there is nothing in the literature that

23   says a foot pedal of the type that was sold by Heim

24   or was involved in this accident would be

                                                    28

1    inappropriate, unreasonably dangerous, which should

2    be outlawed.

3         And if you look at the philosophy

4    associated with safeguard devices, there is nothing

5    that says a foot pedal would require in this

6    particular case a front door on it or any other

7    kind of inhibiting device on the front of the foot

8    pedal.  So I believe that the foot control that was

9    used on this Heim press was reasonably safe for its

10   reasonably foreseeable use.

11        Q.   What does reasonably foreseeable mean to

12   you?  When you use that term, what does it mean?

13        A.   Well, I think from a general standpoint

14   foreseeability means that there is something that

15   you can predict and have some capability of

16   controlling what you are predicting.

17        So it is foreseeable, for example, that a

18   meteor will strike the earth but you really can't

19   do much about it because you don't know when and

20   where and how big or anything else about it.

21        It is not foreseeable that someone is

22   going to use a coke bottle as an automobile.

23   Certain things it just -- they just don't make

24   sense that one would be used for this kind of

                                                    29

1    thing.  So those are some of the boundaries about

2    foreseeability.

3         I think in this case it is reasonable to

4    expect that parts will be bent and shaped in a

5    press brake.  I think it is reasonable to expect

6    that the employer will provide the dyes and provide

7    safeguarding at the point of operation, that the

8    employer will provide supervision and training for

9    their employees, that they will apply

10   administrative controls to safeguard those people

11   and that if a particular foot switch were needed

12   that had some unique, unusual characteristics to

13   it, that the employer, the people responsible for

14   that production operation would probably be in the

15   best position to make that decision.

16   Q.   What does reasonably foreseeable mean to

17   you when you use that in a report evaluating a

18   product?

19   MR. ROBINSON:  Objection, asked and answered.

20   THE WITNESS:  I think it means where you have

21   some predictability associated with things and you

22   have some ability to control that predictability.

23   BY MR. HARTMAN:

24   Q.   For it to be reasonably foreseeable you

                                                    30

1    need predictability and the ability to control it;

2    am I correct?

3        A.    Or do something about it or modify it,

4    yes, I think so.  You know in a general universal

5    sense, yes.

6        Q.    When evaluating foot control usage with a

7    press brake, would you analyze a foot control usage

8    with a press brake or would you utilize foot

9    control usage with power presses as well in making

10   your analysis?

11       MR. ROBINSON:  Object to your form.

12       THE WITNESS:  Are you talking about me making

13   the analysis?  Who would be making this analysis?

14   BY MR. HARTMAN:

15       Q.    Your analysis.

16       A.    My analysis just as an outside consultant?

17       Q.    Yes -- well, let's talk about as an

18   outside consultant you are retained to analyze the

19   facts and circumstances of this case; am I correct?

20       A.    Yes.

21            I think what I would do if I were asked

22   what kind of foot control should be on a press

23   brake, I would first go look at the codes and

24   standards.  And OSHA and ANSI embrace, allow,

                                                    31

1    endorse, encourage, publish the acceptability of

2    having the foot control as was there as of the time

3    Heim sent it out and was there at the time of the

4    accident.  Those are all considered to be

5    acceptable whether it would be a mechanical power

6    press or a press brake.

7         Then I would go and look at what

8    competitors are doing.  And if you look at the

9    competitive literature, the documentation, articles

10   about foot controls, both the literature and what

11   competitors have been doing and continue to do to

12   this date are to provide foot controls that

13   typically do not have a door on the front.

14        I would then go to the manufacturers of

15   foot controls and look at their catalogs and see if

16   they make any kind of prohibition saying you should

17   only use a foot control with a door on the front

18   here.  You should never use it there.

19        I have done those things.  It seems to me

20   that all of those resources say that the foot

21   control, as it was sold by Heim and at the time

22   this accident occurred, would be considered to be

23   reasonably safe.

24   Q.    Thank you but you haven't answered my

32

1    question, sir.

2        My question is in evaluating the foot

3    control that is to be placed on a press brake, do

4    you analyze the foot controls that are actually

5    with the press brake or would you also look at the

6    foot control's interaction with mechanical power

7    presses?

