# EXHIBIT F

# PART 2

1    of equipment.

2          They just sell foot controls.  And they

3    have not found that there is any reason for them to

4    specify that one is superior and one is inferior

5    for the application of a power press or the

6    application of a press brake.

7    BY MR. HARTMAN:

8      Q.   My question, sir, is, am I correct that

9    Linemaster does not make recommendations as to what

10   foot controls its customers should buy to utilize

11   on their product?

12     MR. ROBINSON:  Objection, that was asked and

13   answered twice.  This is now the third time.  You

14   apparently don't like the answer which has been

15   given.

16     THE WITNESS:  They don't and I believe the

17   reason is because there is no superior or inferior

18   application.

19   BY MR. HARTMAN:

20     Q.   Have you ever spoke to Linemaster for them

21   to have told you the reason why they don't

22   recommend foot controls?

23     A.   They do recommend foot controls.  They

24   just don't recommend a particular configuration.

                                              46

1    I have not called them up and asked them

2    specifically but it is obvious that they have no

3    prohibition in their books.  And if they, as a

4    manufacturer of this component, felt it was

5    critical or essential or important, I would have

6    expected that they would have made that part of

7    their brochures, part of their sales catalog, part

8    of their literature.

9          And I have looked at Linemaster catalogs,

10   and I have never seen any limitation about applying

11   this foot control that was either sold at the

12   time -- sold by Heim or installed at the time of

13   the accident or one with a front door on it.  They

14   have no prohibitions, limitations, suggestions or

15   recommendations.  So in my mind they are all

16   probably equally good.  They have some upsides and

17   some downsides.

18       Q.    All what are equally good?

19       A.    All of those two categories of foot

20   controls, those that do have a front door on it and

21   those that do not.

22       Q.    When you evaluate a press brake such as in

23   this case, do you in formulating your opinion as to

24   the foot brake -- strike that.

                                                    47

1          In evaluating the press brake in this case

2     and the use of the foot control that we allege

3     caused the accident to Ms. Lindquist, do you rely

4     upon the ANSI standard to make a determination as

5     to whether or not the foot control made the press

6     brake defective?

7          MR. ROBINSON:  Objection to the form, also

8     asked and answered.

9          THE WITNESS:  What I would do is rely on the

10    OSHA criteria first.  The OSHA criteria says that

11    all points of operation should be safeguarded.

12    They also embrace the ANSI standard.  The ANSI

13    standards say that these kinds of locations for a

14    part as the plaintiff was working on should have

15    safeguarding.

16         The safeguarding is not the control, the

17    actuating device.  It is not the foot control in

18    this case.  The foot control is not the

19    safeguarding device.  It is supposed to have a

20    point-of-operation safeguarding device which

21    traditionally in press brakes have been probably

22    light curtains and things like those.  But it could

23    also be physical barrier guards especially in a

24    part like she was making, a small part.

48

1        And you also, I would look at the concept of

2    both the manufacturer of this equipment and the

3    concept that was part of OSHA for a while and is a

4    regulation and a part of OSHA and ANSI now as a

5    recommended guideline that people not, if possible,

6    not put their hand into the point of operation.

7        There are lots of tools, mechanical tools that

8    could have been used for the -- apparently for the

9    operation she was undertaking which would have

10   again avoided this hazard, her exposure to this

11   hazard.  So that's what I would have looked to

12   first.  But I wouldn't have looked to the ANSI

13   standards all by themselves in a void.

14   BY MR. HARTMAN:

15       Q.   Well, assume for me, will you please, that

16   the foot control did not meet the ANSI standard

17   that was supplied with the press brake.

18       A.   In what way?

19       Q.   That it was an uncovered foot control.

20       A.   But it was covered.

21       Q.   I am asking you to assume for me as true

22   that it was an uncovered foot control.

23       A.   You mean there was no top cover--

24       Q.   No top cover, no side.

49

1      A.    Okay.

2      Q.    And it was supplied with the press brake

3    that Ms. Lindquist's injuries occurred on?

4      A.    Uh-huh.

5      Q.    Would you agree, sir, that supplying that

6    foot control with that machine would make the

7    machine defective?

8      MR. ROBINSON:    Object to the form of the

9    question.

10     THE WITNESS:    I think if that device was

11   provided and there was proper point-of-operation

12   safeguarding or there was some administrative

13   controls that could be enforced and utilized to

14   prevent hands being in dyes, that it probably would

15   be acceptable not to have the shielding at the top

16   and side shielding.

17     But ANSI appears to have endorsed top and side

18   shielding for foot controls and probably a strict

19   interpretation of just what's written in the ANSI

20   standard would imply that it would have to have a

21   top and side shielding, not front shielding in any

22   way.

23     But I can envision configurations where even

24   though it wouldn't comply with that component of

                                                    50

1    ANSI, the machine would probably still be

2    reasonably safe because of the point-of-operation

3    safeguarding.

4    BY MR. HARTMAN:

5        Q.    Would it be reasonably safe for a

6    manufacturer to include a unguarded foot control

7    with a press brake without knowing the type of

8    safety mechanisms that are going to be attached to

9    the machine once it leaves its possession?

10        MR. ROBINSON:  Objection to the form.

11        THE WITNESS:  My recommendation back in the

12    '70s and even today would be that you should, if

13    you are going to provide a foot control for a

14    machine of this type, that it have side guarding

15    and top guarding.

16    BY MR. HARTMAN:

17        Q.    Would you agree, sir, that if it did not

18    have top or side guarding it would make a press

19    brake dangerous in certain circumstances?

