# EXHIBIT F

# PART 3

1    objection.

2        THE WITNESS:  Yes, with my understanding of

3    what those words mean, yes.

4    BY MR. HARTMAN:

5        Q.   This is a substantial addition to the

6    press.  Did you indicate that the two palm -- two

7    hand controls and movable pedestal is a substantial

8    addition to the press?

9        A.   Yes.

10       Q.   What do you mean by it is a substantial

11   addition to the press?

12       A.   Well, you know what the two hand controls

13   look like.  They probably weigh 50 pounds or more,

14   and they are big.  And they weren't there when the

15   press was sold and someone came along, and

16   I believe it was Cory, they had that installed as a

17   possible feature for this press.  And I think it is

18   a substantial change in the way the press would

19   operate, perform, appear, function, all of those

20   types of things.

21       Q.   Would it affect the way the foot control

22   would work when utilized with the press brake?

23       MR. ROBINSON:  I will object to the form of the

24   question.

91

1      THE WITNESS:  If you turn the key to the two

2   hand controls, the foot control wouldn't work at

3   all.

4   BY MR. HARTMAN:

5      Q.   If you turn the key to foot control, would

6   the foot control operate as it had originally been

7   intended to in conjunction with the press brake?

8      MR. ROBINSON:  Objection to the form.

9      THE WITNESS:  You know, I have never seen that

10  demonstrated that it would.  I have assumed that it

11  probably would but factually I don't think anyone

12  took the foot control that was sent by Heim and

13  used it with this two hand control to see if

14  turning the switch actually did that.  I assume it

15  probably did but I haven't seen it done by anyone.

16  BY MR. HARTMAN:

17     Q.   So you have no information with regard to

18  that?

19     A.   I don't think anyone does, that's correct.

20     Q.   You have no information relating to that?

21     A.   I haven't seen anyone have any information

22  in that regard.

23     Q.   I understand about your statement about

24  anyone.  I am asking you personally --

92

1    A.    Including myself.

2    Q.    So you have no information as it relates

3    to that issue?

4    A.    I have not seen it demonstrated.  I don't

5    have demonstrated information.

6    Q.    Do you have an opinion as to whether or

7    not the addition of a two hand control and a

8    movable pedestal is a good addition or a bad

9    addition?

10    MR. ROBINSON:  Object to the form of the

11    question.

12    THE WITNESS:  That depends.

13    BY MR. HARTMAN:

14    Q.    Please tell me why, what it depends on.

15    A.    Well, these two hand controls are supposed

16    to have control reliability.  If it doesn't have

17    control reliability, it probably isn't a good thing

18    to do.  They are supposed to be anti-repeat,

19    anti-tie down.  If it doesn't perform that way, it

20    is probably not a good idea.  They are supposed to

21    be spaced in such a way and configured in such a

22    way that it is difficult for someone to cheat them.

23        It is consideration about where you should

24    place two hand controls because of the possibility

93

1    of causing the machine to start to cycle and then

2    moving your body part into an accident area.

3          So you can't say that the addition of two

4    hand controls is always good or always bad.  There

5    are a lot of other considerations.

6    BY MR. HARTMAN:

7          Q.   Did the addition of the two hand control

8    on the Heim press brake that Ms. Lindquist was hurt

9    on contribute to her accident?

10    MR. ROBINSON:  Object to the form of the

11    question.

12    THE WITNESS:  I think the way it may have

13    contributed to her accident is that the machine

14    probably should have been cycled for the part she

15    was making probably using the two hand controls and

16    using point-of-operation safeguarding.

17          But it itself is separate how it might interact

18    with the foot control, it itself probably didn't

19    change.  I am assuming it didn't change the

20    functioning of the foot control.

21    BY MR. HARTMAN:

22          Q.   Do you have any information that leads you

23    to believe that the placement of the two hand

24    control and movable pedestal for use on the Heim

94

1    press brake that Ms. Lindquist was injured

2    contributed to her accident?

3       MR. ROBINSON:  Objection.  You just asked it.

4    He just gave you an answer.  You apparently didn't

5    like his answer.

