# EXHIBIT F

# PART 4

1    pieces in the unitized dye, and you put it in the

2    press.  And there won't be a pinch point that an

3    operator would be exposed to.  But for many other

4    operations the dyes manufacture or produce a pinch

5    point.

6    BY MR. HARTMAN:

7        Q.   On the fourth paragraph down the page you

8    indicate, and it is in bold, a press brake by

9    itself must be considered an incomplete machine and

10   only one component in a production system.

11       A.   That's correct.

12       Q.   Is that your testimony today?

13       A.   That's a quote from the National Safety

14   Council and I believe that's true.

15       Q.   So a press brake is part of a system by

16   which parts are ultimately molded or shaped?

17       A.   Or other things, yes.

18       Q.   Next, the last sentence in that paragraph

19   says, likewise training and supervision of

20   equipment operators was the responsibility of Cory;

21   am I correct?

22       A.   Yes.

23       Q.   Does a press brake manufacturer expect

24   that the employer will undertake training and

                                                     126

1    supervision of the use of its equipment?

2        MR. ROBINSON:  Object to the form of the

3    question.

4        THE WITNESS:  I believe it is reasonable to

5    expect that, for a manufacturer of a product like

6    this to expect that the employer will provide

7    training, supervision for his operators of this

8    kind of machine, yes.

9    BY MR. HARTMAN:

10       Q.   Do you expect that training and

11   supervision to be followed by the operators once

12   the employer gives it to them?

13       A.   Yes, with the proviso if the training or

14   supervision is in some way obviously compromising

15   their safety or well-being, putting them at some

16   risk that they can reasonably perceive, then

17   I think the employee -- in fact if you go and look

18   at the OSHA criteria, they say employees have a

19   responsibility for their own safety.

20            So if you are an employee and your

21   employer tells you to take a pencil and stick it in

22   your eye, even though your employer tells you to do

23   that, you shouldn't do it.  You have a certain

24   responsibility for your own safety per OSHA and

                                              127

1    I think per just common sense that you should have

2    a certain responsibility for your own safety.

3        Q.   At the time of the manufacture and sale of

4    the press brake involved in this accident, was the

5    2001 version of OSHA in existence?

6        MR. ROBINSON:  What?  I am sorry.

7    BY MR. HARTMAN:

8        Q.   The 2001 version of the OSHA requirements

9    as it relates to press brake safety in existence?

10       A.   No.

11       Q.   Would you expect a manufacturer of a 1978

12   machine to follow the 2001 OSHA regulation as it

13   relates to press brake safety?

14       A.   No.

15            OSHA didn't come into existence with rules

16   and regulations until very early '70s and the ANSI

17   standard with regards to press brakes were in the

18   early '70s also.  That would be the time that

19   people involved in this kind of equipment would be

20   embracing and incorporating those standards if they

21   hadn't already done it by just the tradition in the

22   country.

23       Q.   In your experience are you familiar with

24   Heim's manufacture and sale of press brakes?

128

1      A.    I don't understand your question.

2      Q.    You have been out in the work force.  Have

3      you run across Heim press brakes?

4      A.    I probably have.  I can't say specifically

5      this press at that location but I wouldn't be

6      surprised that I came -- that I was in the presence

7      of a Heim press brake.

8      Q.    Do you have any specific recollection

9      today as to whether or not you were in the presence

10     of a Heim press brake?

11     A.    I don't know exactly.

12           Let me turn my phone off.  Sorry.

13           I did a lot of inspections when I was with

14     the EPA, with Ford Motor Company, when I was with

15     the Clark Equipment Company, the Euclid division

16     and we had our own manufacturing facilities and

17     outside vendors who manufactured things and

18     I visited their plants.  And they used all kinds of

19     machine tools including press brakes.

20           But I can't tell you with exact certainty

21     that it was a certain kind of Heim press brake in

22     use at a certain plant.  I don't have that specific

23     recollection.  I wouldn't be surprised if they were

24     Heim but I don't know specifically.

                                                    129

1      Q.    So you can't identify whether or not you

2    have ever seen a Heim press brake in use?

3      A.    I don't remember if I have or haven't.

4      Q.    Do you know whether or not -- can you

5    identify any manufacturers of press brakes that you

6    were exposed to in the period of say 1975 to 1985?

7      A.    It seems to me that there were -- Bliss

8    made some that I remember being around.  When I was

9    at the John Deere plant -- I remember they used

10   press brakes at the John Deere plant and I probably

11   somewhere in my file I have notes as to the brand.

12   I don't remember.  It seems to me it may have been

13   either Cincinnati or Cincinnati Millicron.

14   I remember seeing those presses in use at I think a

15   Ford supplier, both presses and press brakes.

16   Those are the ones that pop into my mind.

17     Q.    From the period of 1985 to the present, do

18   you recall in your experience being exposed to any

19   Heim press brakes?

20     A.    Not specifically, no.

21     Q.    Okay.

22     A.    I may have but I don't recollect.

23     Q.    Can you identify any brand names of press

24   brakes you have seen in the period from 1985 to the

                                                    130

1    present while out in the field?

