# EXHIBIT F

# PART 5

1    perhaps field inspection reports and the case

2    captions and the artifact would have been

3    searchable.

4    BY MR. HARTMAN:

5        Q.    Do you know if that exists today?

6        A.    I don't know.

7        Q.    I am going to take you down to the

8    paragraph on page 13 that begins with another

9    safety philosophy.

10       A.    Uh-huh.

11       Q.    It says another safety philosophy

12   developed over the years by safety professionals in

13   using evaluation of equipment, risk minimization is

14   a safety priority approach or hierarchy.

15             Are you familiar with that safety

16   hierarchy?

17       A.    Yes.

18       Q.    Can you explain for us what that hierarchy

19   is?

20       A.    Hierarchy goes something like this, in a

21   vacuum, in a void, if you knew nothing else, this

22   is the way you might approach a hazard.  The best

23   thing you can do is eliminate the hazard.

24             So if the hazard is exposure to a

                                                    167

1    chemical, if you could eliminate that chemical and

2    substitute something else, that would be the best

3    thing you can do.  And typically you can't always

4    do that.  But if you could and it is reasonable and

5    falls within other kind of constraints, that would

6    be probably the best thing you could do.

7         After that comes safeguarding.

8    Safeguarding includes things like physical barrier

9    guards and hardware things but it also can include

10   devices, methods, those kinds of things.

11        The third, fourth and fifth items which

12   sometimes shift their position include things like

13   training, warning and personal protective equipment

14   and/or clothes, clothing.

15        So in this case the use of tools would

16   have been one way of helping to safeguard this

17   particular area.  Excuse me.  The primary way,

18   though, since you cannot typically, on a press

19   brake you cannot always eliminate the hazard, the

20   most common thing to do is to provide safeguarding.

21   And that typically takes the form of light curtains

22   or other kinds of barriers to prevent your hands

23   from being in the point of operation during the

24   cycle.

168

1      Q.    Would the protection against inadvertent

2    activation of the machine be a safeguarding method

3    in the safety hierarchy?

4      A.    No, the control activation of machines is

5    not intended to be a way of safeguarding the point

6    of operation on equipment like power presses and

7    those kinds of things.  What they want, what they

8    being ANSI and OSHA want, is that point of

9    operation having a safeguarding applied to it,

10    which generally, as I said, is light curtains or

11    barrier guards.

12          As I mentioned before, there are some

13    situations where it is not reasonable to expect

14    that you are going to use a barrier kind of guard

15    and then you go to administrative/supervisory kinds

16    of activities.  But the way to safeguard this point

17    of operation is not to change the foot pedal from

18    one pedal to another.  It is just not part of that.

19      Q.    Is inadvertent activation of a press brake

20    ever a good thing?

21    MR. ROBINSON:  Object to the form of the

22    question.

23    THE WITNESS:  Well, let me put it this way,

24    inadvertent of the press brake at certain times

                                                    169

1    could be a terrible thing.  It can ruin the press

2    brake.  It can ruin parts.  It can ruin dyes and it

3    can injure people.  But there a lot of times when

4    presses are inadvertently activated and none of

5    those things happen.  That's the best I can answer

6    that.

7    BY MR. HARTMAN:

8        Q.   Is it ever good?

9        MR. ROBINSON:  Same objection.

10       THE WITNESS:  I don't know.  I have never

11   really thought about it in that context.  As I sit

12   here, I can't think of something good about it; but

13   most of the time I think it winds up being benign.

14   But there are serious considerations when any kind

15   of equipment starts up at an inappropriate time.

16       If your car were to start up at an

17   inappropriate time, it could cause problems.  If

18   your car were to move at an inappropriate time, it

19   could cause problems.  That doesn't mean that the

20   brakes are bad or the accelerator is bad.  It is

21   just unexpected things can quite often cause

22   problems.

23   BY MR. HARTMAN:

24       Q.   Have you applied the safety priority --

                                                    170

1    have you applied a safety prioritization system in

2    evaluating this accident with Ms. Lindquist?

3        MR. ROBINSON:  I will object to the form of the

4    question.

