# EXHIBIT F

# PART 6

1    hypothesis or that kind of concept means people

2    will rely on this device and the fact that it has a

3    failure mode where you hit your foot on the front

4    of it and it opens up means that there is a failure

5    mode that can manifest itself in a new hazard.

6         I don't have a problem using the fact that

7    there is safety philosophy in Ralph Barnett's

8    publications that you shouldn't add a safety device

9    if it is going to cause a new hazard or aggravate

10   an existing hazard.  I think putting the door on

11   does cause a new hazard or aggravate existing

12   hazards.

13        So I could use those.  I have used them to some

14   extent.  But they are not really the one or two

15   primary sources that I would use for making this

16   evaluation because I think that would be

17   inappropriate.

18        But from a philosophical standpoint I have no

19   problem using these and I guess to some extent

20   I may have used them.

21   BY MR. HARTMAN:

22        Q.   Okay.  If you would have said you may have

23   used them, you would have answered my question.

24        A.   Well, you know, I tend to be long-winded.

                                              200

1    I am sorry.

2        MR. ROBINSON:  Yeah, we have the time to spend

3    here today.  If the witness ever wants to describe

4    his answer and his thought process as he has just

5    done in getting to his answer, I just don't want

6    him to be under any misconception that's what he is

7    required to do or being asked to do.

8    BY MR. HARTMAN:

9        Q.    On page 15 you indicate Linemaster never

10   promoted the front cover foot control for press

11   brake -- for a press brake of this type and to this

12   date does not in any way suggest and/or restrict

13   the sales of covered or uncovered foot switches for

14   press brakes.

15           Did I accurately read your statement?

16       A.    Yes.

17       Q.    Am I correct that Linemaster does not

18   promote any type of foot control for press brakes?

19       A.    That's correct.

20       Q.    Am I correct that they do not suggest or

21   restrict the sales of any of its foot controls for

22   any product?

23       A.    As far as I am aware of, that's correct.

24       Q.    You refer to Linemaster, American Foot

201

1    Switch Leader Catalog, 1979, Woodstock,

2    Connecticut, 1979 in your report; am I correct?

3    That's at the very bottom.

4        A.    Yes.

5        Q.    Do you have a copy of that with you?

6        A.    No, I don't.

7        Q.    Could you provide me with a copy of that,

8    please?

9        A.    I think that -- I will see if I can get a

10    copy of that, yes.

11        Q.    Thank you very much.

12        A.    The entire document or the -- what I have

13    quoted here?

14        Q.    I would like the entire catalog.

15        A.    I don't know if I have the entire catalog.

16    I may just have the page I am quoting from.

17        Q.    Whatever you have.  If you just have the

18    page, I have a copy of that.  If you have the

19    entire document, I would prefer that.

20        A.    Okay.  Can you put that request in

21    writing?  Because I am not going to remember it

22    based on this deposition.

23    MR. ROBINSON:  It will go through me and then

24    we will separately include your time for any

202

1    follow-up requests so that Mr. Hartman can foot

2    that bill.

3    BY MR. HARTMAN:

4        Q.    Does ANSI or OSHA permit -- promote the

5    latch trip lever contained in the Model 511

6    Linemaster foot control?

7        MR. ROBINSON:  Object to the form.

8        THE WITNESS:  Do they promote it?

9    BY MR. HARTMAN:

10       Q.    Yes.

11       A.    I have never seen it identified as the

12   preferred method, no.

13       Q.    Do they embrace it?

14       MR. ROBINSON:  Objection to the form.

15       THE WITNESS:  I haven't seen it identified as

16   here is the example of what we would recommend as

17   far as giving an example.  I don't think they would

18   disallow it but I haven't seen it where it says

19   this is the -- this is the best way to do it.

20   BY MR. HARTMAN:

21       Q.    Does ANSI ever say this is the best way to

22   protect a foot control from inadvertent activation?

23       MR. ROBINSON:  Object to the form.

24       THE WITNESS:  I think by giving -- diagrams and

203

1   giving functional characteristics particulars they

2   do promote it.  They talk about it should be

3   guarded from the top and from the side.  They never

4   talk about it needing to be guarded from the front.

5   So I think that is a way of promoting that

6   configuration.

7   BY MR. HARTMAN:

8      Q.   So if ANSI has a diagram of a foot

9   control, they are promoting the foot control is

10  your testimony?

11     A.   I think they are giving it as an example

12  and by doing it, they are promoting that.  They are

13  demonstrating here is a good example.  I don't

14  think they would put -- without saying this is a

15  bad example, I don't think they would put it in

16  their documentation and offer it if it was the bad

17  example or an inadequate example.

