# EXHIBIT H

# PART 3

1    separating themselves from the individual code

2    committees that write these rules because code

3    committees in the last decade or so have been

4    getting sued and ANSI wants to put themselves an

5    arm's length away from the code committees if they

6    should write something that gets them involved in a

7    lawsuit.  So ANSI is very careful about stating

8    that they do not approve or endorse the standards.

9         Q.    They publish standards?

10        A.    They publish standards, exactly.

11        Q.    So an ANSI standard is merely a -- a

12   standard published by ANSI?

13        A.    Yes.

14        Q.    And in order to be published by ANSI, you

15   need to only qualify by meeting its procedural

16   requirements; am I correct?

17        MR. ROBINSON:  Let me object to the form of

18   that question.

19   BY MR. HARTMAN:

20        Q.    Well, ANSI has procedural requirements

21   that if you meet, they will publish your standard?

22        A.    You certainly have to meet ANSI's

23   procedural requirements.  There is a lot more

24   requirements beyond procedures that have to be met

91

1    as well such as the makeup of each individual

2    committee.

3        Q.   But that's a procedure and if you meet the

4    makeup -- if you meet the procedure that they

5    require for the group, the makeup of the group, and

6    if you meet the procedure as it relates to

7    geographic locale, if you meet the consensus

8    procedure, if you meet those procedures and you

9    have a standard that gets through those procedures,

10   then ANSI will publish it, correct?

11       A.   Yes.

12       MR. ROBINSON:  Object to the form of the

13   question.

14   BY MR. HARTMAN:

15       Q.   So what they look at is the makeup of the

16   group, the geographic diversity and the consensus

17   of the group?

18       MR. ROBINSON:  I will object to the form of the

19   question.

20       THE WITNESS:  Certainly those are among the

21   items that ANSI oversees.

22   BY MR. HARTMAN:

23       Q.   Are there any other items that I am not

24   aware of?

                                                    92

1      A.    I am sure there are dozens and dozen more.

2    Just based on my own involvement with the ladder

3    code committee and the committee having been

4    audited a couple of times by ANSI over the last ten

5    years, the procedures, manual gets bigger and

6    bigger every year.

7      Q.    But we are talking about basically it is

8    those type of procedures that one, a group has to

9    meet and then ANSI will publish a standard?

10     A.    Yes.

11     Q.    ANSI does not have standards of its own?

12     A.    That's correct.  As a matter of fact, in

13    the last couple of years ANSI doesn't even want the

14    code committees to call themselves an ANSI

15    committee anymore.  They have changed the language

16    now to accredited standards committee.  That's what

17    we -- the language we have to use now just to

18    further illustrate their desire to stay an arm's

19    length away from the individual committees.

20     Q.    If I am not mistaken, correct me if I am

21    wrong, but it emanates from a lawsuit out in

22    California because ANSI was sued because of a

23    standard; am I correct?

24     A.    I think there have been more than one

93

1    instance where a standard committee gets sued.

2    Whether ANSI is making these changes because they

3    were the named defendant or they know of someone

4    else who was the named defendant, I am not aware.

5        Q.    ANSI doesn't -- has made changes because

6    it doesn't want to be responsible for the standards

7    it publishes; am I correct?

8        A.    Yeah.

9        Q.    ANSI doesn't want to have legal liability

10   as it relates to bad standards that may get passed?

11       A.    Yes, I mean the one I am familiar with is

12   this Pool and Spa Institute having been sued.

13       Q.    And ANSI approved of a standard that was

14   later found not to be a safe standard and they

15   found themselves as defendants in a lawsuit?

16       A.    I think that's generally what I have

17   heard.

18       Q.    We are just clarifying a lot of this

19   because there is a lot going on.  I appreciate your

20   help.

21       MR. ROBINSON:  Whenever you get a chance,

22   I would like to take a break.

23       MR. HARTMAN:  Why don't we do that now because

24   I have needed one for about ten minutes?

                                              94

1      THE VIDEOGRAPHER:  Off the record at 10:00 a.m.

2                     (A short break was taken.)

3      THE VIDEOGRAPHER:  This is the beginning of

4  Tape No. 2.  Back on the record at 10:13 a.m.

5  BY MR. HARTMAN:

6      Q.   Now, I asked you -- we started and got off

7  the track a little bit with regard to ANSI.  But

8  with regard to the 1973 standard, would you read

9  the section as it relates to foot controls as

10  opposed to foot pedals?  And I am asking you to

11  read the standard.

