# EXHIBIT H

# PART 4

1    secondary source or a different source other than

2    the articles themselves?

3        A.    If I don't find it in these articles, then

4    I will look at other Barnett publications.

5        Q.    Okay.  So you would refer to other Barnett

6    publications in order to make your determination as

7    to whether or not he relied on field experience in

8    Switalski Exhibit 3 through five?

9        A.    Yes.

10       Q.    But those would be published papers?

11       A.    Yes.

12       Q.    What I am trying to find out,

13   Mr. Switalski, is is there any source of

14   information you would have other than the published

15   documents by Professor Barnett that you would be

16   using to make that determination?

17       A.    Well, I indicated earlier that I know that

18   with regard to accident statistic literature, that

19   one of more authors has drawn the correlation

20   between riding the pedal, inadequate press guarding

21   and amputation injuries.  If I am going to need to

22   be expressing opinions or I am requested to express

23   opinions about that or to at least support that

24   statement, I will gather that literature.

126

1    BY MR. HARTMAN:

2        Q.    Now, you are going on an issue.  I don't

3    think you understand my question.  Maybe you do you

4    but I want to make sure you understand my question.

5            My question is with regard Professor

6    Barnett, your statement is that in his articles he

7    relied upon field experience?

8        A.    Yes.

9        Q.    In order for you to make the determination

10    that Professor Barnett relied upon field

11    experience, you are going to look to other articles

12    written by Professor Barnett?

13        A.    Yes.

14        Q.    That's the only way you would tell if

15    Professor Barnett relied on field experience?

16        A.    Yes, other than asking him directly.

17        Q.    Right.  I mean the reason I am asking is

18    maybe there is a big database that you have or that

19    you are aware of that would have working papers for

20    these articles that you are attempting to refer to

21    or something.

22        A.    Well, any database that might exist for

23    these articles would be in Professor Barnett's

24    control if they exist any longer.

                                                    127

1    Q.    Okay.  So you are going to look at the

2    articles to make that determination?

3    A.    Yes, yes.

4    Q.    Thank you.  I am just trying to clarify

5    things.  I mean it sounds like you know --

6    MR. ROBINSON:  You are not going to limit him

7    to what he can or can't do to follow up in the

8    areas of inquiry.  If he thinks of something else

9    he can do, talk Professor Barnett, whatever the

10   case may be, then I don't want your questions to

11   suggest that he is limited in some way.  He can do

12   whatever he wants that would enable him to have as

13   much information as he can on any of these issues.

14   If you are concerned about a database, then perhaps

15   you should ask him is there a database.

16   MR. HARTMAN:  I just did.

17   MR. ROBINSON:  It took a long time to get

18   there.

19   MR. HARTMAN:  Paul, I am going to get to where

20   I want to go the way I want.

21   MR. ROBINSON:  I understand you are going to do

22   that.

23   MR. HARTMAN:  Then please let me ask my

24   questions.

128

1      MR. ROBINSON:  I haven't interrupted your

2  questions.

3  BY MR. HARTMAN:

4      Q.   Sir, I am not trying to limit you.  I am

5  trying to find out what your decision-making

6  process will be in order to make a determination

7  that Professor Barnett's articles include field

8  experience; do you understand?

9      A.   Yes.

10     Q.   And my understanding is is that your

11  decision-making process to make that determination

12  will be by reviewing other articles written by

13  Professor Barnett to see if they refer to field

14  experience; am I correct?

15     A.   Yes, but I will refer to the ones already

16  marked as exhibits first just in the interest of

17  not taking the time today during the deposition to

18  do it.

19     Q.   And those are Exhibit 2 through 5?

20     A.   Yes.

21     Q.   And then you will look at other Professor

22  Barnett articles as well?

23     MR. ROBINSON:  Mr. Hartman, he said it ten

24  times at least, yes, he is going to do that.

129

1      THE WITNESS:  Yes.

2      MR. HARTMAN:  Your statement is longer than my

3  next question, Paul.

