# EXHIBIT H

# PART 5

1      A.    Yes.

2      Q.    How does the judicial value system work?

3      A.    The judicial value system is often

4   responsible for making changes in technology.  If

5   the -- if, for example, the judicial value system

6   comes out with a pattern of verdicts against, let's

7   say, a -- what would be a good example -- metal

8   fuel tanks that explode in collision, the judicial

9   value system by coming out with verdicts against

10  metal fuel tank manufacturers will encourage a

11  change in technology to make the fuel tanks made

12  out the plastic, for example.

13      Q.    Is that a value system that you as an

14  engineer would deem appropriate to use in making a

15  decision as to incorporate a safety feature that

16  has upside and a downside?

17      MR. ROBINSON:  Objection to the form.

18      THE WITNESS:  Yes, it can be, especially when

19  the judicial system is comprised of more than one

20  judge.  Much like our Supreme Court where the

21  justices will not necessarily all agree with one

22  another but there will still be a consensus.

23  BY MR. HARTMAN:

24      Q.    I am looking for the article that talks

159

1    about -- I am sorry.

2         In Switalski Exhibit No. 6, Principles of

3    Human Safety, you have the intrinsic classification

4    of safeguarding system on Table III of page 5?

5    A.    All right.

6    Q.    Do you agree that that table of systems

7    should be followed?

8    MR. ROBINSON:  Objection to the form.

9    THE WITNESS:  It is not a table of should

10   follow or shouldn't follow.  It is a statement of

11   factual observation that every safety device falls

12   into one of these eight categories.

13   BY MR. HARTMAN:

14   Q.    Do you agree that if it is a --

15   A.    I am sorry.  Seven categories.

16   Q.    Do you agree if it is a Category 1 or 2,

17   it should always be included -- the safety device

18   should always be included with the product?

19   A.    Yes, if there is a safety device that is

20   associated only with upsides or has no effect on

21   the safety of a system, it is better to include it

22   than not include it.

23   Q.    If it is a Class 4 or 5, you would include

24   it only if a value system approved of it, correct?

160

1      A.   Yes.

2      MR. ROBINSON:  Hold on.  Objection to the form.

3      THE WITNESS:  Yes.

4  BY MR. HARTMAN:

5      Q.   Do you agree that it is proper to --

6  strike that.

7           Do you agree that if the safety device in

8  this situation such as a foot control that is a

9  Class 4 or 5 can only be incorporated in the

10  product if it meets some type of approval?

11     MR. ROBINSON:  Objection to the form.

12     THE WITNESS:  What I am saying in my report is

13  that when you have a proposed safety device and

14  with that safety device is a potential negative

15  effect, a downside, before an individual designer

16  or an individual manufacturer includes a product of

17  that nature into its larger product, the guidance

18  given by a value system should be existing.

19  BY MR. HARTMAN:

20     Q.   Okay.  We are saying the same thing.

21     A.   Okay.

22     Q.   Okay.  So an engineer doesn't make the

23  decision to include a Class 4 or 5 safety system

24  absent a value system approval?

161

1      A.    An individual engineer should not.    A

2    group of engineers, however, can through consensus

3    and that's basically your standards and codes

4    committees.

5      Q.    Okay.  But just to clarify the record,

6    I am just breaking it down into two pieces what you

7    have just said.

8          Am I correct that an individual engineer

9    does not include a Class 4 or 5 safety device in a

10   product absent a value system approving it?

11     A.    They should not, correct.

12     Q.    If the value system approves it, then it

13   should be incorporated?

14     MR. ROBINSON:  Objection to the form.

15     THE WITNESS:  It would be reasonable on the

16   part of the individual product manufacturer or

17   engineer to incorporate it then because a value

18   system has given its approval for use.

19   BY MR. HARTMAN:

20     Q.    Okay.  Now if it is a group of engineers

21   that come together, they can -- they can form their

22   own value system to approve of the safety system

23   that is a Class 5, 4 or 5?

24     A.    Yes.

                                                    162

 1      Q.    Let's turn to the next page, please.

 2            It says, further evaluation to proposed

 3   front gate.  You cite a Safeguard Evaluation

 4   Protocol, A Decision Tree For Standardizing,

 5   Optionalizing, Prohibiting, Ignoring, Enhancing Or

 6   Characterizing Safeguards; am I correct?

 7      A.    Yes.

 8      Q.    Do you have that article with you?

 9      A.    I do.

10      Q.    May I see it, please?

11                  (Whereupon, a discussion was

12                  had on the video record but off

13                  the written record.)

