# EXHIBIT J

# PART 1

1

1          UNITED STATES DISTRICT COURT

2        WESTERN DISTRICT OF PENNSYLVANIA

3                    -   -   -

4   TINA LINDQUIST,              :

5              PLAINTIFF, :

6    -VS-                        : CASE NO. 04-249E

7   HEIM, LP,                    :

8              DEFENDANT. :

9                    -   -   -

10        Deposition of DENNIS R. CLOUTIER, a

11   witness herein, taken by the plaintiff as upon

12   direct examination pursuant to the Federal Rules

13   of Civil Procedure and pursuant to agreement and

14   stipulations hereinafter set forth at the offices

15   of Dinsmore & Shohl, 1600 Chemed Center, 255 East

16   Fifth Street, Cincinnati, Ohio at 8:22 a.m. on

17   Tuesday, April 11, 2006, before Lisa Conley, RMR,

18   CRR, CCP, a notary public within and for the State

19   of Ohio, and by audio/visual means before Marlene

20   Dori, CLVS.

21                    -   -   -

22

23

24

2

1    APPEARANCES:

2     On behalf of the Plaintiff:

3            Dallas W. Hartman, Esq.

4                  of

5            Dallas W. Hartman, PC

6            2815 Wilmington Road

7            New Castle, Pennsylvania   16105

8     On behalf of the Defendant:

9            Paul R. Robinson, Esq.

10                 of

11           Meyer, Darragh, Buckler, Bebenek &

12           Eck, PLLC

13           US Steel Tower, Suite 4850

14           600 Grant Street

15           Pittsburgh, Pennsylvania   15219-6194

16                   -   -   -

17             S T I P U L A T I O N S

18           It is stipulated by and between counsel

19    for the respective parties that the deposition of

20    DENNIS R. CLOUTIER, a witness herein, may be taken

21    as upon direct examination pursuant to the Federal

22    Rules of Civil Procedure, and pursuant to

23    agreement; that the deposition may be taken in

24    stenotypy by the notary public-court reporter and

3

1  transcribed by her out of the presence of the

2  witness; that the transcribed deposition is to be

3  submitted to the witness for his examination and

4  signature, and that signature may be affixed out

5  of the presence of the notary public-court

6  reporter.

7                      -   -   -

8                    I N D E X

9  WITNESS                              DIRECT EXAM

10 Dennis R. Cloutier                        4

11                     -   -   -

12                 E X H I B I T S

13 PLAINTIFF'S EXHIBITS                   MARKED

14 No. 1, a copy of a multi-page letter dated    85

15     March 15, 2005, to Paul Robinson from

16     Dennis Cloutier.

17 No. 2, a 1-page copy of a photograph.      85

18                     -   -   -

19

20

21

22

23

24

4

1           THE VIDEOGRAPHER:  Today is April

2    the 11th, 2006.  The time now is 8:22 a.m.  This

3    is in the US District Court, Western District of

4    Pennsylvania, Case No. 04-249E, in the matter of

5    Tina Lindquist, Plaintiff, versus Heim, LP,

6    Defendant.  At this time I'll have counsel

7    introduce themselves, please.

8           MR. HARTMAN:  My name is Dallas

9    Hartman.  I represent the Plaintiff, Tina

10    Lindquist.

11           MR. ROBINSON:  Good morning.  Paul

12    Robinson representing the Defendant, Heim, LP.

13           THE VIDEOGRAPHER:  At this time the

14    court reporter will swear in the witness, please.

15                       (Witness sworn.)

16           DENNIS R. CLOUTIER

17    of lawful age, a witness herein, being first duly

18    sworn as hereinafter certified, was examined and

19    deposed as follows:

20           DIRECT EXAMINATION

21    BY MR. HARTMAN:

22           Q.   For the record, would you please

23    state your full name.

24           A.   Dennis Roger Cloutier.

5

1          Q.    Mr. Cloutier, my name is Dallas

2     Hartman.  I represent Tina Lindquist.  We're

3     taking your videotaped deposition in the discovery

4     matter of this case.

5               It's my understanding that you

6     authored a report of March 15th, 2006?

7          A.    Yes.

8          Q.    Are you represented by counsel

9     today?

10         A.    I am accompanied by the counsel for

11     Heim.

12         Q.    Okay.  Would that be Mr. Robinson?

13         A.    Yes.

14         Q.    And am I correct that Mr. Robinson

15     retained your services in this matter?

16         A.    Yes.

17         Q.    Will you give us your current

18     address, Mr. Cloutier?

19         A.    6624 Parkland Avenue, Cincinnati,

20     Ohio.

21         Q.    And how long have you been at that

22     address?

23         A.    Since 1982.

24         Q.    What kind of business are you

6

1   currently engaged in?

2          A.    I am a safety consultant.

3          Q.    Would you describe for us what a

4   safety -- what your duties are as a safety

5   consultant?

6          A.    I provide safety consulting services

7   to business and industry relative to industrial

8   safety.

9          Q.    What type of businesses have you

10  been employed by as it relates to providing safety

11  consulting services?

12         A.    Machine manufacturers, food

13  ingredients manufacturers, the Occupational Safety

14  and Health Administration, and various

15  manufacturing firms that use machinery to make

16  products.

