# EXHIBIT J

# PART 2

1   it is not authoritative because it's merely

2   testimonials of what people have done and what

3   they've found have worked for them in their

4   particular situation.

5          Q.   So you don't deem the National

6   Safety Council to be authoritative as well?

7          A.   No.

8          Q.   So I'm trying to find out, how is it

9   that you make a determination that you're going to

10  incorporate other people's opinions and writings

11  into your report as a basis to make or formulate

12  an opinion?

13          MR. ROBINSON:   Objection to the

14  form.

15          A.   If material is out there in the

16  public domain that has been published that is

17  consistent with what I have learned over the past

18  30 plus years in industry, I feel it's accurate

19  and it's representative of what is going on in the

20  industry or what has taken place in the industry,

21  I'll rely upon that because it is from what I

22  determine a fair representation of what is really

23  happening.

24          Q.   Okay.   So over your 29 plus years

48

1   with Cincinnati, Inc., you've evaluated

2   approximately 30 to 35 claims by operators that

3   they were injured at the point of operation

4   because of inadvertent activation of the press

5   brake, correct?

6           A.   I've investigated those claims.

7           Q.   Okay.  And of those claims, only

8   five turned out to be claims where there was

9   inadvertent activation of the press brake; am I

10  correct?

11          A.   I didn't say specifically five.  I

12  said less than five.

13          Q.   Okay.

14          A.   A very small number.

15          Q.   And the other cases were determined

16  that there was not inadvertent activation of the

17  press brake?

18          A.   Correct.

19          Q.   And of those less than five cases,

20  half of those cases, because of the statistical

21  probability of how many press brakes are out

22  there, being 50 percent with gated foot controls

23  and 50 percent being ungated foot controls, you

24  testified half of those cases involved inadvertent

1    activation by the use of gated foot controls,

2    correct?

3                 MR. ROBINSON:  Objection to the

4    form, mischaracterizes prior testimony.

5            A.    (Shaking head.)

6            Q.    Let me break that down in pieces.

7            A.    Yeah.  I don't believe I said that,

8    and I don't believe I testified in such a way that

9    you can draw that conclusion, that half of the,

10   half of the less than five were ungated or gated.

11   I know I have direct recollection of one of them

12   being a foot pedal, which is a manual device, so

13   it doesn't even fall into this alleged foot switch

14   family.

15           Q.    I'm sorry.  I'm not -- I did not

16   make the distinction with foot pedal.

17                 So of the five -- less than five

18   cases where there was inadvertent activation of

19   the machine by the foot control or foot pedal --

20           A.    Okay.

21           Q.    -- your testimony is approximately

22   half of those would have involved gated foot

23   controls?

24                 MR. ROBINSON:  Objection,

1   mischaracterizes testimony.

2               MR. HARTMAN:   Well, I don't believe

3   it does.

4   BY MR. HARTMAN:

5               A.   Well, I'll give you a possibility,

6   may have involved as many as two-and-a-half or two

7   gated, but I cannot testify here that that is

8   true, in fact the case.

9               MR. ROBINSON:   And for the record,

10  the mischaracterization occurs, I think -- and if

11  I'm mistaken, it's my apologies, I thought the

12  testimony was that half of the 35 or so instances

13  or claims involving inadvertent activation claims

14  were what the testimony was from this witness as

15  to those that contained a gate.   You have now

16  moved that now to be half of the five, when that

17  may be the case, but I don't think that was the

18  prior testimony.   That's the problem I have with

19  the way you tried to flip that.

20              MR. HARTMAN:   Well, I think I

21  characterized it accurately, in that an

22  overwhelming majority of the cases of the 30 to 35

23  cases turned out to be cases or claims not

24  involving inadvertent activation of the foot

1    control.  So how could it be involving the gate if

2    there was no inadvertent activation of the foot

3    control?

4                MR. ROBINSON:  I think you've

5    changed the testimony, Mr. Hartman, that's my

6    problem with the way you've raised it.

7                MR. HARTMAN:  Well, I'm here to

8    find out what you know.

9    BY MR. HARTMAN:

10               Q.   Tell me, on the cases that did

11   not -- that you investigated that over that less

12   than five number, am I correct that there was a

13   determination made that there was not inadvertent

14   operation of the machine, there was not

15   inadvertent activation of the machine by use of

16   the foot control?

17               A.   I don't understand that question at

18   all.

19               MR. ROBINSON:  Yeah.  Objection to

20   the form.

21               Q.   Well, am I correct, sir, that

22   earlier you testified that there were claims of

23   inadvertent activation of the foot control that

24   you know of in approximately 30 to 35 claims?

52

1          A.    Yes.

2          Q.    And am I correct, sir, that you

3    testified that of those 30 to 35 cases, after

4    there was an examination and an investigation and

5    evaluation of those claims, less than 5 turned out

6    to be actual claims or situations involving

7    inadvertent activation of the foot control?

8          A.    Actual inadvertent activation, yes.

9          Q.    The rest were something other than

10   inadvertent activation of the foot pedal or foot

11   control?

12         A.    Yes.

13         Q.    So we are talking about the same

14   thing.

15              MR. ROBINSON:  Objection to your

16   comment.

17         Q.    Now --

18              MR. ROBINSON:  You may now have

19   obtained some additional testimony, but to suggest

20   that you didn't change the testimony, not saying

21   intentionally, but for whatever reason,

22   previously, I think is mistaken.

