# EXHIBIT J

# PART 3

95

1          Q.    Did it appear to have the basic

2    features that you would expect to be on a two palm

3    pedestal?

4          A.    Yes.

5          Q.    On page 3 of your report, sir, would

6    you agree that the commentary in ANSI is not part

7    of the ANSI standard?

8                MR. ROBINSON:   I'll object to the

9    form of the question.

10         A.    Yeah.   What do you mean by

11   "commentary"?

12         Q.    Well, there's the ANSI standard and

13   then there are commentaries or illustrations onto

14   the side; am I correct?

15         A.    If you're referring to the

16   two-column format that's found in B 11.3, the

17   left-side column is the requirements of the

18   standard and the right-side column is explanatory

19   information.

20         Q.    Okay.   Would you agree that

21   explanatory information that is found in the right

22   column has not been voted on or approved by the

23   committee that drafted the standard?

24         A.    No.

96

1          Q.    Would you explain to me how

2    information gets to the commentary as opposed to

3    incorporated in the standard?

4          A.    The committee writes both and agrees

5    upon both.

6          Q.    Is it your testimony today that you

7    have the same consensus with regard to the

8    standard that you do the commentary?

9          A.    The committee, yes.

10         Q.    So the committee approves both the

11   standard and the same margin of approval is

12   achieved by the committee for the commentary?

13         A.    Yes.

14         Q.    Why is it, then, that the standard

15   prefaces itself by saying that the commentary are

16   basically for illustrative purposes only and not

17   part of the standard itself?

18         A.    Because that's what it is.

19         Q.    What does the committee expect

20   individuals who are reviewing the commentary --

21   Strike that.

22              Is there an understanding by the

23   committee who drafts the standard as to how the

24   commentary will be utilized by the public?

97

1          A.    Yes.

2          Q.    And what is that understanding?

3          A.    It's an expectation that the

4    right-side language helps the reader understand

5    what might be technically difficult to understand

6    on the left side.   It provides suggestions for

7    compliance or meeting the requirements of the

8    standard, which is on the opposite side, opposite

9    paragraph on the left side.   It gives the

10   standards writers an opportunity to explain

11   themselves.

12         Q.    Is it meant to be all-inclusive, is

13   the commentary meant to be all-inclusive or is it

14   just merely an example of a typical type of

15   device?

16         A.    The latter.

17              MR. ROBINSON:   Excuse me.

18   Objection to the form.

19         Q.    So it's meant to give an example of

20   a particular standard and what it's speaking to?

21              MR. ROBINSON:   Same objection.

22         A.    Not of a standard, but it's intended

23   to give an example of a particular methodology or

24   practice which might help the user comply with the

1    requirements that are found on the left side.

2         Q.    Have you seen the drawing of a

3    shielded foot pedal in conjunction with the ANSI B

4    11.3 standard?

5         A.    Yes, I have.

6         Q.    Okay.  To the best of your

7    knowledge, would a drawing that had a shielded

8    foot control with a gate also be an example as to

9    what the ANSI standard is seeking as it relates to

10   foot controls?

11                   MR. ROBINSON:  Objection to the

12   form.

13        A.    Well, it could be, but there's never

14   been one illustrated in the B 11.3 standard.

15        Q.    There is one illustrated in the same

16   language on the B 11.1 standard, though; am I

17   correct?

18                   MR. ROBINSON:  Objection to the

19   form.

20        A.    You might have to direct me to a

21   particular revision of that B 11.1 standard for

22   that purpose.

23        Q.    The most recent.  Mr. Switalski

24   testified that the most recent B 11.1 standard has

1   a gated foot control as an illustration of a

2   properly protected foot control.

3           A.   That would be the 2000 version?

4           Q.   Yes.

5                MR. ROBINSON:  I'll object to the

6   form of the question.  I'm not sure there is a

7   question pending actually.

