# EXHIBIT J

# PART 4

1   use palm button switches; am I right?

2           A.   Yes.  In this situation, there was

3   only one set of palm button controls.  It was a

4   small press brake, and there was only one operator

5   involved in the operation of the machine.

6           Q.   Are there two types of set-ups with

7   regard to palm button switches, a single set?

8           A.   I don't understand your question.

9           Q.   Are there two types of set-ups that

10  you can have a palm button switch, meaning you

11  have to press both buttons at the same time or

12  that you can press one and press the other one at

13  a different time; am I correct?

14          A.   It all depends on how the electrical

15  system is designed.

16          Q.   Would you tell me what the different

17  types are called?

18          A.   The original palm button stations

19  were designed with no consideration between the

20  two actuating switches, where one could be

21  depressed, and a significant time later, the

22  second one could be depressed and cause motion.

23          Q.   What's that called, what kind of

24  timing device is that?

130

1          A.    There is no timing device in that.

2          Q.    What is that palm button switch

3    called, though?

4          A.    (Shaking head.)

5          Q.    Am I correct that there's a

6    particular name for that?

7          A.    If you have a name, why don't you

8    tell me what your name is and I'll confirm whether

9    it's what I'm indicating now.

10         Q.    Well, my understanding is one is a

11   concurrent switch and one is a simultaneous

12   switch.

13         A.    (Shaking head.)

14         Q.    A concurrent switch is one where, if

15   you hit the one button and then a time elapses and

16   hit a second button, it will cycle the machine.

17   Are you familiar with that?

18         A.    And you're saying the distinction

19   between concurrent and simultaneous is the

20   simultaneous has to be done in less than half a

21   second?

22         Q.    Yes.

23         A.    Well, that's the common thinking

24   today.

131

```
 1              Q.    What is?
 2              A.    The distinction between concurrent
 3      and simultaneous.
 4              Q.    So tell me, do you understand the
 5      distinction between a concurrent and simultaneous
 6      switch?
 7              A.    Yes.
 8              Q.    What is a concurrent switch?
 9              A.    It is as I initially started
10      describing, is one switch is down, and then the
11      other one can be actuated at any period of time
12      after the first one is depressed if the first one
13      is held depressed, and a cycle would occur on the
14      given machine --
15              Q.    Okay.
16              A.    -- that the palm button station is
17      connected to.
18              Q.    What is a simultaneous switch?
19              A.    Well, early on, before we move into
20      simultaneous, the industry moved into concurrent
21      with a less than 1 second time between the two,
22      and that was the understood time constraint even
23      under concurrent operation.  If you didn't have
24      them concurrently actuated within a second of each
```

1    other, then you would not be allowed to cycle the

2    machine.

3              Today the industry has gotten more

4    specific and drawn the distinction, and actually

5    in the early '80s California started the ball

6    rolling and Cal OSHA required a less than .5

7    second actuation of the two palm button switches

8    in order to initiate machine motion.

9         Q.   Well, when it has less than a .5, is

10   it called simultaneous?

11        A.   That's what it has evolved into

12   today, simultaneous, and actually that is in the

13   process of changing too.

14        Q.   Okay.  Would you agree, sir, that

15   the ANSI standard as it relates to presses

16   utilizes the term "concurrent" --

17              MR. ROBINSON:  I'll object to the

18   form of the question.

19        Q.   -- as it relates to two palm button

20   switches?

21        A.   Which version are you talking about?

22        Q.   The most recent version.

23        A.   Uses concurrent, I think that

24   probably would be correct.

1         Q.    And would you agree, sir, or do you
2    have an opinion today as to whether or not the
3    simultaneous activation of a two palm button
4    switch is safer --
5                   MR. ROBINSON:   Objection.
6         Q.    -- than a concurrent activation of a
7    two palm button switch?
8                   MR. ROBINSON:   I didn't mean to
9    interrupt, my apologies.  Objection to the form.
10        A.    Whether you call it concurrent or
11   regardless of what you call it, if the action of
12   the control circuit is the same, there's no
13   difference between them.  And incidentally,
14   concurrent and simultaneous are being replaced by
15   synchronous; that's going to be the new term,
16   "synchronous."
17        Q.    But we don't have that term yet.  So
18   we're talking about old machines and old palm
19   buttons, and back in '78 concurrent was a very
20   specific definition; am I correct?
21        A.    No.   That's one of the problems,
22   concurrent was never really specified as to less
23   than 1 second or less than .5 seconds.
24        Q.    But concurrent did mean, if you hit

134

1  one button and hit a second button at a later

2  time, the machine would cycle, correct?

3          A.    Yeah, but that was a requirement

4  that was linked more to the anti tie-down feature

5  than it was concurrent.

