# EXHIBIT J

# PART 5

170

1   Mr. Hartman.  We're not going to finish anything

2   until you give me the chance.

3                   MR. HARTMAN:  Go ahead.

4                   MR. ROBINSON:  We don't need the

5   unprofessional comments.

6                   MR. HARTMAN:  That's fine.

7                   MR. ROBINSON:  You've done it a

8   number of times.

9                   MR. HARTMAN:  That's fine.

10                  MR. ROBINSON:  So there's really no

11  need for it.

12                  MR. HARTMAN:  That's fine.

13                  MR. ROBINSON:  You asked a

14  misleading question that was argumentive.

15                  THE WITNESS:  Let's take a break.

16                  MR. ROBINSON:  Hold on.  That was

17  argumentive and it was very misleading, so I

18  raised the objection, and you know you did it, so

19  let's just move on with your next question.

20                  MR. HARTMAN:  Sir, was --

21                  MR. ROBINSON:  Hold on, the witness

22  wants to take a break, so let's take a break.

23                  MR. HARTMAN:  Well, I want to ask

24  one question.

1           MR. ROBINSON:  No, we're taking a
2    break.
3           MR. HARTMAN:  I want to ask one
4    question, sir.
5           MR. ROBINSON:  We are taking a
6    break.
7           MR. HARTMAN:  If you need to take a
8    break --
9           MR. ROBINSON:  You're not going to
10   ask another question.
11   BY MR. HARTMAN:
12        Q.   Sir, my question is:  Was my
13   question to you misleading, so that I can prepare
14   a better question for when you come back off the
15   break; was there any part of my question when I
16   asked you to assume certain facts that was
17   misleading?
18           MR. ROBINSON:  I'll object to the
19   form of that question.
20        A.   And I forget the specifics of the
21   question now after this banter, so when we come
22   back --
23        Q.   When I asked you the question, did
24   you feel it was misleading?

172

1             MR. ROBINSON:  Would you let the

2    witness take the break that he asked for, Mr.

3    Hartman, can you give him that professional

4    courtesy?

5             MR. HARTMAN:  Yeah, I'll do that.

6    I want to prepare my question.  I mean, I want to

7    make sure that it's not misleading.

8             MR. ROBINSON:  We'll have time to

9    do that today.

10            THE VIDEOGRAPHER:  Do you agree to

11   go off the record at the same time?

12            MR. ROBINSON:  Yeah.

13            THE VIDEOGRAPHER:  Then we are

14   going off the record.  One second, please.  We are

15   off.

16                         (Brief recess.)

17            THE VIDEOGRAPHER:  You're back on

18   the record.

19   BY MR. HARTMAN:

20        Q.   Sir, I'm going to restate the

21   question that was proposed to you earlier, and I

22   want you to listen carefully.  I want you to

23   assume that Ms. Linquist's foot was outside of the

24   foot control before she began hand-forming the

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330  FAX (513) 381-3342

```
 1  part on the press brake and that her foot somehow
 2  inadvertently activated the foot control so as the
 3  die closed in on her hand -- the press closed in
 4  on her hand.
 5             Would you agree, sir, that under
 6  those circumstances there's no indication that she
 7  would have been riding the foot control prior to
 8  the activation?
 9             MR. ROBINSON:  I'll object to the
10  hypothetical, not based upon facts of record.
11        A.    Based upon that hypothetical, I have
12  to say no.
13        Q.    No, what?
14        A.    Or yes.
15        Q.    Yes?
16        A.    Yes.
17        Q.    Okay.  Yes, there's no evidence of
18  riding the foot control in that situation; am I
19  correct?
20        A.    Yes.
21        Q.    On page 3 of your report under
22  "Standards and Regulations," it says:  "The
23  American National Standards Institute is a private
24  organization that is in the business of providing
```

174

1    procedures and governance for the development of a

2    national consensus standards."  Did I correctly

3    read that?

4              A.   Yes.

5              Q.   Am I correct, sir, that ANSI sells

6    standards; they don't adopt standards?

7                   MR. ROBINSON:   They do what?

8              A.   No.

9              Q.   Sell the standards.

10                  MR. ROBINSON:   Sell the standards?

11             Q.   Yes.

12             A.   They do sell standards, yes.

13             Q.   ANSI does not write standards; am I

14   correct?

