# EXHIBIT J

# PART 6

1          Q.    I appreciate that, but that was not
2    responsive to my question, sir.  My question is,
3    assuming the benefits of the foot -- gated foot
4    control equal the detriments of the foot control,
5    do you believe -- Strike that.
6               Sir, I want you to assume that the
7    benefits of the gated foot control are equaled by
8    the detriments of the gated foot control; in that
9    situation do you believe a gated foot control
10   should be supplied with a machine?
11              MR. ROBINSON:  Object to the form,
12   the breadth.
13         A.    The problem is that what you're
14   balancing is or what you're stating is a
15   characterization of my testimony earlier when I
16   said in the overall scheme of use of these foot
17   controls.  There are places, there are industrial
18   places that I've been into where foot controls
19   with gates on the openings of them are completely
20   functional, and then there are other places where
21   they are completely useless, and then there are
22   other places, yet, that there's a mix.
23              So in the overall scheme of things,
24   it may be a push between whether it's more

1   beneficial than it isn't; but, you know, for some

2   people, it may be just what they need, and for

3   those people, it's worth being there.

4              So I guess that answers your

5   question by saying I would not recommend not to

6   provide a gated foot switch, if that is what the

7   selection of an original equipment manufacturer

8   chose to do or if that's what a user chose to buy

9   from Linemaster, you know.  If they can make it

10  work for them and they can supervise the proper

11  use of it, then that's fine and that's perfect.

12  That's exactly what we're trying to achieve in

13  safety.

14         Q.   I understand what your analysis is,

15  but I'm asking you that, if you assume that the

16  benefits of a gated switch in the general

17  population to which you're selling the switch

18  along with your machine are equal to the

19  detriments that switch will provide, in that

20  situation do you provide the gated foot control as

21  a standard piece of equipment?

22             MR. ROBINSON:  Objection, asked and

23  answered.  I object to the form, but he's just

24  indicated an answer to that very question saying

208

1    that you can't do it like that.

2              A.    I can't answer that question any

3    differently.  If you don't like what I said, I'm

4    sorry, you're going to have to live with it

5    because I cannot come up with a different answer.

6              Q.    Well, you haven't answered the

7    question.

8              MR. ROBINSON:   That's argumentive

9    and that's not true at all.

10             MR. HARTMAN:   Fine, fine.

11   BY MR. HARTMAN:

12             Q.    With regard to including a safety

13   device on a machine, if the cost is equal to the

14   detriment of including that device on a machine,

15   do you as a safety engineer include that device on

16   the machine as standard equipment or does the

17   cost -- does the benefit of the machine have to

18   outweigh the detriment of the safety device?

19             MR. ROBINSON:   Objection to the

20   form.

21             A.    You don't do that, you don't look at

22   one safety device and try to do a cost/benefit

23   analysis of just that device.  You have to look at

24   the overall picture of what is being done, the

1    cost of the machine, cost of everything, the

2    production and everything involved in it.  You

3    just don't look at the cost of a gate on a foot

4    switch versus the cost of no gate on the same foot

5    switch.

6            Q.   No, I'm sorry, maybe that's our

7    confusion.  When I talk about "cost," I'm talking

8    about -- In the context of a gated foot control,

9    I'm saying the cost of the gated foot control

10   would be the increase in incidence -- according to

11   your testimony, the increase of incidence of

12   riding the foot pedal and accidents that may occur

13   because of that.  The benefit of the gated foot

14   control is that it prevents inadvertent activation

15   of the machine in certain instances.  When I talk

16   about the "cost," I'm talking about the number of

17   accidents that it may -- the number of people that

18   might be injured because of the device, and I'm

19   talking about the benefit, the number of people

20   who are protected by the device.

21            I'm asking you, sir, when you do an

22   analysis of a safety feature, do you do a

23   cost/benefit analysis in that regard?

24            MR. ROBINSON:  I object to the form

210

1   of the question.  That was asked previously, and

2   he gave an answer at length.

