# EXHIBIT "A"

Not Reported in F.Supp.2d, 2004 WL 887470 (E.D.Pa.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.
Therese MCMULLEN Plaintiff,
v.
CROWN EQUIPMENT CORP. Defendant.
No. Civ.A.00-1366.
March 31, 2004.

Karen Reid Bramblett, Steven L. Smith, Stewart L. Cohen, Kessler, Cohen & Roth, P.C., Philadelphia, PA, for Plaintiff.
Michael J. Wiggins, Cabaniss Smith Toole & Wiggins PL, Maitland, FL, Robert Toland, William J. Conroy, Campbell Campbell Edwards & Conroy PC, Wayne, PA, for Defendant.

ORDER

TUCKER, J.
*1 AND NOW, this 31 day of March, 2004, upon consideration of Defendant's Motion for Summary Judgment (Doc. 51), Plaintiff's Response in Opposition (Doc. 52), and Defendant's Reply Brief (Doc. 53), IT IS HEREBY ORDERED that the motion is GRANTED IN PART and DENIED IN PART as follows:

1. Defendant's motion for summary judgment as to Plaintiff's failure to warn claims is GRANTED. Plaintiff does not contest Defendant's contention that these claims are insufficient as a matter of law.

2. Defendant's motion for summary judgment as to Plaintiff's strict liability claim is DENIED.[FN1] Sufficient evidence has not been produce to support a finding that the 60PE pallet jack ("PE Jack" or "PE Model"), the jack Plaintiff was using when she was injured, is not unreasonably dangerous.[FN2]

> FN1. Under Pennsylvania law, "[t]o establish a case under the strict liability doctrine, a plaintiff must prove that the product was defective, and that the defect proximately caused the plaintiff's injuries." *Surace v. Caterpillar, Inc.,* 111 F.3d 1039, 1044 (3d Cir.1997) (citation omitted). Upon defense motion, the court must conduct a risk-utility analysis and determine whether the product at issue is "unreasonably dangerous" as a matter of law. *Id.* "[T]he question for the court to determine is whether the evidence is sufficient, for purposes of the threshold risk-utility analysis, to conclude as a matter of law that the product was not unreasonably dangerous." *Id.* at 1049 n. 10. This inquiry is governed by the "Wade factors," seven factors that the court may take into consideration in "weighing a product's harms against its social utility." *Id.* at 1046 (citing *Smialek v. Chrysler Motors Corp.,* 290 Pa.Super. 496, 502, 434 A.2d 1253 (1981)).

> FN2. Interestingly, while urging the Court to find that the PE Jack is not unreasonably dangerous as a matter of law, Defendant devotes considerable space to contending that the risk-utility question is one for the jury to decide. Defendant also advocates the position that "there is no great risk that the outcome [in this case] will be any different if this issue is decided by the jury in this case, and in any event such risk is outweighed by Crown's interest in jury resolution of the issue." Def. Mot. at 6. This is an incorrect statement of the law. See *Surace,* 111 F.3d at 1049 n. 10 ("[T]he question for the court to determine ... as a matter of law that the product was not unreasonably dangerous."). In any case, it is unclear how the claim that this issue should be heard by a jury serves Defendant's interests on a motion for summary judgment.

(a) Defendant's main argument is that the alternative design proffered by Plaintiff is not a safer alternative to the PE Jack based on its erroneous belief that Plaintiff's alternative design would require enclosure of the operator's compartment of the PE Jack. Def. Mot. at 4. Plaintiff's claim is that the 60PC pallet jack ("PC Jack" or "PC Model"), also manufactured by Defendant, is the safer alternative, a design which is (I) unquestionably feasible (it has been in production and on the market for several years), (ii) has been tested under real world conditions, (iii) has both a lower accident rate and lower rate of severe injury than the PE Model, and (iv) at minimum, possesses the same utility as the PE Model. In its reply, Defendant contends that the accident rate of both models is *de minimus,* and on this basis urges that the PE Model be found not unreasonable dangerous. No evidence, such as expert opinion, is cited in support of this assertion, nor does it answer the question of whether the *seriousness* of the injuries suffered by operators using the PE Model is a socially acceptable risk for which Defendant should not be held strictly liable. Compare Surace, 111 F.3d at 1048 (holding seriousness of injury precluded finding machine not unreasonably dangerous).

(b) "In a strict liability case, the court must balance the utility of the product against the *seriousness and likelihood of the injury* and the availability of precautions that, though not foolproof, might prevent the injury." Surace v. Caterpillar, Inc., 111 F.3d 1039, 1049-50 (3d Cir.1997) (first emphasis added; original emphasis omitted). There is evidence of a death, multiple head and back injuries, concussions, a punctured lung, severed foot, an amputated foot, an amputated ring finger, fractured pelvises, and a possible fractured skull, among the many broken bones (to include compound fractures) and lacerations suffered by operators involved in accidents using the PE Model. See Pl. Exh. K [hereinafter "PE Model Accident Summary"]. Comparable injuries were not documented for the PC Model. See Pl. Exh. L [hereinafter "PC Model Accident Summary"].

