# EXHIBIT "A"
## Part 1

1        IN THE UNITED STATES DISTRICT COURT FOR THE
             WESTERN DISTRICT OF PENNSYLVANIA
2
3                         - - - -

TINA LINDQUIST,                    )
4                                  )
                                   )
5                                  )
                                   )
6              Plaintiff,          )
                                   )
7              -vs-                )        Civil Action
                                   )        No. 04-249E
8    HEIM, L.P.,                   )
                                   )
9                                  )
                                   )
10                                 )
             Defendant.            )        CERTIFIED TRANSCRIPT
11
12
                          - - - -
13
        VIDEO DEPOSITION OF:  John Hood, M.D.
14
                          - - - -
15
16        DATE:      February 23, 2007
                     Friday, 2:00 p.m.
17
18        LOCATION:  300 State Street
                     Erie, PA
19
20        TAKEN BY:  Plaintiff
                     Tina Lindquist
21
22        REPORTED BY:  Cynthia A. Hawley
                        Notary Public
23                      AKF Reference No. CH98501
24
25



2

1              VIDEO DEPOSITION OF JOHN HOOD, M.D.,
a witness, called by the Plaintiff, Tina Lindquist,
2  for examination, in accordance with the Federal Rules
of Civil Procedure, taken by and before Cynthia A.
3  Hawley, a Court Reporter and Notary Public in and for
the Commonwealth of Pennsylvania, at the offices of
4  Hand Microsurgery, 300 State Street, Suite 205, Erie,
Pennsylvania, on Friday, February 23, 2007,
5  commencing at 2:07 p.m.

6

                          - - - -

7

8  APPEARANCES:

9       FOR THE PLAINTIFF, TINA LINDQUIST:
Raymond J. Conlin, Esq.
10  LAW OFFICES OF DALLAS W. HARTMAN
2815 Wilmington Road
11  New Castle, PA   16105
P 724-652-4081
12  F 724-652-8380

13

14       FOR THE DEFENDANT, HEIM, L.P.:
Gary M. Scoulos, Esq.
15  MEYER DARRAGH BUCKLER BEBENEK ECK, P.L.L.C.
U.S. Steel Tower
16  Suite 4850
600 Grant Street
17  Pittsburgh, PA   15219-6194
P 412-553-7075
18  F 412-471-2754
gscoulos@mdbbe.com
19

20

      ALSO PRESENT:
21  Ronald J. Stephens, videographer

22

23

24

25

3

1                        * I N D E X *

2    Examination by Mr. Conlin  - - - - - - - - - - -   4
     Examination by Mr. Scoulos  - - - - - - - - - -  54
3    Re-Examination by Mr. Conlin - - - - - - - - - -  60

4    Certificate of Court Reporter  - - - - - - - - -  63

5

6

7

8

9                    * INDEX OF EXHIBITS *

10   Deposition Exhibit 1 - - - - - - - - - - - - - -  24
     Deposition Exhibit 2 - - - - - - - - - - - - - -  53
11   Deposition Exhibit 3 - - - - - - - - - - - - - -  53
     Deposition Exhibit 4 - - - - - - - - - - - - - -  51
12

13           (Exhibits were retained by Mr. Conlin.)

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. CONLIN:  Before we begin with the

2      doctor's deposition, counsel and I have agreed

3      that at the time of the trial of this matter

4      the defendants are going to stipulate to the

5      amount of medical bills paid by the worker's

6      compensation carrier without the need for

7      further testimony from Dr. Hood or anybody from

8      his staff in the billing department.

9           I had forwarded a stipulation to

10     Attorney Robinson back on December 6th of 2006

11     and at that time the amount of bills that

12     worker's compensation had paid was $199,739.57.

13     I have reason to believe that that number has

14     increased and it will certainly increase by the

15     time this matter proceeds to trial.

16           I just want to make sure that we have

17     that understanding with defense counsel that

18     that figure can go in without further testimony

19     from the physician.

20           MR. SCOULOS:  Yes, we have that

21     agreement.  And it's our intention to formalize

22     the agreement via stipulation.  And we realize

23     if for some reason we can't hammer out a

24     stipulation you have the right to recall

25     Dr. Hood or anyone else for that matter to

1          prove your case.

2                    On the subject of agreements in

3          today's deposition, it's my understanding that

4          you might, but you are not sure if you will,

5          have the doctor review and identify photographs

6          of his patient.  So we do not clutter up the

7          record, I will pose my objections to certain of

8          the photographs at this time with the

9          understanding that I have a standing objection

10         if you do choose to display them today.

