# EXHIBIT "A"
## Part 2

1   A.    Yes, she did.  She, once again, had some

2           contractors of that hand, and the bone didn't

3           heal initially to the toe, to the finger

4           metacarpal.

5   Q.    What do you mean by contractors, doctor?

6   A.    Just the, it was curling down.  So it stuck

7           down like this.

8   Q.    Kind of knarled?

9   A.    You could use that term.

10  Q.    As a result of that contractor what did you

11          recommend, what kind of treatment?

12  A.    I, I'm sorry because of the two surgical teams

13          there's twice as many --

14  Q.    We understand.

15  A.    -- operations.  Let's see.  On May 3, 2004 we

16          had a nonunion of the metacarpal.  So at that

17          point she had broken that plate.  And we

18          removed it, bone grafted it and did what was

19          known as a rodding of the metacarpal.  I put a

20          piece of metal right down the middle of the

21          bone.

22  Q.    Doctor, you've said twice she'd broken the

23          plate.  Do you mean she actually did something

24          to break it or the plate broke?

25  A.    Both.  The plate is made out of titanium.  They

Pittsburgh, PA
412-261-2323    /    Greensburg, PA
724-853-7700    /    Erie, PA
814-453-5700          AKF

```
 1              are about as thick as your wire glasses.  And
 2              just like a paper clip that you cycle, if you
 3              cycle it enough before the bone has knitted
 4              itself together the plate can fail.  And that's
 5              what happened.
 6    Q.        Okay.  And did it require additional plating on
 7              May 3rd of 2004?
 8    A.        We didn't plate.  At that point I put a rod
 9              down the center of the bone.
10    Q.        And can you describe the size of that rod?
11    A.        Um, they were 045 K wires.  So they're 45 one
12              thousandths of an inch thick.
13    Q.        Can you help me with that?  Is that like as big
14              as a pencil lead or --
15    A.        Thinner.
16    Q.        Thinner.
17    A.        There was, there were two pins.  One was 62 one
18              thousandths and the other one was 45 one
19              thousandths.  But yeah, they're both smaller
20              than a No. 2 lead pencil.  Maybe the size of a
21              mechanical pencil lead.
22    Q.        In the concept of rodding, you hear that
23              sometimes with long bone injuries in the leg.
24              Is that the same principle, you put a rod
25              through the center of the bone?
```



1  A.    Yes, it is.  It's basically the exact same

2        thing.  Even though metacarpals are short they

3        are still long bone.  They don't have an

4        irregular shape.  They're long and have joints

5        on either end.  So yeah, it's very similar to

6        rodding a femur or a tibia.

7  Q.    And why, what are you attempting to do when you

8        stick that rod in the remnants of these

9        fingers?

10 A.    What we're trying to do is to get the bone to

11       knit back together.  And a rodding -- I mean,

12       you are starting to get into biomechanics.  A

13       rod is more of a load sharing device whereas a

14       plate is not.  So all the forces have to go

15       through the plate.

16              When the titanium plate is on there

17       and the screws with a rod in the center the

18       bone actually sets most of the force against

19       itself while the little rod in there acts as a

20       stent to keep it in position.

21 Q.    Now doctor, by my count we're up to our sixth

22       surgery.  During this entire process, we're now

23       up to May of 2004 --

24 A.    Um-hum.

25 Q.    -- from an injury that occurred in September of

1       2002.  Is Tina having pain and limitations in

2       her hands during this two-year time period?

3  A.   Yes, she is.  Uh-huh.

4  Q.   And are you managing that as best you can with

5       medications and things like that?

6  A.   Yes.

7  Q.   Do you release her and send her on her way

8       after that sixth surgery, or does she require

9       additional care from you?

10  A.   No.  She needs some more care.

11  Q.   What's this next surgical procedure you needed

12       to perform on Tina?

13  A.   I believe it was March 7th of 2005.  At that

14       point we, she had a dorsal scar and the web

15       space between the thumb and the index finger

16       remnant was rather small.  So it means that the

17       thumb was kind of contracted like this.  So she

18       couldn't get around objects big enough to, like

19       a glass of water she couldn't hold on to with

20       that hand.

