**EXHIBIT "A"**

1

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

- - -

TINA LINDQUIST,           )
                          )
                          )
                          )
          Plaintiff,      )
                          )
            -vs-          )   Civil Action
                          )   No. 04-249E
HEIM, L.P.,               )
                          )
                          )
          Defendant.      )

ORIGINAL

- - -

VIDEO DEPOSITION OF:  John Hood, M.D.

- - -

DATE:       February 23, 2007
            Friday, 2:00 p.m.

LOCATION:   300 State Street
            Erie, PA

TAKEN BY:   Plaintiff
            Tina Lindquist

REPORTED BY: Cynthia A. Hawley
             Notary Public
             AKF Reference No. CH98501

        with a sharp knife the zone of injury is very narrow. So I can save the vast majority of the structures. Versus an injury which is basically just a crushing nature like being hit with a sledge hammer and the width of the damage is the width of the sledge hammer.

        So that amount of tissue in this instance was severely damaged so we had to take a lot out. Um, we, I almost always expect with these types of injuries one or two other operations that are related to either tissues dying, infection, the hardware not holding, vascular problems where the blood vessels clot off and we have to go back in and free up the blood vessels, take the little clot out and then sew them back together again.

Q. So after the first surgery, if I'm correct, Tina's thumbs would have been intact on each hand; is that correct?

A. That's correct. There are no injuries to her thumbs.

Q. And her ring and long finger would have been intact on each hand?

A. Yes.

Q. Doctor, I'm going to show you a series of five

```
 1         photographs and ask if you can identify those
 2         for us?
 3   A.    Yeah.  These are Tina's hands probably close to
 4         a month out after the surgery I would say from
 5         my recollection.
 6   Q.    Is that how her hands would have appeared after
 7         the surgery, after that 10 to 12-hour procedure
 8         that you just described?
 9   A.    The black areas would not have been there.
10         Okay.  The hands would have been much more
11         swollen than what they are here.
12   Q.    Okay.
13   A.    And they would have been rather bloody.
14   Q.    Okay.  Is that how her hands appeared though
15         through the course of her post-op?
16   A.    Yes.
17   Q.    Okay.
18   A.    Yes.
19   Q.    Can you turn that around so the jury can see
20         those?
21   A.    (Witness complies).
22   Q.    Thank you.
23               MR. CONLIN:  Just for the record, I'm
24         going to have the court reporter mark that as
25         Hood Deposition Exhibit 1, and it's photographs
```



1       70, 79, 80, 75 and 77.

2                    - - - -

3       (Exhibit No. 1 marked for identification.)

4                    - - - -

5   BY MR. CONLIN:

6   Q.  Doctor, after that initial surgery and post-op
7       stay did Tina develop complications?

8   A.  Some of the skin necrosed.

9   Q.  What does that mean?

10  A.  That means some of the skin died.

11  Q.  Was an additional surgery necessary?

12  A.  Yes.

13  Q.  When did you do your next surgery on Tina?

14  A.  Let's look here. Sometimes the electronic
15      system is not as good as the paper system, so
16      excuse me for being a little slow here. Let's
17      see.

18  Q.  Doctor, according to the records I've seen I
19      believe the procedure was on October 5th of
20      2002.

21  A.  Yes.

22  Q.  If that helps you find it on your computer.

23  A.  With almost 400 pages of documents in here it
24      gets a little lengthy. Let's see here. What
25      was that date, 10/5 you said?

1  Q.   And in the four and a half years that you've
2       known her, from the time you met her in the
3       operating room with the two surgical teams up
4       until the last time you saw her --
5  A.   Um-hum.
6  Q.   -- has Tina been compliant with all the
7       recommendations and suggestions that you've
8       made to her?
9  A.   Yes.
10 Q.   Have you ever had her complain or refuse to do
11      one of the therapies that you had asked her to
12      do?
13 A.   No.  But she was really upset when I wouldn't
14      let her have chocolate for a few months.
15 Q.   Doctor, in addition to the photographs we used
16      on the board I'm going to just show you what
17      we're going to mark as Hood Deposition 4 and
18      have you leaf through that.
19                    - - - -
20      (Exhibit No. 4 marked for identification.)
21                    - - - -
22      (There was a brief pause in the proceedings.)
23                    - - - -
24
25 BY MR. CONLIN:

1  Q. Doctor, do those photographs fairly and
2     accurately depict the chronology of the
3     condition of Tina's hand from the time you
4     first saw her in September of 2002 up until the
5     time, up until the present?
6  A. Yes, it does.
7            MR. CONLIN: At this time I would ask
8     the judge to permit the photo album which is
9     marked as Dr. Hood's Deposition Exhibit 4 to be
10    passed among the jury.
11 BY MR. CONLIN:
12 Q. Doctor, have all the opinions that you've
13    offered here today regarding the treatment you
14    performed on Tina Lindquist been offered with
15    any reasonable degree of medical certainty?
16 A. Yes, sir.
17 Q. And is it your opinion within a reasonable
18    degree of medical certainty that all of the
19    injuries that you treated Tina Lindquist for,
20    that being the traumatic amputation of eight
21    fingers on her hands were reasonably related to
22    the accident took place on September 25, 2002?
23 A. Yes.
24 Q. And do you feel that these conditions are
25    permanent?

53

1  A.    Yes.
2  Q.    That's all I have, doctor. May have some
3        cross-examination for you.
4  A.    Can we go on hold for a second? I need to use
5        the rest room.
6              THE VIDEOGRAPHER: Sure. We're now
7        going off the record. It is approximately 2:58
8        p.m.
9                          - - - -
10 (There was a brief pause in the proceedings.)
11                         - - - -
12             MR. CONLIN: I'm going to mark these
13       as exhibits 2 and 3 for Hood. No. 2 being
14       photographs 142, 145, 149, 153 and 162. And
15       Hood 3 being photographs 168, 170, 173, 175,
16       176, 178 and 181. And this is four.
17                         - - - -
18 (Exhibit Nos. 2 & 3 marked for identification.)
19                         - - - -
20 (There was a brief pause in the proceedings.)
21                         - - - -
22             THE VIDEOGRAPHER: We are now back on
23       the record. It is approximately 3:00 p.m.
24
25                         - - - -