IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TINA LINDQUIST,                    )
                  Plaintiff        )
                                   )
          v.                       )        CIVIL ACTION NO. 04-249 ERIE
                                   )
HEIM, L.P.,                        )
                  Defendant        )

HEARING ON OBJECTIONS TO MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Tuesday, February 20, 2007.

APPEARANCES:
          DALLAS W. HARTMAN, Esquire, appearing on behalf
          of the Plaintiff.

          PAUL R. ROBINSON, Esquire, appearing on behalf
          of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

1                              P R O C E E D I N G S

2

3              (Whereupon, the proceedings began at 1:15 p.m., on

4     Tuesday, February 20, 2007, in Courtroom C.)

5

6              THE COURT:  All right, who's here on behalf of the

7     defendant today?

8              MR. ROBINSON:  Paul Robinson, your Honor.

9              THE COURT:  All right, do you want to come on up.

10    Just to set the stage here, I've had the opportunity to take a

11    fairly close look at the file.  I've looked at your objections,

12    the Magistrate Judge's Report and Recommendations.  I actually

13    went back and looked at the original summary judgment motion.

14    You moved for summary judgment on several bases, including --

15    first, I think, I'm not suggesting necessarily, but it seems

16    you put a lot of your summary judgment eggs in the lack of

17    identity, inability to establish the identity basket.  So why

18    don't we start there?

19             MR. ROBINSON:  Thank you, your Honor, may it please

20    the court.  Your Honor is correct, that the most significant

21    issue that we raised, the first issue that we raised had to do

22    with product identity.  Because there is no doubt, no one has

23    cited any case law to suggest to the contrary, that my client

24    cannot be liable if it did not sell the allegedly defective

25    product.

1    THE COURT:  Let's shine the appropriate evidentiary

2    light on the burden of proof light.  It isn't their burden to

3    establish unquestionably, it is their burden to establish by a

4    preponderance of the evidence such that a jury would not be

5    speculating if they were to reach the conclusion that they

6    manufactured the machine.  Let me ask a couple of preliminary

7    and factual questions to see if there are things both parties

8    don't disagree on relative to this.  And as an aside, it's my

9    understanding your client has no records whatsoever that it

10   would, that it has no written records that would establish

11   conclusively precisely what it was that they were manufacturing

12   in 1978, is that right?

13   MR. ROBINSON:  Close, your Honor.  We have the

14   record that shows what we were selling with all presses --

15   THE COURT:  There is no affidavit or deposition that

16   I have been able to find, as a matter of fact, there is an

17   interrogatory where your people basically say they're not sure.

18   I know you're talking about what has been referred to as a

19   schematic, and it has the SW on it, and it has the other number

20   that's escaping me.  First of all, I'm not sure it's a

21   schematic at all, it didn't appear to have any drawings.  But

22   there is nothing of record, there is argument in your brief,

23   but I could find nothing of record where any representative of

24   Heim conclusively said that that document establishes that's

25   what we sold?

4

1          MR. ROBINSON:  Yes.  And I apologize, I didn't

2    finish my thought there, your Honor.  We have the document that

3    shows what we typically sold with our presses, the 532-SHW in

4    1978.  The problem is that I cannot say definitively, my client

5    cannot say definitively that something happened that the

6    caller, that the purchaser called and said we want a gated foot

7    control.  And then we want something else.

8          THE COURT:  In fairness to you, it's not your burden

9    to establish that it wasn't yours, it's their burden to

10   establish that it was.

11         MR. ROBINSON:  And I've attacked it both ways, your

12   Honor.

13         THE COURT:  You certainly aren't going to get

14   summary judgment on this record on the basis that you have

15   established conclusively that it wasn't your record.  I don't

16   think you think that yourself, do you?

17         MR. ROBINSON:  Actually, well, no -- I actually

18   think there's enough on that issue, your Honor.  But we have to

19   look at the evidence that's in front of us, rather than make up

20   evidence --

21         THE COURT:  Which we're about to do.

22         MR. ROBINSON:  The evidence is that it was a 532,

23   that's the only evidence we have.

24         THE COURT:  So your position really is this.  You

25   cannot establish conclusively beyond a reasonable doubt, like

1    it happens in some rare cases, that it wasn't your machine, but

2    so we can frame the argument and for purposes of your

3    objections, your argument really is that the state of this

4    record is such, based upon all the evidence, that no reasonable

5    jury could conclude that it was your machine, based upon

6    anything other than rank speculation; is that pretty much your

7    position?

8           MR. ROBINSON:  That is exactly right, your Honor.

9    And the plaintiff has conceded as much, and the plaintiff's

10   expert has conceded as much, both of them, Mr. Ulmenstine and

11   Mr. Barnett.  Both have conceded, unequivocally, that they

12   cannot testify, and that they have seen no evidence to indicate

13   to this court that the foot control that Tina Lindquist was

14   using at the time of our accident was the same one that was

15   sold 24 years later.  They both have unequivocally testified to

16   that.

17          THE COURT:  All right.  Let me ask you a couple of

18   questions, then we'll get into some of the record.  Is it

19   undisputed that the Linemaster Model 532-SW -- incidentally, I

20   think it's unhelpful if we simply say Linemaster, as people

21   have done in this record, because there are two types of

22   Linemasters, from what I've been able to determine.  But, in

23   any event, is it undisputed that the Linemaster Model 532 did

24   not contain an anti-trip mechanism, which is contained in the

25   Model 511-B and the foot control that the plaintiff was using

6

1    at the time did contain a foot control mechanism, I haven't

2    been able to see any dispute on that?

3          MR. ROBINSON:  There is no dispute, both of the

4    plaintiff's experts have conceded, they've looked at the

5    photographs, there is testimony from them when they were given

6    the photographs of the accident machine, said it contains an

7    anti-trip mechanism, there is no dispute in the record.  And

8    the plaintiff's experts have conceded that the 532 does not

9    contain an anti-trip mechanism.

10          THE COURT:  So what that does for inferentially and

11    I think conclusively, is that it establishes, for purposes of

12    our further discussion, that the model that we're looking at is

13    a 511?

14          MR. ROBINSON:  That is undisputed that the model

15    that was being used by the plaintiff at the time of her

16    incident was a 511, you are correct, your Honor.  And there is

17    no evidence that we sold a 511 back at that time.

18          THE COURT:  All right.  I have the affidavit of

19    Ralph Barnett, who's the plaintiff's expert here.

20          MR. ROBINSON:  Is this the affidavit that was

21    submitted after his deposition and after the summary judgment

22    was filed, your Honor?

23          THE COURT:  Let's see, the best I can tell you on

24    that is it would have been filed on May 22, 2006.

25          MR. ROBINSON:  Okay, thank you.

1              THE COURT:  Do you know where I am on that?

2              MR. ROBINSON:  I do.

3              THE COURT:  Pertinently to our discussion, he says a

4    Linemaster ungated foot switch -- and there is no question that

5    this thing was ungated?

6              MR. ROBINSON:  There is no question.

7              THE COURT:  Originally accompanied and/or was

8    provided with the subject press brake at the time of the

9    initial sale and/or distribution by Heim as the only means of

10   activating the press brake.  It goes on to say this same model

11   of switch, an ungated Linemaster foot switch, was the same type

12   of model of foot switch that was involved in plaintiff's

13   accident of September 25, 2002.  And then in paragraph five, he

14   says photographs taken after plaintiff's accident are

15   consistent and illustrate a Linemaster foot switch, which is

16   not constructed with a safety gate.  This was the same type and

17   model of foot switch shipped by Heim at the time of the press

18   brake's initial sale and/or distribution and used by plaintiff

19   at the time of her accident of September 25, 2002.  Now, I

20   guess by your lights that begs the underlying question as to

21   whether, he says that was the same type.  You basically say

22   this, that there is no evidence in the record from which a

23   reasonable jury could conclude that it was that type of foot

24   switch, the ungated foot switch, that was being sold by Heim in

25   1978, is that right?

8

1          MR. ROBINSON:  That is correct, your Honor.  And if

2    I may, that affidavit did come out after Mr. Barnett's

3    deposition, where Mr. Barnett in his deposition, his sworn

4    testimony, absolutely contradicted his affidavit.  He indicated

5    in his sworn testimony that he could not even indicate and

6    testify whether or not Heim's foot control that was sold in

7    1978 with this machine was gated or ungated.  Because he

8    doesn't have any way to determine that.

9          THE COURT:  Do you have -- if you don't have it

10   handy, that's all right.  Do you have the excerpt of Barnett's

11   deposition that would have accompanied the plaintiff's motion

12   for summary judgment?

