1   this accident occurred. However, industry standards generally
2   are not admissible in this case. However, one of the primary
3   defense experts in this case, Mr. Cloutier, who worked with
4   Cincinnati Machine, which is a major competitor to Heim, has
5   indicated that his company, during the 30 years that he was the
6   product liability supervisor there, provided gated foot
7   controls with all of its press brakes. It did not provide
8   gated controls with any, it did not know of gated foot controls
9   being provided with punch presses. And the purpose of that was
10  to prevent inadvertent activation of the machines.
11  Furthermore, the defense expert in this case has indicated that
12  there is no evidence, none, in his 25 plus years, 25 or 30
13  years, that there was any increase in injury due to riding the
14  foot control, utilizing a gated foot control with a press
15  brake. And that is in our record.
16          THE COURT: Finally, what do you say about Mr.
17  Robinson's argument on intended use?
18          MR. HARTMAN: Intended use is exactly what she was
19  doing. The intended use of that machine was to utilize it as a
20  punch press to bend, mold and form parts. Furthermore, your
21  Honor, the record absolutely is clear that the law is clear
22  that you cannot rely upon subsequent uses of a machine to make
23  your product safe. And, in addition, it's a known, intended,
24  expected and foreseeable use, as evidenced by Mr. Cloutier's
25  testimony, that this product would be utilized at times without

```
 1  point of operation protection.  Professor Barnett has indicated
 2  the same.
 3          THE COURT:  He says foreseeability is no longer in
 4  play in Pennsylvania, that's not a test?
 5          MR. HARTMAN:  Second generation foreseeability I
 6  believe is out, according to his case.  In order to determine
 7  intended use, one must determine the means by which the product
 8  is actually intended to be utilized by people and how it is
 9  used.  As the court, as in its example, nobody intends anybody
10  to get injured.  So to say that foreseeability is out, the only
11  intent is the relevant issue, that would not be accurate.  In
12  this situation, the case that is cited by Mr. Robinson is a
13  property damage claim.
14          THE COURT:  The case today you mean?
15          MR. HARTMAN:  Yes.  And as the court is aware,
16  having seen product liability cases in property damage
17  scenarios, the law is generally viewed much more strict than it
18  is in personal injury matters, where someone has been injured.
19  Furthermore, the intended use, and the court specifically says,
20  if the intended use of the material, in that case was as it's
21  used as a building product, caused the danger, than it would
22  have been actual.  But here it was because someone brought in
23  an outside source.  Here we have no outside source, we have
24  intended use.  The product as it left the manufacturer had a
25  defective foot control, an ungated foot control.  She was using
```

1   an ungated foot control --
2           THE COURT: Here's where I have a problem with this
3   other theory of yours on design identity. I take it that in
4   order to marry, if you will, the foot control switch with the
5   rest of the press brake, there was nothing unique -- it wasn't
6   unique in the sense that only a Heim, excuse me, only a Heim or
7   Linemaster foot control switch could appropriately fit on
8   there?
9           MR. HARTMAN: There's no evidence either way, your
10  Honor.
11          THE COURT: No evidence either way. But your
12  position that if Heim didn't sell one with a foot brake, with a
13  foot gate to begin with, Heim could theoretically be liable, to
14  take an extreme case, 40 years down the road after three
15  different foot gates had gone through -- after three different
16  foot pedals had been purchased and utilized, the last of which
17  without a gate was the one actually causing the injury. Your
18  theory is that -- your theory is that somehow by virtue of the
19  initial sale, Heim would have lulled subsequent users into a
20  false sense of security?
21          MR. HARTMAN: No, your Honor. My position is that
22  the original design has certain characteristics that make it
23  dangerous, regardless of whether or not you substitute
24  component parts that are similar. Now --
25          THE COURT: That's a duty to warn issue, though.

1  That's different than design defect, isn't it.  For instance,
2  if they had a gated switch, if this had a foot gate, you
3  wouldn't need a warning on the device that said, for instance,
4  only utilize when your gate is down and is operational.  Of
5  course, there wasn't a gate switch in this particular case
6  apparently.  I'm having a hard time understanding how a
7  manufacturer, how the overall manufacturer can be liable for a
8  component part from someone else that is acquired years later
9  and causes injury, if the original supplier of the product
10 didn't supply the component part.  Unless your theory is a
11 failure to warn theory?
12         MR. HARTMAN:  Your Honor, in all due candor to the
13 court, it is not a failure to warn theory.  But, again, let me
14 take you back to the Ford.  We know tires wear out.  So if your
15 Ford has a Firestone Z rated tire, and it came with the
16 vehicle, and after you wear your tires out, you go down to the
17 local Firestone store and buy the exact same tire or maybe
18 because they've improved on the tire, it's still Z rated and
19 you put it on your vehicle.  And it's found out that because of
20 the design of the vehicle, a Z rated tire, it does not have
21 sufficient ability to withstand the forces imposed on it, that
22 you need for an A rated tire, you could sue Ford for the
23 injuries you incurred with that replacement tire with the same
24 characteristics.
25         THE COURT:  With all respect, but that's because in

```
 1   those cases you're talking about, the underlying product that
 2   Ford supplied in some form or fashion is a contributing cause
 3   to those tires wearing out, so it doesn't matter what tires on
 4   there?
 5           MR. HARTMAN: That's the original design of the
 6   product that includes that. Again, because it's different
 7   sidewall strengths, etc. What we have here is we have a design
 8   of a press brake that includes an ungated foot cover, the
 9   Linemaster. We know that, I believe the record would establish
10   it would be one of two types, if you would believe Heim's
11   position on that. And we know we have those same types.
12           THE COURT: Let me hear what he has to say, then
13   we'll wrap up, thank you.
14           MR. HARTMAN: Thank you, your Honor.
15           THE COURT: Do you have a couple minutes you want to
16   talk to me?
17           MR. ROBINSON: I do, your Honor, thank you. Just a
18   couple other points that you had inquired into, I wanted to
19   give the court the record answers for those. You had asked who
20   does the specing for the particular press brake, and the answer
21   that was given was that was Heim. That is belied by the
22   record. Mr. Mase was specifically asked those questions by Mr.
23   Hartman on page 51 and 52. The response was that the customer
24   already has knowledge of what he wants to produce, has
25   researched that product and has provided a manufacturer, such
```