8        MR. ROBINSON:  Excuse me one second.

9        Objection to the form.  Asked and answered and

10   argumentative.

11       THE WITNESS:  I don't think you were

12   listening --

13   BY MR. HARTMAN:

14       Q.   I listen well.

15       A.   Well, then I maybe need to re-emphasize

16   it.  I said I would look at both.  In fact I would

17   look at all kinds of machinery that have foot

18   controls on them to see if there is some unique,

19   special foot control configuration or feature that

20   would be acceptable.

21       But my basic and primary resource would

22   not be comparing press brakes to mechanical power

23   presses.  It would be looking at what's allowed,

24   what's endorsed, what's encouraged, what's

33

1    approved, what's become the custom and practice.

2    And all of those based on the literature, based on

3    manufacturers would be the kind of foot control in

4    place again when this was sold and at the time of

5    the accident.

6    BY MR. HARTMAN:

7        Q.    In 1978 were any of Heim's competitors

8    providing gated foot controls with their press

9    brakes?

10       A.    I haven't seen any literature that shows

11   that as any kind of standard feature.  I would

12   imagine that in '78 a purchaser of a press brake or

13   any device that used a foot control could have gone

14   to the manufacturers of foot controls and had them

15   configured with front doors, flaps, other switches,

16   other devices on them.  But I don't remember seeing

17   any literature indicating that that was the custom

18   and practice or standard by any manufacturer in

19   this country.

20       Q.    Well, as -- do you consider yourself a

21   safety engineer in evaluating machine products?

22       A.    Yes.

23       Q.    Okay.  As a safety engineer would you

24   agree that notwithstanding the custom and practice

34

1    and what the codes permit, if you have a way that

2    will protect an operator of a machine, you should

3    incorporate that method?

4        MR. ROBINSON:  Let me object to the form of the

5    question, specifically the breadth.

6        THE WITNESS:  Yeah, I don't understand what you

7    mean.

8    BY MR. HARTMAN:

9        Q.   You don't understand the question that if

10   as a safety engineer notwithstanding the fact that

11   the machine complies with the applicable codes --

12       A.   Uh-huh.

13       Q.   -- and that it is built in line with the

14   custom and practice of other machine

15   manufacturers --

16       A.   Uh-huh.

17       Q.   -- that if you knew of a safety device

18   that would protect operators, would you include

19   that safety device on a machine?

20       MR. ROBINSON:  Same objection.

21       THE WITNESS:  I would say, no, and I need to

22   explain that.

23       I mean the example would be automobiles.  I use

24   that as an example.  There are automobiles that

35

1    have every safety feature and device on it that

2    cost upward of 50, $60,000.  There are cars that

3    are sold in this country that cost $15,000 that

4    don't have all of those features.

5        The $15,000 car with not every safety feature,

6    whistle and bell on it is considered to be

7    reasonably safe.  And I as a safety engineer

8    working for an automobile company would not say you

9    have to make every new car with every advanced

10   safety feature possible on it.  That would be

11   unreasonable, traditionally not what's done.

12       And actually, if you look at some of the safety

13   philosophy out there, there are three things that a

14   design has to be.  It has to be functional.  It has

15   to be reasonably safe, and it has to have a

16   component of cost associated with it that comes out

17   of the welfare of society.  So it would actually be

18   a violation of the code of ethics to mandate that

19   every possible safety feature be put on every

20   machine or every product out there.

21   BY MR. HARTMAN:

22       Q.   Would -- in your analysis would you

23   evaluate the cost of the safety feature in

24   conjunction with the cost of the machine to make a

36

1    determination as to whether or not you would

2    include that safety feature?

3        A.    You would look at -- the very first things

4    you would look at would be the codes and standards

5    and criteria there are.  If there were no such

6    things and you were in a void, it is a brand new

7    product, as a designer you would look at the

8    functionality.  You would look at the reasonable

9    safetiness of the product, and you would look at a

10   cost component that comes out of the idea of

11   welfare.  So you wouldn't look at the cost

12   exclusively by itself.