20        MR. ROBINSON:  Objection to the form, also

21    asked and answered.

22        THE WITNESS:  It could in certain

23    circumstances.

24

51

1   BY MR. HARTMAN:

2       Q.   And it would be unreasonably dangerous in

3   certain circumstances; am I correct?

4       A.   In certain circumstances, that's correct.

5       Q.   And that would be certain circumstances

6   that are foreseeable to the manufacturer; am

7   I correct?

8       MR. ROBINSON:  Objection to the form.  It is

9   speculative as well.

10      THE WITNESS:  In certain circumstances it might

11  be foreseeable to the manufacturer, yes.

12  BY MR. HARTMAN:

13      Q.   You indicate that ANSI embraces, allows,

14  encourages and endorses shielded foot controls; am

15  I correct?

16      A.   Uh-huh.

17      Q.   Would you also agree that any foot control

18  that has a shield on it regardless of whether it

19  has a gate or not would be embraced, allowed,

20  encouraged or endorsed by ANSI?

21      MR. ROBINSON:  Object to the form.

22      THE WITNESS:  Could you say that question back?

23  Any foot control?

24

52

1   BY MR. HARTMAN:

2       Q.   Yes, that has a shield on it regardless of

3   whether it has a gate on it or an anti-trip latch

4   in the back?

5       A.   Well, no, it should have control

6   reliability.  It should be within a force and

7   functional range of human use.  I think they would

8   endorse the kind of foot control that was sold with

9   this machine by Heim and the kind that would have

10  been there at the time of this accident.

11          But I can envision a foot control that has

12  a top shield and a side shield that's made out of

13  cardboard that wouldn't be acceptable or one that's

14  made out of the best metals so it could never be

15  compromised but it has no control reliability or

16  one that the force is so high or the movement is so

17  strange, it would cause some kind of problem for

18  the operator.

19      Q.   That's a fair distinction.  I apologize.

20  I did not make -- my thought process did not

21  include those types of scenarios.

22          Would you agree that a Linemaster 511 with

23  a gate would be an -- a foot control that would be

24  embraced, allowed, encouraged or endorsed by ANSI

53

1    for use on press brakes?

2        MR. ROBINSON:  Objection to the form.

3        THE WITNESS:  I don't think it would be

4    disallowed but it is not the one that's promoted by

5    them.  It is not the one that they in their

6    literature that they depict.  It is not the one

7    that's generally sold.  It is not the one that OSHA

8    has in their on their website and their publication

9    showing this is an appropriate foot switch.

10       They would not eliminate one with a door on the

11   front nor would they eliminate one that would

12   necessarily have red, white and blue stripes on it.

13       It is ultimately the responsibility of the

14   employer for the safety; and if the employer

15   chooses one where there is a foot switch inside a

16   foot switch inside a box, that's their

17   responsibility.  But if an OSHA inspector comes out

18   and inspects them and finds out that that renders

19   the machine unreasonably dangerous, they will

20   probably get a citation.

21       So they -- what I said before is is the foot

22   switch as sold by Heim and/or the foot switch there

23   at the time of the accident is visually the one

24   that's shown in the OSHA and ANSI standards and in

                                                    54

1    other National Safety Council publications as being

2    acceptable and promoted.  But certainly you could

3    put other kinds of devices on if you want.

4    BY MR. HARTMAN:

5        Q.    Would you agree that a gated -- a

6    Linemaster 511 that was gated if provided by Heim

7    with this machine would have been embraced,

8    allowed, encouraged or endorsed by ANSI?

9        MR. ROBINSON:  Objection, you just asked that

10   and he just gave you a lengthy answer on it and now

11   you apparently want him to give a different answer.

12       THE WITNESS:  You said if it would be.  You

13   mean would they allow it?

14   BY MR. HARTMAN:

15       Q.    Yes.

16       A.    I don't think they would disqualify it but

17   it is not the one that they promote as far as being

18   the one that's described and shown in their

19   literature.

20       Q.    Well, are you -- is it your testimony

21   today that ANSI promotes only the type of foot

22   cover that's shown in the illustration with the

23   standard?

24       A.    No, I am not saying that.  What I am

55

1    saying is if you have got a product line and you

2    say, here is a good example, that's the one you are

3    promoting.  Certainly you have all of these other

4    kinds of configurations but this is the one that's

5    considered to be a prime, good example.

6            There may be reasons not to use a foot

7    pedal with a gate on it, on the front, and one of

8    those reasons is people riding the pedal.  So that

9    may be one of the reasons that they don't use it as

10   their prime example in many of their publications.

11           But you can and they do manufacture them

12   with lip latches.  They manufacture them with doors

13   on the front.  They manufacture them with a lot of

14   other features, coloration, size, extra width,

15   those kinds of things, additional resistance to

16   moisture, odd environments, shielding from EMI, all

17   of those kinds of things.

18           But the one that was sold by Heim, the one

19   that was there at the time of the accident is the

20   one that is demonstrated in their literature as

21   being acceptable.

22   Q.    Would a Linemaster 511 with a gated --

23   that was gated comply with the ANSI standard as it

24   relates to press brakes?

                                                        56

1        MR. ROBINSON:  Objection, asked and answered

2    again.

3        THE WITNESS:  Yes, it would.

4    BY MR. HARTMAN:

5        Q.   Would a Linemaster 511 that was ungated

6    comply with the ANSI standard?