6       THE WITNESS:  She wasn't using the two hand

7    control at the time of the accident.  I think had

8    she been using it and using it properly and had it

9    been configured properly, this accident most likely

10   would not have happened.  But she wasn't using it

11   at the time of the accident.  It is a substantial

12   change to the piece of equipment.  I think it could

13   have saved her these injuries but it obviously was

14   not in use.

15   BY MR. HARTMAN:

16      Q.   It didn't cause her injuries, though,

17   correct?

18      MR. ROBINSON:  Objection.  You just asked it

19   again because you don't like his answer.

20      THE WITNESS:  I think the lack of using it

21   caused or contributed to her accident.

22   BY MR. HARTMAN:

23      Q.   The next paragraph you indicate, and

24   I quote, there are few photographs of a foot

95

1    control reportedly in use at the time of the

2    accident.  The photographs show some

3    characteristics that are inconsistent with the

4    original foot control and its exact manufacturer

5    cannot be determined based on the photographs.

6          Did I accurately read your report?

7    A.   Yes.

8    Q.   What characteristics were in the

9    photographs that indicate to you that the foot

10   control involved in this accident was not the

11   original foot control at the time of the

12   manufacture of this machine?

13   A.   I think the primary thing is the fact that

14   the pedal, that the Linemaster foot controls, every

15   part of the housing and components are kind of a

16   bright orange; and I believe the photographs show

17   that the pedal is darkened.  And that makes me

18   wonder if that control might not have been a hybrid

19   or modified or made by someone else.

20   Q.   Would you expect a foot control that is

21   used for 30-plus years to become darkened inside of

22   the shield?

23   MR. ROBINSON:  Object to the form.

24   THE WITNESS:  Well, obviously the foot control

96

1    wasn't used for 30-some years because the foot

2    control that was there at the time of the accident

3    is different than the foot control that was sold by

4    Heim.

5        But certainly I would expect the foot control

6    might change its color to some extent.  I don't

7    know that I would even expect, depending on the

8    production, that a foot control pedal would

9    necessarily survive for 30 years.

10       I believe the testimony of one of the people

11   for the maintenance for Cory said it looked new to

12   him and he wouldn't be surprised if that was the

13   original equipment.

14       But that's what I was referring to in this

15   sentence was the fact that the pedal itself appears

16   to be dark, and I think Linemaster did not sell

17   them that way.

18   BY MR. HARTMAN:

19       Q.   If it was a Linemaster, is it your

20   testimony you would expect to see orange on the

21   inside?

22       A.   That's correct.

23       Q.   The next paragraph you indicate, the

24   self-inflicted injury appears to have occurred when

97

1    the plaintiff pressed her foot downward on the foot

2    control while still having her hand within the dye

3    on the press brake; am I correct?

4        A.   Yes.

5        Q.   When you talk about self-inflicted, do you

6    mean because she inadvertently activated the press,

7    is that how she self-inflicted these injuries?

8        A.   She -- her movement, her body movement,

9    her actions are what initiated -- and her -- having

10   her hands in the point of operation are what caused

11   this injury.

12            It wasn't as if there was an electrical

13   short or there was some lightning or some other

14   person came along and threw a switch.  It was

15   through her own actions with the foot control and

16   her own actions with her hands.

17       Q.   And it is your understanding that the

18   accident happened because Ms. Lindquist

19   inadvertently activated the foot control causing

20   the press brake to cycle; am I correct?

21       A.   It is my understanding that her foot

22   pressed down on the foot control and that caused

23   the press brake to cycle and that's -- and her

24   hands were at the point of operation and that's why

98

1    they were injured, that's correct.

2        Q.   Do you believe it was an inadvertent or

3    advertent pressing down on the foot control?

4        A.   You know, that's an interesting question.

5    I don't believe it was inadvertent in that she had

6    a muscle twitch necessarily that caused it.

7    I believe that it is probably that she is leaving

8    her foot on the foot control and that she is

9    familiar with cycling the machine, and she cycles

10   it probably by some mental signal going through her

11   nervous system causing her foot to move.

12           But we will never know that because no one

13   took a photograph or documented it at the time or

14   there is no way to properly document that.  So

15   I guess that's my opinion about that.

16       Q.   Do you have any evidence that she intended

17   to operate the foot control while her hands were in

18   the dye?