2    A.   I don't remember the names.  If I looked

3    at the list of presses on that sheet, I might be

4    able to remember.  There was like an Asian company

5    like Wysong or something like that I remember

6    seeing.  There was a plant in Detroit that used

7    press brakes but I don't remember the name right

8    offhand.

9    Q.   Have you ever testified in cases other

10   than this one where there has been an analysis of a

11   foot control in use with either a press brake or a

12   mechanical power press?

13   A.    I know I testified in a case with foot

14   control on saws.

15          And I know I testified in a case on a

16   press or mechanical press, press brake or

17   mechanical press where the primary issue were

18   pullback devices on people's hand.  And I think

19   that was actuated by a foot control.

20          And I think I had a case where a light

21   curtain had failed, and I believe that press,

22   I think, was a mechanical press.  And I believe

23   that was also operated with a foot control.

24   Q.   Were people injured in that case where the

1    light curtain failed?

2        A.   Yes.

3        Q.   Were people injured in the pullback device

4    case?

5        A.   Uh-huh.

6        Q.   Were you -- by the way, what percentage do

7    you -- are you retained by defendants and what

8    percentage are you retained by plaintiffs in the

9    cases that you have been asked to evaluate?

10       A.   I don't have a log of every case I have

11   been retained in and whether it is plaintiff or

12   defense.  So the best I can do is kind of assume

13   that what I have testified in is maybe

14   representative of the bigger pool of cases that

15   I have been retained in.

16            And if you look at a longer time window,

17   maybe like 10 years, it is probably about 60/40

18   defense.  And if you look at a shorter time window,

19   probably like the last three or four years, it is

20   probably a 40/60 defense.  But on an annual basis

21   if I testify either at trial or at deposition on a

22   new case, it is probably about 12 times a year, a

23   combination of trials and depositions.

24            So if one or two cases switches from

                                              132

1    defense to plaintiff, you get that kind of swing.

2    So it is probably, you know, it oscillates around a

3    60/40, 40/60 split.

4         Q.    And maybe I limited myself but when

5    I asked you about cases that you testified to or

6    with regard to foot controls and press brakes or

7    foot controls and punch presses or mechanical power

8    presses, as you call it, I am also talking about

9    cases that you have authored reports.

10        A.    As I said, every time someone retains me,

11   I, first of all, don't always know that a lawsuit

12   has been filed or if it is going to be filed.  And

13   I don't keep track of cases just because I wrote a

14   report.  There is no reason for me to keep track of

15   how many plaintiff, how many defense.

16             I do keep track of cases where I have

17   testified in and every six, seven, five months,

18   I go and update that list.  And if you look at

19   that, as I said over maybe from my recollection,

20   because it is usually like a four- or five-year

21   moving time window, the longer period is probably a

22   little more defense work.  And maybe if you only

23   looked at the last three years, it is probably a

24   little more plaintiff.

                                                  133

1    Q.   My question, sir, was not as a follow-up

2    to the division of plaintiffs and defendants that

3    you work with.  I am talking about cases that you

4    were involved in.  I am asking you just basically

5    numerically were there cases you were involved in

6    where you evaluated foot controls in conjunction

7    with press brakes or mechanical power presses that

8    you authored reports that you haven't told me about

9    today?

10   A.   There could have been.  Nothing pops into

11   my mind as I sit here.

12   Q.   On page 9 you indicate that ANSI as the

13   publishers --

14   A.   What paragraph are we on?

15   Q.   First paragraph.

16   A.   Okay.  The first paragraph on my page 9

17   starts out OSHA.

18   Q.   I am taking you over to the portion where

19   it talks about ANSI, though, as the publishers of

20   nationally-recognized consensus standards.

21   A.   Okay.

22   Q.   Is it your statement today that ANSI is

23   the publisher of nationally-recognized consensus

24   standards?

135

1      A.    Many of the standards that ANSI publishes

2   are recognized national consensus standards and in

3   particular OSHA for this kind of equipment looks to

4   the ANSI B-11.3 standard as a recognized consensus

5   standard.

6      Q.    Do you recognize ANSI as a publisher of

7   nationally-recognized consensus standards as it

8   relates to power press brakes?

9      A.    Yes.

10      Q.    What does consensus standard mean to you?

11      A.    A consensus standard means to me that the

12   authors, the entities that produce the standard had

13   a broad representation.  They followed a

14   well-documented procedural methodology to create

15   the standard.  They had a balloting on it where it

16   was reviewed.  People had an opportunity to comment

17   on it, to criticize it, to request additional

18   changes, request it be eliminated, expanded,

19   contained other information, that it is in many

20   ways compared to other collateral documents and

21   standards that may be used for part of the basis

22   for that standard.  And then on a fairly regular

23   basis it is reviewed and updated and kept current,

24   those kinds of things.