5        THE WITNESS:  I think I have.  I don't know

6    that I have formally went through it in here but

7    I think I mentioned several times that the solution

8    to this hazard, the solution that would have

9    prevented this accident is not with the foot

10   control but with point-of-operation safeguarding

11   which it is my understanding Cory had on --

12   available for this kind of machine and for other

13   press, mechanical presses and maybe other press

14   brakes at the facility.

15       So they were aware of it.  They had it.  They

16   had it in place.  They had it -- they are familiar

17   with it.  It wasn't like they were strangers of

18   this kind of safeguarding.  They just didn't apply

19   it on this machine and allowed it to be operated

20   without point-of-operation safeguarding.  That

21   would be Item No. 2 on the safety hierarchy,

22   providing some kind of safeguarding.

23   BY MR. HARTMAN:

24       Q.   Would you agree, sir, that had not

                                                    171

1    Ms. Lindquist inadvertently activated the foot

2    control on the day of her accident, this injury

3    would not have occurred?

4        MR. ROBINSON:  Object to the form of the

5    question.  Misstates the testimony.  Misstates this

6    witness's prior testimony where he did not

7    acknowledge the inadvertent activation at all.  So

8    you are now trying to get an answer that changes

9    his prior testimony.  It is very misleading the way

10   you did that.

11       THE WITNESS:  Yeah, you know, I think

12   previously I said I think she was riding the pedal.

13   But regardless there are a lot of things you could

14   say if it wasn't for this, this accident wouldn't

15   have happened.

16       Maybe if she had been home that day, it

17   wouldn't have happened.  Maybe if someone else had

18   volunteered for the job, it wouldn't have happened.

19   Maybe if there had been a lightning storm and the

20   power went out, it wouldn't have happened.

21       The reason this accident happened isn't because

22   she may have, and I don't believe she did, but you

23   are alluding to maybe she inadvertently stuck her

24   foot in there.  The reason this accident happened

172

1    is because her employer ignored all of the training

2    criteria, all of the supervisory criteria, all of

3    the guarding criteria of ANSI, their industry and

4    OSHA.

5        They set up the machine and allowed it to be

6    operated without a point-of-operation safeguarding.

7    They set it up where she was having her hands in

8    the point of operation.  They didn't encourage her

9    or test her or verify for themselves that she read

10    the manual, that she followed any of the

11    instructions in the manual or on the machine and

12    they allowed that condition to go on long enough

13    that eventually I believe while riding the pedal

14    she injured her hands.

15    BY MR. HARTMAN:

16        Q.   Sir, my question is had not Ms. Lindquist

17    have activated the foot control, would you agree

18    that she would not have been injured on the day of

19    her accident?

20        A.   No, no, had her hands not been in there --

21    I mean there are a lot of things.  You know, where

22    do you want to draw the line?  It is -- the cause

23    of this accident -- the cause of this accident

24    isn't that she -- that you are alleging that her

173

1    foot accidentally went in there.

2         That's allowed to happen.  That's allowed

3    by the codes and standards to happen.  You are

4    supposed to have a point-of-operation safeguarding.

5         The question you should be asking me is

6    isn't it true this accident wouldn't have happened

7    if this employer did the custom and practice, if

8    this employer followed ANSI standards, if this

9    employer followed OSHA standards, if this employer

10   put on this machine what they had on every other

11   machine in the adjacent area, those kinds of

12   safeguarding.  That's what would have prevented

13   this accident from happening.

14        But you are posing a question that, you

15   know, if you want, yes, if it wasn't for that, it

16   wouldn't have happened but that's not the causal

17   factor here.

18   Q.   Sir, my question is -- I am entitled to

19   ask the question as I see fit and you are obligated

20   to answer my question.

21   MR. ROBINSON:  Well, that implies that he

22   hasn't.

23   MR. HARTMAN:  Well, he has not answered my

24   question.

                                                174

1          MR. ROBINSON:   That's argumentative.   What's

2     the question?