18     Q.   Do you believe that a covered foot control

19  with a latch in it is a safer foot control for

20  operating a press brake than merely a covered foot

21  control?

22     MR. ROBINSON:  Objection to the form.

23     THE WITNESS:  I think safer is a difficult

24  thing to evaluate in this case.  It enhances some

1    features but it can cause some other problems.  So

2    it is just -- I think I would characterize it is a

3    different feature but I don't know that it is

4    always going to be safer.  I don't think it has

5    been studied to verify that it is always safer.

6    Therefore, I really can't say that it is always a

7    safer design.

8    BY MR. HARTMAN:

9        Q.   Are you aware of any analysis as to the

10   511 foot control with a latch as compared to the

11   covered foot control without the latch?

12       A.   I haven't seen any analysis that says that

13   one is measurably safer than the other.

14       Q.   Do you have an opinion as to whether one

15   is measurably safer than the other?

16       MR. ROBINSON:  Objection, just asked and

17   answered.

18       THE WITNESS:  I think there could be

19   circumstances where it may be safer and other

20   circumstances where it does nothing and a third set

21   of circumstances where it might cause another kind

22   of accident scenario.

23   BY MR. HARTMAN:

24       Q.   With regard to a foot control being

205

1    included as standard equipment on a brake press --

2         A.    Press brake.

3         Q.    -- press brake, do you have an opinion as

4    to whether or not the toe latch should be included

5    as standard equipment as opposed to a foot control

6    without the toe latch?

7         MR. ROBINSON:  Objection to the form.

8         THE WITNESS:  I see no reason that the standard

9    equipment with a toe latch.

10        And when I say that, I mean that it has to have

11   a toe latch.  You can provide it that way but

12   I don't believe it has to have a toe latch for it

13   to be reasonably safe.

14   BY MR. HARTMAN:

15        Q.    Is a manufacturer who includes as standard

16   equipment a -- strike that.

17             Is a manufacturer of press brakes who

18   includes a foot control with a toe latch violating

19   any standard that you are aware of?

20        A.    No.

21        MR. ROBINSON:  Objection to the form.  Excuse

22   me for interrupting.

23   BY MR. HARTMAN:

24        Q.    On page 18, please.

206

1      A.    Yes.

2      Q.    Item 3, the plaintiff's expert states it

3    is axiomatic in safety engineering that every

4    safety device or system will eventually degrade.

5      A.    Yes.

6      Q.    Do you agree with that?

7      A.    That he said that?

8            I agree that he said that, yes.

9      Q.    Do you agree with that statement?

10     A.    Well, the choices of words here, will

11   eventually degrade.  It kind of depends on what you

12   mean by degrade.  If it means will eventually fail

13   and if eventually means given an infinite amount of

14   time, then, yes.

15           And if it's degrade means fail, then, yes.

16           If eventually means over a reasonable

17   lifetime and degrade does not mean fail, then

18   I would disagree with him.

19     Q.    So you do not agree with the statement

20   that over the reasonable life of every safety

21   device it will eventually fail?

22     MR. ROBINSON:  Objection to the form.  Also

23   asked and answered.

24     THE WITNESS:  Over the -- every safety device

                                                    207

1    over its reasonable life will fail?

2    BY MR. HARTMAN:

3        Q.   Would you expect that a safety device to

4    -- would you expect a safety device if properly

5    designed to fail over the reasonable life

6    expectancy of that safety device?

7        MR. ROBINSON:  Objection to the form.

8        THE WITNESS:  I think that a safety device

9    should be designed so that over its reasonable life

10   it doesn't fail.  In reality we cannot make things

11   perfect in all ways.  So I would expect that there

12   will be with safety devices a very small, minute

13   number that may fail prematurely.

14   BY MR. HARTMAN:

15       Q.   Is it your testimony today that -- strike

16   that.

17           Do you have an opinion today as to whether

18   or not a Linemaster 511 with a cover would fail

19   during its reasonable life expectancy?

20       MR. ROBINSON:  Objection to the form and the

21   breadth.

22       THE WITNESS:  I don't know that you can say

23   what a reasonable life expectancy is for that

24   product.  It depends on how it is being used.

                                                    208

1    There are pieces of equipment where that pedal

2    might be used once a day and it is in a very nice

3    environment.  There are other places it might be

4    used every other second, 24 hours a day, and it is

5    a bad, dirty environment.

6        I don't know that there is enough information

7    in your question to answer it and have it be a

8    meaningful answer.

9    BY MR. HARTMAN:

10        Q.   So you have no opinion today?

11        MR. ROBINSON:  Objection to the form.

12        THE WITNESS:  I don't think there is enough

13    information in the question the way you posed it

14    for me to have a meaningful answer.