12     A.   Yes.

13          Okay.  Foot control, actuation prevention

14  is Section 4.2.4.2.4 of the standard and it reads,

15  the foot control shall be protected so as to

16  inhibit accidental actuation by falling or moving

17  objects or by someone stepping on it.  Means shall

18  be provided for manually locking the foot control

19  to inhibit such accidental actuation.

20     Q.   Now, am I correct that with regard to foot

21  controls, it talks about inhibit accidental

22  actuation and with regard to a foot pedal it talks

23  about prevent accidental activation?

24     A.   Yes.

95

1      Q.   There is a difference, would you agree?

2      A.   Yes.

3      Q.   What is your understanding of -- as to the

4    difference as it relates to the ANSI standard on

5    foot pedal as opposed to foot control?

6      A.   With regard to the foot pedal, accidental

7    actuation can be prevented because the older style

8    mechanical foot pedal could physically be removed

9    from the machine or there would be a built-in latch

10   or otherwise that physically prevented the downward

11   depression of the pedals.

12        With the foot control it is asking that

13   accidental actuation be inhibited.  I think the

14   committee recognizes that you cannot prevent

15   actuation of the control when the normal, the

16   normal way of activating the control was also the

17   way one would accidentally activate the controls.

18   It can't be prevented but features can be added to

19   try and inhibit or to decrease the likelihood of

20   the accidental actuation.

21     Q.   So when you have a foot pedal in the

22   normal use of the machine with a foot pedal, there

23   are means by which you could prevent the operator

24   from accidentally activating the foot pedal?

96

1     A.   Yes, as I said, it amounts to the physical

2  removal of the pedal from the machine when you

3  are -- when you are not operating.

4     Q.   Well, how about during the operation of

5  the foot -- of the press brake with the foot pedal,

6  can you prevent accidental activation of the foot

7  pedal under those circumstances?

8     A.   No, you can't.

9     Q.   You cannot?

10    A.   No, you can't.

11    Q.   Now in 1973 do you know what mechanisms

12  were available by the foot control manufacturers

13  that would -- that could be used to prevent or

14  inhibit inadvertent activation of the pedal?

15    MR. ROBINSON:  I will object to the form of the

16  question.  You have included prevent and inhibit,

17  which is contrary to I think the testimony that was

18  just given.

19    MR. HARTMAN:  I am sorry.

20  BY MR. HARTMAN:

21    Q.   Okay.  In 1973 do you know what foot

22  controls were available that would inhibit

23  accidental activation of the foot control?

24    A.   Yes, I think we have already touched on

1  every one of these features, the top guard, the

2  side guards.  I think Linemaster alone has the toe

3  latch, and eventually all of the major foot switch

4  manufacturers came out with some form of a front

5  gate.

6     Q.   And the front gate was available in 1973

7  as well?

8     MR. ROBINSON:  I am going to object -- is that

9  a question or is that just a statement?

10  BY MR. HARTMAN:

11    Q.   Do you agree with that statement?

12    A.   It was certainly available with some

13  manufacturers.  I don't know the specific date that

14  all of the different manufacturers came out with

15  their version of front gate is unknown to me.

16    Q.   But in 1973 the front gate was available

17  on foot controls by some manufacturers?

18    MR. ROBINSON:  Object to the form.  I will

19  object to the form of that question.

20    THE WITNESS:  Yes.

21  BY MR. HARTMAN:

22    Q.   And in 1977, 1978, the front gate was

23  available on a foot control manufactured by

24  Linemaster; am I correct?

98

1    A.    Yes.

2    Q.    And a foot control with a front gate would

3    be approved by ANSI, that ANSI standard that you

4    just read?

5    MR. ROBINSON:  I will object.  This has been

6    asked and answered.  He said they don't approve for

7    certain things.  All of this has been asked and

8    answered.  You are now trying to get what you

9    couldn't get before from his answers into a quick,

10   well, let me just say it again, maybe he will say

11   yes.  It is inappropriate.

12   MR. HARTMAN:  I am not trying to do that.

13   MR. ROBINSON:  That's the result that gets

14   reached if there is an answer that's inconsistent

15   with what he has already answered on.  So let's

16   please ask some new questions.