4      MR. ROBINSON:  It doesn't matter.  You took how

5  long to get the same question.  It is frustrating.

6  I apologize for my frustration but that was just a

7  ten-minute diatribe as to what he going to do to

8  follow up.

9      MR. HARTMAN:  Okay.  I don't think so but you

10  are entitled to your opinion.

11  BY MR. HARTMAN:

12      Q.   On page 5 of your report after the quote

13  of foot controls must be guarded, please note that

14  OSHA does not require the foot control to prevent

15  accidental activation by the foot control user but

16  rather by another worker; am I correct?

17      A.   Yes.

18      Q.   Okay.  Would you explain what you mean by

19  that?

20      A.   Well, I am quoting out of OSHA Publication

21  3170, Safeguarding Workers and Protecting Workers

22  From Amputations.  In their publication I think

23  OSHA correctly recognizes that nothing can be done

24  to prevent the person who is expected and

                                                    130

1    anticipated to activate the foot control to also

2    somehow prevent the same person from accidentally

3    activating the same foot control.

4         But what can be done is preventing other

5    workers from accidentally activating the foot

6    control and that basically means disconnecting it

7    when it is not in use, when the main operator is

8    not present or blocking the pedal so that it can

9    physically not be pushed down.

10   BY MR. HARTMAN:

11       Q.   So what you are saying, am I correct, is

12   that OSHA when it talks about prevent accidental

13   activation by the foot pedal, they are talking

14   about all the time preventing it?

15       A.   Yes, in -- preventing the machine tool

16   from being operated the way it was intended to be

17   operated at times when it is not desired to operate

18   it.

19       Q.   But OSHA doesn't talk about inhibiting the

20   accidental activation of the foot pedal?

21       A.   No, they don't.

22       Q.   And they don't talk about inhibiting the

23   accidental activation of the foot control?

24       A.   No, they don't.

                                                    131

1      Q.    Okay.  So prevention it means so it never

2    happens?

3      MR. ROBINSON:  Objection to --

4    BY MR. HARTMAN:

5      Q.    As opposed to inhibiting meaning trying to

6    prevent to the best means possible; am I correct?

7      MR. ROBINSON:  Objection to the form.

8      THE WITNESS:  Yes.

9    BY MR. HARTMAN:

10     Q.    So your understanding of inhibiting means

11    trying to prevent it to the best possible and -- am

12    I correct?

13     MR. ROBINSON:  Objection to the form.

14    BY MR. HARTMAN:

15     Q.    What does inhibit mean?

16     A.    To make less likely.

17     Q.    And what does prevent mean?

18     A.    To prevent means to -- what would be a

19    good word -- remove any potential for a certain

20    event from occurring.

21     Q.    Okay.  So when they are talking about

22    preventing, they are talking about a complete

23    elimination of accidental activation?

24     MR. ROBINSON:  Objection to the form.

132

1      THE WITNESS:  Yes.

2   BY MR. HARTMAN:

3      Q.   And when I say they, I am talking about

4   OSHA; you understand that?

5      A.   Yes.

6      Q.   Your next paragraph says, the foot control

7   involved in Ms. Lindquist's accident had two

8   additional features to protect against inadvertent

9   activation of the foot pedal.  The pedal was

10  equipped with side guards as well as a toe latch

11  feature that required the operator to fully insert

12  their foot into the pedal guard and push a latch

13  rearward before the pedal could be depressed; did

14  I read that accurately?

15     A.   Yes.

16     Q.   And is that correct today?

17     A.   I believe so, yes.

18     Q.   Okay.  So the pedal that was involved in

19  this accident had features that would protect

20  against inadvertent activation?

21     A.   Yes, it did.

22     Q.   One was a toe latch?

23     A.   Yes.

24     Q.   And one was a foot, a HOOD over the pedal?

133

1    A.   Yes, and the other were side guards.

2    Q.   And side guards.  Okay.  I should have

3  said the full cover.  When I said cover, I thought

4  a cover was side guards included but okay.

5  I wasn't trying to mislead you.

6       Do you know whether or not the toe latch

7  provides protection from riding the pedal?  And it

8  is if you know, sir.