14                  (Whereupon, SWITALSKI Deposition

15                  Exhibit No. 7 was marked for

16                  identification.)

17   BY MR. HARTMAN:

18      Q.    You cite the Safeguard Evaluation

19   Protocol, Switalski Exhibit No. 7?

20      A.    Yes.

21      Q.    Is that an article that you have read?

22      A.    Yes, it is.

23      Q.    Is that an article that you co-authored?

24      A.    No, it is not.

                                                    163

1      Q.   Did you provide any part of that article?

2      A.   No.

3      Q.   Is that an article that you find a

4    authoritative?

5      A.   Yes, it is.

6      Q.   Is it an article that you rely upon in

7    making your decisions as to safety features to be

8    included in a product?

9      A.   Yes.

10     Q.   I notice one of the examples is a seat

11   belt that's utilized in analyzing a Class 4 or 5?

12     A.   Yes, I believe it is the Class 4 because

13   the seat belt is a good example of a safety device

14   that sometimes hurts, sometimes helps and sometimes

15   does nothing.

16     Q.   So I am just asking you, so I know that

17   there is another organization that oversees seat

18   belts but I don't know the particulars about it.

19   But, let's say, ANSI approved of seat belts in

20   cars, let's assume.  Would that be sufficient

21   justification to include seat belts with cars?

22     A.   Yes.

23     Q.   Would a reasonable engineer include seat

24   belts with cars if ANSI approved of such a thing?

164

1      A.   Well, again, ANSI isn't going to make the

2    approval but, yes.

3           The code committee will make the approval

4    and then it would be reasonable for an individual

5    engineer who works for an individual manufacturer

6    to go ahead and use it.

7      Q.   Okay.  Would you -- if ANSI said it is

8    okay to put seat belts in cars, let's just assume

9    for me that the ANSI committee, the ANSI -- start

10   all over please.

11          Let's say the ANSI standard stated that it

12   was okay to put seat belt in cars?

13     A.   Yes.

14     Q.   Would that be a value system that would

15   permit seat belts to be placed in cars?

16     A.   Yes.

17     Q.   Would it be a value system that an

18   engineer should follow in placing seat belts in

19   cars?

20     MR. ROBINSON:  Objection to the form.

21     THE WITNESS:  Yes, because it involves a

22   consensus group.

23   BY MR. HARTMAN:

24     Q.   Would it be a standard -- would it be a

165

1    value system that would mandate their use in cars?

2        A.    No, ANSI does not carry the power of law

3    except in those situations where it has been

4    adopted by reference, where the ANSI standards have

5    been adopted by reference into OSHA and the like

6    which does carry the power of law.

7        Q.    So the -- would you -- if the ANSI

8    standard said seat belts were approved, would you

9    expect that a reasonable engineer would include

10   seat belts with cars?

11       A.    Yes, I would.

12       MR. HARTMAN:  We are going to have to leave

13   that because she is going to need to copy it and

14   get it back to you.

15       THE WITNESS:  Okay, that's fine.

16   BY MR. HARTMAN:

17       Q.    I would ask you to assume that a judicial

18   system says that if the cost of the safety feature

19   is outweighed by the benefit of the safety feature,

20   would that be a value system that would be followed

21   by a reasonable engineer?

22       MR. ROBINSON:  Objection to the form.

23       THE WITNESS:  It would not only be a value

24   system but the engineer's codes of ethics would

166

1    likewise reject something where cost outweighs

2    benefits.

3    BY MR. HARTMAN:

4        Q.    And as part of the cost I am indicating,

5    you know, like a seat belt, the downside of the

6    seat belts are outweighed by the people saved; you

7    understand that?

8        A.    Yes, if the seat belt, for example, cost

9    $10,000 to put into an automobile, we may not have

10    them because the cost is so high.

11        Q.    Actually, I was going in a little

12    different direction.  When I talk about the cost

13    versus the benefit, I am talking about the economic

14    cost and the increase in danger, for example, in a

15    seat belt.  The cost might be a hundred dollars per

16    seat belt, and it might be that you might have

17    5,000 people hurt by the seat belt.  The benefit

18    might be that you are saving a hundred thousand

19    people -- and I am just exaggerating to give you an

20    example -- and the cost associated with those

21    injuries might far outweigh the hundred dollars per

22    car.

23            If the judicial system has that as the

24    value system, would it be reasonable for the

167

 1    engineer to include the seat belt with the

 2    automobile?