17         Q.    Have you had the opportunity to

18  review the testimony of Professor Barnett in this

19  matter?

20         A.    No, I have not.

21         Q.    Have you had the opportunity to meet

22  with Mr. Robinson this morning to prepare for this

23  deposition?

24         A.    Yes, I have.

7

```
 1              Q.   And, approximately, what time did
 2    you meet with Mr. Robinson?
 3              A.   I picked him up at his hotel just
 4    before 7:00, and we had breakfast together.
 5              Q.   Okay.  What issues did you discuss?
 6              A.   The elements of the case, some of
 7    the testimony of Mr. Barnett, some of the
 8    evidentiary evidence that has been provided
 9    through discovery so far.
10              Q.   What elements, what is your
11    understanding of the elements of this case are?
12              A.   I understand that the major
13    complaint that is being alleged against Heim is
14    the type of foot switch that was on the machine at
15    the time of the occurrence and how the machine was
16    being used.
17              Q.   What type of machine -- Strike that.
18              What type of foot control was on the
19    Heim machine at the time of this occurrence?
20              A.   It's my understanding it was a
21    Linemaster foot switch.
22              Q.   Do you know what model number?
23              A.   I believe it was a 511, Model 511.
24              Q.   Would you describe what your
```

8

1   understanding is, a Linemaster Model 511 switch

2   is?

3            A.    It's an anti-trip type foot switch,

4   which has a toe release type of mechanism.

5            Q.    What's the purpose of the toe

6   release on the Model 511?

7            A.    The toe release latches the

8   actuating pedal in the up position and requires an

9   operator to insert their foot completely into the

10  foot switch to release the toe latch before

11  operating -- or before depressing the operating

12  lever.

13           Q.    What's the purpose of having a toe

14  latch on that foot switch, if you know?

15                 MR. ROBINSON:   Objection to the

16  form.

17           A.    The toe latch is a device that is

18  intended to reduce or minimize the possibility or

19  the probability of inadvertent actuation of the

20  foot switch.

21           Q.    You indicated -- First you said

22  "possibility" and then you said "probability,"

23  what was that change about; would you explain to

24  me what inadvertent activation of the foot switch

9

1    means?

2                    MR. ROBINSON:  Objection to the

3    form.

4         A.    The difference between possibility

5    and probability is, possibility is just

6    speculation, anything is possible; but in

7    probabilities you can actually numerically specify

8    what the likelihood of something happening is as

9    opposed to it not happening.

10        Q.    Okay.  So the anti-trip toe latch

11   probably reduces the likelihood of accidental

12   activation; am I -- I don't -- You made a change.

13        A.    It reduces the probability.

14   Probability is measured from 0 to 1, 1 is a

15   definite happening, 0 is a definite not happening,

16   and somewhere in between there is the probability

17   rating.

18        Q.    Okay.  So the anti-trip toe latch

19   reduces the probability of accidental activation

20   of the foot switch --

21        A.    Yes.

22        Q.    -- foot control?

23        A.    Yes.

24        Q.    Do you know what -- by what

10

1    reduction it provides?

2            A.    No.

3            Q.    You just know that it does?

4            A.    That's the way it's been presented

5    to industry.

6            Q.    Do you agree with that

7    representation?

8            A.    Yes.

9            Q.    Okay.  Would the anti-trip toe latch

10   reduce the probability of accidental activation of

11   the foot control if the operator is riding the

12   pedal?

13           A.    No.

14           Q.    Never?

15           A.    Say that again, ask that question

16   again.

17           Q.    You said it would not reduce the

18   probability of accidental activation of the foot

19   control if the operator is riding the pedal.

20           A.    That's correct, that's what I said.

21           Q.    Are you saying it would never

22   operate to inhibit accidental activation of the

23   foot control in that situation?

24           A.    No.

11

1          Q.    Would you explain how you came to

2    that conclusion?

3          A.    My experience working in the

4    industry.

5          Q.    Well, tell me what experience you

6    have in the industry.

7          A.    I began working in the industry,

8    metal fabricating industry, which is associated

9    with press brake operation, in 1973.  I spent nine

10   years as a field service representative working on

11   machines, repairing them, visiting various users

12   of press brakes during that period of time.  After

13   that, I entered into the safety area relative to

14   the operation and use of press brakes, and I

15   worked that area from 1982 to 2001, and I continue

16   to operate -- work that area.

17         Q.    What observations did you make

18   during that 20 years or so of experience in the

19   metal fabricating industry that leads you to

20   believe that the anti-trip toe latch would not

21   inhibit accidental activation of the foot control

22   when the operator is riding the pedal?

23         A.    Because when the operator's foot is

24   in there, the toe latch is released --

12

1          Q.    Would that be --

2          A.    -- if they're riding the foot

3   switch.

4          Q.    Okay.  Maybe we're talking about two

5   different things.  So on the anti-trip toe latch

6   foot control, your definition of riding the pedal

7   would have the operator releasing the latch and

8   keeping it released as they're riding the pedal;

9   is that correct?

10         A.    That is the definition of riding a

11  foot switch.

12         Q.    I'm sorry.  Tell me the definition

13  of riding a foot switch.

14         A.    That is my definition of riding a

15  foot switch, keeping your foot in the foot switch

16  to actually keep the foot switch actuated all the

17  time.