23              MR. HARTMAN:  The record will speak

24   for itself.

53

1              MR. ROBINSON:  I know it will.  I

2    don't need you to tell me.  Everything we say on

3    the record speaks for itself.  That's why the

4    court reporter is here.

5    BY MR. HARTMAN:

6         Q.   Sir, would you then say that of the

7    less than five cases, to the best that you can

8    estimate, approximately half of those cases --

9    Strike that.

10             Sir, of the less than five

11   situations that involved actual inadvertent

12   activation of the foot control, approximately half

13   of those involved gated foot controls?

14        A.   No, I can't say that.

15        Q.   Would it be correct that you don't

16   know how many of those involved gated foot

17   controls?

18        A.   Correct.

19        Q.   So of the five, less than five

20   situations, you can't testify today as to how many

21   involved gated foot controls?

22        A.   They could be all ungated foot

23   switches, they could be all gated foot switches,

24   they could be all manual foot pedals or any

54

1 | combination of those three.

2 |        Q.    Okay.  So you have no testimony on

3 | that, no facts?

4 |        A.    All I can testify is that the one

5 | that I remember was a manual foot pedal, for

6 | certain.

7 |        Q.    Thank you.

8 |              Does Cincinnati, Inc., make the

9 | decision to include gated foot controls on its

10 | machines based on the size of the machine?

11 |        A.    No, not that I'm aware of.

12 |        Q.    Okay.  What information does

13 | Cincinnati, Inc., utilize to make its -- Strike

14 | that.

15 |              What information did Cincinnati,

16 | Inc., utilize to make a decision to include gated

17 | foot controls on its press brakes?

18 |              MR. ROBINSON:  Objection to the

19 | form.  Excuse me.

20 |        A.    That decision was made before I

21 | joined the company, and I do not know what was the

22 | basis of that decision.

23 |        Q.    Are gated foot controls used on all

24 | sizes of Cincinnati, Inc.'s, gated -- Strike that.

1           Are gated foot controls utilized on

2   all sizes of Cincinnati, Inc.'s, press brakes?

3           A.   To the best of my knowledge, yes.

4           Q.   And again, I want to be clear, you

5   agree with the decision to include gated foot

6   controls on press brakes?

7               MR. ROBINSON:   I'll object to the

8   form of the question.

9           A.   No, I don't believe I testified to

10  that.

11          Q.   I thought you testified earlier that

12  you agreed with Cincinnati, Inc.'s, decision to

13  include gated foot controls for use with its press

14  brakes?

15          A.   Yes.   That's a different question

16  than you just asked.

17          Q.   Are there different press brakes

18  that you would not include gated foot controls

19  with?

20          A.   No.   You asked, first, if I agreed

21  with Cincinnati, Incorporated's decision.   Then

22  you asked if I agreed that gated foot switches

23  should be on press brakes.   And the former is

24  true; the latter is not true.

1        Q.    Why is there a change between your

2    agreement with Cincinnati, Inc.'s, use of gated

3    foot controls with its machines with the statement

4    that you don't agree that gated foot controls

5    should be utilized with press brakes?

6        A.    Now as an independent consultant, I

7    have a different perspective.

8        Q.    And that would be since 2001?

9        A.    Yes.

10        Q.    Okay.  And what is your perspective

11    as an independent -- What has changed your

12    perspective as an independent consultant?

13        A.    The gated foot switches encourage

14    riding of the foot switch, and I believe that, if

15    there is an operation or a facility where that is

16    a problem because of the gated foot switches, the

17    gate should be removed in order to discourage the

18    riding practice.

19        Q.    So basically, your testimony is, if

20    you see that the gated foot control encourages

21    riding the pedal, then you should remove the gate?

22            MR. ROBINSON:  I'll object to the

23    form of the question.

24        A.    Yes.  The responsibility for that is

```
1   on the supervision and management of the

2   manufacturing facility where the machines are

3   being used that have gated foot switches or toe

4   release foot switches or whatever type of foot

5   switch.  If they see the practice of riding taking

6   place, it's their responsibility to bring it to a

7   stop.

8            Q.   But if they don't see the practice

9   of riding the foot control with the gated foot --

10  Strike that.

11            If an employer does not see the

12  practice of riding the foot control with the gated

13  device, you would not tell them to remove the

14  gate; would you?

15            MR. ROBINSON:  I'll object to the

16  form of the question.

17            A.   If they do not see it or they do not

18  recognize it, if it's not happening, then I would

19  not recommend removing the gate.

20            Q.   Thank you.

21            MR. ROBINSON:  And I apologize, so

22  soon into it, I need a bathroom break whenever you

23  get a chance.

24            MR. HARTMAN:  I could use it, too.
```

58

1   Let's do it now.

2                   THE VIDEOGRAPHER:   One second,

3   please.  We're off.

4                               (Brief recess.)

5                   THE VIDEOGRAPHER:   You're back on

6   the record.

7   BY MR. HARTMAN:

8           Q.   Sir, earlier you indicated that you

9   reviewed several, two specifically, of Professor

10  Barnett's articles; am I correct?

11          A.   Yes.  They're Triodyne articles.

12          Q.   Triodyne articles, but they were

13  authored or co-authored by Professor Barnett?