8           Q.   Am I correct?

9           A.   I believe so.

10          Q.   Okay.  And the language as far as

11  what the B 11.1 foot standard is requesting to be

12  included on a foot control is the same as the B

13  11.3 language; am I correct?

14          A.   I don't understand that question.

15          Q.   Are you familiar with the B 11.1

16  standard as it relates to properly -- what a foot

17  control -- what features a foot control should

18  have on it?

19          A.   Somewhat, yes.

20          Q.   Okay.  Would you agree that the B

21  11.1 standard as it describes the features that a

22  foot control should have on it in use in

23  conjunction with a punch press is the same

24  language found in B 11.3, foot controls for press

100

1    brakes?

2                    MR. ROBINSON:  Objection to the

3    form.

4         A.    That's possible.  I've not made a

5    word-by-word comparison to the two, though.

6         Q.    Okay.  Today can you tell me -- Do

7    you have any reason why the B 11.1 foot control

8    illustration is different than the B 11.3

9    illustration for foot controls?

10        A.    No.

11        Q.    You have no reason to know that?

12        A.    Why it's different in B 11.1 as

13   compared to B 11.3?

14        Q.    Right.

15        A.    No.

16        Q.    Does it surprise you that it's

17   different?

18        A.    No.

19                    MR. ROBINSON:  Objection, objection

20   to the form.

21        Q.    Would you expect it would be

22   different in B 11.1 as opposed to B 11.3?

23        A.    No.

24        Q.    Do you agree with the B 11.1

1   standard that a shielded and gated foot control is

2   a foot control that allows the operator of punch

3   presses to operate the machine safely?

4              MR. ROBINSON:  Objection to the

5   form.

6         A.   I don't agree or disagree.  I don't

7   know that that language is in there.

8         Q.   Do you agree that a shielded foot

9   control with a gate will serve to inhibit

10  accidental or inadvertent activation of the

11  machine?

12        A.   No.

13             MR. ROBINSON:  Objection, objection

14  to the form as well.

15        Q.   You do not agree that it will

16  inhibit accidental or inadvertent activation?

17        A.   That's correct.

18        Q.   Why do you disagree with that

19  statement?

20        A.   Because it encourages riding of the

21  foot switch, so -- which defeats the function of

22  the gate.

23        Q.   Does it encourage riding of the foot

24  switch in every application?

102

1          A.   Oh, I don't know that I would say

2    every application, but many applications.

3          Q.   Does it encourage riding the foot

4    switch on every machine?

5          A.   Same answer.

6          Q.   Do you know today whether or not a

7    gated foot control encourages riding the foot

8    pedal, riding the pedal, when used with a press

9    brake?

10         A.   Yes.

11         Q.   What information do you have that

12   allows you to make that opinion?

13         A.   Thirty years of experience.

14         Q.   What have you seen in 30 years that

15   allows you to make that opinion?

16         A.   Seeing gated foot switches being

17   ridden by operators.

18         Q.   You've seen open foot switches being

19   ridden as well?

20         A.   Yes.

21              MR. ROBINSON:  I'm sorry, I didn't

22   hear the question, I'm sorry.

23         Q.   Okay.  You've seen non gated foot

24   switches being ridden as well?

103

1        A.    Those being those with the toe

2   releases, yes.

3        Q.    You've seen those without the toe

4   releases that were not gated being ridden as well?

5        A.    Did I say -- I don't believe I've

6   heard that question yet this morning.

7              MR. ROBINSON:  Right.  I'll object

8   to the form.  It's argumentive.

9              MR. HARTMAN:  That's fair.

10             MR. ROBINSON:  It's assuming that

11  his prior comment was inconsistent with those when

12  it's not.

13             MR. HARTMAN:  Okay.

14  BY MR. HARTMAN:

15       Q.    Have you seen shielded foot switches

16  that have neither -- that do not have the toe

17  latch ever being ridden?