6          Q.    Well, when ANSI speaks to two palm

7  button switches on presses, whether it be punch

8  press or press brake, it uses the term

9  "concurrent" and has only used the term

10 "concurrent"; am I correct?

11         A.    Yes.

12         Q.    And you understand as a safety

13 engineer that concurrent when it was first adopted

14 back in the '70s was not simultaneous, did not

15 mandate simultaneous as we know it today; am I

16 correct?

17             MR. ROBINSON:   I'll object to the

18 form of the question.

19         A.    Back in the '70s concurrent -- the

20 language in general did not get into that level of

21 specificity.

22         Q.    So a concurrent two palm button

23 switch in '78 would allow you to hit the device,

24 hit one palm button, and at a later time hit the

1    other palm button, and it would cycle, correct?
2                MR. ROBINSON:  I'll object to the
3    form of the question.
4         A.   It could do that.  It all depended
5    on how the manufacturer of the palm button station
6    and the control logic decided to do it.
7         Q.   It would satisfy the ANSI
8    requirement if you could hit the one button and
9    then a minute later hit the other button and cycle
10   the machine for two palm button switches?
11        A.   I suppose it would, yes.
12               MR. ROBINSON:  I'll object to the
13   form of the question.
14        Q.   Would you agree that simultaneous as
15   you defined it, less than a half a second lapsing
16   between the pressing of the buttons, is a safer
17   design than not having a time limit on the two
18   palm button switch?
19               MR. ROBINSON:  Objection to the
20   form.
21        A.   I can't say that I really ever
22   thought about simultaneous being safer than
23   concurrent.
24        Q.   So you have no opinion as to whether

136

1    or not simultaneous is safer than concurrent?

2              A.    Correct.

3              Q.    And you have no opinion as to

4    whether or not concurrent is safer than

5    simultaneous?

6              A.    Correct.

7              Q.    You don't know which one is safer?

8              MR. ROBINSON:    I'll object to the

9    form of that question.

10             Q.    You can answer.

11             A.    I object to the inference that

12   you're suggesting that I don't know what is safe

13   and what is not safe.

14             Q.    I'm asking you with regard to two

15   palm button switches and one that's a concurrent

16   device as opposed to one that's a simultaneous

17   device.

18             A.    I don't agree with your definition

19   of concurrent and simultaneous.  I want you to

20   show me where it's codified that simultaneous

21   means .5 seconds.  If you could show me that now

22   and show me that concurrent says something longer

23   than that, you know, then I'll give you that there

24   is a distinction between them.  But I'm saying I

1    could pick up any code or any standard and see

2    "concurrent" in there and interpret it any way I

3    want, and I can pick up any standard that says

4    "simultaneous" and interpret that any way I want.

5         Q.   I would like you to pick up any

6    standard as it relates to press brakes and show me

7    where it says simultaneous is utilized in

8    conjunction with two palm button switches?

9         A.   Well, don't --

10        Q.   Please, do you have one?

11             MR. ROBINSON:   Hold on, let me make

12   the objection here.  I don't know if we have

13   every -- If you have a standard you want to show

14   him, that's the way to do it, Mr. Hartman, but to

15   suggest that he has the library here and the means

16   to just pull out any one word or two words from

17   all of the ANSI standards is argumentive,

18   harassing, and misleading.

19             MR. HARTMAN:   Fine, you can make

20   your objection.

21   BY MR. HARTMAN:

22        Q.   I'm saying to you, sir, that there

23   is a difference that you know of as a safety

24   professional between the use of concurrent and

138

1    simultaneous; is there not?

2         A.   Yes.

3         Q.   Okay.  The difference as you

4    understand it to be is simultaneous means to you

5    less than .5 seconds between the depression of the

6    pedals -- the palm buttons on a two palm button

7    switch; am I correct?

8         A.   Yes, it could be palm button

9    stations, yes.

10        Q.   Concurrent means a time greater than

11   .5 seconds with regard to --

12        A.   It doesn't have to.

13             MR. ROBINSON:  Objection.

14        A.   No.  It could be greater, it could

15   be less.

16        Q.   But it would -- But concurrent

17   includes the permission to allow it to be greater,

18   whereas, simultaneous says it must be less than .5

19   seconds, to you?

20        A.   Yes.  But show me where that's

21   required in any standard, Mr. Hartman.

22        Q.   Sir, I'm not --

23        A.   What I feel --

24        Q.   I'm not the witness today.

1         A.    -- what I think is not dictating

2 what industry is doing, except until we get the

3 new standard out, and then it will be more clearly

4 laid out.

5         Q.    Okay. Is it going to be more

6 clearly laid out in the new standard?

7         A.    Well, it's going to be using the

8 word "synchronous" instead of either of those two

9 crummy terms.