15             A.   That's correct.

16             Q.   Another group writes the standards

17   and adopts standards?

18             A.   Well, what do you mean by adopt?

19             Q.   Well, what does the subcommittee

20   group do in order to get -- develop a standard?

21             A.   They sit down and write a standard.

22             Q.   And then, ultimately, it's approved

23   by a certain number of the members of the

24   subcommittee; am I correct?

1          A.    Not the subcommittee.  A different

2    committee.

3          Q.    Who's the different committee?

4          A.    The committee that's established by

5    the standards development organization.

6          Q.    And that would be the subcommittee

7    picks a committee to approve of the subcommittee's

8    standard?

9          A.    No, the other way around.  The

10   Accredited Standards Committee picks a

11   subcommittee to write a standard.  The

12   subcommittee writes the standard, and the

13   Accredited Standards Committee approves it.

14         Q.    And ANSI basically markets the

15   standard; am I correct?

16         A.    No.  ANSI gives its final approval,

17   which basically gives it the ANSI label.  It's not

18   an ANSI standard until ANSI approves it.

19         Q.    Well, sir, am I correct that ANSI

20   doesn't evaluate the standard itself, they

21   evaluate the procedures by which the standard was

22   developed?

23         A.    Correct.

24         Q.    So when ANSI adopts a standard, they

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330  FAX (513) 381-3342

176

1   merely say by adopting it that that standard has

2   met their procedural requirements so that they can

3   say it's theirs now?

4         A.   The operative term is "approve," not

5   adopt, approve.

6         Q.   Okay.  So when ANSI approves a

7   standard, they're not approving the substance of

8   the standard, they're approving the procedure by

9   which the standard was developed?

10        A.   Correct.

11        Q.   ANSI doesn't write standards and

12  evaluate the standards from a substantive basis?

13        A.   Correct.

14        Q.   Are you aware that ANSI now is

15  moving further away from their standards?

16             MR. ROBINSON:  Object to the form

17  of the question.

18        A.   I don't understand what you mean by

19  that question.

20        Q.   Mr. Switalski indicated that ANSI is

21  now trying to move out of the standards business

22  because they don't want liability for standards

23  that have been approved by them; are you aware of

24  that?

1        A.    No.

2        Q.    You're not aware of lawsuits that

3   have been brought against ANSI for standards that

4   have been issued that have caused injury?

5             MR. ROBINSON:   I'll object to the

6   form of that question.

7        A.    No, I know of no standard that's

8   ever caused an injury.

9        Q.    Okay.  Do you know of any litigation

10  brought by ANSI by an injured because they took

11  issue with the standard that ANSI approved?

12       A.    No.

13       Q.    Is ANSI undertaking any type of

14  changes in its corporate structure that you're

15  aware of as it relates to identifying itself with

16  the standards that historically it had approved?

17       A.    I'm not aware of any.

18       Q.    Let's go to page 4, second full

19  paragraph, it says:  "Although, power presses and

20  power press brakes are both metal-forming machine

21  tools, there exists significant differences in the

22  operation and safety aspects of these machines so

23  as to justify two different safety standards"; am

24  I correct?  Did I correctly read that?

178

1           A.    Yes.

2           Q.    Is that your testimony today?

3           A.    Yes.

4           Q.    And once again, just for

5    clarification, you would not apply a power press

6    standard to press brakes nor would you do it vice

7    versa; am I correct?

8           A.    Except for the qualification that I

9    stated earlier this morning.

10          Q.    Which was?

11          A.    In some applications a press brake

12   is used to do power press-type work; remember

13   that?

14          Q.    Right.

15          A.    Okay.

16          Q.    With regard to foot controls,

17   though, you wouldn't apply the power press

18   standard to the press brake standard?

19          A.    Not necessary, no.

20               MR. ROBINSON:  I object to the form

21   of that question.

22          Q.    And with regard to evaluation to

23   safety of a particular type of foot control, you

24   would not analyze that foot control on punch

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330  FAX (513) 381-3342

1   presses and then make the conclusion -- apply that

2   conclusion to press brakes; would you?