3          Q.   Sir?

4          A.   You do the cost/benefit analysis

5   that is more comprehensive than what you're just

6   simply asking here, and if everything balances

7   out, then you have to make the decision.

8          Q.   Who is "you"?

9          A.   You as the user or you as a supplier

10  or you as the one making the decision of whether

11  to go with a flapped foot switch or gated foot

12  switch or non gated foot switch.  You have to make

13  that moral, that economic, you know, that

14  practical decision.  If you're the user and you're

15  in a facility and you're looking at your employees

16  and you know what your employees do and you know

17  what their habits are, you go with the best way --

18  the best feature that is compatible with what they

19  do and achieves the greatest safety for you.

20         Q.   But how about if you're the

21  manufacturer of the press brake and you're

22  including a gated -- a switch with your machine,

23  do you make that same type of analysis?

24              MR. ROBINSON:  Object to the form

211

1    of the question.

2            A.    If you -- You know, if you have the

3    information needed to make that kind of

4    cost/benefit analysis, and for the most part,

5    manufacturers of those machines I believe do not

6    have that information because they don't know the

7    work force, they don't know the environment,

8    supervisory environment, the management

9    environment within which the machines are going.

10   So they make a decision, I would guess, based upon

11   the custom and practice in the industry at the

12   time.  Look around at what the other machine tool

13   makers are using, you know, is it practical for

14   your particular machine.

15            You know, I'm sure Singer who makes

16   sewing machines, if they still make sewing

17   machines, are not going to include or consider

18   gated foot switches for their sewing machines.

19   It's an inappropriate application for their

20   particular situation.  You know, that's the kind

21   of thing that I would expect an OEM to do.

22            Q.    Did Cincinnati ever do an analysis

23   as to the people that would be protected by gated

24   foot switches as opposed to people who would be

212

1    injured by gated foot switches because of misuse

2    of the gated foot switch?

3            MR. ROBINSON:  Objection, asked and

4    answered.

5        A.   I don't know.  I never saw one.

6        Q.   Okay.  On page 4 of your report, you

7    talk about the OSHA citation that was given to

8    Corry, I believe; am I correct?

9            MR. ROBINSON:  That he references

10   it on page 4 or that they were given a citation?

11       A.   Yeah, I believe it's in the bottom

12   paragraph, as a matter of fact, 1910.212 is the

13   section under which the Corry Manufacturing was

14   cited by OSHA.

15       Q.   Would you agree, sir, that no matter

16   how bad the foot switch would have been as

17   supplied by Heim, that Heim would not have ever --

18   would not have received any citation from OSHA?

19           MR. ROBINSON:  I object to the

20   form.

21       A.   This citation, this whole thing

22   about OSHA here and the citation under 212 against

23   Corry had nothing to do with the foot switch.  It

24   doesn't even talk about the foot switch.

213

1          Q.   I understand that.  But if the foot

2   switch was defective, assuming that it was, OSHA

3   wouldn't cite Heim; would they?

4               MR. ROBINSON:  Object to the form

5   of the question.

6          A.   No.

7          Q.   OSHA just cites the employer, they

8   don't go cite the manufacturers of machinery; do

9   they?

10         A.   No.  We talked about that earlier

11  this morning.

12         Q.   Just clarifying it with regard to

13  this specific provision.  So the fact that OSHA

14  cited Corry for certain violations is not an

15  indication that the Heim press brake was safe or

16  not safe --

17              MR. ROBINSON:  I'll object to

18  the --

19         Q.   -- in its design?

20              MR. ROBINSON:  I apologize for

21  interrupting.  I'll object to the form of the

22  question.

23         A.   That's correct.  It's relative to

24  the use of the machine on the day of the Lindquist

214

1    occurrence.

2          Q.    On page 5 we talk about HOOD.  Is it

3    your testimony -- I'm going to the second

4    paragraph.  It appears that you -- that you're

5    indicating that the business community pressured

6    OSHA to repeal HOOD as it relates to power

7    presses?