*2 The Court recognizes use of equipment such as the PE Jack carries with it some inherent danger. Notwithstanding, Defendant may not simply rely on its contention that the accident rate for the PE Model is *de minimus* in this case, in light of Plaintiff's evidence.[FN3] See Surace, 111 F.3d at 1048. To find for Defendant, this Court must conclude that "the evidence is sufficient ... to conclude as a matter of law that the [PE Model] was not unreasonably dangerous." Id. at 1049 n. 10. Defendant has not produced sufficient evidence *in this case* to support such a finding given the level of severe injury associated with the PE Model.[FN4]

> FN3. Defendant has sold over 97,000 units of the PE Jack since 1970. Since 1978, Defendant has documented the PE Jack as being involved in 591 accidents. See PE Model Accident Summary. The evidence indicates that of the 591 accidents, 307 accidents (or 52%) were similar to Plaintiff's accident. Pl. Resp. at 4. Of the 307 comparable accidents, the injuries in 114 cases were classified as minor or as having no injuries. Id. "Severe" accidents are those which required the employee to be away from work three (3) or more days. PE Model Accident Summary at 1. The remaining 193 accidents (or 62%) comparable to Plaintiff's accident resulted in injuries which were classified as "severe." Pl. Resp. at 4. In contrast, the PC Model (of which approximately 12,000 have been sold) is documented as being involved in only 34 accidents, with 15 involved in accidents comparable to Plaintiff's and only 2 of the 15 comparable accidents resulting in severe injuries. Id. Plaintiff also asserts that warning labels and instructions accompanying the PE Model "exacerbates th[e] problem ... [by] demand[ing] that operators keep their bodies within the 'running lines' of the unit, but never defin[ing] the term 'running lines.'" Id. at 16 (citing Pl. Exh. D). Defendant does not respond to these arguments except to state, without citation to evidence or case law, that the accident rate of the PE Model is *de minimus.* Def. Reply at 1.

> FN4. In absence of producing evidence demonstrating that the severity of the injury associated with the PE Model should not expose it to strict liability, Defendant relies heavily on decision of other courts concerning its product. While such decisions may, in appropriate situations, be persuasive, that is not the case in this matter. Defendant relies particularly on Shetterly v. Crown Controls Corp., 719 F.Supp. 385 (W.D.Pa.1989). In *Shetterly,* the plaintiffs' expert conceded that (1) "he knew of no alternative product that was as productive [as the PE60 Model]," and (2) he "did not know whether or not his

suggestive alternative was feasible or practicable." <u>Shetterly, 719 F.Supp. at 392</u>. That is not the case here. Plaintiff's experts have identified Defendant's PC Model as a safer feasible alternative. Further, *Shetterly* was decided based on (1) the court's determination that the plaintiff expert's alternative design was not feasible and would likely expose the operator to more danger, (2) accident data covering only the years from 1979 to 1987, and (3) the court's determination that the plaintiffs offered "no credible evidence on risk-utility issues." *Id.* at 393, 398. In addition, contrary to Defendant's assertion otherwise, see Def. Reply at 3, the *Shetterly* court's decision was also predicated in part on its conclusion that the plaintiffs were negligent in operating the PE60 pallet. *Id.* at 402 ("Each *plaintiff* put himself in a position of obvious danger[.]") (emphasis in original). For these reasons, among others, *Shetterly* is not dispositive of the instant matter.

3. Defendant's motion for summary judgment on grounds of federal preemption is DENIED. This argument is predicated on Defendant's incorrect assertion that Plaintiff's safer alternative design would require enclosure of the operator's compartment of PE Model, rather the PC Model. The parties do not contest that the PC Model complies with federal standards, rendering this ground for summary judgment moot.

E.D.Pa.,2004.
McMullen v. Crown Equipment Corp.
Not Reported in F.Supp.2d, 2004 WL 887470 (E.D.Pa.)

Motions, Pleadings and Filings (Back to top)

• 2:00cv01366 (Docket) (Mar. 15, 2000)
END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

This Court assumes that the average ordinary consumer is well acquainted with the propensity of all manner of elastic items to recoil after they have been extended and released. In fact, in Dr. Pastore's report, he acknowledges that the danger associated with the recoil energies of an elasticized cord "is known from basic physics as well as common experience from ordinary exposure to the behavior of elastomeric materials such as rubber bands, bungee cords or any type of elastomeric cord." Pls.' Resp., Ex. D, p. 2. Furthermore, because of the obviousness of the danger of recoil, a warning to that effect is not required. *Ellis*, 545 A.2d at 914. Because the recoil danger is well known by the public, the user would be aware of the danger and how to avoid that danger.

    7. The Feasibility, on the Part of the Manufacturer, of Spreading the Loss by Setting the Price of the Product or Carrying Liability Insurance.

Our district court cases have stated that while a manufacturer or supplier is usually able to spread the cost of a plaintiff's loss to all consumers of a product by raising the price of the product, the feasibility of doing so depends upon balancing the remaining factors in the risk/utility analysis. *Riley*, 913 F.Supp. at 890 (citing *Monahan*, 856 F.Supp. 955); *Van Buskirk*, 100 F.Supp.2d at 289. If after examining the first six factors, the utility of the product outweighs its risks, then shifting the cost of the plaintiff's loss to the defendant is not fair, and therefore, not feasible. *Id*. This Court has concluded that four of the six previous risk/utility factors favor the Defendants. Therefore, since these factors show that the Ranier jacket is not unreasonably dangerous, the defendants " 'should not have to spread among [their] customers the economic loss resulting from injuries from a product that is not defective.' " *Van Buskirk*, 100 F.Supp.2d at 289 (quoting *Monahan*, 856 F.Supp. at 964).

After weighing these seven factors, this Court finds that the Ranier jacket is not in a defective condition, unreasonably dangerous. Therefore, since the Plaintiffs have not crossed this threshold, the strict liability claim will not move forward.