11                   In particular, I have objections to

12         photos 69 through 80.  Those are the numbers

13         that have been used throughout the proceedings.

14         69 through 80 inclusive.  The basis for the

15         objection is that those photographs are highly

16         prejudicial and the prejudicial effect

17         outweighs their relevancy and their utility in

18         having the doctor explain what he was facing

19         throughout the course of his treatment.  Do you

20         agree?

21                   MR. CONLIN:  I disagree with the

22         reason, but you certainly have the objection.

23                   MR. SCOULOS:  You agree to standing

24         objection?

25                   MR. CONLIN:  I agree it's a standing



1    objection.  You do not need to interrupt me.

2    And just so there's no misunderstanding, I will

3    be using photographs.  I simply don't know if

4    I'll being using all the ones you find

5    erroneously objectionable.

6           MR. SCOULOS:  Yes.  Understood.

7    Thank you.

8           THE VIDEOGRAPHER:  Today is Friday

9    February 23, 2007.  The time is approximately

10   2:07 p.m.  The location is 300 State Street,

11   Erie, Pennsylvania.  My name is Ronald J.

12   Stephens, video specialist.  This is case No.

13   04-249E, entitled Tina Lindquist, plaintiff,

14   versus Heim, L.P., defendant.

15          The deponent is Dr. John M. Hood,

16   M.D.  This deposition is requested by the

17   plaintiff.  Counsel and everyone here will

18   please identify themselves for the record.

19          MR. CONLIN:  Ray Conlin on behalf of

20   the plaintiff.

21          MR. SCOULOS:  Gary Scoulos on behalf

22   of Heim, Incorporated.

23          THE VIDEOGRAPHER:  The deponent may

24   now be administered the oath by Cindy Hawley of

25   AKF Court Reporting.

```
1    ---------------------------------------------------------
2                         JOHN HOOD, M.D.,
3                     being first duly sworn,
4              was examined and testified as follows:
5                             -  -  -  -
6                            EXAMINATION
7                             -  -  -  -
8    BY MR. CONLIN:
9    Q.    Good afternoon, doctor.  As I stated earlier my
10         name is Ray Conlin.  I'm here on behalf of Tina
11         Lindquist.  Would you please state your name
12         for the members of our jury?
13   A.    Yes.  My name is John Michael Hood.  I am a
14         orthopedic physician who has training in hand
15         surgery and microsurgery.
16   Q.    Where do you maintain your principle office,
17         doctor?
18   A.    300 State Street, Suite 205 in Erie,
19         Pennsylvania.
20   Q.    So just a few blocks from the Federal
21         Courthouse?
22   A.    That's correct.
23   Q.    Can you tell us a little bit about your
24         education, doctor?  Where did you attend
25         college?
```

1   A.     I went to Gannon University here in Erie,

2          Pennsylvania.  I was part of the Gannon

3          Hahnemann program, which I went to

4          undergraduate for two years.  Basically put

5          three and a half years training in a two-year

6          time frame.  Then went directly on to medical

7          school at Hahnemann University in Philadelphia.

8                  There I detriculated after four years

9          and got my M.D.  From there I went to Hamot

10         Medical Center in Erie, Pennsylvania for a

11         five-year residency in orthopaedics.  Following

12         that residency I went back to Philadelphia to

13         the University of Pennsylvania for a one-year

14         fellowship in hand and upper extremity surgery.

15   Q.    Can you explain for me, doctor, what is a

16         fellowship?  What's the meaning of that word?

17   A.    Well, a fellowship is, it's almost like being a

18         journeyman.  Okay.  I am already a qualified

19         orthopedic surgeon, but I wanted extra special

20         training in a certain subset of orthopedics, in

21         this case hand upper extremity and

22         microsurgery.

23                  So it was a year working with three

24         hand surgeons in the Philadelphia area,

25         University Hospital, Children's Hospital,



1      Philadelphia Yaden Hospital.  And over in

2      Cherry Hill.  There was a couple offices I went

3      to as well in New Jersey.  But the whole year

4      was devoted into learning and dealing with

5      disorders of the upper extremity.

6   Q.  Okay.  Doctor, did you ever obtain any type of

7      board certification in your specialty?

8   A.  Yes.  I am certified in orthopaedics.  And I've

9      passed the certificate of additional

10     qualification for hand surgery.

11  Q.  Can you explain for us the significance in the

12     process of becoming board certified first

13     generally in orthopedic surgery and then in the

14     subspecialty?