21           So we basically removed some scarring

22       that was on the back of the hand that she found

23       very painful whenever it touched anything, as

24       well as we proceeded with doing a web space

25       deepening procedure.  So we make this wider and

1           a little bit deeper down so that she can get it

2           over and around larger objects.

3    Q.    Is that depicted in that photograph, the

4           deepened web space?

5    A.    No, it's not.

6    Q.    Okay.  Did that surgery to deepen the web space

7           improve her ability to use that thumb?

8    A.    Yeah.  She was able to get around objects that

9           were probably a centimeter and a half to 2

10          centimeters wider and deeper than what it was

11          before.  So that's about three quarters of an

12          inch to an inch.

13   Q.    That's her seventh surgery; is that correct?

14   A.    I believe it is.  Seventh or eighth.

15   Q.    And is that -- well, if you put, actually with

16          that emergency one in the middle of the night

17          that was counted, so I guess that would be her

18          eighth where you had to come in when the toe

19          needed saved?

20   A.    Um-hum.

21   Q.    Those procedures that you're doing up to that

22          point in time, are these all under general

23          anesthetic in an operating room?

24   A.    Yes, they are.

25   Q.    Was Tina released from your care after that



41

```
 1              eighth surgery, which is the mastisizing and
 2              the web space deepening you just described?
 3    A.        No.
 4    Q.        Did she continue to follow with you?
 5    A.        Yes, she did.
 6    Q.        What additional complications did she develop
 7              that required your intervention?
 8    A.        Um, the toe that we had transferred developed
 9              fairly decent power and flexion, meaning she
10              could come down and make a fist with it and had
11              pretty good power with it.  The problem was it
12              was kind of stuck in a hook position.  And the
13              tendon that straightens the fingers out on the
14              back side of the hand were scarred down.  So I
15              did a tendon release of that digit.
16    Q.        So it's actually the tendon that would
17              typically hold a person's finger but because
18              there's a toe attached there you released that?
19    A.        Yeah.  Well, it's now her finger.  But it's,
20              yeah, that tendon that allows you to straighten
21              them out was caught in scar tissue.  So I
22              released the scar tissue from that so it would
23              get better straightening of the finger.
24    Q.        And when was that procedure done, doctor?
25    A.        I believe it was, that is January 30th of 2006.
```



1  Q.   So between the time you saw her on September

2       25th of 2002, the day she was injured, and

3       January of 2006, were there also occasions

4       where you had prescribed various types of

5       physical therapy or occupational therapy for

6       Tina?

7  A.   Yes, there were.

8  Q.   Can you explain to the members of the jury what

9       it was you were trying to do by recommending

10      those various therapies?

11 A.   Well, decreasing swelling, increasing range of

12      motion, increasing her ability to feel and

13      understand what she's feeling with her digits,

14      working on what we call ADLs, that's short for

15      activities of daily living, trying to work on

16      dressing herself, feeding herself, working on,

17      you know, buying groceries, dealing out change

18      and money, that sort of thing.  So the

19      activities that we in everyday life need to do.

20 Q.   Did Tina have limitations in these activities

21      of daily living as a result of these traumatic

22      injuries she sustained?

23 A.   Yes, she did.

24 Q.   And did you as her treating orthopaedic surgeon

25      observe those limitations as you saw her in the

|    |    |    |
|----|----|----|
| 1 |    | office and consulted with her and counselled |
| 2 |    | her? |
| 3 | A. | Yes. |
| 4 | Q. | Doctor, what I'd like to do is run through a |
| 5 |    | day with Tina Lindquist and talk to you about |
| 6 |    | activities of maybe you can give me an idea |
| 7 |    | whether or not she can do them? |
| 8 | A. | I'll do my best. |
| 9 | Q. | When she wakes up in the morning is Tina |
| 10 |    | Lindquist able to use what's left of her hands |
| 11 |    | to brush her teeth and to get herself ready in |
| 12 |    | the morning? |
| 13 | A. | She can do that.  It's difficult, but she can |
| 14 |    | do that. |
| 15 | Q. | How about activities like shampooing her hair? |
| 16 | A. | Um, shampooing she can probably do.  I'm not |
| 17 |    | quite sure how well she does with brushing her |
| 18 |    | hair. |
| 19 | Q. | How about using the toilet, was there ever a |
| 20 |    | period of time she had a difficult time with |
| 21 |    | matters of hygiene like that? |
| 22 | A. | Yes.  There was a considerable time where she |
| 23 |    | needed somebody else to assist her on toilet |
| 24 |    | care. |
| 25 | Q. | For how long of a period of time would this |