13         MR. ROBINSON:  The excerpt that would have

14   accompanied the plaintiff's motion for summary judgment?

15         THE COURT:  I stand corrected, the plaintiff's

16   appendix in opposition to the motion for summary judgment.

17   Both of you submitted portions, neither of you submitted the

18   document in its entirety.  As an aside, this is just for a

19   future day, future reference, and there would be no way of you

20   knowing this, but in all summary judgment cases, it is my very

21   strong preference that I get an entire transcript.  Because as

22   I was reading through some of these things, I would get to a

23   page and with bated breath I would await to see what was going

24   to come on the next page and 15 pages would be skipped.  And

25   some of it was important material.  I'm not suggesting anything

1    was intentionally left out. But that's neither here nor there.

2    I'm looking at page 73 of Barnett's deposition. It would be at

3    the top of the page, it's styled page 21 of 50.

4            MR. ROBINSON: Is this on the plaintiff's exhibits?

5            THE COURT: It is, it's plaintiff's exhibits. Let

6    me make sure we're on the same page.

7            MR. ROBINSON: You said page 21?

8            THE COURT: 21 of 50 and at the bottom it says

9    page 73.

10           MR. ROBINSON: I have it here, your Honor.

11           THE COURT: There is a question at line 17, "are you

12   able to tell by looking at these photographs with certainty who

13   the manufacturer of this foot control is that is shown in

14   photograph 29 and 30?" He says "I think that it's, I don't

15   know what certainty means. Question: Certainly? Answer: As

16   an expert, you know, it looks like a Linemaster, and the, I've

17   had a lot of experience with that, had somebody copied a

18   Linemaster so that it's a fake Linemaster, that's always a

19   possibility. But, you know, the likelihood, as far as I'm

20   concerned, is that it's a Linemaster." You go on to say "I

21   understand what you're saying, you have no way to confirm

22   whether or not it is a copy, right, or some other manufacturer,

23   is that right? That's right." Isn't a fair reading of that,

24   because nothing can be absolutely certain in this world, that

25   what he's really saying there is that to a reasonable degree of

1    engineering certainty that's a Linemaster?

2         MR. ROBINSON:  To him it looks like a Linemaster,

3    I don't think that's a reasonable degree of certainty.  He's

4    looking at a picture and saying it looks like a model that

5    Linemaster produces.  He's also saying it looks like it could

6    be an imitation from another manufacturer.  So I don't think

7    that would establish to an engineering degree of certainty,

8    your Honor.

9         THE COURT:  On then page 77, 23 of 50, and I presume

10   this is you asking the questions all the way through here.  The

11   question is "do you have any way of knowing that the foot

12   control that is shown in photographs 29 and 30" -- and

13   incidentally, I may have missed them, are these photographs

14   part of my record?

15        MR. ROBINSON:  I believe they are, your Honor.  This

16   is the plaintiff's, I have seen some photographs referenced by

17   the plaintiff --

18        THE COURT:  Whether they're plaintiff's or

19   defendant's, do you know if I have before me any photographs

20   that purport to be the foot control switch that the plaintiff

21   was using at the time of her accident?

22        MR. ROBINSON:  You do.

23        THE COURT:  All right, we'll talk about where those

24   are in a minute.  In any event, your question, "do you have any

25   way of knowing that the foot control that is shown in

1    photographs 29 and 30, accompanied the sale of the press brake

2    back in 1978?"  To which he responded "all I can tell you is

3    that this is the type of foot switch that I'm familiar with

4    that would have accompanied the unit, but I can't tell you that

5    it was the foot switch that came with it.  I can simply tell

6    you that it is exactly the kind that I've seen on that finished

7    press brake by Heim and in the past."  Finally, let me just

8    finish with one other short -- I'm now going to page 85.  Which

9    would be page 26 of 50, line 20.  Actually, let's start at line

10   13.  "Question:  And you are assuming that it had a kick plate

11   because the model that she was using had a kick plate.  And we

12   don't have any way to prove or disprove that."  And he says

13   "well, I have more.  Question:  Is that accurate what I said so

14   far?  But there is more, go ahead.  First of all, it has to do

15   with inductive inference that every machine that I saw in the

16   '76, '75, '80, all had the Linemaster.  Every one I'd ever seen

17   by Heim has had a Linemaster, and the Linemasters that they had

18   in the late '70s all had this, this locking plate to the back."

19   Incidentally, your deposition transcript had page 85, but it

20   did not include the following page.  Don't we have at least

21   this.  Fortunately, I'm not a fact finder here, but I have to

22   draw all inferences.  Don't we have a situation where you have

23   an expert who says he is familiar with the type of foot switch

24   that the defendant was manufacturing in the late '70s, and he

25   is opining that that was the type of switch that they were

12

1    manufacturing in the '70s, and it looks for all the world to

2    him like the foot switch he's looking at in the photograph is

3    the type of foot switch that he knew them to manufacture in the

4    late '70s.  Why isn't that enough.  It still gives you a lot to

5    argue about, but if I bump this out on summary judgment on

6    that, wouldn't one of my friends up at the Third Circuit throw

7    this back at me like a tennis ball?

8                MR. ROBINSON:  No, sir.  By him indicating that it

9    is a Linemaster appearing foot switch, that does not establish

10   the plaintiff's burden of proving that it is the same model.

11   And, in fact, the same one that was sold.  He doesn't meet his

12   burden of proof by showing it's a Linemaster.  Just as though

13   someone else wouldn't meet their burden of proof by showing

14   it's a Ford.  They have to get specific and show that we sold

15   it.  And if you look at page 83 of Mr. Barnett's deposition

16   testimony, he concedes unequivocally that he cannot tell you

17   and tell us what model was sold with the press.

18                THE COURT:  Well, in fairness, though, and every

19   perceived opportunity in a summary judgment battle should be

20   seized upon, whether you're the movant or non-movant.  But, for

21   instance, the fact that there was an alleged mistake on the

22   model number in one of the reports or deposition, they simply

23   explain it on the basis that it's form over substance, they got

24   the numbers wrong.  Doesn't this guy say that he doesn't know

25   much about model numbers, but he does know about the machine

1    itself?

2           MR. ROBINSON:  He acknowledges, and so does his

3    assistant that did the actual research, that she was using a

4    511 model and he acknowledges --

5           THE COURT:  They had it wrong at one point?

6           MR. ROBINSON:  They specifically indicated that it

7    was a 532 that was sold.

8           THE COURT:  And you jumped on that in your brief.

9    And fair enough, but putting this whole thing in context, it's

10   really of no moment?

11          MR. ROBINSON:  And I did not rely on that, your

12   Honor.  My point was that whenever it came down to them looking

13   at everything and giving us their opinions as to what model was

14   sold in '78, they came up with a number of reasons why it was a

15   532.  Their report said they looked at the photographs, it

16   looked like a 532.  The records from Heim shows it's a 532.  It

17   didn't have a kick plate, which is a 532.  So with respect to

18   your Honor's initial question, it is not enough for him to say

19   it's a Linemaster.  As your Honor pointed out at the very

20   beginning of the argument, the model number that she was using

21   was a different model number, it included a kick plate.  Back

22   in 1978 there is no evidence whatsoever, and the plaintiffs

23   have conceded there is no evidence whatsoever, that there was a

24   kick plate model sold with this machine.  What the plaintiff's

25   have to show is that I sold the one she was using.  It doesn't

1  exist and there's no evidence --

2  THE COURT:  The plaintiff's I don't think precisely

3  concede that.  They say, don't they, their expert Barnett says

4  that -- just to be clear, bear with me one second -- an

5  anti-trip mechanism, is that just another word for a kick

6  plate?

7  MR. ROBINSON:  It is, it's on the rear of the

8  housing, yes.

9  THE COURT:  All right.  Nobody disputes that the

10  532, which is the model that you say you were selling in '78,

11  no one disputes that that did not contain a kick plate, right?

12  MR. ROBINSON:  That's correct.

13  THE COURT:  But doesn't Barnett say, and I'm

14  paraphrasing, but this is the upshot of his testimony, okay,

15  I'm looking at a picture.  That to me, meaning Barnett, that

16  shows a foot switch that does not contain a kick plate.  That

17  foot switch that I'm looking at is a 511, and it's not a 532.

18  And, furthermore, because I was active in the industry

19  throughout the '70s and was familiar and had seen many of them

20  in use in the product line, I know exactly what Heim was

21  manufacturing and putting on the floor in those days.  And I

22  can tell you that what I'm looking at here is the same thing

23  that I was looking at back then.