1   as Heim or someone else, a typical tonnage, such as 70 ton, a
2   certain length being a six foot would be the request, it is a
3   general purpose machine. The question went then so the typical
4   sales transaction does not involve Heim trying to ascertain
5   what the press brake is going to be utilized for? The answer
6   was correct. Then Mr. Hartman asks, a customer makes that
7   decision and makes the request for Heim as to the size of
8   tonnage and length of the bed? The answer was correct. There
9   is no evidence to suggest in this case or in any case that Heim
10  specked out with any input from the purchaser, HB Machinery,
11  whose use we have no idea what it was.
12              THE COURT: What is your response to Mr. Hartman's
13  position that irrespective of his ability to show that it was
14  the same model that was sold that actually ended up injuring
15  your client, that he still stays in the ball game because once
16  a defective design, always a defective design, regardless of
17  what interim supplier may have supplied a press brake?
18              MR. ROBINSON: So that argument would mean, as your
19  Honor pointed out, that in perpetually Heim would be
20  responsible for anyone else's sale, any other defendant's sale
21  of an ungated foot control, that has never been the law of
22  Pennsylvania. To use the analogy that if the plaintiff was
23  utilizing the vehicle, they're talking about some inherent
24  defect with the vehicle itself such that the tire contributes
25  to. If the allegation is that the tire is defective, then Ford

```
 1   cannot be liable if they did not in fact sell that tire.
 2   That's what all of our product liability principles go back to,
 3   did you sell the defective product.  Or, as your Honor points
 4   out, did you lull someone or instruct someone that you should
 5   only buy a particular part with their product and they did not.
 6   One of the other questions you asked, your Honor, which was
 7   very pointed and you asked is there any testimony about whether
 8   or not this product, that the foot control looked like the old
 9   1978 foot control.  Jan Oviatt from Corry Manufacturing, your
10   Honor --
11               THE COURT:  He said it looked like a new one to him,
12   didn't he, something like that?
13               MR. ROBINSON:  He's the person that actually
14   installed it on the press brake.  He said it looked, that he
15   would be surprised if it was because it was a fairly newer
16   model and all its labels.  And Mr. Hartman asked him on page
17   66 -- how did he say it, couldn't this be that older product,
18   and he said no.  No, simply because the wear of the machine,
19   the condition of the machine, compared to the foot pedal.  So
20   the person that actually installed it, said it doesn't look
21   like it could have possibly been a 1978 vintage foot control.
22   Just a couple other points.  You asked about the yellowish, and
23   the answer was well, those were from photographs.  That is as
24   inaccurate as you could be.  There were two people that
25   testified as to what the color of the foot brake -- excuse me,
```

1   that what color of the foot control was that Tina Lindquist was
2   using at the time.  Those two people were plaintiff, who didn't
3   look at the photograph, she said she thought it was yellow,
4   that's the plaintiff.  The other person was the co-worker, a
5   Mr. Rooney.  He didn't look at the photograph, he said he
6   recalled it being yellow.  So the only testimony that exists
7   with regard to color were from two people at the plant, one
8   being the plaintiff them self.  The only other point I wanted
9   to make, your Honor, was that what the plaintiffs are relying
10  upon is solely Barnett's comment that it looked like a 511.  It
11  looked like a 511.  It looked like a 532, because it has the
12  same exterior housing.  That doesn't get them anywhere to show
13  you that Heim sold the product that she was using.  If I might
14  give you a couple of quotes, your Honor.  Matthew Ulmenstine,
15  who works with Barnett, said, this is on page 66 and 67, "he
16  has no idea if the plaintiff was using the foot control that
17  was sold with the machine in 1978."  On page 110.  "He does not
18  know what Heim sold in 1978."
19          THE COURT:  But in fairness, that wasn't his area of
20  expertise.
21          MR. ROBINSON:  Then let me go to Barnett.  And
22  Barnett said, on page 82, "no one has said that Heim sold the
23  511."  On page 83, "I cannot tell what model came with the
24  press."  On page 85, "I do not know if it even had a gate when
25  it was sold in '78."  And page 91, "there is no evidence that

64

1  it is the same foot switch." Those are all from Professor
2  Barnett in his sworn testimony. Then he comes in with an
3  affidavit after a motion for summary judgment is filed and
4  somehow attempts to persuade the court that it's the same make
5  or model or same make and model, despite his prior testimony
6  and despite his not giving any further indication in his
7  affidavit as to what he's now relying upon, rather than merely
8  attempting to defeat the defendant's motion for summary
9  judgment with a conclusory statement.
10              THE COURT: Thank you. Now, before you folks leave,
11  let's go off the record here for a second.
12
13              (Discussion held off the record.)
14
15
16              (Whereupon, at 3:18 p.m., the proceedings were
17  concluded.)
18
19                              - - -
20
21
22
23
24
25

65

1  C E R T I F I C A T E

4     I, Ronald J. Bench, certify that the foregoing is a
5  correct transcript from the record of proceedings in the
6  above-entitled matter.

11  _____
12  Ronald J. Bench