13           So, for example, on this machine there is

14   a well-documented accident scenario that occurs on

15   all equipment that uses foot controls of people

16   riding the pedal and putting a door on a front flap

17   or a door on these foot controls encourages people

18   to ride the pedal.

19           So, again, going back to these three basic

20   tenets of design, adding that door causes a new

21   hazard, a new accident scenario that may be reason

22   to disqualify using it.

23       Q.    Have you written any articles that discuss

24   the issue of the gated foot control increasing the

                                                    37

1    probability or likelihood of riding the pedal?

2        A.    I don't know that I ever have.

3        Q.    What articles have you read that discuss

4    that phenomenon?

5        A.    There are some OSHA articles.  There is an

6    article by a guy from NIOSH, Etherton.  I think is

7    his name.

8        Q.    Would you tell me the name of that

9    article, please?

10       A.    Sure.  It is called Machine-Cycling Errors

11   With Foot Switches and Repetitive Tasks.

12       Q.    Do you have that article with you?

13       A.    Sure, I have an abstract and the entire

14   article.

15       Q.    I would like to mark that as Exhibit 1,

16   please.

17       A.    They are not stapled together.  Do you

18   want them as one?

19       Q.    The abstract and the article, we will call

20   them both one.

21       A.    Do you have a stapler or something so they

22   won't walk away from each other?

23             And that concept of riding the pedal is

24   discussed in, I believe, National Safety Council

                                                      38

1    publications, OSHA publications, other publications

2    about the use of foot controls of this type with a

3    flap on the front.

4        Q.    Do you consider the OSHA publications that

5    discuss riding the pedal to be authoritative?

6        MR. ROBINSON:  Object to the form of the

7    question.

8        THE WITNESS:  I have been involved in safety

9    enough and have taken courses in epidemiology, for

10    example, that what you generally should not do is

11    just look at one unique article all by itself and

12    base everything on that one article.

13        Typically you look at the community of

14    articles, the community of standards, how long they

15    have been around, those kinds of things; and they

16    become more powerful.  Certainly if there is only

17    one article, there is only one test that's ever

18    been performed and that's what you are stuck with,

19    then it winds up that's the only thing you have.

20        In this case I think the body of literature

21    supports the concept that foot controls that have

22    doors on the front or flaps on the front, that they

23    inhibit or make it more difficult to get the people

24    to get their foot in and out and because of that

39

1    typically once they get their foot in, they leave

2    it in.

3        Especially if it is a process where there is a

4    repeated need to cycle the piece of equipment

5    whether it is a saw, a press or press brake,

6    mechanical press or press brake.  And that is okay

7    if there is adequate and complete

8    point-of-operation safeguarding or if there is kind

9    of a Hands Out of Dye philosophy that can be

10    enforced and embraced and supervised and

11    maintained.

12        But quite often there appears to be a series of

13    accident scenarios where people are riding the foot

14    pedal and because of that they inadvertently

15    actuate it at the wrong time and either cause

16    damage to the machine, the dye or to themselves.

17    BY MR. HARTMAN:

18        Q.    Are you aware of any article that

19    specifically discusses the ease of access to the

20    foot pedal as being a contributing factor to riding

21    the pedal?

22        A.    Well, I think among these they talk about

23    that.  I don't know if they say it as clearly as

24    that.  That's the implication to me.

                                                    40

1           I think one of the ones that talks about

2    that most pointedly in this case happens to come

3    from a Triodyne safety brief where they talk about

4    these foot pedals having the doors, that one of the

5    accident scenarios associated with that is the

6    operator riding the pedal.

7           But I believe some of these other articles

8    if they don't come out and say it that pointedly,

9    I mean it is the obvious conclusion that that's

10   what they are saying.

11        Q.    Obvious to who?

12        A.    Obvious to anyone who is trained and

13   experienced on safety and reading technical

14   articles.

15        Q.    So it is obvious to you?

16        MR. ROBINSON:  Object to the form,

17   argumentative.  You just ignored his answer.

18        THE WITNESS:  I think it is obvious to me.

19   I think it is obvious to any safety practitioner.

20   I think it is obvious to anyone who's been around

21   this kind of equipment.