7        A.   Yes, it would.

8        Q.   Is there a difference in the likelihood of

9    an operator riding the pedal -- is there a

10   difference between a press brake and a power press

11   as to the likelihood an operator would ride the

12   pedal of the foot control?

13       A.   You mean a mechanical power press,

14   correct?

15       MR. ROBINSON:  Object to the form.

16   BY MR. HARTMAN:

17       Q.   Yes.

18       A.   And I think --

19       Q.   Let me tell you what I am trying to get to

20   so that -- what I am wondering is if you are

21   operating a mechanical power press, is the operator

22   more likely to ride the pedal of the foot control

23   when operating a mechanical power press or is an

24   operator more likely to ride the foot control when

                                                      57

1    operating a press brake?

2       MR. ROBINSON:  Objection to the form.  It also

3    makes assumptions.

4       THE WITNESS:  There is nothing in the

5    literature, whether it is the codes or standards or

6    the general literature or investigations or Ralph

7    Barnett's publication -- and he published a fair

8    amount about foot controls -- that says that press

9    brakes are -- people are more or less likely to

10   ride the pedal compared to mechanical power

11   presses.

12      I think the key factor in people riding a pedal

13   is that it is in a manual mode and that if there is

14   a very long lag time between operations, in other

15   words, someone makes a -- does some process with a

16   device and, for example, walks away and comes back,

17   they certainly cannot ride the pedal because they

18   are physically gone.

19      But if we look specifically for this case, this

20   mechanical -- this press brake has a cycle speed of

21   30 cycles per minute.  So effectively if you -- if

22   you were making the right kind of part, every two

23   seconds you could be hitting the foot control if it

24   is in manual operation.  And certainly you might

                                              58

1    want to ride the pedal when you are doing that.

2        A mechanical power press, there are a lot of

3    production runs where there is long lag times

4    between pieces and you might not want to run --

5    keep your foot in there and ride the pedal.  So

6    there isn't a mandate one way or the other.

7        And if anyone tries to tell that you there is,

8    they are absolutely wrong; and there is no basis

9    for saying that.

10       And I brought literature with me here today

11   that shows the press -- the rate, the cycling rate

12   or the times per cycle for press brakes and

13   particularly this press brake compared to

14   mechanical power presses way overlap.  It depends

15   on the operation --

16   BY MR. HARTMAN:

17       Q.   What literature was that?

18       MR. ROBINSON:  Were you finished, Dr. Hutter?

19       THE WITNESS:  No, I wasn't.

20       It way overlaps and it more depends on the part

21   that's being made and the dynamics of the

22   equipment.  And again for this press, this press

23   brake, it is intended to be run at a fairly high

24   cycle rate or strokes per minute.

59

1          The two things I brought were from the

2     fabricator, from their website, Press Brake Buyer's

3     Guide, which lists, oh, a dozen or more

4     manufacturers and then within each manufacturer

5     many different kinds of models.  And it tells you

6     effectively the speeds of operation.

7          And then from --

8          MR. HARTMAN:  Can we mark that as Exhibit

9     No. 2, please?

10         THE WITNESS:  You know, Exhibit No. 1, I guess

11    was never really, a stamp was never really put on

12    it.  Should we do that now?

13         MR. HARTMAN:  Yeah, we should do that.

14         THE WITNESS:  Or I may be be wrong but maybe it

15    was but --

16                    (Whereupon, HUTTER Deposition

17                    Exhibit No. 1 and 2 were marked

18                    for identification.)

19         THE WITNESS:  Some of these are my originals,

20    so if you want copies attached to my deposition,

21    I guess at the end of this deposition, make copies

22    and give me the original or the copies.

23         MR. ROBINSON:  That's how we have been doing

24    it.  You keep your -- I would like you to keep your

                                                          60

```
 1    originals, and we will keep copies.

 2    BY MR. HARTMAN:

 3        Q.    Have we marked Exhibit No. 3?

 4        A.    No.

 5              No. 3 is a listing from the journal called

 6    Stamping.  And it is mechanical presses and again

 7    lists several, over a dozen manufacturers and

 8    within each manufacturer several different models

 9    and again gives the speeds.  And if you look at

10    them, the cycle time or the cycles per second or

11    the interval between part production well overlap

12    those for press brakes.  So there is no standard

13    where you can say this machine always works slow

14    and this machine always goes fast.

15                          (Whereupon, HUTTER Deposition

16                          Exhibit No. 3 was marked for

17                          identification.)

18    THE WITNESS:  And as long as we are --

19    MR. HARTMAN:  Hold on one second just while she

20    is putting the mark on.

21    THE WITNESS:  And as long as we are on the

22    subject, there was -- because I heard that

23    Professor Barnett had taken this position, I went

24    on the Internet and found a document or an article
```

61

1    that says How Fast is Fast and they talk about

2    different speeds for presses, for example.  And

3    they talk about presses that have 50 strokes a

4    minute, 120 stroke per minute, 15 strokes a minute

5    and some that go as high as 500 to 1200 strokes a

6    minute.

7        So there isn't a standard rate that you can say

8    that all mechanical presses operate at and there

9    isn't some standard rate press brakes work at.  But

10   if you look at this particular press brake --

11   BY MR. HARTMAN:

12       Q.   Is that marked as an exhibit?

13       A.   Not yet.

14       MR. HARTMAN:  Let's have that marked as a

15   number.  Do we have 3?  Let's have that marked as

16   No. 4, please.

17       THE WITNESS:  If you looked at this particular

18   press brake, again, the cycle time is about two

19   seconds.  I could see if someone wanted to make a

20   part every two seconds, they would probably leave

21   their foot in the -- on the pedal to do that.