19       A.   No, I don't think she was intending on

20   maiming herself or amputating fingers.

21       Q.   What evidence do you have that

22   Ms. Lindquist left her foot in the foot control at

23   the time of her accident immediately prior to the

24   operation of the foot control?

99

1        A.    Most of the evidence is based on human

2     factors kinds of things, literature, probabilities,

3     functionality of this kind of equipment and the

4     task she is doing.  I mean there have been two

5     general situations described here, either she is

6     riding the pedal and her foot goes down at an

7     inappropriate time when her hands are there or

8     somehow her foot just magically slides into this

9     place, takes a whole bunch of turns and maneuvers

10    and does it at an inappropriate time.

11           I think it is more likely than not that

12    her foot was in there.  And if you look at her own

13    testimony, even though she says she doesn't think

14    her foot was there, there is many times in her

15    testimony or there is a time in her testimony when

16    she is not absolutely certain as to what went on.

17           People, when they are using this kind of

18    equipment or controls of this type, become

19    habituated to doing certain things and they don't

20    make overt cognitive records in their mind of

21    what's going on.

22           It is like when you drive into the office

23    or into work, if you take the same route over and

24    over again, you habitualize yourself to where there

                                                       100

1    are stop signs, to where there might be children,

2    to where there might be a problem in the road.  And

3    if they suddenly put up a new stoplight or a new

4    traffic control device, you might be startled by it

5    or actually violate that new control because you

6    have become habituated to it.

7           Foot controls people become habituated to.

8    It is talked about in the literature.  It is talked

9    about in the literature that the most common kind

10   of accident where people get hand amputations or

11   hand injuries is because they have been riding the

12   pedal.

13          And if you look at this from a human

14   factors standpoint that there is an incentive to do

15   that, this machine can run fairly fast and she is

16   making a significant number of parts per day.  This

17   isn't a one or twosie kind of operation.  If you

18   look at the human factors associated with an

19   accidental slide in, it is so complicated and

20   contorted, it seems very unlikely that that's what

21   happened.

22   BY MR. HARTMAN:

23      Q.   You talk about literature that you rely

24   upon for habituated, to show that.  Can you tell me

                                                  101

1    what literature you are -- the articles or journals

2    that you are referring to?

3       A.    I didn't specifically bring those with me

4    but I think most of the articles I mentioned that

5    talked about the general safety philosophy that

6    were in my report, talk about the concept of people

7    developing workplace habits.

8       Q.    What article is that, sir?  I am sorry.

9    I have read your report many times.  I don't know

10   what article you are talking about.

11      A.    Okay.  I didn't bring any articles with

12   me, and I didn't in my report here cite the

13   well-known --

14      Q.    What page are you on?

15      A.    I am not done with what I was answering.

16            -- the well-known concept of people being

17   habituated to certain behaviors but in articles and

18   in books like those on page 14 in the last

19   paragraph, it starts out with the word indeed,

20   Safety Management and Occupational Safety and

21   Health and a couple of the books I had in taking

22   human factors courses -- I can't get their name

23   right offhand, but they talk about -- and it is

24   well-known in the literature and you know it from

                                                      102

1    your own life experiences that people have certain

2    habits.

3            I have a habit of drinking a lot of water

4    when I am talking.  Some people play with pens when

5    they are doing things.  People who use a certain

6    control repeatedly over and over again become

7    habituated to it.

8            In fact I think in one of Professor

9    Barnett's publications he talks about in cars and

10   automobiles people becoming habituated.  They don't

11   have to look to see where the brake pedal is, where

12   the clutch is, where the gas pedal is.  You know by

13   habit what pedal to push on and where it is at.  We

14   develop these habits.

15           She would have been habituated to leaving

16   her foot on this kind of control.  She would have

17   also been habituated to the fact to know that there

18   is a foot control somewhere around that foot, that

19   it is not way over here, that it is not behind her,

20   that it is not eight inches off the floor.