135

1      Q.    Does the ANSI standard as it relates to

2    foot controls --

3      A.    Wait, wait, there is no ANSI standard for

4    foot controls that I am referring to.

5      Q.    Okay.  There is not an ANSI standard as it

6    relates to foot controls in conjunction with power

7    press brakes?

8      MR. ROBINSON:  I will object to the form of the

9    question.

10     THE WITNESS:  There is an ANSI standard for

11   press brakes and in that ANSI standard there are

12   references to different kinds of foot control, foot

13   operated devices and that's what I am referring to

14   here.

15   BY MR. HARTMAN:

16     Q.    Okay.  So the ANSI standard for press

17   brakes that references foot controls, is it meant

18   to be exhaustive as to the types of foot controls

19   that ANSI recognizes as meeting the standard for

20   use with press brakes?

21     MR. ROBINSON:  Object to the form of the

22   question.

23     THE WITNESS:  You know, I don't know that there

24   is anything that's exhaustive.  I mean if you

                                              136

1    looked at the bible, you probably could write

2    another paragraph or two if you wanted to make it

3    more exhaustive.

4        It defines what -- I believe it defines what is

5    reasonable and gives examples and uses terminology

6    that's consistent and available to the public and

7    meaningful for the public and there are

8    opportunities to ask for interpretations.  But it

9    is not exhaustive in terms of it turns over every

10   rock and gives you every variation and every

11   combination.

12       Most of these standards are -- try to be

13   performance standards where they give you

14   performance criteria and then you as the designer

15   try to meet that performance.

16       So it will say, for example, a standard might

17   say it will restrain an object of five pounds going

18   five miles an hour.  It is up to you to figure out

19   how to do that.  That's a performance standard.

20   And a lot of the criteria in the ANSI standards try

21   to embrace performance characteristics.

22       So as far as foot controls, they talk about

23   them having control reliability.  They don't tell

24   you how to do that.  They say but it should be

137

1    reliable at a certain level and it is up to you as

2    a designer to figure that out.

3        In the case of safeguarding foot controls, they

4    say they should have side shields and they should

5    have a top shield so things can't fall on them, so

6    people can't come by and step on the top of them.

7    And it is up to you whether you want to use

8    cardboard to do that, glass, platinum or steel.

9    You can use whatever you want but they give you

10   this performance criteria.

11       Nowhere in the standard do they give you

12   performance criteria that says a foot control

13   should be designed in such a way that someone can't

14   accidentally slip their foot into it for it to

15   operate.

16   BY MR. HARTMAN:

17       Q.   But if you made such a foot pedal it would

18   be in compliance with the standard, would you

19   agree?

20       MR. ROBINSON:   I will object to the form of the

21   question.

22       THE WITNESS:   Not necessarily.   It depends on

23   how you make it.   It depends if it has these other

24   characteristics.   You could make it with a -- and

138

1    Linemaster does make a foot control with a door on

2    the front.  But even that control we have talked

3    about in other depositions and in my deposition,

4    the faults and failings of that, the problems with

5    that and Ralph Barnett has testified and I believe

6    he has testified, I know it is in his publications,

7    he has talked about the fact that even those with

8    doors on the front, that if you hit them hard from

9    the front, the door opens up and your foot goes

10   right inside.  So as far as preventing inadvertent

11   actuation, even that doesn't solve the problem.

12       So it has its ups and downs and if you follow

13   the protocol, the criteria, I don't believe you

14   would come to the conclusion you would put the door

15   on this foot control for this application.

16   BY MR. HARTMAN:

17       Q.   Have you ever studied the phenomenon that

18   you just discussed where if you hit the gate hard

19   enough, it would allow access to the foot control

20   and allow activation of the foot control?

21       A.   Well, you know, when you say study, as

22   being a professor at a university, that has a

23   special meaning to me.  I haven't performed some

24   kind of statistical study of that but I have one of
                                                    139

1    these kinds of Heim -- I mean Linemaster foot

2    controls with the door on the front.

3         And as you are aware of, it has a curl on

4    the front and if you hit -- I know I have done this

5    myself -- if you hit that with your foot, it

6    depends a little bit on the kind of shoe and how it

7    angles, approach and everything, you can get the

8    door to move open.

9         It is designed for that to happen because

10   if it was totally slammed shut, you would have to

11   reach down with your hand and open it.  So it is

12   intended that the tip of your foot, a part of your

13   foot can hit it and cause it to open.  And I have

14   demonstrated for myself the phenomenon that he

15   talks about and has written about in one of his

16   publications, that you can bounce the door open.

17   Q.   Other than demonstrating for yourself that

18   phenomenon that you discussed, have you seen it in

19   any other context?

20   MR. ROBINSON:  Objection to the form.  Also it

21   has been answered previously with reference to the

22   publications.

23   THE WITNESS:  The only place I can think of is

24   in Ralph Barnett's, one of his safety briefs

140

1    clearly states that that is a problem with that

2    configuration.