3     BY MR. HARTMAN:

4          Q.   My question sir, is, if Ms. Lindquist had

5     not activated the press brake by use of the foot

6     control on the day of this accident, would she have

7     been injured?

8          A.   I can't answer it any better than

9     I already have.

10         Q.   Would she have been injured?

11         A.   I can't answer that question any better

12    than I already have.

13         Q.   Is it your testimony that you cannot

14    answer me that had she not activated the foot

15    pedal, she would not have been injured?

16         A.   No, what I am testifying, I can't answer

17    it any better than I already have; and if I give

18    you a yes-or-no answer, it would be misleading and

19    deceptive.   And I don't intend to do that.   So I am

20    giving you the best, complete, clear answer I can.

21         Q.   What is deceptive about if she had not

22    operated the foot control, the machine would not

23    have cycled and her hand would not have been

24    injured?   What is deceptive about that statement?

175

1          MR. ROBINSON:  Objection, argumentative.

2     BY MR. HARTMAN:

3          Q.    That statement?

4          MR. ROBINSON:  Objection, argumentative.

5          Why are you yelling, Mr. Hartman?

6     BY MR. HARTMAN:

7          Q.    Answer me.

8          A.    My answer if I were to give that answer

9     would be deceptive because it leaves out important

10    facts, the fact that it is not safeguarded, the

11    fact that the employer knew it was safeguarded, the

12    fact that the employer avoided and did not follow

13    all of these mandated requirements, that the

14    employer had these safeguards readily available to

15    them and they didn't use those.  Those kind of

16    things, leaving those things out leaves someone who

17    doesn't know that with a misleading conclusion.

18    And I am sworn here to tell the truth, the complete

19    truth, at least that's my impression, and answering

20    the question yes or no would not do that.

21         Q.    Sir, would you agree that the machine

22    cycled by the operation of the foot control on the

23    day of Ms. Lindquist's injury?

24         A.    Yes, it did.

                                                    176

1    Q.   Would you agree, sir, that had she not hit

2    the foot control the machine would not have cycled?

3    A.   I will agree with that.

4    Q.   Would you agree that had the machine not

5    cycled there would have not been the opportunity

6    for her hands to be crushed?

7    MR. ROBINSON:  I will object to the form of the

8    question.

9    THE WITNESS:  Had the machine cycled -- repeat

10   that.

11   BY MR. HARTMAN:

12   Q.   Sir, my question was, had the machine not

13   cycled while her hands were in the dye, she would

14   not have sustained the injury?

15   A.   Sure, if her hands were out of the dye

16   because there a was a point-of-operation

17   safeguarding, for example, or followed procedures,

18   she would not have been injured.

19   Q.   No, I am saying, sir, if your hands are in

20   the dye and the machine doesn't cycle, you will not

21   be injured; will you agree with me on that?

22   A.   Injured as she was, that's correct.

23   Q.   The last full paragraph of page 13.

24   A.   The one that starts out the use?

177

1    Q.    Yes.

2    A.    Uh-huh.

3    Q.    The use of a front cover over the foot

4    control would result in a configuration that from a

5    safety perspective might help the operator, might

6    do nothing to help the operator or might hurt the

7    operator; is that your testimony for that?

8    A.    Yes.

9    Q.    The plaintiff's expert has identified this

10   type of device as a Class 5 device on the

11   classification of safeguarding device, Ralph

12   Barnett, R. Barnett, P. Barroso, Junior, Triodyne

13   Safety Brief, V.1, N.1, Reprint April 1981.

14        Did I correctly read that?

15   A.    Yes.

16   Q.    Do you understand what the classification

17   of safety devices is as authored by Professor

18   Barnett and Mr. Barroso?

19   A.    Sure, I think in his development of that

20   over the years I have actually given him examples

21   of things.

22   Q.    Do you agree with the classification

23   systems outlined on -- in the article on the

24   classification of safeguarding devices?

178

1        MR. ROBINSON:  Object to the form.

2        THE WITNESS:  Do I agree that he wrote it --

3   BY MR. HARTMAN:

4        Q.   No, do you agree with classifying safety

5   systems as outlined in that article?