15    BY MR. HARTMAN:

16        Q.   Is there enough information in the

17    materials that were supplied to you by Mr. Robinson

18    during the pendency of this case to make a

19    determination as to whether or not a covered foot

20    control would have failed had it been supplied with

21    the press brake in 1978?

22        MR. ROBINSON:  Objection to the form.

23        THE WITNESS:  I don't think so.

24

209

1    BY MR. HARTMAN:

2        Q.    I would like to turn you to page 20.

3        A.    Yes.

4        Q.    At the top where you have the quoted

5    portion, line four, where it says the installation.

6        A.    Uh-huh.

7        Q.    Your quote is the installation of

8    redundant guards and safety devices as backup

9    safeties were not judged to significantly improve

10   safety.

11            Did I correctly read that?

12       A.    I believe so.

13       Q.    Do you agree with that statement?

14       MR. ROBINSON:  Object to the form.

15       THE WITNESS:  I believe that that's what the

16   author wrote.  Do I believe that that's true?

17   BY MR. HARTMAN:

18       Q.    Yes.

19       A.    Let's see.  This has to do with this is

20   the middle of the whole paragraph here.  Let me

21   read it to myself, if I could.

22            Yeah, I think what they are saying is that

23   redundant guards or backup devices were not the

24   point-of-operation safeguarding and they were found

                                          210

1    not to be sufficient with no hands in dyes kind of

2    concept.  So I think I generally agree with that.

3         Q.   I am going to refer you to the safety

4    brief entitled Foot Controls:  Riding the Pedal by

5    Ralph Barnett; are you familiar with that document?

6         A.   I have some familiarity with it.  Do you

7    have an extra copy for me to look at?  Or let me

8    try to find it here.

9         Q.   I believe you have a copy in your file.

10   I saw it this morning.  I have a copy for myself;

11   but if you can't find it, I will certainly give you

12   mine.

13        A.   Yes.

14        MR. HARTMAN:  Would you mark that as

15   Exhibit 11?

16                        (Whereupon, HUTTER Deposition

17                        Exhibit No. 11 was marked for

18                        identification.)

19        THE WITNESS:  Do you want it on mine or yours?

20        MR. HARTMAN:  Well, we can do it either way.

21   Whichever way --

22        THE WITNESS:  The only reason I hesitate to put

23   it on here is mine follows the copies I sent to

24   you; and if I take it out of here, then things

                                                    211

1    start getting misplaced.  But, okay, I will put it

2    on here.  Make sure I have all of the pages.

3      Okay.

4    BY MR. HARTMAN:

5      Q.    Looking at Exhibit No. 11, there are,

6    I believe, 12 pictures of foot controls; am

7    I correct?

8      A.    Yes.

9      Q.    Do any of those foot controls not satisfy

10   ANSI B11.3?

11     MR. ROBINSON:  Object to the form.

12     THE WITNESS:  I think in a strict

13   interpretation of the ANSI standard, foot controls

14   1, 2, 3 and 4, because they don't have side

15   shielding on them, may not conform with the current

16   standard of ANSI.  But I believe if they were

17   utilized in a proper way where there is sufficient

18   point-of-operation safeguarding, they may be deemed

19   by OSHA to be reasonably safe.

20   BY MR. HARTMAN:

21     Q.    We are talking about ANSI, I am sorry.

22         With regard to the ANSI B11.3 that was in

23   existence in 1978 would you agree, sir, that all 12

24   comply with the standard?

212

1      A.    Yes.

2      Q.    Now, has there been a change with regard

3    to the foot control requirements in the ANSI

4    standards that would possibly eliminate foot

5    controls No. 1 through 4?

6      A.    Yes, I think the standards -- I don't

7    remember what year -- required a side shield or

8    recommended side shields.

9      Q.    Would it be a fair statement, sir, that as

10   long as you meet the recommendations of the ANSI

11   B11.3 requirements related to foot controls, then

12   the foot control is approved by ANSI?

13     MR. ROBINSON:  Object to the form of the

14   question.

15     THE WITNESS:  Can you say that again?

16   BY MR. HARTMAN:

17     Q.    Would you agree, sir, that as long as you

18   meet the ANSI requirements as it relates to foot

19   controls that are outlined in B11.3, then the foot

20   control is approved for use on press brakes?

21     MR. ROBINSON:  Same objection.

22     THE WITNESS:  I think if it meets all of the

23   criteria in those standards, yes.  Approved meaning

24   it is okay to use it.

                                                  213

1       Are we done with this document?

2   BY MR. HARTMAN:

3       Q.   Yes, at this moment we are.

4       A.   Let me put it in the stack here so I don't

5   walk away with it.