17   MR. HARTMAN:  Paul, I will ask whatever

18   questions I feel like asking.  And if you have a

19   problem with my question -- every time you have

20   asked me to rephrase something, if the witness

21   hasn't understood it, I am more than willing to do

22   it.  This is not about the sharp practice of law.

23   This is trying to find out --

24   MR. ROBINSON:  Well, you and I disagree on the

99

1    manner in which some questions are asked.  I am

2    raising a very valid objection.  These questions

3    have been asked and answered, many of them multiple

4    times.  And all I am asking, for purposes of the

5    Court really, because I know that you are going to

6    ask whatever you want, is that we begin to address

7    some new areas.

8        MR. HARTMAN:  Okay.

9    BY MR. HARTMAN:

10       Q.   Is there a difference between something

11   that's acceptable by ANSI and something that's

12   ANSI-approved, that would be approved by ANSI?

13       A.   Well, as I think I touched on before, ANSI

14   doesn't approve anything.  I think where we are

15   going with this, I can say that there is nothing in

16   the ANSI standards that would disallow the use of a

17   foot control with a front gate.

18       Q.   Looking at Switalski Exhibit No. 4,

19   and I am asking you to compare the Linemaster with

20   the anti-trip mechanism that's shown in exhibit --

21   is in Drawing No. 8 with the Linemaster Hercules

22   foot control that's in Exhibit No. 4.

23       A.   All right.

24       Q.   Can you look at those, please?

                                              100

1      A.    Four and eight?

2      Q.    Correct.

3      A.    All right.

4      Q.    The paper -- one of the premises in the

5   paper I believe that you have indicated is as you

6   move from left to right in those photos, that the

7   riding the pedal becomes more prevalent?

8      A.    Yes, that's how they are arranged.

9      Q.    Okay.  Would you explain to me why riding

10  the pedal is more prevalent in No. 8 as opposed to

11  No. 4?  What feature makes reading the pedal more

12  prevalent?

13     A.    It is ever so slightly more difficult to

14  put your foot all the way into Pedal No. 8 in order

15  to depress the -- or not depress -- but push the

16  toe latch before pressing down the pedal than it is

17  with the switch in Illustration No. 4 with no toe

18  latch.

19     Q.    So it is based on incremental degrees of

20  difficulty in putting your foot in the pedal?

21     A.    Yes.

22     Q.    Is what leads to one riding the pedal?

23     A.    Yes.

24     Q.    And there would be a difference in the

101

1    likelihood of riding the pedal between

2    Photograph 1 -- I mean Drawing No. 1 and No. 3

3    that's referenced in Switalski Exhibit No. 4?

4         A.   Yes.

5         Q.   And that would be based on incremental

6    increases in difficulty in getting your foot in?

7         A.   Yes.  And that is borne out in the number

8    of activations, I think it is, in 60 seconds.  The

9    more quickly one can actuate the pedal per unit

10   time, there is a direct correlation with how easy

11   it is to get your foot into and out of the pedal.

12   That Linemaster clipper switch in Illustration

13   No. 1 had the highest activation rates per unit

14   time.

15        Q.   Am I correct that there are certain

16   situations where riding the pedal is not dangerous?

17        MR. ROBINSON:  I will object to the form of the

18   question.

19        THE WITNESS:  I think aerial work platforms

20   would be such an example where the pedal in effect

21   is used as an emergency -- not as an emergency stop

22   control but as a deadman control.  The pedal has to

23   be remained depressed in order to enable all of the

24   other operator controls.

                                                      102

1        So, let's say, for example, the operator of an

2    aerial work platform has a heart attack while he is

3    in the basket of the control platform, his foot

4    will theoretically leave the pedal which in turn

5    will disable all of the other operating controls.

6    So it has to do with the application of the pedal.

7        In that situation it is used for deactivating

8    the controls or as with the press brake, it is used

9    to initiate the activation of the machine.

10   BY MR. HARTMAN:

11       Q.   Would you agree that an analysis as to

12   what type of foot control should be placed on a

13   particular machine is a machine -- a

14   machine-by-machine analysis that needs to take

15   place?

16       MR. ROBINSON:  I will object to the form of the

17   question.

18       THE WITNESS:  Absolutely.

19   BY MR. HARTMAN:

20       Q.   So but with regard to a press brake, you

21   would want to analyze press brakes as to determine

22   what type of foot control should be placed on it;

23   am I correct?

24       MR. ROBINSON:  Objection to the form of the

103

1    question.