9    MR. ROBINSON:  I am not sure what that means.

10  If he has an opinion on it then --

11    THE WITNESS:  I think in some instances it does

12  and in some instances it does not.  If the operator

13  rides the pedal in such a way that the foot is kept

14  fully inserted into the foot switch housing, it

15  does not provide protection against riding the

16  pedal.  If the operator keeps their foot partially

17  inserted into the foot switch housing, then the

18  latch will in effect latch the pedal in the

19  unactivated position and provide protection against

20  riding the pedal.

21  BY MR. HARTMAN:

22    Q.   Your next paragraph says the 2002 safety

23  standard for press brakes additionally recognizes

24  the hazard associated with unattended actuation of

134

1    the foot operating means; am I correct?

2        A.    Yes.

3        Q.    Is that an accurate statement?

4        A.    Yes.

5        Q.    Was that hazard also known in 1978?

6        MR. ROBINSON:  Objection to the form.

7        THE WITNESS:  I believe it was, yes.

8    BY MR. HARTMAN:

9        Q.    With the adoption -- strike that.

10            In 1973 was it known to the industry as a

11    whole that there was a hazard associated with the

12    unintended actuation of the foot operating means?

13        MR. ROBINSON:  Objection to the form.

14        THE WITNESS:  I am sorry.  Was it known to who?

15    BY MR. HARTMAN:

16        Q.    Industrywide.

17        A.    Industrywide?

18            I don't know I wasn't around in 1978 what

19    the industry knew or didn't know.  What I do know

20    is when the safety standard addressed the need or a

21    requirement to have a supervisory key selector

22    switch between hand and foot and that was in 2002.

23        Q.    Do you know of whether or not there is a

24    hazard associated with accidental activation of a

                                                        135

1    foot control in conjunction with the use of a press

2    brake?

3         MR. ROBINSON:  Objection to the form.

4         THE WITNESS:  Can I hear that question once

5    more, please?

6                        (Whereupon, the record was

7                         read.)

8         THE WITNESS:  Yes, there is a hazard associated

9    with accidental activation of any kind of control

10   including foot controls; and it doesn't matter what

11   kind of machine it is associated with.

12   BY MR. HARTMAN:

13        Q.   And how long have you known that?

14        A.   Probably most of my life.  I can't put a

15   specific time or date on it.  It seems like a

16   rather obvious statement.

17        Q.   Okay.  So it is almost an intuitive

18   statement to you?

19        A.   Yes.

20        Q.   When did you graduate college?

21        A.   1980 the first time.

22        Q.   When you graduated college, did you know

23   that there was a hazard associated with the

24   unintended activation of a machine?

                                                    136

1     A.    I suspect I did.

2     Q.    It is my understanding that there are two

3     general classifications of people that will work on

4     press brakes.  One is a setup individual and one is

5     an operator; am I correct?

6     MR. ROBINSON:  Objection to the form.

7     THE WITNESS:  Larger press shops will also have

8     a maintenance department but very -- setup is

9     considered a subset of maintenance.  So if we say

10    maintenance and operation, I go with you a hundred

11    percent.

12    BY MR. HARTMAN:

13    Q.    How about if we go maintenance, setup and

14    operator; is that easier?

15    A.    That's fine.

16    Q.    Do you have an opinion as to whether or

17    not a press brake manufacturer has an obligation to

18    manufacture the press brake so as to protect all

19    three individuals, types of individuals that will

20    come in contact with the machine?

21    MR. ROBINSON:  Objection to the form, asked and

22    answered.

23    THE WITNESS:  I think basically the same

24    regulations that apply to the press operator also

137

1    apply to setup and maintenance personnel.  However,

2    because the setup and maintenance personnel because

3    of the nature of what they are doing, have to have

4    their hands in the dye area because they are the

5    ones installing and removing the dyes, there is a

6    little bit higher degree of care that one has to

7    exercise to protect themselves.