 3        MR. ROBINSON:  Objection to the form.

 4        THE WITNESS:  In other words you are saying if

 5    there were a value system out there who rejects the

 6    seat belt such as the judicial value system?

 7    BY MR. HARTMAN:

 8        Q.   No, no, I am saying the judicial value

 9    system -- if the judicial value system says that in

10    order to determine whether a safety item should be

11    placed on a product, you weigh the cost of the

12    item, meaning economic, and increase in injury,

13    versus the benefit, meaning less people being

14    injured and money saved.

15        A.   Yes.

16        Q.   Would that be a value system that a

17    reasonable engineer would utilize to make a

18    determination to include a safety feature on a

19    product?

20        MR. ROBINSON:  Objection to the form.

21        THE WITNESS:  Oh, absolutely.

22    BY MR. HARTMAN:

23        Q.   Would you answer that please?

24        A.   Absolutely.

168

```
 1      Q.   Is that a reasonable value system?

 2      A.   Yes.

 3      Q.   Is that a value system that you have ever

 4   used?

 5      A.   I don't know that I have been in the

 6   position to have to choose whether or not to

 7   include a new proposed safety device other than in

 8   the framework of litigation matters like we are

 9   doing here today.

10           But, yes, I would say I have used it

11   because in effect that's what I am doing with

12   regard to the front gate that Barnett is proposing

13   for press brake foot controls.

14   BY MR. HARTMAN:

15      Q.   Okay.  What is the cost of the front gate?

16      A.   I don't know.

17      Q.   No.  I am saying what is the cost that you

18   factored in?

19      A.   What is the cost -- I haven't factored in

20   any cost.

21      Q.   Okay.  What is the benefit of the front

22   gate?

23      A.   The benefit of the front gate is that it

24   will reduce the likelihood of inadvertently
```

169

1    stepping into a foot control.

2    Q.    Okay.  On page 9, Item No. 2, the last

3    sentence of your report, you indicate it is not

4    possible to prevent someone from inadvertently

5    stepping into the pedal when the intended use of

6    the pedal involves stepping on it.  This holds true

7    for the proposed front gate.  Its use is not a

8    guarantee that an inadvertent activation will not

9    or cannot occur.

10        Would I be correct in indicating that

11   there is no guarantee with any safety device that

12   injury will not occur?

13   A.    Yes, that is true.  And I think it is

14   especially true for the foot switch gate because

15   intending to activate the foot switch involves in

16   effect getting past that gate.

17   Q.    But if you are not intending to activate

18   the foot switch and somehow your foot gets in

19   there, the gate does protect you if there is no

20   intent?

21   MR. ROBINSON:  I will object to the form.

22   THE WITNESS:  If you are not intending to

23   activate the foot switch and your foot gets in,

24   then by definition the gate hasn't protected you.

170

1    BY MR. HARTMAN:

2        Q.    No.   I am saying the gate would protect

3    you in that situation.   If you are outside the foot

4    switch and you are not intending to activate it and

5    somehow your foot goes forward, the gate protects

6    you from that situation; am I correct?

7        MR. ROBINSON:   Objection -- excuse me.   I am

8    sorry to interrupt.   Objection to the form.

9        THE WITNESS:   Sometimes it will and sometimes

10   it will not.

11   BY MR. HARTMAN:

12       Q.    Do you have any studies as to the

13   percentage of times it would protect you in that

14   situation versus when it will not protect you?

15       A.    No, I am not aware of any study of that

16   nature that's ever been performed.

17       Q.    If the gate operates as it is intended to

18   do, it will protect you from inadvertently placing

19   your foot into the foot pedal when it is down?

20       MR. ROBINSON:   Objection to the form.

21       THE WITNESS:   Again, sometimes it will and

22   sometimes it won't.

23       MR. ROBINSON:   That's been asked and answered.

24

171

1    BY MR. HARTMAN:

2        Q.   What situations will it not?

3        A.   The situation where someone inadvertently

4    steps into the foot control and gets past the gate,

5    the same way that someone who is intending to

6    operate the foot control gets past the gate.

7            The same foot motion can occur in both

8    instances.  One time the operator wants to activate

9    the pedal; the other time they don't.  But it is

10   the same motion that will get someone into the

11   pedal in either situation.

12       Q.   Would it inhibit that from occurring?

13       MR. ROBINSON:  Objection to the form.

14       THE WITNESS:  That's a very difficult one to

15   address because when the inadvertent actuation

16   occurs, it hasn't inhibited it.  When the

17   inadvertent actuation doesn't occur, then it has

18   inhibited it.