18         Q.    So it would include having the toe

19  latch depressed --

20         A.    Yes.

21         Q.    -- on the Model 511?

22         A.    Yes.

23              THE VIDEOGRAPHER:  Does everybody

24  have their phones off?

13

1        MR. ROBINSON:  I'm sorry.

2   BY MR. HARTMAN:

3        Q.    So just so we have the record

4   straight, with regard to the Model 511 Linemaster

5   foot control with the anti-trip toe latch, your

6   definition of riding the pedal on that control

7   would be the operator has the foot fully inserted

8   with the toe latch depressed so that they can push

9   the pedal up and down at anytime?

10       A.    Yes.

11       Q.    The toe latch would be rendered

12  neutral in that situation?

13       A.    Yes.

14       Q.    It would not be activated in that

15  situation?

16            MR. ROBINSON:  I'll object to the

17  form of that question.

18       A.    No.

19       Q.    It would not?

20       A.    That's not what I said, it's not.

21       Q.    Well, the toe latch would be

22  depressed so that it doesn't latch the foot pedal

23  in that situation?

24       A.    Correct.

14

1          Q.   I see in your resume you have

2   approximately 19 years with Cincinnati,

3   Incorporated, Cincinnati, Ohio, as your employer;

4   am I correct?

5          A.   No.

6          Q.   I have from 1973 to 1979,

7   Cincinnati, Incorporated, Cincinnati, Ohio,

8   Product Safety Coordinator.

9          A.   No.

10          Q.   That's not accurate?

11          A.   No.

12          Q.   Who were you employed with during

13   that period of time?

14          A.   Cincinnati, Incorporated.

15          Q.   What did I say?  I thought I said

16   Cincinnati, Incorporated.

17          A.   As a Product Safety Coordinator, and

18   I was not a Product Safety Coordinator between

19   1973 and 1979.

20          Q.   My first question, though, sir,

21   was -- I'm sorry.  My first question was that you

22   were employed for approximately 19 years by

23   Cincinnati, Incorporated?

24          A.   And I said no.

15

1        Q.   Can you tell me, when it says 1973

2   to 9/2001, Cincinnati, Incorporated, Cincinnati,

3   Ohio means?

4        A.   1973 to 2001?

5        Q.   Yes.

6        A.   That's 29 years; isn't it?

7        Q.   Math was never a good thing, I

8   apologize.

9        A.   Okay.

10       Q.   Okay.  So for 29 years you were

11   employed by Cincinnati, Incorporated?

12       A.   Yes.

13       Q.   Okay.  I wasn't trying to cut your

14   time down.  I just didn't add the numbers up

15   right.

16       A.   I'm only answering your questions.

17       Q.   That's okay.

18            Who is Cincinnati, Incorporated?

19       A.   They are a machine tool

20   manufacturer.

21       Q.   What kind of machine tools do they

22   manufacture?

23       A.   They make mechanical and hydraulic

24   power press brakes, mechanical and hydraulic power

16

1  squaring shears, laser cutting systems, powdered

2  metal compacting presses, hydraulic power presses,

3  and I believe that's their entire product line

4  today.

5        Q.   Is a hydraulic power press, would

6  that be also called a punch press?

7        A.   Yes, it could be.

8             MR. ROBINSON:  I'll object to the

9  form of the question.  My apologies.

10       Q.   Is there a difference between press

11 brakes and punch presses, to your understanding?

12       A.   Yes.

13       Q.   Would you tell me what the

14 differences are?

15       A.   The types of work that they do.  The

16 power press is a machine that is -- has a defined

17 work area, a structure where the work is performed

18 within that structure.  A press brake is a long --

19 performs long, narrow bending, and it has an area

20 which is called point of operation where the

21 material is actually worked, but a large portion

22 of the material is outside of that area during the

23 forming operation.  Whereas, a punch press, all of

24 the piece part itself is contained within the area

1   of the machine.

2         Q.   Are there any other differences that

3   you can tell me between punch presses and press

4   brakes?

5         A.   There are numerous differences

6   relative to control systems and the safety

7   requirements associated with each machine and the

8   type of operator interfaces that are associated

9   with each machine, and the size, just the physical

10  size of each machine.

11        Q.   What are the differences in the size

12  of each type of machine?

13        A.   Press brakes run from as small as 20

14  to 30-ton capacity, maybe 4 feet long in length,

15  and 5 or 6 feet in height to up to 2,000 or

16  2500-ton capacity, up to 60 feet long, and maybe 2

17  or 3 stories high.

18             Power presses, on the other hand,

19  are from very light tonnages, again 15, 20, even

20  maybe less than 15 tons, up to 40 or 50,000-ton

21  capacity.  They are the sizes of houses in some

22  cases or as small as a bench-type of press that

23  could fit on a typical work bench.

24        Q.   Are there differences generally in

18

1  the speed by which power presses -- or punch

2  presses and press brakes operate?

3              MR. ROBINSON:  I object to the form

4  of the question.

5        A.    There are differences in speed

6  within each type of machine as well as compared

7  between each other.

8        Q.    Would you tell me, when compared to

9  each other, what the differences are?