14          A.   Yes.

15          Q.   Do you know Professor Barnett?

16          A.   Yes, I believe I met him once.

17          Q.   Have you ever been involved in any

18  consultations with Professor Barnett?

19          A.   No.

20                   MR. ROBINSON:  Any what?

21                   MR. HARTMAN:  Consultations.

22                   MR. ROBINSON:  Thank you.  I

23  thought you said confrontations.

24                   MR. HARTMAN:  No, consultations.

1              THE WITNESS:  No.

2    BY MR. HARTMAN:

3         Q.   Okay.  Have you ever attended any of

4    Professor Barnett's lectures?

5         A.   No.

6         Q.   Have you ever consulted with

7    Professor Barnett on any matter of engineering?

8         A.   No.

9         Q.   Am I correct that your exposure to

10   Professor Barnett has been limited to one

11   occasion?

12        A.   Yes, like I said, I believe I met

13   him once.

14        Q.   And where would that have been?

15        A.   I really don't remember, probably at

16   some safety function, maybe National Safety

17   Council or some seminar maybe.  I don't remember

18   exactly.

19        Q.   Do you have any opinion of Professor

20   Barnett's abilities to analyze safety features on

21   press brakes?

22        A.   No.

23        Q.   During your 29 years with

24   Cincinnati, Inc., was the protection of operators

1    from inadvertent activation of press brakes a

2    priority?

3              MR. ROBINSON:  Object to the form.

4          A.   A priority?  I'm not sure I know how

5    to answer that question.  Was it important, was it

6    reflected in the safety literature; yes.

7          Q.   Did you consider it important in

8    your duties with Cincinnati that operators be

9    protected at the point of operation?

10         A.   Yes.

11         Q.   Did you consider it important in

12   your 29 years with Cincinnati, did you consider it

13   important that operators be protected from

14   inadvertent activation of press brakes?

15             MR. ROBINSON:  Object to the form.

16         A.   That's -- No, that's a

17   mischaracterization of what I would say.  It's

18   important to minimize the probability of

19   inadvertent actuation of a foot control or a hand

20   control or any type of control for a machine tool.

21         Q.   Did Cincinnati spend time and effort

22   in trying to prevent inadvertent activation of its

23   press brakes by use of a foot control or a

24   two-hand control?

61

1            MR. ROBINSON:  Objection to the

2     form.

3            A.    Cincinnati made efforts to reduce

4     that probability, yes.

5            Q.    And would you agree, sir, that the

6     reason you reduced that probability of inadvertent

7     activation of press brakes, either by foot control

8     or two-hand control, would be because -- would be

9     so as to protect the operator in the event they're

10    working on a press brake?

11            MR. ROBINSON:  Objection to the

12    form.

13            A.    Yes, yes and no, because, you know,

14    unintended operation of a machine is not a

15    desirable event under any circumstance, so based

16    on that context right there, any measures taken to

17    reduce the possibility of an unintended cycle of a

18    machine goes to an advancement of the overall

19    safety of the operation.

20            Q.    Do you know what HOOD is?

21            A.    Is that with a period after each

22    letter?

23            Q.    Yes.

24            A.    Yes.

1        Q.   Okay.   Would you tell us what is

2   commonly referred to as HOOD?

3        A.   It's an acronym that stands for

4   hands out of die operation.

5        Q.   And what does that mean?

6        A.   That's a production philosophy

7   relative to power press brakes, and other machine

8   tools as well, that prescribes operation of the

9   machine without the need for an operator's hands

10  to enter into the hazard located at the point of

11  operation of the machine.

12       Q.   Am I correct that HOOD is directed

13  to the employer as opposed to the operator?

14            MR. ROBINSON:   Objection to the

15  form.

16       A.   That would be a too narrow

17  characterization of HOOD.   HOOD is directed to the

18  operation of the machine.

19       Q.   And who would implement the hands

20  out of die method of operation of the machine?

21       A.   It would be the operator who uses

22  the machine, the set-up man who sets the tooling

23  to the machine, the supervisor of the area where

24  the machine is being used, production engineering,

1    people who determine how piece parts are made on a

2    particular machine and determine the die

3    configuration for that particular part, and

4    overall management of an operation or of a

5    company.  It's a philosophy that is motivated

6    throughout the entire organization, and it

7    involves everybody to accomplish that.

8            Q.   Does it involve the manufacturer of

9    the particular press brake?

10           A.   Very little.

11           Q.   What involvement does HOOD have with

12   the manufacturer of the press brake?

13           A.   Manufacturers from their position

14   have the opportunity to recommend it and describe

15   it and provide information about it, but very

16   little with respect to implementation of it.

17           Q.   Okay.  HOOD is basically geared

18   toward the company utilizing the machine and its

19   employees?

20           A.   Yes.

21           Q.   Do you agree with the statement that

22   the operator basically operates the job of the

23   press brake as prescribed by the operator's

24   employer?

1            MR. ROBINSON:   Object to the form

2   of the question.

3            A.   I don't -- Say that again, restate

4   that.

5            Q.   Would you expect in the normal

6   course of business in the operation of a press

7   brake that the operator perform the function as

8   mandated by the employer?

9            MR. ROBINSON:   Objection to the

10  form.

11           A.   That depends upon the particular

12  organization.  I've seen where operators have

13  little control over what is done with a press

14  brake, and I've seen situations where the

15  operators have complete control over what is done

16  on a press brake as far as their involvement in

17  the production operation on a press brake.