18             MR. ROBINSON:  I'll object to the

19  form.  I don't know how you're referring to

20  "shielded," Mr. Hartman.

21       Q.    Sir, do you know what a shielded

22  foot switch is?

23       A.    I believe I understand you mean the

24  type of foot switch that has the covered hood on

104

1  both top and two sides.

2          Q.   Correct.

3          A.   It's difficult for me to answer that

4  question because, when a foot switch is being

5  ridden, I cannot see the front of the foot switch

6  where the operator's toe is to determine whether

7  there's a toe release in there or not.

8          Q.   Okay.

9          A.   So unless I come back and see the

10  foot switch without the foot in the foot switch, I

11  can't really make that determination.

12          Q.   Did you keep any statistics as to

13  what type of foot switches were being ridden --

14  foot controls were being ridden more than other

15  types of foot controls?

16          A.   No, I recorded no data.

17          Q.   Okay.  Do you have a mental

18  impression today as to what type of foot controls

19  were being ridden more often than others?

20              MR. ROBINSON:  Objection to the

21  form.

22          A.   More often than others, yes.

23          Q.   And what's your opinion today?

24          A.   The dual-action type of foot

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330  FAX (513) 381-3342

105

1    controls tend to be ridden more often than not.

2          Q.    What's a dual-action type of --

3          A.    Either the flap or the toe release

4    where you have to push up, push up on a flap or

5    push in on a toe release before you can depress

6    the actuating treadle in a downward motion.

7          Q.    How many?  Compare the numbers for

8    me.

9          A.    What do you mean, compare the

10   numbers?

11         Q.    Well, what percentage of individuals

12   riding the foot pedal were utilizing a shielded

13   foot control without a gate and what were using

14   the shielded foot control with a toe latch and

15   which ones were using the shielded foot control

16   with a toe latch and a gate?

17              MR. ROBINSON:  Objection to the

18   form of the question.

19         A.    Well, let me try to respond this

20   way, and it's about as specific as I can get.  I

21   have seen foot switches with gates being ridden.

22   I've seen foot switches with toe releases being

23   ridden, and I'm sure I've seen foot switches

24   without toe releases being ridden.  I have seen

106

1   foot switches with gates tied up out of the way to

2   take them completely out of the picture.

3           I have seen foot switches with toe

4   releases with the springs detached or tied back to

5   take them completely out of the picture.  So both

6   of those are just like shielded foot switches with

7   no HOOD or no toe release.  And I've seen that

8   probably in an even mix across the board of the

9   misuse of those types of switches over the 30

10  years that I've been walking factory floors.

11          Q.   Would you agree, sir, that since

12  Cincinnati included gated foot switches with their

13  machines since the early '70s, that a majority of

14  your exposure in that 30 years of employment with

15  Cincinnati would have been to gated foot switches,

16  foot controls?

17          A.   No.

18          Q.   It is not?

19          A.   No.

20          Q.   Is that because you were exposed to

21  Cincinnati machines manufactured prior to their

22  inclusion of the gated foot control?

23          A.   Well, that as well as being exposed

24  to manufacturing facilities that didn't buy just

107

1    Cincinnati press brakes, they bought other

2    manufacturers' press brakes that used ungated foot

3    switches or the toe-release type Linemaster foot

4    switches or the gated foot switches by Linemaster

5    or Square D or Allen Bradley.

6           Q.   Did you rely upon Professor

7    Barnett's research as to the increased incidence

8    of riding the pedal on certain types of foot

9    controls?

10          A.   Rely upon it relative to this --

11          Q.   Case.

12          A.   -- case or rely upon it relative to

13   what I would talk to people about during the, you

14   know, '80s and '90s?

15          Q.   Rely upon it as it relates to this

16   case.

17          A.   It had -- Relied upon?  It had a

18   somewhat of input into my conclusions, but I can't

19   really say that I relied upon it.

20          Q.   Did you agree with the findings in

21   his report as it relates to the increase in riding

22   the foot pedal as it relates to certain types of

23   foot controls?