10         Q.    And what does synchronous mean?

11         A.    Yes.

12         Q.    What does it mean?

13         A.    Synchronous?

14         Q.    (Nodding head.)

15         A.    That's at the same time within a

16 half second, and it's going to be clearly laid

17 out, and that's going to be in the new B 11.1

18 standard.

19         Q.    So you're here as a safety

20 professional, and I'm -- and I don't mean to take

21 issue with you, but I'm looking for what your

22 opinions are, sir.

23         MR. ROBINSON: Yeah, and let's

24 object to that because I don't think these issues

1   were laid out in the report at all, and to throw
2   out new issues and to suggest that you're going to
3   get opinions on all issues from the witness
4   without any type of preparation by the witness at
5   all on the issues I think is very misleading and
6   inappropriate.
7                   MR. HARTMAN:  I'm merely reciting
8   what the witness has stated in his report and
9   trying to find out exactly what he knows and what
10  he means when he talks about -- And I refer you to
11  page 6 of your 7-page report, where you state the
12  second -- it might the third full paragraph, a
13  dual palm button control requires simultaneous
14  activation of two push buttons by both hands in
15  order to initiate machine motion.
16  BY MR. HARTMAN:
17          Q.    Am I correctly reading your report?
18          A.    Yes.
19          Q.    And am I correct that you indicate
20  that a dual palm button control requires the
21  simultaneous actuation of two push buttons by both
22  hands?
23          A.    Yes.
24          Q.    Am I correct that that is your

1    opinion; that is not a code requirement?

2            A.    Oh, because I use simultaneous

3    instead of concurrent?

4            Q.    Yes.

5            A.    That's just a selection of a word

6    there.

7            Q.    Well, sir, that selection of the

8    word is important when we talk about two palm

9    button switches because the code speaks to a

10   different term; am I correct?

11           A.    You mean concurrent?

12           Q.    Yes.

13           A.    Sure.

14           Q.    Okay.  And concurrent to you could

15   be simultaneous, but it could also be something

16   where the lapse of time between striking the two

17   buttons is a much greater time; am I correct?

18           A.    Or much less, yes.

19           Q.    Well, it can't be less because

20   simultaneous is less than .5 of a second, though;

21   can it?

22                 MR. ROBINSON:  Objection.

23           A.    So concurrent could be less than .2

24   seconds; couldn't it?

142

1        Q.    Yes.  But concurrent --

2        A.    So that would be less than .5, which

3    is less than simultaneous.

4        Q.    Okay.  But concurrent means that

5    there is no prescribed amount of time between

6    pushing the two button times that is mandated,

7    correct?

8        A.    Is that your interpretation because

9    that's --

10        Q.    I'm asking you.

11        A.    Sounded like your statement to me.

12        Q.    It's a --

13        A.    No, I don't know of any, any

14    specification that defines what concurrent is.

15        Q.    And the standard uses concurrent?

16        A.    Yes.

17        Q.    And you use the word "simultaneous"?

18        A.    Yes, I do.

19        Q.    And simultaneous means less than .5

20    of a second?

21        A.    Yes, I'll go along with that.

22        Q.    Would you --

23            MR. ROBINSON:  Let me object.  That

24    question has been asked and answered many, many

1   times.
2          Q.    Why do you say a dual palm button
3   control requires the, requires the, simultaneous
4   actuation as opposed to it requires the concurrent
5   actuation?
6          A.    Because when I wrote that, I was
7   thinking the same time, which is what simultaneous
8   means, at the same time.
9          Q.    Oh, so you're using it in basically
10  not a --
11         A.    It's an English word.  It's not a --
12  Well, I guess it's now a legalese word, which
13  means a half of a dozen different things.
14         Q.    Well, it's an engineering word
15  because simultaneous -- I'm asking you an
16  engineering term.  I'm using --
17              MR. ROBINSON:  Let me object to the
18  statement.  It is an English word.  To suggest
19  it's not an English word and it's only an
20  engineering word is argumentive.
21              MR. HARTMAN:  Paul, I appreciate
22  it, but, you know, your objections are well noted.
23  I disagree with them.  I think that this witness
24  knows exactly what the issue is as it relates to

1   this here.

2   BY MR. HARTMAN:

3           Q.   My question is:  Do you mean

4   simultaneous in that a two palm button control

5   must be less than .5 of a second or do you mean it

6   just generally, you have to hit the button with

7   one hand and hit the other button with the other

8   hand or at some other time?

9           MR. ROBINSON:  I'll object to the

10  form of that question.

11          A.   No.

12          Q.   What do you mean by that, tell me?

13          A.   What I just said before.

14          MR. ROBINSON:  Objection, asked and

15  answered.  You can answer it again, but you asked

16  it and he's answered it a number of times.