3                   MR. ROBINSON:  Objection to the

4   form.

5           A.   I see no need to do that, no.

6           Q.   So if you're analyzing foot controls

7   and press brakes, you would analyze foot controls

8   on press brakes?

9                   MR. ROBINSON:  Object to the form

10  of the question.

11          A.   Yes.

12          Q.   You wouldn't analyze foot controls

13  on punch presses?

14                  MR. ROBINSON:  Same objection.

15          A.   For the -- For what purpose?

16          Q.   For the safety of the foot control

17  as it relates to utilizing it on a press brake.

18          A.   Oh, I don't know.  You may want to

19  cross-reference that.  You may want to look at

20  what's written in another standard.  We do that

21  all the time, as we did all of the new standards

22  or as we revise old ones, to share the knowledge

23  of what another subcommittee has written about a

24  particular subject.  I can't say that we've done

1    that with regard to foot switches over the years,
2    but certainly with respect to programable logic
3    controllers and other types of systems on
4    machinery, we utilize the work of other
5    committees, rather than to try to reinvent the
6    wheel when we're working on our own standards in
7    our own subcommittee.
8              Q.   But with regard to foot controls on
9    press brakes, you would analyze foot controls
10   utilized in conjunction with press brakes; am I
11   correct?
12             MR. ROBINSON:  Objection, asked and
13   answered.  You've just ignored what he said.
14             Q.   Am I correct, sir?
15             A.   No.  You just -- I just answered
16   your question --
17             Q.   No.  You --
18             A.   -- by saying that we may or may not
19   evaluate what's written in another standard
20   regarding foot switches or foot controls for all
21   of the reasons that I just gave you in that answer
22   about referencing what other standards have
23   written about programable logic controls and
24   things like that.  The dynamic of developing a

1    standard is such that you don't do it in a

2    subcommittee in a vacuum.  You do it in a

3    subcommittee gleaning information and knowledge of

4    what other subcommittee work is being done and

5    gain from the overall experience of the other

6    people.

7              Q.   With regard to drafting a standard,

8    you're talking about that context; am I correct?

9              A.   Yes.

10             Q.   But if you were out there evaluating

11   whether or not you wanted to put a foot control on

12   a press brake, the type you should utilize, would

13   I be correct that you would want to analyze foot

14   controls used on press brakes to see which is the

15   safest?

16             MR. ROBINSON:  Objection, asked and

17   answered, also to the form.

18             A.   Yeah.  I think, I think the same

19   type of dynamic takes place out in the actual

20   workplace.  When a user of a press brake for one

21   reason or another is having a problem with a

22   control mechanism, whether it's a foot control or

23   a palm button or whatever it is, they may look at

24   the control on another machine and say that's a

1    pretty good control, works pretty good for our

2    people, even though it may be on an injection

3    molding machine or something completely different,

4    you know, that works well, the people are used to

5    it, they're comfortable using it, and that type of

6    control would work on this machine, does it -- and

7    then make the evaluation, if that control creates

8    any conflict with the particular ANSI standard for

9    the machine that you're working on.

10            Q.    Do you believe that the

11   hazards -- Do you believe there's the same hazard

12   associated with inadvertent activation of punch

13   presses as it relates -- exists as the hazard in

14   conjunction with press brakes?

15            MR. ROBINSON:   Objection to the

16   form.

17            A.    I need to hear that again.   I'm

18   sorry.

19            Q.    Okay.   Is there any difference in

20   the number of -- Strike that.

21            Is riding the foot control -- the

22   propensity to ride the foot control the same on

23   punch presses as it is press brakes?

24            MR. ROBINSON:   Object to the form.

183

1        A.    I can't answer that question

2   definitively.  It all depends on the work that's

3   being performed on the machine, press brake versus

4   punch press or power press.

5        Q.    How about the typical application

6   that you would use a press brake as opposed to the

7   typical application for a punch press, is riding

8   the foot control as prevalent on a press brake in

9   its typical use as opposed to punch presses?

10       MR. ROBINSON:   Objection to the

11  form.