8          A.    The metal stamping industry, yes.

9          Q.    And they had the ability to pressure

10   OSHA to repeal a provision that you think is safe?

11              MR. ROBINSON:  I'll object to the

12   form of that question.

13         A.    The metal stamping industry filed

14   suit against OSHA for that particular provision

15   and the federal law.

16         Q.    And then ANSI modified its standard

17   to comply with the -- to mirror OSHA?

18         A.    No.  As you alluded to before in

19   your question, ANSI didn't do anything.  It's the

20   subcommittee that wrote B 11.1 chose to modify its

21   standard and be consistent with the OSHA

22   requirement.

23         Q.    But the committee still believed

24   that the HOOD procedure, mandating HOOD, was a

215

1    safer means of operating the machinery, correct?

2         A.    Correct.

3         Q.    Next paragraph, you say:  "The facts

4    of this case require us to return to the

5    discussion of press brakes.  Ms. Lindquist was not

6    injured while operating power press."  Did I

7    correctly read that?

8         A.    Yes.

9         Q.    And that was an important

10   distinction to you in analyzing this accident, is

11   that she was operating a press brake, not a power

12   press; am I correct?

13        A.    Yes.

14        Q.    Next paragraph, you indicate that

15   "The evidence shows that a foot switch was

16   provided with the machine in 1978," correct?

17        A.    Yes.

18        Q.    Is that still your testimony today?

19        A.    Yes.

20        Q.    Next sentence says that, "There is

21   no evidence to indicate what make or model foot

22   switch was provided at that time"; am I correct in

23   your statement?

24        A.    Yes.

216

1        Q.    Am I correct today that you have no

2   opinion as to the make or model of the foot switch

3   that was provided with the Heim press brake?

4        A.    That's correct.

5        Q.    Further, your report indicates in

6   the same paragraph, "Also the evidence does not

7   give us any indication if the original end user,

8   Avco-Lycoming, utilized the originally provided

9   foot switch or added its own or installed a palm

10  button station or other control device on the

11  press brake when incorporating it into its

12  production operations"; am I correct?

13       A.    Yes.

14       Q.    And is that your testimony today?

15       A.    Yes.

16       Q.    So you have no evidence regarding

17  that issue either way?

18       A.    As to what Heim did with the machine

19  once they received it, that's correct.

20       Q.    Or with regard to Avco-Lycoming and

21  what they may have done with a foot switch or two

22  palm button switch?

23       A.    I'm sorry, did I say Heim?

24       Q.    Yes.

217

1          A.    I meant Avco.  With regard to what

2   Avco-Lycoming did with the machine once they

3   received it, we have no information.

4          Q.    And you have no personal information

5   with regard to what Avco-Lycoming did with regard

6   to a two palm button switch or a foot pedal --

7          A.    Correct.

8          Q.    -- or a foot control; am I correct?

9          A.    Correct.

10          Q.    When making a decision to add a

11   safety feature on a machine as standard equipment,

12   what analysis would you perform?

13                 MR. ROBINSON:  Object to the form

14   of the question, the breadth of the question, and

15   it's also been addressed at length during the

16   deposition.

17          A.    I believe the considerations are to

18   look at what you want to achieve by adding

19   whatever device it is and the anticipated

20   accomplishment of reaching those goals or those,

21   you know, achievements, which is does this

22   particular device actually get you there, does not

23   it not introduce hazards of its own, is it easily

24   maintained, is it reliable, that type of thing.

218

1          Q.    And when you say does it introduce

2    any additional hazards, would that be you would

3    have to factor in the cost side of the thing,

4    meaning, you know, how many hazards does it

5    introduce, how many people could be hurt compared

6    to the benefits?

7          A.    No, not necessarily going that far

8    with other injuries and subsequent occurrences and

9    things like that.  It's just that you do a risk

10   assessment, you put this device on whatever it

11   might be, you do a risk assessment after

12   incorporating this device and evaluate it to

13   determine if it controls the hazard, hazards, that

14   you initially intended it to control.