    B. Negligence

*\*6* Plaintiffs allege that Defendants owed them a duty to exercise reasonable care and not to create a product which involved an unreasonable risk of physical harm. Plaintiffs further claim that Defendants breached this duty by failing to perform safety tests on the Ranier jacket and by releasing a product that involved an unreasonable risk of injury without an adequate warning. To succeed on a claim of negligence under Pennsylvania law, a plaintiff must establish: (1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct; (2) a failure to conform to the required standard; (3) a causal connection between the conduct and the resulting injury; and (4) a resulting actual loss or damage. *Monahan*, 856 F.Supp. at 965 (citing *Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1366 (3d Cir.1993)).

The duty analysis in a negligence claim depends on whether a reasonable person should have foreseen the likelihood of harm to the plaintiff resulting from the defendant's conduct. *Id*. (citing *Griggs v. BIC Corp.*, 981 F.2d 1429, 1435 (3rd Cir.1992)). If the risks inherent in a defendant's conduct were foreseeable, the court must analyze whether the foreseeable risks were unreasonable. *Id*. Since the Pennsylvania Supreme Court has not set forth a standard for the courts to follow in this area, the Third Circuit has opined that Pennsylvania courts would utilize a risk/utility analysis in determining whether the foreseeable risks were unreasonable. *Id*. (citing *Griggs*, 981 F.2d at 1435-36). This risk/utility analysis balances "the risk, in light of the social value of the interest threatened, and the probability and extent of the harm, against the value of the interest which the actor is seeking to protect." *Griggs*, 981 F.2d at 1436. The *Griggs* court explained this analysis by stating that:

No person can be expected to guard against harm from events which are not reasonably to be anticipated at all, or are so unlikely to occur that the risk, although recognizable, would commonly be disregarded .... On the other hand, if the risk is an appreciable one, and the possible consequences are serious, the question is not one of mathematical probability alone .... As the gravity of the

possible harm increases, the apparent likelihood of its occurrence need be correspondingly less to generate a duty of precaution.

*Griggs,* 981 F.2d at 1436 (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts §§ 31, at 170-71 (5th ed.1984)).

When looking at the facts in the light most favorable to the Plaintiffs, it is possible that the risk of eye injury from the elasticized draw cord and cord locks of the Ranier jacket was foreseeable. However, even if the risk of such an injury was foreseeable, the risk was not unreasonable under a risk/utility analysis of the Ranier jacket. First, the probability and extent of harm from the Ranier jacket was very low. According to Defendants, this accident is unique and Plaintiffs have offered no evidence of any other accidents involving the Ranier jacket. Second, Defendants claim that the fully adjustable hood of the Ranier jacket provides superior visibility and freedom of movement which would be sacrificed if alternative hood closure methods were to be adopted. Even though one of the alternative hood closure methods offered by Dr. Pastore may be an adequate substitute (see section III. A. 4., supra), this court agrees with the Defendants, that under a risk/utility analysis, the utility of the Ranier jacket design outweighs the extremely low risk of injury. Therefore the risk posed by the jacket design was not unreasonable.

*7 Lastly, a defective condition also includes the lack of adequate warnings for a product's safe use. *Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107, 119 (3rd Cir.1992); *Berkebile,* 337 A.2d at 902. However, a defendant can be negligent for failure to warn of a danger only if that danger is not obvious. *Id.* As discussed above, the risks inherent in an elasticized cord are obvious and are assumed to be known by the general public (see section III. A. 6., supra). Therefore, because the risk of recoil was obvious, there was no negligence by the Defendants for failure to warn purchasers that the cord had elastic properties which could cause it to recoil if stretched and released. Because Plaintiffs have not shown that Defendants breached a duty owed to them, the final negligence factors need not be examined and summary judgment on the negligence claim is appropriate.

C. Breach of Implied Warranties [FN4]

FN4. Plaintiffs' complaint states that Defendants "expressly represented or in some other manner expressed warranties that the outerwear hooded jacket and its component parts were safe for use for the purposes intended and were of merchantable quality." Compl., ¶ 29; Am. Compl., ¶ 27. However, Plaintiffs have provided no evidence whatsoever regarding an express warranty and have not addressed express warranties in their Response to Defendants' present Motion. Therefore, this Court finds that Plaintiffs have abandoned this ground for relief. See *Monohan,* 856 F.Supp. at 966.

"Both the implied warranty of merchantability and the warranty of fitness for a particular purpose arise by operation of law and serve to protect buyers from loss where the goods purchased are below commercial standards or are unfit for the buyer's purpose." *Altronics of Bethlehem, Inc. v. Repco, Inc.,* 957 F.2d 1102, 1105 (3d Cir.1992). Under the warranty of merchantability, goods must be "fit for the ordinary purposes for which such goods are used." 13 Pa.C.S.A. § 2314(b)(3). However, the warranty of fitness for a particular purpose requires that the seller had reason to know, at the time of contracting, "any particular purpose for which the goods [were] required" and "that the buyer [relied] on the skill or judgment of the seller to select or furnish suitable goods." 13 Pa.C.S.A. § 2315. In that case, an implied warranty arises that the goods are fit for the particular purpose. *Id.* To establish a breach of either implied warranty, plaintiffs must show that the item purchased from the defendant was defective. *Altronics,* 957 F.2d at 1105.

This Court has found, both under a strict liability analysis and under a negligence analysis, that the Ranier jacket is not defective. In the absence of a defect, Plaintiffs claim for breach of implied warranties fails. Furthermore, the Ranier jacket and the elasticized cord hood closure are fit for the ordinary purposes for which they are used: the jacket protected its wearer from the elements and the cords properly allowed for adjustments of the hood. Although there are alternative styles of hood

closures, this style comprising an elasticized cord and cord locks is commonly used and accepted. Also, no evidence has been presented that Plaintiffs told any representatives of Defendants any particular purpose for which the jacket was to be used or that any representatives knew that Plaintiffs were relying on their skill and judgment in choosing the jacket. Therefore, summary judgment is appropriate for Plaintiffs' breach of implied warranty claims.