15  A.  Well, it means that the governing body in

16     orthopedics has decided that by passing the

17     examinations, both the written and oral

18     examinations in orthopedics, that I am

19     qualified to practice and proceed with the

20     responsibilities of an orthopaedic surgeon in

21     this country.

22          The certificate of additional

23     qualification is a specialty examination that

24     one can take after taking a year long

25     fellowship.  And in passing that examination I



1         have made the qualification for the American

2         Society for Surgery of the Hand and able to

3         officially say that I'm a hand surgeon.

4    Q.   Okay.  Doctor, are you currently involved in

5         the instruction of any medical students or

6         residents?

7    A.   Yes, I am.

8    Q.   Can you tell me just briefly about that?

9    A.   At Hamot, where I actually had my orthopedic

10        residency, we still have a residency program.

11        I teach residents from Hamot Medical Center.  I

12        teach residents from Millcreek Community

13        Hospital in their orthopedic program.  I teach

14        residents at Shriner's Hospital for Crippled

15        Children in pediatric orthopedics to Hamot

16        residents, University of Pittsburgh and

17        residents from the Michigan area.  I don't

18        remember which hospital it is, but residents

19        that follow through there.

20   Q.   And in your practice are you also called upon

21        from time to time to give lectures and seminars

22        to other surgeons about your subspecialty of

23        hand surgery?

24   A.   Yes, I am.

25   Q.   How long have you been licensed to practice

1   medicine in the Commonwealth of Pennsylvania?

2 A. Since 1990, since 1990.

3 Q. In addition to the lectures --

4 A. I believe it was 1990.  Sorry.  It's been so

5   long I'm forgetting.

6 Q. In addition to the lectures and seminars that

7   you do for other physicians have you ever been

8   called upon to write any articles or present

9   any exhibits relative to your subspecialty of

10   hand surgery?

11 A. Yes, I have.

12     MR. CONLIN:  At this time I would

13   offer Dr. Hood as an expert witness in the

14   specialty of orthopedic surgery of the hand and

15   upper extremity and ask counsel if they have

16   any questions on qualifications.

17     MR. SCOULOS:  We have no objection to

18   the doctor's participation, nor do we have any

19   questions.  Thank you.

20     MR. CONLIN:  Thank you.

21 BY MR. CONLIN:

22 Q. Doctor, have you been Tina Lindquist's treating

23   hand surgeon since September 25th of 2002?

24 A. Yes, I have.

25 Q. Can you explain to the members of the jury how

Pittsburgh, PA
412-261-2323 / Greensburg, PA
724-853-7700 / Erie, PA
814-453-5700

AKF

```
 1            it was that you first met Tina?
 2   A.   I was called to the emergency room, um, on that
 3        day.  Tina apparently had been in an industrial
 4        accident at her place of employment, Corry
 5        Manufacturing Company I believe it was.  She
 6        apparently had a press close down on both of
 7        her hands.  And she had very severe injuries to
 8        both hands.
 9   Q.   When you say very severe injuries, did you
10        record your observations of how Tina appeared
11        the very first time you saw her with respect to
12        her hands?
13   A.   Yeah.  She basically had a crushing injury and
14        evulsions.  So her fingers were pressed to
15        about the thickness of a quarter between -- and
16        I'll show you here -- between this level here,
17        which is the, we call this the distal ulnar
18        crease.  So that crease right through there up
19        until this area.  So this area from here to
20        here was completely crushed and evulsed.
21             She had torn all the blood vessels to
22        all four of the fingers apart on both hands.
23        She had mashed the tendons that allow you to
24        bend and extend the fingers, but they were
25        basically intact.  And the bones and the joints
```



13

```
 1            were completely destroyed in this zone from
 2            about here across there of the hand.
 3                       So these knuckles back through here
 4            were gone.  And for the small finger, most of
 5            this finger was crushed in both hands and
 6            crushed up to about this level.  So the tips
 7            were all right but the rest of the fingers were
 8            completely demolished.
 9     Q.     And you say that they were crushed down flat
10            almost to the width of a quarter?
11     A.     Yes.
12     Q.     So if you hold your hand sideways it would have
13            been that thin?
14     A.     Yes.
15     Q.     And that would have been true for both her
16            right hand and her left hand?
17     A.     Yes, sir.
18     Q.     Now, is there a name for that?  What is the
19            original diagnosis that you gave to that
20            injury?
21     A.     Basically it's a crush evulsion injury of her
22            hands, of her fingers, index, long, middle and
23            small finger, ring and small fingers of both
24            hands.
25     Q.     And in your years of orthopedic surgery had you
```