44

```
 1         woman have needed assistance with toilet care?
 2    A.   Oh, I think it was over a year.
 3    Q.   How about vigorously shampoo your hair, wash
 4         your hair, does she have the ability to do that
 5         with what's left of her hands?
 6    A.   Well, using the palms and her thumbs she can do
 7         it.  But you know, getting, she would not have
 8         been able to with the bones not healing and the
 9         open wounds obviously.  So the length of time
10         that it took to get the wounds closed I would
11         not have allowed her to do that sort of thing.
12    Q.   How about matters of feminine hygiene, doctor,
13         would she be able to attend to that with her
14         injuries?
15    A.   With significant difficulty.  I think inserting
16         a tampon, that sort of thing would have been
17         very difficult.
18    Q.   Have you ever heard or learned that she needed
19         assistance with that at some point?
20    A.   She basically told me that she needed
21         assistance for most everything initially.
22    Q.   Doctor, after she gets out of the shower would
23         she be able to dress herself and affix the
24         buttons on her sleeve and on her blouse?
25    A.   No.
```

1    Q.    Would she be able to snap up a blouse if it had

2          snaps instead of buttons?

3    A.    No.

4    Q.    Would she be able to bend over and tie her

5          shoes without difficulty?

6    A.    Not right away.  It was a few years.  I

7          remember her coming in to me and she was very

8          proud about the fact that a week or two before

9          was the first time she was able to tie her

10         shoes.

11   Q.    She would have been, what, 24 years old when

12         she --

13   A.    Yeah, 24 or 25.

14   Q.    How about putting on socks?

15   A.    With extreme difficulty.  Once again, it's a

16         matter of having enough pinch to get the sock

17         over the foot and up the leg.

18   Q.    How about putting pierced earrings in or

19         clipping a clasp on a necklace if she wanted?

20   A.    I don't think she can do that.

21   Q.    How about to put on eyeshadow, mascara, makeup

22         with what she has left of her hands, is she

23         going to be able to do that without difficulty?

24   A.    Not without difficulty.  She'll have quite a

25         bit of difficulty with that.



46

```
 1    Q.    How about care for an infant, you know, the

 2          onesies that the babies wear, the snaps, do you

 3          think she has the ability to take care of

 4          those?

 5    A.    With quite a bit of difficulty.  She may be

 6          able to do that, but it would not be a very

 7          easy task at all for her.

 8    Q.    So after she gets through the dressing portion

 9          of the day would she be able to go down and

10          prepare a meal?  Can she carry pots and pans?

11    A.    Maybe just with her thumbs.  But she's not

12          going to be able to lift them, like a frying

13          pan or something like that, a saute pan.  She

14          can't to that.

15    Q.    How about if she wanted to stir batter to make

16          brownies or pancakes?

17    A.    I don't believe she has enough strength to do

18          that with her hands.

19    Q.    How about if she wanted to pour a glass of milk

20          out of a gallon jug?

21    A.    I don't believe she's got enough power,

22          strength in the hands to do that.

23    Q.    What if she decided she wanted to have a can of

24          a diet Coke, could she pull the can up?

25    A.    No.
```

1    Q.    Could she cut up a chicken breast and eat it

2          without difficulty?

3    A.    With a modified fork and knife she probably

4          could.  But once again that would have to be

5          modified.

6    Q.    Are these available at the restaurants here in

7          Erie that you've seen?

8    A.    No.

9    Q.    How about vegetables, could she get peas on a

10         spoon or a fork?