24  MR. ROBINSON:  He does not say that, your Honor, he

25  says it's a Linemaster.  And that's what he's equating his

1  familiarity with.  He in no uncertain terms throughout his

2  testimony says that he can't say it's the same thing.  He says

3  that pointblank, that he cannot say this is the same foot

4  switch that was sold in '78.  If you look at page 85, your

5  Honor, before where you began reading.  I asked him, "so you

6  were just assuming in your opinion," this is line 8, "that it,

7  one, did not have a gate, and we don't have any way of

8  disproving or proving that, right?  Right."  He can't even tell

9  us if the foot pedal sold in 1978 had a gate.  If it had a

10  gate, that's his only theory of defect --

11          THE COURT:  What was the precise -- first of all,

12  just to set the stage as to what this lawsuit is all about,

13  I'll let plaintiff's counsel row his own oar on that.  But I

14  mean for all the argument about identity, and we're going to

15  talk about causation, foreseeability, this is a garden-variety

16  case in the sense that the plaintiff's theory is that if you

17  would have had a foot gate on there, I wouldn't have

18  accidentally stuck my foot in and activated the punch press,

19  that's all this is about, isn't it?

20          MR. ROBINSON:  That is what their theory is now,

21  yes.

22          THE COURT:  Did your 532, the one that you believe

23  you began, you were manufacturing as of the date of the sale of

24  this machine or component part to be more accurate --

25          MR. ROBINSON:  Yes, we don't manufacture them.

1        THE COURT:  In any event -- was the 532 that you say

2  was being manufactured, did that contain a foot gate?

3        MR. ROBINSON:  No.  No, sir.

4        THE COURT:  I'm not sure it's necessarily relevant

5  for purposes of our discussion, but in terms, if you will,

6  product safety, in using that term I'm not suggesting that

7  whatever product is at issue here is unsafe.  But what was the

8  material difference between the 511 and the 532?

9        MR. ROBINSON:  The material difference is the kick

10  plate in the rear of the interior of the housing, that's the

11  material difference.  And the material difference for purposes

12  of this lawsuit is that we didn't sell a 511.

13        THE COURT:  Well, you had sold 511s at some point?

14        MR. ROBINSON:  After 1984.  Then we know this was

15  sold in 1978.  At the time of this sale, we didn't sell a 511.

16  So this isn't a spoliation type of argument where we can say,

17  as the plaintiff's have alleged and cited to case law, that say

18  because it's a design defect case, you don't need the specific

19  product.  Well, that's a completely different issue.  This is

20  product identification, where I or my client as a seller of an

21  allegedly defective good, has to in fact be the seller.

22        THE COURT:  No doubt about that.

23        MR. ROBINSON:  If my client did not sell this

24  particular foot pedal that Tina Lindquist was using at the time

25  of her incident, my client cannot be held liable as in seller

1    of a defective product.  Same type or model does not cut it

2    under Pennsylvania law that we have to follow.

3            THE COURT:  Now, bear with me a second here.

4    Now, a corporate designee's deposition testimony was taken, is

5    that right, Mr. Mase?

6            MR. ROBINSON:  Yes, sir, Mr. Mase.

7            THE COURT:  And I'm looking at page 163 of his

8    deposition testimony, page 28 of 41 at the top.

9            MR. ROBINSON:  Is it where we had attached to ours

10   as defendant's?

11           THE COURT:  I don't know if you attached it or he

12   attached, but my suspicion is, only by looking at the nature of

13   the testimony, that he attached it.

14           MR. ROBINSON:  What was the page number?

15           THE COURT:  It would be page 163 of Mr. Mase's

16   testimony.  It would be 28 of 41 at the top.

17           MR. ROBINSON:  I have it, your Honor.

18           THE COURT:  All right.  Starting at line 11, he was

19   asked "you did testify that it does appear --

20           MR. ROBINSON:  What page again?

21           THE COURT:  Page 163, at the bottom.

22           MR. ROBINSON:  I have it.

23           THE COURT:  I assume this is plaintiff's counsel

24   questioning.  "You did testify that it does appear to be the

25   general type of foot pedal that would have been supplied with

1   this machine, am I correct? Answer: Correct. Question: Your

2   original foot pedal would have been orange, this is orange,

3   correct?" And then you interrupt, "actually he's indicated he

4   really wasn't sure, he thinks it might been orange, but he

5   wasn't there, he doesn't know." And then there is a little

6   scuffle between counsel as to what's going on there. Don't you

7   have your own corporate designee kind of weighing in on this

8   and being a bit more helpful to the plaintiff than he is to

9   you?

10          MR. ROBINSON: No, sir. I would not dispute that

11  the picture that is shown of the foot pedal looks to be the

12  same general type of Linemaster that existed when we sold them,

13  no one would dispute that. I could have brought the two

14  products, and they are similar in appearance.

15          THE COURT: Besides Heim -- well, first of all, the

16  record does tell me that Linemaster is the name of the company

17  that supplied these things, is that right?

18          MR. ROBINSON: Largest supplier.

19          THE COURT: They were a principal, if not exclusive

20  supplier to Heim of that component part of the punch press

21  mechanism during the relevant period of time, were they not?

22          MR. ROBINSON: No, sir. We have used Linemaster, we

23  have used Kinematics, I believe is the other one that's in the

24  record. And they certainly were not our exclusive provider,

25  they supplied their foot pedals, and still do to this day,

1   around the world.

2          THE COURT:  So at least I can get some stuff out of

3   my mind, Kinematics, whatever you said, that's not even in play

4   here, no one is saying this thing looks like a Kinematics,

5   right?

6          MR. ROBINSON:  No one is saying that.  But the point

7   is no one knows exactly what was sold in 1978, is the only

8   reason why I mentioned that.

9          THE COURT:  Do you have with you, I had it with me,

10  but since I've been bombarded with 10,000 sheets of paper, I've

11  managed to lose it.  Do you have the schematic upon which --

12  which is called the schematic that you folks place so much

13  emphasis on?

14         MR. ROBINSON:  I do, your Honor.  I think the

15  plaintiff had attached it to theirs as well, and I have it

16  here.

17         THE COURT:  Now, what is this document and where did

18  it come from; and how is it by appropriate record evidence

19  identified and substantiated in the record?

20         MR. ROBINSON:  This document is a business record of

21  Heim to show what type of foot controls were sold with their

22  presses at various periods of time in history.  Mr. Anthony

23  Mase spoke to the issue, of the drawing that your Honor has

24  before you, and has indicated, as had all of the experts, that

25  they're familiar with this types of drawings.  And this would

1   indicate --

2            THE COURT:  Incidentally, not to interrupt you, and

3   the question is born of my lack of engineering expertise.  When

4   I hear the word drawing, I think of a mechanical drawing

5   showing the parts, the actual physical -- like a draftsman

6   drawing a machine.  I don't see anything like that on this, all

7   I see is writing?

8            MR. ROBINSON:  You're exactly right, your Honor --

9            THE COURT:  This isn't a schematic, is it?

10           MR. ROBINSON:  It all depends on the nomenclature.

11  It is Heim's historical document to show what presses, excuse

12  me, what foot controls were sold with, as it indicates on here,

13  all presses at various points in time.  And you'll see that

14  it's a 1974 drawing, July 9th of '74.

15           THE COURT:  When you say a 1974 -- we don't have the

16  drawing, what we have is a box that says drawn by BH,

17  description electric foot control switch, and then the date

18  7/9/74.  And then part number A-470-D, used on all presses.  I

19  take it, would I be right, that it's likely that what would be

20  accompanying this document, in this little box down there,

21  would have been an actual physical drawing?

22           MR. ROBINSON:  No, sir.  No, sir, we don't, Heim

23  does not manufacture the foot controls, so they do not prepare

24  drawings.  This is purely a historical document to show what

25  they supplied.

1          THE COURT:  Fair enough.  Now, without further
2   interruption from me, you tell me what you think this should
3   tell me?
4          MR. ROBINSON:  And the evidence indicates, your
5   Honor, that this shows beginning on July 9th of 1974, that Heim
6   supplied Model 532-SWH foot controls, those are Linemaster foot
7   controls, electric in nature, on all of its presses.  That then
8   changed on, note box number one above it, on November 9th of
9   1982, they changed from Model 532-SWH to the Model 511-B4.
10          THE COURT:  I'm sorry, on what date was that?
11          MR. ROBINSON:  That would be November 9th of 1982.
12  And I might have said '84 earlier in the argument, I apologize,
13  I think I did, I misspoke.  November 9th of 1982, that was
14  changed to the 511-B4.  Which is also the Linemaster, a
15  Linemaster model.  Yet, again, different than what the
16  plaintiff's experts indicate that she was using, that would be
17  a 511-B2.  That has to do with circuitry, B2 and B4, as I
18  understand, your Honor, is the difference between those two
19  models.
20          THE COURT:  Not to interrupt you, but what type of
21  Linemaster is it your contention that they were using in '78
22  when they sold this original punch press?
23          MR. ROBINSON:  It is documented on this particular
24  sheet of paper, your Honor, and through the testimony, it was a
25  532-SWH.