22        I used to work in the automobile industry and

23   would go to plants where they would use presses and

24   press brakes and other devices that used foot

                                                    41

1    controls.  And I have seen people where there is a

2    flap on the front riding the pedal.

3        It just -- it was obvious to me that part of

4    the reason is the need to get in and out is --

5    would be -- if you took your foot out each time, it

6    would be so often that it would cut down on your

7    productivity and probably cause some kind of

8    fatigue or maybe even illness with your foot doing

9    that repeatedly or problem with your foot.

10   BY MR. HARTMAN:

11       Q.   What type of gated foot control did you

12   see in these plants?

13       A.   Typically the kind we have been talking

14   about here, a foot control of about the same

15   geometry, about the same design, just with a flap

16   on the front.

17       Q.   Well, is there a difference between the

18   mouse trap flap and the top level swivel flap?

19       MR. ROBINSON:  Object to the form of the

20   question.

21       THE WITNESS:  Well, the fact that you say --

22   that you said one is this and one is that, yes,

23   there is a difference.  But as far as it inhibiting

24   your ability to get your foot in there and being an

                                                    42

1    incentive for someone to ride it, no, I don't think

2    there is a difference.

3    BY MR. HARTMAN:

4        Q.    Is there a difference in the ease by which

5    you can defeat the gate on the foot control between

6    a bottom-hinged foot control and a top-hinged foot

7    control?

8        A.    No, you can usually defeat it by putting a

9    piece of wood or a piece of tape or anything else

10   like that in either case.

11       Q.    Would you agree that if you defeat the

12   foot -- the gate part of the foot control that you

13   are basically using the foot control in a manner

14   that it is not intended?

15       MR. ROBINSON:  Object to the form of the

16   question.

17       THE WITNESS:  Well, you are using the foot

18   control, the foot control feature in the way it was

19   intended.  You are just not using this device that

20   in some ways inhibits your foot, under many cases

21   inhibits your foot going into it.  But I think if

22   someone had designed safety based on that, then you

23   would be avoiding that.

24       But a lot of times these foot controls are

                                                    43

1    chosen just because they are available from the

2    parts room.  They may have been -- a lot of these

3    foot controls have a universal feature where they

4    can be moved from machine to machine to machine.

5    So if that particular foot control is broken, they

6    may go to the parts crib and get another foot

7    control that's on a shelf that does or doesn't have

8    a front door on it.

9    BY MR. HARTMAN:

10       Q.   I understand that but if it has a gated

11   foot control -- if it is a gated foot control, the

12   manufacturer intends for the gate to be utilized;

13   am I correct?

14       MR. ROBINSON:  I will object to the form of

15   that question.

16       THE WITNESS:  If it is gated they intended

17   there to be a gate there.  Whether it is to be

18   utilized is really the responsibility of the people

19   responsible for the workplace, typically the

20   employer.  They know for this worker, for this task

21   that it is important that that foot control be

22   open, be guarded, be big, be small, be in a certain

23   location, be anchored, be movable.

24       It is their responsibility to make those

                                                    44

1    choices, to select what they think is appropriate

2    for their work environment, to anchor them or not

3    anchor them, to make them function one way or

4    another way.  That's their responsibility.

5    BY MR. HARTMAN:

6        Q.   Am I correct that Linemaster does not make

7    recommendations as to what foot control should be

8    purchased from it to manufacturers of press brakes?

9        MR. ROBINSON:  Object to the form.

10       THE WITNESS:  Yes, I believe that's correct.

11   And I believe that's because there is no government

12   requirement.  There is no ANSI requirement.  There

13   has been no research.  There has been no custom and

14   practice establishing that a particular foot

15   control is better or superior whether it is for a

16   press brake or a mechanical power press.

17   BY MR. HARTMAN:

18       Q.   But Linemaster does not recommend foot

19   controls to its customers; am I correct?

20       A.   They do not recommend -- they have a line

21   of foot controls.  They do not say a power press

22   should only use this kind of foot control and not

23   that kind of foot control whether it is a press

24   brake or a power press or a table saw or any kind

                                                    45