22                    (Whereupon, HUTTER Deposition

23                     Exhibit No. 4 was marked for

24                     identification.)

                                                    62

1    BY MR. HARTMAN:

2        Q.    Have you relied upon Exhibits 2, 3 and 4

3    to formulate your opinions in this case?

4        A.    I don't know that I have relied on them.

5    I knew these numbers or these ranges before but

6    I figured you would say, well, where are you coming

7    up with that.  And I just picked three articles to

8    demonstrate that.  You can go on the web and get

9    from particular manufacturers -- and I have looked

10   at these, I just didn't print them all out -- the

11   cycle times for their press brakes, the cycle times

12   for their mechanical power presses and the cycle

13   times in strokes per second widely overlap.

14         So I don't know if you would call it

15   relying on it.  I just used these as examples.

16       Q.    Is it your contention that the information

17   contained in Exhibits 2, 3 and 4 is accurate?

18       A.    I believe it is accurate to demonstrate

19   the phenomenon I am talking about, yeah, or

20   sufficiently accurate.

21       Q.    Would I be correct that the information

22   contained in 2, 3 and 4 is information that

23   illustrates your opinion that there is an overlap

24   between press brake and mechanical power press

63

1    speeds?

2        A.    Yes, it is not an exhaustive demonstration

3    of that but since this is just a new theory that

4    surfaced in the last few days here, I thought

5    I would go online and find examples to contradict

6    that.

7        Q.    When did you go online?

8        A.    For these articles?

9        Q.    Yes.

10       A.    I was looking to see if they have a date

11   on them.  This one looks like it has a date of

12   4/10.  Today is the 12th.  So that would have been

13   Monday.

14            Another one, this article has a date of --

15   at least the abstract has a date of 4/11.  I think

16   the article was actually bought probably over the

17   weekend.  So it has been -- I believe they were at

18   the time or since the time of Ralph Barnett's

19   deposition.

20       Q.    Who did you speak with in order to

21   determine the substance of Professor Barnett's

22   deposition?

23       A.    Mostly to the attorney but when

24   Mr. Switalski got back to the office, I did ask

                                              64

1    him, because he had met with Mr. Robinson I believe

2    the night before his deposition -- I am not certain

3    exactly if that's correct but I think he did -- and

4    I think he relayed to me that Ralph Barnett had

5    taken these new and unusual positions that weren't

6    detailed in his report and had acknowledged that

7    there were some errors in his report, acknowledged

8    that even though he has taken these positions, he

9    has never published anything about it, never made

10   mention of it before.

11        Q.    So who did you talk to in order to

12   determine what Professor Barnett had said prior to

13   7:00 o'clock this morning?

14        A.    The only two people I talked to with any

15   meaningful content about Professor Barnett's

16   deposition was a brief conversation with Bill

17   Switalski and a brief conversation with the

18   Attorney Robinson.

19        Q.    And Mr. Robinson would be this morning?

20        A.    Yes.

21        Q.    And Mr. Switalski would have been last

22   week?

23        A.    I think it was the day of his deposition.

24        Q.    Are you familiar with the Triodyne safety

65

1    briefs that Mr. Switalski testified to?

2        A.    I am not -- I haven't read his deposition,

3    so I am not certain which ones he testified to

4    specifically.    I referred to several of them in my

5    report.    And I think I probably looked at all of

6    the ones that Mr. Switalski looked at.    But

7    I didn't do a one-for-one comparison.

8        Q.    Have you co-authored any of the articles

9    with Professor Barnett?

10        A.    In the safety brief?

11        Q.    Yes.

12        A.    I have authored articles that have been

13    set out under the banner of the safety brief for

14    related publications but the only one I think where

15    I was a co-author with Ralph Barnett was one having

16    to do with meat grinder safety, meat grinder throat

17    safety.

18            But I wasn't a co-author to any of the

19    ones having to do with his -- there is two or three

20    that talk about foot pedals, foot controls and

21    there are three or four that talk about different

22    safety philosophies that I believe those

23    philosophies are now being violated by his position

24    in this case.

66

1        Q.   Do you agree with Professor Barnett's

2    safety philosophies as outlined in his articles?

3        MR. ROBINSON:   I object to the form and the

4    breadth of that question.

5        THE WITNESS:   That's like saying do you believe

6    in all of the state laws.   I haven't read each and

7    every word of everything he has written especially

8    in the last few years since I have been out of

9    there.   But I am familiar with his publishing on

10   things like the safety hierarchy, compatibility

11   kinds of things.

12       He has a flow chart that would help you

13   identify based on a classification of safeguarding

14   devices whether or not they should or should not be

15   used; and if you follow that procedure, that

16   protocol that he promoted, you would not use the

17   foot control that he is now promoting, this foot

18   control with a guard on the front.

19       So in response to your question, I have read

20   many of the things.   I don't know that I believe in

21   all of them.   Some of them I think rang true, some

22   of them I think are perhaps pretentious and are

23   more philosophical than factual.

24

67

1    BY MR. HARTMAN:

2        Q.   Well, let's talk about with regard to the

3    safety feature flow chart.

4        A.   Uh-huh.

5        Q.   Do you agree that that flow chart is a

6    good chart to utilize in analyzing whether or not a

7    safety feature should be included or excluded on a

8    product?