21           She has placed her foot so many times in

22   that foot control that she has to know that it is

23   there.  She has to know how it functions; and she

24   has to know if she leaves her foot in there, it

                                             103

1    will save her having to move her foot back and

2    forth and back and forth.  And this machine can

3    cycle as fast as 60 times or 30 times a minute so

4    there could be some production mode where she would

5    be doing this that often.  So she has been

6    habituated to that.  And I think that's part of

7    this riding the foot pedal and why it is

8    accidentally activated.

9         And that one article by the fellow from

10   NIOSH talks about that when there is an especially

11   fairly short cycle time -- and it is like 17 cycles

12   per minute I think is what it is -- that that is

13   where there starts to be a correlation between

14   people accidentally stepping on the control and

15   getting some kind of an injury.

16        So that's -- they don't use the word

17   habituation but that's what they are talking about

18   in that article.  And I think that was one of the

19   articles -- the article that we made as an exhibit

20   early on in my deposition.

21   Q.   What is the National Safety Council?

22   A.   What is it?

23   Q.   Yes.

24   A.   My understanding, it is a not-for-profit

                                                    104

1    organization.  It is headquartered in one of the

2    western suburbs of Chicago.  It has been around

3    from I think the '20s or '30s whose goal it is to

4    promote safety whether it be in the workplace,

5    consumer safety, personal safety, those kinds of

6    things.

7          They author many documents, publications,

8    books on safety.  They are the organization that

9    provides the framework for a variety of groups that

10   are outside of the National Safety Council to come

11   together and either write safety documents, give

12   safety seminars or to sit on safety-related

13   standards committees.

14         So, for example, I am not employed by the

15   National Safety Council but they have a Power Press

16   and Forging and Metal Fabrication Committee that

17   includes press brakes.  And I have been a member of

18   that committee for 20-some years and vice-chairman

19   and chairman and a presenter at many of their

20   conferences having to do with a variety of

21   equipment including press brakes.

22         We have authored publications about

23   safeguarding.  So I am one of the cited authors in

24   their publication on power press safeguarding and

                                                    105

1    one of their authors on general safeguarding of

2    equipment.  That's what they do.  That's kind of

3    their structure.  I think through them I was

4    actually on a B-11 committee, two different

5    committees having to do with machine tools

6    including equipment like the press brake.

7        Q.   Am I correct it is not a governmental

8    entity?

9        A.   No, it is not.

10       Q.   Am I correct it is not a governmental

11   organization?

12       A.   It is not a branch of the government, no.

13   They may have contracts with the government to do

14   certain kinds of things but they are not a branch

15   of the federal government or state government.

16       Q.   Have you ever read the Accident Prevention

17   Manual For Industrial Operations published by the

18   National Safety Council?

19       A.   I have read bits and pieces of it.

20   I doubt I have read every word in it.

21       Q.   Have you cited National Safety Councils in

22   your report?

23       A.   Yes.

24       Q.   Are you relying upon the articles that you

106

1    cited in order to formulate the opinions contained

2    in your report?

3        MR. ROBINSON:  Object to the form.  Excuse me.

4        THE WITNESS:  I am using them as examples.

5    I could have cited one.  I could have cited a

6    half-dozen in support of those opinions.  But it

7    seemed to me it would be fruitless to try to make

8    the most exhaustive list of articles.  I picked

9    articles that I thought were representative of a

10   broad theory concerning this equipment.

11       So, for example, for ANSI standards

12   I looked at three different years.

13       For data sheets on press brakes I looked at

14   multiple years.  I also looked at mechanical power

15   presses, which is not the product here but it is a

16   brother or sister kind of product.

17       And I looked at National Safety Council, their

18   accident prevention manuals and their other data

19   sheets and other publications.  And I cited some of

20   those in here.  I don't think they are -- I am not

21   aware of anything that is inconsistent with their

22   broader publication.

23   BY MR. HARTMAN:

24       Q.   What does a chairman's responsibility --

107

1    what are the responsibilities of a chairman of the

2    power press, forging and metal fabricating section

3    of the National Safety Council?

4         A.    You know, it is probably written down

5    somewhere; and I don't have it memorized.   But

6    generally the responsibility is to through that

7    committee to help facilitate the committee's

8    promotion of safety, whether that be in the form of

9    seminars, data sheets, answering questions,

10   providing guidance to people who have problems,

11   promoting safety through posters, through other

12   kinds of presentations, to making sure that the

13   membership has a broad representation on the

14   committee, to go to different manufacturing

15   facilities and see how other people are doing

16   things.