3    BY MR. HARTMAN:

4        Q.    On page 11 of your report --

5        A.    Yes.

6        Q.    -- the citation at the end where -- excuse

7    me -- the last paragraph it says, a review of the

8    literature for press brake shows that it is obvious

9    that the custom and practice during these years was

10   not to promote or require the use of front covered

11   foot controls for safety and press brakes.  Indeed

12   in a publication by the plaintiff's expert, it is

13   reported that the typical foot switches found in

14   industry are the open front control -- open front

15   foot control, not the front covered foot control he

16   now demands in the case.  Open-sided and

17   side-shielded foot switches, lifts are typical of

18   the control candidates found in industry.

19          Then you cite Professor Barnett's article,

20   Reciprocating Versus Pivoting; am I correct?

21       A.    Yes.

22       Q.    Is that your testimony today?

23       A.    Yes.

24       Q.    And you hold true to that?

141

1    A.    I believe so, yes.

2    Q.    Are you relying on Professor Barnett's

3    article to formulate your opinions that open-sided

4    and side-shielded foot switches are typical of the

5    control candidates found in industry?

6    A.    No, no, I am using that -- I agree with

7    him that that is true.  And I cite this document

8    where he talks in general about foot controls and

9    in this part of his publication he is talking about

10   generally in industry that you see that

11   configuration and I agree with that.

12         And I have been to plants where they have

13   had foot controls.  I have -- my employer has had

14   plants where they have had foot controls.  I have

15   looked at the literature, the codes, the standards.

16   That appears to be the custom and practice.

17   Q.    Are you aware of any manufacturer that did

18   not follow that custom and practice in the 1970s?

19   MR. ROBINSON:  Object to the form of that

20   question.

21   THE WITNESS:  I am not aware of any that

22   didn't -- I am not aware of any that mandated the

23   use of a front -- a front covering on a foot

24   control of a press brake of this type.

                                              142

1    BY MR. HARTMAN:

2         Q.   What do you mean of this type?  What type

3    is this?

4         A.   Well, I mean there are press brake that

5    are bigger or smaller, do different things of one

6    that would be competitive with this product, the

7    same approximate size, configuration, those kinds

8    of things.

9         Q.   Are you saying that size of the press

10   brake might make a difference in the type of foot

11   control utilized with the press brake?

12        A.   No, what I am saying is in my evaluation

13   of this, I am really looking at things that are

14   kind of in the same arena.

15             I am not looking at a press brake that

16   might be used in some shipyard where they are

17   trying to press a piece of iron that's 80 feet or a

18   hundred feet long.  I didn't look at those.

19   I don't know what they use.  But they probably have

20   multiple workers and they may have those foot

21   controls all in series so that no one person can

22   activate it.  I am looking at a press brake that's

23   like this one for comparison purposes.

24        Q.   Would a press brake like this one be a

                                                  143

1   single operator press brake; would that be a fair

2   definition?

3       MR. ROBINSON:  I will object to the form of the

4   question.

5       THE WITNESS:  Well, I don't know that I would

6   characterize it as a single operator.  If you look

7   at the specification for this, it has a speed.  It

8   has capacity.  It has a stroke.  It has a shunt

9   height.  It has a dye area, a certain width, a

10  certain depth, those kinds of things.

11  BY MR. HARTMAN:

12      Q.   Is it your testimony today, and I need to

13  know, that different specifications of the items

14  you just enumerated may mandate a different type of

15  foot control?

16      A.   No, I didn't say that at all.  You asked

17  me if the custom and practice, how did I come up

18  with the custom and practice is what I thought you

19  had said.  And I said I looked at the codes and

20  standards, the regulations, the documents written

21  about it and other manufacturers.

22           I didn't try to find every manufacturer in

23  the world at every point in time.  But the ones

24  I did look at that I am using for a basis of

                                                    144

1    comparison are ones that are about the same size.

2         Q.    Who would that be?

3         A.    They would be those -- some of them are in

4    the documents that I have provided you here.  There

5    is, I think, Wysong.  I have a brochure from them.

6    I think I have a brochure from Cincinnati.  There

7    are other brochures of other manufacturers in here

8    of press brakes.

9         Q.    So you would be looking at what other

10   manufacturers did in the 1970s to determine custom

11   and practice as one of your elements for custom and

12   practice?

13        A.    Not only 1970s but other periods of time

14   and currently.  And I would expect that if

15   currently that is not mandated, that it wouldn't

16   have been mandated in the '90s, '80s or '70s.

17             And I also am not looking at just the

18   custom and practice based on what people did but

19   I looked at the custom and practice based on the

20   codes and standards.  That's why I have got the

21   1970-something version of this ANSI standard, the

22   '80s-something version and the 2002 version, to

23   show there has been a consistency in the standards

24   over time in that regard also.

                                                      145

1    Q.   But you referred to the standards.  Then

2    you also -- and you also indicated a separate

3    element that you referred to is the customs and

4    practices?