6        MR. ROBINSON:  Same objection.

7        THE WITNESS:  You can classify safety devices

8   in various different ways.  That is just one way

9   that has been done by other people and Ralph

10  Barnett incorporated it into a safety brief.

11  BY MR. HARTMAN:

12       Q.   Have you ever used that classification

13  system in classifying safety devices?

14       A.   I actually use that as one of the examples

15  of ways to classify safety devices in a safety

16  course that I teach.

17       Q.   Is it a legitimate method of classifying

18  safety systems?

19       MR. ROBINSON:  I will object to the form of the

20  question.

21       THE WITNESS:  It is legitimate but it can't be

22  taken in a vacuum.  You can't just say we are going

23  to classify things and not think about codes and

24  standards, criteria, accident trends, all of those

179

1    other kinds of things.

2        But if someone puts you in a room and says all

3    I want you to do is come up with two or three

4    different ways of classifying safety devices, this

5    could be one of those ways.

6    BY MR. HARTMAN:

7        Q.   Do you classify the foot control with a

8    gate as a Class 5 safety system?

9        A.   I would say following this protocol, this

10   method, it would be a Class 5 device.

11       Q.   In your analysis of this type of safety

12   system with a gated foot control, would you utilize

13   the classification system?

14       A.   I didn't understand the question.  Say

15   that again.

16       Q.   Well, would you use the classification

17   system as outlined in the --

18       A.   Safety briefs?

19       Q.   Safety brief on the classification of

20   safeguarding devices to evaluate the foot control

21   in this situation?

22       MR. ROBINSON:  Objection to the form.

23       THE WITNESS:  No, I wouldn't -- I probably

24   wouldn't approach it that way.  The way I would go

                                              180

1    is I would look at the codes and standards and see

2    what they mandate, what they require.

3        And they allow, they mandate, they require the

4    kind of pedal that we saw that was sold with this

5    product when Heim -- when it left Heim's control

6    and at the time of the accident.  So I would look

7    to that.  I wouldn't waste time trying to classify

8    it.

9        The only reason for this section to be here is

10   Ralph Barnett has said this is a good way to make

11   this evaluation, and he has come up with a chart

12   and a classification system that if you follow and

13   if you use, you have to come to the conclusion that

14   the gate on the front of a pedal is a bad idea for

15   Heim to require or mandate on a press brake of this

16   type.

17   BY MR. HARTMAN:

18       Q.   So basically the reason you have that

19   paragraph is to comment on Professor Barnett's

20   analysis as opposed to saying you are using the

21   system for your own analysis?

22       A.   I am commenting on the fact that prior to

23   this case he published documents and embraced

24   positions having to do with classification and

181

1    safeguarding, application of safeguards that are

2    180 degrees or just the opposite to what he is now

3    saying in this case.  That was the reason.

4        Q.   Sir, the reason you said that specific

5    citation is because you are pointing out that with

6    regard to that citation at that point in your

7    report is to illustrate that Professor Barnett has

8    testified or has classified things differently in

9    prior situations?

10        MR. ROBINSON:  Object to the form.

11        THE WITNESS:  Not that he has classified things

12    in prior depositions.  That in his report and for

13    this case he has taken a position that's counter to

14    his general publications about safety and this is

15    one.

16    BY MR. HARTMAN:

17        Q.   So you are not incorporating the

18    classification system outlined in the

19    classification of safety devices as part of your

20    analysis as to whether or not the foot control with

21    a gate is appropriate for use with a Heim press

22    brake?

23        MR. ROBINSON:  Objection to the form.

24        THE WITNESS:  I wouldn't have used that

                                          182

1   classification system, no.  It wouldn't be a

2   primary resource.  You might -- if someone said

3   make an exhaustive list of all of the reasons why

4   not to do this, this might be one of them; but it

5   wouldn't be the first, second or third.

6   BY MR. HARTMAN:

7       Q.   Is that something that you used in

8   determining that you would not utilize a gated foot

9   control on a press brake?