6       Q.   Sir, do you agree with the statement that

7   power press brakes are not power presses but a

8   totally distinct machine by themselves?

9       MR. ROBINSON:  Objection, asked and answered at

10  length in the beginning of the deposition and then

11  again in the middle of the deposition.

12      THE WITNESS:  You know, they are alike but they

13  are different.  They have different codes and

14  standards by OSHA and ANSI.  They have some

15  similarities.  They have some differences.  We

16  talked about them in quite a bit of detail in the

17  early part of this deposition.

18      So depending on what that author is talking

19  about -- it is probably Ralph Wellington -- they

20  are different machines.  They are not the exact

21  same thing.  It is kind of like talking about a

22  pickup truck and an automobile.  They are kind of

23  alike but they are kind of different.

24

                                        214

1    BY MR. HARTMAN:

2        Q.    Do you agree with the statement, the power

3    press brake is one of the most versatile machines

4    in a metal fabricator's plant?

5        A.    It could be one of the most, yes.  In fact

6    I think I used that terminology in my report.

7        Q.    Do you agree with the statement that the

8    power press brake's long, narrow work area enables

9    thousands of different part configurations to be

10   formed using general purpose tooling?

11       A.    Yes.

12       Q.    Do you agree with the statement that

13   usually press brakes are used for small and medium

14   lot size work?

15       A.    Lot size work, is that the last part of

16   what you said?

17       Q.    Yes, yes.

18       A.    Usual --

19       MR. ROBINSON:  Let me object to the form of the

20   question.

21       THE WITNESS:  It is quite often that they are

22   used for smaller production runs.  But this plant,

23   it seems like, was making this part over long

24   periods of time.  So that might be a little

215

1    inconsistent at least with that notion.  I think

2    that's Ralph Wellington's work in his article.

3    BY MR. HARTMAN:

4        Q.    Would you expect an operator to support

5    the piece being formed in a press brake -- strike

6    that.

7            Would you expect an operator to be

8    independently supporting a piece of metal that's

9    being worked with on a punch press?

10       MR. ROBINSON:  I will object to the form.

11       THE WITNESS:  There could be some operations on

12   a punch press where an operator could be supporting

13   a piece of the piece being worked on.

14   BY MR. HARTMAN:

15       Q.    Would you expect it to occur though?

16       MR. ROBINSON:  Object to the form of the

17   question, also asked and answered.

18       THE WITNESS:  You know, expect, I wouldn't be

19   surprised to find a process in a plant that uses a

20   mechanical press where part of the piece being work

21   on is outside of the press and a person is

22   supporting it.

23       MR. HARTMAN:  Can we take a break for one

24   minute?

                                                    216

1          Off the record at 12:33 p.m.

2                          (A short break was taken.)

3     MR. HARTMAN:  We are done.

4              FURTHER DEPONENT SAITH NOT.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

217

1  STATE OF ILLINOIS  )

2                     )  SS:

3  COUNTY OF C O O K  )

4      I, Deanna Amore, a notary public within and for

5  the County of Cook County and State of Illinois, do

6  hereby certify that heretofore, to-wit, on the 12th

7  day of April, 2006, personally appeared before me,

8  at 33 North LaSalle Street, Chicago, Illinois, GARY

9  HUTTER, in a cause now pending and undetermined in

10 the United States District Court for the Western

11 District of Pennsylvania, wherein TINA LINDQUIST is

12 the Plaintiff, and HEIM, L.P. is the Defendant.

13     I further certify that the said witness was

14 first duly sworn to testify the truth, the whole

15 truth and nothing but the truth in the cause

16 aforesaid; that the testimony then given by said

17 witness was reported stenographically by me in the

18 presence of the said witness, and afterwards

19 reduced to typewriting by Computer-Aided

20 Transcription, and the foregoing is a true and

21 correct transcript of the testimony so given by

22 said witness as aforesaid.

23     I further certify that the signature to the

24 foregoing deposition was reserved by counsel for

219

1    the respective parties.

2        I further certify that the taking of this

3    deposition was pursuant to Notice, and that there

4    were present at the deposition the attorneys

5    hereinbefore mentioned.

6        I further certify that I am not counsel for nor

7    in any way related to the parties to this suit, nor

8    am I in any way interested in the outcome thereof.

9        IN TESTIMONY WHEREOF:  I have hereunto set my

10    hand and affixed my notarial seal this _19th_ day

11    of ___April___, 2006.

12

13

14

15

16

         _____

17         NOTARY PUBLIC, COOK COUNTY, ILLINOIS

18

19

20

21

22

23

24

                                              220