2        MR. HARTMAN:  Will you do me a favor, though?

3    Will you let me finish my question before you

4    object?  Because I am worried that when she is

5    transcribing it, it is not going to come out as a

6    clear question.

7        MR. ROBINSON:  That was accidental on my part.

8    I thought you were finished.  My apologies.

9    BY MR. HARTMAN:

10       Q.   Am I correct that if you want to make a

11   determination as to the foot control used on a

12   press brake, it would be an analysis done with

13   regard to press brakes?

14       MR. ROBINSON:  Objection to the form.

15       THE WITNESS:  It certainly can be, and

16   I certainly agree it is best to do it on a

17   machine-by-machine basis.

18   BY MR. HARTMAN:

19       Q.   Would it be a

20   type-of-machine-by-type-of-machine basis or a

21   machine-by-machine basis, meaning press brakes in

22   whole or would you take different models of press

23   brakes to do the analysis?

24       MR. ROBINSON:  Object to the form.

104

1      THE WITNESS:  Style of machine is good.

2    Individual press brakes are better.  If the

3    manufacturer of the machine tool knows more detail

4    about the customer's application, then it is better

5    still.

6    BY MR. HARTMAN:

7      Q.   With regard to providing a pedal as

8    standard equipment with a press brake, would you

9    agree it would be best to understand, make an

10   individual determination with regard to the

11   particular press brake?

12     MR. ROBINSON:  Objection to the form.

13     THE WITNESS:  Yes, generally the more

14   information the machine tool manufacturer has, the

15   better position they are in to select the best foot

16   control.

17   BY MR. HARTMAN:

18     Q.   There would be a different analysis with

19   regard to a multi-purpose press brake than one

20   would have as opposed to a multi-purpose punch

21   press; am I correct?

22     MR. ROBINSON:  Objection to the form.

23     THE WITNESS:  Both machines being multi-purpose

24   in nature makes the distinction very difficult

105

1   because the machine tool manufacturer simply isn't

2   going to know enough about all the different

3   purposes that either form of machine are going to

4   be put to to select one type of foot switch over

5   another.

6   BY MR. HARTMAN:

7       Q.   Well, if they are providing a foot switch

8   as standard equipment, wouldn't it be the

9   manufacturer's job to provide a foot switch that

10  provides the most protection for the highest number

11  of applications?

12      MR. ROBINSON:  Let me object to the form of the

13  question.  It is misleading.  It also ignores his

14  last statement and his last answer to the question

15  where he explained to you why the distinction would

16  not be there that you want to be there.

17      MR. HARTMAN:  I don't think he said that.

18  I think you are mischaracterizing his testimony.

19      MR. ROBINSON:  You can suggest whatever you

20  want but the record is the record.

21      MR. HARTMAN:  Right.  I said I think

22  I understand and heard something different.

23      THE WITNESS:  It is certainly desirable but

24  when we preface a machine as being multi-purpose,

106

1    it is virtually impossible for the machine tool

2    manufacturer to make a selection because the

3    ultimate use, the type, size, style of parts being

4    manufactured is simply not going to be known.

5    BY MR. HARTMAN:

6        Q.    So am I correct that it is your testimony

7    today that it is impossible to make the selection

8    of the best foot control for -- the safest foot

9    control for a multi-purpose machine by the

10   manufacturer?

11       MR. ROBINSON:  I will object to the form of the

12   question.

13       THE WITNESS:  It is -- it is not impossible but

14   it is something the manufacturer is going to have

15   to do based on prior experience with similar

16   machines rather than anticipated future use of the

17   machine they are selling.

18   BY MR. HARTMAN:

19       Q.    What does that mean?

20       A.    Well, when you have a multi-purpose

21   machine --

22       Q.    Let's talk about a multi-purpose press

23   brake.

24       A.    Okay.  What the machine tool manufacturer

107

1    is going to know is --

2        MR. ROBINSON:  Hold on.  I didn't make an

3    objection before.  The implication that has just

4    been made by reference to the press brake suggests

5    that there is a distinction when the witness has

6    already indicated there wouldn't be a distinction

7    for multi-purpose power presses, mechanical power

8    presses versus mechanical press brakes.  So the

9    question as phrased suggests that there is.  And

10   the answer now being given only relates to press

11   brake.  I think that is very misleading.