8    BY MR. HARTMAN:

9        Q.   But the machine manufacturer's

10   responsibilities to your understanding extend to

11   the setup individual, the maintenance man and the

12   operator to the extent the machine operator -- the

13   machine manufacturer has responsibility?

14       MR. ROBINSON:  Objection to the form.

15       THE WITNESS:  Yes.

16   BY MR. HARTMAN:

17       Q.   Now, am I correct that with regard to

18   press brakes, it is foreseeable that operators will

19   have their hands in the dye area?

20       MR. ROBINSON:  Objection to the form.

21       THE WITNESS:  Yes, I think there is a pattern

22   of operators reaching into the dye space or point

23   of operation.

24

138

1    BY MR. HARTMAN:

2        Q.    In fact some of the operator protective

3    systems are designed so that while a worker's hands

4    are in a dye area, if the dye begins closing,

5    mechanically their hands are removed from that

6    area; am I correct?

7        A.    Yes, I believe you are referring to the

8    pull-back or pull-out device.

9        Q.    A present sensing device would work in a

10   way that would allow a worker to put their hand in

11   the dye area, do some work and remove it before the

12   machine could be activated; am I correct?

13       A.    That's correct.  The present sensing

14   device, however, does not have the ability to pull

15   the hands out.

16       Q.    Correct, correct.

17            I would refer you to your report on

18   page 6, please, first full paragraph beginning with

19   the fourth line down it says, as OSHA 3170 has

20   correctly pointed out, the electric foot control

21   works best when the operator is in a sitting

22   position.  Did I accurately read your report?

23       A.    Yes.

24       Q.    Would it be a correct statement to say

139

1  that the sitting position is the best position for

2  which an operator should utilize a foot control?

3      MR. ROBINSON:  Object to the form.

4      THE WITNESS:  It is not necessarily the best.

5  It is certainly an acceptable means of using a foot

6  control.  But if balance is the concern -- and

7  I think balance is something that Professor Barnett

8  focused on in his report -- then sitting is the

9  best.

10 BY MR. HARTMAN:

11     Q.  So if Ms. Lindquist was operating the

12 press brake at the time of her injury by sitting

13 down with the foot control by her side, that is not

14 something that you would find fault with?

15     MR. ROBINSON:  Object to the form.

16     THE WITNESS:  I would not.

17 BY MR. HARTMAN:

18     Q.  And your next sentence says, the sitting

19 position all but eliminates the problem of

20 balancing one's self on one foot and reduces the

21 physical fatigue associated with high pedal

22 activation forces and large pedal movements,

23 correct?

24     A.  Yes.

140

1    Q.    Do you agree with that statement?

2    A.    Yes, of course, I wrote it.

3    Q.    Sometimes experts in my experience have

4    had changes or misstated or misread something or

5    have found something, I am just clarifying your

6    status as of today.  I am not implying that you

7    should.  I just want to make sure we know what the

8    status of your opinions are as of today.

9    A.    Okay.  Understood.

10    Q.    Your next sentence says, the electric foot

11    control can also be utilized by standing as well as

12    a seated operator; am I correct?

13    A.    Yes.

14    Q.    So am I correct if Ms. Lindquist was using

15    the foot pedal and it had by her side when she was

16    working on her machine on the day of the accident,

17    the fact she was standing and using the foot pedal

18    would not be a problem to you?

19    MR. ROBINSON:  Objection to the form.

20    THE WITNESS:  No.

21    BY MR. HARTMAN:

22    Q.    Okay.  Your next paragraph says, there are

23    acceptable applications for both the electric foot

24    controls as well as the mechanical foot pedal.

141

1    Only the press user is capable of making an

2    appropriate decision regarding which style of

3    control is the best and safest use for a given

4    production run; am I correct?

5        A.   Yes.

6        Q.   Did I accurately read your statement?

7        A.   You did, yes.

8        Q.   When you talk about the press user, am

9    I correct we are talking about the employer as

10   opposed to the operator?

11       A.   The operator is certainly a user of the

12   press.  They are the ultimate user.