19   BY MR. HARTMAN:

20       Q.   Let's assume there were a hundred

21   opportunities for it to occur, do you have any data

22   that would suggest that how many times out of that

23   hundred, the gate would not inhibit it as opposed

24   to inhibit?

172

1      MR. ROBINSON:  Objection to the form.

2      THE WITNESS:  No, as I have already said, there

3   is no study to my knowledge that has ever been

4   conducted along those lines by anyone.

5   BY MR. HARTMAN:

6      Q.   You are just basing your statement on the

7   fact that it could occur that way?

8      A.   Yes.

9      Q.   You have no data to indicate that?

10     A.   Correct.

11     Q.   From a safety standpoint do you have an

12   opinion as to whether or not a foot pedal is safer

13   in protecting against inadvertent operation of the

14   machine as opposed to a foot control?

15     MR. ROBINSON:  Objection to the form.

16     THE WITNESS:  Yes, I believe that the features

17   associated with the older style mechanical pedal

18   are less likely to involve inadvertent actuation

19   because you do have to raise your leg up higher.

20   It is typically higher off the floor.  It typically

21   has a higher activation force.  And I think Barnett

22   pointed out all of those things in his report.

23   BY MR. HARTMAN:

24     Q.   You agree with that?

173

1       A.   Yes.

2       MR. ROBINSON:  Let me object to the form.

3   I don't know what "that" means.

4   BY MR. HARTMAN:

5       Q.   What you just stated?

6       A.   Yes.

7       Q.   And you agree with Professor Barnett's

8   treatise on that issue?

9       MR. ROBINSON:  I will object to the form.  What

10   treatise are we referring to?

11   BY MR. HARTMAN:

12       Q.   Statement relating to that issue?

13       A.   Yes, I simply pointed out on the flip side

14   features associated with the foot control that

15   Barnett didn't talk about.

16       Q.   And that would be outlined in paragraph 6

17   on page 10 of your report?

18       A.   Yes.

19       Q.   Do you have anything to add to paragraph 6

20   in your report as it relates to the safety features

21   the foot control provides?

22       MR. ROBINSON:  Other than what's in his report?

23       MR. HARTMAN:  He specifically indicated that

24   with regard to the safety features the foot control

174

1    provides that are not found on a foot pedal are

2    contained in paragraph 6.

3    BY MR. HARTMAN:

4        Q.   Am I correct, sir?

5        A.   Yes, I tried to be all-inclusive in

6    paragraph 6; and I see I have included the safe

7    distance, the ability for the operator to be

8    seated, the reduction of operator fatigue and the

9    reduction in the need for an operator to stand

10   balanced on one leg are all safety features

11   associated with the foot control that are not

12   common to the older foot pedal.

13   BY MR. HARTMAN:

14       Q.   Right.  That's the difference between a

15   foot control and a foot pedal as it relates to

16   safety is in paragraph 6?

17       MR. ROBINSON:  I will object to the form of

18   that question.

19       THE WITNESS:  Yes.

20   BY MR. HARTMAN:

21       Q.   Sir, if -- I want you to assume for me

22   that Ms. Lindquist was not riding the pedal and did

23   not intend to activate the foot pedal at the time

24   of her accident.

175

1      A.    Well, I certainly agree that she did not

2   intend to activate it.

3      Q.    Would you agree that if there was a gate

4   on the foot control and her foot was outside of the

5   foot control at the time of this unintended

6   activation and the gate worked as it was expected

7   to, meaning preventing her foot from going into the

8   foot control, that this accident would not have

9   occurred?

10     MR. ROBINSON:  I object to the form of the

11  question and the hypothetical.

12     THE WITNESS:  The gate is not designed to

13  prevent her foot from getting into the foot

14  control.  It is specifically designed to allow an

15  operator to get their foot into the foot control

16  otherwise the foot control is a useless piece of

17  equipment.  So, no, it is not -- the presence of a

18  gate on that foot control does not guarantee that

19  this accident would not have happened.

20  BY MR. HARTMAN:

21     Q.    I am not asking that.

22        Would you agree that a gate is intended to

23  prevent unintended activation of the foot control?

24     A.    That's the only reason the gate is there,

176

1  yes.

2      Q.  Okay.  So if the gate is on the foot

3  pedal -- strike that.

4          If the gate is on the foot control and

5  Ms. Lindquist's foot is outside of the foot control

6  and the gate does what it is intended to do, which

7  is prevent unintended entrance into the foot

8  control, would you agree this accident wouldn't

9  have occurred?