10       A.    Really, there isn't any.  Some of

11 the larger press brakes and the larger punch

12 presses or power presses will run at strokes of 15

13 to 20 strokes per minute, and some of the smaller

14 ones will run at strokes of 30 to 60 strokes per

15 minute, and then it goes across lines.

16       Q.    Okay.  Would you expect to find

17 press brakes that have operating cycles greater

18 than 40 to 60 strokes a minute?

19       A.    No, I wouldn't expect that.

20       Q.    Would you expect to see punch

21 presses that have stroke capacities at greater

22 than 40 to 60 strokes per minute?

23       A.    Maybe some of the smaller ones.

24 There are -- There is a specific family of power

19

1    presses that are called high-speed presses that

2    run much faster, but in the general forming

3    industry, they pretty much match up evenly across

4    all the lines.

5         Q.    In your report I notice that you

6    make a clear distinction between press brakes and

7    power presses; am I correct?

8         A.    Yes.

9         Q.    Okay.  Would you agree that the

10   standards that apply to punch presses are not the

11   same standards that would apply to press brakes?

12              MR. ROBINSON:  Objection to the

13   form.  You can answer all of the time.  I

14   apologize for interrupting.

15        Q.    Let me ask the question again.

16   Would you agree, sir, that the standards that you

17   would apply to power presses, punch presses, would

18   not be the same standards that you would apply to

19   press brakes?

20              MR. ROBINSON:  Same objection.

21        A.    Under most circumstances that is

22   true.

23        Q.    What circumstances would you mingle

24   the standards?

1        A.    There are some instances where press

2   brakes are used to do power-press type of work.

3   They have modifications made to them so they can

4   accept power press-type dies, which are entirely

5   different than press brake dies, and in those

6   circumstances, the actual forming of material and

7   point of operation safeguarding requirements are

8   most often better applied if B 11.1 is used for

9   the point of operation safeguarding as opposed to

10  B 11.3.

11              MR. ROBINSON:   That's B 11.1 and B

12  11.3 for the court reporter's sake.

13        Q.    When you analyzed Ms. Lindquist's

14  injury, am I correct, you did not mingle the

15  standards as you applied them to this accident?

16        A.    Correct.

17        Q.    You used B 11.3?

18        A.    Correct.

19        Q.    And B 11.3 is because you were

20  evaluating the press brake operating and

21  performing in this capacity as a press brake,

22  correct?

23        A.    Yes.

24        Q.    And it was not operating in the

1    capacity of a punch press?

2              A.    That is correct.

3              Q.    It's my -- Strike that.

4                    During your 29 plus years with

5    Cincinnati, Incorporated, did you have the

6    occasion to examine what other press brake

7    manufacturers were doing as it relates to

8    utilization of foot controls?

9              A.    I would not use the term "examine."

10   "Observe" would be a better word.

11             Q.    During that 29-year period that you

12   were employed by Cincinnati, Incorporated, who

13   were Cincinnati, Incorporated's major competitors

14   from the US market in the sense of US

15   manufacturers of press brakes?

16             A.    The major US competitors at the time

17   that I was working was Pacific Press & Shear,

18   Chicago Press Brake Company, Verson, V E R S O N,

19   Niagra Press & Shear or Press Company, Wysong, W Y

20   S O N G, & Miles, M I L E S, Company.  That's all

21   that come to mind at the present time.

22             Q.    Do you know if any of the

23   manufacturers that were competitors of Chicago,

24   Incorporated during the period of time that you

22

1    were employed by Chicago are still in business?

2          A.   I wasn't employed by Chicago.

3          Q.   I'm sorry, I'm not trying to mix

4    that, I'm sorry.  Strike that.

5               Do you know if any of the companies

6    that were competitors of Cincinnati, Incorporated

7    are still in business, manufacturing of press

8    brakes?

9          A.   The only one I know for sure is

10   Pacific.

11         Q.   They're still in business?

12         A.   I believe so.

13         Q.   Was Heim a competitor of Cincinnati?

14         A.   Yes, they were.

15         Q.   Do you know the number of press

16   brakes that Cincinnati would have sold on an

17   annual basis on an average during the period of

18   your employment with them?

19              MR. ROBINSON:  I'll object to the

20   form of the question.

21         A.   I would estimate somewhere in the

22   neighborhood of 100 to 125 annually.

23         Q.   Did Cincinnati, Incorporated have a

24   research department that analyzed safety

23

1    mechanisms to be incorporated onto the press

2    brakes?

3             A.    They had a research and development

4    department; part of their function was to perform

5    the function that you just described, yes.

6             Q.    Do you know whether Cincinnati,

7    Incorporated ever studied foot controls as they

8    relate to incorporation of use on the press brake?

9             A.    I guess I need you to explain or

10    define what "study" means.

11            Q.    Did they ever do an analysis as to

12    what type of foot control to place on the

13    Cincinnati press brake?

14            A.    I do not know.

15            Q.    Are you aware of any analysis done

16    by any manufacturer as to what type of foot

17    control should be placed on a press brake?

18            A.    No.

19            Q.    Are you aware of any analysis done

20    by any organization whatsoever that has studied

21    the type of foot control to be placed on a press

22    brake?