18           Q.   So in the typical course of

19  analyzing the multiple uses of press brakes, some

20  plant's operators will have input, others they

21  won't?

22           A.   In addition -- That is true with

23  respect to input, also, with respect to making the

24  decision.

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330  FAX (513) 381-3342

1              Q.    Would you expect, though, that in
2    some situations that operators would perform the
3    job as mandated by the employer with no input?
4              A.    That's what I said, yes.
5              Q.    And that's something that is known
6    in the industry?
7              A.    Yes.
8              Q.    That is something that Heim would
9    know; would you agree?
10                  MR. ROBINSON:   Objection to the
11   form.
12             A.    No.
13                  MR. ROBINSON:   Speculative nature.
14             Q.    Would that -- Would the --
15                  MR. ROBINSON:   Same objection for
16   the industry as well and the form and the breadth
17   of that question.
18             Q.    Was HOOD ultimately repealed from
19   inclusion in OSHA and the ANSI standard?
20                  MR. ROBINSON:   Objection to the
21   form.
22             A.    Well, you have to be a little more
23   specific than that.   In the B 11.1 power press
24   standard, mechanical power press standard, hands

1    out of die language was removed following the

2    reversal of the Occupational Safety and Health

3    Administration's decision to remove it in the

4    middle 1970s; that's relative to power presses.

5    Regarding power press brakes, it has always been

6    in the standard and it remains in the standard

7    today.

8              Q.    But with regard to OSHA, they have

9    revoked the HOOD requirement, correct?

10             A.    As it applies to mechanical power

11   presses.  That's a very important distinction

12   there.

13             Q.    It's my understanding that OSHA does

14   not make a difference between the mechanical power

15   presses and press brakes; am I incorrect in that

16   statement?

17             A.    Yes.

18             Q.    Okay.  So OSHA still has the no

19   hands in die requirement for press brakes?

20             A.    No.

21             Q.    Has OSHA ever mandated HOOD for use

22   with press brakes?

23             A.    No.

24             Q.    So OSHA doesn't mandate HOOD for

1   press brakes?
2          A.   OSHA mandates nothing specifically
3   for press brakes, zero.
4          Q.   Did OSHA ever mandate HOOD for any
5   press that could include press brakes?
6               MR. ROBINSON:  I'm sorry, what was
7   the question?
8          Q.   Did OSHA ever mandate HOOD for any
9   press that could include press brakes?
10              MR. ROBINSON:  Objection to the
11   form.
12         A.   No.  I explained that the OSHA
13   requirement for hands out of die operation was
14   included in 1910.217, which is the mechanical
15   power press regulation within OSHA.  There is no
16   comparable regulation within OSHA applicable to
17   press brakes, there is none.
18         Q.   Okay.  So the mechanical power
19   presses' standard that you're talking about that
20   OSHA has has no application to press brakes?
21         A.   It says it right in its scope, press
22   brakes are excluded.
23         Q.   Sir, this is a discovery deposition.
24   You are an expert.  I'm a lawyer trying to find

68

1    out what you know and what you do.

2         A.    I'm sure Ralph probably told you

3    that, though.

4         Q.    We've talked about a lot of things.

5               Is HOOD feasible for use with power

6    press brakes a hundred percent of the time?

7               MR. ROBINSON:  Objection to the

8    form.

9         A.    Yes.

10        Q.    One hundred percent of the time HOOD

11   is feasible?

12              MR. ROBINSON:  Objection, asked and

13   answered.

14        A.    Yes.

15        Q.    Okay.  Can you see situations where

16   HOOD has been applied to the use of a power press

17   brake but the operator still becomes injured at

18   the point of operation?

19        A.    Can I foresee?

20        Q.    Yes.

21        A.    If it's incorporated in the

22   operation of the machine, no, there's no way that

23   I could predict that that would happen.

24        Q.    What happens if there's a failure in

1    the HOOD process, meaning let's say would one of

2    the ways be a light current that you could achieve

3    HOOD?

4                    MR. ROBINSON:  Objection to the

5    form.

6            A.   No.

7            Q.   A light current does not -- is not a

8    HOOD mechanism?

9            A.   There is, there is no HOOD

10   mechanism.  HOOD is a philosophy.  HOOD is a way

11   of operating these machines that says design the

12   dies, design the operation, design the particular

13   part so the operator does not have to reach

14   between the dies to load the part or to remove the

15   part or to in any way form the part.

16           Q.   Would you agree that there are also

17   numerous ways that operators interact with

18   machines where they do have their hands in the die

19   area and it's understood by the industry that

20   operators will have their hands in the die area?

21                   MR. ROBINSON:  Objection to the

22   form.

23           A.   Which industry are you talking

24   about?  Are you talking about in general; yes.

70

1          Q.    Press brake industry.

2          A.    Oh, press brake industry.

3                MR. ROBINSON:  Same objection.

4          A.    Yes.

5          Q.    So the press brake industry

6     understands that operators will work with their

7     hands in the die area; am I correct?

8                MR. ROBINSON:  Objection to the

9     form.

10         A.    I believe that's a fair evaluation,

11    that that acknowledgment or recognition is there.

12    It does nothing to diminish the need to continue

13    to promote hands off die operation.

14         Q.    And I understand that the hands out

15    of die operation is something that the industry is

16    promoting, but I need to know what they understand

17    actually happens at the ground level with

18    operators of press brakes.