24          A.   Yes.

108

1        Q.   Did you find fault with any of

2   Professor Barnett's analysis in that article?

3        A.   In some of his conclusions, I don't

4   completely agree; others, I can understand what

5   he's saying and agree.

6        Q.   What conclusions do you disagree

7   with?

8        A.   Oh, we'll have to go look through

9   each one of them.

10        Q.   Okay.  We're here, let's grab the

11   article and let's look at it.

12             MR. ROBINSON:  Take a break now and

13   change the tape.

14             MR. HARTMAN:  Take a break.

15             THE VIDEOGRAPHER:  One second,

16   we're going off the record.  We're off.

17                          (Brief recess.)

18             THE VIDEOGRAPHER:  Tape no. 2,

19   you're back on the record.

20   BY MR. HARTMAN:

21        Q.   Sir, I believe you're reading the

22   Triodyne Safety Brief, "Foot Controls:  Riding the

23   Pedal"?

24        A.   That's correct.

1        Q.    Okay.  Is there any information in

2    that article that you disagree with?

3        A.    Probably the better characterization

4    is, rather than disagree, is I dislike some of his

5    terms, like finger on the trigger and stuff like

6    that, little things.

7              He makes a comment here that:  It is

8    a universal admonition in machine design that

9    controls be fashioned to minimize the probability

10   of accidental activation.  Tripping is the worry

11   when foot controls are employed because operators

12   seldom scrutinize the floor surface when they're

13   working.

14             And I disagree with that, especially

15   people, operators, who are operating press brakes

16   because of the need to move around in front of the

17   machine and load parts and remove parts and that

18   type of thing and be able to move around as the

19   part is being formed, for the most part, my

20   experience, the people who are operating press

21   brakes are acutely aware of what's on the floor

22   around them.

23             Q.    So basically, you're disagreeing

24   with the regard to press brakes in that tripping

110

1    is not an issue as causing accidental or

2    inadvertent activation because there's so much

3    movement in front of the press brake by the

4    operator?

5                    MR. ROBINSON:  Object to the form

6    of the question.

7            A.    Well, I think the term "tripping"

8    here is physically tripping over a cord.

9            Q.    I believe so too.

10           A.    And not -- You know, and the cords

11   that are used, more often than not, are special

12   electrical wires that are flexible and designed to

13   lay flat and not curl as one of the requirements

14   for the electrical cords on foot-type controls,

15   and when those types of wires are utilized,

16   there's minimal tripping hazard.  I just don't

17   agree with him there.

18           Q.    So you don't agree with him, his

19   statement that tripping is a --

20           A.    Is a worry when foot controls are

21   incorporated any more than tripping is a concern

22   for any reason --

23           Q.    Okay.

24           A.    -- material laying on the floor,

1    pallets laying on the floor, that type of thing.

2            Q.    What is it about the operation of a

3    press brake that makes you believe tripping is not

4    a hazard?  I'm asking about the operation of the

5    press brake and movement around the press brake as

6    opposed to the cord itself.

7            MR. ROBINSON:  Objection to the

8    form.

9            A.    (Shaking head.)  Well, my suggestion

10   is that tripping from the cord presenting a

11   tripping hazard is not a major concern because

12   operators are aware of where things are in front

13   of the press brake because of what they need to do

14   in order to operate and perform a particular

15   function.

16           Q.    What does an operator need to do in

17   front of a press brake in order to do a particular

18   function?

19           MR. ROBINSON:  Objection to the

20   form.

21           A.    It is determined by the job that's

22   being done, where the raw material is positioned,

23   where the finished product is positioned, what

24   actions the operator has to go through in order to

112

1   move the blank piece from one location to the

2   point of operation and then take it from the point

3   of operation to the next location, if there's two

4   people involved, if palm button controls are used,

5   where those controls are positioned, if a foot

6   control is used, where that control is located,

7   the operator is aware of all of that.