17          Q.   What do you mean by that sentence?

18          A.   The control requires the two buttons

19  to be actuated at the same time.  That's all I

20  meant by that.

21          Q.   When you say "at the same time,"

22  would that include if you hit one button and then

23  at a later date hit the other button?

24          A.   It may.

1          Q.   Okay.   Thank you.

2               Let's go back to page 3, please,

3     under the topic "The Occurrence Involving Tina

4     Lindquist"; are you there?

5          A.   Yes.

6          Q.   You indicate that, in the first

7     paragraph, "The forming job requires four

8     different set ups of the press brake."  What do

9     you mean by "four different set-ups of the press

10    brake"?

11         A.   The testimony that I reviewed,

12    deposition testimony from other individuals,

13    indicated that it was a four-step process where

14    the set-up man had to insert one set of dies and

15    Ms. Lindquist had to form the part with that set

16    of dies; and then that die set had to be changed

17    out with another set and she formed the second

18    bend; and then that die set had to be changed out

19    to a third pre bend or a third operation, which it

20    was called a butterfly operation, and all of the

21    parts had to be formed using that die set; and

22    then the fourth bend, which was the cylindrical

23    forming die, was installed and all of the parts

24    had to be formed using that die.

1           Q.    And you indicate that,

2    approximately, 200 parts were being formed?

3           A.    That's what I gleaned from the

4    testimony.

5           Q.    Is your understanding of the job

6    that Ms. Lindquist was performing on the day of

7    her accident a job that you would typically expect

8    to be performed by press brakes?

9                 MR. ROBINSON:  I'll object to the

10   form of the question.

11          A.    I can't really say.  I've not seen

12   the actual part, drawing of the part or the actual

13   shape of the part at the beginning or at the end.

14   My presumption was that the part was a flat blank

15   to begin with and that it was a round cylinder

16   when it finished the four operations.  Whether

17   that could be done on some type of other machine,

18   I've not had the opportunity to make that

19   evaluation.

20          Q.    But my question is -- Let me be a

21   little bit more clear.  Would you agree, sir, that

22   the forming of the parts as you understand them to

23   be formed would be a use of the press brake that

24   was expected?

1          MR. ROBINSON:  I'll object to the

2   form of the question.

3          A.   Yes, it could very well be;

4   although, I don't, I don't know what the butterfly

5   operation encompassed.  I didn't see any specific

6   information in the testimony describing that.

7          Q.   How about the final forming the

8   piece on the mandrel and letting the press

9   interface with the piece then to make it a

10  complete cylinder, is that something that you

11  would expect a press brake to be utilized in

12  doing?

13         A.   Yes.  I've seen that type of forming

14  work on press brakes in the past.

15         Q.   The next paragraph, you indicate,

16  "Forming of the cylindrical shape required the

17  operator to manually preform the part around the

18  mandrel."  Is that an accurate statement?

19         A.   Yes, that's what I said there.

20         Q.   Do you still hold true to that?

21         A.   That's the way I understand what was

22  happening from the testimony I reviewed.

23         Q.   "This pre-forming was accomplished

24  on the actual mandrel which served as the lower

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330  FAX (513) 381-3342

1    half of the forming die set while it was position

2    in the machine"; am I correct?

3          A.    Yes.

4          Q.    Do you still hold to that statement?

5          A.    I have not received any information

6    to contradict that from the testimony I've

7    reviewed.

8          Q.    Your next sentence is:  "Therefore

9    it was necessary for Ms. Lindquist to place her

10   hands between the upper and lower die to fit the

11   part around the mandrel"; is that an accurate

12   statement?

13         A.    Yes.

14         Q.    And you still believe that to be

15   true?

16         A.    Yes.

17         Q.    Do you know the capacity of the

18   press brake involved in this accident?

19         A.    My understanding, it was a 70-ton

20   capacity machine.

21         Q.    Do you know how many parts it could

22   form in a day or is there any way to determine

23   that or how many parts would you expect to be

24   formed in a day?

1             MR. ROBINSON:  I'll object to the
2    form of that.
3             A.   There's no way to make that
4    determination.
5             Q.   Okay.  The next paragraph indicates
6    that you believe that Mr. Rooney was in charge of
7    setting up the machine and changing the dies after
8    the operator completed each of the previous
9    operations on the entire lot, correct?
10            A.   I don't --
11            MR. ROBINSON:  Just so I
12   understand, what are you asking him when you say
13   "correct"; are you saying is that what it says?
14            MR. HARTMAN:  I'm asking did I read
15   it basically correctly.
16            MR. ROBINSON:  Okay.  That's what I
17   wanted to make sure because you said that a number
18   of times.
19            MR. HARTMAN:  Then I'm going to ask
20   if he agrees with it.  When I ask you do you still
21   hold true to that opinion today, then I want to
22   know.
23            MR. ROBINSON:  I just didn't know
24   what you meant by --

1          MR. HARTMAN:  That's fine.

2          MR. ROBINSON:  When you read it and

3   you say "correct," I don't know what that means.