12       A.    I don't think I can answer that

13  question because of the varied uses I've seen for

14  both of those particular machine types.  There are

15  jobs on power presses that are more conducive to

16  riding than there are elsewhere on other machines,

17  on other presses, and the same for press brakes.

18  Some jobs are just -- you know, invite that type

19  of operation, whereas, other jobs make it very

20  impractical to ride.  So it's really hard to say

21  that, you know, power press work is more conducive

22  to riding than press brake work.  It just doesn't

23  fit that way.

24       Q.    So you don't know?

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330  FAX (513) 381-3342

184

```
 1              MR. ROBINSON:  No, no, no.
 2   Objection to the form.
 3              THE WITNESS:  That's not what I
 4   said.
 5              MR. ROBINSON:  He said he can't
 6   make the determination.  He didn't say he doesn't
 7   know.
 8   BY MR. HARTMAN:
 9        Q.   Well, if you can't make a
10   determination, do you know?
11              MR. ROBINSON:  Well, you can argue
12   that all you want until you're blue in the face,
13   that's your own interpretation of that.  I object
14   to the form.
15        Q.   When you say you can't make a
16   determination, would I be correct in stating that
17   you can't give an opinion as to whether or not
18   there's a greater propensity for riding the pedal
19   with press brakes as opposed to punch presses?
20              MR. ROBINSON:  Yeah, objection.
21   That isn't what he said.  He said you can't make a
22   determination, they both have propensities, and
23   you can't categorize one versus the other as you
24   want him to do.
```

1             MR. HARTMAN:  I'm not asking him to

2    categorize.

3             MR. ROBINSON:  No, that is what you

4    wanted him to do.  He's given you an answer.

5             MR. HARTMAN:  Paul, let me ask my

6    question, okay?

7             MR. ROBINSON:  I did.

8             MR. HARTMAN:  Quit testifying.

9             MR. ROBINSON:  Now I'm objecting to

10   it.

11            MR. HARTMAN:  Quit testifying.

12            MR. ROBINSON:  There's no testimony

13   here.

14            MR. HARTMAN:  Yes, there is.

15   BY MR. HARTMAN:

16        Q.   Do you know whether or not the

17   hazard of riding the foot control is greater

18   than -- greater on a press brake than it is on a

19   punch press?

20            MR. ROBINSON:  Objection, asked and

21   answered, also to the form.

22        A.   The hazard is the same.  Whether it

23   happens more often on one versus the other,

24   there's just too much variety, variability, in the

1    operation of the machines in their own particular

2    families to make that determination that one is

3    more likely to be ridden than the other, just

4    can't make that determination.

5                Q.    So you're saying it's based on the

6    use to which the machine is put to at the

7    particular time gives rise to the risk?

8                A.    Use of a machine at a particular

9    time, use of a machine in a particular facility

10   that makes a particular type of part.  There's --

11   It's all over the ballpark.

12               Q.    Is there a correlation between the

13   speed by which you have to operate the machine

14   with the foot control and the propensity to ride

15   the pedal?

16               MR. ROBINSON:  Objection to the

17   form.

18               A.    Not in my experience.

19               Q.    So if you have to do 60 parts a

20   minute as opposed to 20 parts a minute, the

21   propensity to ride the pedal with a particular

22   foot switch would not be greater in 60 parts per

23   minute as opposed to 20 parts per minute?

24               MR. ROBINSON:  Objection to form.

187

1              A.    Not in my experience.

2              Q.    Would there be a difference with

3      regard to propensity of riding the pedal with

4      regard to actions you have to take after you've

5      formed the part or work with the part and the

6      propensity to ride the pedal?

7                    MR. ROBINSON:  Objection to the

8      form.

9              Q.    Meaning, if you have to form the

10     part and then put it somewhere, does that increase

11     or decrease the propensity to ride the pedal?

12                   MR. ROBINSON:  Objection to the

13     form.

14             A.    It depends on where somewhere is.

15     If it's a step away or two steps away, then

16     obviously riding the foot pedal is not taking

17     place, but if it's within arm's reach, riding the

18     foot pedal could continue to take place.  So there

19     is a function there.

20             Q.    Okay.  Is there a correlation

21     between the propensity to ride the pedal based on

22     sitting or standing?