15               And then you also assess it to

16   determine if there are any new hazards that could

17   present the opportunity for an occurrence to take

18   place or injury by the placement of this device or

19   this safety whatever it is.  And if you do

20   identify new hazards, then you either modify,

21   remove and try something else or add another type

22   of safety device to incorporate or to safeguard

23   against those particular new hazards.  The whole

24   risk assessment is an iterative process, you keep

1  looking at it from different angles.

2        Q.   Thank you.  At the bottom of page 6,

3  last sentence, it says:  "In 1978 when Heim

4  selected the foot switch that was originally

5  provided with the press brake, there is no

6  possible way they would have been able to foresee

7  any of the above considerations outlined in the

8  above Safety Brief conclusion."

9        A.   Yes.

10        Q.   Would you explain that to me?  I

11  don't understand what you mean by that.

12             MR. ROBINSON:  One second.  I'll

13  object to the form of the question.

14        A.   Okay.  Previously in that paragraph,

15  I make reference to Safety Brief, Volume 12, no.

16  4, "Foot Controls, Riding the Pedal," and in the

17  conclusion, IV, paragraph 9, it states:  "The

18  proper selection of a foot control is not

19  straightforward.  It involves many considerations,

20  including knowledge of operator movement in the

21  work space, steadiness requirements for part

22  insertion, the use of point of operation

23  safeguards, technology transfer, maximum or

24  continuous stroke rate of the controlled machine,

220

1   and the various anticipated uses of the foot

2   control on multi-mode machinery."

3              Now, all of those variables are

4   considerations that should be taken when applying

5   controls to machines.  And my statement is saying

6   that Heim in 1978 had no ability to anticipate

7   what Corry Manufacturing would be doing with

8   regard to these elements in 2001 or 2002.

9         Q.   Okay.  Thanks for that

10  clarification.

11             THE VIDEOGRAPHER:  I need to go off

12  the record to change the tape.  Good time to

13  break?

14             MR. HARTMAN:  Yeah.

15             THE VIDEOGRAPHER:  We're going off

16  the record.  One second, please.

17                           (Brief recess.)

18             THE VIDEOGRAPHER:  Tape No. 3,

19  we're back on the record.  You may begin.

20  BY MR. HARTMAN:

21        Q.   Sir, would you agree that the

22  requirement that an operator place his or her

23  hands into the die space area is a misuse of the

24  machine in certain circumstances and not a misuse

1   of the machine in other circumstances?

2              MR. ROBINSON:  Object to the form

3   of that question.

4        A.   No, I don't think so.  I think that

5   a press brake -- If the job is given sufficient

6   planning, I can't think of a press brake job that

7   I've seen that can't be done with the operator not

8   having to place his hands between the dies in the

9   machining operation.

10       Q.   Are you aware of a point of

11  operation protection safety device that pulls

12  one's hands out of the die area when --

13       A.   Yes.

14       Q.   -- when the ram comes down?

15       A.   Yes.

16       Q.   Is that an approved -- Is that an

17  acceptable point of operation safety device on a

18  press brake?

19              MR. ROBINSON:  Objection to the

20  form.

21       A.   What you're referring to is called a

22  pull-back device.

23       Q.   Yeah.

24       A.   And it is an acceptable point of

1    operation safeguarding device for press brakes,

2    and when properly adjusted, it prevents the

3    operator from reaching into the die area.  It does

4    not allow him to get between the dies.

5           Q.   So even utilizing that type of

6    safety device, you would not expect an operator to

7    put his or her hands in the die area?

8           A.   If the pull-back is properly

9    adjusted, his hands -- his or her hands should not

10   be able to get between the dies.

11          Q.   Would you agree that there are a lot

12   of -- that there are numerous reports of injuries

13   occurring to operators who get their hands caught

14   in the point of operation area?

15              MR. ROBINSON:  I'll object to the

16   form of the question.  It's also been asked and

17   answered.  "Numerous" is vague and broad.