## IV. CONCLUSION

**8* This Court finds that the Ranier jacket is not unreasonably dangerous. This Court also concludes that there is no genuine issue of material fact presented in Plaintiffs' claims for negligence and breach of implied warranty. Therefore, this Court grants Defendants' motion in full.

An appropriate order follows.

## ORDER

AND NOW, this 22nd day of February, 2001, upon consideration of the Joint Motion for a Ruling that the Ranier Jacket is not Unreasonably Dangerous as a Matter of Law, or, Alternatively, for an Evidentiary Hearing on the Issue, and for Summary Judgment on Plaintiffs' Negligence and Breach of Warranty Claims filed by Defendants Jansport, Inc. and Mackenzie Merchandising, Inc. (Dkt. No. 27) and Plaintiffs' Response thereto, it is hereby ORDERED that:

(1) the Rainier jacket is not unreasonably dangerous as a matter of law and Plaintiffs' strict liability claims against Defendants Jansport, Inc. and Mackenzie Merchandising, Inc. are DISMISSED with prejudice; and

(2) the Joint Motion for Summary Judgment filed by Defendants Jansport, Inc. and Mackenzie Merchandising, Inc. on Plaintiffs' negligence and breach of warranty claims is GRANTED.

E.D.Pa.,2001.
Epler v. Jansport, Inc. subsidiary of VF Corp.
Not Reported in F.Supp.2d, 2001 WL 179862 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 16,033

Motions, Pleadings and Filings (Back to top)

- 2000 WL 34617119 (Trial Motion, Memorandum and Affidavit) Brief in Support of the Joint Motion of Defendants, Jansport, Inc. and Mackenzie Merchandising, Inc., for A Ruling that the Ranier Jacket is not Unreasonably Dangerous as a Matter of Law, or; Alternatively, for an Evidentiary Hearing on the Issue, an d for Summary Judgment on Plaintiffs' Negligence and Breach of Warranty Claims (Nov. 13, 2000) Original Image of this Document (PDF)
- 2000 WL 34612152 (Expert Report and Affidavit) (Report or Affidavit of Christopher M. Pastore) (Jul. 20, 2000)
- 2000 WL 34616910 (Expert Deposition) Oral Deposition of William R. Howard (May 2, 2000) Original Image of this Document (PDF)
- 2:00CV00154 (Docket) (Jan. 11, 2000)
END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "B"



Hand, Microsurgery and Reconstructive Orthopaedics, LLP

John D. Lubahn, MD, FACS
Mary Beth Cermak, MD
John M. Hood, MD
D. Patrick Williams, DO

December 12, 2005

Dallas W. Hartman, Esquire
2815 Wilmington Road
New Castle, PA 16105

300 State Street, Suite 205
Erie, PA 16507

RE: Tina Lindquist Ossa

Dear Attorney Hartman:

Phone: 814/456-6022
FAX: 814/ 456-7040
e-mail: hmro@erie.net

My original diagnosis of Tina on the day that I first saw her was amputations of both hands of her index, long, ring and small fingers both left and right hand

Board Certified
Specialty Trained

The course of her treatment was, initially, several hours of surgery under general anesthetic for an attempt at replantation of multiple digits. Out of the mangled mess of digits that we were given we attempted to replant four of them two on each hand. Out of those the two digits on the left hand, I believe, survived and the two digits on the opposite hand did not survive. She was in the hospital for several weeks. She had blood transfusions and multiple operations for debridement of the necrotic tissues.

She was home as an outpatient and under direct care and needed 24 hour care because of the inability of taking care of herself since both hands were severely involved. She had quite a bit of pain and discomfort throughout this time frame, which we treated, with oral analgesics. As the healing continued and signs of bony fusion took place we were able to start increasing the activity levels of the hands.

It was soon evident, however, that the hand in which the digits failed to survive needed more length to make it a somewhat reasonable hand. In an effort to improve function we proceeded with a second toe to third metacarpal transfer. This, again, was several hours of surgery, about 6 to 8 as I recall, requiring several days of inpatient hospitalization, significant pain and potentially risky anticoagulation to maintain the viability of the transplanted toe to the hand. This faired reasonably well except for failure of the bone to

Dallas W. Hartman, Esquire
RE: Tina Lindquist Ossa
December 12, 2005
Page 2

heal at which point we proceeded with procedures to try to encourage and entice the bone to heal. This finally was successful.

She has, at this point, short digits on the one hand in the long and ring position which have poor flexibility but can be used in gross grasping  No fine manipulative maneuvers are really possible with this hand and this is the better of her two hands. The contra lateral side having the toe to hand transfer is somewhat useful for activities requiring a small amount of pinch force in a relatively small size of objects, because anything too large does not fit between the span of her thumb and toe.

She is going to have severe limitations in her ability to perform even daily activities such as washing herself and clothing herself will be an arduous chore and difficult in the form of having difficulty zippering, buttoning, and tying

She may need further surgical intervention for the possibility of either a bone lengthening of the remnant of the index finger of the hand that has the toe transposed or the possibility of another second toe to hand transfer to try to improve the power on that hand.

If those are the case, the cost of those surgeries will be in the $10,000.00 to $20,000.00 dollars  category for physician cost and probably close to a $100,000.00 dollars or so for  cost of intensive care units and hospital stays, medication and such.