1   encountered somebody who had the type of crush
2   evulsion injury?
3   A.   Yes.
4   Q.   Did you develop a battle plan and course of
5   action about how you were going to attempt to
6   treat this problem?
7   A.   Yes.
8   Q.   Can you explain for me what the initial
9   treatment was that you gave to Tina?
10  A.   Well, you know, initially she was stabilized in
11  the emergency room, given fluids, given some
12  pain medicine.  We called immediately for the
13  operating room and said that we needed to
14  operate in teams in the operating room because
15  we needed to work on both hands at the same
16  time.
17          This type of surgery often will last
18  12, 14 hours when trying to revascularize and
19  repair and reconstruct these severe crushing
20  injuries and evulsion injuries.  You need to
21  reestablish blood flow.  You need to
22  reestablish bony continuity.  You need to
23  reestablish skin, so coverage of those
24  underlying soft tissues.  And you need to
25  reestablish nerve supply so that eventually

1    there is some feeling to these fingers.

2             In the operating room with her, two

3    surgeons took care of her.  I took care of her

4    right hand.  Dr. Williams, one of my other hand

5    surgery associates, took care of her left hand.

6    We had two operating microscopes in the room.

7             And the initial inspection of the

8    wounds under the microscope showed that the

9    small fingers were unsalvageable because the

10   crushing was so far out that trying to place

11   those back on would have left a, really just a

12   nonviable knubbing or very small piece, maybe

13   something like that on the end.  And being down

14   there it wouldn't have made much difference.

15            We found once exploring the

16   neurovascular bundles that the index fingers,

17   um, were I believe more poor on the left side.

18   So of the fingers that were remaining on the

19   left hand, the middle finger and the ring

20   finger were successfully revascularized,

21   meaning to put the blood supply back into the

22   fingers.

23            That includes repairing arteries so

24   that there's flow of blood into the fingers,

25   and veins so that there is flow out of the

1        fingers.  The skeleton was fixed with something

2        called K wires.  They're very thin wires that

3        are about 10, 12 inches long that have sharp

4        points on the end.  They're about the thickness

5        of a paper clip and diameter of the wire itself

6        to give us temporary fixation so we can focus

7        on doing the vascularized portion of this.

8              On her right hand I was able to

9        successfully, at least initially, get the

10       index, long and ring finger to be

11       revascularized, and we pinned those as well.

12       So we had several blood vessels to fix.

13             There is a time frame with that.  Um,

14       warm ischemia, meaning the fingers being at

15       room temperature, we really only have about

16       eight hours of time to reconnect the blood

17       supply before the damage is so bad that there

18       is no hope of them staying.

19             Cold ischemia we're able to keep them

20       cold.  If it was like it is outside today,

21       let's say, and she was stuck outside for

22       several hours she might have a 24-hour time

23       frame to do it.

24   Q.  But given the fact it happened in a warmer --

25   A.  September, right.

1  Q.   So you have to basically race against the clock

2       to revascularize these fingers?

3  A.   Yes.

4  Q.   And you said you had to connect the arteries

5       and the veins to take the blood into and out of

6       the fingers?

7  A.   Yes, sir.

8  Q.   Are there -- how large are the arteries and

9       veins in the finger?  How do you do that?

10 A.   Um, about a 32nd of an inch in diameter.  We do

11      it under a microscope.  We have special tools

12      that are very similar to a watchmaker's tools.

13      They are very fine forceps and needle holders

14      that we work under the microscope anywhere from

15      4 to 20 magnification to clean up and bring

16      these vessels together.  And I use thread

17      that's thinner than a human hair to suture

18      these blood vessels back together.

19 Q.   If I understand you correctly, doctor, are you

20      actually stitching the two damaged ends of the

21      blood vessels together with a thread finer than

22      a human hair?

23 A.   That's correct.

24 Q.   And you're doing that with the use of a

25      microscope?



1  A.    That is correct.

2  Q.    When you said there were two surgical teams,

3        can you tell me how many people would have been

4        there during that first operation?

5  A.    Oh, dear.

6  Q.    Two surgeons.

7  A.    Two surgeons.  Probably three or four

8        circulators.  Two scrubs that are actually, you

9        know, assisting us directly.  There was

10       probably one or two residents in there as well.

11 Q.    Anesthesiologist?

12 A.    Anesthesiologist, probably a nurse anesthetist

13       as well as a nurse anesthetist student.