11   A.    Maybe something like peas she could, but I

12         think she'd have some difficulty with something

13         that you would have to al dente.  Vegetables,

14         if you had to poke them like maybe not really

15         soft carrots things like that would be

16         difficult for her to develop enough pinch force

17         to hold that.

18   Q.    How about if she wanted to do something out in

19         the yard, would she be able to rake leaves?

20   A.    Probably not.

21   Q.    How about pull weeds out of the garden?

22   A.    No.

23   Q.    What if she went over to the local Unimart or

24         to Dairy Mart and wanted to pump gas, would she

25         be able to do that?



1   A.    I don't believe she would have enough span of

2         her hand to activate the hose.

3   Q.    How about, doctor, you've had the ability to

4         look at your computer and use your office notes

5         there with your laptop computer which, and the

6         courtroom's full of them now.  So my question

7         to you, is Tina Lindquist with what's left of

8         her hands going to be able to do that, use a

9         keyboard?

10  A.    Not very well.  She'll be able to use her

11        thumbs, kind of a two finger kind of punching

12        into it but definitely not regular typing.

13  Q.    How about the numbers on a cell phone, would

14        she be able to do that?

15  A.    Probably with both hands kind of cupping it

16        with one and using her thumb or replanted digit

17        she might be able to do that.

18  Q.    How about when she's pumped gas, assume

19        somebody has pumped it for her, is she going to

20        be able to reach in and get change out and hold

21        dimes and nickels and quarters?

22  A.    Very difficult for her.

23  Q.    How about her ability to lift things with those

24        two hands?

25  A.    If she can scoop underneath it she can probably

```
 1              lift it.  But it's a matter of getting
 2              underneath it.  She won't be able to pinch
 3              anything more than a few pieces of paper to
 4              lift and carry.
 5    Q.        She might be able to pull a Kleenex out of a
 6              box?
 7    A.        Yeah, that she might be able to do.
 8    Q.        How about her ability to grasp something, how
 9              would that be limited?
10    A.        Well, it's limited by the length of her digits.
11              Since they are significantly shorter and don't
12              have the flexibility of normal fingers she will
13              have difficulty with grasping.  She's kind of
14              stuck at a particular size.  She can't go above
15              that because she can't get the fingers out far
16              enough.
17                        And even if she could extend them out
18              far enough they are not long enough to allow
19              her to get deep enough around a large object to
20              allow her to physically hold onto it.
21    Q.        How about if she's in a grocery store, can she
22              steer a shopping cart?
23    A.        I think she can do that.
24    Q.        Just hook her thumbs on it?
25    A.        Yeah.  Hook her thumbs on it and use what's
```

1           left of her digits to, as long as it's kind of
2           a pushing type of motion.
3    Q.    Would she be able to participate in any type of
4           sports that you can think of?
5    A.    Nothing's coming to mind.
6    Q.    And is this condition that Tina suffers from
7           and the limitations that she suffers from
8           permanent?
9    A.    Yes.
10   Q.    Do you anticipate, in your medical opinion,
11          these limitations getting any better for her
12          over time?
13   A.    No.
14   Q.    Do you anticipate these limitations getting any
15          worse over time?
16   A.    Probably not, no.
17   Q.    So where she is now with her, what she can do
18          now is basically what you think she's going to
19          be able to do for the rest of her life as far
20          as physically?
21   A.    Yes.  I do believe she's, from a surgical
22          standpoint, maximum medical improvement.
23   Q.    Doctor, is Tina Lindquist still a patient of
24          yours, or has she been discharged?
25   A.    No, she's still a patient of mine.



51

1  Q.    And in the four and a half years that you've

2        known her, from the time you met her in the

3        operating room with the two surgical teams up

4        until the last time you saw her --

5  A.    Um-hum.

6  Q.    -- has Tina been compliant with all the

7        recommendations and suggestions that you've

8        made to her?

9  A.    Yes.

10 Q.    Have you ever had her complain or refuse to do

11       one of the therapies that you had asked her to

12       do?