22

1            THE COURT:  A 532-SWH.  Now, go up to, above the

2   square, the two notations that are up in the middle.  The

3   second notation says A-470-D, and then below it says anti-trip

4   foot control.  Cat number, and then they scratch out 532-SWH

5   and they put in 511-B4; what am I supposed to make of that?

6            MR. ROBINSON:  That's the first change.  If you look

7   at box one, right above the box in the lower right-hand corner,

8   that number one coincides with the information that is included

9   in the first handwriting.  And then you'll see a number two

10   above the second handwriting, that coincides with the second

11   number two change that is referenced above that box.  So that

12   indicates they are now switching on November 9th of 1982, from

13   the 532-SWH to the 511-B4.

14            THE COURT:  Now, apropos to that document, in

15   response to Interrogatory No. 4, and I can't remember if it was

16   the first set, second set or third set, but I'm accurately

17   quoting the answer.  The answer relative to this document was

18   that it may be the drawing for the foot switch supplier to the

19   machine, but Heim has no way of confirming or verifying this.

20   Isn't that the beginning and the end of the story?

21            MR. ROBINSON:  I'm not sure what you mean by the end

22   of the story, your Honor.

23            THE COURT:  The end of the story in this sense.

24   That is the only thing of record I have where any

25   representative of Heim weighs in on what really should be made

1    of this document.  And the argument you're making to me and I'm

2    not being critical at all, Mr. Robinson, you're doing your

3    regular good job, isn't that grist for argument for the jury on

4    this record.  No one from Heim comes in and says conclusively,

5    as a matter of fact, they say quite equivocally, we don't know

6    for sure, isn't that a fair characterization?

7            MR. ROBINSON:  It is not a fair characterization

8    that that's for the jury, your Honor, it's not my burden to

9    prove that the plaintiff was using something that was sold by

10   me.  What we did --

11           THE COURT:  You're right.  But in fairness, and I

12   pointed that out at the beginning, we don't want to get the

13   cart in front of the horse.  But in fairness, it kind of takes

14   the air out of the balloon that even if that is thrown into the

15   mix on the plaintiff's burden of proof, it doesn't do much to

16   damage their proof, does it?

17           MR. ROBINSON:  Here's what we tried to do, your

18   Honor.  And I may be repeating some of what I said before.  We

19   have a drawing.  We can say to the court this is the drawing

20   that existed, and I don't want to get stuck on the word

21   drawing.  We have a historical document that shows us what foot

22   control we were using back in 1978.  And that shows a 532.  But

23   can we as a company sit here and bring up to you the person

24   that was involved in the actual sale of this press brake back

25   in 1978, no.  Is there a possibility that something happened,

24

1     that someone special ordered an item that there was a foot
2     pedal on the shelf, that something else happened, that we
3     didn't even supply one, that something happened, isn't that
4     possibility there, it is.  And I would not want to commit to my
5     client, and my client would not want to commit, without having
6     someone that was there at that sale or a definitive piece of
7     paper that said in this particular sales file, this is exactly
8     what was sold.

9              THE COURT:  You know, 30 years or so in the
10    manufacturing world is not a huge span of time, it seems to me,
11    in terms of records and whatnot.  It's really of no moment in
12    resolving this summary judgment, it's more of curiosity to me.
13    In asking this question, I'm not suggesting any nefarious
14    motives or anything, spoliation, nothing.  But both in this job
15    and in my former life when I used to do what you're doing,
16    somewhat less what plaintiff's counsel is doing, but
17    occasionally, I had never run across a case where the alleged
18    manufacturer could not conclusively demonstrate what it was
19    they were putting out, I've never seen it in all my years.
20    We know you can't, but can you tell me why you can't, what
21    happened to your records?

22             MR. ROBINSON:  We have a record, your Honor, that
23    surely suggests --

24             THE COURT:  But everybody comes up and tiptoes
25    around it like it's radioactive and nobody will weigh in on it?

1          MR. ROBINSON:  Could someone from my company have

2    indicated based on this record that we sold -- in all honesty,

3    in all truthfulness, that this record definitively shows that

4    we sold a 532-SWH, no.  And without that, your Honor, it is not

5    tiptoeing, it is trying to be as accurate as we can.

6          THE COURT:  And, incidentally, I'm not suggesting

7    otherwise, as a matter of fact, I think your folks are being

8    quite up front.

9          MR. ROBINSON:  My argument would be better had I had

10   someone say from the company this was a 532 without a doubt,

11   and we know without a doubt it was a 511.

12         THE COURT:  When they supplied the answer to you,

13   that you supplied in the interrogatory to them, I think they

14   were being straightforward.

15         MR. ROBINSON:  We were.  But, again, we have to look

16   at the evidence that exists, rather than speculate, we look to

17   this document and say this is the only document, the only real

18   evidence we have, which is a 532, and set that aside.  The

19   plaintiff's experts and the plaintiffs themselves acknowledge

20   they are unable to indicate that the foot press or the foot

21   pedal that Tina Lindquist was using was sold by Heim.

22   Unequivocally, they have said that throughout their testimony.

23   After that was all given, after our motion for summary judgment

24   is filed, then comes this affidavit, that throws out these

25   nebulous terms, it's the same model or type, and then in one

1   reference it says same model and type.

2        THE COURT:  But isn't this true, then I'm going to

3   move on to rest of your argument, I want to get into a little

4   more of the merits of the thing here, but isn't this true.

5   Doesn't this partake a little bit of if it walks like a duck

6   and quacks like a duck, it's probably a duck.  In the sense

7   isn't it true the only way they could conclusively prove that

8   it was the model that you sold, if they were somehow, if you

9   had kept better records and they were able to acquire the

10  actual sales document, which described that very piece at the

11  time it was first sold?

12       MR. ROBINSON:  They can criticize the record keeping

13  of the company all they want, but that doesn't make them meet

14  their burden of proving it's my product.

15       THE COURT:  I agree with that.  All right, let's

16  talk about causation in this case.  And, once again, just like

17  identity, an element of any tort, including a 402(a) case, is

18  you have to be able to demonstrate that the alleged defect,

19  design defect -- and this is a design defect case, although,

20  there may be some warning issues that were thrown around,

21  eventually that all slips away and becomes a design defect

22  case.  It has to have been a substantial contributing factor in

23  the loss.  Tell me why you think independently of identity they

24  have a problem there?

25       MR. ROBINSON:  The plaintiff does not know how the

1   accident happened, at all.  She's unequivocally indicated she

2   does not remember her foot accidentally slipping into this

3   housing of the foot control as the plaintiff's expert has

4   surmised.  The only thing she can indicate is that she recalls

5   her foot being outside of the foot control.

6          THE COURT:  Just so I'm clear, as I said before, a

7   gated foot control switch doesn't permit you, for instance, an

8   operator, for instance, from inadvertently inserting your foot,

9   is that right, is that the purpose of the gate?

10          MR. ROBINSON:  It's the hope, Professor Barnett has

11   indicated in his testimony that it's very easily defeated by a

12   strong foot to the gate and it pops up.

13          THE COURT:  Tell me if this isn't really true,

14   though, and I understand perfectly your position on causation.

15   Because in many 402(a) cases, except those in which the

16   plaintiff is dead or was otherwise knocked out and losses his

17   own memory, the plaintiff can recount in great detail what he

18   was or she was doing when the accident happened and exactly

19   what the mechanism was.  But isn't this like the second cousin

20   of res ipsa, in this sense that Barnett comes on and says I'm

21   familiar with the machine, that machine could not have

22   self-activated unless a foot was in.  And if a gate had been

23   there, a foot wouldn't have been in; isn't that essentially

24   your position?

25          MR. ROBINSON:  No, it's not, because what Professor

1    Barnett has indicated is that he acknowledges an activation can

2    occur if the foot is riding the pedal.  In fact he indicates

3    that's the number one cause of operator error.  And he also

4    concedes that if her foot was inside that pedal, riding the

5    pedal, the gate has become meaningless.