9        MR. ROBINSON:  Objection to the form.

10       THE WITNESS:  You know, good, sharp, good

11   philosophy.  It is a philosophy.  I don't know that

12   it is a superlative philosophy but it is a

13   philosophy that Ralph Barnett has embraced,

14   promoted and continues to promote except in this

15   case.

16       I think it has some weaknesses and some

17   strengths in it, and I can understand the basis of

18   it.  But I think if the result of that philosophy

19   applied here, it would be contrary to the positions

20   he is taking here.

21   BY MR. HARTMAN:

22       Q.   Is it a means that you would utilize in

23   making a determination as to whether or not a

24   safety feature should be included with a particular

68

1    product?

2        MR. ROBINSON:  Objection to the form.  Excuse

3    me.

4        THE WITNESS:  It might be included in the means

5    but I don't think it would be a stand-alone means.

6    BY MR. HARTMAN:

7        Q.   So is it your testimony -- is your

8    testimony geared more towards Professor Barnett did

9    not follow his own flow chart or you disagree with

10   the flow chart?

11       MR. ROBINSON:  I will object to the form of the

12   question.

13       THE WITNESS:  That he is at total odds to his

14   own safety philosophy as defined by that article

15   and as visually displayed in that flow chart.  It

16   is -- if you would follow his flow chart and the

17   rationale behind it and protocol behind it, you

18   would come to the conclusion that this foot control

19   with a front gate on it should not be applied to

20   this press, this press brake by the manufacturer of

21   the press brake.

22   BY MR. HARTMAN:

23       Q.   Do you -- my problem is I am not sure that

24   you are not relying upon the flow chart to say that

                                                      69

1    the foot control should not be included with the

2    press brake.  Are you relying upon the flow chart

3    as part of the decision-making process to conclude

4    that a gated foot control should not be included on

5    this press brake?

6        MR. ROBINSON:  Objection to the form.

7        THE WITNESS:  You asked me before would I rely

8    on it, and I said to some degree I would.  There

9    are probably other things that should be taken into

10   account that are not addressed here.

11   BY MR. HARTMAN:

12       Q.   Would you tell me what those are?

13       A.   It is not an exhaustive chart.  It is not

14   an exhaustive protocol.  But it is a protocol that

15   he feels he created that he has published and that

16   he promotes.  And if you were to follow that

17   protocol, you would come to the conclusion that the

18   foot control as sold by Heim or as there at the

19   time of the accident would be proper and in fact a

20   foot control with a door on the front would be

21   inappropriate for Heim to have provided.

22            Now, was there another question?

23       Q.   Yeah, my question is you said it would be

24   something that you would be -- the flow chart is

                                                      70

1    something that you would use in conjunction with

2    other things in order to make a determination as to

3    whether or not a gated foot control should be

4    placed on the Heim press brake.  Would you please

5    tell me what those other things are?

6        A.    Well, I haven't made an exhaustive list of

7    what all those other things would be but a couple

8    of things pop into my mind.

9            First of all, I believe that flow chart

10    makes the assumption that employers are doing

11    reasonable things as far as training their people,

12    as far as supervising their people, as far as

13    complying with codes and standards.

14            I think it assumes that there isn't some

15    bizarre, unusual work pattern or practices going

16    on.  I think it assumes that the work force is

17    reasonable in communicating with their supervisors

18    and people in charge, there is not a language

19    problem, a language barrier.

20            Those kinds of things are not really

21    addressed in it.  I think there are maybe perhaps

22    some assumptions.  And there are probably other

23    things but I just haven't -- before I came to this

24    deposition, I didn't try to think of all of the

71

1    faults or failings or short ends in that chart.

2    But if you follow that chart, again, you would come

3    to the conclusion that a foot pedal with a door on

4    it should not be provided by Heim.

5        Q.   So your utilization of the chart in your

6    report is directed to the fact that from your

7    opinion Professor Barnett did not follow the chart

8    to reach his conclusions?

9        MR. ROBINSON:   I will object to the form of the

10    question.

11        THE WITNESS:   That's correct.  He promotes this

12    chart.  This is his philosophy.  That is what he

13    embraces.  And for some reason on this particular

14    case he has ignored it, hasn't talked about it in

15    his report.  And if you were to go through that

16    protocol, you would very obviously come to the

17    conclusion that you should not put a foot control

18    with a door on it on this machine as provided by

19    Heim.

20    BY MR. HARTMAN:

21        Q.   My question, sir, is really, yes or no.

22    And my question is, so your testimony and your

23    report where you incorporate the flow chart is

24    geared towards saying Professor Barnett did not

72

1    apply the flow chart to his analysis correctly; is

2    that a correct statement?

3        MR. ROBINSON:  Objection to the form, asked and

4    answered.  And this witness never has to give a

5    yes-or-no answer if that would be ambiguous and

6    unclear to someone that read this transcript later

7    on and has every right to explain any yes-or-no

8    answer and for you to suggest otherwise is wrong.

9    BY MR. HARTMAN:

10       Q.   Go ahead, sir.

11       A.   I will try to answer the best I can.  He

12   never applies that.  He never in his report

13   mentions that protocol.  He never uses it in his

14   analysis.  It is never brought out.  He never

15   explains why there might be a reasonable

16   inconsistency.

17           He ignores it because in my reading of it

18   and his testimony are that they are incompatible

19   one with another, and I said that in my report.

20   That philosophy that he has written and promoted is

21   incompatible with his position that there should be

22   a front gate on this device.