17             So whether I was chairman, vice-chairman

18   or just on the committee, we would go to the John

19   Deere plant and see how they would do things

20   including the use of press brakes and mechanical

21   power presses.

22             We went to Ford plants to do those kinds

23   of things.

24             We went to -- the committee went to NASA

108

1    or Boeing, rather, to look at airplane production

2    again using parts that are made on press brakes and

3    power presses and those kinds of things.

4         That's generally what they do.  I think

5    there was some added responsibility for collecting

6    money and making annual reports and getting certain

7    paperwork in on time but those were kind of

8    procedural things.

9    BY MR. HARTMAN:

10        Q.   Your report on page 2 indicates that you

11   were a contributor and reviewer of the National

12   Safety Council's publications, Safeguarding

13   Illustrated and The Power Press Safety Manual.

14        Did I accurately read that?

15        A.   That's correct, yes.

16        Q.   As a contributor and reviewer, did you

17   edit those publications to see to it that they were

18   accurate?

19        A.   Most of the time the editor doesn't do

20   that.  So you just asked me did you use a paint

21   brush to sand something.

22        The editor typically is someone who is

23   employed by the National Safety Council to make

24   sure the grammar is right because engineers are

109

1    poor at grammar and spelling, make sure that we

2    have parallel structures, make sure that when we

3    use Roman numerals, we don't switch to Arabic

4    numerals.

5        What my role and a handful of other

6    people's roles were was to read it to make sure it

7    is correct, to try to update it if there was

8    something new and interesting and to make sure that

9    there was a certain consistency throughout that

10   document and other documents related to these

11   issues.

12       Q.   When you say read it to make sure it was

13   correct, read it to make sure it was grammatically

14   correct or substantively correct?

15       A.   Technically correct.

16       Q.   Explain to me what technically correct

17   means.

18       A.   In other words if something said it is

19   supposed to be four inches and it was supposed to

20   be 40 inches, the hope was that we would catch that

21   mistake.  If it said something was supposed to be

22   red and it was supposed to be r-e-d and it was

23   spelled r-e-a-d, it is both an editing kind of

24   thing as far as words but it is also a technical

110

1    thing as far as the -- it is supposed to be a

2    color, not an activity.

3        So we were looking for that.  We were

4    looking for better art work, more clearer verbiage

5    every now and then.  Sometimes we would have added

6    a phrase or a comma some place or added a sentence

7    or a better explanation of something, those kinds

8    of things.

9    Q.    As a contributor, what portions of those

10   publications did you contribute?

11   A.    I would have to go back and look

12   specifically.  My recollection was in the Power

13   Press and Safety Manual I reviewed everything that

14   was there, offered suggestions and changes and

15   clarifications.  And then I think I actually

16   authored a whole section having to do with kind of

17   industrial hygiene considerations in that kind of

18   equipment.

19       And in the other publication --

20   Q.    Which would be Safeguarding Illustrated?

21   A.    Yeah, I remember commenting on several of

22   the diagrams, asking for clarification, putting

23   arrows in or using better words that were more

24   descriptive and more current words, more consistent

                                            111

1    terminology, those kinds of things.

2        Q.    Did you contribute any of the text to the

3    Safeguarding Illustrated?

4        A.    I probably offered and may have included

5    phrases and sentences but I doubt if I offered --

6    I know I didn't offer a page of text.  But there

7    may have been a sentence or two here or there, a

8    few words here or there, a phrase here or there,

9    maybe, you know, the addition of arrows pointing so

10    it was clearer what things were being talked about,

11    probably asked for certain artwork to be modified,

12    updated, changed, removed, enlarged, those kinds of

13    things.

14        Q.    You indicate that your work on human

15    factors and machine safety was published in the

16    Stamping journal; am I correct?

17        A.    Yes.

18        Q.    Do you have a copy of that article with

19    you here today?

20        A.    No, I don't, but it is on the Internet.

21        Q.    How would I find it on the Internet?

22        A.    If you want, I will send you a copy.  Why

23    don't you send the attorney a request for that?