5    A.   No, I referred to custom and practice

6    which includes codes, standards, regulations,

7    literature, what you see people doing then, between

8    then and now and what you see them doing now.  All

9    of that collaborates to make a custom and practice.

10        And I don't think the custom and practice

11   for press brakes have already changed from the mid

12   '70s to today with regard to the use of a foot

13   pedal of this general configuration without a front

14   door on it.

15   Q.   Has it changed with regard to the use of

16   gated foot controls?

17   A.   That's what I am talking about, a gate on

18   the front or a door on the front or something like

19   that.  You can go to the OSHA website right now and

20   see that they talk about press brakes and they show

21   a foot pedal -- it is in my report -- without a

22   door on the front, without a gate on the front.

23   And that's what they are saying, this is fine, this

24   is a good example.

146

1      Q.    Would you agree, though, that OSHA applies

2    to the employer?

3      A.    OSHA can only fine and cite employers.

4    They can sometimes incite -- cite secondary and

5    third level employers.  So -- but they don't have

6    the right or authority to cite a manufacturer who

7    manufactures something that's brought into your

8    employment place.

9      Q.    So OSHA can't mandate what Heim should do

10   with regard to the type of foot control it includes

11   with its press brake; am I correct?

12     MR. ROBINSON:  I will object to the form of the

13   question.

14     THE WITNESS:  They can't do it through any kind

15   of citation but effectively they have some

16   influence because if Heim made a press brake that

17   was in conflict with OSHA standards, OSHA in their

18   activities would give so many citations and it

19   would be precluded from being used, that they would

20   lose market share and would not be able to sell

21   that product.  The word would get around that a

22   Heim press with this configuration doesn't comply

23   with OSHA standards, don't buy it.  So they do have

24   a bully pulpit in that regard but they can't give

147

1    them a citation.

2       Q.   So OSHA cannot cite Heim for making a

3    defective product that it ships to Cory?

4       A.   That's correct.  And it is not a defective

5    product.

6       Q.   I am not asking for your opinion as to

7    whether its defective.  I am saying if Heim sent a

8    defective product to Cory, OSHA is not going to

9    cite Heim for the defective product?

10      A.   No, they would have cited Cory; and in

11   this case they cited Cory but not for a defective

12   product in regards to the foot switch.  They cited

13   Cory for not having the appropriate safeguarding in

14   forms of point-of-operation safeguarding for the

15   operator.

16      Q.   I understand.

17      A.   I am glad.

18      Q.   OSHA was silent as to Heim's culpability

19   in this matter; am I correct?

20      MR. ROBINSON:  Objection to the form.

21      THE WITNESS:  OSHA had no criticism of the foot

22   pedal, whether it had a front closure on it or not.

23   They were critical of the lack of

24   point-of-operation safeguarding which is what's

                                                148

1    mandated by OSHA.  It is what's mandated by ANSI.

2    It is what the custom and practice is for

3    safeguarding the point of operation.

4    BY MR. HARTMAN:

5        Q.    OSHA was silent in its report as to

6    whether or not Heim supplied a defective foot

7    control with its machine; am I correct?

8        MR. ROBINSON:  I object to the form of the

9    question.

10       THE WITNESS:  I guess --

11       MR. ROBINSON:  Also asked and answered.

12       THE WITNESS:  Taken in context of what

13   I said, I guess.

14   BY MR. HARTMAN:

15       Q.    Is it reasonably foreseeable that

16   operators of press brakes would place their hands

17   in the dye area?

18       MR. ROBINSON:  Objection to the form.

19       THE WITNESS:  It is foreseeable that under

20   certain circumstances operators will put their

21   hands in the dye areas with the proviso that it is

22   recommended by OSHA, by ANSI and other safety

23   organizations that that not be done.  And it is

24   recommended and required by OSHA and ANSI that

149

1    point-of-operation safeguarding be applied to those

2    pieces of equipment.  And in some very unusual

3    circumstances it is supervisory or administrative

4    controls be provided to prevent people from being

5    injured if and when they choose to do that.

6    BY MR. HARTMAN:

7        Q.   I understand but it is reasonably

8    foreseeable that individuals would place their hand

9    in the dye area of a press brake?

10       MR. ROBINSON:  Objection to the form, asked and

11   answered.

12       THE WITNESS:  I have answered it with an

13   explanation because it would be misleading just to

14   say yes or no on that.

15   BY MR. HARTMAN:

16       Q.   What is a supervisory safeguard?  You

17   indicate in your explanation that you use the term

18   supervisory safeguard.

19       A.   Sure, your expert hasn't explained that to

20   you?  I am surprised it hasn't come up.

21       Q.   Well, sir, your caveat on that is not the

22   purpose of this deposition.  The purpose of this

23   deposition is to understand what you know and how

24   you explain it because different people in the

                                                    150

1    course of events can cite things in a different

2    way; am I correct?

3        A.   Sure.

4        Q.   So my concern is today to know what you

5    consider supervisory protection or controls as you

6    have just utilized them in your explanation.