10      MR. ROBINSON:  Objection to the form.

11      THE WITNESS:  No, what I would use are the

12   codes and standards.  But if someone said what

13   about beyond codes and standards, what about beyond

14   custom and practice, what about beyond what someone

15   else is selling, what else could you do?  How else

16   could we approach this?  I might say, well, there

17   is this classification system and let's try to use

18   that.

19      And if we use that, we find we are consistent

20   with the codes and standards and custom and

21   practice that do not embrace the use of a foot

22   pedal with a door on it for press brakes.

23   BY MR. HARTMAN:

24      Q.   I understand that if someone asked that

                                              183

1    but in formulating your opinion did you use that

2    classification system as part of your analysis as

3    to why a gated foot control should not be utilized

4    in conjunction with the Heim press brake?

5         MR. ROBINSON:  Objection to the form.

6         THE WITNESS:  I considered it.  I went through

7    it but I didn't use it as my primary analysis, no.

8    BY MR. HARTMAN:

9         Q.   Did you use it as any part of your

10   analysis?

11        A.   Just to point out the inconsistency.

12        Q.   So you basically have just used it to

13   rebut what Professor Barnett has said to show he

14   has been inconsistent in his report --

15        A.   What I did was I said, let's assume that

16   We were to use press -- Ralph Barnett's safety

17   philosophy.  Let's assume we were to use it.  It

18   would be -- it would result in a conclusion

19   contrary to what he has testified in his deposition

20   and in his report.  That's what I primarily used it

21   for.

22        But as I said, you could use it.  I don't

23   know that I overtly used it, and I wouldn't think

24   it is the primary deciding factors by any means.

184

1    But it is inconsistent with what his philosophy is

2    in his writings and what he is now saying in this

3    case.

4       Q.    If his classification system would have

5    said that the foot control should be utilized, the

6    gated foot control should be utilized in

7    conjunction with a press brake, would that have

8    changed your opinion?

9       MR. ROBINSON:  Objection to the form.

10      THE WITNESS:  Well, it would be an irrational

11   result.  It would be inconsistent with the thing.

12   If you have something that says it should be round,

13   round, round and now I say it should be square, you

14   would say this article doesn't make any sense.

15      So if you use the philosophy, philosophical

16   aspects here, you wouldn't come to that conclusion;

17   and if it did, you would say this article doesn't

18   make sense.

19      THE VIDEOGRAPHER:  Off the record at 11:47 a.m.

20                   (A short break was taken.)

21      THE VIDEOGRAPHER:  This is the beginning of

22   Tape No. 3.  Back on the record at 11:51 a.m.

23   BY MR. HARTMAN:

24      Q.    Let's turn to page 14, please.

                                              185

1      A.    Sure.

2      Q.    With regard to training and the safety

3   hierarchy, would HOOD be a training method of

4   safeguarding machines?

5      MR. ROBINSON:  Object to the form.

6   BY MR. HARTMAN:

7      Q.    Do you know what HOOD is?

8      A.    Yes.

9      Q.    What is HOOD?

10     A.    HOOD is an abbreviation or acronym that

11  stands for Hands Out of Dyes.

12     Q.    Is part of the Hands Out of Dyes method of

13  safeguarding the machine, the operator, involve

14  training of the operator?

15     MR. ROBINSON:  Objection to the form.

16     THE WITNESS:  That's two questions really.

17     Hands Out of Dyes is a recommended practice

18  that currently is not a complete adequate way of

19  safeguarding most machines in most operations but

20  it is something that's embraced by ANSI.  It is

21  something embraced by OSHA.  It is something

22  embraced by the safety community.

23     It relies heavily on supervision, training and

24  worker's ability to perform their function with the
                                                186

1    right kinds of, in this case, perhaps right kinds

2    of hand tools to take pieces and put them in and

3    take them out.

4    BY MR. HARTMAN:

5       Q.   So HOOD requires supervisory training,

6    operator training, designing the interface with the

7    point of operation and use of tools by the

8    operator?

9       MR. ROBINSON:  Objection to the form.

10      THE WITNESS:  It requires that the worker, the

11   operator be trained, has supervision and probably

12   in this particular operation be provided with tools

13   so as to put the piece parts in and to take the

14   completed or the part out after it has been

15   processed.