12   BY MR. HARTMAN:

13       Q.   Sir, I think Mr. Robinson is suggesting

14   that you testify a particular way.  My

15   understanding is that you said there would be

16   distinctions based on a machine-by-machine basis.

17   If you get down to the individual machines, there

18   would be a distinction with regard to types of

19   machine and then there would be a distinction --

20   meaning press brake versus punch presses, and then

21   there would be a further distinction with regard to

22   the types of uses the manufacturer knew.  So there

23   are multiple distinctions in this decision-making

24   tree; is there not?

                                                    108

1      MR. ROBINSON:  Hold on.  Objection to the form.

2   You threw a lot of things in there that were not

3   stated.  I think you indicated different uses of

4   the manufacturers as opposed to uses by the

5   end-user?  Very misleading.

6      MR. HARTMAN:  Would you read the question?

7      MR. ROBINSON:  You trailed off some but

8   I thought I heard manufacturer.  Would you read

9   that question back?

10                     (Whereupon, the record was

11                      read.)

12      MR. ROBINSON:  Objection, compound, misstates

13   prior testimony and misleading.

14   BY MR. HARTMAN:

15      Q.   Do you understand that question, sir?

16      A.   I think so.

17      Q.   Okay.

18      A.   When the press brake manufacturer decides

19   to include a foot switch, what they have at their

20   disposal for making that decision is prior

21   experience with all the press brakes they have sold

22   in the past.  And they make a selection of a foot

23   switch based on that prior experience because the

24   press brake is a multi-functional machine by its

109

1    nature and the press brake manufacturer rarely

2    knows anything about the future use of this new

3    machine they are building, they can only act based

4    on previous feedback from previous similar machines

5    they have built.

6           In this particular case I recall reading

7    some testimony from Heim that said our customers in

8    the past never complained about the foot control we

9    were using.  There was no reason to change

10   something that was already working satisfactorily.

11   I think that's a very reasonable conclusion on the

12   part of Heim to draw with respect to continuing to

13   use the same foot switch product.

14      Q.   But am I correct that when Heim is

15   supplying a foot pedal -- strike that.

16           Am I correct that when Heim is supplying

17   the foot control, it has to anticipate that that's

18   a multi-purpose on a multi-purpose press brake, it

19   has to anticipate the large body of uses to which

20   it is going to be utilized; am I correct?

21      MR. ROBINSON:  Objection to the form.

22      THE WITNESS:  They can't because that large

23   body is infinite in size.

24

110

1    BY MR. HARTMAN:

2        Q.    Would you agree that it would be better to

3    do an analysis with regard to the foot control you

4    are going to place on a press brake by looking at

5    the uses to which press brake have been put to in

6    the past as opposed to evaluating punch presses in

7    the past?

8        MR. ROBINSON:    Objection to the form.

9        THE WITNESS:    Yes, I agree that would be

10    better.

11    BY MR. HARTMAN:

12        Q.    So would you agree that it would be the

13    appropriate way for a manufacturer to go about it

14    is by analyzing press brakes used in the past?

15        A.    Yes.

16        Q.    And if you are designing a foot control

17    for punch presses, you look at punch press use in

18    the past?

19        A.    Yes.

20        MR. ROBINSON:    Objection to the form.

21    BY MR. HARTMAN:

22        Q.    Am I correct?

23        A.    Yes.

24        Q.    At the time Heim manufactured the press

111

1    brake that was involved in Ms. Lindquist's

2    injuries, the ANSI standards that are cited in your

3    report that were adopted after 1978 were not ANSI

4    standards that Heim would have had in their

5    possession; am I correct?

6        A.   Of course not.

7        Q.   They wouldn't have had drafts of the

8    documents in their possession; am I correct?

9        MR. ROBINSON:  Let me object to the speculative

10   nature of that type of question.

11   BY MR. HARTMAN:

12       Q.   Well, sir, you have been on ANSI

13   committees; am I correct?

14       A.   Yes.

15       Q.   Okay.  And I think the ANSI standard that

16   was proposed -- that was adopted as it relates to

17   press brakes after '73 was, 84?

18       A.   '82.

19       Q.   '82, I am sorry.

20           So would the '82 standard in the form that

21   it was adopted be something that Heim would have

22   had in its possession in '78?

23       MR. ROBINSON:  Objection, asked and answered.

24       THE WITNESS:  It is certainly possible that

112

1    there was an earlier draft and then only if Heim

2    had an in-house representative participating in the

3    committee.