13       Q.   Well, am I correct that user is routinely

14   defined in the industry as the company that's using

15   the press brake as opposed to the operator?

16   Operators tend to be referred to as operators.

17   Users are --

18       A.   Yes, I agree that many standards make that

19   distinction between users and operators.

20       MR. ROBINSON:  Please give me time to

21   interject.

22       Objection to the form.  You didn't communicate

23   as to what standard.  It is just very confusing.

24

                                                      142

1    BY MR. HARTMAN:

2        Q.   When you talk about user in the context of

3    press brake, we are talking about the employer and

4    the setup people for the employer; am I correct?

5        MR. ROBINSON:  Let me object.  You have asked

6    it.  He has answered it.  He has indicated the

7    employee is the ultimate user.  You can't just now

8    ask it again to try to get a different answer.

9        MR. HARTMAN:  I can do whatever I want.

10       MR. ROBINSON:  That would be improper for you

11   to do that.  Objection, asked and answered.

12       MR. HARTMAN:  Well, you are implying that

13   you are doing it.  I am not doing it.  I am trying

14   to make sure we have a dialogue here where we both

15   understand what's going on.

16       MR. ROBINSON:  No, that's not what's going on.

17       MR. HARTMAN:  Because up until now I don't

18   think you understand that there was a difference

19   between the user and what --

20       MR. ROBINSON:  I don't need snide comments

21   about what I understand and what I don't

22   understand.  Let's just ask the question.

23   BY MR. HARTMAN:

24       Q.   In the press brake industry, who is the

143

1   user?

2       A.   Well, the user certainly includes the

3   employer, the maintenance people, the setup people

4   and the operator, although there are a whole bunch

5   of special rules that apply to the operator as

6   well.  But they are all users of the machine.

7       Q.   But the rules with regard to the tooling

8   and operating arrangement are directed toward the

9   setup person and the employer; am I correct?

10      MR. ROBINSON:  Objection to the form.

11      THE WITNESS:  Yes, everything having to do with

12  setup falls into the maintenance category.

13  BY MR. HARTMAN:

14      Q.   And an operator that's not also a setup

15  individual does not decide how the machine is set

16  up with regard to a foot control or a tool pump by

17  the switch; am I correct?

18      MR. ROBINSON:  Objection to the form.  In any

19  situation?  In any employer's shop?  In any

20  manufacturing plant?  Is that what you are asking

21  him to comment upon?

22      MR. HARTMAN:  I think he understands.

23      MR. ROBINSON:  I am asking for clarification of

24  the question.

144

1      MR. HARTMAN:  I am asking him to answer.

2      MR. ROBINSON:  Objection to the form.

3      THE WITNESS:  I think you drew the distinction

4   of an operator who is not part of the setup group.

5   BY MR. HARTMAN:

6      Q.   Correct.

7      A.   Yes, that operator is not the one that's

8   supposed to be making the decision or supervising

9   how the machine is set up for them to use.

10     Q.   And a supervisory switch is called a

11  supervisory switch because you are expecting a

12  supervisor to make the decision as to foot control,

13  two palm button, am I correct?

14     A.   Yes, absolutely.

15     Q.   And you have read Ms. Lindquist's

16  deposition; am I correct?

17     A.   I have.

18     Q.   Is there anything in her deposition

19  testimony that leads you to believe that she also

20  performed the function of a setup person?

21     MR. ROBINSON:  Object to the form.

22     THE WITNESS:  There is not.

23  BY MR. HARTMAN:

24     Q.   Is there -- have you read the

145

```
 1   co-employee's depositions?

 2       A.   Yes, I have.

 3       Q.   Is there anything that you have read in

 4   any of the co-employee's depositions that led you

 5   to believe that Ms. Lindquist was a setup person?

 6       MR. ROBINSON:  Object to the form.  I don't

 7   know how you are referencing setup.  It seems you

 8   are attempting to include the ability to move the

 9   switch from two palm to foot control in setup.

10   I think that is misleading the way it is asked.

11   BY MR. HARTMAN:

12       Q.   Is it my leading the way I asked it?

13       MR. ROBINSON:  I didn't say he thought it was

14   misleading.

15       MR. HARTMAN:  I think the --

16       THE WITNESS:  The answer to the question you

17   asked me is no.

18   BY MR. HARTMAN:

19       Q.   No, there is nothing that you have read

20   that indicates Ms. Lindquist was a setup person,

21   correct?

22       A.   Correct.

23       Q.   Is there anything that you have read that

24   leads you to believe Ms. Lindquist could make the
```

146

1    decision to utilize the key function to switch the

2    machine from foot control to two palm button

3    switch?