10     MR. ROBINSON:  I will object to the form of

11  that question.

12     THE WITNESS:  Yes.

13  BY MR. HARTMAN:

14     Q.  And on paragraph 8 on page 10, would it be

15  a fair statement -- I think I have asked you this

16  -- but would it be a fair statement to say that you

17  don't know what model foot control came with this

18  machine at the time it was sold in 1978?

19     A.  Yes.

20     Q.  Did you see anything in all of the

21  depositions that led you to believe -- that

22  indicated that Ms. Lindquist was riding the foot

23  pedal at the time of this accident?

24     A.  No, I saw no specific indicators that she

177

1   was not -- that she was riding the foot pedal.

2          I guess the only reason a suspicion to the

3   contrary may remain in my mind is that no

4   explanation was ever offered or given as to how the

5   inadvertent actuation took place.

6   Q.   Would you expect that someone who loses

7   eight of her, all eight of her fingers in a machine

8   would know how the activation took place?

9   MR. ROBINSON:  I will object to the form of

10  that question.  That's quite improper.  You are

11  asking him to speculate as to what she would know.

12  THE WITNESS:  I guess I investigated enough

13  injuries to know that sometimes there is total

14  amnesia on the part of the victim.  Certainly this

15  injury is extremely traumatic; and I guess, no,

16  I wouldn't be surprised that Mrs. Lindquist would

17  be unable to determine how her foot contacted the

18  pedal.  And again simply because no explanation has

19  been offered as to how the inadvertent activation

20  took place at least leaves some suspicion in my

21  mind with regard to whether there was riding the

22  pedal going on.

23  BY MR. HARTMAN:

24  Q.   You have -- you are aware that there is

178

1    nothing mechanically wrong with regard to the press

2    brake, correct?

3        A.    Correct.

4        Q.    Okay.  And would you agree that this

5    accident occurred by use of the foot control?

6        MR. ROBINSON:  I will object to the form of

7    that question.

8    BY MR. HARTMAN:

9        Q.    By activation of the foot control?

10       A.    Yes, there was no other activation means

11   that anyone has identified to cause the press to

12   cycle.

13       Q.    So your opinions and your -- strike that.

14            Your investigation of this accident leads

15   you to believe that there was activation of the

16   machine by the foot pedal that caused this

17   accident?

18       A.    Yes.

19       MR. HARTMAN:  Can we go off the record for a

20   minute?

21       THE VIDEOGRAPHER:  Off the record at 12:01 p.m.

22                    (A short break was taken.)

23       THE VIDEOGRAPHER:  This is the beginning of

24   Tape No. 3.  Back on the record at 12:06 p.m.

179

1  BY MR. HARTMAN:

2      Q.   In your report you have excerpts of the

3  testimony of people that have been deposed in this

4  case; am I correct?

5      A.   Yes.

6      Q.   Does your report contain all of the

7  excerpts that you believe relevant to formulating

8  the opinions that are contained in your report?

9      MR. ROBINSON:  Object to the form of that

10  question.

11      THE WITNESS:  I believe there are.  I would

12  have included anything else that I felt needed to

13  be used to support my opinions otherwise.

14  BY MR. HARTMAN:

15      Q.   Okay.  Tell me about the split of your

16  business between plaintiffs and defendants.

17      A.   I am going to estimate that perhaps

18  three-quarters of my business is defense and the

19  remaining quarter plaintiff as it exists today.

20      Q.   Does it matter to you who retains you as

21  to what your opinion is?

22      A.   Well, I typically have I good feel for

23  what direction my opinions have to go in before

24  I'll formally accept an assignment; and if I feel

180

1    that positions I have taken in the past or the

2    position that the client will express to me from

3    the get-go that they want to hear is something that

4    I disagree with or isn't compatible with what

5    I have written or testified to in the past, then

6    I wouldn't accept it.

7    BY MR. HARTMAN:

8        Q.   Would it be a fair statement that you form

9    your opinions independent of who hires you?

10       A.   Yes.

11       Q.   When you were with Professor Barnett, did

12   you do the same?

13       A.   Yes, I did, especially with regard to the

14   cases where the client expected me to do the

15   testifying.  There were certainly occasional cases

16   where I didn't necessarily agree with Professor

17   Barnett's opinion but I worked on it anyway because

18   the client wasn't interested in my opinion.  They

19   were interested in Professor Barnett's opinion.