23            A.    No.

24            Q.    Am I correct that the ANSI

24

1    committee, the committee that formulated the

2    standard that was published by ANSI, did not study

3    the type of foot control that should be placed on

4    a press brake?

5                    MR. ROBINSON:  Objection to the

6    form.

7            A.    Which committee are you referring

8    to?

9            Q.    Well, were you a member of the B

10   11.3 Committee?

11           A.    I am a member of the B 11.3

12   Committee.

13           Q.    Okay.  What committee is it that

14   formulated the B 11.3 standard?

15           A.    The Subcommittee for Power Press

16   Brake Safety.

17           Q.    Okay.  So the Subcommittee for Power

18   Press Brake Safety, you are a member of that

19   committee?

20           A.    Yes.

21           Q.    Did that committee study and

22   identify the type of foot control that should be

23   placed on a press brake?

24           A.    Not in the way you're asking the

25

1    question, so I'd say no.

2         Q.   Okay.  Well, there's a little bit of

3    hesitation in your answer, and would you explain

4    to me what you're thinking of that gives rise to

5    that hesitation?

6              MR. ROBINSON:  Objection to the

7    form.

8         A.   The writing committee as it develops

9    or revises a standard reflects on the types of

10   controls that are currently in use in industry at

11   the time of the revision process or the

12   development process, if you go back to 1971 and

13   '72 when the B 11.3 standard was originally

14   drafted, and essentially writes the standard or

15   writes the language of the standard based upon the

16   practice -- the custom and practice of the

17   industry at the present time.

18        Q.   So what the standard does, is adopt

19   the practice and custom that's in use at the time

20   as the foot control that would be utilized with

21   the press brake?

22        A.   I think "adopts" is an improper

23   word.  It evaluates.  It's not uncommon for a

24   committee to look at what's going on in the

26

1   industry and write language that prohibits a

2   particular type of practice or a particular type

3   of device, if it is justified in the view of the

4   committee.

5          Q.   Okay.  Were you a member of the B

6   11.3 Committee in 1971 and '72?

7          A.   No.

8          Q.   When is the first time you gained

9   membership to the committee for the B 11.3

10  standard?

11         A.   I believe it would have been about

12  2000, 1999 maybe.

13         Q.   From 1971 to '72 to 2000, are you

14  aware of any research done by the committee, the B

15  11.3 Committee, that analyzed riding the pedal as

16  a problem in conjunction with foot controls?

17         A.   No, I'm not.

18         Q.   From the time of your admission to

19  the committee in 2000 to the present, are you

20  aware of any study or any analysis done by the

21  committee that evaluates the hazard of riding the

22  pedal in conjunction with use of foot controls?

23         A.   No, I cannot recall the subject

24  coming up at any committee meeting that I

1    attended.

2            Q.    Would I be correct in saying that,

3    with regard to the committee's analysis and what

4    they have analyzed and what they haven't analyzed

5    from 1971 to '72 to the year 2000, you have no

6    information as to what the committee has analyzed?

7            A.    That is correct.

8            Q.    You have no knowledge as to what

9    types of tests they may or may not have performed

10   as it relates to foot control usage with press

11   brakes?

12           A.    Correct.

13           Q.    And you're not aware of any safety

14   evaluation that's been done by the committee to

15   determine whether or not a gated foot control is

16   safer than an ungated foot control in conjunction

17   with usage of a press brake?

18           A.    Correct.

19           Q.    Are you aware of any research done

20   by any entity that has analyzed the safety aspects

21   of a gated foot control used in conjunction with a

22   press brake?

23           A.    No.

24           Q.    Am I correct, sir, that a gated foot

28

1   control used in conjunction with a press brake is

2   permitted by the B 11.3 standard?

3            MR. ROBINSON:  Objection to the

4   form.

5        A.   Say that again, please.

6        Q.   Am I correct, sir, that the B 11.3

7   standard permits a gated foot control to be used

8   in conjunction with a press brake?

9            MR. ROBINSON:  Same objection.

10       A.   The B 11.3 standard is silent on the

11  issue, and if you want to interpret that as

12  permission, go right ahead, but it doesn't say one

13  way or the other anything about a gated foot

14  switch.

15       Q.   Would a -- You're an expert on the B

16  11.3 standard; am I correct?

17       A.   I'm a member of the committee of the

18  B 11.3.

19       Q.   Are you here to testify as an expert

20  with regard to the B 11.3 standard?

21       A.   No.  I think I've been retained in

22  this case to be an expert as it applies to press

23  brakes.

24       Q.   Okay.  But you've applied the B 11.3

29

1    standard, correct?

2           A.   Yes, I have.

3           Q.   And in your application of the B

4    11.3 standard, you understand how to interpret the

5    standard; am I correct?

6           A.   Yes.

7           Q.   And you would understand what is

8    permitted and what is not permitted; am I correct?

9           A.   Yes.

10          Q.   Would the gated foot control be

11   permitted under the B 11.3 standard for usage on a

12   press brake?

13               MR. ROBINSON:  Objection to the

14   form, also asked and answered.

15          A.   The previous answer stands.  The

16   standard is silent on it, so industry is allowed

17   to interpret that however they wish.  If somebody

18   uses a gate or doesn't use a gate, they're not

19   going to be in violation of the B 11.3 standard.

20          Q.   If it was prohibited, the standard

21   would indicate so, correct?