19                Am I correct, sir, that the press

20    brake manufacturers know that operators will work

21    with their hands in the die area of press brakes?

22                MR. ROBINSON:  Objection to the

23    form.

24         A.    Yes, I believe that's a fair

1   characterization.

2              Q.    Did Cincinnati, Inc., know that

3   operators would work with their hands in the die

4   area of its press brakes?

5              A.    Yes.

6              Q.    Did Cincinnati, Inc., know that

7   operators would work with their hands in the die

8   areas on press brakes at times where there's no

9   point of operation --

10             A.    No.

11             Q.    -- protection?

12             A.    (Shaking head.)

13             Q.    They did not know that that could

14  occur?

15             A.    Oh, I'm sure that they knew that it

16  could occur, but they did not know that it would

17  occur at any particular time.

18             Q.    Well, over the course of

19  manufacturing a thousand machines, would they have

20  reason to know that it would occur at sometime

21  during the life of those machines?

22                  MR. ROBINSON:  Objection to the

23  form.

24             A.    No, I don't think you can reasonably

1   say that.

2           Q.   Well, sir, am I correct that there

3   are injury statistics with regard to press brakes

4   of individuals who receive amputations at the

5   point of operation?

6           A.   Yes.

7           Q.   Okay.  Would you agree, sir, that in

8   order to have an injury at the point of operation

9   with your hands that your hands would be in the

10  die area?

11          A.   Yes.

12          Q.   Would you also agree, sir, that if

13  your hands are injured in the die area at the

14  point of operation of a press brake, that the

15  individual or entity was not using the HOOD method

16  of working with the machine?

17              MR. ROBINSON:  Object to the form.

18          A.   It may or may not have been, but

19  yes.

20          Q.   It could have been -- They could

21  have been utilizing the HOOD, it might have just

22  been defective HOOD; would you agree?

23              MR. ROBINSON:  Objection to form.

24          A.   Yes.

73

1          Q.    Would you agree, sir, that if a
2    person with those statistics of people that are
3    injured at the point of operation with their
4    hands, if it wasn't -- if they weren't utilizing a
5    HOOD procedure, they could have been using a point
6    of operation procedure that failed?
7                MR. ROBINSON:  Objection to the
8    form.
9          A.    A point of operation procedure, I
10   don't --
11         Q.    System that failed.
12         A.    I don't understand the question.
13         Q.    Okay.  Well, there are statistics
14   published about amputations at the point of
15   operation with regard to press brakes; am I
16   correct?
17         A.    Not really.
18         Q.    You don't know of any statistics?
19         A.    With regard to press brakes?
20         Q.    Yes.
21         A.    None that I've seen recently
22   regarding press brakes.
23         Q.    Would power press statistics be
24   utilized to make an evaluation as to point of

1    operation protection on press brakes?

2              A.    I would not think so.

3              Q.    So your testimony today is you would

4    utilize nothing, no analysis, that relates to

5    punch presses in order to evaluate press brakes;

6    am I correct?

7                    MR. ROBINSON:  Objection to the

8    form.

9              A.    I guess I'm not sure I'm

10   understanding your -- Are you asking is it fair to

11   take a power press statistic and transpose it into

12   a press brake evaluation; then I would say no,

13   it's not fair to do that.  Is it fair to try to

14   lump them all together; no, it's not fair to do

15   that.  You're not getting a fair or accurate, you

16   know, representation of accidents that are

17   happening on press brakes as opposed to power

18   presses.  And as far as I know, my answer is

19   relative to before, I know of no data collection

20   specifically on press brake accidents at the point

21   of operation.

22             Q.    Are you aware in your 29 plus years

23   of accidents involving operators at the point of

24   operation of press brakes?

75

1          A.    Yes.

2                Q.    Are you aware that industry-wide

3     it's known that operators of press brakes will

4     have injuries to their hands and fingers at the

5     point of operation while operating press brakes?

6          A.    Yes.

7                MR. ROBINSON:   Objection.

8                Q.    Would you agree, sir, that that

9     knowledge of injuries happening to the hands of

10    operators operating power -- press brakes would

11    allow you to make a determination that those

12    operators are not using point of operation safety

13    mechanisms?

14               MR. ROBINSON:   Objection to the

15    form.

16          A.    No.

17               Q.    What does that information allow you

18    to conclude?

19          A.    That individuals are getting injured

20    at the point of operation.

21               Q.    Okay.   How are they getting injured?

22          A.    That's what the investigation is all

23    about, to determine how the injuries are taking

24    place.

1          Q.   Well, have you ever investigated
2    accidents involving point of operation -- injuries
3    at the point of operation by press brake operators
4    where there was no HOOD procedure in place and no
5    point of operation protection?
6          A.   Yes.
7          Q.   How many times?
8          A.   I have no recollection.
9          Q.   Can you give me an estimate?
10         A.   No.
11         Q.   Can you tell me how long ago it was?
12         A.   I believe my earliest accident
13   investigation was in 1976, '75 maybe, yeah, that's
14   the earliest one.
15         Q.   So was that investigation involving
16   an operator who injured his or her hands at the
17   point of operation while using a press brake where
18   there was no point of operation protection?
19         A.   No.  There was protection in place.
20         Q.   How did the operator get injured in
21   that situation, if there was protection in place?
22         A.   Somebody else operated the controls,
23   that I recall.
24         Q.   Would you agree, sir, that operators

1   are known to have been injured at the point of

2   operation while operating a press brake where

3   there's been a HOOD procedure in place?