8          Q.   Okay.  What else -- Is there

9   anything else with regard to Professor Barnett's

10  article, "Foot Controls, Riding the Pedals," that

11  you dispute or take issue with?

12         A.   In this one I don't see anything

13  that jumps off the page with me.  I didn't mark it

14  for that particular situation.  Nothing else.

15         Q.   Okay.  Do you agree with the

16  conclusions Professor Barnett reached in "Foot

17  Controls:  Riding the Pedal"?

18              MR. ROBINSON:  Object to the form

19  of the question.

20         A.   In general, I have no problem with

21  his conclusions.

22         Q.   And, specifically, do you have any

23  problem with his conclusions?

24         A.   No.

113

1          Q.   I'd like to refer your attention to

2    "Foot Control Activation, Reciprocating Versus

3    Pivoting," which has been cited in your paper.

4    That's the other paper Professor Barnett did.

5               Did you rely upon any of the

6    information contained in the Triodyne Safety Brief

7    "Foot Control Activation, Reciprocating Versus

8    Pivoting" in formulating your opinions in this

9    case?

10         A.   There's general information in here

11   that essentially I agree with that has a bearing

12   on some of my opinions, but to say that I relied

13   upon this document specifically for something that

14   is contained in my report would be improper.

15         Q.   Okay.  What information is in that

16   article?

17         A.   An example here, on the last page --

18   or it's on page 4 actually, not page 5, Bullet F:

19   When hand-steadiness is important, riding the

20   pedal and hold down release are far and away the

21   most efficient activation strategies for foot

22   controls.  As a consequence, the motivation is

23   enormous for abandoning the safer pivoting or

24   reciprocating activating methods.

114

1          That I think is an important comment

2     based upon the facts that we know were in place or

3     that we suppose were in place when Ms. Lindquist

4     was injured.

5          Q.    What facts are important to you as

6     it relates to that passage that you've read?

7          A.    What Ms. Lindquist was doing at the

8     time, I understand, was hand forming a part on a

9     mandrel, which was located on the bed of the press

10    brake, which required her hands to be involved in

11    that.  I consider, you know, hand-steadiness and

12    the use of the hands to actually form the part or

13    preform the part applicable to this particular

14    paragraph, and her concentration is there and not

15    on what her foot is doing in the foot switch.

16         Q.    Well, you say "in the foot switch."

17    Do you have any evidence that indicates that at

18    the time of this accident Ms. Linquist's foot was

19    in the foot switch at the time that she was

20    injured?

21         A.    I reviewed testimony of several

22    Corry Manufacturing individuals who made that

23    conclusion after they came to the press brake

24    subsequent to the occurrence and inspected it and

1   verified that it was operating properly in all

2   respects and the only way that the machine could

3   have cycled is if Ms. Lindquist depressed the foot

4   switch.

5            Q.   Do you agree with the conclusion --

6   Strike that.

7            Do you agree with the statement that

8   the only way this machine could have cycled is by

9   activation of the foot switch?

10           A.   Yes, I do.  There's a possibility --

11  or a probability, excuse me, of a phantom cycle,

12  but these machines don't generally phantom cycle

13  without something breaking, and when something

14  breaks, it's generally discovered in an

15  investigation following that breakage and that

16  phantom cycle.

17           Q.   You have no evidence that something

18  broke; am I correct?

19           A.   Correct.

20           Q.   And the only evidence that exists as

21  of this date is that the machine was operating by

22  using a foot control?

23           A.   And properly in all respects.

24           Q.   And that activation of the foot

116

1   control was necessary to cause the machine to

2   operate, correct?

3                    MR. ROBINSON:  I'll object to the

4   form of the question, particularly to the term

5   "necessary."

6           Q.   Well, at the time of this accident,

7   the only way to operate the machine was by use of

8   the foot control?