4   It's not really a question.

5   BY MR. HARTMAN:

6          Q.   It says:  "The press brake was set

7   up by Corry employee Robert Rooney.  Mr. Rooney

8   would change dies for each of the four operations

9   on the part after the operator completed each

10  previous operation on the entire lot."  Did I

11  correctly read your statement?

12         A.   Yes.

13         Q.   Do you still hold true to that

14  opinion after reviewing the evidence?

15         A.   Yes.

16          MR. ROBINSON:  Let me object to the

17  reference to the term opinions, but --

18         Q.   Okay.  Is that accurate still today?

19         A.   This is the information -- I've not

20  received any information to contradict that

21  statement.

22         Q.   This is the information that you're

23  utilizing to make your opinions, though, correct?

24         A.   The information here is from what I

1   learned reading the discovery information.

2            Q.    But this is your understanding of

3   what you've learned in reading the discovery

4   information that you're relying upon to make your

5   opinions in your report; am I correct?

6            A.    Yes.

7            Q.    Let's go down to the next sentence.

8   It says:  "With the final die set in the machine

9   to make the round shape, the distance between the

10  upper and lower die components is estimated to be

11  approximately 2-and-one-quarter inch.  This is the

12  space within which the operator had to place the"

13  parts -- "the part and preform it around the

14  mandrel," and then have you in parentheses, "with

15  her hands" close paren, period.  Did I accurately

16  read that statement?

17           A.    Yes.

18           Q.    Is that the information that you

19  pulled out of the materials sent to you by

20  Mr. Robinson that you utilized to make your

21  opinion?

22           A.    Except for the estimate, that

23  estimate was my own conclusion based upon the

24  material I read.

1          Q.    But these are the facts that you
2    relied upon in making your -- reaching your
3    conclusions, correct?
4          A.    I don't understand what you're
5    asking.
6          Q.    This is your understanding as to
7    what happened on the day of the accident --
8          A.    What Ms. Lindquist was doing at the
9    time.
10         Q.    -- and what Ms. Lindquist was doing
11   and what her responsibilities were for you to
12   formulate your opinions; am I correct?
13         A.    Yes.
14         Q.    Next it indicates that:
15   "Ms. Lindquist was positioned in front of the
16   press brake with a tray of parts to her side.  She
17   had positioned the foot switch operator control
18   between her and the front of the machine.  A stool
19   was positioned behind her."  Did I accurately read
20   your report?
21         A.    Yes.
22         Q.    Are those the facts that you pulled
23   from the discovery materials sent to you by
24   Mr. Robinson upon which you relied upon in making

153

1  your opinion?

2          A.   Yes.

3          Q.   It's your understanding that there

4  was a stool at the point of operation; am I

5  correct?

6          A.   No.

7          Q.   There was a stool positioned behind

8  her?

9          A.   Yes.

10         Q.   Do you find any fault with having a

11 stool located in proximity to Ms. Lindquist while

12 she's operating the press brake?

13         A.   No.

14         Q.   You indicate that the foot switch

15 operator control was between her and the front of

16 the machine; am I correct?

17         A.   Yes.

18         Q.   Do you find any fault with the

19 location of the foot control as it being placed

20 between Ms. Lindquist and the machine?

21         A.   No.

22         Q.   Is that something that you would

23 expect a typical operator to do when operating a

24 press brake?

154

1          A.    Yes.

2          Q.    Let's go to the next paragraph,

3    please.  It says, "Ms. Lindquist testified that

4    she did not activate the foot switch," correct?

5          A.    Yes.

6          Q.    You disagree with that; am I

7    correct?

8          A.    Yes.

9          Q.    You believe that she did activate

10   the foot switch?

11         A.    Yes.

12         Q.    Do you agree that it was an

13   inadvertent activation of the foot switch?

14         A.    Yes.

15         Q.    There's nothing to indicate that she

16   intended to activate the foot switch with her

17   hands in the machine; is there?

18         A.    Yes -- No, correct.

19         Q.    You don't believe that she intended

20   to do this; am I correct?

21         A.    I have no information to determine

22   that one way or another.

23         Q.    You indicate that, "Other Corry

24   employees testified that Ms. Lindquist had to be

1    riding the foot switch and inadvertently depress

2    the actuating pedal as her body position shifted

3    forward as she was reaching into the die area."