23                   MR. ROBINSON:  Objection to the

24     form of the question.  Excuse me, I'm sorry.

1          A.    Not in my experience.

2          Q.    What factors correlate to the

3    increased propensity to riding the pedal in your

4    experience?

5                MR. ROBINSON:  Objection, asked and

6    answered at length, also to the form.

7          A.    The type of work that's being

8    performed on a machine, the type of safeguarding,

9    the type of use of the machine, the size of the

10   part, the location of the parts as the blanks

11   before they go into the work area, as they're

12   retrieved from the work area and where they're

13   stored after, the type of foot control, the

14   location of the foot control, all of those are

15   factors, the posture and position of the operator,

16   the build of the operator, all of that goes into

17   the dynamic of operating machinery.

18         Q.    In your 29 years with Cincinnati,

19   did you ever come across any information that

20   Cincinnati's inclusion of a gated foot control

21   with its press brakes gave rise to increased

22   riding of the pedal?

23                MR. ROBINSON:  Objection to the

24   form, also asked and answered.

1      A.    Yeah, I think I answered that once

2  before, that there was no data, but there was just

3  a continued awareness that riding of the foot

4  pedal was becoming a common occurrence on gated

5  foot switches.

6      Q.    Was there any difference on the foot

7  switches between -- You know what a mouse trap

8  design is?

9      A.    A mouse trap design?

10      Q.    Yeah.  Do you know what a top-hinged

11  or bottom-hinged gated foot control is?

12      A.    Yeah.

13      Q.    What is the bottom -- The mouse trap

14  design, my understanding is that it's a

15  bottom-hinged gated foot control.

16      A.    The Allen Bradley switch, yeah.

17      Q.    Is there a difference in the

18  riding -- incidence of riding the pedal between

19  the bottom-hinged gated foot control as opposed to

20  a top-hinged gated foot control?

21           MR. ROBINSON:  Objection to the

22  form.

23      A.    In my experience on most of the

24  Allen Bradley bottom-hinged switches that I've

1    seen, the trap door has been removed or the spring

2    has been cut.

3                  MR. ROBINSON:  Or, I'm sorry?

4           A.    Spring has been cut.

5                  MR. ROBINSON:  Thank you.

6           A.    So the trap door lays flat and it's

7    out of the picture.

8           Q.    Okay.  And on the top-hinged ones

9    like the Linemaster 511 -- Is that what Cincinnati

10   utilized?

11                 MR. ROBINSON:  Objection to the

12   form.

13          A.    Yes.

14          Q.    Okay.  Are you aware of

15   Cincinnati -- Did Cincinnati ever do a safety

16   alert or a recall notice or something to its -- to

17   the owners of its press brakes that they were now

18   offering gated foot controls?

19          A.    Yes.

20          Q.    Okay.  And do you recall what those

21   safety alerts said?

22                 MR. ROBINSON:  Let me object to the

23   form, just the terms that you chose, I don't --

24   Let me just leave it at that.

1           A.    The company developed product safety
2    data sheets on each feature that was available on
3    press brakes or shears or whatever products that
4    the company was making.  And the foot switch had
5    its own particular product information sheet
6    describing what it did and what the retrofit
7    package included and how to go about obtaining a
8    retrofit package.
9           Q.    Were you part of that
10   decision-making process?
11          A.    I was part of the development of
12   that data sheet.
13          Q.    Okay.  And was that data sheet
14   accurate as it was put out to the public?
15          A.    Actually, I should correct that
16   prior sentence.  I was involved in the revision
17   and updating of that data sheet, because that data
18   sheet was generated before I joined the product
19   safety department.  And, of course, it was
20   accurate in what it said.
21          Q.    Do you agree that a safety retrofit
22   kit that included a gated foot control was safer?
23                MR. ROBINSON:  Object to the form
24   of the question.

192

1          A.    No.

2          Q.    Was it more dangerous?

3          A.    No.

4          Q.    Would it be safer in circumstances?

5               MR. ROBINSON:  Object to the form

6    of the question.

7          A.    Yes.

8          Q.    Was the gated foot control to --

9    utilized to prevent inadvertent activation of the

10   foot control?