18          A.   Point of operation injuries do occur

19   on press brakes.

20          Q.   Would you agree that point of

21   operation injuries occur most typically when a

22   body part is placed in the die area?

23              MR. ROBINSON:  Objection to form of

24   the question.

1      A.   Yes.

2           Q.   And would you agree that most point

3    of operation injuries occur when an operator

4    places his or her hands or fingers into the die

5    area?

6           A.   By definition, that's what's going

7    to happen, yes.

8           Q.   What is the National Safety Council?

9           A.   It's an organization that's

10   committed to safety of the -- I can't even say, I

11   can't really say the average worker in America

12   because they go into highway safety, and campus

13   safety, and off-the-job safety.  They address all

14   different kinds of safety-related issues.

15          Q.   Is it an authoritative organization?

16               MR. ROBINSON:  I'll object to the

17   form of the question.

18          A.   No.  I've indicated back earlier

19   this morning that I didn't feel that National

20   Safety Council publications are authoritative.

21          Q.   Are you aware of any National Safety

22   Council articles relating to press brake safety

23   that you would deem authoritative?

24          A.   No.  The data sheets and the

224

1  information that's found on the "Accident

2  Prevention Manual" are representative of best

3  practices.  Actually, the data sheet on press

4  brakes is echoing the B 11 standard, but it's not

5  verbatim to the B 11.3 standard; so even though I

6  participated in the authoring of it, I don't

7  consider it authoritative.

8            MR. HARTMAN:  I have no further

9  questions.  Thank you for your time.

10            MR. ROBINSON:  I don't have any

11  questions.  We'll read.

12            THE WITNESS:  Read and sign.

13            MR. ROBINSON:  Read, if you would,

14  just to be sure we're comfortable with the

15  transcript, no disrespect to the court reporter.

16            THE VIDEOGRAPHER:  At this time

17  we're going off the record.  This concludes

18  today's deposition.  Time now is 12:39.  One

19  second, please.

20

21            DENNIS R. CLOUTIER

22       DEPOSITION CONCLUDED AT 12:39 P.M.

23               -   -   -

24

```
1              C E R T I F I C A T E
2   STATE   OF   OHIO    :
3                       :  SS
4   COUNTY  OF  HAMILTON :
5       I, LISA CONLEY, RMR, CRR, CCP, the
6   undersigned, a duly qualified and commissioned
7   notary public within and for the State of Ohio, do
8   hereby certify that before the giving of his
9   aforesaid deposition, the said DENNIS R. CLOUTIER
10  was by me first duly sworn to tell the truth, the
11  whole truth and nothing but the truth; that the
12  foregoing is the deposition given at said time and
13  place by the said DENNIS R. CLOUTIER; that said
14  deposition was taken in all respects pursuant to
15  agreement; that said deposition was taken by me in
16  stenotypy and transcribed by computer-aided
17  transcription under my supervision; that the
18  transcribed deposition is to be submitted to the
19  witness for his examination and signature; that I
20  am neither a relative of nor attorney for any of
21  the parties to this cause, nor relative of nor
22  employee for any of their counsel, and have no
23  interest whatever in the result of the action.
24
```

226

1          IN WITNESS WHEREOF, I hereunto set my

2    hand and official seal of office at Cincinnati,

3    Ohio, this

4              day of                    , 2006.

5

6

7

8    MY COMMISSION EXPIRES: LISA CONLEY, RMR, CRR, CCP

9    JULY 28, 2009.        NOTARY PUBLIC-STATE OF OHIO

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

226

1          IN WITNESS WHEREOF, I hereunto set my

2    hand and official seal of office at Cincinnati,

3    Ohio, this

4    10th day of May          , 2006.

5

6

7

8    MY COMMISSION EXPIRES: LISA CONLEY, RMR, CRR, CCP

9    JULY 28, 2009.         NOTARY PUBLIC-STATE OF OHIO

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24