I do not believe that she will be prone to arthritic conditions secondary to this per se,  because she doesn't have any fingers or joints associated with those fingers. Nor is she capable of performing activities to the level to where out the joints in a significantly quickened fashion.

She also has significantly lost her ability to perform gainful employment activities at her level of education. She has probably lost close to 70% of her

Dallas W. Hartman, Esquire
RE: Tina Lindquist Ossa
December 12, 2005
Page 3

ability to use the upper extremities in an effective fashion secondary to her bilateral multiple amputations.

Sincerely,

John M. Hood, M.D.

JMH/bas

# EXHIBIT "C"

**FORENSIC HUMAN RESOURCES**
413 Sylvania Drive
Pittsburgh, PA 15229

Phone: (412) 260-8000                                                                 Fax: (412) 364-7221

November 11, 2005


Mr. Dallas W. Hartman, Esq.
Dallas W. Hartman, PC
2815 Wilmington Road
New Castle, PA 16105


Dear Mr Hartman:


This report has been prepared and is submitted in response to your request for an economic loss evaluation in the case of your client, Tina Lindquist Ossa.

You asked that we become familiar with your client's background and current circumstances in order to provide an opinion as to the labor economic effects as a result of a workplace accident on September 25, 2002. We interviewed Ms Ossa and reviewed her educational background and work history. We also reviewed the following documents:
- Discharge summary from Hamot Medical Center, dated October 7, 2002;
- Discharge summary from Hamot medical Center, dated December 12, 2003;
- Copy of transcript of Ms. Lindquist Ossa's deposition conducted June 28, 2005; and,
- Pennsylvania Department of Labor, Bureau of Workers' Compensation Form LIBC-495

Tina Lindquist Ossa was born June 24, 1982, and is currently 23 years old. She graduated from Corry Area High School in 2000. After graduation, she started work at a Pizza Hut but after five months, she changed jobs and began work at Corry Manufacturing. She earned $7.13 per hour, $14,830 per year. She also received employee benefits, including medical insurance, which we estimate have an average value of 29 6% of her wages ("*Employer Costs for Employee Benefits – June 2005*," US Department of Labor, Bureau of Labor Statistics, USDL 05-1767, September 16, 2005)

Ms. Lindquist Ossa was involved in a workplace accident on September 25, 2002, when she suffered a crush injury to both hands. The October 7, 2002, discharge summary diagnosis was "Crush injury to bilateral hands with amputations of the index, long, ring and small fingers of bilateral hands." The ring and middle fingers of the right hand were reattached. On December 8, 2003, Ms. Ossa underwent an additional surgery at which time a toe from her right foot was transferred to her left hand. She indicated that she has had eleven or twelve surgeries to date.

Ms Lindquist Ossa is concerned about the impact her physical restrictions will have upon her ability to earn a living. She will no longer be able to work in a job that requires manual dexterity, nor will she be able to work in a sedentary position that requires keyboarding skills, without

*Expert Witness in Matters of Employability, Lost Earnings
and Diminished Earning Capacity*

Tina Lindquist Ossa                                                                 Page 2

adaptive technological assistance. Also, with her physical restrictions, she will face a number of obstacles in a job search, among them is the fact that "[a]nother possible explanation for the low employment rate [of people with disabilities] is that employers are reluctant to hire people with disabilities because of the perceived risk associated with hiring an individual who may require costly supports or lag behind in productivity." (Bricourt, John C. and Bentley, Kia J., "*Disability Status and Perceptions of Employability by Employers,*" Social Work Research, Vol 24, no. 2, June 2000, pp 87-95.). The US Census Bureau, using data from the 2000 Census, shows that, in Pennsylvania, 30.2% of those women with a physical disability between 21 and 64 years old are employed and that only 17.2% worked full-time year-round in 1999 (U.S. Census Bureau, *Disability Status of the Civilian Noninstitutionalized Population by Sex and Selected Characteristics for the United States and Puerto Rico 2000 (PHC-T-32)*. In Erie County, PA, 7.2% of the women ages 21 to 64 report a physical disability and of that number, only 31.2% were employed (Houtenville, Andrew J. 2005. "Disability Statistics in the United States." Ithaca, NY: Cornell University Rehabilitation Research and Training Center on Disability Demographics and Statistics (StatsRRTC). www.disabilitystatistics.org. Posted April 4, 2005.) The CWIA publication, "Summary of Pennsylvania UC Covered Employment by County and Industry, 1st Quarter, 2005." shows that employment in Erie County grew by 2.1% from the previous year with the majority of that employment growth in the mining (42.0%), transportation (17.0%) and certain manufacturing industry segments (Beverage (14.8%), Petroleum and Coal Products (73.7%) and Machinery Manufacturing (23.5%))

These data are general in nature, addressing a wide range of disabilities and the impact on employment. They do not focus on a specific type of work disability. The most specific study on how injuries impact earning capacity was published by the US Department of Veteran's Affairs. *The Code of Federal Regulations, 38 Part 4* contains a Schedule of Disability Ratings in which the VA rates the impact on earning capacity that a particular injury is projected to have. The CFR percentage ratings "represent as far as can practicably be determined the average impairment in earnings capacity resulting from such diseases and injuries and their residual conditions in civil occupations" (§4.1). Amputation of multiple fingers (§4.71A. Code 5131) carries a loss rating of 80%. (d) of that section states:

> Amputation or resection of metacarpal bones (more than one-half the bone lost) in multiple finger injuries will require a rating of 10 percent added to (not combined with) the ratings, multiple finger amputations, subject to the amputation rule applied to the forearm

*The New Worklife Expectancy Tables Revised 2002.* (Vocational Econometrics, Inc., Louisville, KY, 2002) cites the future worklife expectancy of a female who graduated high school, age 23, who is unimpaired, that is with no work disability, as 30.3 years.