14 Q.    During that initial surgery -- that procedure

15       is done under general anesthesia?

16 A.    Yes.

17 Q.    Did she require any type of blood transfusions

18       or additional care like that?

19 A.    I don't recall.  That's pretty much taken care

20       of by the anesthesiologist while we're focused

21       on trying to revascularize the tissue.

22 Q.    Okay.  Now, after that is she transferred to

23       post-op?

24 A.    Yes.

25 Q.    Can you tell me how she was after that first

19

1         surgery?

2    A.    Well, we had her fairly well, for lack of a

3          better term, doped up.  What we try to do after

4          surgery with these types of injuries is to

5          prevent them from making adrenaline.  All

6          right.  Now, pain can give you adrenaline.

7          Being anxious will make more adrenaline.  Doing

8          depositions will make you produce adrenaline.

9          So all those types of things can increase that.

10              And what adrenaline does is that it

11         constricts the blood vessels.  It makes them

12         smaller so that the flow of blood going through

13         them is less and less, and if it gets small

14         enough it will clot off the blood vessel and

15         then the finger dies.

16              So we had her on medications, such as

17         Thorazine, which used to be a long time ago

18         used as an antipsychotic medication, but in

19         lower doses it has two effects.  One, it has a

20         calming effect so that they tend not to care

21         what's going on.  And two, it has a

22         vasodilatory effect, meaning it makes the blood

23         vessels kind of relax and get bigger.

24              We also, we have had her on some sort

25         of a anticoagulant, Heparin, intravenously

1       initially, pain medicine either through a

2       constant intravenous infusion or intermittent

3       injections.

4               Her room would have been very warm.

5       We usually try to keep the room above 78 to 82

6       degrees.  The whole idea there is to make the

7       body think that it's very hot out.  And when

8       things are very hot the blood vessels in the

9       arms and legs dilate more so they get larger,

10      and also try to help the blood flow into and

11      out of the fingers.

12              And she gets a lot of fluids.  We try

13      to dilute the blood so that there aren't

14      necessarily as many platelets or red blood

15      cells going through the area.  So it's like

16      thinning the fluid so that it's not as viscous,

17      so that it flows more freely.

18   Q.  Did Tina remain stable during that process

19      post-op?

20   A.  Yes, she did.

21   Q.  Did you follow with her on a daily basis?

22   A.  Yes.  Twice daily initially.

23   Q.  Was she an in-patient for that period of time?

24   A.  Yes, she was.

25   Q.  How long would she have remained an in-patient

1    following that first surgery?

2  A.  Oh, boy.  At least a week.  It may have been

3      two weeks.  I would not have let anybody after

4      a replantation leave before a week.

5  Q.  Okay.  Now, at that point in time did you

6      anticipate there would be any complications

7      from the injuries she sustained back on

8      September 25th of 2002?

9  A.  As far as anticipate, I would say yes because,

10     I mean, for a severe crushing injury it's

11     always a balance between how much tissue do you

12     remove to ensure that you have what's left

13     that's viable and how much do you try to save

14     so that you can try to improve function.

15          So there's a balance there.  And

16     obviously there is a zone of injury.  There's a

17     zone where if you looked under a microscope

18     that a pathologist would look at that he would

19     say this is normal tissue.  Then you get to a

20     part where he says, oh, there's hemorrhage in

21     the tissue, there's damage, there's crushing

22     nature going on through here.

23          And then you go to the other end

24     where it says, oh, this is normal tissue again.

25     Well, ideally if you get your finger cut off

1 with a sharp knife the zone of injury is very

2 narrow.  So I can save the vast majority of the

3 structures.  Versus an injury which is

4 basically just a crushing nature like being hit

5 with a sledge hammer and the width of the

6 damage is the width of the sledge hammer.

7    So that amount of tissue in this

8 instance was severely damaged so we had to take

9 a lot out.  Um, we, I almost always expect with

10 these types of injuries one or two other

11 operations that are related to either tissues

12 dying, infection, the hardware not holding,

13 vascular problems where the blood vessels clot

14 off and we have to go back in and free up the

15 blood vessels, take the little clot out and

16 then sew them back together again.

17 Q. So after the first surgery, if I'm correct,

18 Tina's thumbs would have been intact on each

19 hand; is that correct?

20 A. That's correct.  There are no injuries to her

21 thumbs.

22 Q. And her ring and long finger would have been

23 intact on each hand?