13 A.    No.  But she was really upset when I wouldn't

14       let her have chocolate for a few months.

15 Q.    Doctor, in addition to the photographs we used

16       on the board I'm going to just show you what

17       we're going to mark as Hood Deposition 4 and

18       have you leaf through that.

19                  - - - -

20       (Exhibit No. 4 marked for identification.)

21                  - - - -

22       (There was a brief pause in the proceedings.)

23                  - - - -

24

25 BY MR. CONLIN:



1  Q.    Doctor, do those photographs fairly and

2        accurately depict the chronology of the

3        condition of Tina's hand from the time you

4        first saw her in September of 2002 up until the

5        time, up until the present?

6  A.    Yes, it does.

7              MR. CONLIN:  At this time I would ask

8        the judge to permit the photo album which is

9        marked as Dr. Hood's Deposition Exhibit 4 to be

10       passed among the jury.

11 BY MR. CONLIN:

12 Q.    Doctor, have all the opinions that you've

13       offered here today regarding the treatment you

14       performed on Tina Lindquist been offered with

15       any reasonable degree of medical certainty?

16 A.    Yes, sir.

17 Q.    And is it your opinion within a reasonable

18       degree of medical certainty that all of the

19       injuries that you treated Tina Lindquist for,

20       that being the traumatic amputation of eight

21       fingers on her hands were reasonably related to

22       the accident took place on September 25, 2002?

23 A.    Yes.

24 Q.    And do you feel that these conditions are

25       permanent?



53

1    A.    Yes.

2    Q.    That's all I have, doctor.  May have some

3          cross-examination for you.

4    A.    Can we go on hold for a second?  I need to use

5          the rest room.

6                THE VIDEOGRAPHER:  Sure.  We're now

7          going off the record.  It is approximately 2:58

8          p.m.

9                          - - - -

10        (There was a brief pause in the proceedings.)

11                         - - - -

12                MR. CONLIN:  I'm going to mark these

13         as exhibits 2 and 3 for Hood.  No. 2 being

14         photographs 142, 145, 149, 153 and 162.  And

15         Hood 3 being photographs 168, 170, 173, 175,

16         176, 178 and 181.  And this is four.

17                         - - - -

18        (Exhibit Nos. 2 & 3 marked for identification.)

19                         - - - -

20        (There was a brief pause in the proceedings.)

21                         - - - -

22                THE VIDEOGRAPHER:  We are now back on

23         the record.  It is approximately 3:00 p.m.

24

25                         - - - -



54

1                     CROSS-EXAMINATION

2                         - - - -

3    BY MR. SCOULOS:

4    Q.    Yes, thank you, Dr. Heim (sic).  As you know my

5          name is Gary Scoulos, and my office represents

6          the Heim Company.  I have just a very few

7          series of questions for you.  Listening to your

8          testimony regarding the surgeries and the

9          purposes of those procedures, would I be

10         correct to say that one of your main aims was

11         to restore as much functionality in her hand

12         and the salvageable fingers as possible?

13   A.    Yes, that would be correct.

14   Q.    And you told us, and it was obvious that for a

15         long period of time, a year or so she was much

16         dependent on other people for activities of

17         daily living and her own hygiene?

18   A.    That's correct.

19   Q.    But now though she has gained, regained at

20         least some independence, hasn't she?

21   A.    I would say yes.  That's our whole goal.

22         That's correct.

23   Q.    Now, for a while certain things were impossible

24         but now they are possible although obviously

25         she has difficulty with certain activities?



1  A.    Some of those activities, like I said, she's,

2         as time goes by they, individuals learn ways of

3         dealing with it and working around things.

4         That's correct.

5  Q.    The shoe tying example, for a while she

6         couldn't do it, now she does?

7  A.    That's correct.

8  Q.    And she is able to do some light cooking, but

9         we understand the point heavy objects, pots and

10        pans she wouldn't be able to do?

11 A.    No.

12 Q.    And throughout your course of dealing with her

13        she has told you her successes as they, as they

14        occurred?