6            THE COURT:  Riding the pedal is a bad thing, right.

7    Tell me if this is right.  Is riding -- let me roll it back.

8    We don't even have to talk about comparative negligence because

9    we're on the 402(a) side.  And assumption of the risk has

10   become about as rare as a unicorn around these parts for

11   purposes of 402(a) cases.  This argument really runs to your

12   intended use, doesn't it, in part?

13           MR. ROBINSON:  I actually hadn't addressed it in

14   that sense, your Honor.  I had it in the sense that the

15   plaintiff can't tell us how this accident happened, and there

16   are multiple ways it could have happened.  The plaintiff's

17   expert just can't pick one without any evidentiary facts.

18           THE COURT:  How could it have happened without, in

19   some form or fashion, a foot coming in contact with the

20   business end of the interior of that foot control switch?

21           MR. ROBINSON:  For purposes of this argument, your

22   Honor, we'll assume that -- there is a two palm button switch

23   that could have been used, too.  Electrical issue is not in the

24   case.  There is no doubt that application of the pedal, of the

25   foot switch --

1    THE COURT:  The guilty appendage, and I don't use

2    that term pejoratively, is the foot?

3    MR. ROBINSON:  That's correct.  But the serious

4    question in our case is, is the foot, is there any evidence

5    that the foot involuntarily picked up, moved forward, targeted

6    the housing, pushed the anti-trip mechanism and then goes down,

7    there is none of that.

8    THE COURT:  Then that leaves us with two

9    possibilities, doesn't it.  Either somehow the operator in this

10   case was riding the switch, riding the brake, whatever you want

11   to call it, or her foot inadvertently slipped in, if you will,

12   and activated it; those are the only two possibilities?

13   MR. ROBINSON:  That's correct.

14   THE COURT:  The intentional one, one is accidental.

15   But for purposes of causation, it doesn't really make much

16   difference from a legal standpoint, does it?

17   MR. ROBINSON:  If the foot -- it does, your Honor,

18   if the foot is already inside the pedal, she's riding the

19   pedal, if the foot is already inside the switch and she's

20   riding the pedal, she's already bypassed the gate

21   intentionally.

22   THE COURT:  Tell me if this isn't true, though.  But

23   the theory of the case, in part, on the plaintiff's side, is if

24   you had a gate switch that was down, it would eliminate or make

25   significantly more difficult the propensity of an operator to

1    ride the back brake?

2        MR. ROBINSON:  No, plaintiff's expert has said the

3    exact opposite.  The plaintiff's expert has said by having a

4    gate, the number one problem with gated foot controls are that

5    they encourage the operator to ride the pedal, so that they

6    don't have to constantly and with fatigue, pick up that pedal

7    or pick up that gate every single time.  So no, the plaintiff's

8    expert has written on it, he's acknowledged it, he's testified

9    to it in this case, that it actually encourages riding the

10   pedal.

11       THE COURT:  All right.  Forgive me, though, I had

12   thought that the gate was a mechanism, for lack of a better

13   term, that would have slipped in front of the opening for the

14   foot, isn't that right?

15       MR. ROBINSON:  That's exactly right.

16       THE COURT:  I'm not suggesting that you're

17   recounting what Barnett said is inaccurate, but if that's the

18   case and if intuitively it's easier to put your foot in an open

19   space then to put your foot through a gate or lift the gate to

20   get your foot in, why would it encourage more allegedly

21   abnormal use if you had a gate?

22       MR. ROBINSON:  What he has indicated through his

23   testing is that it is extra movement, you actually have to,

24   with each operation you have to actually lift up the gate and

25   then insert your foot, and that slows down production, it is

1  fatiguing.

2          THE COURT:  Are you saying that he believes people

3  disregard gates?

4          MR. ROBINSON:  Unequivocally, written on that and

5  testified to that.  That they defeat the gate because it adds

6  that additional method to their using of whatever it is a press

7  brake or a power press.  He unequivocally indicated that --

8          THE COURT:  Where does he say that in his

9  deposition?

10          MR. ROBINSON:  I read it again last night, your

11  Honor, I didn't cite the actual pages.  But he said it

12  throughout, and in his expert report, which we've attached.

13          THE COURT:  Do you have his expert report handy?

14          MR. ROBINSON:  I do.  I'm not certain that it's in

15  the expert report.  I may have probed that at the deposition

16  after I obtained all of his articles on that subject.

17          THE COURT:  All right, fair enough.  There's a

18  separate argument on intended use, foreseeability, is that

19  right?

20          MR. ROBINSON:  There is, your Honor.  And really is

21  more generally stated in that there's an absence of a defect,

22  which is then defined by whether or not it's safe for its

23  intended use.

24          THE COURT:  Obviously, the question of causation is

25  almost always a jury question if there's disputed issues of

1    material fact.  The question of identity, similarly, if there

2    are disputed issues of material fact, that would be a question

3    for the jury.  But is the question of intended use or

4    foreseeability, is that a mixed question of law and fact, is

5    that for the court?

6              MR. ROBINSON:  The question of whether or not of

7    defect is purely a question of law.  And most recently, your

8    Honor, I cited the case that was issued by the Supreme Court of

9    Pennsylvania in May of '06.  There were some other discussions

10   in the Phillips v. Cricket Lighters case, in which my firm was

11   involved --

12             THE COURT:  Did you win or lose?

13             MR. ROBINSON:  We won at the Supreme Court.  But it

14   was a plurality opinion.  Some of them made more accurate, I

15   should say more consistent pronouncements with the previous

16   rulings.  But now I cited and I have a copy for your Honor, if

17   you'd like.

18             THE COURT:  What is the upshot of the case?

19             MR. ROBINSON:  The upshot of the case says that

20   there was no possibility for the court to ever use

21   foreseeability in an intended user analysis ever again.  That

22   you can only look to the actual intended use.  Once you attempt

23   to assert whether or not a use that may not be intended is

24   foreseeable, then you have walked over into the negligence

25   arena and we are not going to have it anymore.

1          THE COURT:  However you phrase the test in your

2 brief, what is the issue then, given this new case?

3          MR. ROBINSON:  The issue then -- the general

4 question is, is the product defective.

5          THE COURT:  You used the term foreseeable, didn't

6 you?

7          MR. ROBINSON:  Pardon me.

8          THE COURT:  Didn't you use the term foreseeable in

9 your papers, that the use was not foreseeable -- maybe not?

10          MR. ROBINSON:  No, your Honor.

11          THE COURT:  All right, I apologize.

12          MR. ROBINSON:  The magistrate used that as her

13 justification or recommending that the summary judgment be

14 denied.

15          THE COURT:  Let me give you another swipe at this

16 because I think I'm screwing up your argument.

17          MR. ROBINSON:  I don't mind at all, your Honor.

18          THE COURT:  I do because I'm not going to be able to

19 figure out what's going on.  I don't want to be the architect

20 of my own confusion, which I frequently am.  Tell me what is

21 the third issue here?

22          MR. ROBINSON:  The third issue is that there is no

23 evidence that there is any defect in the foot control or the

24 press brake in the foot control.  And the argument is as

25 follows.  Pennsylvania law defines defect as either possessing

34

1    an element or lacking an element --

2              THE COURT:  That makes it unsafe for its intended

3    use.

4              MR. ROBINSON:  At the time it was sold in 1978.

5              THE COURT:  Then really you just backtracked to your

6    original argument, haven't you?

7              MR. ROBINSON:  No, sir.  Because I'm now talking

8    about what was the intended use of this product.  Number one,

9    the intended use of the product, and if you look at Exhibit H,

10   the warning right on front of the machine, never put your hands

11   in here.  So we know and no one would ever contest, that the

12   intended use of this product is to never have your hands

13   underneath that rail.  More importantly --

14             THE COURT:  Not to interrupt you, but if that's what

15   it means, if that's what intended use means and, for instance,

16   take your example, clearly it would not be an intended use of

17   the product that you chop your hands off.  But the fact that

18   you do chop your hands off can't deprive you of your

19   availability to bring a 402(a) action, otherwise, the dog is

20   chasing its own tail?

21             MR. ROBINSON:  Your Honor is referencing a result.

22   We're talking about what it is intended for, how the product is

23   actually intended to be used.

24             THE COURT:  Let me say it this way.  How was the

25   product on this record used in a manner that was non-intended?

1          MR. ROBINSON:  In two significant ways.  One is the
2     plaintiff and the plaintiff's employer -- actually put their
3     hands inside the machine.  What the plaintiff was doing at the
4     time of the incident was hand forming a piece of metal around a
5     die, if you will, it's called a mandrill, directly under the
6     ram, and directly contrary to all of the warnings on the
7     machine, all of the warnings in the manual that was attached to
8     the machine.  And against what all the experts have said would
9     be not something you would ever want to do.