23       Q.   Did you use that flow chart in order to

24   arrive at your opinion that the gated foot control

                                                    73

1    was not necessary for this press brake?

2        MR. ROBINSON:  Objection to the form, asked and

3    answered.

4        THE WITNESS:  No, I came to that conclusion

5    based on all of these other things but if you do

6    use that, you will also come to that conclusion.

7    But I didn't use it for that purpose.

8    BY MR. HARTMAN:

9        Q.   Am I correct that Mr. Switalski was

10    brought in because he is more familiar with the

11    articles written by Professor Barnett than you are?

12        MR. ROBINSON:  Objection to the form of that

13    question.

14        THE WITNESS:  That's probably a question you

15    should really ask the person who retained him.

16    I believe somewhere in the development of my

17    involvement in this case I was asked, do you know

18    other people who are familiar with Ralph Barnett's

19    publications, his safety philosophy, the positions

20    he has taken in prior cases.

21        And I said, you know, I know two guys who used

22    to work for him, who worked very closely for him

23    who were his project engineers on some occasions

24    and maybe they could help you.  And I think

74

1    I mentioned two individuals and Bill Switalski was

2    one of those people.

3    BY MR. HARTMAN:

4        Q.    Have you ever testified that any of

5    Professor Barnett's articles were authoritative?

6        A.    I try not to say that any stand-alone

7    document is authoritative.  Sometimes you can't do

8    that.  I think most of the things that Ralph

9    Barnett has published are taking bits and pieces of

10   what a lot of other people have done and put them

11   together in a nice package.

12            So I may have used them as examples that

13   simply explain, for example, the safety hierarchy.

14   But the safety hierarchy isn't something that he

15   actually developed.  If you look at the literature,

16   that philosophy has been around for a long, long

17   time.  What he did was he took that philosophy

18   that's been around for a long, long, time and put

19   it in a nice, concise article and gave some

20   examples and put numbers on it and published it.

21            But that philosophy isn't some special

22   philosophy that he came up with.  It comes from the

23   safety literature.  So I may have used it as an

24   example because it is so nice and concise in some

75

1    ways.  But if that document didn't exist, that

2    philosophy would still be out there in other

3    documents.

4        Q.    Have you ever used Professor Barnett's

5    articles as authoritative in any of your testimony?

6        A.    Like I said, I try not to use any one

7    article as authoritative.  So I doubt if I used any

8    of his articles as deemed the authoritative one, at

9    least none that I can think of.

10            But I may have used them -- I actually

11    have used them in classrooms as examples that bring

12    together a safety philosophy that I think is a

13    nice, concise document.  Instead of having to copy

14    a hundred pages for students, I only have to copy

15    ten maybe or three or four pages.  So in the safety

16    classes I teach, I actually have used some of

17    these; and I have shown the strengths, the

18    weaknesses, the pitfalls in the development of

19    these different safety philosophies.

20        Q.    You used the term, you have not used any

21    of Professor Barnett's article as "the"

22    authoritative.  I am not asking you if you have

23    testified in the past that Professor Barnett's

24    articles are "the" authoritative.

76

1          I am asking you, sir, have you ever

2     testified that Professor Barnett's articles are

3     "an" authoritative source as opposed to "the"

4     authoritative source?

5     A.    And I said before, I try not to ever rely

6     on any one document as being "the" authoritative.

7     Sometimes you have no choice.  Fortunately for

8     almost all of the things that Professor Barnett has

9     published in his safety briefs, there are a lot of

10    documents that there is a -- there is a body of

11    literature that supports a particular philosophy.

12    And in many cases he has taken bits and pieces of

13    that body of information and put it into a

14    document.

15         So I would call the body of information

16    authoritative but rarely would any one document

17    within there be the authoritative document.

18         Now, sometimes there is an authoritative

19    document.  For example, in this case I think there

20    is an authoritative drawing that shows that there

21    was a point in time when one foot control was used

22    and another point in time a different foot control

23    was used.  I would say that's a fairly

24    authoritative document showing that.

77

1           So in that case there aren't -- there

2      isn't a body of literature about that because it is

3      something no one would have written about.  But

4      I think that document is fairly authoritative as

5      far as an inflection point with regards to the

6      model of foot control that was used.

7           Heim sold it with a particular kind of

8      Linemaster foot control and somewhere in the '80s

9      they changed to another model.  And the model that

10     was involved in the accident is different than what

11     Heim originally sold this press with, this press

12     brake with.

13     Q.   The drawing you are referring to is what

14     drawing, sir?

15     A.   It is buried in these documents.  Let me

16     see if I can find it.

17     THE VIDEOGRAPHER:  Off the record at 9:37 a.m.

18                    (A short break was taken.)

19     THE VIDEOGRAPHER:  This is the beginning of

20     Tape No. 2.  Back on the record at 9:42 a.m.

21     THE WITNESS:  I think you had asked me what

22     document was I referring to and I believe this came

23     out of the discovery.  And it is --

24     MR. HARTMAN:  Can we mark that, please?  I am

78

 1    sorry to interrupt.

 2        THE WITNESS:  Sure.  It seems to have a number

 3    on it, part number at least, A as in apple, 407-D

 4    and it is on Heim, Corp., letterhead.

 5                        (Whereupon, HUTTER Deposition

 6                         Exhibit No. 5 was marked for

 7                         identification.)