24    And I will send him a copy, and he will send it to

112

1    you.

2         Q.   I am making that request now.

3         A.   I won't remember it now, so pardon my poor

4    memory on things like that.

5         Q.   Let's go to page 3.

6         A.   Sure.

7         Q.   Materials reviewed specifically for this

8    matter, does that section outline the materials

9    that you reviewed for this matter?

10        A.   Specifically is spelled wrong, isn't it?

11             Pardon me?  Are these --

12        Q.   By the way, specifically is spelled

13   incorrect.  We won't hold that against you though.

14        A.   Your question was --

15        Q.   Are those -- under the materials reviewed

16   specifically for this matter, are those the

17   materials that you reviewed in anticipation for

18   preparing your report?

19        A.   I think so, yes.

20        Q.   Were there any other materials that you

21   intend on relying upon in order to formulate the

22   opinions in this matter?

23        A.   Well, there were a bunch of materials

24   I sent to Mr. Robinson that he sent on to you,

113

1     I believe.  And then based on the new positions of

2     Ralph Barnett from his deposition, I made copies of

3     these other materials, some of which we have talked

4     about here.  I am not sure if we talked about all

5     of them.

6          Q.   What other materials -- okay.

7               So am I correct that any additional

8     materials that are not cited in materials reviewed

9     specifically for this matter would be materials

10    contained in those you forwarded to Mr. Robinson to

11    be forwarded to me?

12         A.   Yes.

13         Q.   Or new materials --

14         A.   Or they are cited in the text here.  There

15    are a lot of web pages or things off the Internet

16    or other documents.  In other words, in this list

17    of materials reviewed I don't think I ever

18    mentioned any of the safety briefs.  But I talk

19    about them a lot, and I reference them in the

20    report.

21              There are those books we talked about on

22    page 14.  I don't think they are detailed here

23    because they are detailed in the report.

24         Q.   Okay.  So the materials you are going to

                                                      114

1    rely upon in order to formulate your opinions would

2    be materials specifically reviewed for this matter,

3    those materials, materials that you sent to

4    Mr. Robinson for him to forward to me?

5        A.    Uh-huh.

6        Q.    Materials specifically cited in the body

7    of the article and those that you prepared in

8    response to Professor Barnett's deposition?

9        A.    That's correct.

10       Q.    Okay.  Would you please identify for me

11   any additional documents that have not been

12   identified that you have obtained in response

13   Professor Barnett's deposition?

14       A.    That I specifically obtained in response

15   Professor Barnett's deposition, that was your --

16       Q.    Right.

17       THE WITNESS:  Why don't we take like a

18   three-minute break?  Let me go through here and see

19   what they are.  Otherwise I am just going to be on

20   tape fumbling around looking for those kinds of

21   things.

22       MR. HARTMAN:  No objection.

23       THE VIDEOGRAPHER:  Off the record at 10:24 am.

24                       (A short break was taken.)

                                                    115

1          THE VIDEOGRAPHER:  Back on the record at

2     10:28 a.m.

3          THE WITNESS:  I think you asked me what other

4     things -- my recollection is what other things are

5     not on this list, are not in the report or haven't

6     been turned over that I absolutely certainly have

7     some knowledge of.

8          The only things I can think of that are not

9     there were I have two DVDs.  One I believe is Ralph

10    Barnett's testing and I think the other one is a

11    video inspection without sound; then an article

12    entitled Press Brakes and You -- Whose Business is

13    Safety?  Everybody's; a --

14         MR. HARTMAN:  Let's mark that, please.

15    Would that be No. 8?

16         THE COURT REPORTER:  That would be 8.

17                          (Whereupon, HUTTER Deposition

18                          Exhibit No. 8 was marked for

19                          identification.)

20         THE WITNESS:  A Internet downlisting

21    specifically for a Cincinnati company on a press

22    brake again showing the cycle time for their press

23    brakes.

24         The other document just had a whole bunch of

                                                   116

1   different press brakes, and I thought I would look

2   in a little more detail about one manufacturer.

3   And again they have cycle times of, oh, like 1.4

4   and 2 seconds as examples.