7        A.   There are allowances in codes and

8    standards and from OSHA for press brakes.  There

9    are certain procedures, certain functions that can

10   be performed on a press brake and for that matter

11   to some extent could also be performed on a

12   mechanical power press where it is very difficult

13   and financially impractical to put a

14   point-of-operation safeguard.

15       Under those circumstances you can have

16   supervisory or administrative controls where people

17   have special training, special supervision, you

18   limit the amount of pieces that are made, you take

19   special precautions, you go slow with production,

20   those kinds of things.  And those are typically

21   called administrative or supervisory safeguarding

22   methods.

23       Q.   Do you know what a supervisory switch is?

24       A.   I am assuming you are talking about the

                                                151

1    switch on this machine that allows a key to put it

2    from the jog, foot and hand control and off

3    positions.

4        Q.   Yes.

5        A.   But different people have different

6    meanings for it.

7        Q.   What do you call that switch?

8        A.   It is really a selector switch that's

9    operated with a key.

10       Q.   Do you have an opinion today as to who

11   makes the selection in the typical plant as to

12   utilizing the selector switch for the modes of

13   operation?

14       MR. ROBINSON:  Object to the form.

15       THE WITNESS:  Typically, we are talking about

16   typical, general, and there are specific variations

17   from this, the person who sets up the machine is

18   familiar with the dyes, is familiar with the

19   process, the procedures that are going to be

20   performed, familiar with the person who is doing

21   the task and their training makes that choice.  So

22   they typically set it to whether in this case it

23   should be two hand controls or foot control or off

24   and take the key away.

                                              152

```
 1        There are some circumstances where that
 2   responsibility is also the responsibility of the
 3   person who might be running the machine.
 4   BY MR. HARTMAN:
 5        Q.   What circumstances would it be the
 6   responsibility of the person who might be running
 7   the machine?
 8        A.   You see a lot of times for small run
 9   productions where there cannot be
10   point-of-operation safeguarding that a senior
11   person who might actually be like a floor foreman
12   who normally sets up the machine for someone else
13   and then walks away, that they set it up for
14   themselves, have the key and make the selection and
15   they leave the key in the machine while they are
16   doing the short run production or put it in their
17   pocket while they are doing it.  But they are
18   actually making the selection and running the
19   machinery.  And likewise maintenance and repair
20   people might have that same capability.
21        Q.   On page 12 --
22        A.   Sure.
23        Q.   -- under warnings and manual?
24        A.   Yes.
```
                                                   153

1    Q.    Item No. 3, the second section of numbered

2    items, it says the operator must read and

3    understand the manual.

4    A.    Yes.

5    Q.    Is it your testimony today that an

6    operator must read the entire manual and understand

7    it?

8    A.    I think at a minimum they should read and

9    must read the safety admonitions in the manual and

10   those features and functions that they are going to

11   be working with.  So if there is something in the

12   manual about how the on-off switch works, if there

13   is something about an emergency stop that they

14   would have to know about, if there is something

15   about how to make a normal adjustment that an

16   operator might make, then I think they need to read

17   it and understand it.

18        If there is a section in the manual about

19   how to do some special service, some engineering

20   calculation, how to evaluate the performance or

21   economic performance or wear or those kinds of

22   things, I don't expect that they should necessarily

23   read it with an eye to understanding it.  Certainly

24   they can read it.

                                              154

1            But definitely you would expect, and

2    I think it would be reasonable to expect, that if

3    you give someone a manual for a piece of equipment,

4    that they are going to try to read and try to

5    understand and follow all of the safety admonitions

6    and the functional things that they have to deal

7    with.

8        Q.    What if they have received on-the-job

9    training without the manual, would you expect them

10   to still read the manual and understand it?

11       A.    I have seen situations where the

12   on-the-job training has been so good that reading

13   the manual is just a repeat of it.  But I think on

14   a machine like this, reading the manual, at least

15   the safety admonitions are so easy, so simple, so

16   direct, that I would still recommend that the

17   operator occasionally -- read it to begin with and

18   then occasionally throughout their career reread

19   those sections.

20       Q.    Item No. 7 you say that the operation of

21   the foot control is guarded over the top and should

22   be positioned to a safe position.

23       A.    Location.

24       Q.    Location, I apologize.  Let me read that

155

1    again.

2          Item No. 7, you say that the operation of

3    the foot control is guarded over the top and should

4    be positioned to a safe location.

5          A.    Yes.

6          Q.    Do you find fault with the location of the

7    foot control as it has been described to you with

8    Ms. Lindquist's injury on the day of the accident?

9          A.    Yes and no.

10          Had there been point of operation

11    safeguarding as there was supposed to be, then

12    the -- and it was performing the way it should,

13    most likely the way she was sitting, the way she

14    was doing things and the location of the foot

15    control, as best I can understand it, would be

16    fine.

17          There is some concern about foot controls

18    that are too close to machines and that someone can

19    hit the foot control and before the machine can

20    completely cycle, they move their hand or other

21    body part into a point of operation and get injured

22    by that.