16   BY MR. HARTMAN:

17      Q.   Do you know why HOOD has not been

18   instituted as a means to eliminate hands being in

19   the dye area?

20      MR. ROBINSON:  Objection to the form.

21      THE WITNESS:  Because when it was introduced,

22   it was introduced at a time when procedural

23   standards were not accepted very well.  And at that

24   point in time in the '70s, most of the standards

                                                      187

1    were being written around hardware kinds of things.

2        Today, if HOOD was introduced today, it might

3    be more likely to be embraced and accepted because

4    we have many more procedural standards that are

5    accepted now.

6        The problem with HOOD was that employers

7    started to use it in place of safeguarding.  They

8    started to rely too heavily on it.  And when they

9    could have easily provided point-of-operation

10    safeguarding, they would say, well, we will just

11    train the guy or train the person and rely on that

12    when it probably was better to do it other ways.

13        HOOD also had some application for small

14    production runs where point-of-operation

15    safeguarding may have been impractical.  And under

16    those circumstances it was decided that you could

17    run a machine and put your hands in the point of

18    operation as long as there was a lot of

19    supervision, administrative controls and it cost

20    production which meant money.

21    BY MR. HARTMAN:

22        Q.   On the first full paragraph of page 14

23    beginning with additionally --

24        A.   Yes.

188

1      Q.    -- it says additionally there is some

2   enhanced hazard communication to an operator in the

3   use of this, where in the sheer operation of the

4   machine informs the operator of the presence of a

5   potential hazard at the point of operation.

6         Did I correctly read your report?

7      A.    I think so.

8      Q.    And is that your testimony today?

9      A.    Yes.

10     Q.    Would you explain what you mean by the

11   sheer operation of the machine informing the

12   operator of a hazard communication?

13     A.    If I have a hole in that wall that your

14   finger could fit in and you have no idea what's on

15   the other side, you might put your finger in it not

16   knowing what's on the other side.  It is just a

17   hole in the wall.

18         But if the rest of the wall was Plexiglass

19   and you saw that on the other side of the wall

20   there were bunch of poisonous snakes and if you put

21   your finger in there, the snakes would bite you,

22   you probably wouldn't put your finger there.

23         This machine manifests its danger every

24   time it makes a piece.  There is a huge ram.  There

                                              189

1    are huge dye pieces.  There are stationary pieces

2    that come together with enough force to bend and

3    shape metal.  And there is no doubt about it that

4    if you have your hand there, it will be injured.

5          Ralph Barnett in one of his publications

6    has the Doctrine of Manifest Danger, which talks

7    about that fact.  When danger announces itself,

8    that phenomenon itself is part of the safety of the

9    machinery.

10         When brakes start to fail and they start

11   to make an ugly noise before they put you in

12   jeopardy, that's part of the safety of the machine.

13   When a machine starts to vibrate for three days

14   before it throws a piece out and hurts you, that

15   vibration is alerting you to that something is

16   wrong.

17         This machine, its very action tells the

18   operator that if they have their hand in there and

19   they touch the controls or the controls were to go

20   off by themselves, that they would be seriously

21   hurt.

22         Now the plaintiff in this case

23   acknowledged the fact, and I think she used the

24   term, yeah, it is common sense that if my hands are

                                              190

1    in there and I put my foot on the pedal, I am going

2    to be hurt.

3         So I am talking about it.  Ralph Barnett

4    had a publication about it.  The plaintiff in this

5    case acknowledges she knew that was the situation.

6    Q.    The Doctrine of Manifest Danger is the

7    protocol advocated by designers for causing a

8    machine or a system to communicate to users that

9    its safety has been compromised before the injury

10   occurs; is that correct?

11   A.    Yes.

12   Q.    And the Doctrine of Manifest Danger, is

13   that something you understand?