4    BY MR. HARTMAN:

5        Q.   So we have no way of knowing whether or

6    not the ANSI standard of 1982 was in Heim's

7    possession in '78?

8        A.   I agree, we just don't have a way of

9    knowing.

10       Q.   I am just trying to clarify things.  Some

11   of these things to me are quite obvious but when

12   you get into the engineering realm, there is little

13   caveats and issues that --

14       MR. ROBINSON:  Mr. Hartman, you began the

15   questioning by suggesting to him that they would

16   not have and now we have got the conclusion that of

17   course he would have know way of knowing that.

18       MR. HARTMAN:  If he says he has no way of

19   knowing, that's fine.  I probably should have asked

20   would you have any way of knowing to begin with.

21   If I knew all of the questions I was going to ask

22   before I came today, I would have some type of

23   better ones.  So it is always good to armchair

24   quarterback like Mr. Robinson is doing to my

113

 1   questions --

 2       MR. ROBINSON:  We don't need your snide

 3   comments, Mr. Hartman.  You just don't need to do

 4   it.

 5       MR. HARTMAN:  That is not snide, Paul.

 6       MR. ROBINSON:  It is.

 7       MR. HARTMAN:  It is not.  It is not meant to

 8   be.

 9       MR. ROBINSON:  It is not necessary for the

10   deposition.

11       MR. HARTMAN:  Paul, if you are taking offense,

12   I am sorry.  It is not meant to be sarcastic.

13       MR. ROBINSON:  There is just no need for that

14   in a discovery, in any deposition.

15       MR. HARTMAN:  Paul, nothing is going on.

16       MR. ROBINSON:  Please ask the next question.

17       MR. HARTMAN:  We have been getting along well

18   all day.  There is no issue here from my

19   perspective.

20       MR. ROBINSON:  I understand.

21   BY MR. HARTMAN:

22       Q.  Am I correct, sir, that OSHA governs

23   employer conduct?

24       A.  Yes.

114

1      Q.   OSHA does not govern manufacturer conduct,

2    manufacturer's conduct; am I correct?

3      A.   Only as far as manufacturing operations

4    within a manufacturer's plant would go.

5      Q.   So OSHA is not applicable to Heim in the

6    way it designs the press brake involved in this

7    case; am I correct?

8      MR. ROBINSON:  Objection to the form of the

9    question.

10     THE WITNESS:  Correct.

11   BY MR. HARTMAN:

12     Q.   Do you understand what my question was,

13   sir?

14     A.   I think so.

15     Q.   Tell me what your understanding was of my

16   question so we can clarify the record.

17     MR. ROBINSON:  Please don't get confused.  When

18   I object to form, that doesn't mean that I don't

19   understand it or that he doesn't understand it.

20   I think it can be interpreted in various different

21   ways.  Actually, there are a number of different

22   form objections, so don't assume that means that

23   I thought that he didn't understand it.  I don't

24   want you to waste your time going through that.

115

1    I never suggested he doesn't understand it.

2    I couldn't possibly know what he understands but --

3        MR. HARTMAN:  That's why I am asking him to

4    explain what he understands.

5        MR. ROBINSON:  I didn't want you to be misled

6    in thinking that's the reason for that objection.

7    The reason for the objection was that it could be

8    read to suggest that it doesn't have any impact on

9    the legal issues involved with this case versus

10   whether or not under OSHA's regulations and

11   enforcement, whether they would try to have it

12   applicable to a manufacturer.  That was the form

13   objection to the question.

14       MR. HARTMAN:  I think that's a legal argument.

15   I understand it now.  I didn't understand it

16   before.

17   BY MR. HARTMAN:

18       Q.   Sir, would you agree as far as the

19   manufacturer and the manufacturer -- strike that.

20           With regard to Heim and its making the

21   press brake that was involved in Tina's accident,

22   Heim didn't have to follow OSHA standards with

23   regard to the manufacturing of that machine, did

24   it?  I am not talking about the manufacturing

116

1    process.  I am talking about designing and elements

2    to the machine.

3        A.   And that's a distinction I was going to

4    make.  With respect to Heim's design of the

5    machine, the OSHA regulations do not apply to them.