4        A.    I believe she testified she wasn't even

5    aware of the existence of the key.  So she is not

6    in a position to make that decision.

7        Q.    Is there anything that you have read about

8    Ms. Lindquist's ability and decision-making process

9    that would lead you to believe that she should be

10   entitled to make that decision as to utilize the

11   supervisory switch to make a change from foot

12   control to two palm button switch?

13       A.    Not unless she was a -- qualified to

14   participate in setup of the press, she is not the

15   one that's supposed to be making the decision.

16       Q.    And I appreciate that.  Is there anything

17   that you read that indicated that she was qualified

18   to be that person?

19       A.    No.

20       Q.    I need to see those three articles,

21   please, wherever they are.

22       A.    Right here.

23       MR. ROBINSON:  Make sure we keep those

24   separate.

                                                    147

1       THE WITNESS:  Sure.  All the other ones that

2    are marked are here.

3       MR. ROBINSON:  Great.

4       Do you know why I am receiving multiple faxes

5    from your office?

6       MR. HARTMAN:  You shouldn't have any faxes.

7       MR. ROBINSON:  I have two faxes so far.  One is

8    a three-page, and one is a four-page.

9       MR. HARTMAN:  Off the record.

10      MR. ROBINSON:  I would like it on the record.

11   I would like all of our conversations on the

12   record.  I am just asking if you know.

13      MR. HARTMAN:  The only thing it would be is

14   I have assigned my office research as to what

15   I should do with regard to my inability to get

16   Dr. Hood (phonetic) for a deposition date within

17   the time.  I have assigned that to Ray Conlon.

18   What he is doing, he is doing.

19      MR. ROBINSON:  Thanks.

20      MR. HARTMAN:  I have not seen anything today

21   that would say that there would be a fax coming.

22      MR. ROBINSON:  I am telling you I have received

23   two faxes and I am just -- I received one Monday

24   before I left for my West Virginia mediations for

148

1    two days.  And I am just curious if this is

2    something else I should be concerned about on a

3    Friday.

4        MR. HARTMAN:  The only thing it would be would

5    be something with Dr. Hood if it is.

6    BY MR. HARTMAN:

7        Q.    You indicate that on page 7, when a safety

8    system offers an accident hazard potential of its

9    own, there is unequivocal agreement in the safety

10    literature against the use of the safety system,

11    correct?

12        A.    Yes.

13        Q.    Then you indicate, the safety philosophy

14    is highlighted in the December 1982 publication by

15    Barnett and Hamilton, correct?

16        A.    Yes.

17        Q.    For example, the National Safety Council

18    wrote in 1995, it is a cardinal rule that

19    safeguarding one hazard should not create an

20    additional hazard, correct?

21        A.    Just one correction, in 1975, not '95.

22        Q.    I am sorry.  Okay.

23            And the article you are referring to is

24    the Philosophical Aspects of Dangerous Safety

149

1    Systems, which is marked as Switalski No. 3?

2        A.    Yes.

3        Q.    You indicate -- you cite the National

4    Safety Council also, correct?

5        A.    Yes.

6        Q.    Do you deem the National Safety Council's

7    writings on foot controls to be authoritative in

8    your research?

9        MR. ROBINSON:  Objection to the form.  Which

10   one are you referring to?

11       THE WITNESS:  To my knowledge the National

12   Safety Council doesn't have any publications

13   specific to foot controls.  What I am citing is

14   their position on safe guarding one hazard should

15   not create an additional hazard.