20       Q.   But was his opinion at that time

21   independent, meaning was it his honest opinion to

22   the best of your knowledge?

23       MR. ROBINSON:  Object to the form of the

24   question.  I will still object to the form of that

181

 1   question.

 2       THE WITNESS:  As far as I can tell.

 3   BY MR. HARTMAN:

 4       Q.   Well, you worked for the man for 20 years;

 5   am I correct?

 6       A.   Plus.

 7       MR. ROBINSON:  You can go through all of those

 8   things, Mr. Hartman.  You have that.  That's asked

 9   and answered.  You know how long he has worked for

10   him.  It is already put down.  He is not going to

11   know internally Professor Barnett's comment, as he

12   said, the best he can tell.

13   BY MR. HARTMAN:

14       Q.   Make a long story -- would you agree that

15   you have no information as to whether Professor

16   Barnett chooses to mold his opinion based on who

17   retains him?

18       MR. ROBINSON:  Object to the form of the

19   question.

20       THE WITNESS:  I have no special reason to

21   believe he would do that.

22   BY MR. HARTMAN:

23       Q.   Okay.  Just trying to clarify.  You have

24   worked with him.  I don't know if in the middle of

182

1    the case Mr. Robinson might ask you something

2    personal about your relationship with Professor

3    Barnett.  I have to ask these questions because you

4    have that relationship.  I need to get it on the

5    record so I am not surprised if you would have that

6    information and Mr. Robinson would ask that during

7    the trial.  Do you understand why I am doing that?

8        A.   Yes.

9        Q.   So basically you have no opinion as to

10   Professor Barnett ever doing anything that would be

11   suggestive of molding his testimony for a

12   particular client?

13       A.   Well, I think had that occurred it

14   wouldn't be a matter of opinion either.  I mean it

15   either did occur or didn't occur.  It is a fact

16   matter and I can't -- I can't say that I have ever

17   seen Professor Barnett do that including those

18   instances where I disagreed with his opinion.

19   There are many times when reasonable people

20   disagree with one another.

21   BY MR. HARTMAN:

22       Q.   Thank you.  I needed to clarify that.

23            With regard to Linemaster products, would

24   a -- would you expect Heim to have relied upon

183

1    Linemaster to select the foot pedal that

2    accompanied this machine or would you expect Heim

3    to select the foot pedal that would accompany the

4    machine?

5        MR. ROBINSON:  I will object to the form of the

6    question.

7        THE WITNESS:  I would expect Heim to do the

8    selecting.

9    BY MR. HARTMAN:

10       Q.   Of the foot pedal?

11       A.   Yes.

12       Q.   And why is that?

13       A.   Linemaster is even further removed from

14   the ultimate use of their product.  Heim has

15   expertise in foot pedals, not press brakes.

16       Q.   So Heim would know what foot pedals to

17   include with this --

18       A.   I am sorry.  Linemaster.  I think I said

19   Heim.

20           Linemaster has expertise in foot pedals,

21   not in press brakes.  Heim is the expert in press

22   brake manufacture.  Cory Manufacturing is the

23   expert or supposed to be the expert in press brake

24   use.

184

1      Q.   But Heim would be the expert in selecting

2    the foot pedal that would be standard equipment

3    with its press brake?

4      MR. ROBINSON:  Objection to the form of the

5    question.

6      THE WITNESS:  Yes.

7      MR. HARTMAN:  Sir, thank you for your time.

8    I have no further questions.

9                      EXAMINATION

10   BY MR. ROBINSON:

11     Q.   Sir, would the end-user be in the best

12   position to select a foot control for a press

13   brake?

14     A.   Yes.

15     Q.   And was that a conclusion reached in

16   Professor Barnett's Exhibit 4, Foot Controls:

17   Riding the Pedal in No. 9 where he lays out the

18   factors that Professor Barnett yesterday indicated

19   that on a number of them would be known by the

20   end-user?

21     A.   Yes, I think he neatly summarizes many of

22   the different factors that go into foot pedal

23   selection; and the machine tool manufacturer is

24   just not in a position to know things that are

185

1   listed here such as a point of operation

2   safeguarding, operator movement in the work space

3   and so forth.

4        Q.   Do you know if Avco Lycoming, the original

5   purchaser of this press brake, chose the model of

6   foot control they wanted with the machine; do you

7   know one way or the other?

8        A.   I have no reason to believe they did or

9   didn't.  I just don't have any information.