22          A.   Yes.

23               MR. ROBINSON:  Objection to the

24   form of that question.  I don't understand it.

1          Q.    You understand the question; don't

2    you?

3                MR. ROBINSON:    That has nothing --

4    We went through this before.    Anytime I raise an

5    objection, it doesn't mean that the witness

6    doesn't understand it or that the witness has a

7    problem with it, it's from me from a legal point

8    of view having problems with it.

9                MR. HARTMAN:    I understand.

10               MR. ROBINSON:    I know.

11               MR. HARTMAN:    I understand your

12   legal thing.

13               MR. ROBINSON:    You have a habit of

14   asking the witness if he understands the question

15   after my objection, and I don't want to be, as we

16   talked about before, misleading to you, and that's

17   not what I'm saying at all.

18               MR. HARTMAN:    I understand that and

19   sometimes it might be, and I'm just trying to make

20   sure that this witness understands the question.

21               MR. ROBINSON:    I understand.

22   BY MR. HARTMAN:

23          Q.    You understood that question?

24          A.    Repeat it just since there's an

31

1    issue over it.

2    (The record was read back by the court reporter.)

3    BY MR. HARTMAN:

4         A.   Yes.

5         Q.   Does the B 11.3 standard prescribe

6    issues as to -- Strike that.

7              Does the B 11.3 standard prescribe

8    what features a foot control should have if it's

9    going to be incorporated on a press brake?

10        A.   It provides general requirements for

11   foot controls.

12        Q.   Okay.  What are the general

13   requirements for foot controls that are to be

14   utilized on press brakes?

15             MR. ROBINSON:  Objection to the

16   form.

17        A.   Paraphrasing the language that's in

18   the standard, it essentially requires foot

19   controls that are protected against actuation from

20   falling objects or inadvertent actuation from

21   stepping upon it or stepping on the foot switch

22   or --

23             MR. ROBINSON:  I didn't hear the

24   last part.

32

1           A.    -- foot control, inadvertent

2    operation from stepping on the foot control.

3           Q.    Would a covered foot control meet

4    those requirements?

5           A.    Yes.

6           Q.    Is the covered foot control

7    permitted by the ANSI standard, the 11.3, for use

8    in conjunction with press brakes?

9                 MR. ROBINSON:  Objection to the

10   form.

11          A.    The covered foot control is one type

12   of meeting the requirements of the standard.

13          Q.    So, sir, would you agree that, if

14   you had a covered foot control with a gate, that

15   would be one type of meeting the requirements of

16   the standard?

17                MR. ROBINSON:  Objection to the

18   form.

19          A.    Yes.

20          Q.    So a foot control that is covered

21   and has a gate would be one of the methods of

22   meeting the requirements of the standard for

23   incorporation of a foot control on a press brake?

24                MR. ROBINSON:  Objection to the

33

```
1   form.
2             A.   Yes.  It would be the same as just a
3   covered foot pedal, foot switch.
4             Q.   Would a covered foot switch with an
5   anti-trip latch be one method of meeting the
6   requirements of the standard for foot control
7   usage in conjunction with press brakes?
8             A.   Yes, with or without the toe
9   release, the latch.
10            Q.   So the ANSI standard is satisfied by
11  a covered pedal, correct?
12            A.   As soon as you cover the pedal, the
13  standard is satisfied.  If you go beyond that,
14  you've covered the pedal and the standard is
15  satisfied.
16            Q.   So if you go beyond it, the standard
17  is still satisfied, correct?
18            A.   Yes.
19            Q.   Is the ANSI standard a value system
20  that you adhere to?
21                 MR. ROBINSON:  Objection to the
22  form.
23            A.   Me, personally?
24            Q.   Yes.
```

34

1          A.    A value system?  I would answer that

2    as that I recognize the ANSI B 11.3 standard as

3    the only authoritative document in industry

4    relative to the safety of press brakes.

5          Q.    Would your testimony -- In your

6    analysis with regard to Tina Lindquist, would it

7    be a fair statement to say that, if the press

8    brake meets the B 11.3 standards, it's safe, and

9    if it doesn't satisfy the B 11.3 standards, it's

10   unsafe?

11               MR. ROBINSON:  Objection to the

12   form.

13         A.    With regard to Tina Lindquist --

14         Q.    Yes.

15         A.    -- and the press brake that she was

16   operating, I would say yes.

17         Q.    Other than meeting the standard or

18   not meeting the standard and making your

19   determination with regard to this case as to

20   whether or not the press brake is safe, is there

21   anything else that you would utilize as the means

22   to make a determination as to whether or not the

23   Heim press brake was safe?

24         A.    Within the context of this case, I

1    think the B 11.3 standard provides the needed

2    guidance to make that machine safe for Tina

3    Lindquist on the day of her occurrence.

4              Q.    So your opinion today as it relates

5    to the press brake that was involved with

6    Ms. Lindquist is, your analysis begins and ends

7    with regard to the safety issues with B 11.3?

8              MR. ROBINSON:  Objection to the

9    form.

10             A.    Yes.

11             Q.    Are you aware of any manufacturer at

12   anytime in your 29 plus years with Cincinnati,

13   Incorporated that provided a gated foot control

14   with their press brake?