4             MR. ROBINSON:  Objection to the

5   form.

6             A.   I can't, I cannot respond

7   specifically yes, but over the years, I would -- I

8   can't imagine that I have not investigated an

9   accident where the employer had incorporated a

10  hands out of die practice, but I can't

11  specifically name one.

12            Q.   Okay.  Have you ever investigated an

13  accident where the operator was injured while

14  operating a press brake at the point of operation

15  when the point of operation mechanism failed and

16  that was the cause of the injury?

17            MR. ROBINSON:  Objection to the

18  form.

19            A.   No.

20            Q.   Have you ever operated point of

21  operation failure causing injury to an operator of

22  a press brake?

23            MR. ROBINSON:  Objection to the

24  form.

78

1                A.    I don't understand that question.

2                Q.    Well, have you ever investigated an

3     accident where the point of operation system,

4     safety system, failed, thereby, the operator was

5     injured in the die area?

6                MR. ROBINSON:   Objection to the

7     form.

8                A.    And you're saying the injury was the

9     result or caused by the failure of the

10    safeguarding system?

11               Q.    Well, the safeguarding system

12    allowed the machine to continue operating when a

13    person was in the die area, is what I'm saying.

14               MR. ROBINSON:   Objection to the

15    form.

16               A.    And the failure -- I don't

17    understand failure.

18               Q.    Are you aware of any situations

19    where there's been a point of operation safety

20    mechanism that's failed?

21               A.    Failed, I can't say for sure one way

22    or the other.   I can't remember.

23               Q.    Okay.  Is it proper for the

24    manufacturer of a press brake to select the foot

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330   FAX (513) 381-3342

1    control to be provided as standard equipment?
2                    MR. ROBINSON:  Objection to the
3    form.
4          A.    I don't know what you mean by
5    "proper."  Most OEMs, if they provide a foot
6    control, make the selection based upon what's
7    available from the suppliers of those types of
8    foot controls.
9          Q.    OEM is what?
10         A.    Original equipment manufacturer.
11         Q.    So Cincinnati, if they're
12   manufacturing a press brake, makes the selection
13   of the foot control to be supplied with its press
14   brake?
15                   MR. ROBINSON:  Objection to the
16   form.  Are you asking at all times?
17                   MR. HARTMAN:  When it's supplied as
18   standard equipment, yes.
19                   MR. ROBINSON:  I just want to make
20   sure I understood.  That could be read a couple of
21   different ways.  Objection to the form.
22   BY MR. HARTMAN:
23         A.    With regard to Cincinnati,
24   Incorporated and it providing foot controls on its

1    press brakes, it has a standard foot control that

2    is provided, unless it's otherwise specified by

3    the purchaser of the machine, understanding that

4    most all of the machines Cincinnati, Incorporated

5    builds are custom-built machines.

6              Q.   Are you aware of other manufacturers

7    of press brakes providing a standard equipment

8    foot controls with their press brakes?

9              A.   I can't really answer that, how they

10   determine what is standard equipment and how they

11   build their machines, if they build them by spec.

12             Q.   Do you know whether or not Heim

13   supplied a foot control with the press brake

14   involved in Ms. Linquist's accident?

15             A.   To my understanding, they did.

16             Q.   Do you know how Heim would have made

17   the selection for what foot control they would

18   have supplied as standard equipment?

19             A.   No.

20                  MR. ROBINSON:   Objection to the

21   form, assumes Heim made the selection.

22             Q.   Okay.   Is there anything that you've

23   read or any document that you've seen that

24   indicates that Heim did not make the selection of

1    the foot control that it supplied with its press

2    brake?

3                    MR. ROBINSON:  Object to the form.

4            A.    I've not seen any evidence either

5    way on that.

6            Q.    Okay.  Well, did you read the manual

7    and the parts book that came with the Heim?

8            A.    Yes, I did, I believe.

9            Q.    Okay.  Do you recall where it said

10   it supplied a foot control as standard equipment

11   with the press brake?

12           A.    Yes.

13           Q.    Would that indicate to you that Heim

14   supplied a foot control as standard equipment with

15   the press brake involved in this accident?

16                   MR. ROBINSON:  Objection to the

17   form.

18           A.    A foot control, yes.

19           Q.    Did you see anywhere in the

20   materials where Heim indicated that the purchaser

21   had the right or the opportunity to select a foot

22   control for the press brake?

23                   MR. ROBINSON:  Objection to the

24   form.

1              A.    I didn't see either way, one way or

2    the other.

3              Q.    Didn't speak to it at all in the

4    materials?

5              A.    I don't remember seeing anything

6    that spoke to it.

7              Q.    And on the first page of your March

8    15th, 2006 report, you indicate that you "relied

9    upon 30 years in the machine tool industry and

10   referencing appropriate governmental regulations

11   and industry standards relative to the activity

12   taking place and equipment in use at the time"; am

13   I correct?

14             A.    Yes.

15             Q.    Okay.  The industry standards

16   relative to the activity taking place, would that

17   be the ANSI B 11.3 standard?

18             A.    Yes.

19             Q.    Are there any other standards that

20   you relied upon relative to industry standards?

21             A.    No, not that I can recall at this

22   time.