9                    MR. ROBINSON:  Objection to the

10  form of the question.

11          A.   I think there was also a palm button

12  station on the machine that could have been used

13  in lieu of the foot switch.

14          Q.   But am I correct that the palm

15  button switch was switched to the foot control

16  method?

17          A.   Yes.

18          Q.   And am I correct, Ms. Lindquist --

19  the only testimony that exists is Ms. Lindquist

20  didn't know that the two palm button switch was to

21  be used in conjunction with this machine?

22                   MR. ROBINSON:  I'll object to the

23  form, mischaracterizes testimony.

24          A.   I don't recall that to be the

```
 1   testimony.

 2            Q.   Do you recall anything contrary to

 3   that statement?

 4            A.   That the palm button station was

 5   there and available, if it was chosen to be used.

 6            Q.   Who would have made the choice,

 7   according to the testimony you've read?

 8                 MR. ROBINSON:  I'll object to the

 9   form of that question.

10            A.   I don't remember now if I read

11   deposition testimony about that or if I read that

12   in other documentation, I can't remember

13   specifically where I got that from.

14            Q.   Would you agree that a palm button

15   switch -- Strike that.

16                 Would you agree that a palm button

17   console would have a supervisory key on it?

18                 MR. ROBINSON:  Object to the form

19   of the question.

20            A.   It may or it may not.  My

21   understanding is that this one did.

22            Q.   Should it have a supervisory key on

23   it?

24            A.   Somewhere involved in the control
```

118

1    circuitry, there should be a selector switch that

2    allows that palm button station to be turned on or

3    off.

4            Q.    You say "selector switch," but am I

5    correct that a selector switch is to be operated

6    by a supervisory key?

7                    MR. ROBINSON:    I'll object to the

8    form of the question.

9            A.    The standard doesn't require a

10   supervisory key operated-type switch.    It just

11   requires supervisory control over the selection.

12   So it can be a regular selector switch that's

13   enabled by a key operated switch somewhere else.

14           Q.    But a supervisor is to make that

15   decision as to whether to use the foot control or

16   the two palm button switch?

17                   MR. ROBINSON:    Pardon me, before

18   there's an answer, I need to have that question

19   read back or restated.    I didn't hear it, I'm

20   sorry.

21   (The record was read back by the court reporter.)

22                   MR. ROBINSON:    Objection to the

23   form.

24   BY MR. HARTMAN:

119

1            A.    That's not necessarily true, no.

2            Q.    Is it your testimony today that

3    it's -- that it's appropriate for an operator that

4    is not a set-up person to make the decision as to

5    whether or not to utilize the foot control or the

6    two palm button switch when both are available?

7                      MR. ROBINSON:  Objection to the

8    form.

9            A.    In some organizations, it is

10   appropriate, yes.

11           Q.    Do you think it's appropriate?

12           A.    Yes, in some organizations that

13   are -- operators are qualified to make that

14   decision.

15           Q.    Do you have any evidence that

16   Ms. Lindquist is a qualified operator to make that

17   decision?

18           A.    I have no evidence one way or the

19   other.

20           Q.    What would qualify an operator to

21   make that decision?

22           A.    That would depend upon Corry

23   Manufacturing's policies.

24           Q.    Okay.  And if Corry Manufacturing

1    did not permit Ms. Lindquist to make that

2    decision, would that -- would you expect her to

3    make a decision contrary to what her employer

4    states?

5                MR. ROBINSON:  I'll object to the

6    form of the question.

7            A.    I don't know that you can say that

8    if they did not -- to not give her the training or

9    the authority is to suggest that she has a

10   prohibition or she gets a prohibition against

11   using it or making that decision.  I don't think

12   the two link together.

13           Q.    Would you expect an operator at

14   Corry Manufacturing to be able to make the choice

15   to utilize the foot control versus the two palm

16   button switch?