4    Did I correctly read that?

5                A.    Yes.

6                Q.    And is it my understanding that

7    your -- Do you believe that she was riding the

8    foot switch?

9                A.    Yes.

10               Q.    Okay.  Is that because of what the

11   other Corry employees have testified to?

12               MR. ROBINSON:   Let me object to the

13   form of that question.

14               Q.    Or is it something else?

15               MR. ROBINSON:   I'll object to the

16   form of that.  I don't know if it's an either/or.

17               A.    It's a combination of the experience

18   that I have over the years and the information

19   that I received reading the discovery material.

20               Q.    What experience do you have over the

21   years that would lead you to believe that on the

22   day of this accident Ms. Lindquist was riding the

23   foot pedal -- the foot control?  I'm sorry.

24               A.    Inadvertent actuations are often the

1    result of shifting weight where people have their
2    foot on the foot control and they move from one
3    position to another, their upper body moves from
4    one position to another, and their weight shifts
5    from their heel to their toe on their foot, and as
6    a result, the foot switch is depressed, and that
7    only happens when the foot is remaining inside the
8    foot switch.
9              Q.   Would you agree, sir, that
10   inadvertent activation can occur as a result of
11   someone's foot going from outside of the foot
12   control inadvertently going inside to the foot
13   control and activating the foot pedal in that
14   mechanism?
15             MR. ROBINSON:   Let me object to the
16   form of that question.
17             A.   That's a possibility, depending upon
18   the type of foot switch that's used for the
19   operation of the machine.
20             Q.   With regard to the foot switch, the
21   Model 511, would you agree, sir, that inadvertent
22   activation can occur by -- when someone's foot is
23   outside of the foot control and inadvertently goes
24   into the foot control as long as it goes far

1    enough back to hit the latch?

2              MR. ROBINSON:  Let me object to the

3    form of the question.

4         A.   Well, that qualification changes the

5    situation that I believe was taking place at the

6    time of Ms. Linquist's occurrence.  Your foot is

7    not going to go 5 inches into the foot control,

8    into the housing, release the toe release, and

9    depress the pedal just by a shifting of the

10   weight.

11             And there was no reason that I could

12   see from the testimony that I reviewed that caused

13   Ms. Lindquist to make any kind of foot movements

14   when she went from one position to another

15   retrieving a part and loading it.  I saw no

16   indication that she was moving anywhere.

17        Q.   You saw no indication that she was

18   not moving either; am I correct?

19             MR. ROBINSON:  Let me object to the

20   form of that question.

21        A.   Well, I think there's sufficient

22   information in the testimony that properly led me

23   to the conclusion that she was staying and

24   remaining in a stationary position.

1          Q.    What testimony did you rely upon to
2   come to that conclusion that she was remaining in
3   the station?

4          A.    The description of where she was
5   located, and where the foot switch was, and where
6   the stool was, and just, you know, what she was
7   doing at the time led me to believe that she
8   wasn't moving, she wasn't going anywhere, she was
9   stationary.

10         Q.    Well, explain to me what your
11  understanding is as to what she was doing at the
12  time as to make her stationary.

13         A.    She was retrieving parts from one
14  side of her, either the right or the left, it
15  doesn't specify, putting them into point of
16  operation, which was very close to her, in front
17  of her, and then taking the finished part and
18  moving it to another station to the other side and
19  just going like this.  (Indicating.)  And there
20  was no need for her to move.  Maybe reach to the
21  far side of the pallet to retrieve parts or to
22  discharge parts, but no need -- on the size part
23  that I understand was taking place here, a
24  relatively small part from the photographs that I

159

1    was able to view, there was no need for her to be

2    mobile at all.

3            Q.   Do you know whether she was sitting

4    or standing or leaning?

5            A.   No.  I think I state this in my

6    report, that there's no definitive evidence that

7    shows whether she was standing, leaning or sitting

8    at the time.

9            Q.   Would that have any bearing on your

10   understanding as to what she was doing with her

11   foot at the time this accident occurred?

12           A.   It may.  If there's no -- If she's

13   sitting, completely sitting, there's no real

14   weight on her feet.  It's really actually more

15   dangerous that way, but it still doesn't really

16   change the end result.

17           Q.   What is more dangerous?

18           A.   Well, if she leaves her foot inside

19   the HOOD, I think the leaning, shifting of weight,

20   has more of a likelihood to cause that switch to

21   be fully released and then reactivated.

22           Q.   If you're sitting?

23           A.   I think so, yes.

24           Q.   But sitting is an appropriate way to

160

1   operate the press brake at the time she was

2   injured; am I correct?