11         A.    Yes.

12         Q.    If the gate is in place and the

13   operator is not riding the pedal, does the gate

14   work to inhibit inadvertent activation of the foot

15   control?

16         A.    Yes.

17               MR. ROBINSON:  Objection to the

18   form.

19         A.    Yes, but, you know, sistering to

20   your previous question, is it safer, yes, in some

21   respects; it's more dangerous also in some

22   respects, too.  So they balance itself -- it

23   balances itself.

24         Q.    It's more dangerous because of why?

1          A.    Because it encourages riding the

2     foot switch.

3          Q.    Well, is it your testimony today,

4     sir, that the dangers of riding the foot control

5     are equal to the benefit of preventing inadvertent

6     activation when the foot -- the gated foot control

7     is made available to the public?

8               MR. ROBINSON:   Object to the form

9     of the question.

10         A.    In the overall scheme of things,

11    yes.

12         Q.    So it's a neutral device, then?

13         A.    Yes.

14         Q.    It really -- From your testimony, it

15    doesn't make the machine safer?

16         A.    It never was -- I think that's a

17    mischaracterization of what the trap door or the

18    flapped-gated foot switch was ever intended to do.

19    It was intended to reduce the likelihood of an

20    inadvertent actuation of the machine.  Whether a

21    machine is inadvertently actuated or not, if it's

22    properly safeguarded, everything is okay.  You can

23    still have some damage to machine components and

24    things like that in an inadvertent cycle of the

194

1    machine, but if the machine is properly
2    safeguarded, you're not going to get an individual
3    injured.
4             Q.   Is it your testimony today that a
5    properly safeguarded machine cannot cause injury
6    to anyone through an inadvertent activation?
7             A.   Of course not.  That's not what I've
8    said all day long.
9             Q.   Okay.  So a properly guarded machine
10   can cause injury to the operator in certain
11   circumstances; am I correct?
12               MR. ROBINSON:  I'll object to the
13   form.
14             A.   Not only the operator.  You just
15   said it before, you said it could be anybody, and
16   that's a true statement.
17             Q.   The operator --
18             A.   So don't just narrow it down to the
19   operator.
20             Q.   Okay.  Or the operator could be
21   injured; am I correct?
22             A.   Yes.
23             Q.   The person -- A coworker could be
24   injured, correct?

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330  FAX (513) 381-3342

1          A.    Yes.

2          Q.    The maintenance people can be

3    injured; am I correct?

4          A.    Yes.

5          Q.    A technician can be injured; am I

6    correct?

7          A.    You can say "personnel," just say

8    "personnel," that term.

9          Q.    All personnel could be injured on a

10   properly guarded machine at certain times?

11         A.    That probability exists.

12              MR. ROBINSON:   Continuous objection

13   to the form of all of those questions.

14         Q.    Would I be fair, sir, to say that

15   you know of that actually happening out there in

16   the field in your 30 years of experience?

17         A.    Of what?

18              MR. ROBINSON:   Objection.   We went

19   through all of these questions and answers

20   previously in the deposition.

21              MR. HARTMAN:   Well, Paul, if we

22   have, which I disagree, what does your objection

23   do, because I'm going to continue asking anyway,

24   so what does your objection do?

1           MR. ROBINSON:  What does it do?

2           MR. HARTMAN:  Yes.

3           MR. ROBINSON:  It preserves the

4    objection to asked and answered.

5           MR. HARTMAN:  Oh, okay.

6           MR. ROBINSON:  So once you've

7    already gotten your answer that you're not

8    satisfied with, if you ask it again and the

9    witness says something different, then the law

10   doesn't allow that trap to occur, to answer your

11   legal question.

12          MR. HARTMAN:  It wasn't a trap.

13          THE VIDEOGRAPHER:  Excuse me, can

14   we go off the record for one second, please.

15                         (Brief recess.)

16          THE VIDEOGRAPHER:  You're back on

17   the record.

18   BY MR. HARTMAN:

19       Q.  Sir, are you aware of individuals

20   being injured when there was proper point of

21   operation protection on press brakes?

22          MR. ROBINSON:  Same objection.

23       A.  Yes.

24       Q.  Do you -- Today can you describe any

1    examples of how that would occur?