In calculating Ms. Lindquist-Ossa's future lost earnings capacity, we take into account the fact that she was at the beginning of her career and that this career opportunity was eliminated. Had she been able to continue to work in manufacturing, it is reasonable to expect that her wages would increase over the course of her worklife expectancy. To reflect that increase in her knowledge, skills and ability and the resultant increase in wages she would have enjoyed, we

Tina Lindquist Ossa                                                                                                    Page 3

used data from the Pennsylvania Department of Labor and Industry website, http://www.paworkstats.state.pa.us/, that show the median wage for employees in the manufacturing segment of the Erie County economy is $12.93 per hours ($26,897 per year) Another scenario to consider is that Ms. Lindquist-Ossa may move to other locations within Pennsylvania to pursue better paying job opportunities  The median wage for the manufacturing sector in the Commonwealth is $30,948 per year

Past Lost Income:   (September 25, 2002 – November 3, 2005)

| | | |
|---|---|---|
| Wages: | ($14,830 X 3 1 years) | $46,057 |
| Benefits: | ($46,057 X 29.6%) | $13,633 |
| Total past lost income: | | $59,689 |

Future Lost Earnings Capacity:

Median manufacturing wage in Erie County:
| | | |
|---|---|---|
| Wages: | ($26,897 X 30 3 years) | $814,979 |
| Loss rating: | ($814,979 X 80%) | $651,983 |
| Lost benefits: | ($651,983 X 29 6%) | $192,987 |
| Total future lost earnings capacity: | | $844,970 |

Median manufacturing wage in Commonwealth of Pennsylvania:
| | | |
|---|---|---|
| Wages: | ($30,948 X 30.3 years) | $937,724 |
| Loss rating: | ($937,724 X 80%) | $750,180 |
| Lost benefits: | ($750,180 X 29.6%) | $222,053 |
| Total future lost earnings capacity: | | $972,233 |

Ms. Lindquist Ossa's total lost income, both past lost wages and benefits and future lost earnings capacity, is in the range $904,660 to $1,031,922, to a reasonable degree of professional certainty.

We reserve the right to amend this report should additional information be made available.

Very truly yours,

*[signature]*

Donal F Kirwan, SPHR

*Expert Witness in Matters of Employability, Lost Earnings
and Diminished Earning Capacity*

**EXHIBIT "D"**

Not Reported in F.Supp.2d, 2001 WL 179862 (E.D.Pa.), Prod.Liab.Rep. (CCH) P 16,033

Motions, Pleadings and Filings

United States District Court, E.D. Pennsylvania.
Lee EPLER and Julieann Epler, h/w, Plaintiffs,
v.
JANSPORT, INC. subsidiary of VF Corporation, El Cid, and Mackenzie Merchandising, Inc., Defendants.
No. CIV. A. 00-CV-154.
Feb. 22, 2001.

MEMORANDUM

KELLY, J.
*1 Presently before this Court is the Motion for a Ruling that the Ranier Jacket is not Unreasonably Dangerous as a Matter of Law, or, Alternatively, for an Evidentiary Hearing on the Issue, and for Summary Judgment on Plaintiffs' Negligence and Breach of Warranty Claims (Dkt. No. 27) filed by Defendants Jansport, Inc. and Mackenzie Merchandising, Inc. ("Jansport" and "Mackenzie" or "Defendants"). Plaintiffs Lee Epler and Julieann Epler, husband and wife, ("Mr. Epler" and "Mrs. Epler" or "Plaintiffs") instituted this products liability action against Jansport, Mackenzie and El Cid FN1 for injuries sustained by Mr. Epler on December 18, 1998. Plaintiffs claim that design defects in Jansport's Ranier jacket, manufactured by El Cid, marketed to Jansport through Mackenzie, and distributed by Jansport, caused injury to Mr. Epler. For the following reasons, the Motion is granted.

> FN1. Defendant, El Cid, has failed to enter an appearance or respond to the pleadings filed by the parties in this matter.

I. BACKGROUND

On December 18, 1998, Mr. Epler put on the Ranier jacket, which he had worn five or six times previously, and went outside to walk his dog and mail a letter. While outside, the wind suddenly picked up and it began to snow, resulting in a small squall. Mr. Epler turned his back to the wind and then zipped up the jacket. Mr. Epler then bent down and flipped up the hood of the jacket while at the same time grabbing the hood's draw cords.FN2 The draw cord slipped out of Mr. Epler's hand and recoiled towards his face. As a result, the plastic cord lock at the end of the cord struck Mr. Epler in his left eye causing injury.

> FN2. The draw cords consist of an elasticized cord running through the hood with plastic cord locks at the ends of the cord.

Plaintiffs filed this lawsuit against Jansport on January 11, 2000 claiming strict liability, negligence and breach of warranties. Plaintiffs later amended the Complaint to include Mackenzie and El Cid as Defendants. On November 13, 2000, Jansport and Mackenzie filed the instant Motion.

II. STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is material only if it might affect the outcome of the suit under governing law. <u>Id. at 248.</u>

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Further, the non-moving party has the burden of producing evidence to establish prima facie each element of its claim. <u>Celotex,</u> 477 U.S. at 322-23. If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper. <u>Id. at 322; Wisniewski v. Johns-Manville Corp.,</u> 812 F.2d 81, 83 (3d Cir.1987).