24 A. Yes.

25 Q. Doctor, I'm going to show you a series of five

Pittsburgh, PA
412-261-2323 / Greensburg, PA
724-853-7700 / Erie, PA
814-453-5700

AKF

1           photographs and ask if you can identify those

2           for us?

3    A.     Yeah.  These are Tina's hands probably close to

4           a month out after the surgery I would say from

5           my recollection.

6    Q.     Is that how her hands would have appeared after

7           the surgery, after that 10 to 12-hour procedure

8           that you just described?

9    A.     The black areas would not have been there.

10          Okay.  The hands would have been much more

11          swollen than what they are here.

12   Q.     Okay.

13   A.     And they would have been rather bloody.

14   Q.     Okay.  Is that how her hands appeared though

15          through the course of her post-op?

16   A.     Yes.

17   Q.     Okay.

18   A.     Yes.

19   Q.     Can you turn that around so the jury can see

20          those?

21   A.     (Witness complies).

22   Q.     Thank you.

23                 MR. CONLIN:  Just for the record, I'm

24          going to have the court reporter mark that as

25          Hood Deposition Exhibit 1, and it's photographs



1       70, 79, 80, 75 and 77.

2               - - - -

3       (Exhibit No. 1 marked for identification.)

4               - - - -

5  BY MR. CONLIN:

6  Q.    Doctor, after that initial surgery and post-op

7       stay did Tina develop complications?

8  A.    Some of the skin necrosed.

9  Q.    What does that mean?

10  A.    That means some of the skin died.

11  Q.    Was an additional surgery necessary?

12  A.    Yes.

13  Q.    When did you do your next surgery on Tina?

14  A.    Let's look here.  Sometimes the electronic

15       system is not as good as the paper system, so

16       excuse me for being a little slow here.  Let's

17       see.

18  Q.    Doctor, according to the records I've seen I

19       believe the procedure was on October 5th of

20       2002.

21  A.    Yes.

22  Q.    If that helps you find it on your computer.

23  A.    With almost 400 pages of documents in here it

24       gets a little lengthy.  Let's see here.  What

25       was that date, 10/5 you said?

Pittsburgh, PA
412-261-2323   /   Greensburg, PA
724-853-7700   /   Erie, PA
814-453-5700



25

1    Q.    10/5 of '02.

2    A.    Okay.  Yes.  Okay.  I've got it.

3    Q.    Can you tell us, is that the time that she

4          developed the complications with the skin on

5          her hands dying?

6    A.    Well, over the time from the date of her

7          initial procedure and the injury until then,

8          yes, that's when I felt that things had, we

9          call it declaring where the tissues have pretty

10         much shown me to a significant extent that this

11         is definitely not going to make it, the tissue

12         definitely is going to make it and the zone of

13         indecision is somewhat smaller.

14   Q.    What type of procedure was done on October 5th?

15   A.    We did a called an irrigation and debridement.

16         So the margins of the tissue that weren't

17         healthy of the left hand were debrided down to

18         healthy appearing tissue and we did a dressing

19         change.  On the right hand we did an amputation

20         of the right index finger because that finger

21         had obviously died and did a dressing change

22         and once again some debridement of the long and

23         ring finger tissues around that zone of the

24         hand.

25   Q.    By debridement, does that mean you are cutting

1    back the dead tissue?

2 A.  Yes.

3 Q.  Are these procedures, the debridements and the

4    amputation, those are done under general

5    anesthetic?

6 A.  Yes, sir.

7 Q.  Were there any complications from that

8    appointment or from that procedure?

9 A.  No, nothing unusual.

10 Q.  Did Tina continue to follow up with you both as

11    an in-patient at Hamot and here in your office?

12 A.  Yes, she did.

13 Q.  And during the course of your follow-up

14    treatment did she develop additional problems

15    that required yet another surgery?