15 A.    Yeah.

16 Q.    She would say; doctor, guess what I did?

17 A.    That's correct.

18 Q.    That sort of thing.  Okay.  Now, I was a little

19        confused about your answers about her ability

20        to use a keyboard on the computer or cell

21        phone.  You were demonstrating?

22 A.    Yes.

23 Q.    And you were only using your thumbs?

24 A.    Correct.

25 Q.    Is there any reason why she couldn't use one of

1        her fingers?

2  A.    Yeah.  The feeling in those fingers is not

3        normal.  And when you are talking about the

4        need for light pinch or light touch activities,

5        your ability to close your eyes and touch

6        something and know that you are touching it,

7        she doesn't have that in those digits that were

8        replanted because of the damage to the nerves

9        with that initial injury.

10              So her thumbs are still the only two

11       normal digits she has.  So for doing activities

12       that would require a fair amount of touch

13       activity, let's say like reading brail, being

14       able to feel the mild contours of things, she

15       can do that much more easily with her thumbs

16       than she can with any of the other digits that

17       are there.

18  Q.   That's understood.  But what about using the

19       fingers to depress an elevator button?

20  A.   She could probably do that.

21  Q.   Or to use a cell phone, press the buttons on

22       the cell phone?

23  A.   Once again, she might try to use it, but I

24       think she finds that to be not as efficacious

25       or not as easy as using her thumbs to do so.

1       Once again, because of the size of the buttons

2       and the need to press correctly on those.  I

3       mean, I know I even have difficulties

4       periodically punching in the keyboards on as

5       small as some of these phones are.

6               But with the absence of good feeling

7       on the remaining digits that she has that makes

8       things more difficult.  Um, really those digits

9       that are there don't have much flexibility and

10      they don't have great feeling, but they extend

11      the hand hopefully enough that she uses her

12      thumb to basically do gripping activities.

13      She's still mostly a thumb dependent person.

14  Q.  Turning quickly to the foot, you told us the

15      second toe was used during the transfer.  And

16      would I be correct to say the reason you used

17      that particular digit is that the loss of it

18      limits the resulting impairment in the foot?

19  A.  That is correct.  If, of all the toes to use

20      the second and third toe probably cause less

21      disability than using of the great toe or the

22      other two smaller toes.

23  Q.  At this point, doctor, does she have any

24      impairment in her foot as a result of the

25      harvesting of the toe?

1    A.    She still has occasional soreness when she

2          walks any great distances like walking through

3          a mall or something like that she'll still

4          fatigue pretty easily.  But she's able to get

5          around the house fairly well with it.

6    Q.    If we were talking in terms of occupations and

7          looking down the road for Tina's future

8          employment, would you restrict her to sedentary

9          work?

10   A.    Um, I would -- I hate that term because it

11         really denotes lower extremity disability or

12         back disability than it does upper extremity.

13         What I would restrict her from is activities

14         that require any gripping, any power activities

15         with the hand, any fine dextrous motions that

16         need to be done on a timed basis.

17               Um, so like if she was to run a parts

18         machine, let's say, and she had to keep up with

19         the machine I don't think she would be able to

20         do that.  I just don't think the hands would

21         tolerate it.  Um, like I said, power

22         activities.  So anything that requires her to

23         squeeze or pinch she's not going to be able to

24         do.

25               Fine motor control activities.  So if



1        she had sewing or things of that nature she

2        wouldn't be able to do.  Something that she

3        pushes her thumbs with, yeah, she'd be able to

4        do.  She might be able to control a joy stick

5        or something like that maybe.  I don't know for

6        sure.  I guess if it was custom made so that

7        she had the ability to use it in her hand she

8        might be able to use something along those

9        lines.

10   Q.   Now doctor, I realize we're talking in

11        generalities at this point.

12   A.   Yes.

13   Q.   And at this point I think we should just back

14        up and just confirm, at no point did you have

15        her physical capacities formally evaluated with

16        any type of testing; is that true?

17   A.   That's correct.  She has not had a disability

18        exam nor a functional capacity exam to date.