10          The second way, and what I really have highlighted,
11    your Honor, in our motion, is that it was the press brake was
12    being used without the mandated point of operation safety
13    device.  Point of operation safety device is what is required
14    by OSHA and what is required by ANSI to be installed by the
15    employer.  There are many different types.  There are pull-back
16    types, there are mats.  There are light curtains, which are
17    actually added to this machine by the employer after the
18    incident.  The plaintiff's expert has conceded that only the
19    employer, that was their first theory of liability against us,
20    is that Heim should have supplied a point of operation safety
21    device with this machine.  Their expert removed that and said
22    no, you can't.  Only the employer, who can make a hundred or a
23    thousand different types of activities and motions with this
24    machine --

25          THE COURT:  Say that again?

1              MR. ROBINSON:  A point of operation safety device.

2              THE COURT:  What does it do?

3              MR. ROBINSON:  It's called a presence sensing device

4    and a light curtain.  It has a light curtain, a beam that will

5    see your hands when they're in the ram area and will not permit

6    that ram to lower.  They were installed by the employer after

7    this particular incident on this actual machine and used.

8    Plaintiff's expert concedes that this press brake was intended

9    to be used and only used with a point of operation safety

10   device.

11             THE COURT:  But doesn't the record reflect or

12   doesn't the expert say that there were many employers who never

13   installed those things?

14             MR. ROBINSON:  Yes, and then you get into

15   foreseeability, which has no place in this analysis.  What he

16   has conceded is that it was intended to be used with the point

17   of operation safety device and it was not.

18             THE COURT:  All right.  Anything else on this point?

19             MR. ROBINSON:  No, those were the two significant

20   issues.

21             THE COURT:  There are some warranty issues, but they

22   all dovetail back?

23             MR. ROBINSON:  All except the one, your Honor, the

24   warranty issues are barred by a four-year statute of

25   limitations and it was never addressed at all by the court, it

1    wasn't imposed by the plaintiffs.  They do dovetail back on the

2    defect issue, but they're barred by the statute of limitations

3    that ran in 1982.

4          THE COURT:  I'm inclined to think that probably is

5    the case.  But as they say or as most plaintiffs would say, in

6    old cases the warranty claims almost always die on the

7    limitations vine, but they don't care as long as they still

8    have a 402(a), a point I'm about to explore more fully now with

9    plaintiff's counsel.

10         MR. ROBINSON:  Thank you, your Honor.

11         THE COURT:  Thank you.

12         MR. HARTMAN:  Good afternoon, your Honor, my name is

13   Dallas Hartman, I'm here with Wayne Reed of my office.  I'll be

14   doing the argument.  Thank you very much for your time.  As the

15   court has correctly pointed out in the questioning of Mr.

16   Robinson in this matter, your Honor, this is most truly a

17   design defect case.  Under a 402(a), we have to look at the

18   design of the product at the time that it was originally sold.

19   The design of the product, by the way, I think it's important

20   for the court to know that from the plaintiff's perspective, as

21   the evidence indicates, the product in question here is a press

22   brake.  And the reason I bring that to the court's attention is

23   twofold.  One is that a press brake differs significantly in

24   the testimony of all relevant parties in this matter, including

25   experts, from that of a punch press.  Mr. Robinson in the

1   earlier argument before the district magistrate, the discovery,

2   consistently maintained that the term press brake and punch

3   press are not interchangeable, that they are two completely

4   different types of machines with different designs.  There has

5   been an attempt, since Mr. Barnett has been involved in this

6   case, to confuse those two, and they are distinct products that

7   have different characteristics and different applications as it

8   relates to foot controls.

9          The second issue, your Honor, is that this is a

10  press brake and that is the product, a component part of this

11  product is a foot control which activates the machine.  We are

12  looking at the design of the product at the time it was

13  originally sold by Heim.  There's no dispute that Heim sold

14  this product.  There is no dispute from the records that we

15  have at this point in time that the product was accompanied

16  with a foot control.  I do not believe that there is any

17  legitimate dispute at this point in time that the original foot

18  control, as designed by Heim to accompany this product, lacked

19  a gate.  And it is the failure to have a gate on the foot

20  control that was incorporated into the decision of the Heim

21  press brake, that is the design defect.

22         THE COURT:  All right, I'm with you there.  Now,

23  let's cut to the chase.

24         MR. HARTMAN:  Yes, your Honor.

25         THE COURT:  First of all, you don't disagree with me

1    that you don't get to a jury and you don't get out of summary

2    judgment land unless you can raise a triable issue of fact on

3    product identity, such that a jury, if the same evidence we

4    have before me was put before a jury, a jury wouldn't be

5    sitting there speculating, but could draw the reasonable

6    inference that it was them, do you agree with that?

7            MR. HARTMAN:  I agree with that, your Honor, as we

8    continue to have the dialogue between yourself and myself, when

9    I talk about we only need to show a material dispute, I do not

10   want the court to interpret that I do not believe in my case.

11   Our burden at this point in time is to show, basically (a),

12   that there are facts which exist, if believed by the jury,

13   would allow us to recover in this situation.

14           THE COURT:  By way of summary, then, what is your --

15   recognizing you don't have in your hand, because they don't

16   have it in their hand to necessary to get summary judgment --

17   you don't have a smoking gun in your hand in the nature of a

18   document, do you?

19           MR. HARTMAN:  Yes, I do, your Honor.

20           THE COURT:  What is it?

21           MR. HARTMAN:  From the plaintiff's perspective, it

22   is our position that I, as representing plaintiffs, only need

23   to establish the design of the product as it was sold.  If I

24   could show that that design at the time it was originally sold

25   is similar in the context of a defect, then what was utilized

40

1    by my client at the time, then I have shown --

2              THE COURT:  That's a fall back position, that is a

3    different position.  Your major position and I don't want to

4    put words in your mouth, but your major position, as I

5    understand you papers, isn't that.  Your major position is,

6    your argument went this way.  We can establish without the

7    undue speculation that the machine, that the foot brake that

8    she was using at the time of the accident was not a 532, but it

9    was a 511?

10              MR. HARTMAN:  Yes, that is correct.  It is our

11   position that we can establish that the foot control she was

12   utilizing at the time she was injured, was the same make and

13   model that's supplied with the machine at the time of sale.

14              THE COURT:  All right.  And your position would be,

15   since we know it -- at least the evidence suggests it wasn't a

16   532 because it had an anti-trip mechanism and we know the 532

17   didn't have an anti-trip mechanism, right?

18              MR. HARTMAN:  We know the difference between the two

19   types.

20              THE COURT:  And we know there's only two types of

21   Linemasters that we're dealing with, right?

22              MR. HARTMAN:  In the context of this case, yes, your

23   Honor.

24              THE COURT:  In the context of this case and for your

25   purposes, if you were to go to trial on this case, you would be

1  arguing to the jury that what we're dealing with here is a 511,

2  is that right?

3         MR. HARTMAN:  I would argue, if we were to

4  preference that, she was utilizing a 511 at the time of the

5  accident.

6         THE COURT:  Tell me those facts or those facts in

7  the record or the reasonable inferences that can be drawn from

8  those facts that create a triable issue of fact, insofar as

9  you're concerned, sufficient to get you to the jury on product

10 identity?

11        MR. HARTMAN:  Your Honor, the facts that we would

12 utilize to establish that 511 was the model, the particular

13 model that would have accompanied this machine and, your Honor,

14 I do not concede that is our burden, but for the purpose of

15 this issue, we would start with the manual --

16        THE COURT:  Wait a second, what do you not concede

17 is your burden, just so we're on the same page?

18        MR. HARTMAN:  Your Honor, I believe that we can

19 establish the 511.  I do not concede before the court today

20 that it is the plaintiff's burden in the context of a product

21 liability case to show that it was a 511 as opposed to a 532.

22        THE COURT:  We'll talk about that later.  For

23 purposes of my question, assume that your basket is 511 and

24 fill up the eggs?

25        MR. HARTMAN:  I was going to proceed that way, your

1    Honor.  I would start with the manual.  I would show the

2    pictures of the manual that has been represented to us that

3    accompanied the machine.  The manual, this particular manual

4    shows what appears to be a Linemaster product, an open product,

5    no gate.  It does not show whether or not there is an anti-trip

6    mechanism involved.  I would next utilize the pictures involved

7    in this case, which clearly purports to show the Linemaster in

8    all material aspects of it; the shape, the color, the size.