 8    BY MR. HARTMAN:

 9        Q.   And what does that document tell you, sir?

10        A.   This document tells me that there was a

11    switch from a Linemaster A -- or a 511 switch to a

12    Linemaster -- it was from a 532 to a 511.  So in

13    the past it had been a 532, and it changed to a

14    511, again, made by Linemaster.

15             And I believe the 532 had the shields on

16    the sides and on the top.  It didn't have the lip

17    latch.  And I think at that point in time, again in

18    the '80s, it was changed to a configuration that

19    had what I referred to as the lip latch or another

20    mechanism to some way inhibit the movement of the

21    pedal itself.

22             And it is my understanding at the

23    time that that would have been a change that Heim

24    made but at the time of the accident there was a

                                                    79

1    change that wasn't a Heim-supplied foot control

2    because they weren't supplying it in the year this

3    was sold --

4        Q.   What were they supplying at the time of

5    this accident, Heim?

6        A.   I believe it was a 532.

7        Q.   Sir, at the time of the accident, what

8    foot control were they supplying?

9        A.   I don't remember.

10       Q.   From looking at that document, based on

11   that document at the time of the accident, what

12   kind of foot control would Heim have been

13   supplying?

14       A.   You can't tell that from this document.

15       Q.   Well, the document talks about what type

16   of foot control they are supplying after 1982; does

17   it not?

18       A.   Right, but it could be in '83, '84 and '85

19   they made other changes.  All this tells you is

20   that in that year and that date there was a change

21   from this to this.  But I don't know that in the

22   year of the accident that there hadn't been three

23   or four subsequent changes.

24       Q.   Sir, I am going to show you two pages

80

1    containing four pictures of foot controls.

2        MR. HARTMAN:  I would like you to mark those as

3    -- what would that be, six?  Exhibit 6 will contain

4    both pages.

5                        (Whereupon, HUTTER Deposition

6                        Exhibit No. 6 was marked for

7                        identification.)

8    BY MR. HARTMAN:

9        Q.  Can you tell me what model -- is that a

10   Linemaster product?

11       A.  This switch actually has the name Hercules

12   foot switch on it.  Hercules is a brand that

13   Linemaster acquired.  So even though it doesn't say

14   Linemaster at least on the label that I can read

15   here --

16       Q.  I would ask you to look at the bottom of

17   the label because I believe it does say Linemaster

18   Switch Corporation.

19       A.  I can't tell without a magnifying glass or

20   the original copy.  What I am saying is the

21   Hercules line of foot controls was, my

22   understanding was purchased by Linemaster or part

23   of their product line.  I think they also have

24   switches that don't have the name Hercules on it,

                                                     81

1    that have Linemaster on it.

2        Q.    Well, let me give you two additional

3    pictures and have you look at them.  We will call

4    those photographs Exhibit No. 7.

5            Look at Exhibit No. 7, does that clarify

6    for you that it was a Linemaster switch?

7                            (Whereupon, HUTTER Deposition

8                            Exhibit No. 7 was marked for

9                            identification.)

10    THE WITNESS:  This picture 261 clearly shows a

11    label that says Linemaster switch below Hercules

12    foot switch.

13    BY MR. HARTMAN:

14        Q.    I am going to represent to you, sir, that

15    those were photographs that were taken in

16    Mr. Robinson's office of a foot control that was

17    provided to us as a foot control that Linemaster --

18    that Heim currently has at its facility for usage.

19        A.    Okay.

20        Q.    Is that the same type of foot control that

21    is referenced in the document that you indicate is

22    authoritative as to the type of foot control placed

23    on presses after 1982?

24        MR. ROBINSON:  Object to the form of the

                                                    82

1    question.

2        THE WITNESS:  Yes, I think the document that

3    I referred to, Exhibit 5, shows that in the early

4    '80s, '82, there was a change to a 511-B4 and the

5    photographs, at least this one set of photographs

6    clearly show the catalog number 511-B4.

7    BY MR. HARTMAN:

8        Q.   So if that, if the foot control outlined

9    in Exhibit 6 and 7 is the foot control that Heim

10    currently has available for its presses, would you

11    agree, sir, that the document that you are

12    referencing speaks to the same type of foot control

13    that Heim currently has?

14        MR. ROBINSON:  Object to the form of the

15    question.

16        THE WITNESS:  Yes, it does refer to that.

17    I don't know what happened between '82 and the

18    dates associated with this product.  There were

19    changes in between.

20        And the point I was trying to make was we were

21    talking about authoritative documents.  This is the

22    only document I have or that's been provided that

23    I am aware of that shows when this press was sold

24    it had a different foot control than the foot

83

1    control at the time of the accident.

2    BY MR. HARTMAN:

3        Q.    And that's because there is a change noted

4    on that document that indicates that it is 1982,

5    correct?

6        A.    That's correct.

7        Q.    Would you agree, sir, that that document

8    that you are referring to as the authoritative

9    document that we have marked as exhibit,

10    I believe -- what number exhibit is that, your

11    drawing?

12        A.    It is exhibit, Hutter Exhibit No. 5.

13        Q.    Hutter Exhibit No. 5, would you agree,

14    sir, that if that document is in fact

15    authoritative, it would note other changes in the

16    foot control that occurred after 1982?

17        A.    No, that's not necessarily true.

18        Q.    That's not necessarily true?

19        A.    No.

20        Q.    Why is that?

21        A.    Because -- let's suppose they made a

22    hundred changes.  You wouldn't expect that they

23    would on one document put those hundred changes on

24    there.  If there is one or two changes, typically

84

1    you see that trail especially if there is no major

2    geometry change to the product.