5        Do you want to mark that also?

6        MR. HARTMAN:  Yes, please.

7                      (Whereupon, HUTTER Deposition

8                      Exhibit No. 9 was marked for

9                      identification.)

10       THE WITNESS:  Then I think this document was

11   part of what was documents from my file that were

12   copied that I believe I sent to you.  But just to

13   make sure I have a B-11 committee document from

14   September of '89 asking questions about

15   interpretations of some of the standards and in

16   particular on the last page there is a statement

17   that says, since the employer is the one who

18   determines the tooling method of feeding operation

19   and safeguarding, only the employer is able to

20   determine if the provisions of this clause are

21   required.

22       This clause has to do with safeguarding.  So

23   I think it was part of that material that was sent

24   over but just to be on the safe side.

117

1      MR. HARTMAN:  We will mark that as well,

2    please.

3      THE WITNESS:  Sure.

4                    (Whereupon, HUTTER Deposition

5                    Exhibit No. 10 was marked for

6                    identification.)

7      MR. HARTMAN:  That would be No. 9; am

8    I correct?

9      THE COURT REPORTER:  Ten.

10     THE WITNESS:  And then I think in the documents

11   here I mentioned I did an inspection and I talk

12   about photographs but -- and I know I sent to

13   Paul's office the photographs and the video but

14   I don't know for certain if those have been given

15   to you or not but I have a copy of the photographs

16   and of the videotape.

17   BY MR. HARTMAN:

18     Q.  I believe I have a videotape and I don't

19   recall seeing photographs.  That doesn't mean that

20   they weren't forwarded to me.  I am not implying

21   that at all.

22     MR. ROBINSON:  I think they were and they

23   should have been.

24     MR. HARTMAN:  Let me look at those photographs.

                                                    118

1          MR. ROBINSON:  In fact Professor Barnett

2     referenced them in his testimony, so I know they

3     would have come through you.

4          MR. HARTMAN:  I am just being doubly sure just

5     checking through.

6          Paul, some of the photos look familiar.  Some

7     of them are not -- and again I am not implying --

8     there has been so much exchanged in this.  I would

9     ask that you please provide me with just a

10    photocopy of these at your earliest convenience.

11         Thank you, sir.

12         MR. ROBINSON:  Why don't you check to see if

13    you have them first?  We wouldn't give you

14    piecemeal photographs, and we have confirmed that

15    you have them because Professor Barnett commented

16    on them and how there were photographs of other

17    machines located at the facility where the press

18    brake was located at the time of Dr. Hutter's

19    inspection.

20         So rather than just asking us to do something

21    that appears to be unnecessary, why don't you

22    confirm whether or not you have them or not?

23         MR. HARTMAN:  I believe Professor Barnett

24    referenced the videotape, and the videotape has an

                                                    119

1    inspection of other machines.  But I will check

2    anyway.

3        MR. ROBINSON:  If you would.  I would be glad

4    to fire off another copy for you.

5    BY MR. HARTMAN:

6        Q.   Sir, it is my understanding that -- I am

7    sorry.

8            Are there any more articles or documents

9    that you have relied upon in formulating your

10   opinions in the report that have not been

11   identified?

12       A.   I don't think so.

13       Q.   So the information -- the documents that

14   you have produced today that we have marked as

15   exhibits, the articles referenced in the body of

16   your argument, excuse me, your report, those other

17   materials specifically we reviewed for this matter,

18   would that be the extent -- and those cited in that

19   paragraph as far as textual documents?

20       A.   And those obviously we have just labeled

21   now.

22       Q.   Yes.

23       A.   I guess, you know, I have got years of

24   going to school and looking at documents that there

                                                      120

1    is sometimes things that I am aware of that I don't

2    think anyone would need a document for.  And

3    I don't know that there is something I am intending

4    to rely on but I guess there could be.

5         I didn't intend to hold anything back.

6    And I believe these are all of the documents

7    that I would normally be using.  But if someone

8    asked a question, oh, what's the basis of OSHA, you

9    know, I happen to know it came out of a certain

10   piece of legislation.  I didn't provide that

11   document here.

12   Q.   So other than those things which are

13   apparently very clear to you, you have identified

14   the documents that you have relied upon in

15   formulating your opinions in this matter?