23          So there are some circumstances where the

24    location of the foot control is more important and

                                                    156

1    in more recent standards you see the recommendation

2    or requirement that foot controls be anchored in a

3    specific location depending on what's being

4    processed and how the dyes are being used and how

5    big or the shape of the piece part.

6         But for this particular accident where it

7    is small and the way the accident occurred, I don't

8    have a problem with the foot pedal or foot control

9    being where it was described.

10    Q.    I refer you to page 13 of your report,

11    please.

12    A.    Sure.

13    Q.    Paragraph 2.

14    A.    The one that starts out one?

15    Q.    Yes.  It says, one of the other safety

16    concepts used in offering add-on safety features is

17    that the application of an add-on safeguard itself

18    should not cause a new or aggravated hazard.  The

19    application of a front cover to a foot control for

20    this type of equipment causes a new or aggravated

21    hazard, that of riding the foot control.

22         Did I correctly read your report?

23    A.    Yes, I think so.

24    Q.    And is that your testimony today?

157

1    A.    Yes.

2    Q.    And the new or aggravated hazard caused by

3    adding a front gate would be the riding of the foot

4    control?

5    A.    That's correct, at least that's one of

6    them.  That's the major one.

7    Q.    Is there another one?

8    A.    Well, and I think I mentioned this later

9    on, the fact that even with the front door on a

10   device like this, whatever you want to call it, a

11   gate -- and this is like the dependency, I think

12   that's in the section I talk about it -- people

13   start depending on it and they say I don't have to

14   care where my foot -- how close it comes or if I am

15   playing around with the foot pedal, it has got a

16   door on the front but that door, a couple of things

17   could happen, it could stick in the open position

18   or as Ralph Barnett has testified, if you hit it

19   the right way with the right force, it will pop

20   open and your foot will go in anyway or whatever is

21   hitting it will go in anyway.  So those are

22   additional hazards.  But the one that's talked

23   mostly about in the literature is the riding of it.

24   Q.    Do you agree with the concept of the

                                                      158

1    dependency hypothesis?

2        MR. ROBINSON:  Object to the form of the

3    question.

4        THE WITNESS:  I think in certain contexts, yes.

5    The fact that people depend on things isn't always

6    bad but under certain circumstances and certain

7    designs that people start to depend on things

8    especially for functionality that it wasn't

9    anticipated for, then you run into a problem.

10       So when people know, for example, that a cable

11   can support a hundred pounds but they also know

12   that it really can probably support 300 before it

13   fails and if people start changing their behavior

14   and are depending on this additional capacity, that

15   can cause problems.  So it is bad to depend on

16   that.

17       I have brakes on my car and I know they will

18   stop a car in a certain distance and there is

19   nothing bad with me depending on them doing that.

20   So, you know, it has a place.  The dependency

21   hypothesis or that concept has a place.

22   BY MR. HARTMAN:

23       Q.   How do you apply the dependency hypothesis

24   to a front gate on a foot control?

                                              159

1       A.   Well, as I mentioned, you know, we have

2    got two different things.  We have got this safety

3    device should not cause its own new hazard or

4    aggravate a hazard but we have this dependency

5    hypothesis and I gave you two examples.

6           If people start depending on the front

7    door and they say, I think my foot can't get in

8    there because it has a front door on it, then there

9    is no reason for them to keep track of where the

10   foot pedal is, keep track of where their foot is

11   with regard to it.  They might actually decide they

12   want to kick the foot pedal because they are mad

13   thinking that this front door is going to protect

14   them.

15          The day that that front door stays in the

16   up position, it gets stuck, jams up there for one

17   reason or another or the day they kick it -- and

18   Ralph Barnett has identified this and I talked

19   about it too -- if you kick it the right way, it

20   will open.  And you're depending on it not opening

21   and providing its protection and it fails in either

22   of those two ways, you have a situation where the

23   dependency hypothesis would say this causes another

24   accident scenario.

160

1      Q.   Your quote is recently completed research

2    has confirmed that some press manufacturers -- what

3    some press manufacturers hypothesized, the mouse

4    trap front cover design is unsafe for most punch

5    press operations since it encourages the practice

6    of riding the pedal.  And then you footnote

7    Philosophical Aspects of Dangerous Safety Systems;

8    is that correct?

9      A.   Yes.

10     Q.   Is that what you intend on testifying to

11   in this matter?

12     A.   Yes.

13     Q.   Do you hold true to that statement today?

14     A.   It is just a quote.  I believe I quoted it

15   properly.  I guess it could be there could be a

16   typo in there.  But other than that I believe

17   I quoted it properly and I believe that's the

18   correct reference.

19     Q.   Do you agree with that statement?

20     MR. ROBINSON:  Let me object to the form of the

21   question.

22     THE WITNESS:  I agree -- I don't know that it

23   confirms what press manufacturers have hypothesized

24   but I agree with the concept that adding a front

                                              161

1    door or gate to a foot control encourages the

2    practice of riding the pedal.