14   A.    Yes.

15   Q.    Is that something you agree with?

16   MR. ROBINSON:  Object to the form.

17   THE WITNESS:  You know this, the Doctrine of

18   Manifest Danger is a title that Ralph Barnett has

19   put on this.  This concept has been around for a

20   long time, and we have all known it.

21   We know that you shouldn't step out in front of

22   a moving car; and the bigger the car is, whether it

23   is a truck, it is even more likely you don't want

24   to step out in front of.  If it is a little kid on

                                              191

1    a tricycle, you might step out in front of it

2    because you know it is not a big danger.

3        So these concepts in some ways are ubiquitous

4    in our upbringing in the United States.  So it is

5    not like I agree that someone has come up with

6    putting this title on here.

7        This concept is something I don't think is

8    something that you say you agree with.  I think it

9    is something we have all experienced.  And in a

10    safety brief this was just made into an article to

11    highlight that.

12    BY MR. HARTMAN:

13        Q.    What do you call the protocol advocated by

14    designers for causing a machine or system to

15    communicate to users its safety has been

16    compromised before an injury occurs?

17        A.    What do I call it?

18        Q.    Yes.

19        A.    I call it that people have some common

20    sense and can identify many of the hazards in their

21    environment, work environment, home environment and

22    they respond appropriately.

23            Now, there are some hazards it is hard to

24    understand.  So a hot pot, a little kid doesn't

192

1    know it is hot and they are apt to take their hands

2    on it and get burned.  So that's an example of a

3    hazard that doesn't manifest its danger.

4         Now and perhaps you could make pots that

5    when they got hot, changed color and then you can

6    see it is hot because it changes color and we

7    haven't done that.

8         But there is this protocol that we go

9    through in our every day lives as users and

10    protocols that people use in designing equipment

11    that help to tell us that there is a hazard there.

12    It may be the way a machine moves, it vibrates,

13    makes a noise, a light comes on.  All of those

14    things tell us there is a hazard here and that's

15    what this manifest danger fancy titled article was

16    about.

17         And it was put kind to make it a little

18    more interesting in the context of when things

19    fail.  But manifest danger isn't just about when

20    things fail.  If the danger is there, sometimes it

21    manifests itself in a very obvious way; and

22    sometimes it is hidden.

23         In this case that danger would have been

24    very obvious to anyone who uses this machine.

193

1      Q.    Is there a protocol advocated by designers

2   for causing a machine or system to communicate to

3   users its safety has been compromised before an

4   injury occurs?

5      A.    I think there is this general protocol

6   that you try to alert people in your design and in

7   your use of equipment, you appreciate that, that

8   something is hazardous, yes.

9      Q.    What is the compatibility hypothesis that

10   you utilized in the fourth full paragraph, third

11   line, it says, in the deposition of one of the Cory

12   setup personnel, it is indicated that all other

13   presses at the plant utilized light curtains and/or

14   two hand controls but plaintiff's expert has

15   ignored his own compatibility hypothesis.

16      A.    Yes.  If you look at Ralph Barnett's

17   publications, one of them has a section about the

18   compatibility hypothesis.  And the idea is if you

19   have five similar machines that they should have or

20   one machine with five similar hazards on it, for

21   example, that all of those hazards should have

22   about the same level of safety.

23          So if there are five pinch points on a

24   machine and one has a guard on it that's

194

1    interlocked, then they probably all should have

2    guards that are interlocked because people have the

3    expectation that it is going to be guarded equally.

4    So there is this compatibility kind of thing.

5        It is incompatible if one is guarded to a

6    higher level than another.  So if you have multiple

7    machines and they all have light curtains on them,

8    in some ways it is very incompatible to have a very

9    similar machine, has similar kinds of things, has

10   similar kinds of hazards and you don't put it on

11   there.

12       The reasonable thing to do is to try to

13   make those machines all consistent and compatible

14   one with the other which would mean in this case

15   having light curtains on this machine.

16       So in his writings Ralph Barnett has

17   embraced this idea that workplaces should have

18   consistency or compatibility in safeguarding

19   approaches.  In this particular case he hasn't

20   mentioned that.  He has ignored that, the fact that

21   other machines with similar hazards have light

22   curtains on it and this one doesn't.  That is

23   incompatible.  That can lead to an accident by

24   itself.