6        Q.   Okay.  So with regard to the Heim's design

7    of the press brake that injured Ms. Lindquist, the

8    OSHA regulations do not come into play?

9        MR. ROBINSON:  Objection to the form,

10   specifically of the machine that injured Tina

11   Lindquist.

12       MR. HARTMAN:  Let me re-ask that then.

13   BY MR. HARTMAN:

14       Q.   With regard to the machine that's at issue

15   in this case, am I correct that OSHA has no input

16   as to how Heim designs that machine?

17       A.   I don't believe so.

18       Q.   Okay.  And with regard to the selection of

19   the foot control OSHA has no input to Heim as to

20   what foot control it selects?

21       A.   Again I think that's accurate.

22       MR. ROBINSON:  Let me object to the form of

23   that question.

24       MR. HARTMAN:  Would you tell me what your

McCorkle Court Reporters, Inc.
Chicago, Illinois (312)263-0052

1    problem is?

2        MR. ROBINSON:  I don't possibly know if OSHA

3    had some involvement in some way with Heim or

4    someone else other than through a regulatory type

5    of enforcement but I don't know if there is any

6    evidence to suggest whether or not Heim would have

7    considered OSHA regulations if it did in fact have

8    some role somehow in this process and I don't think

9    Mr. Switalski would have any way of knowing that

10   either.

11   BY MR. HARTMAN:

12       Q.   Well, with regard to your understanding of

13   the selection of the foot control, OSHA doesn't

14   govern Heim in selecting the foot control it is

15   going to include on the press brake; am I correct?

16       MR. ROBINSON:  Objection, that has been asked

17   and answered.  I think you have got that part out.

18       MR. HARTMAN:  I don't think I do.  I would like

19   to hear an answer.

20       MR. ROBINSON:  It has been asked and answered

21   three times.  Sure, you can ask it again.  But he

22   has very clearly testified that OSHA's standards do

23   not govern how Heim would design its product.

24       Is that accurate, Mr. Switalski?

                                                      118

1        THE WITNESS:  Yes.

2    BY MR. HARTMAN:

3        Q.    Let me ask it.

4        A.    Including the foot switch selection.

5        Q.    So am I correct that OSHA does not govern

6    how Heim designs its products and the foot

7    selection process?

8        A.    Yes, that's also my understanding.

9        Q.    Thank you.

10            Would you agree that exceeding as it

11    relates to the foot controls, that if you exceed

12    the ANSI requirements of foot controls included

13    with the press brakes, that that's a good thing?

14        MR. ROBINSON:  Objection to the form of the

15    question.  Very broad, it doesn't have any

16    limitations.

17    BY MR. HARTMAN:

18        Q.    You can answer.

19        A.    I think any manufacturer is free to try

20    and exceed regulatory requirements when it is

21    possible to exceed them.  The requirements simply

22    establish what is reasonably safe.  There is no

23    prohibition against trying to do better.

24        Q.    Would you agree that that's a good thing

                                                    119

1    to try to do better?

2        MR. ROBINSON:  Objection to the form of the

3    question.

4        THE WITNESS:  When it is possible to do better,

5    yes, certainly.

6    BY MR. HARTMAN:

7        Q.    Are you -- other than those articles that

8    we referred to in 3 through 5, Exhibits 3 through

9    5, are you aware of any other publications that

10   discuss the causes of riding the pedal?

11       A.    No, I think -- I think Barnett's

12   publications are the only publications that I have

13   ever come across that relate the presence of the

14   front gate to the misuse of riding the pedal.

15   I don't recall any other author writing about that

16   topic.

17       Q.    So to the best of your knowledge Professor

18   Barnett is the only individual that has written

19   authoritative articles as to things that cause

20   riding the pedal?

21       MR. ROBINSON:  Objection to the form of the

22   question.

23       THE WITNESS:  Yeah, of the literature that

24   I personally have reviewed, I believe Barnett is

                                                    120

1    indeed the only one who has at least, as I said,

2    drawn a correlation between front gate and

3    encouragement to ride the pedal.  That doesn't mean

4    there are no operators who ride the pedal and foot

5    controls that have no front gate.  It is still a

6    misuse either way.

7

8    BY MR. HARTMAN:

9        Q.   But your answer to me, sir, seems to be

10   limiting his article to the front gate as limiting

11   as being a means to cause to ride the pedal.

12   I believe your earlier testimony was the article

13   was written to show that ease of access was the

14   correlation to riding the pedal?

15       MR. ROBINSON:  Let me object to the form of

16   that question.  That is a misleading question.