16   BY MR. HARTMAN:

17       Q.    Would the National Safety Council's

18   position on mechanical presses be authoritative for

19   your research?

20       MR. ROBINSON:  Objection to the form.

21   Which one?

22       MR. HARTMAN:  I am just asking him generally.

23       MR. ROBINSON:  Generally is not the right way

24   to ask the question.  Objection to the form.

150

1      MR. HARTMAN:  I can ask it.

2      MR. ROBINSON:  You can ask it.  You are

3  correct.

4      THE WITNESS:  That hasn't been determined yet.

5  I haven't looked at what the National Safety

6  Council has wrote with regard to mechanical power

7  presses.

8  BY MR. HARTMAN:

9      Q.   So would you feel that you have the

10  ability to reject the National Safety Council's

11  position on a case-by-case basis?

12      MR. ROBINSON:  Objection to the form of the

13  question.

14      THE WITNESS:  Yes, of course.

15  BY MR. HARTMAN:

16      Q.   If you were -- strike that.

17          On page 8 it says, in February 1988

18  Barnett and the undersigned co-authored a

19  publication entitled Principles of Human Safety.

20  Did you author such a publication?

21      A.   Yes.

22      Q.   Do you have a copy of it with you?

23      A.   Yes, I do.

24      Q.   May I see it, please?

151

1          Would I be fair in stating that you

2    consider Principles of Human Safety an

3    authoritative document?

4        A.    Yes.

5        Q.    Is it something that you would rely upon?

6        A.    I would and I have.

7        MR. HARTMAN:  Would you mark that?

8                    (Whereupon, SWITALSKI Deposition

9                     Exhibit No. 6 was marked for

10                    identification.)

11   BY MR. HARTMAN:

12       Q.    Would you describe Professor Barnett's

13   involvement and your involvement with the article

14   Principles of Human Safety?

15       A.    Yes, Principles of Human Safety was

16   originally written because Barnett was an invited

17   author on a new textbook that was being developed

18   for agricultural engineers in particular.  However,

19   he and I both saw a potential problem with the

20   different invited authors that were to do different

21   chapters.  We knew that they were -- some people

22   were very defense-oriented.  Some people were very

23   plaintiff-oriented in the world of litigation.  And

24   we suspected that the textbook would never come

                                                      152

1    together because different authors were expressing,

2    you know, not wanting to appear in the same

3    publication with some of the other authors.  And

4    indeed that eventually is what happened.

5         So we were invited to write the chapter on

6    safety for this textbook and that chapter was

7    eventually published because it was written.  We

8    finished it as the safety brief called Principles

9    of Human Safety.  It also explains why most of the

10   examples in that paper are agricultural examples in

11   nature because of the original intent to be a

12   chapter in a book for agricultural engineering

13   students.

14   Q.   Are you done?

15   A.   Yes.

16   Q.   What was your input to this article, what

17   section or can you describe it?

18   A.   Yes, let me just see the front page there

19   with the table of contents.

20        As you see, many of Barnett's already

21   existing publications are in effect reprinted in

22   here but with regard to, let's see here, in the

23   Roman numeral II, Part E, the zero mechanical state

24   and all of its subsections is the part that

153

1    I wrote.

2            Barnett and I collaborated a bit in the

3    warnings section, which is Roman numeral III-F

4    because that was new.  That had not been published

5    before.

6            My assignment was also to put together the

7    references in the bibliography section.

8        Q.   So your section zero mechanical state was

9    entirely yours?

10       A.   Zero mechanical state, yes.

11       Q.   Warnings was you and Barnett, a

12   collaboration, and then you put together the

13   references, et cetera?

14       A.   Yes.

15       Q.   The rest was Barnett?

16       A.   The rest was Barnett.  And as I said, for

17   the most part, it was a re-publication of a number

18   of earlier safety briefs.

19       Q.   And that article is authoritative?

20       A.   Yes.

21       Q.   Do you still use those principles today?

22       A.   I certainly did in this case so, yes.

23       Q.   And the new hazard that the gated foot

24   pedal presents is what?