10       Q.   Has anyone ever -- does any evidence exist

11   that you are aware of in your review of this case

12   to suggest that Heim made the decision as to which

13   one to supply with the press brake that was sold to

14   Avco Lycoming through HB Machinery the distributor

15   in 1978?

16       A.   No, I have seen no documentation from

17   either end as to who made that decision.

18       Q.   The press brake I think was referenced in

19   the beginning of your deposition to have a capacity

20   of 35 strokes per minute; is that right?

21       A.   Yes, the press brake involved in this

22   injury.

23       Q.   Are there many power presses that have a

24   capacity of less than that, 35 strokes per minute?

186

1      A.   Yes, there certainly are.  As you get

2  higher and higher in power press or punch press

3  tonnage, the machines get considerably slower than

4  that.

5      Q.   Okay.  And when you mentioned that the

6  term power press can be used as both press brakes

7  and for punch press, what are you referring to?

8           I asked you before we went on the record

9  after the break to pull out the ANSI standards for

10  power presses, mechanical power presses and for

11  power press brakes.  And I see the term power

12  presses, power press used in both standards.  Is

13  that what you are referring to when you say the

14  word power press --

15      A.   Yes.

16      Q.   -- has been used in both vernaculars?

17      A.   Yes, the phrase power press appears in the

18  title of both the punch press safety standard as

19  well as the press brake safety standard.

20      Q.   And I guess they are both presses of some

21  sort and they are both powered; does that make

22  sense?

23      A.   Yes.

24      Q.   You attached some exhibits to your report,

187

1    one of which is the illustration of a foot control

2    in the ANSI standard B11.3, 1973, applicable to

3    power press brakes; is that right?

4         A.   Yes, I did.

5         Q.   Does that illustration contain a gate?

6         A.   It does not.

7         Q.   Do you know of any -- I notice that the

8    ANSI standards subsequent to 1973 including the one

9    you attached as Exhibits 4 for 1982 -- excuse me --

10   5 for 1982 and 6 for 2002 also contain

11   illustrations and it appears that neither of those

12   subsequent ANSI compilations in the illustrations

13   of foot controls show foot controls with gates as

14   well; is that correct?

15        A.   That's also correct.

16        Q.   Do you know of any ANSI standard, ANSI

17   commentary or ANSI illustration that either -- that

18   requires the use of a gate?

19        A.   No.

20        Q.   Do you know of any ANSI standard,

21   explanation, commentary or illustration that

22   suggests that a gate should be used?

23        A.   I believe the most current mechanical

24   power press standard has a page of illustrations of

188

 1    different styles of foot controls and one of them

 2    does have the front gate.

 3        Q.   Is that for the power press or for the

 4    power press brake?

 5        A.   For the mechanical power press, not the

 6    brake.

 7        Q.   I didn't ask my question very clear.

 8    I appreciate that clarification.

 9             Do you know of any ANSI standard relative

10    to power press brakes or explanatory comments or

11    illustrations that suggest a gate should be used on

12    a foot control?

13        A.   No.

14        Q.   In working with Professor Barnett for

15    20-plus years, did Professor Barnett ever indicate

16    to you a distinction as to when a gate should be

17    used on a foot control based upon whether or not

18    the foot control was used on a power press brake or

19    a mechanical power press?

20        A.   No, he did not.

21        Q.   Does his article that he wrote that has

22    been attached as Exhibit 4 titled Foot Controls:

23    Riding the Pedal make any distinction between the

24    use of a gate and the dangers caused by that gate

189

1    that is riding the pedal, increased frequency of

2    riding the pedal, does the article make any

3    distinction between the gate being used on foot

4    controls applied to mechanical power presses or

5    mechanical press brakes?

6        A.    No, it does not.

7        Q.    And do you know of any other occasion

8    where Professor Barnett has expressed an opinion,

9    whether it be in his writings, through his

10   teachings, through his training of his employees or

11   in any situation where Professor Barnett has

12   attempted to draw the distinction that he is in

13   this case, that is that a gate should be used on a

14   power press brake but not on a power press?

15       A.    No, I don't.  This particular project is

16   the first time I have heard him express an opinion

17   of that nature.

18       Q.    Has this come as a surprise to you?

19       A.    It has, yes.

20       MR. ROBINSON:  Those are all of questions

21   I have.

22       MR. HARTMAN:  A couple of questions

23                  FURTHER EXAMINATION

24   BY MR. HARTMAN:

190

1      Q.    Do you agree with the statement that

2   although power presses and power press brakes are

3   both metal forming machines there exist significant

4   differences in the operation and safety aspects of

5   these machines to justify two different safety

6   standards?