15             MR. ROBINSON:  Objection to the

16   form.

17             A.    Yes, at various times over the

18   years.

19             Q.    Would you identify what

20   manufacturers you're aware of that provided gated

21   foot controls with their press brakes?

22             MR. ROBINSON:  Object.  You mean at

23   anytime?

24             MR. HARTMAN:  During his 29 years.

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330  FAX (513) 381-3342

1          MR. ROBINSON:  Okay.  Objection to

2    the form.

3    BY MR. HARTMAN:

4          A.   I believe Pacific provided a gated

5    foot switch later on.  Cincinnati, Incorporated

6    provided gated foot switches.  Chicago provided

7    gated foot switches.  Amada provided or provides a

8    gated-type foot switch; that's A M A D A.  I

9    believe LBD, just the letters L B D, provides a

10   gated-type foot switch; and possibly Trumpf, T R U

11   M P F, provides a gated-type foot switch.

12         Q.   Are you aware of any of the

13   manufacturers of press brakes that you've just

14   named that provided gated foot controls with their

15   press brakes having done so in the period of 1971

16   to 1982?

17         MR. ROBINSON:  Objection to the

18   form.

19         A.   '71 to '82 would be Cincinnati,

20   Incorporated, it would be Chicago, it would

21   be -- That's all I can think of.  I know there was

22   another one out there, I can remember the foot

23   switch, but I can't remember the press brake.

24         Q.   Are you aware of any of the

1   manufacturers of press brakes that you just

2   enumerated that included gated foot controls with

3   their press brakes still doing so, doing so today?

4                    MR. ROBINSON:  Objection to the

5   form.

6            A.    Well, the only two that are left are

7   Pacific and Cincinnati, and both of them do, I

8   believe.

9            Q.    Okay.  Are you aware of a press

10  brake manufacturer that offers a gated foot

11  control as standard equipment with their press

12  brakes?

13                   MR. ROBINSON:  Objection to the

14  form.

15           A.    I don't know about Pacific, whether

16  it's standard or not.  I believe on some

17  Cincinnati machines it's standard.

18           Q.    Do you know why on some Cincinnati

19  machines it would be standard and others it would

20  not be?

21           A.    No.

22           Q.    Have you ever had discussions with

23  the person responsible at Cincinnati as to why

24  they included gated foot controls with their press

38

1  brakes?

2          A.    It was a corporate decision made

3  early on to provide that type of foot switch.

4          Q.    Do you know why that decision was

5  made?

6          A.    Yes.

7          Q.    Would you tell us?

8          A.    It was anticipated that it would be

9  a requirement in the B 11.3 standard, and the

10 design was changed to accommodate that anticipated

11 change -- or requirement, I should say, but that

12 requirement never did get into the standard.

13         Q.    But Cincinnati continued to use the

14 gated foot control; am I correct?

15         A.    Yes.

16         Q.    Are you aware of any increase in

17 accidents to the operator of Cincinnati press

18 brakes with the incorporation of the gated foot

19 control?

20         A.    No.

21         Q.    Are you aware of any decrease in the

22 accidents to operators of Cincinnati press brakes

23 with the incorporation of the gated foot control?

24         A.    No.

39

1          Q.    Did you agree with Cincinnati,

2    Incorporated's decision to include a standard

3    equipment on their press brakes a gated foot

4    control?

5                MR. ROBINSON:   Objection to the

6    form.

7          A.    I didn't have that opportunity.

8          Q.    Okay.  Do you agree with Cincinnati,

9    Incorporated's decision today to include gated

10   foot controls as standard equipment on some of

11   their press brakes?

12         A.    Yes.

13         Q.    You agree with that decision?

14         A.    Yes.

15         Q.    And am I correct that you were a

16   product liability litigation manager for

17   Cincinnati, Incorporated?

18         A.    No.

19         Q.    In your curriculum vitae, it

20   indicates that your task from February -- I'm

21   sorry, from 1982 to September 2001 involved as one

22   of your functions provide management on product

23   liability litigation.

24         A.    That was one of my responsibilities,

1    one of my functions, but I was not the manager.

2              Q.   Okay.  What does providing

3    management on product liability litigation mean?

4              A.   If Cincinnati, Incorporated were to

5    receive a lawsuit from an individual such as

6    yourself, I would take that lawsuit and initiate

7    the processing of that lawsuit, hire attorneys in

8    the local area or consult with others to hire

9    local attorneys, arrange for machine inspections

10   and other types of things that are done at the

11   beginning of litigation, and essentially work

12   closely with the selected law firm and selected

13   lawyer in managing the overall defense of

14   Cincinnati, Incorporated.

15             Q.   During your 29 plus years with

16   Cincinnati, Incorporated, are you aware of anyone

17   that was injured utilizing a Cincinnati,

18   Incorporated press brake where they were injured

19   at the point of operation because of inadvertent

20   activation of the foot control?

21             MR. ROBINSON:  Would you read that

22   question back?  I'm sorry.

23             MR. HARTMAN:  Yeah, that's fine.

24   (The record was read back by the court reporter.)