23             Q.    And you indicate that the government

24   regulations, would that be the OSHA regulations in

83

1    effect at the time?

2            A.    Yes.

3            Q.    Am I correct that in 1978 the OSHA

4    regulations were silent as to press brakes?

5            A.    They were silent with respect to

6    specific requirements for press brakes, but they

7    were not silent relative to the machinery in

8    general.

9            Q.    And what standard or regulation that

10   OSHA promulgated would you contend applied to

11   press brakes?

12           A.    1910.212.

13           Q.    And what does that regulation say?

14           A.    "General machine requirements."

15           Q.    And what general machine

16   requirements did you rely upon in formulating the

17   opinions contained in your report of March 15th,

18   2006?

19           A.    That's a very short section within

20   OSHA, and it merely states, and I'm paraphrasing,

21   that the employer shall provide point of operation

22   safeguarding for its machinery.

23           Q.    Would you agree, sir, that OSHA does

24   not mandate what manufacturers of machinery such

1    as press brakes are to do and incorporate on their

2    machines for sale to the public?

3              A.    Correct.

4              Q.    OSHA has no -- does not govern Heim

5    in any way with regard to the design of the press

6    brake at issue in this matter?

7              A.    That's correct.

8              Q.    And OSHA would have no bearing on

9    Heim's responsibility as to what features should

10   be incorporated on the press brake involved in

11   this accident?

12              MR. ROBINSON:  Objection to the

13   form.

14              A.    There is no direct requirement in

15   OSHA for that.

16              Q.    So OSHA has no bearing on Heim's

17   responsibilities as it relates to manufacturing

18   press brakes with regard to the design?

19              MR. ROBINSON:  Objection to the

20   form.

21              A.    The answer before stands.  There is

22   no direct requirement in OSHA that applies to the

23   manufacture of press brakes.

24              Q.    You also indicate on page 2 of your

1    report that you relied upon sales documentation;

2    am I correct?

3             Do you have your report with you?

4         A.   Yes.

5         Q.   You might want to pull it out

6    because we're going to be going through some

7    things.  Also in your file I noticed the large

8    picture of a press brake; would you pull that out

9    as well for the court reporter?  Would you also

10   pull out the picture?  There's a picture of the

11   press brake in the front of your folder that I

12   saw.  I'd like to mark your report as Coultier 1

13   and that photograph as Coultier 2, please.

14   (Plaintiff's Exhibit Nos. 1 and 2 were marked for

15   identification.)

16        Q.   Sir, would Coultier 1 be the -- an

17   accurate copy of your report authored in this

18   matter?

19        A.   Yes.

20        Q.   Okay.  And would you tell me what is

21   depicted in the photograph we've marked as

22   Coultier 2?

23        A.    I received this photograph attached

24   to a cover letter from Mr. Robinson's paralegal

 1   indicating that this was a photograph of a Heim

 2   machine -- of the Heim machine involved in this

 3   matter prior to it leaving the Heim -- leaving

 4   Heim and being shipped to H-B Machinery.

 5            Q.   May I see that, please.

 6            A.   (Indicating.)

 7            Q.   Do you have any way to verify the

 8   authenticity of that photograph?

 9               MR. ROBINSON:   Object to the form

10   of the question.

11            A.   There are two ways that I would

12   verify the authenticity of it.  One is it came

13   from legal counsel from Heim; and, two, it looks

14   like a photograph taken inside a facility that

15   manufactures Heim press brakes.

16            Q.   Does it look like the press brake

17   involved in this accident with Ms. Lindquist?

18            A.   Yes.

19            Q.   Does the photograph show a foot

20   pedal?

21            A.   No, it does not.

22            Q.   Does it show a two palm button

23   switch?

24            A.   No, it does not.

87

1          Q.    You indicate in your report on page

2    2 that you reviewed sales documentation.  What

3    sales documentation did you review in formulating

4    the opinions in this case?

5          A.    There are some sales documents that

6    were provided to me in the discovery material that

7    I looked at.

8          Q.    Would you --

9          A.    I believe some communication between

10   H&B machinery at that time, in 1978.

11         Q.    Were you able to determine from the

12   sales documentation or any documentation in your

13   file as to what the uses the Heim press brake was

14   going to be put to at the time of the original

15   purchase?

16         A.    No.

17         Q.    Do you have any opinion today as to

18   what uses the Heim press brake was going to be put

19   to at the time of the original purchase -- sale?

20         A.    Yes.

21         Q.    You have an opinion today?

22         A.    Yes.

23         Q.    And what is that based on?

24         A.    The reason why H&B Machinery would

88

1   be obtaining a press brake for Avco-Lycoming in
2   Connecticut.
3          Q.   Have you spoken to H&B Machinery?
4          A.   No.
5          Q.   Do you know of H&B Machinery?
6          A.   No.
7          Q.   Do you know of Avco-Lycoming?
8          A.   Yes.
9          Q.   How do you know of Avco-Lycoming?
10         A.   I used to service them as a service
11  representative for Cincinnati, Incorporated.
12         Q.   Okay.  Has Avco-Lycoming ever spoken
13  to you as to why they purchased the Heim press
14  brake?
15         A.   No.
16         Q.   Do you know why they purchased the
17  Heim press brake?
18         A.   I have an idea based upon my
19  experience being there.
20         Q.   Tell me what your idea is.
21         A.   To bend sheet metal.
22         Q.   Okay.  Do you know what size of
23  sheet metal?
24         A.   No.