17           A.    At Corry Manufacturing?

18           Q.    Yes.

19           A.    I can't answer that question.  I

20   don't have the information about Corry

21   Manufacturing that I need to make that decision.

22           Q.    What information would you need?

23           A.    I need to understand better what

24   goes on at Corry Manufacturing.

121

1          Q.    If her supervisors tell her -- told

2    you that it was not appropriate for her to make

3    that decision, would you have any reason to

4    dispute that?

5                MR. ROBINSON:  Objection to the

6    form of the question.

7          A.    As we sit here today, no.

8          Q.    Would you agree that, with

9    Ms. Linquist's acts under the prohibition from her

10   employer to make that choice to not -- Strike

11   that.

12               Do you have an opinion today as to

13   whether or not Ms. Lindquist should have made the

14   independent decision to utilize the two palm

15   button switch versus the foot control?

16         A.    Yes.

17         Q.    What is your opinion?

18         A.    That she should have or Mr. Rooney

19   should have, one of the two of them should have

20   made the selection of palm buttons.

21         Q.    I'm asking you about Ms. Lindquist

22   specifically, not Mr. Rooney, because Mr. Rooney

23   has testified that he has set-up experience.

24   Ms. Lindquist has no set-up experience, according

1    to all of the testimony in this case, that you

2    have of all of the depositions.

3              My question, sir, is:  Do you have

4    an opinion today as to whether or not

5    Ms. Lindquist should have made an independent

6    decision to utilize the two palm button switch as

7    opposed to the foot control?

8         A.   Yes.

9              MR. ROBINSON:  Objection, asked and

10   answered, mischaracterizes in the instructions to

11   this witness as to what the prior testimony is and

12   was asked to answer.  Let me state that objection.

13   Go ahead, I'm sorry.

14        Q.   What is your opinion?

15        A.   I think that she should have made

16   that decision.

17        Q.   Based on what?

18        A.   Based upon a natural recognition of

19   the hazard that she was involved in.

20        Q.   Is it your testimony today, sir,

21   that any operator in any plant can make the

22   decision to change the procedure by which the

23   set-up has been made on a press brake?

24             MR. ROBINSON:  Objection,

1    argumentive.

2              A.    No, that's not what I testified.

3              Q.    Is it your opinion today that

4    Ms. Lindquist has the -- should make independent

5    decisions to change the set-up on a press brake to

6    switch from foot control to two palm buttons?

7              MR. ROBINSON:   Objection to the

8    form of the question.

9              Q.    Switch.

10             A.    My opinion is that Ms. Lindquist has

11   the responsibility to herself to either make the

12   change or request a change to be made if she

13   recognizes the hazard that she is exposed to by

14   hand-forming a part around a mandrel that's in the

15   point of operation of the press brake.

16             Q.    So are you faulting this accident on

17   Ms. Lindquist?

18             MR. ROBINSON:   I'll object to that.

19             Q.    Are you placing the fault of this

20   accident on Ms. Lindquist for not using the two

21   palm button switch?

22             MR. ROBINSON:   I'll object to the

23   form of the question.

24             A.    No.

124

1          Q.    Am I correct that, based on the

2    testimony you've read, that she did everything

3    that she was instructed to do by her employer?

4                MR. ROBINSON:   I'll object to the

5    form of the question.   You're ignoring the

6    testimony that he just gave.

7          A.    Given the information that I have,

8    she utilized what was provided to her, but failed

9    to take the necessary step afterward to ensure her

10   own safety.

11         Q.    And that step would have been what?

12         A.    To set the foot switch aside, turn

13   on the palm buttons and use them.

14         Q.    So is it your testimony today, sir,

15   that the two palm button switch was necessary to

16   be used in conjunction with the Heim press brake

17   to protect Ms. Lindquist from this accident?

18         A.    To form this particular part, it

19   would have been appropriate point of operation

20   safeguarding for Ms. Lindquist.