3           A.   An acceptable --

4                MR. ROBINSON:  Objection to form.

5           A.   I'm not going to -- I'm sorry.

6                MR. ROBINSON:  That's okay.

7           A.   I'm not going to say appropriate.  I

8   don't have a problem with people sitting when

9   they're operating press brakes, if they are

10  properly safeguarded.

11               MR. ROBINSON:  I'm sorry, if they

12  are what?

13               THE WITNESS:  If they are properly

14  safeguarded.

15               MR. ROBINSON:  Thank you.

16  BY MR. HARTMAN:

17          Q.   Are you relying upon what the other

18  Corry employees have said in their testimony to

19  come to the conclusion that Ms. Lindquist was

20  riding the pedal?

21          A.   Partially.

22               MR. ROBINSON:  Yeah.  Let me object

23  to the form.  You asked that before, and the

24  witness responded that there were a number of

1  factors, and your question if read back to a jury

2  or a court later would suggest that it was the

3  only factor.

4              MR. HARTMAN:  No.

5  BY MR. HARTMAN:

6        Q.   As part of your decision that she

7  was riding the pedal, are you relying upon other

8  Corry employees?

9        A.   Partially, yes.

10       Q.   What have they said to make you

11 believe that she was riding the pedal?

12       A.   Paraphrasing, their comments were

13 that, after the occurrence, they inspected the

14 machine, operated the machine with the foot

15 control, and found it to be operating in all

16 respects -- operating properly in all respects,

17 excuse me, and determined that there was no -- or

18 there was no likelihood of a phantom-type cycle,

19 so it had to be operated or cycled using the foot

20 switch, and that Ms. Lindquist was more than

21 likely riding the foot switch to cause that to

22 happen.

23       Q.   Well, do you know whether or not the

24 other employees are capable of making the leap

1    from the machine was operating properly,

2    therefore, the foot pedal had to be utilized to

3    activate the machine to conclude that she was

4    riding the foot pedal?

5                    MR. ROBINSON:  Let me object to the

6    form.  That isn't what was said by the witness or

7    by the witnesses that have been referenced.

8         Q.   Go ahead, you can answer.

9         A.   Yes.

10        Q.   You are relying upon their -- You

11   know that they -- How did they reach the decision?

12        A.   You asked me a question, and I

13   answered it yes, and I get the impression that you

14   forgot what the question was.

15        Q.   I did.

16        A.   Maybe you ought to ask her to read

17   it back.

18        Q.   Well, maybe I'll ask them the way I

19   feel like it, and there's no need for us to be

20   confrontational.

21                    MR. ROBINSON:  That was --

22                    MR. HARTMAN:  I'm talking, I'm

23   talking.

24                    MR. ROBINSON:  Don't start raising

1   your voice and suggesting that the witness is

2   being confrontational.

3               MR. HARTMAN:   There's no need to be

4   wise.   And if you ask me if I forget something, I

5   will, and just like when I ask you if you know

6   something, I expect you to give me a full answer.

7   Okay.   I'm not playing games with you; I expect

8   you not to be with me.

9               MR. ROBINSON:   Now, for my comment.

10              MR. HARTMAN:   Go ahead.

11              MR. ROBINSON:   You don't need to be

12  harassing.   You don't need to make statements.

13  You apparently are offended that you forgot your

14  question --

15              MR. HARTMAN:   No.

16              MR. ROBINSON:   -- that he answered.

17              MR. HARTMAN:   No.

18              MR. ROBINSON:   Let me finish,

19  please, please give me that courtesy.

20              MR. HARTMAN:   I will, you deserve

21  it.

22              MR. ROBINSON:   Thank you.   So to

23  suggest that you didn't get a full answer when you

24  don't even remember your question is kind of rude,

1   it's kind of rude, Mr. Hartman. And then for you

2   to raise your voice as you did because you're

3   upset that you forgot your own question, why don't

4   we just move on, and maybe have the court reporter

5   to read it back would be the smart thing to do or

6   ask another question, rather than get

7   confrontational with the witness, please.

8              MR. HARTMAN: Paul, you know, I

9   love the way you twist and manipulate as you

10  always do. The fact --

11             MR. ROBINSON: We've heard that

12  from you before, Mr. Hartman.

13             MR. HARTMAN: The fact is that I

14  can acknowledge mistakes, unlike some people in

15  the room, specifically yourself.

16             MR. ROBINSON: The record is going

17  to show that you cannot acknowledge your mistake,

18  the way you reacted to this witness.

19             MR. HARTMAN: No. I reacted to him

20  being wise, telling me how to ask my questions.

21             MR. ROBINSON: It will speak for

22  itself, please. There's no need for us to

23  continue talking about it. What else do you have

24  to say about it?