2             A.    An operator is operating a press

3    brake and the point of operation safeguarding

4    utilized for the job that was being done is a

5    presence sensing device.  The presence sensing

6    device is set for the operator while he or she is

7    in position in front of the machine loading the

8    part, removing the part, so the bottom-most light

9    casts its beam across the top of the work piece

10   and, you know, above the operator's hands.

11            During the operation, the operator

12   goes and gets a chair and sits down and continues

13   operating the press brake doing the same job.  Now

14   his hands are coming at the point of operation at

15   a different angle, which is lower and below the

16   sensing field of the point of operation.  He

17   cycles the machine thinking -- or his foot is in

18   the foot control, and he reaches in thinking that

19   the light beam is going to stop the machine, and

20   in actuality, he's reaching under the light

21   device, and an injury takes place.

22            Q.    I believe your report indicates that

23   a brake press is part of a system; am I correct?

24            A.    Yes.

198

1           Q.   Would you agree that with regard to
2     the brake press, when it's sold in conjunction
3     with a foot control, that both the brake press and
4     the foot control should be designed so as to
5     inhibit to the extent feasible inadvertent
6     activation?
7                 MR. ROBINSON:  I'll object to the
8     form of that question.
9           A.   No.  There's no practical way for a
10    supplier of a press brake to do that and ensure
11    that that is -- ensure that that gets done once
12    the machine is put in operation.
13          Q.   Okay.  Would you agree that, when a
14    foot control is supplied with a press brake, that
15    the foot control should be designed so as to
16    inhibit to the extent feasible inadvertent
17    activation?
18                MR. ROBINSON:  Objection to the
19    form.
20          A.   That's part of the requirements in
21    the ANSI standard.  Yes.
22          Q.   And is inadvertent activation of a
23    foot control ever a good thing?
24                MR. ROBINSON:  Objection to the

199

1   form.

2          A.   No.

3          Q.   Would you agree, sir --

4          A.   I think that's a -- No, I have to

5   say no to that question, but -- yeah, that's no.

6          Q.   Would you agree that, had not

7   Ms. Lindquist inadvertently activated the foot

8   control on the date of her accident, she wouldn't

9   have suffered the injuries she had?

10              MR. ROBINSON:  Objection to the

11  form.

12         A.   Say that again.

13         Q.   Would you agree, sir, that had not

14  Ms. Lindquist inadvertently operated the foot

15  control on the day of her accident, she wouldn't

16  have sustained the injuries she sustained?

17              MR. ROBINSON:  Same objection.

18         A.   If she had not inadvertently

19  actuated the foot switch, the machine would not

20  have cycled, no.

21         Q.   And she wouldn't have been injured,

22  correct?

23         A.   Correct.

24         Q.   And if there was a gate on the foot

1   control that she was utilizing that day and that
2   gate had operated so as to prevent her from
3   inadvertently activating the foot control, she
4   wouldn't have had the injuries she has today; am I
5   correct?
6                   MR. ROBINSON:  I'll object to the
7   form of the question.
8           A.   No, I don't believe that.  The gate
9   serves the same purpose as the toe release.  We
10  really don't know whether the foot switch on the
11  day of the operation had a toe release or not.  A
12  lot of people are speculating about that, but, you
13  know, whether there was a toe release or whether
14  there was a gated foot switch or whether it was a
15  foot switch with neither, I think the likelihood
16  of it happening is all the same because I think
17  her foot was there inside the switch.
18          Q.   Sir, if you assume that
19  Ms. Lindquist testified accurately when she said
20  her foot was outside of the foot control before
21  the activation of the machine that caused her the
22  injury, and there was a gate on the foot control,
23  and the gate served its purpose so as to prevent
24  or inhibit inadvertent activation, would you agree

201

1   under that set of circumstances this accident

2   would not have occurred?

3                  MR. ROBINSON:  Objection to the

4   form of the question.

5          A.   Well, there's no arguing that.  I

6   mean, given that very narrow, specific set of

7   circumstances and assuming that the gate performed

8   its function, you're making a lot of assumptions,

9   but you have to agree with that, yes.

10         Q.   Well, the gate's intended function

11  is to prevent the foot from going in the foot

12  control inadvertently; am I correct?