**\*2** Under Pennsylvania law, in a strict liability action, the court must decide as a threshold matter, "whether the evidence is sufficient, for purposes of the threshold risk-utility analysis, to conclude as a matter of law that the product was not unreasonably dangerous, not whether the evidence creates a genuine issue of fact for the jury." <u>Surace v. Caterpillar, Inc.,</u> 111 F.3d 1039, 1049 n. 10 (3d Cir.1997)(clarifying <i>Azzarello v. Black Brothers, Inc.,</i> 480 Pa. 547, 391 A.2d 1020 (Pa.1978)). The burden of establishing that the product is not unreasonably dangerous through the risk/utility analysis lies with the defendants, and the evidence on this threshold issue must be viewed in the light most favorable to the plaintiff. <u>Riley v. Becton Dickinson Vascular Access, Inc.,</u> 913 F.Supp. 879, 884 (E.D.Pa.1995).

III. DISCUSSION

A. Strict Liability

When this Court has diversity jurisdiction over a case, it must apply the substantive law of Pennsylvania under the Erie doctrine. See <u>Erie R. Co. v. Tompkins,</u> 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The Pennsylvania Supreme Court has adopted the Restatement (Second) of Torts section 402A. <u>Webb. v. Zern,</u> 422 Pa. 424, 220 A.2d 853 (Pa.1966). This section makes a seller of products "strictly liable for the physical harm caused by a product sold in a defective condition unreasonably dangerous to the user." <u>Jordon by Jordan v. K-Mart Corp.,</u> 417 Pa.Super. 186, 611 A.2d 1328, 1330 (Pa.Super.1992) (citing <u>Berkebile v. Brantly Helicopter Corp.,</u> 462 Pa. 83, 337 A.2d 893, 899 (Pa.1975)).

Section 402A requires the plaintiff to prove that: (1) the product was defective; (2) the defect existed when it left the hands of the manufacturer; and (3) the defect caused the harm. <u>Ellis v. Chicago Bridge & Iron Co.,</u> 376 Pa.Super. 220, 545 A.2d 906, 909 (Pa.Super.1988)(citing <u>Berkebile,</u> 337 A.2d at 898). Courts applying Pennsylvania law in strict liability cases must "determine, initially and as a matter of law, whether the product in question is 'unreasonably dangerous.' " <u>Riley,</u> 913 F.Supp. at 881; <u>Azzarello,</u> 480 Pa. 547, 391 A.2d 1020. If the court finds that the product is not in a defective condition, unreasonably dangerous, then the court will dismiss the plaintiff's strict liability claim in the same manner as in a typical summary judgment determination. <u>Surace,</u> 111 F.3d 1039 at 1049 n. 10.

Under Pennsylvania law, when deciding whether strict liability applies because a product is or is not in a defective condition, unreasonably dangerous, the court must weigh the following seven factors of a risk/utility analysis: (1) the usefulness and desirability of the product-its utility to the user and the public as a whole; (2) the safety aspects of a product-the likelihood that it will cause injury and the probable seriousness of the injury; (3) the availability of a substitute product which would meet the same need and not be as unsafe; (4) the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility; (5) the user's ability to avoid danger by the exercise of care in the use of the product; (6) the user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (7) the feasibility, on the part of the manufacturer, of spreading the loss

by setting the price of the product or carrying liability insurance. *Surace,* 111 F.3d at 1046 (citing *Dambacher by Dambacher v. Mallis,* 336 Pa.Super. 22, 485 A.2d 408, 423 n. 5 (Pa.Super.1984)); *Van Buskirk v. West Bend Co.,* 100 F.Supp.2d 281, 285 (E.D.Pa.1999); and John W. Wade, On the Nature of Strict Tort Liab. for Prods., 44 Miss. L.J. 825, 837-38 (1973)). An examination of each risk/utility factor follows.

    1. The Usefulness and Desirability of the Product-Its Utility to the User and to the Public.

**\*3** Defendants claim that the usefulness and desirability of a jacket with an adjustable hood for keeping the elements at bay is self-evident. Plaintiffs do not dispute the utility of a jacket such as the Ranier jacket. However, Plaintiffs claim, without support, that the relevant inquiry does not concern the usefulness and desirability of the jacket as a whole, but only concerns the usefulness and desirability of the elasticized draw cord and cord locks. This Court has been unable to find any case law that supports Plaintiffs' position. Rather, the case law found by this Court implies that this first risk/utility analysis factor concerns the utility of the product as a whole, not simply the utility of one particular piece of the product. *See Van Buskirk,* 100 F.Supp.2d at 286 (focusing the analysis of the first factor on the utility of a four cup deep fryer as a whole and not on the allegedly defective parts of the fryer); *Monahan v. Toro Co.,* 856 F.Supp. 955, 958 (E.D.Pa., 1994) (stating that riding lawn tractors are useful and desirable). Thus, we agree with the Defendants that a jacket with an adjustable hood, such as Jansport's Ranier jacket, is useful, desirable, and has great utility to the user and to the public as a whole.