16 A.  Yes, she did.

17 Q.  Can you tell me when it was that you were

18    forced to perform your third surgery on Tina

19    Lindquist?

20 A.  All right.

21 Q.  And I believe that's the osteotomy.

22 A.  Yeah.  That's why I'm -- excuse me for

23    muttering for myself.  I'm sorry.  I'm just

24    trying to read through this.  I believe that

25    would have been 2/17/03.



```
 1   Q.   What type of operation did you perform that
 2        day, doctor?
 3   A.   Um, let's see here.  I have a physical exam.
 4        Hold on.  I need to go to the op report.  We
 5        did a osteotomy with plating of the left long
 6        and ring finger and removal of the left great
 7        toe nail.
 8   Q.   Can you tell us what an osteotomy is?
 9   A.   It's where the bones are cut and cleaned out at
10        the end.  So it's like, um, what we basically
11        did there is like what they do with grapevines
12        in the United States.  You have a root system
13        that's part of a different plant than the
14        growing part, the leafy part of the grape, and
15        you splice it together.  Okay.  So we're
16        basically trying to get the two pieces of bone
17        to grow together to make a solid piece of bone.
18   Q.   Is that procedure done under general
19        anesthetic?
20   A.   Yes, it was.
21   Q.   Does it require a hospital stay?
22   A.   Um, I believe we kept her in over night.  I
23        don't believe that was outpatient.
24   Q.   Did Tina continue to follow with you as a
25        patient after that osteotomy?
```



 1  A.    Yes.

 2  Q.    Was there any complications from that

 3        osteotomy?

 4  A.    She failed to heal that bone.

 5  Q.    When you say she failed to heal, the bones

 6        failed to join together?

 7  A.    Yes.

 8  Q.    As a result of that was additional treatment

 9        necessary?

10  A.    Yes.

11  Q.    Can you tell us, doctor, what you had to do

12        surgically since the osteotomy failed?

13  A.    Basically she had broken the plates, which are

14        those tiny pieces of metal that I put screws

15        through to hold the bone together.  On April

16        21st of 2003 we, I took down those nonunion

17        sites, meaning I opened it up, took the scar

18        tissue out that was between the bones and put

19        new plates and screws on to them.

20  Q.    In that osteotomy, is that when you're actually

21        putting a small metal plate and screw in her

22        fingers?

23  A.    The osteotomy is technically the cutting of the

24        bone itself.  The plating is the action of

25        putting the plates and screws on.



| | | |
|---|---|---|
| 1 | Q. | So that fourth procedure would have been to |
| 2 | | take out those plates and screws? |
| 3 | A. | The initial ones and putting a new set in |
| 4 | | because she broke the first ones. |
| 5 | Q. | Did you continue to follow with Tina as a |
| 6 | | patient in your office after that fourth |
| 7 | | operation? |
| 8 | A. | Yes, I did. |
| 9 | Q. | Did she develop any additional complications? |
| 10 | A. | Yes.  She had problems with infections in the |
| 11 | | soft tissues mostly on the left hand. |
| 12 | Q. | And as a result of that what type of treatment |
| 13 | | did you render to help her with those |
| 14 | | infections? |
| 15 | A. | She got antibiotics, a couple courses of I |
| 16 | | believe Keflex and some Ciprofloxacin, or Cipro |
| 17 | | was the general term for it. |
| 18 | Q. | Now doctor, at that point in time you had to |
| 19 | | remove another digit of Tina's hand, mainly I |
| 20 | | think it was the index finger of the right |
| 21 | | hand? |
| 22 | A. | Right hand. |
| 23 | Q. | Is that correct? |
| 24 | A. | Yeah. |
| 25 | Q. | I'm going to show you a series of photographs, |



30

```
 1           doctor, and ask you if those depict Tina's

 2           hands as they would have looked after that

 3           third surgery, the osteotomy?

 4    A.     Yes, they would.  Though, um, they are after

 5           the osteotomy.  But these pictures of her left

 6           hand are, this is showing pictures after her

 7           toe to hand transfer.  So the right hand would

 8           have looked that way.  Oh, sorry.

 9    Q.     Doctor, while the videographer is panning

10           through those pictures, were you able to get

11           the infection that was plaguing Tina after that

12           fourth surgery under control?

13    A.     Yes.

14    Q.     And you did that through medication?

15    A.     Yes.

16    Q.     Did she continue to come to your office for

17           treatment and various therapies?

18    A.     Yes, she did.

19    Q.     Was there an occasion that you had to perform

20           yet a fifth surgery on Tina Lindquist?

21    A.     Yes.

22    Q.     Can you explain to us, can you explain what

23           procedure it was that you did?

24    A.     Well, there was a couple of things I think

25           you're getting at.  First she came to the
```



1        office and she was scheduled for what we call a

2        toe to hand transfer where we take one of the

3        person's toes and put it on the hand, use it as

4        a digit.

5             Prior to that she got an infection in

6        her toenail of the foot that we were going to

7        use.  So I had to take her toenail off again in

8        the office and then wait for that to clear

9        before we could schedule her for that surgery

10       for the toe to hand transfer.

11  Q.    Why, or what goes into the process of deciding

12        that a patient is a candidate for a toe to hand

13        transfer?