19   Q.   But based on your long experience with her

20        would you agree that Tina is not totally

21        disabled from the work force despite her severe

22        injuries?

23   A.   Total, I hate using absolute words.  Um, she is

24        very significantly limited, but I would say she

25        is probably not totally.  There may be a job

1        out there somewhere that she might be able to

2        do.

3    Q.    Okay, doctor.  Those are all the questions I

4        have.  Thank you.

5    A.    Sure.

6                         - - - -

7                    REDIRECT EXAMINATION

8                         - - - -

9    BY MR. CONLIN:

10   Q.    Doctor, you say there's a job out there

11        somewhere she might be able to do.  She's still

12        not released from care; is that right?

13   A.    That's correct, she's not.

14   Q.    Do you anticipate she's going to need

15        additional care?

16   A.    Um, this is the type of thing that I will

17        probably never discharge her from care.  She is

18        always going to be within the practice to some

19        extent, probably until after the day I retire

20        because she's a lot younger than I am and I

21        don't plan on practicing until I'm in my late

22        90s on average.

23            So there's a good chance that there

24        will be issues, not necessarily surgical

25        issues, that she runs into that she may need

1        help with or expertise or me to direct her into

2        somebody who can help her with that.  Let's say

3        occupational therapy or like you said

4        functional capacity evaluation or maybe a

5        disability determination exam, depending on

6        what goes on here, might be appropriate for her

7        to hone down what she is capable of doing or if

8        she's having problems with a specific task that

9        she just has not found a way to perform that

10       she needs to.

11              Let's say she gets pregnant and has a

12       baby, there are going to be issues there that

13       she's going to have difficulties with and may

14       need the help of a therapist or certain types

15       of braces or mechanical aids or some way of

16       teaching her how she can get by to do these

17       sorts of things.

18   Q.  Well, is there any plan to do another toe to

19       hand transplant?

20   A.  No.  She, I don't believe that she's interested

21       in that at this point.

22   Q.  Is there any anticipation that she's going to

23       need any additional surgeries on any of these

24       remaining digits?

25   A.  No.

1    Q.    But as far as you are concerned you don't

2          anticipate ever discharging this woman from --

3    A.    No.

4    Q.    -- your care?

5    A.    No.  She has a severe disability that, as I

6          said, as time goes by and the activities and

7          the things that are important to her in her

8          life change are probably going to be needed at

9          least on an advisory role to try to help her

10         and guide her in a particular problem that that

11         stage of life brings to her.

12   Q.    That's all I have for you, doctor.  Thank you.

13               MR. SCOULOS:  Nothing further.  Thank

14         you, doc.

15               THE WITNESS:  Sure.

16               THE VIDEOGRAPHER:  This concludes the

17         video deposition of Dr. John M. Hood, M.D.  The

18         time is approximately 3:10 p.m.

19                     - - - -

20         (The proceedings were concluded at 3:10 p.m.)

21                     - - - -

22

23

24

25

```
 1  COMMONWEALTH OF PENNSYLVANIA )      CERTIFICATE
 2  COUNTY OF ERIE               )      SS:
 3       I, Cynthia A. Hawley, a Court Reporter and
 4  Notary Public in and for the Commonwealth of
 5  Pennsylvania, do hereby certify that the witness,
 6  JOHN HOOD, M.D., was by me first duly sworn to
 7  testify to the truth, the whole truth, and nothing
 8  but the truth; that the foregoing deposition was
 9  taken at the time and place stated herein; and that
10  the said deposition was recorded stenographically by
11  me and then reduced to printing under my direction,
12  and constitutes a true record of the testimony given
13  by said witness.
14       I further certify that the inspection, reading
15  and signing of said deposition were waived by counsel
16  for the respective parties and by the witness.
17       I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21       IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 8th day of March,
23  2007.
24  _____
25                        Notary Public
```

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Cynthia A. Hawley, Notary Public
City Of Erie, Erie County
Pittsburgh, PA      My Commission Expires Mar. 30, 2009      Erie, PA
412-261-2520          724-658-7760          814-453-5700
Member, Pennsylvania Association of Notaries