9    The pictures do show an anti-trip mechanism, that is in very

10   front of the foot control.  I would then bring in Professor

11   Barnett.  Professor Barnett indicated that he has experience

12   with Heim products at the relevant point in time of the

13   manufacture and sale, distribution of this product, as well as

14   years prior to then.  That the Heim products that he was aware

15   of and that had seen in his years and years of exposure during

16   the relevant periods of the manufacture and sale of this

17   product, all contain Linemaster's anti-trip mechanism.  I

18   believe that those facts, if believed by a jury, would be

19   sufficient to establish that the Linemaster that was utilized

20   by my client was the same make and model that was supplied with

21   the press brake at the time of its original sale and

22   manufacture.

23           THE COURT:  Refresh my recollection as to who the

24   press brake -- what's the whole machine called?

25           MR. HARTMAN:  Press brake.

1              THE COURT:  To whom was that sold first?

2              MR. HARTMAN:  I believe Lycoming was a company up in

3      Connecticut.

4              THE COURT:  Do you know?

5              MR. ROBINSON:  It was sold to a distributor, HB

6      Machinery, in Connecticut.  That had their discussions with

7      Avco Lycoming, who was the end user.  So it was sold to a

8      distributor --

9              THE COURT:  Then it went to auction, didn't it?

10             MR. ROBINSON:  Then after 20 years of use, it went

11     to auction.  Unbeknownst to Heim, it was sold at an auction and

12     purchased by Corry, the plaintiff's employer.

13             MR. HARTMAN:  Your Honor, there has been an attempt

14     by counsel and by Heim, in their argument, to contend that the

15     product is a foot control, we have to show that this exact foot

16     control was the exact foot control that accompanied the machine

17     in the original sale.  That is not correct when you're dealing

18     with a component part of a machine and you're alleging design

19     defect.  For example, in many cases there are replacement

20     parts.  If the replacement part has been utilized as one that

21     is within the design of the original product, if you bring in a

22     replacement part --

23             THE COURT:  What if, and I just say this

24     hypothetically, what if company X, during this 20-year period

25     that this machine was moving between Avco and then into auction

1    and then before it got to Corry, what if, and I say this just

2    hypothetically, what if whatever was sold with the machine

3    originally wore out and they went and got themselves another

4    one from company X -- Linemaster wasn't the only supplier of

5    these things in the market, were they?

6              MR. HARTMAN:  No, your Honor, they were not.

7              THE COURT:  So what if somebody else sold the

8    present possessor of, whoever that may have been, the press

9    brake, another foot brake, foot switch, like the one, let's

10   assume it's the one that's on there, how for goodness sakes

11   could Heim be responsible for somebody else's foot brake?

12             MR. HARTMAN:  Because we're looking at the design of

13   the product at the time of its sale.  And the design of the

14   product --

15             THE COURT:  But did Heim design the component part?

16             MR. HARTMAN:  No, Heim designed the product which

17   included the component part.  Honor, if I may give an example.

18   If you had a Ford truck that calls for the Z rated tires.  If

19   all, assuming all Z rated tires are the same.  If it's

20   ultimately found out that that Z rated tire for that Ford truck

21   makes the design of the truck dangerous, then whether or not

22   you have the original Z rated tire on the vehicle or a

23   replacement Z rated tire on the vehicle, as long as it had the

24   same characteristics as the original, would make Ford

25   responsible, because they're the designers, we're looking at a

1   design.  Just like in spoliation cases, your Honor.  In design

2   defect cases, I don't even need the product, I just need the

3   actual product.  Whereas, if you're looking at a malfunction

4   case, that's where I think Heim gets its argument.  In

5   malfunction cases, you need the actual product.  Because in a

6   malfunction case, you need the actual product of the company

7   because you're looking at some characteristic of that component

8   part that didn't do as it was intended to.

9         THE COURT:  Does the record here reflect, was it

10  Heim that was responsible for specing the foot brake mechanism

11  or were the dimensions and characteristics of the foot brake

12  mechanism entirely up to the individual component part

13  manufacturer?

14        MR. HARTMAN:  Your Honor, if you read Professor

15  Barnett's deposition, he will tell you that the manufacturer is

16  responsible for selecting the type of foot control that goes

17  with the product.  And if you agree with the arguments

18  presented by Heim and its experts that you can't use a gated

19  foot control, then that further supports the fact that the

20  manufacturer had specifically chosen to have an ungated foot

21  control accompanying its product.

22        THE COURT:  Tell me if this is a secondary argument,

23  just so I make sure I understand what you're trying to tell me.

24  Is your position secondarily, whether it was a 511 or a 532,

25  whatever it was, it was ungated when it came out of Linemaster

1    and when it was sold by Heim?

2            MR. HARTMAN:  That's about 80 percent of our

3    position.  It's not only that it was ungated, but if you assume

4    some of this speculation by Heim as it relates to that drawing,

5    which we do not, but if you take Mr. Robinson's argument that

6    drawing has any validity, those are two models of foot controls

7    that were proffered by Heim as being suitable with its

8    products.  For example, if you take this drawing -- I don't

9    know what it is, we'll call it a drawing for this purpose.  If

10   at some point, if represents what Mr. Robinson says, if at some

11   point in time you have to replace the foot control after,

12   because it wore out, and you would call Heim for the product,

13   they would tell you that you need a 511 according to that

14   drawing, that is the approved part that you would have been

15   told to get as a replacement because that's what they used.

16           THE COURT:  What does the record tell me the

17   expected life expectancy of a foot control mechanism was?

18           MR. HARTMAN:  There is some testimony in the record,

19   your Honor, I believe it could be 15 to 25 years.

20           THE COURT:  But if a subsequent purchaser or the

21   original purchaser, if you will, 15 or 20 years down the road

22   wanted to get a new one, they wouldn't necessarily have to call

23   Heim or Linemaster, they could go somewhere else?

24           MR. HARTMAN:  But if they picked up one that was

25   defective, you would assume it would be something similar to

1    that, that's exactly what we have, your Honor.

2            THE COURT:  I don't know, I'd have to think about

3    that.

4            MR. HARTMAN:  But what we do have, your Honor, is we

5    have the utilization of a foot control that we can establish

6    was a 511, with evidence that that was what accompanied the

7    product at the time it was originally sold.

8            THE COURT:  You're pretty much stuck with a 511, as

9    I read your fellow, he weighs in on, because of this anti-trip

10   mechanism and his experience, you are riding the 511 horse in

11   this case, aren't you, primarily?

12           MR. HARTMAN:  Your Honor, with all due candor to the

13   court, that is what his testimony is because that is what he

14   truly believes.  My research, my analysis of this case is that

15   I do not have to ride the 511 horse.  I have to show that it

16   was, I was more concerned in preparing this case, the way I saw

17   it, in showing that it would be an approved replacement part,

18   which we have.  If Mr. Robinson's statement as to what that

19   document means would be undisputed that the 511 is an approved

20   part that was to be used with this machine and it had the same

21   defective characteristic by being ungated.

22           THE COURT:  At the time of the sale, at the time of

23   the sale in 1978, it is your position, is it not, that whatever

24   model would have been attached on it, whatever Linemaster model

25   would have been attached to it, it would not have had a gate?

1          MR. HARTMAN:  That's correct.  And that design
2   defect made the entire machine defective.
3          THE COURT:  All right.  And there is evidence of
4   record, circumstantial though it may be, to suggest that the
5   foot switch that was on it, appears to have been the original
6   foot switch that was on it?
7          MR. HARTMAN:  The original type, I do not believe
8   that we have -- the original switch that left the factory, I do
9   not believe I have that.  I have people that have the
10  impression that it's of the age, I have no one saying, I have
11  nobody that can say that was in the box with the machine at the
12  time, I do not, your Honor.
13         THE COURT:  The actual, you mean, in other words,
14  that actual part --
15         MR. HARTMAN:  The exact same one.
16         THE COURT:  All right.
17         MR. HARTMAN:  I have testimony that's the exact same
18  type.  I have testimony that it's the exact same type that
19  would have been --
20         THE COURT:  I think you misunderstood my question.
21  I understand the evidence that you have is that it looks like a
22  Linemaster 511, it quacks like one, it talks like one, it does
23  whatever it's supposed to do, and so it is in all likelihood
24  one that they would have produced.  You don't have the serial
25  numbers, etc., I understand that.  My question was different

1    than that.  My question was, and I'm not exactly sure whose
2    burden it would be on this -- in recognizing that you disagree
3    with Mr. Robinson's position that you have to establish that
4    his actual foot control, when I say his, I mean the component
5    part, that was sold with the machine, was on the machine when
6    your client's foot went in it, you disagree with that.  But
7    assume that he's right, only for purposes of my question, is
8    there evidence in the record that not only -- this to me is
9    important, is there evidence in the record that not only
10   establishes inferentially that the product that was sold was a
11   Heim product, when I say a Heim product, I mean a component
12   part, but that to address Mr. Robinson's concerns, that it was
13   more likely than not, if you will, that it was the same product
14   that was on the machine when your client stuck her foot in it?
15               MR. HARTMAN:  I believe the jury can infer by the
16   fact that it's the same make and model and vintage.  From my
17   perspective and I believe from them seeing that it has the same
18   type of degradation and physical properties --
19               THE COURT:  And that's by virtue of Barnett's
20   testimony, primarily?
21               MR. HARTMAN:  Yes, that they could infer that it was
22   the same one.
23               THE COURT:  What about this orange, yellow business?
24               MR. HARTMAN:  It's purely a photo quality issue,
25   your Honor.  In the context of -- it's a second generation of a

1    photo.  When you're looking at the photo, it appears yellow.