3        But you wouldn't expect to go to Ford

4    Motor Company and find a drawing of wheels that

5    dates back to the first car they made and had all

6    of the wheels that were ever made on a Ford

7    product.

8        This just happens to document the original

9    configuration in '74.  It doesn't tell you anything

10   what happened before '74 and that in '82 there was

11   this design change.  But it doesn't tell you what

12   happened from '82 to current time.

13   Q.    What type of document would tell you that?

14   MR. ROBINSON:  Object to the form of the

15   question.

16   THE WITNESS:  I don't know that there is any

17   one type of document.  You might have subsequent

18   pages like this that show different changes,

19   different options.  There may have been different

20   standards, standard configurations.  It depends on

21   the corporate policy and procedures.  I don't think

22   there is any -- necessary to believe there is any

23   one other document that would show all the changes

24   that may have gone on.

85

1    BY MR. HARTMAN:

2        Q.    Do you have any other information that

3    leads you to believe that the Heim press brake

4    involved in this accident did not have a Model 511

5    foot control on it at the time it left Heim?

6        MR. ROBINSON:    I will object to the form of the

7    question.

8        THE WITNESS:    That it did not have a 511.

9        This is the only document.    This document

10   I think is the kind of document I would expect to

11   see showing a change in this time window.    But

12   subsequent changes may not have been -- may never

13   have occurred or may never have been occurred or

14   marked on this document and they were marked on

15   other documents.

16       All this tells me is that in '74 there was this

17   532 and then in '82 it was changed to a 511.

18   BY MR. HARTMAN:

19       Q.    I understand that.    I am asking you --

20       A.    It is the only document I have in that

21   regard.

22       Q.    Do you have any other information in that

23   regard in your possession?

24       A.    No.

86

1    Q.    Do you know if any -- do you know of any

2    other information that exists that would allow you

3    to identify the type of foot control that was --

4    accompanied the Heim press brake at the time of the

5    sale by Heim?

6    A.    You know, I think in some manuals here

7    they show generally a foot control.  So you kind of

8    see some foot controls but there is not enough

9    detail.  But it shows you, for example, that there

10   isn't the dual foot control or that it is not a

11   treadle kind of control.  But none of the

12   photographs that I have seen have enough detail to

13   distinguish what model of Hercules or what model of

14   Linemaster switch is there.

15   Q.    So your statement that the Heim press

16   brake that was involved in this accident did not

17   have the Model 511 foot control accompanying it at

18   the time of this sale by Heim is based solely on

19   the document that you have indicated marked as

20   Exhibit No. 5?

21   A.    That's correct.

22   Q.    I would like to refer you to your report.

23   A.    Sure.

24         Okay.

87

1       Q.    The third paragraph on the first page.

2       A.    Uh-huh.

3       Q.    Beginning with its intervening ownership

4    and application of approximately --

5       A.    Okay, yes.

6       Q.    Let me read it.  It says, its intervening

7    ownership and application over the approximately

8    25-year period between initial introduction to the

9    stream of commerce and the date of the accident is

10   not completely known.

11          Is that an accurate statement?

12       MR. ROBINSON:  Object to the form.

13       THE WITNESS:  I don't think the combination of

14   owner and application is -- I haven't seen anything

15   that documents it.

16   BY MR. HARTMAN:

17       Q.    Is that what you intend to testify to in

18   this matter?

19       MR. ROBINSON:  Objection to the form.  We have

20   gone through this at length.  The report itself

21   speaks to the issues that will be testified to that

22   is contained within the report.  The deposition

23   gives you the right to ask questions regarding all

24   of these issues that are within the fair scope of

88

1    the report.  So it is not an appropriate question

2    to ask the witness what he might be asked to

3    testify to either by you on cross or by me on

4    direct examination.

5    BY MR. HARTMAN:

6        Q.    Fine.  Go ahead.  You can answer the

7    question.

8        A.    I don't think I have seen anything that

9    identifies the combination of ownership and

10   application and documents it completely over that

11   25-year time period.  In other words, we don't know

12   what it was used for every day.  We don't know how

13   it was maintained.  We don't have -- I haven't seen

14   a complete file of all of the maintenance records

15   on it.

16       Q.    Sir, I am going to be going through your

17   report in fairly exhaustive detail.  My purpose for

18   going through the report is two-fold.  One is to

19   find out if what you say in your report you still

20   hold true today; and two, there will be questions

21   from me as to the basis for which opinion is

22   contained in the report.

23            The purpose of this deposition is for me

24   to find out, because there may be changes in your

89

1    testimony, there may be new facts gained since the

2    time of you authoring this report.  And that's the

3    purpose for me asking questions.

4            So, sir, my question is, its intervening

5    ownership and application over the approximate

6    25-year period between initial introduction into

7    the stream of commerce and the date of the accident

8    is not completely known.

9    A.    Yes, I think that's true.

10   Q.    Next is you say, Cory Fabricating sold two

11   hand controls on a movable pedestal after they

12   purchased the press as used equipment.

13           Is that an accurate statement?

14   A.    I believe so.

15   Q.    And is that what you intend on saying if

16   asked during the course -- in the trial of this

17   matter?

18   MR. ROBINSON:  Objection.  If I could have a

19   continuing objection I won't interrupt you on this

20   issue when you are asking if he is intending to

21   testify on certain issues.  That doesn't bind us in

22   any way or bind Dr. Hutter from testifying

23   regardless of what answer he may give to that.

24   MR. HARTMAN:  You can have a continuing

90