16   A.   Yes.

17   Q.   In your videotape at the very end of the

18   tape there is a very brief snippet of tape that

19   shows you looking at the electrical system of the

20   press brake, the Heim press brake; do you recall

21   that?

22   A.   I remember something but I don't remember

23   the details of it.  I think it was opening up the

24   cabinet looking at some wiring, yes.

121

1       Q.    Is there anything that -- strike that.

2             Is there anything that you saw in your

3    examination of the electrical system of this press

4    brake that caused or contributed to the accident

5    Ms. Lindquist was involved in?

6       MR. ROBINSON:  Object to the form of the

7    question.

8       THE WITNESS:  I haven't made that

9    determination.

10   BY MR. HARTMAN:

11      Q.    Have you -- are you investigating that?

12      A.    Not currently, no.

13      Q.    Do you intend to investigate that?

14      A.    I have no intention but I guess someone

15   could ask me to look into it.

16      Q.    Let's go to page 7 of your report, please.

17      A.    Sure.

18      Q.    By the way, prior to appearing today did

19   you happen to review your report in preparation of

20   today's testimony?

21      A.    I think the last time I reviewed the

22   report in any detail was for the last scheduled

23   deposition I was supposed to have last week was

24   canceled or postponed.

                                            122

1      Q.   I know nothing about a deposition

2  canceled.

3      MR. ROBINSON:  Pardon me?

4      THE WITNESS:  Last week I was scheduled, I was

5  supposed to be deposed --

6      MR. ROBINSON:  It was scheduled to be taken in

7  the afternoon.

8      MR. HARTMAN:  We had that very discussion --

9  you are talking about Friday if we got done with

10  Switalski --

11      MR. ROBINSON:  Sure, that's what we planned on,

12  him starting it --

13      THE WITNESS:  I was prepared to go that day and

14  right before that was probably the last time

15  I looked at it in some great detail.

16  BY MR. HARTMAN:

17      Q.   Have you had the chance to review your

18  report?

19      A.   Yes.

20      Q.   Is there anything contained in your report

21  that you would like to change before we go any

22  further?

23      A.   I would like to change the spelling of

24  specifically.  But as I sit here I can't think of

123

1    anything that I would think that's material to my

2    opinions that I would like to change.

3        Q.    Is there anything that when you read it

4    the last time, you felt was inaccurate even if it

5    wasn't material?

6        A.    I can't think of anything.

7        Q.    In the second paragraph you indicate,

8    referring to press brakes, that it is usually

9    considered a multi-purpose machine typically able

10   to produce long V-type bends through the use of

11   owner-supplied dyes; am I correct?

12       A.    Yes.

13       Q.    Is that a distinguishing characteristic of

14   a press brake?

15       MR. ROBINSON:  Object to the form of the

16   question.

17       THE WITNESS:  Only in that they tend to have

18   longer, narrower beds than mechanical presses but

19   you could put a long, narrow bed on a mechanical

20   press.

21   BY MR. HARTMAN:

22       Q.    You indicate that the machine does not

23   have a pinch plate that caused the plaintiff's

24   injuries when it left the control time; am

                                          124

1    I correct?

2        A.   Yes.

3        Q.   Am I correct, sir, that the only way a

4    press brake can become operational is if it does in

5    fact ultimately have a pinch plate?

6        MR. ROBINSON:  Object to the form of the

7    question.

8        THE WITNESS:  I would say that the vast

9    majority, the preponderance, 90 percent plus of the

10   operations, there is probably a pinch point.

11   Almost in all circumstances there is supposed to be

12   some kind of safeguarding applied to that.  But

13   I would say, yes, it is probably fair to say that

14   more likely than not you are going to have a pinch

15   point somewhere with the press brake.

16   BY MR. HARTMAN:

17       Q.   So press brakes when they are manufactured

18   are intended to have introduced to them a means by

19   which there is a pinch plate?

20       MR. ROBINSON:  I will object to the form of the

21   question.

22       THE WITNESS:  Typically if there are dyes,

23   those dyes have pinch points.  There are some dyes

24   where they are a unitized dye.  And you put the

125