3    BY MR. HARTMAN:

4         Q.   Do you consider the Philosophical Aspects

5    of Dangerous Safety Systems written by Professor

6    Barnett and Hamilton to be authoritative?

7         MR. ROBINSON:   Object to the form.

8         THE WITNESS:   You know, I would have to go back

9    and look at the entire document to answer that

10   properly.  I only quoted this particular section.

11   As I said before, I don't look to a stand-alone

12   item typically as authoritative unless there is

13   only one item and you are stuck with that.  I try

14   to find second and third and fourth, fifth level

15   sources.

16        I believe this concept that putting a door or a

17   gate on the front of a foot control encourages

18   riding the pedal has been substantiated by a

19   variety of people.  And I think that concept, the

20   concept I believe and I think it is an

21   authoritative kind of concept now.

22   BY MR. HARTMAN:

23        Q.   Did you rely upon the Philosophical

24   Aspects of Dangerous Safety Systems to Formulate

                                              162

1    your opinions in this case?

2        A.    No.

3        Q.    Did you consult the Philosophical Aspects

4    of Dangerous Safety Systems to formulate your

5    opinions in this case?

6        A.    I only consulted that to point out the

7    inconsistency in Ralph Barnett's testimony in

8    regards to his pre law -- this lawsuit publications

9    where he is acknowledging the fact that people tend

10   to ride the pedal when there is a door on the front

11   and his, in the course of this case, willingness

12   now to reject that as a hazard, as a danger and as

13   a downside.  So I only consulted this and the other

14   safety briefs to show the inconsistency between his

15   written testimony -- written statements and his

16   testimony in this case whether it is in the report

17   or in his deposition.

18       Q.    Do you have any other written statements

19   or depositions or transcripts of testimony that

20   support your position that Professor Barnett is

21   testifying inconsistently in this case?

22       MR. ROBINSON:  Object to the form.

23       THE WITNESS:  Well, he only gave one deposition

24   in this case.  How could I have multiple

                                                    163

1    depositions of him in this case?  He only gave one.

2    If he gave two, there might be more inconsistencies

3    in this case.  Are you asking from other cases?

4    BY MR. HARTMAN:

5        Q.    Yes.

6        A.    Okay.  That wasn't your question though.

7    You said in this case.

8              I don't have copies of his depositions

9    from other cases.  He keeps those guarded fairly

10   closely, and I don't have access to them.

11       Q.    My question, sir, I believe if the court

12   reporter would like to read it back but I will

13   repeat it so that you understand it is, do you have

14   any other written statements, reports or

15   depositions that support your position that

16   Professor Barnett is testifying inconsistently in

17   this case?

18       MR. ROBINSON:  Object to the form of the

19   question.

20       THE WITNESS:  No, the only documents I have

21   that I am using for that purpose are the things

22   that he has published in the open media, whether

23   they are safety briefs or other publications that

24   he may have published with ASME or National Safety

                                                  164

1    Council or things like that.

2        I do not have copies of his depositions.  I do

3    not have copies of his reports, and I do not have

4    copies of his notes from other cases.

5    BY MR. HARTMAN:

6        Q.   Have you identified any of his prior

7    depositions, his prior reports or his notes to

8    Mr. Robinson for him to consult to make a

9    determination that Professor -- to consult to allow

10   Mr. Robinson to make a determination as to whether

11   or not Professor Barnett is testifying

12   inconsistently in this case?

13       MR. ROBINSON:  Objection to form.

14       THE WITNESS:  I guess what you are asking me is

15   have I given Mr. Robinson the names of cases that

16   he could check to see if there are depositions

17   where there are inconsistencies?

18   BY MR. HARTMAN:

19       Q.   Yes.

20       A.   No, I have not.

21       Q.   Have you given him the name of cases or

22   clients where you might find -- where Mr. Robinson

23   might find reports?

24       A.   I don't know if I did or didn't but

                                              165

1    I wouldn't be surprised that I may have mentioned

2    that Triodyne in the form of Ralph Barnett

3    testified on behalf of Linemaster and I believe

4    maybe Square D in regards to their manufacture of

5    foot controls and other controls, that he has

6    testified for various press, mechanical, hydraulic

7    press manufacturers and press brake manufacturers

8    defending them concerning issues such as the

9    manufacturer cannot provide a point-of-operation

10   safeguarding but that it should be there.

11        And he may have, but I am not certain, may

12   have testified about the combination of that

13   equipment and press brakes but I don't know the

14   names of any of those cases.  I don't have the

15   notes from those cases, and I don't have his

16   reports.

17        Q.   Do you know where any of that information

18   is located?

19        MR. ROBINSON:  Object to the form.

20        THE WITNESS:  When I used to work at Triodyne,

21   there used to be archives of past closed cases that

22   Triodyne kept in their possession.  And I believe

23   in many of those situations there may have been

24   copies of photographs, videotapes and reports and

166