195

1      Q.   Do you agree with the compatibility

2   hypothesis?

3      MR. ROBINSON:  Objection to the form.

4      THE WITNESS:  I believe in the compatibility

5   hypothesis not using necessarily that term.  It is

6   something that we all have again experienced.  If

7   you have a fleet of cars in your house, two or

8   three cars, as you get from one car to another, the

9   horn is in the center.  The horn is on here.  The

10  horn is on the end of the thing.

11      It is the inconsistency.  So you are in an

12  emergency and you are used to driving the car with

13  the horn on the center.  And you hit the center.

14  It doesn't do anything.  It is not compatible with

15  the other car.

16      So there is this inconsistency that can cause

17  accidents by itself.  If sounding your horn was

18  critical and you couldn't find your horn and you

19  had to search around three different places to find

20  it, it may delay you sounding your horn to the

21  point where there is an accident.

22      So I believe in the fact that compatibility and

23  miscompatibility can lead to reducing accidents and

24  increasing the probability of accidents.

                                              196

1    Q.   Did the incompatibility of safeguards in

2    the Cory plant cause the accident Ms. Lindquist was

3    involved in?

4    MR. ROBINSON:  Objection to the form.

5    THE WITNESS:  I don't think the incompatibility

6    by itself did.  I think it needed a

7    point-of-operation guarding, and I think the

8    point-of-operation safeguarding should have been

9    compatible with the other machines.

10    So if the other machines all used light

11    curtains, I think it is reasonable to use light

12    curtains here.  If all of the other machines used

13    barrier guards and this one used a light curtain,

14    then there might be some incompatibility where

15    people have the expectation that this machine has a

16    barrier guard on it when it doesn't.

17    But I don't think the incompatibility here

18    caused it.  The point I was trying to make in this

19    part of the report was that if you looked at

20    compatibility and incompatibility, the obvious

21    conclusion would be this machine needs to be

22    compatible with the other machines.  It should have

23    had the same safeguarding.  It should have had

24    light curtains.

197

1

2    BY MR. HARTMAN:

3         Q.    On page 15 you indicate that there are

4    additional comments concerning the plaintiff's

5    expert report.

6         A.    Yes.

7         Q.    Does -- did anything in Professor

8    Barnett's report -- strike that.

9              Did you use anything in Professor

10   Barnett's report in order to formulate your opinion

11   that the Heim press brake was safe?

12        MR. ROBINSON:  Object to the form.

13        THE WITNESS:  Did I use anything in his report

14   to conclude that the Heim press is safe?

15        I used the same codes and standards he used.

16   I used the same ANSI and OSHA codes, and they say

17   the press is safe.  The press as far as the foot

18   control the way Heim sold it is safe.

19   BY MR. HARTMAN:

20        Q.    Let me rephrase the question.

21              Did you rely upon any of Professor

22   Barnett's writings or articles or analysis to make

23   your determination that's contained in your report

24   that the Heim press brake was safe?

                                               198

1    MR. ROBINSON:  Object to the form.

2    THE WITNESS:  Well, you kind of asked this

3  question as we have gone along about do I believe

4  in this doctrine, do I believe in this safety

5  philosophy, do I believe in this theorem that Ralph

6  Barnett has before and typically my answer has been

7  in regards to this accident and this piece of

8  equipment and the foot controls, I wouldn't use

9  those.  I would use the codes and standards as

10  primary sources for making that decision.

11    And then I said if I was asked to, I might use

12  other methods and they might include the general

13  literature and the custom and practice.  And one of

14  those other methods might be using some of these

15  philosophical approaches.

16    As I mentioned, I use several of these

17  philosophical approaches in classes I teach about

18  safety.  But you can't take these things in a

19  microcosm and then apply them cart blanche.  There

20  are broad statements in these publications

21  repeatedly that I think are inconsistent, and

22  I used those to identify those inconsistencies.

23  And I don't see a problem in using those.

24    I don't see a problem in saying the dependency

199