17   BY MR. HARTMAN:

18       Q.   Sir, is that a misleading question to you?

19       MR. ROBINSON:  That's a different question,

20   first of all.

21       MR. HARTMAN:  I am asking --

22       MR. ROBINSON:  That's a different question.

23   I am not saying it is misleading to him.

24       MR. HARTMAN:  Who is it misleading to?

                                                    121

1      MR. ROBINSON:  I am saying it is misleading

2  from a legal point of view.

3      MR. HARTMAN:  How is it misleading?

4      MR. ROBINSON:  I am going to state my

5  objection.  You continuously ask this witness in

6  response to an objection if it is misleading to

7  him.  That has no bearing on my objection, none

8  whatsoever.

9      MR. HARTMAN:  Okay.  Well, then --

10     THE WITNESS:  I see the distinction you are

11  trying to make.  There are many other factors that

12  can influence riding the pedal, the size of the

13  foot opening, whether or not there is a toe latch

14  behind the pedal, et cetera, et cetera.  What I am

15  saying is that with regard to the next level of

16  attempt to make the foot control safer, which was

17  the addition of the front gate, Barnett in

18  particular to my knowledge is the only author that

19  has addressed that in such a way to draw a

20  correlation between the presence of the front gate

21  and an increase in riding the pedal.

22  BY MR. HARTMAN:

23     Q.   And I understand what you are saying with

24  regard to that area but my question is broader than

                                                 122

1    that, sir.  I am saying is there any literature out

2    there that you are aware of that indicates that the

3    ease of access, other than Professor Barnett, that

4    says that the ease of access to the pedal is a

5    factor that relates to riding the pedal?

6        A.    I am not aware of any.

7        Q.    Okay.  So with -- because there are

8    multiple things and multiple devices in the foot

9    pedals that according Professor Barnett may or may

10   not influence riding the pedal; am I correct?

11       MR. ROBINSON:  Objection to the form.

12       THE WITNESS:  Yes, I mean there are -- there is

13   a ranking of 12 foot switches in his paper and

14   beginning with Foot Switch No. 2, there is some

15   feature of each foot pedal that somehow causes it

16   to be ranked in such a way that it progresses

17   towards that Allen Bradley switch, which was found

18   to be the most influential in terms of riding the

19   pedal.

20   BY MR. HARTMAN:

21       Q.    Right.  Am I correct that Professor

22   Barnett is the only author that you are aware of

23   that has studied the ease of access to the foot

24   pedal and its relationship on riding the pedal?

123

1      MR. ROBINSON:  Let me object to the form of the

2  question.

3      THE WITNESS:  To my knowledge, yes, he is.

4  BY MR. HARTMAN:

5      Q.   And the conclusions drawn in Switalski

6  Exhibit No. 4 were based upon the speed with which

7  you can activate the pedal; am I correct?

8      MR. ROBINSON:  Objection to the form.  Your

9  question is limiting it or at least could be read

10  to be limiting it.  Objection to the form.

11  BY MR. HARTMAN:

12      Q.   Could you answer that question?

13      A.   Certainly the actuation speed of each

14  style of foot pedal or foot switch is a major

15  influence but those -- the conclusions drawn were

16  also based on field experience in going to plants

17  and observing what actual press operators were

18  doing.

19      Q.   Well, would you show me where it is

20  referred to field experience in Switalski Exhibit

21  No. 4 where Professor Barnett reaches his

22  conclusions?

23      MR. ROBINSON:  Objection to the form.  He

24  didn't say that the paper identifies that.  He says

124

1    it was based on that.  That's misleading.

2        THE WITNESS:  May I see the other two papers

3    also?

4                    (Discussion on the video record

5                    but off the written record.)

6    BY MR. HARTMAN:

7        Q.  Are you ready, Mr. Switalski?

8        A.  Yes.

9        Q.  Okay.  What document are you referring to?

10       A.   I am looking at Foot Controls:  Riding the

11   Pedal.  But I have a very clear recollection that

12   Barnett talked about field experience and foot

13   controls in one of his papers and unless I take

14   more time to look for it, I just can't find it

15   right now.

16       Q.  Is it in any of the papers that are marked

17   as Exhibits 3 through 5?

18       A.   Not that I am seeing at the moment but

19   that doesn't mean no.

20       Q.  So for you to check on it, you will go out

21   and reread these articles to see if it is included

22   in those articles; am I correct?

23       A.  Yes.

24       Q.  You are not intending to go look at some

125