                                                    154

1    A.   It is -- the new hazard is the increase in

2    the likelihood that the user will misuse the

3    product by riding the pedal.

4    Q.   Would it be a -- would I be accurate in

5    saying that if you did not believe -- strike that.

6         Would I be correct in saying if you

7    assumed that there would not be an increase in the

8    likelihood of riding the pedal at the front gate,

9    then the front gated foot control would be

10   appropriate in this situation?

11   MR. ROBINSON:  Object to the form.

12   THE WITNESS:  I think so, yes.  The misuse of

13   riding the pedal is not necessarily the hazard but

14   the hazard that arises out of riding the pedal is

15   the amputation hazard in the machine that the pedal

16   is being used to control.

17   BY MR. HARTMAN:

18   Q.   Right.  The hazard associated with --

19   A.   The point of operation.

20   Q.   The hazard associated with unintended

21   activation of the foot control is amputation?

22   A.   Yes.

23   Q.   And have you done any research to make a

24   determination as to whether or not the hazard of

155

1    riding the pedal with a foot cover is mitigated by

2    the trip latch?

3        MR. ROBINSON:  Objection to the form.

4        THE WITNESS:  I think I responded to a question

5    earlier about how the toe latch addresses some

6    riding-the-pedal scenarios, and it had to do with

7    how far the operator's foot is inserted into the

8    switch.  So, again, I think I am basically going to

9    give the same answer.

10       Yes, it does help to mitigate

11   riding-the-pedal-type accidents because it does

12   prevent those that are associated with the

13   operator's foot not being inserted fully into the

14   foot switch.

15   BY MR. HARTMAN:

16       Q.   You state next that individual designers

17   and manufacturers should not adopt a safety device

18   that creates a new hazard, correct?

19       A.   Yes.

20       Q.   And those examples when a downside exists

21   with the use of a safety device, a value system

22   must weigh the upside and downside effect of the

23   particular safeguarding system, correct?

24       A.   Yes.

                                              156

1      Q.    Would a value system be National Safety

2    Council?

3      A.    I don't think so, not the National Safety

4    Council.  They are not a standards writing or

5    government authority.  I don't think they would

6    rise to the level of a value system.

7      Q.    Would OSHA be a value system?

8      A.    Yes, because it carries with it the power

9    of law.

10     Q.    Would ANSI be a value system?

11     A.    Yes, or at least the committees within

12   ANSI, yes, consensus, more than one person, more

13   than one manufacturer being represented, that sort

14   of thing.

15     Q.    How would you get ANSI's determination

16   that -- from a value system that the cause-benefit

17   should be adopted?  How does ANSI tell you that?

18     A.    It is ultimately not ANSI's decision.  It

19   is the committee operating under the ANSI umbrella.

20   It is basically done through a consensus and it

21   doesn't necessarily mean that a hundred percent of

22   the people vote in favor of or against either.  It

23   is majority.

24     Q.    How does a manufacturer know that the

157

1    consensus has been reached?  Otherwise -- if I am a

2    manufacturer and I want a point of operation to

3    protect a system on a machine that may have a

4    downside, how do I know that the ANSI consensus

5    says that's okay?

6        MR. ROBINSON:  Object to the form.

7    BY MR. HARTMAN:

8        Q.   Or would I ever know?

9        A.   Because it is published in a standard.

10       Q.   Okay.  So -- if the -- I am -- if the ANSI

11   standard permits something, does that mean the

12   value system is okay?

13       A.    It means that it has been judged to be

14   reasonably safe.  Now sometimes -- sometimes the

15   value system -- let's say the Food and Drug

16   Administration approves a new drug and years down

17   the line some new side effect is found.  And they

18   discover they have made a mistake, and the drug is

19   pulled off the market.  But in effect the value

20   system in my opinion should be protecting that drug

21   manufacturer.

22       Q.   Okay.  So if ANSI says -- ANSI will say it

23   is okay; that means the value system says it is

24   okay?

                                                    158