7      A.    Yes.

8      Q.    So there are significant differences

9   between power presses and press brakes?

10     A.    Yes.

11     Q.    So much so that two standards exist?

12     MR. ROBINSON:  He said that.  Asked and

13  answered.  Both were included in this question.

14  You don't need to wave me off.  That's very rude

15  and unprofessional.  He has answered those

16  questions.

17  BY MR. HARTMAN:

18     Q.    Let me follow up on that.

19     MR. ROBINSON:  Pardon me.  I didn't hear what

20  you said.

21     MR. HARTMAN:  I don't know what I said.

22  I didn't know I said something.

23  BY MR. HARTMAN:

24     Q.    You were asked some questions and I am

1    sorry but I believe that Switalski Exhibit No. 4

2    that says Foot Controls:  Riding the Pedal

3    specifically indicates that you select a foot pedal

4    based on a particular machine for which the foot

5    pedal is to be utilized, am I correct?

6        MR. ROBINSON:  Object to the form of the

7    question.

8        THE WITNESS:  I believe so, yes.

9    BY MR. HARTMAN:

10       Q.   So a power press and a press brake are two

11   distinct types of machine, correct?

12       A.   Yes.

13       MR. ROBINSON:  Objection, asked and answered

14   numerous times.

15   BY MR. HARTMAN:

16       Q.   So you would select the foot pedal for a

17   press brake based on press brake issues, not power

18   press issues?

19       MR. ROBINSON:  Objection, asked and answered.

20   BY MR. HARTMAN:

21       Q.   Go ahead.

22       A.   Yes.

23       Q.   And you would pick a foot pedal for a

24   punch press based on punch press issues, correct?

192

1      MR. ROBINSON:  Objection to form and asked and

2   answered.

3      THE WITNESS:  Yes.

4   BY MR. HARTMAN:

5      Q.    So while Professor Barnett did not

6   distinctly say punch presses and press brakes in

7   his article, which has been identified as Switalski

8   Exhibit No. 4, he did indicate that you choose the

9   foot control based on the particular type of

10   machine, correct?

11      A.    Yes, he did.

12      MR. HARTMAN:  No further questions.

13      MR. ROBINSON:  We will read the transcript if

14   that's okay with you.  It seems to be the safest

15   way to go.

16      THE WITNESS:  Preferred.

17      THE VIDEOGRAPHER:  Off the record at 12:22 p.m.

18          FURTHER DEPONENT SAITH NOT.

19

20

21

22

23

24

                                              193

1    STATE OF ILLINOIS  )

2                        )  SS:

3    COUNTY OF C O O K  )

4        I, Deanna Amore, a notary public within and for

5    the County of Cook County and State of Illinois, do

6    hereby certify that heretofore, to-wit, on the 7th

7    day of April, 2006, personally appeared before me,

8    at 33 North LaSalle Street, Chicago, Illinois,

9    WILLIAM SWITALSKI, in a cause now pending and

10   undetermined in the United States District Court

11   for the Western District of Pennsylvania, wherein

12   TINA LINDQUIST is the Plaintiff, and HEIM, L.P. is

13   the Defendant.

14       I further certify that the said witness was

15   first duly sworn to testify the truth, the whole

16   truth and nothing but the truth in the cause

17   aforesaid; that the testimony then given by said

18   witness was reported stenographically by me in the

19   presence of the said witness, and afterwards

20   reduced to typewriting by Computer-Aided

21   Transcription, and the foregoing is a true and

22   correct transcript of the testimony so given by

23   said witness as aforesaid.

24       I further certify that the signature to the

                                                      195

1    foregoing deposition was reserved by counsel for

2    the respective parties.

3        I further certify that the taking of this

4    deposition was pursuant to Notice, and that there

5    were present at the deposition the attorneys

6    hereinbefore mentioned.

7        I further certify that I am not counsel for nor

8    in any way related to the parties to this suit, nor

9    am I in any way interested in the outcome thereof.

10       IN TESTIMONY WHEREOF:  I have hereunto set my

11   hand and affixed my notarial seal this _10TH_ day

12   of _APRIL_ , 2006.

13                                OFFICIAL SEAL
                                  DEANNA AMORE
14                         NOTARY PUBLIC - STATE OF ILLINOIS
                           MY COMMISSION EXPIRES:02/28/08

15

16

17

18   _____

     NOTARY PUBLIC, COOK COUNTY, ILLINOIS

19

20

21

22

23

24

                                                        196