1           MR. ROBINSON:  Objection to the
2    form.
3    BY MR. HARTMAN:
4           A.   Yes.
5           Q.   How many people were injured that
6    you're aware of?
7           A.   I need to qualify the answer because
8    there are numerous allegations of such a
9    happening, but the reality of cases that the
10   evidence actually showed inadvertent actuation was
11   probably less than five that I can remember that I
12   was involved in.
13          Q.   Five out of how many cases were you
14   involved in where it was alleged?
15          A.   Maybe 30, 35, maybe 40 at the most.
16          Q.   And in any of those 30 to 35 cases
17   that you were involved in where it was alleged
18   that the injury occurred because of inadvertent
19   activation of the foot control, were any -- did
20   any of those situations involve a gated foot
21   control?
22          A.   Oh, yes.
23          Q.   How many?
24          A.   I would estimate based upon the

42

1  population of the machines probably half of them.

2          Q.   How would the population of the

3  machines give you rise to an estimate that half of

4  the cases involved foot controls that were gated?

5          A.   Because of the population of

6  machines that had been manufactured by Cincinnati,

7  Incorporated and were out in the field using gated

8  foot controls or using foot-switch type foot

9  controls, half of them were from an era of gated

10 foot controls and half of them were prior to that

11 time.

12         Q.   Okay.  When did the era of gated

13 foot controls begin at Cincinnati, Incorporated?

14         A.   1973.

15         Q.   Did the gated foot controls at

16 Cincinnati, Incorporated include an anti-trip

17 latch?

18         A.   No.

19         Q.   Okay.  Have they ever included an

20 anti-trip latch?

21         A.   No.

22         Q.   Do you believe the inclusion of an

23 anti-trip latch on the gated foot control utilized

24 by Cincinnati would add to the safety of the gated

```
 1   foot control?
 2               MR. ROBINSON:  Objection to the
 3   form.
 4          A.    No, if I understand your question
 5   right, but you'd better restate that because I
 6   think I lost it.
 7          Q.    Okay.  Do you think the anti-trip
 8   latch would provide additional safety to the gated
 9   foot control utilized by Cincinnati on its press
10   brakes?
11          A.    No.
12               MR. ROBINSON:  Objection to the
13   form.
14          Q.    You say no; is that correct?
15          A.    That's correct.
16          Q.    Why is that?
17          A.    Because I believe that the addition
18   of the toe release -- I call it a toe release.
19          Q.    Okay.
20          A.    -- to the flap further encourages
21   the riding of the foot control or foot switch-type
22   control.
23          Q.    Do you have any data to support that
24   opinion?
```

44

1              A.    Just my 29 years of seeing it in the

2    field.

3              Q.    Well, I'm going to -- But do you

4    have any research data, other than your 29 years

5    being in the field?

6                    MR. ROBINSON:   Objection to the

7    form.

8              A.    That those types of features, the

9    gate and the toe release or a combination of both,

10   encourage riding?

11             Q.    Yes.

12             A.    Just the Triodyne Safety Brief.

13             Q.    And what Triodyne Safety Brief are

14   you discussing?

15             A.    I make reference of it in my report.

16   I'm not sure if it was in the 1994 or 1997 brief.

17             Q.    With regard to the Triodyne Safety

18   Briefs that are set in your report, do you agree

19   that those articles are authoritative on the

20   subject matter that they discuss?

21             A.    No.

22             Q.    You do not?

23                   MR. ROBINSON:   I'll object to the

24   form of the question.   I apologize for

1   interrupting, sir.

2          Q.   You do not hold them to be

3   authoritative?

4          A.   Correct.

5          Q.   How is it, then, that you rely upon

6   them, if you don't deem them to be authoritative?

7          A.   I don't rely upon them.

8          Q.   You're not relying upon Triodyne

9   Safety Briefs to formulate any opinions in this

10  matter?

11         A.   I'm using them as a basis for some

12  comments and some rebuttal to Mr. Barnett's

13  report.  But my report when it references the

14  Triodyne Safety Briefs is just quoting out of them

15  and trying to point out areas where Mr. Barnett's

16  testimony is flawed with his own documentation.

17              MR. ROBINSON:  I didn't hear the

18  last part, I'm sorry.

19              THE WITNESS:  With his own

20  documentation.

21              MR. ROBINSON:  Thank you, sir.

22  BY MR. HARTMAN:

23         Q.   So am I correct that the opinions

24  you're giving in this case do not rely on the

1  Triodyne Safety Briefs cited in your report as it
2  relates to the safety of the foot control in use
3  with the Heim press brake involved in this case?
4          A.   No, that really is not necessarily
5  or essentially true, because I do, I do quote a
6  particular paragraph out of one of the safety
7  briefs in my report, so I guess I do have to
8  concede that I do rely upon those briefs, even
9  though I don't believe that they're authoritative.
10 They are published documents.
11         Q.   Would you typically rely upon
12 published documents that you don't rely -- deem to
13 be authoritative in formulating opinions?
14             MR. ROBINSON:  Objection to the
15 form.
16         A.   Yes.  I don't have any problem with
17 doing that.  Everybody does that.  There are very
18 few documents that are out there that have gone
19 through peer review, so we have only limited
20 access to peer-reviewed type documents.  But
21 there's been an awful lot published that's good,
22 good material that we can learn from, material
23 that's published in the National Safety Council
24 that I read and rely upon quite frequently.  But