89

1        Q.   Do you know how many pieces of sheet

2   metal in a day?

3        A.   No.

4        Q.   Would Avco-Lycoming be putting that

5   press brake to a general use?

6        A.   From my experience at Avco-Lycoming,

7   my opinion would be that they would probably be

8   using it in a maintenance function.

9             MR. ROBINSON:   In what, sir, I'm

10  sorry?

11            THE WITNESS:   A maintenance

12  function.

13  BY MR. HARTMAN:

14       Q.   And what would a maintenance

15  function be?

16       A.   The machine located in the

17  maintenance department where maintenance workers

18  would fabricate various components or pieces out

19  of sheet metal for application and repair

20  operations within the facility.

21       Q.   Would you agree, sir, that they

22  would be using it for a wide breadth of uses in

23  the maintenance department?

24       A.   Oh, absolutely, yes.

90

1         Q.    It would not be a specialized use?

2         A.    No, not in maintenance, no.

3         Q.    And you're basing your testimony

4    today based on your assumption that it would have

5    been placed in the maintenance department,

6    correct?

7         A.    That assumption is based upon my

8    experience being at the Avco-Lycoming facility in

9    the 1970s.

10        Q.    Did you ever see this press brake at

11   the after co combing facility in the 1970s?

12        A.    No.   This press brake was there --

13   was obtained after I left that area.

14        Q.    So you really don't know what the

15   press brake was utilized for at Avco-Lycoming,

16   other than you would assume it was for general

17   purposes?

18        A.    Yes, based upon my knowledge of how

19   press brakes are used and my knowledge of how --

20   or what Avco-Lycoming did at their facility.

21        Q.    Is there anything -- Strike that.

22             On page 3 of your report, down at

23   the bottom in bold letters, you have "Heim special

24   duty press brake"; am I correct?

1          A.    On page 3?

2          Q.    I'm sorry, page 2, page 2.  I'm

3    looking at the fax.  Page 2, on page 2 at the

4    bottom, it indicates that, "Heim special duty

5    press brake"?

6          A.    Yes.

7          Q.    Is the use of the term "special

8    duty" inconsistent with your statement that it was

9    a general purpose machine?

10         A.    Not necessarily, no.

11         Q.    Okay.  What do you mean by special

12    duty?

13         A.    What I mean by special duty is,

14    based upon the B 11.3 standard and the control

15    configuration that was originally provided with

16    this machine, it meets the construction

17    requirements for a special duty machine as defined

18    in B 11.3.

19         Q.    Would that be because of the fact it

20    has the ability to accept either a foot control or

21    a two palm button switch?

22         A.    Well, that is an -- That is a result

23    of the fact that it has an air/electric clutch

24    control system on it.

92

1              Q.    What special duty --

2              A.    Air/electric control.

3              Q.    So an air/electric clutch control

4    makes it special duty?

5              A.    Yes.

6              Q.    There's nothing -- When you say

7    "special duty," you're not talking about it was

8    specially built for doing one type of duty?

9              A.    That's correct.

10             Q.    It's just because it has a

11   particular type of clutch control?

12             A.    That's correct.

13             Q.    What would a general duty press

14   brake have?

15             A.    A general duty press brake has a

16   manual foot pedal and a directly operated clutch

17   through a mechanical linkage, which is very

18   similar to what you would find on a manual

19   transmission automobile clutch pedal, just works

20   in reverse.

21             Q.    So the difference between a general

22   duty press brake and a special duty press brake is

23   the type of clutch?

24             A.    Yes, and the control system that

93

1   goes with it.

2           Q.    And the control system on a

3   manual -- I mean, on a general duty press brake

4   would be the treadle that's hooked to the machine?

5           A.    Correct.

6           Q.    And on a special duty, it could be a

7   two palm button switch or a foot control?

8           A.    Or a treadle.

9           Q.    So you could have all types of

10  three -- all three types of operating devices on

11  the special duty press brake, which would be the

12  treadle, the foot control or two palm button

13  switch?

14          A.    Yes.

15          Q.    And special duty has no bearing on

16  the fact that it was specially built for a

17  particular run of products or pieces?

18          A.    It is not suggested to imply that.

19          Q.    Okay.  It doesn't limit the use of

20  the press brake in any way?

21          A.    In some ways the type of control

22  does encumber some type of press brake operations,

23  but if there's a manual control as well as the

24  foot switch or the palm button control, then you

1    have complete versatility with the machine.

2         Q.    Just to clarify, so basically,

3    special duty and general duty press brakes could

4    be used for the same breadth of types of

5    activities?

6         A.    It's terminology to be consistent

7    with the requirements of the B 11.3 standard.

8         Q.    Have you ever personally examined

9    the two palm pedestal that was manufactured by

10   Corry for use with the press brake?

11        A.    No.

12        Q.    Okay.  Have you seen photographs?

13        A.    Yes.

14        Q.    To the best of your knowledge, was

15   that two palm button pedestal manufactured in such

16   a way as to operate the way you would expect a two

17   palm pedestal control device to work?

18             MR. ROBINSON:  I'll object to the

19   form.

20        A.    There's no way I can make that

21   determination through a photograph.

22        Q.    So you don't know if it was done

23   correctly or not?

24        A.    Correct.