21         Q.    Well, with regard to the devices

22   that were there, would you agree, sir, that -- Am

23   I correct that your testimony is, is that the two

24   palm button switch is a necessary component to

1    this set-up in order to protect Ms. Lindquist?

2                    MR. ROBINSON:   I'll object to the

3    form.   I don't know what you mean by "with regard

4    to the devices that were there."  As you know, the

5    testimony has been -- isn't limited to that, so I

6    object to the form.

7            Q.   Okay.  Would you agree that the --

8    Strike that.

9                    Would you agree that the two palm

10   button switch was necessary on the day of

11   Ms. Linquist's accident to protect her from the

12   injury she sustained?

13                   MR. ROBINSON:   I'll object to the

14   form, same objections.

15           A.   Yes, I would, given the two types

16   of -- two methods to control that press brake, to

17   control the motion of the ram of that press brake,

18   that being the foot switch or the two palm button

19   control, the two palm button control would have

20   provided her the appropriate safeguarding that she

21   needed from the hazards at the point of operation.

22           Q.   Have you ever been involved in an

23   accident involving a two palm button switch and an

24   operator being injured?

126

1            A.   Yes.

2            Q.   Am I correct that you can be injured

3    when you're utilizing a two palm button switch as

4    the point of operation safety device?

5                 MR. ROBINSON:  I'll object to the

6    form.

7            A.   I think that a correct

8    representation of what I've witnessed or what I've

9    investigated and learned is that an injury at the

10   point of operation can't take place when two palm

11   button controls are the point of operation

12   safeguarding selected for a particular operation.

13           Q.   So it's possible even utilizing a

14   two palm button switch for Ms. Lindquist to have

15   been injured utilizing the press brake,

16   manufacturing the parts that she had -- was using

17   that day?

18                MR. ROBINSON:  I'll object to the

19   form.  You've now added Tina Linquist's incident.

20                MR. HARTMAN:  Right.

21                MR. ROBINSON:  No.  Previously, you

22   were talking about is it possible, has he ever

23   seen an injury caused by it or when a two palm

24   button was in place.  Now you've just thrown in so

1    it is possible that it could have taken place with

2    Tina Lindquist.  I just want to make sure that

3    it's not misleading, as it sounds.

4              MR. HARTMAN:  It's not misleading.

5    It's absolutely crystal clear that I used Tina

6    Lindquist.  There's no, there's no -- It's a

7    different question.  The witness has the ability

8    to think and hear my questions, and if he has

9    problems with the questions, he can certainly

10   straighten me out, as he's done on several

11   occasions, specifically when I misstated the

12   number of years.

13             I have no problem in restating

14   anything you ask me to restate, sir.

15   BY MR. HARTMAN:

16        Q.   Is it possible that Ms. Lindquist

17   could have been injured performing the same

18   functions she did on the day of the accident with

19   a two palm button switch as the point of operation

20   safety?

21        A.   Not injured in the same manner.  I

22   can -- Not knowing the stopping ability of this

23   particular machine, how long it takes it to stop,

24   there is the potential for the hand to get off of

1  a palm control and into a hazardous area before

2  the ram has an opportunity to completely stop and

3  result in an injury.  That is a very low

4  probability because of the short stroke of this

5  machine being less than -- only 3 inches of total

6  stroke.

7           I doubt seriously if she could have

8  gotten off of a hand control and into a hazardous

9  area fast enough to get herself injured.  She

10 certainly could not have gotten both hands in the

11 point of operation if she were using palm button

12 controls to form this particular part.

13         Q.    There are situations where people

14 have been injured by secondary activation by a

15 co-employee, though; am I correct?

16         A.    That's correct.

17              MR. ROBINSON:  Objection,

18 argumentive.

19         A.    But that is the scenario most often

20 experienced when palm buttons are used as point of

21 operation safeguarding.  It's not the people who

22 are operating the palm buttons, but it's somebody

23 else who is getting hurt.

24         Q.    It happens when there is concurrent