165

1                 MR. HARTMAN:  I'm going to talk
2     about it as long as I feel like it.
3                 MR. ROBINSON:  Then keep talking
4     about it.
5                 MR. HARTMAN:  I will, I will.
6                 MR. ROBINSON:  What else do you
7     have to say about it, Mr. Hartman?
8                 MR. HARTMAN:  I'm going to continue
9     asking my questions.
10                MR. ROBINSON:  Sure.  What else do
11    you have to say about this issue?
12    BY MR. HARTMAN:
13          Q.  My question, sir, specifically is:
14    Are you relying upon the co-employees of Corry,
15    other than the fact that they saw the machine
16    recycle, to come to the conclusion that
17    Ms. Linquist's foot was in -- she was riding the
18    foot pedal?
19                MR. ROBINSON:  Objection to the
20    form, asked and answered.
21          Q.  Okay.
22          A.  I don't recall seeing any testimony
23    indicating that any employee saw the machine cycle
24    at the time of Ms. Linquist's occurrence.  As a

1   matter of fact, I think I read that nobody saw the
2   actual cycle of the machine at the time.
3               What I remember reading is that a
4   number of people came to the machine after
5   Ms. Lindquist was freed and taken away and tested
6   the machine and verified that it was operating
7   properly in all respects, concluded that the only
8   way to cycle the machine was through use of the
9   palm -- use of the foot switch which was being
10  used by Ms. Lindquist at the time of the
11  occurrence, and that there was no likelihood of a
12  phantom cycle.
13              You then, you then asked me if I
14  thought that the people at Corry Manufacturing
15  were qualified to make that evaluation, and you
16  expanded on that.  And my answer to that was yes,
17  and the reason for that is that they're there
18  every day and they know how people operate the
19  machines, and they see people operating the
20  machines, and they've probably seen Ms. Lindquist
21  operate the machine or other machines, similar
22  machines, prior to the day of her occurrence, and
23  know what their habits are.
24       Q.   Go ahead, I'm sorry.

1        A.    I'm done.

2        Q.    Do you know with regard to the

3   assumptions you're making, specifically with

4   regard to any of the employees, whether or not

5   they've had the opportunity to make the

6   observation that she was riding the foot pedal on

7   the day of the accident?

8        A.    Well, I think that's the natural

9   conclusion from the comments that were made in the

10  testimony, that they make that conclusion based

11  upon their knowledge of what they've seen in the

12  past, in the past from the previous operations.

13       Q.    You're assuming that, though?

14       A.    I think that's a valid assumption,

15  yes.

16       Q.    But you don't know that?

17            MR. ROBINSON:  Object to the form

18  of the question.  It's argumentive.  You may not

19  like his opinions.  I think it's inappropriate to

20  phrase it in a way that you do.

21       Q.    Okay.  Do you know whether or not

22  that's true or not?

23       A.    Well, I told you it was a conclusion

24  that I came to by reading the depositions.

1        Q.   Okay.  Did you read Ms. Linquist's

2   deposition where she indicated that she had

3   removed her foot from the foot pedal?

4        A.   Yes.

5        Q.   Okay.  Did you factor that scenario

6   into your conclusions?

7        A.   Yes.

8        Q.   Okay.  And would you agree, sir,

9   that if her foot was outside the foot pedal prior

10  to this accident and inadvertently went into the

11  foot pedal and activated the press brake, that

12  would not have been riding the foot control?

13            MR. ROBINSON:  I'll object to the

14  form of the question.

15        A.   If that's a hypothetical that's

16  based on any kind of fact, yes, but I don't know

17  that there's any evidence that supports that

18  hypothetical.

19        Q.   Well, the evidence is Ms. Lindquist

20  said her foot was outside the foot control after

21  the last time she operated it; am I correct?

22            MR. ROBINSON:  Objection, that's

23  argumentive.  That isn't what you just prefaced

24  your question with.  You had the question, the

1   foot being outside, somehow targeting the housing,

2   going all the way back, hitting the anti-trip

3   mechanism, and then depressing the pedal.

4                   MR. HARTMAN:  Okay.

5                   MR. ROBINSON:  That's what he's

6   talking about.  It's argumentive the way you just

7   rephrased it.

8                   MR. HARTMAN:  Why don't you let him

9   tell me what he's talking about, as opposed to you

10  telling him his answer.

11                  MR. ROBINSON:  No.  Your question

12  was very misleading.

13                  MR. HARTMAN:  You had your chance

14  to prepare him this morning.  If you didn't do a

15  good enough job, then don't do it now while I'm

16  asking the questions.

17                  MR. ROBINSON:  See, there again is

18  the unprofessional.

19                  MR. HARTMAN:  Sir, my question

20  is --

21                  MR. ROBINSON:  Let me finish my

22  statement.

23                  MR. HARTMAN:  My question is --

24                  MR. ROBINSON:  Hold on,