13         A.   Yes, and we know that that doesn't

14  always happen to do that.

15         Q.   But it does work in a majority of

16  the situations; am I correct?

17                 MR. ROBINSON:  Objection.

18         A.   But it doesn't always do that.

19                 MR. ROBINSON:  Please, objection.

20         Q.   But I'm asking --

21                 MR. ROBINSON:  Hold on.

22                 MR. HARTMAN:  Go ahead.

23                 MR. ROBINSON:  I want to make sure

24  there's an objection to the form of that question.

202

1   BY MR. HARTMAN:

2         Q.    Well, would you agree, sir, that

3   nothing always happens?

4         A.    That's right.

5               MR. ROBINSON:  I'll object to the

6   form of that question, and it's also argumentive.

7         Q.    Would you agree that no safety

8   feature always works?

9               MR. ROBINSON:  Objection to the

10  form.

11        A.    I can't answer that question.

12  That's a pretty broad -- Given time, I could

13  probably come up with some safety feature that's

14  always functional, always works.

15        Q.    But none off the top of your head

16  today, correct?

17        A.    Not right off the top of my head,

18  no.

19        Q.    Okay.  And the intended function of

20  the --

21        A.    Acknowledging that you guys need to

22  get airplanes out of here too.

23        Q.    Well, I'm going to ask you, the

24  intended function of the gate on the foot control

1    is to prevent the foot from inadvertently sliding

2    into the foot control, correct?

3                MR. ROBINSON:  I'll object to the

4    form of the question and the term "prevent."

5           A.    The intent is to minimize

6    inadvertent actuation of the foot switch, the same

7    as the toe release is to minimize inadvertent

8    actuation.

9           Q.    And if you have a toe release and a

10   foot control -- Strike that.

11               If you have a toe release and a gate

12   on a foot control, there's two means that would be

13   utilized to prevent inadvertent activation of the

14   foot control; do you agree?

15               MR. ROBINSON:  Object to the form.

16          A.    Yes, just like there's two means to

17   encourage riding of the foot switch.

18          Q.    But you have no evidence or no

19   research that shows that that occurs on that

20   particular foot switch; do you?

21               MR. ROBINSON:  I'll object to the

22   form of the question.  It ignores all of his prior

23   testimony.  It's been asked and answered.

24               THE WITNESS:  I'm sorry?

1          MR. HARTMAN:  Read back the

2    question.

3    (The record was read back by the court reporter.)

4    BY MR. HARTMAN:

5          A.   I think I've testified previously

6    that my experience of working in the industry and

7    being in factories over the past 30 years has

8    educated me on that particular situation.

9          Q.   Do you believe, sir, today that if a

10   safety device by being placed on a machine offers

11   the same amount of benefit as it does harm that it

12   should be included standard on a machine?

13         MR. ROBINSON:  Objection to the

14   form, breadth.

15         A.   I can't answer that without knowing

16   more about the circumstances surrounding a

17   particular machine or surrounding a particular

18   safety device.

19         Q.   Well, if, sir, your testimony is is

20   that a gated foot control promotes riding the foot

21   control, and by promoting the riding of the foot

22   control, the number of injuries is the same as

23   that -- those injuries that would have been

24   prevented by the gate by inhibiting inadvertent

205

1    foot control, activation of the foot control, do

2    you think that type of device should be included

3    with the machine?

4                MR. ROBINSON:  Objection to the

5    form.

6           A.    I think I testified earlier that

7    with proper supervision a gated foot control can

8    achieve its stated goal; but like anything else

9    that takes place in the workplace, it requires

10   management oversight, and supervision, and

11   discipline.

12          Q.    I understand that.

13          A.    So if you don't enforce rules and

14   enforce things like no riding of the foot controls

15   or tying up of the trap doors or tying back of the

16   toe releases -- if those types of things are

17   allowed to happen, then you're going to see the

18   same result as if they didn't exist at all.

19          Q.    All right.

20          A.    But if you do enforce all of those

21   things and ensure that trap doors, gates, do not

22   get tied up or foot controls do not get ridden,

23   then the result will be a decrease in occurrences,

24   I believe.