    2. The Safety Aspects of a Product-The Likelihood that It Will Cause Injury and the Probable Seriousness of the Injury.

Defendants allege that the jacket does not pose any unusual risk of injury. Jansport claims that it has sold and marketed approximately 78,333 units of outwear since 1997 that included an elasticized draw cord and cord locks similar to those incorporated in the Ranier Jacket. This represents 43.3% of the total outerwear sold and marketed by Jansport since 1997. Furthermore, Jansport alleges that, other than this present action, it has not been notified of any other problems, accidents, or injuries in connection with any of these units of outerwear utilizing the elasticized draw cord and cord locks. Plaintiffs have also not produced any evidence of other injuries occurring with the Ranier jacket. One accident arising from one unit out of 78,333 units shows a low likelihood of injury. Simply because "some injuries may occur does not mean that a [product] is defective." *Monahan,* 856 F.Supp. At 959. In the absence of any evidence of other injuries, this factor weighs in favor of Defendants. *See Van Buskirk,* 100 F.Supp.2d at 286; *Riley v. Warren Mfg.,* 455 Pa.Super. 384, 688 A.2d 221, 225-226 (Pa.Super.1997).

Plaintiffs attempt to distinguish *Van Buskirk* and *Warren Mfg.* on the basis that they involved unintended users of the product while in the present action, Mr. Epler was an intended user. However, this distinction has no bearing on whether evidence showing a lack of prior accidents may be used in analyzing this factor of the risk/utility analysis. Furthermore, cases such as *Spino v. John S. Tilley Ladder Co.,* 548 Pa. 286, 696 A.2d 1169 (Pa.1997) and the cases cited therein, cited by the Plaintiffs for the proposition that evidence showing a lack of prior accidents may not be considered by the fact finder, concern the admission of evidence at trial and not during the preliminary risk/utility analysis performed by the court.

    3. The Availability of a Substitute Product Which Would Meet the Same Need and Not Be as Unsafe.

**\*4** Plaintiffs' expert, Christopher M. Pastore, Ph.D., a materials engineer ("Dr.Pastore"), proffers five alternative hood closure designs which he believes would make the Ranier jacket safer than its current configuration utilizing the elasticized cord and cord locks.[FN3] There is no evidence that Dr. Pastore has tested these alternative designs. Dr. Pastore does, however, rely in part upon the Consumer Products Safety Commission's report on the use of draw cords on children's clothing and the risk of strangulation. The Court notes this report is not directly applicable as the Ranier jacket is

designed for adults and Plaintiffs have not alleged a strangulation injury.

> FN3. Dr. Pastore suggests the use of a non-elastic cord, sewing elastomeric tape around the hood opening, or using interior flaps held shut by buttons or Velcro©. However, these designs do not appear to meet the same need as the current Ranier jacket design (see section III. A. 4., infra). Dr. Pastore also suggests using a cord and cord lock located at the back of the hood, or using an elasticized cord and cord locks, like the one at issue, but sewing the loose ends of the cord within the garment to prevent recoil.

However, Defendants have not shown that a jacket utilizing an elasticized cord and cord locks with the loose cord ends sewn into the garment would not be an adequate substitute product that would be "safer overall" and would reduce the risk of recoil. See Riley, 913 F.Supp. at 886. Furthermore, Plaintiffs have shown the availability of this alternative product by producing similar jackets from other manufacturers which utilize an elasticized draw cord and cord locks with the loose cord ends sewn into the jacket. Therefore, this factor weighs in favor of the Plaintiffs because it is possible that at least one of Plaintiffs' alternative designs would meet the same need at the Ranier jacket and not be as unsafe.

### 4. The Manufacturer's Ability to Eliminate the Unsafe Character of the Product Without Impairing Its Usefulness or Making It Too Expensive to Maintain Its Utility.

Plaintiffs also claim that the five alternative hood closure designs would not impair the usefulness of the jacket or make it too expensive to maintain its utility. Of these alternative designs, Defendants claim that the braided non-elastic cord, the elastomeric tape sewn within the hood and the interior flaps held in place by buttons or Velcro© would not allow for the same visibility and freedom of movement as the Ranier jacket currently allows. Further, Defendants claim that a cord and cord lock on the back of the hood would also be unacceptable because the wearer would not be able to see the cord while adjusting the hood and the design could not be utilized by an individual lacking full motion in their shoulders. Defendants allege that these designs would impair the usefulness of the jacket and would create their own safety hazards due to the reduced visibility they would cause.

However, Defendants do not comment upon the use of an elasticized cord and cord locks with the loose cord ends sewn into the garment. Defendants have not shown that this design would not function almost identically to the current design of the Ranier jacket and would not reduce the risk of recoil. Defendants further point out that Dr. Pastore does not offer proof that the alternative designs would not render the Ranier jacket too expensive to maintain its utility. However, while viewing the facts in a light most favorable to the Plaintiffs, it is unlikely that the implementation of this alternative design would render the jacket too expensive to maintain its utility. Therefore, this factor weighs in favor of the Plaintiffs.

### 5. The User's Ability to Avoid Danger by the Exercise of Care in the Use of the Product.

*5 The Court must decide if Mr. Epler acted as an "ordinary" consumer in using care to avoid dangers associated with elasticized cords. Van Buskirk, 100 F.Supp.2d at 288 (citing Berkebile, 337 A.2d at 899 n. 6). The "user" referred to in the risk/utility analysis factors is the ordinary consumer who purchases or uses the product. Surace, 111 F.3d at 1051. A user could avoid the dangers associated with the elasticized cord and cord locks by being mindful of the propensity of elastic cords to recoil and by exercising care by not pulling forcefully on such a cord in the vicinity of the user's face. Such care could reasonably be exercised even in adverse weather conditions. Therefore, this factor weighs in favor of the Defendants.

### 6. The User's Anticipated Awareness of the Dangers Inherent in the Product and Their Avoidability, because of General Public Knowledge of the Obvious Condition of the Product, or of the Existence of Suitable Warnings or Instructions.