14  A.    It comes down to function and what she has as

15        far as fingers or thumb goes.  In this instance

16        Tina's withered fingers on the left hand really

17        gave her nothing more than what basically the

18        palm of your hand would to push against with

19        her thumb.  So she didn't have anything to

20        pinch against.

21             So the whole idea was to either take

22        one or two toes to transfer that to the hand to

23        give her, try to give her a couple of fingers

24        essentially to pinch off against.

25  Q.    So if I understand this correctly, doctor, you

1              surgically removed one of her toes and attached

2              it to her hand?

3    A.    That's correct.

4    Q.    With the hopes that the toe will act as a

5              finger?

6    A.    Yes, essentially, yes.

7    Q.    And is this a procedure that is common?

8    A.    Not common, no.  But it's well documented.

9    Q.    Now, I'm going to show you a series of

10             photographs, doctor.  You, I think you pointed

11             out in this last set that there's actually some

12             pictures here where the toe is attached to her

13             hand?

14   A.    Yes.

15   Q.    Can you just identify maybe by number?

16   A.    168, this one here.  This one here is that.

17             This one here is that.

18   Q.    That's 168, 170, 175?

19   A.    181, um, and yeah, 173.

20   Q.    And in order to do that you have to harvest,

21             surgically harvest the toe; is that correct?

22   A.    That is correct.

23   Q.    I'm going to show you a series of photographs,

24             doctor.  And what do those photographs depict

25             for us?



1   A.    It shows her right foot here and here with one

2          of the toes missing.  That's her left foot with

3          all five toes.  And two pictures of her hand

4          with the toe transposed onto her left hand.

5   Q.    So you would surgically cut which toe off of

6          her foot?

7   A.    Traditionally it's the second toe, and that's

8          what this was.

9   Q.    Okay.  So you take her second toe, I guess the

10         toe next to the great toe?

11  A.    That's correct.

12  Q.    And then you have to do a surgical procedure on

13         her foot?

14  A.    Um-hum.

15  Q.    Is that correct?

16  A.    That is correct.

17  Q.    Does the loss of the toe have any effect on the

18         foot as far as balance or gate?

19  A.    Not a whole lot.  Generally that's been found

20         not to make a big difference after everything's

21         healed in six months to a year down the road.

22  Q.    Okay.  But for six months to a year there would

23         be some issues with balance and gate?

24  A.    More soreness and tenderness in the foot.

25  Q.    And then you surgically, through the same

1     procedure you sew it on to or attach it to her

2     hand; is that correct?

3  A.  That's correct.  We, once again, hook the

4     nerve, the blood vessels, the tendons and the

5     bones back together.

6  Q.  So during this fifth surgery, the toe to hand

7     transfer, it's similar to the first surgery.

8     You have to reva -- but it's a cleaner cut

9     because you do it surgically; is that correct?

10 A.  Yeah, that's correct.

11 Q.  But you have to revas, I think you said you had

12    to make sure that the nerves, the blood

13    vessels, the bones, everything's in conformity;

14    is that right?

15 A.  That is correct, sir.

16 Q.  Did she tolerate that toe to hand transplant?

17 A.  Yes, she did.

18 Q.  Does she now have that toe affixed to her hand?

19 A.  Yes, she does.

20 Q.  And you did that based upon the fact that she

21    would have no function in her hand without

22    that?

23 A.  She would have been much more limited, yes.

24 Q.  After the toe to hand transfer did you

25    discharge Tina and send her on her way, or did



1          she need additional care?

2     A.   She needed additional care.  As a matter of

3          fact, the day of that transplantation I had to

4          come back in the middle of the night to redo a

5          blood vessel because the toe became blue and

6          very cool, which means that blood's getting

7          into it but it's not flowing out.  So it

8          becomes congested.  So I had to redo one of the

9          vascular repairs that evening.

10    Q.   Okay.  So on a toe to hand surgery there was a

11         risk, for lack of a better word, that it was

12         being rejected?

13    A.   Um-hum.  Just lost.  I wouldn't say rejection.

14         Rejection denotes that it's not part of

15         herself.  But yeah, it could have lost it's

16         blood supply and died.

17    Q.   And during that emergency surgery on October, I

18         guess that'd be the 9th of 2003, did you

19         successfully revascularize that toe?

20    A.   Yes.

21    Q.   Does it remain attached to her hand to this

22         day?

23    A.   Yes, it does.

24    Q.   Did she develop additional problems that

25         required treatment?