2    But it's a series of photos where it was orange.  It is clear,

3    the testimony is very clear from all of the independent

4    witnesses that it was orange.

5              THE COURT:  All right, let's take a short recess.

6              (Recess from 2:30 p.m.; until 2:36 p.m.)

7              MR. HARTMAN:  I'd like to draw to the court's

8    attention the case of Davis --

9              THE COURT:  What's the citation?

10             MR. HARTMAN:  The citation is 527 Pa. 260 at 267

11   (1997), 698 F.2d 186, 190.  It's a case cited for the

12   proposition that the law that holds that a manufacturer may be

13   held strictly liable for subsequent changes to an otherwise

14   safe product or such alterations are reasonably foreseeable, is

15   still good law.  And in the context of, if the court would read

16   that case, it is clear that in a design defect case, that it is

17   anticipated that component parts may be interchanged at times,

18   because of the wear and tear on a product.  And that one need

19   only show that the original design of a machine was defective.

20   And that the substitution of a component part at a later date

21   was consistent with the original design of the machine, that

22   too was defective in order to establish a case.  To apply that

23   in this situation, again, your Honor, it is our position, very

24   strong position, that we only need to show that the original

25   design of the machine, as utilized by Ms. Lindquist, was the

51

1   same as when it left Heim Manufacturing.  That original design

2   contained a defect, which was an ungated foot control.  And

3   that that ungated foot control was the type of defect that

4   caused Ms. Lindquist's injury that was utilized by her at the

5   time of this accident.  We believe we can establish it was a

6   511.  We believe that if it's a 511, a 532 or any type of

7   ungated foot switch, as long as it was contemplated in the

8   design of the original press --

9           THE COURT:  With all respect, what if I conclude on

10  reflection that the appropriate test is not that test under the

11  unique facts of this case, but your burden is to raise a

12  triable issue on product identity, both at the time of sale and

13  at the time of injury?

14          MR. HARTMAN:  The product identity is the Heim press

15  brake, we've identified the product.

16          THE COURT:  And on that point it remains your

17  position, irrespective of this secondary argument, that the

18  record is sufficient to trace that product from the sale at

19  Heim to the date of the accident with your client?

20          MR. HARTMAN:  Your Honor, I can show that it's a

21  Heim press brake at the time of the sale and at the time of the

22  accident.  The record shows, there's evidence on the record

23  that shows that the design of the Heim press at the time of the

24  sale and the date of the accident was the same.

25          THE COURT:  How do you establish causation in this

1    case with a client who has absolutely no idea what happened?

2            MR. HARTMAN:  Well, no idea as to the actual way

3    that her foot interfaced --

4            THE COURT:  For purposes of our discussion, that's

5    the most important recollection.

6            MR. HARTMAN:  What we do have is we have expert

7    testimony that indicates that based on Ms. Lindquist's

8    testimony that her foot was outside of the foot control, and

9    that when she, prior to this accident, when she was working on

10   a part and that the experts all concede that the foot control

11   was inadvertently activated.  The causation would be that Mr.

12   Barnett says that if there was a gated foot control and her

13   foot was outside, as she had testified, of the foot control

14   prior to the accident, it would have prevented her from

15   inadvertently activating the press brake.

16           THE COURT:  What do you have to say to Mr.

17   Robinson's point that your expert then went on to testify that

18   as a matter of fact or in his experience a brake, a foot brake

19   would have made it more likely that someone would have

20   compromised this system and rode the foot brake?

21           MR. HARTMAN:  Your Honor, that's where we get the

22   punch press, press brake.  Mr. Robinson in the 200 pages of

23   Professor Barnett's deposition, repeatedly tries to mix and

24   mingle those issues.  And punch presses, because of the

25   repetitiveness and multitude of repeated motions that a person

1    is doing, sometimes as quick as one a second, one every two

2    seconds, there is a known industry danger that a gated foot

3    control can cause someone to ride the pedal.  However, a punch

4    press is for high-speed repetitive movements.  Whereas, a press

5    brake is one that, it's a slow moving machine, it's a larger

6    machine --

7                  THE COURT:  Since I haven't seen the machine,

8    explain to me exactly what this machine did, how quickly it did

9    it, and what it was doing?

10                 MR. HARTMAN:  At the point in time Ms. Lindquist was

11   injured, she had her hands in the machine, she was hand forming

12   a mandrill, it looked like an exhaust, a serrated exhaust.  And

13   what happens is, the way it's supposed to work, is once she's

14   out and activates it, it forms it over a die.  This six-foot

15   wide machine comes down and conforms the product to the die.

16                 THE COURT:  Does it drill holes in it?

17                 MR. HARTMAN:  No, it doesn't.

18                 THE COURT:  Does it press it?

19                 MR. HARTMAN:  Yes, it's six-foot wide.  The bed is

20   six-foot wide.  If the court would look at the bench, it

21   literally looks like the bench up there --

22                 THE COURT:  So it's not one of these things going

23   boom, boom, boom?

24                 MR. HARTMAN:  That's correct.

25                 THE COURT:  Okay.

1      MR. HARTMAN:  Professor Barnett says specifically

2 that in press brake operations, a gated foot control is much

3 safer because in a press brake operation, it's not high speed,

4 it generally requires movement by the operator to utilize it.

5 So an operator can, in this case Ms. Lindquist would put the

6 part on, she might move to get something else, it generally

7 requires a person to leave the foot pedal.

8      THE COURT:  What does the foot pedal do?

9      MR. HARTMAN:  It operates the machine.  You hit the

10 food pedal, it brings it down.

11      THE COURT:  It brings it down.  And when you take

12 your foot off, it stops?

13      MR. HARTMAN:  Correct.  Whereas, as the punch press

14 generally it's a complete cycle.  That's why the difference is,

15 generally speaking, Professor Barnett says why you look at

16 press brakes much different than you do punch presses.  So

17 Professor Barnett says and has opined that the cause of this

18 accident was the uncovered foot pedal, utilized with the press

19 brake.  Because the testimony has been, the fact the way she's

20 operating it at the time, would indicate she was out of the

21 foot pedal and doing the operations.  Because there were parts

22 to her right, parts to her left, forming parts on the chair

23 behind her.  So she would move this way to her left to put a

24 part in, after she got the part, she would move to her right.

25 So it would require you moving the foot out of the foot pedal

1   during each segment of operation.  And it prevents you from,

2   the only reason you'd have to go back in, is if you

3   intentionally wanted to operated a gated foot pedal.  Whereas,

4   in a punch press -- you wouldn't want to take your foot out and

5   put it back in.  In the operation that Ms. Lindquist was

6   doing --

7                THE COURT:  Was she standing or seated?

8                MR. HARTMAN:  There's mixed testimony, it looks

9   likes she was leaning against a seat.  That's not relevant for

10  anyone.

11               THE COURT:  By all events, the essential point of

12  your case is you contend that when she was leaning, whatever

13  she was doing, she inadvertently put her foot in the machine at

14  the time when her arms are over the press?

15               MR. HARTMAN:  That's correct.  And her foot was

16  outside of the foot control after the last activation.

17               THE COURT:  Now, this isn't necessarily germane to

18  our summary judgment motions, but just to round out my thinking

19  here.  Is there an issue in this case about what the industry

20  standards were, what does the record reflect was going on in

21  the manufacturing community at this time, were punch presses

22  ANSI required or not, excuse me, were gated foot controls ANSI

23  required or not?

24               MR. HARTMAN:  There's a debate on that, your Honor.

25  The record supports both arguments that at the point in time